IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

----------------------------------------------------------X

*In re*

Nortel Networks Inc., *et al.*,[1]

              Debtors.

----------------------------------------------------------X

SNMP Research International, Inc.

and

SNMP Research, Inc.,

              Plaintiffs,

v.

Nortel Networks Inc., *et al.*,

              Defendants.

----------------------------------------------------------X

Chapter 11

Bankr. Case No. 09-10138 (KG)

(Jointly Administered)

**Related to Docket No. 18020**

**Hearing Date: May 11, 2017 at 11:00 a.m.**

Adv. Proc. No. 11-53454 (KG)

**Related to Adv. Docket No. 540**

## U.S. DEBTORS' PRE-HEARING BRIEF WITH RESPECT TO SCHEDULE 1

---

[1]     In addition to Nortel Networks Inc., the debtors in these Chapter 11 cases are: Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc. and Nortel Networks (CALA) Inc. Additional information regarding the Debtors can be found in their respective Chapter 11 petitions, which are available at http://chapter11.epiqsystems.com/nortel.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................... 1

BACKGROUND ............................................................................................................... 5

    A. The Parties And The License Agreement ................................................. 5

    B. The SNMP Protocol And The Software At Issue ...................................... 5

    C. The Ever-Changing Claims of International And Inc .................................. 6

ARGUMENT .................................................................................................................... 8

I.    SCHEDULE 1 CONFERS A ROYALTY BUY OUT ON ALL PRODUCTS AND
    PROJECTS ORIGINATING FROM BAY NETWORKS THAT EXISTED
    DURING ITS THREE-YEAR TERM ........................................................... 8

II.   INTERNATIONAL'S PROPOSED NEW INTERPRETATION DISREGARDS
    WHAT SCHEDULE 1 PROVIDES AND WOULD CREATE UNTENABLE
    CONSEQUENCES ...................................................................................... 11

III.  INTERNATIONAL'S OWN ACTIONS AND FORMAL STATEMENTS
    CONFIRM SCHEDULE 1'S MEANING AND EFFECT ............................... 16

    A. International Confirmed Schedule 1's Meaning And Effect Before It Was Signed .. 16

    B. International's Actions Further Confirm Schedule 1's Proper Meaning .................. 20

    C. International's "New Schedules" Argument Does Not Help It ................................ 22

    D. International Confirmed Yet Again Schedule 1's Proper Meaning In a Formal
    Letter In 2006 ......................................................................................... 26

IV.  THE RECORD OF THE PARTIES' CONDUCT AND STATEMENTS ALSO
    ESTABLISHES AN IMPLIED-IN-FACT CONTRACT ................................. 27

CONCLUSION ................................................................................................................ 30

## TABLE OF AUTHORITIES

*Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London,*
    136 F.3d 82 (2d Cir. 1998) ....................................................................................... 9, 12, 15

*Harco Nat'l Ins. Co. v. Arch Speciality Ins. Co.,*
    2008 WL 1699755 (S.D.N.Y. 2008) ...............................................................................28-29

*Martilet Mgmt. Servs., Inc. v. Bailey,*
    2013 WL 5420966 (S.D.N.Y. 2013) ...............................................................................15-16

*Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.,*
    643 N.E.2d 504 (N.Y. 1994)................................................................................................16

*N. Am. Hyperbaric Ctr. v. City of New York,*
    604 N.Y.S.2d 56 (1st Dep't 1993) ......................................................................................27

*Richmor Aviation, Inc. v. Sportsflight Air, Inc.,*
    918 N.Y.S.2d 806 (3rd Dep't 2011).........................................................................27-28, 29

*Sutton v. E. River Sav. Bank,*
    435 N.E.2d 1075 (N.Y. 1982)..............................................................................................15

**Other Authorities**

Williston on Contracts § 32.11 (4th ed.) ....................................................................................16

In accordance with the Court's Scheduling Order Concerning Motion to Amend Proofs of

Claim and Schedule 1 Issue [Adv. D.I. 540], the U.S. Debtors submit this Pre-Hearing Brief

With Respect to the Schedule 1 Issue to be addressed in the May 11-12 hearing.

## PRELIMINARY STATEMENT

1.      In the upcoming hearing, the Court will address the meaning and effect of an

agreement between Nortel and International known as "Schedule 1."[2]  The issue is important:

International and Inc. have asserted a damages claim *in excess of $96 million* based on the

theory, in the words of Dr. Jeffrey Case, that Schedule 1 "went poof" in June 2003.  That

damages figure is stunningly overreaching in itself, because the record demonstrates that a paid-

up royalty buy out for the products at issue would have been available for no more than

███████.  And, more importantly, the claim is utterly baseless: it depends on disregarding

Schedule 1's straightforward meaning and contradicting International's own statements and

actions that repeatedly confirmed that meaning.

2.      It is undisputed that the product that is the subject of this $96 million claim, the

BayStack line of Ethernet switches, was covered by Schedule 1.  The BayStack switches were

developed by Bay Networks in the 1990s, and, following Nortel's acquisition of Bay, they

continued as the same core Ethernet switch product, using the same SNMP Research software

covered by the Bay Networks License and Schedule 1.  (Because these switches originally were

sold under the "BayStack" name and later were rebranded with the "ES" and "ERS" names, they

will be referred to here as the "BayStack/ES/ERS" switches.)  The BayStack/ES/ERS switches

thus were an existing Bay Networks product when Schedule 1 was signed and were covered by

the lifetime royalty buy out that Schedule 1 conferred.

---

[2]      In accordance with the U.S. Debtors' Memorandum of Law in Opposition to Motion to Exclude [Adv. D.I.
547], the U.S. Debtors will refer to SNMP Research, International as "International"; SNMP Research, Inc. as
"Inc."; and International and Inc. together as "SNMP Research."

3.      Thus, the key question is what is the meaning and effect of Schedule 1.  Schedule 1 refers to and incorporates a "royalty buy out" that was provided by a license between International and Bay Networks (the "Bay Networks License"), a company that Nortel acquired in 1998.  A royalty buy out is a paid-up right to use something for the entire life of a product line.  The Bay Networks License conferred a royalty buy out on all Bay Networks products, permitting them to use the designated SNMP Research software for the entire life of the products.  And Schedule 1 likewise conferred that royalty buy out on "[a]ll products of units and projects originating from what was Bay Networks."  Schedule 1 provided for a three-year term, so that any existing products and any development projects originating from Bay Networks that emerged during those three years would take advantage of the lifetime royalty buy out until the products aged out of the marketplace.  New products/projects brought on line after the three-year termination date would need to address royalties on their own merit.

4.      The meaning and effect of Schedule 1 outlined above is plain from its content. And International's own point person in the negotiations, John Southwood, expressly confirmed this meaning and effect before Schedule 1 was signed.  Writing to Nortel's principal negotiator Dave Hyslop, and noting he was aware that "everyone's expectations are [being] fixed for all time," Mr. Southwood stated the following about what he referred to as the "final Bay transfer to Nortel"—i.e., Schedule 1:

> I told [the lawyer preparing Schedule 1] that the royalty buy out would expire in three years. . . . By expire I mean that new products/projects brought on line after three years would address royalties on their own merit.  Current Bay products and development projects for the next three years will take advantage of the lifetime royalty buy out until their products have aged out of the marketplace.[3]

---

[3]      Ex. D-76, Email from J. Southwood to D. Hyslop re FW: Comments please, Nov. 16, 1999 (SNMP_NCA_00105106).

2

This is exactly what Schedule 1 provides and what is meant by Schedule 1's three-year term.

5.      Less than 48 hours later, Southwood sent Hyslop the draft of Schedule 1—with exactly the same content as the final signed version.  Southwood admitted in his deposition that he is not aware of making any suggestion that Schedule 1 would work differently from what he described in his email 48 hours earlier, and there is no such thing in the record.  Yet International and Inc. now insist that Schedule 1 means something drastically different:  that it operates to strip the rights to use SNMP Research software in existing products and projects at the three-year mark.  That plainly is not what Schedule 1 means, and is directly contrary to what International's point person said it means.

6.      When Schedule 1 was awaiting signature, Jeffrey Case of Inc. described it, in an email to James Reeves of Nortel, in a manner consistent with the meaning and effect outlined above.  Reeves had been responsible for originally incorporating SNMP Research's software into the BayStack switches at Bay Networks and he continued to be in charge of the BayStack group at Nortel when Schedule 1 was being executed.  Writing to Reeves, Case referred to "Schedule 1, the document that grandfathers the Bay licenses over to the new Nortel master agreement" and assured him "I was correct when I told you the cost is $0."[4]  Yet now, Case is claiming that what he really meant is that the BayStack products would be stripped of the right to use the software covered by Schedule 1 after three years and, at that point, International could demand tens of millions of dollars in royalties.

7.      This new and baseless argument is contradicted not only by the plain content of Schedule 1 and the statements International made before Schedule 1 was signed, but also by International's own actions and formal statements after Schedule 1 was signed.  For years after

---

[4]      Ex. D-77A, Email from J. Reeves to J. Case, May 15, 2000 (SNMP_NUS_00065616).

3

Schedule 1's June 2003 termination date, International repeatedly renewed an annual Software Service Agreement ("SSA") with Nortel covering the software licensed under Schedule 1. In doing so, International provided updated versions of the software licensed under Schedule 1 to the Nortel group responsible for the BayStack/ES/ERS switches (referred to as the "Bay" group at Nortel), and International collected thousands of dollars in payments from Nortel for that software. As even John Southwood and International's own licensing expert concede, this consistent course of conduct is squarely "inconsistent" with International's new argument about Schedule 1.[5]

8.    Still further, in January 2006, John Southwood of International again confirmed in a formal letter to the BayStack group at Nortel that it had an ongoing right to use the software covered by Schedule 1. He wrote: "Nortel Networks has a license with SNMPRI International for [SNMP Research's software] as referenced under Nortel Schedule 1. That schedule incorporates the paid-up royalties' license previously established by Bay Networks."[6] This statement, made in 2006, unequivocally contradicts International's new argument that the benefit of the paid-up royalty buy out for products covered by Schedule 1 ended in June 2003.

9.    In sum, Schedule 1 confers the royalty buy out of the Bay Networks License on "[a]ll products of units and projects originating from what was Bay Networks" in existence during its three-year term. In addition, even if International could succeed on the new and erroneous interpretation it seeks to apply to Schedule 1, it still could not achieve its goal of establishing that the BayStack/ES/ERS products were unlicensed. New York law is clear that

---

[5]    Southwood Dep. 118:11-12, 119:11-18, 120:20-121:6, Dec. 8, 2016; Ex. D-203, Tollen Report, Feb. 10, 2017 ¶¶ 68-72.

[6]    Ex. D-78A, Fax from N. Knowles for J. Southwood, Jan. 31, 2006 at SNMP_NUS_00092085 (SNMP_NUS_00092083).

when parties continue to operate on the basis that a contract is still operative after its nominal termination date, they create an implied-in-fact agreement that continues in effect.

10.     Such an implied-in-fact agreement would be present here: even if Schedule 1 could be read as International now proposes (which it cannot be), Nortel's ongoing right to use the software covered by Schedule 1 was confirmed by International's repeated renewal of the SSA under which it continued to provide to Nortel the software licensed under Schedule 1, and it was likewise confirmed by International's express and formal written confirmation in 2006 of Nortel's ongoing right to use the software covered by Schedule 1. Thus, the record of International's consistent conduct and statements confirming Nortel's ongoing right to use the Schedule 1 software established an implied-in-fact contract between the parties.

## BACKGROUND

**A.      The Parties And The License Agreement**

11.     As discussed, Schedule 1 references and incorporates the terms of the Bay Networks License so as to confer its royalty buy out on "[a]ll products of units and projects originating from what was Bay Networks" that were in existence during Schedule 1's three-year term. Thus, as Dr. Case described it, "Schedule 1 [is] the document that grandfathers the Bay licenses over to the new Nortel master agreement." The "Nortel master agreement" was executed in 1999 by International and Nortel Networks Corporation, the ultimate parent company, and covers the various Nortel entities around the world, of which NNI is just one.

**B.      The SNMP Protocol And The Software At Issue**

12.     The software covered by the master agreement and Schedule 1 is designed to assist in the implementation of the Simple Network Management Protocol ("SNMP Protocol"), an industry standard that facilitates the monitoring of devices on a network, including, as most relevant here, Ethernet switches. Manufacturers of Ethernet switches—such as Cisco, HP,

Nortel, IBM, etc.—typically provide their own proprietary network monitoring tools, which do not rely on the SNMP Protocol. The principal benefit of supporting the SNMP Protocol in addition to proprietary monitoring tools is simply that the Protocol provides a common language, which in turn facilitates monitoring devices made by different manufacturers on a single screen. If a customer's network is composed of devices from a single manufacturer or a small number of manufacturers, then support for the SNMP Protocol provides little or no benefit.

13.    The SNMP Protocol is a publicly-available standard, set forth in detailed publications. It can be implemented in at least three ways: (i) write your own code; (ii) use a freely available "open source" implementation; or (iii) license software products offered by companies such as SNMP Research and other vendors that provide assistance in implementing the Protocol. Because the SNMP Protocol will operate the same way regardless of how the implementing software is created, the choice among these implementation options has no impact on the finished product. The only benefit (if any) of using software from a vendor such as SNMP Research is simply saving on time and cost of writing the code or adapting an open source implementation to one's product. Reflecting the low-level value of its product offerings, SNMP Research typically offered its software on a paid-up royalty basis, referred to as a "royalty buy out," at a cost of ▨▨▨▨▨▨ for an entire line of products in perpetuity.

**C.    The Ever-Changing Claims of International And Inc.**

14.    This case began with a proof of claim filed by SNMP International for approximately $22,000 in royalties that were due when Nortel filed for bankruptcy in January 2009. The claims have mutated over time and are now focused principally on the BayStack/ES/ERS switches, which as noted are the subject of a baseless claim for more than $96 million—a claim that itself is the subject of the motion to amend proofs of claim that will be heard subsequent to the Schedule 1 issue on May 11-12. The common denominator is that

6

International and Inc. have continually cast about for the most overreaching and overblown claims they can conjure.

15.    At an earlier stage, International and Inc. focused on claims relating to Nortel's sale of its various business lines. As Nortel carried out those sales, it asked its many suppliers, vendors and licensors of technology to work with the purchasers to make arrangements for the continuation of the relationship going forward. This process worked smoothly with the hundreds of third parties who had relationships with Nortel, except for SNMP Research. SNMP Research, by contrast, appeared at each sales hearing and raised objections. Those objections were resolved by making clear to purchasers that they were obtaining no rights to anything belonging to SNMP Research and that they would need to enter into agreements with SNMP Research if they wished to use its software. The sale agreements and sale orders further made clear that only the property of the debtors was being sold, and paid for with the purchase price.

16.    Despite all this, SNMP Research claimed that the debtors somehow "sold" SNMP Research's property and that it is entitled to a portion of the purchase price on this basis. SNMP Research originally argued that its damages based on such a claim would exceed $200 million. But after this Court expressed skepticism about SNMP Research's claim and made clear that it would be viable (if at all) only if SNMP Research could produce evidence that the buyers believed they were purchasing and paying for SNMP Research's property (which SNMP Research cannot supply), SNMP Research has reduced this claim to $3.6 million (which is still completely unfounded). And in SNMP Research's suit against the Canadian Nortel Debtors, Justice Newbould rejected this profits claim outright. *See In re Nortel Networks Corp.*, 2016 ONSC 2732 (Can. Ont. Sup. Ct. J.) [Adv. D.I. 418-1].

17.     In the Canadian suit, SNMP Research responded to this setback by agreeing to dismiss all of its claims against the Canadian Debtors—the same claims it had asserted against the U.S. Debtors—in exchange for the paltry amount of U.S. $3,500. *See* Claim Settlement Agreement, Jan. 27, 2017 [D.I. 17987-1]. Here, SNMP Research is trying a totally different tactic: it filed a motion to amend through which International seeks to withdraw the contractual claims it previously made in multiple proofs of claim over more than six years, and in its place Inc. seeks to introduce itself as a new claimant making a new claim under copyrights belonging to it. Through this fundamental change in claimant and claims, Inc. is now pursuing SNMP Research's long-sought goal: a lottery-like windfall at the expense of the Debtors' rightful creditors.

18.     This attempt to radically change the claims will largely become moot if International does not succeed on its contention that the royalty buy out conferred by Schedule 1 "went poof" in June 2003 and, on that basis, the BayStack/ES/ERS switches allegedly became infringing at that time. As is summarized here and will be further demonstrated at the hearing, that claim is meritless.

## ARGUMENT

**I.    SCHEDULE 1 CONFERS A ROYALTY BUY OUT ON ALL PRODUCTS AND PROJECTS ORIGINATING FROM BAY NETWORKS THAT EXISTED DURING ITS THREE-YEAR TERM**

19.     Schedule 1 refers to and incorporates the royalty buy out of the Bay Networks License so as to confer that royalty buy out on "[a]ll products of units and projects originating from what was Bay Networks" that existed during its three-year term.[7]

---

[7]     Ex. D-7A, Schedule 1A, June 20, 2000 (NNC0024690).

8

20.     It is common ground that, in considering a contract's meaning, the Court must assess the contract as "viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London*, 136 F.3d 82, 86 (2d Cir. 1998).

21.     Schedule 1 specifically refers to and incorporates the Bay Networks License, and accordingly, to understand the meaning of Schedule 1 requires consideration of the Bay Networks License and the rights it conferred.  (The reference to "Bay Networks License" encompasses licenses executed by a predecessor of Bay Networks, SynOptics Communications, Inc., in 1994.)

22.     As noted, the Bay Networks License provided for a royalty buy out as to certain SNMP Research software for use in any and all Bay Networks products.  Specifically, it provided for a royalty buy out for SNMP Research's "EMANATE" software for ▮▮▮▮▮[8] and (per Amendment 2) a royalty buy out for an SNMP Research product called "Asynchronous Request Libraries" (or "ARL") for ▮▮▮▮▮[9]  Bay Networks purchased the royalty buy out for EMANATE, which was used to assist in developing a software agent for the BayStack switches that provided remote monitoring functionality compliant with the SNMP Protocol—a feature that is just one of hundreds of features in these products.[10]  Nortel completed the purchase of the royalty buy out for the ARL product in December 1999, more than a year after it had acquired

---

[8]     Ex. D-2, Bay Networks License, June 27, 1994 at SNMP_NCA_00139195 (SNMP_NCA_00139177).

[9]     Ex. D-4, Amendment 2 to Bay Networks License, Nov. 3, 1999 at SNMP_NUS_00002493 (SNMP_NUS_00002492).

[10]     Ex. D-79A, SNMPRI Customer Ledger, Apr. 13, 2011 at SNMP_NUS_00085604 (SNMP_NUS_00085603).  To be precise, the BayStack products used software that is a subset of EMANATE, referred to as EMANATE/Lite.

Bay Networks.[11]  By exercising these options, Bay Networks and later Nortel obtained a royalty

buy out:  that is, the right to "distribute in perpetuity an unlimited number of binary copies" of

the designated SNMP Research software.[12]

23.    Schedule 1 ensured that the benefit of these royalty buy outs, which Bay

Networks and Nortel obtained at significant cost, would be preserved for all products and

projects originating from Bay Networks that existed when Schedule 1 was signed or that came

into existence during its three-year term.  The specific provisions of Schedule 1 that

implemented this result are as follows:

- The "Specified Product or Project" section identifies the products and projects

  that would receive this benefit as follows:  "[a]ll products of units and projects

  originating from what was Bay Networks."

- The "Development Software" and "Run-Time Software" sections refer to the

  Bay Networks License to identify the specific SNMP Research software that

  was covered by the royalty buy out under the Bay Networks License and

  would likewise be covered by Schedule 1, including EMANATE.

- The "Royalties" section likewise refers to the Bay Networks License, stating:

  "As described in the agreements and amendments thereto between SNMP and

  Bay Networks and its predecessor entities."  As noted, the Bay Networks

  agreements provided for a royalty buy out as to the designated SNMP

  Research software, including EMANATE.

- The "Additional Conditions" section states as follows:

---

[11]    Ex. D-80, Invoice No. 9912LA071, Dec. 29, 1999 (SNMP_NUS_00089711); Ex. D-79A, SNMPRI
Customer Ledger, Apr. 13 2011 (SNMP_NUS_00085603).

[12]    Ex. D-2, Bay Networks License, June 27, 1994 at SNMP_NUS_00139195 (SNMP_NCA_00139177); Ex.
D-4, Amendment 2 to Bay Networks License, Nov. 3, 1999 at SNMP_NUS_00002493 (SNMP_NUS_00002492).

This Schedule supersedes all of the prior agreements between SNMP and Bay Networks and its predecessor entitles as referenced above, and all such agreements are hereby terminated by execution of this Schedule.

This Schedule and the license in regard to the Development Software and Run-Time Software shall terminate and be of no further effect after a period of three years from the last date that this Schedule is executed below.[13]

24.     In sum, Schedule 1 identifies the products and projects to be covered; it refers to and incorporates the Bay Networks License with respect to the SNMP Research software to be covered and the royalty buy out that is to be conferred; and it provides that it will terminate after three years.  Thus, the meaning and effect of Schedule 1 is clear:  that "[a]ll products of units and projects originating from what was Bay Networks" in existence during the three-year term—including the BayStack/ES/ERS switches—will receive a royalty buy out in accordance with the Bay Networks License so that they can use the designated SNMP Research software during the lifetime of the product line.

## II.    INTERNATIONAL'S PROPOSED NEW INTERPRETATION DISREGARDS WHAT SCHEDULE 1 PROVIDES AND WOULD CREATE UNTENABLE CONSEQUENCES

25.     International now offers up a new and fundamentally flawed interpretation of Schedule 1:  that, after three years, Schedule 1 would operate to strip away from the legacy Bay Networks products and projects any right to use the software covered by the Bay Networks License and Schedule 1, such that these products' continued use of that software would be infringing.  This proposed interpretation of Schedule 1 is demonstrably wrong, for at least two reasons.

26.     First, International ignores the fact that Schedule 1 references and incorporates the key elements of the Bay Networks License.  Importantly, as discussed, Schedule 1 incorporates

---

[13]     Ex. D-7A, Schedule 1A, June 20, 2000 (NNC0024690).

11

the royalty buy out of the Bay Networks License.[14]  Again, the Bay Networks License confers a

royalty buy out—that is, the right to "distribute in perpetuity an unlimited number of binary

copies" of the designated SNMP Research software.[15]

27.    The need to consider and account for the royalty buy out under the Bay Networks

License is clear from the face of Schedule 1, as it expressly refers to and incorporates the Bay

Networks License's royalty provisions.  And the importance of doing so is further highlighted by

the analytical framework for assessing a contract's meaning and effect:  the Court must consider

the contract from the perspective of a "reasonably intelligent person who has examined the

context of the *entire* integrated agreement."  *Alexander & Alexander Servs.*, 136 F.3d at 86

(emphasis supplied).  International violates this fundamental tenet by seeking to disregard what

Schedule 1 actually says and does in incorporating the royalty buy out of the Bay Networks

License.

28.    Second, International's proposed new interpretation would lead to a drastic and

untenable consequence:  it would cause existing products and projects covered by Schedule 1 to

be stripped of their right to use the SNMP Research software at the three-year mark, such that

they would be purportedly infringing from that point onward.  What Schedule 1 provided is the

right to incorporate the SNMP Research software into the core codebase of the covered products

such as the BayStack/ES/ERS switches, so that the units of these products made and sold by

---

[14]    *See id.*

[15]    Ex. D-2, Bay Networks License, June 27, 1994, June 27, 1994 at SNMP_NCA_00139195
(SNMP_NCA_00139177); Ex. D-4, Amendment 2 to Bay Networks License, Nov. 3, 1999 at
SNMP_NUS_00002493 (SNMP_NUS_00002492).

Nortel would include that software. To extricate this software from the core codebase would be difficult and time-consuming.[16]

29.    If the parties had intended Schedule 1 to have this meaning and effect, they would have included in Schedule 1 a mechanism for extending the right to use the SNMP Research software in these products beyond the three-year mark. For example, there would be a provision for an additional payment to be made to give these products the right to use the software until they aged out of the market, just as the Bay Networks License itself had provided.

30.    No party could reasonably be expected to put itself in a circumstance in which it loses the right to continue selling existing products with software that has been integrated into them, with no mechanism for extending that right going forward. And no party in International's position could reasonably expect anyone to agree to such a scenario. The absurdity of such a scenario is demonstrated by SNMP Research's damages claims in this case. As noted, Bay Networks obtained the right to use the EMANATE software in perpetuity in all of its products that it ever developed at any time for a single payment of ▓▓▓▓▓. In Nortel's license with International, it likewise entered into schedules for its own products (that is, products not covered by Schedule 1 because they were not legacy Bay Networks products) that provide for a lifetime royalty buy out for the entire product line for a single payment of ▓▓▓▓▓ or less.

31.    But in this lawsuit, in conjunction with International's argument that Schedule 1 operated to strip the BayStack/ES/ERS switches of their right to use the EMANATE software at the three-year mark, Dr. Case claims that International would have refused to agree to an additional royalty buy out payment to cover these products' continued use of this software.

---

[16]    This difficulty of extricating the software is not a measure of its importance or value; it is merely a reflection of the fact that the software is woven into the core codebase and so would be difficult to disentangle, in the same way it would be difficult to extricate thread of a particular color from a multicolor tweed jacket.

Instead, he claims International would have insisted on a different framework that would have

required Nortel to pay over ███████ in royalties for the BayStack/ES/ERS switches.

32.    This stunningly overreaching damages claim is both factually and legally

baseless.  As a factual matter, the record makes clear that a royalty buy out for at most ███████

would have been available and exercised.  Indeed, in other contexts, International repeatedly

reminded Nortel of the availability of the royalty buy out option and recommended choosing it.

And as a legal matter, it is black-letter law that damages cannot be measured by what a plaintiff

self-servingly alleges in a lawsuit that it would have demanded.

33.    But the important point here is that no party would ever put itself in a position in

which the party in International's position could make such an overreaching demand.  If the

parties had intended that existing legacy Bay Networks products and projects would be stripped

of their right to use SNMP Research software at the three-year mark (which they did not), they

would have included a provision addressing how that right could be extended beyond that date.

The absence of any such provision from Schedule 1 further demonstrates why International's

proposed new interpretation cannot be right.

34.    By contrast, the proper reading of Schedule 1 would not lead to this unreasonable

scenario.  Again, what Schedule 1 actually provided is that Bay Networks products and projects

that were in existence during its three-year term received the royalty buy out of the Bay

Networks License, so that they would be able to use the software covered by Schedule 1 until

they aged out of the market.  By contrast, any new project that Nortel began to develop after the

three-year mark would not be covered by Schedule 1.  In that circumstance, at the beginning of

such a new development project, Nortel could decide whether it was interested in using SNMP

Research software in the new development.  If so, it could discuss that possibility with

International and seek to agree on mutually acceptable terms. If not, it could develop its own implementation of the SNMP protocol or choose from among the offerings of other vendors. Thus, under the proper reading of Schedule 1, neither party would be at the other's mercy after the termination of Schedule 1.

35.     Here, too, the reasons that support the proper reading of Schedule 1 and that call for rejecting Schedule 1's fallacious new interpretation flow from the content of Schedule 1 itself. These reasons are further highlighted and bolstered by the canons of contract interpretation. Again, the analytical framework for assessing a contract's meaning emphasizes "the context of the entire integrated agreement" and "the customs, practices, usages and terminology as generally understood in the particular trade or business." *Alexander & Alexander Servs.*, 136 F.3d at 86. As a matter of the context of the agreement and customs and practices in the field of licensing, no licensee could reasonably be expected to agree to a contract under which it will be stripped of the right to continue making and selling existing products in which the software at issue has been embedded. And no licensor could reasonably expect to be able to impose such a one-sided and unworkable scenario on a licensee.

36.     Moreover, the drastic and untenable consequences that would be created by accepting International's proposed new interpretation would be incompatible with the goal of contract interpretation under New York law, which "must be to accord the words of the contract their 'fair and reasonable meaning'" by taking into account "not merely literal language, but whatever may be reasonably implied therefrom." *Sutton v. E. River Sav. Bank*, 435 N.E.2d 1075, 1078 (N.Y. 1982) (citations omitted). "[P]arties to an agreement are presumed to act sensibly in regard to it and an interpretation that produces an absurdly harsh result is to be avoided." *Martilet Mgmt. Servs., Inc. v. Bailey*, 2013 WL 5420966, at *3 (S.D.N.Y. 2013) (citations

omitted, modification in original); *see also* Williston on Contracts § 32.11 (4th ed.)

("[I]nterpretations which render the contract fair and reasonable are preferred to those which

render the contract harsh or unreasonable to one party."). Therefore, "[a] court will endeavor to

give the [contract] construction most equitable to both parties instead of the construction which

will give one of them an unfair and unreasonable advantage over the other." *Metro. Life Ins. Co.*

*v. Noble Lowndes Int'l, Inc.*, 643 N.E.2d 504, 508 (N.Y. 1994) (citation omitted, modification in

original).

37.      In sum, International's proposed reading of Schedule 1 is wrong, both because it

disregards what Schedule 1 actually does by incorporating the royalty buy out of the Bay

Networks License and because it would lead to a scenario that no reasonable party would accept.

## III.    INTERNATIONAL'S OWN ACTIONS AND FORMAL STATEMENTS CONFIRM SCHEDULE 1'S MEANING AND EFFECT

38.      International's own actions and statements concerning Schedule 1 emphatically

confirm the proper meaning of Schedule 1 and they squarely defeat the new interpretation

International is proffering now.

### A.    International Confirmed Schedule 1's Meaning And Effect Before It Was Signed

39.      Shortly before Schedule 1 was signed, International's point person in the

negotiations, John Southwood, expressly explained and confirmed its meaning—including,

specifically, the meaning and effect of providing that Schedule 1 would terminate in three years.

Southwood did so in an email to Nortel's lead negotiator, Dave Hyslop.  This was no casual

comment: Hyslop asked Southwood to review and approve a memo that would be sent to

various constituents at Nortel, and Southwood made clear that in providing his comments, he understood that "everyone's expectations are [being] fixed for all time."[17]

40.    Referring to Schedule 1—which he described as the "final Bay transfer to Nortel"—Southwood stated the following:

> I told [the lawyer preparing Schedule 1] that the royalty buy out would expire in three years. . . . By expire I mean that new products/projects brought on line after three years would address royalties on their own merit.  Current Bay products and development projects for the next three years will take advantage of the lifetime royalty buy out until their products have aged out of the marketplace.[18]

41.    Thus, Southwood explained and confirmed exactly what is meant by providing that Schedule 1 would expire—i.e., terminate—after three years:  1) "new products/projects brought on line after three years would address royalties on their own merit"[19]—that is, they would not receive the benefit of Schedule 1's lifetime royalty buy out; and 2) "[c]urrent Bay products and development projects for the next three years *will take advantage of the lifetime royalty buy out until their products have aged out of the marketplace.*"[20]

42.    Southwood's email is entirely consistent with the language of Schedule 1, which, as noted in Section I, confers the royalty buy out of the Bay Networks License on "[a]ll products of units and projects originating from what was Bay Networks"[21] that existed during

---

[17]    Ex. D-76A, Email from J. Southwood to D. Hyslop re FW: Comments please, Nov. 16, 1999 (SNMP_NCA_00105106).

[18]    *Id.* A project or "development project," as confirmed by Southwood during his deposition, is something in development stages, relatively far away from being launched in the marketplace.  Southwood Dep. 160:25-161:7, 164:5-10, Dec. 8, 2016.  According to a former Nortel engineer, a development project would begin approximately eighteen to twenty-four months before the "product" was then launched in the marketplace.  Mead Dep. 262:11-23, Sept. 28, 2016.  The Nortel License defines "Nortel Network Product" expansively to include "any enhancement, replacement, modification or evolution."  Ex. D-5, License Agreement between NNC and SNMP Research International, Inc., Dec. 23, 1999, at SNMP_NCA_00003623 (SNMP_NCA_00003621).

[19]    Ex. D-76A, Email from J. Southwood to D. Hyslop, Nov. 16, 1999 (SNMP_NCA_00105106).

[20]    *Id.* (emphasis ).

[21]    Ex. D-7A, Schedule 1A, June 20, 1999 (NNC0024690).

Schedule 1's three-year term.  Yet now, after its principal negotiator assured Nortel that this is

exactly what was meant by providing that Schedule 1 would expire in three years, International

has the audacity to argue that this is *not* what Schedule 1 means—and indeed it tells the Court

that this cannot possibly be what Schedule 1 means.

43.    Southwood noted in his email that he had communicated the same understanding

of Schedule 1 to International's counsel, Rick Barnes, who was "crafting" the schedule's text

based on the same confirmatory explanation he was providing to Nortel.[22]  And, less than 48

hours later, Southwood sent Hyslop the draft of Schedule 1—with *exactly* the same content as

the final signed version.[23]  As in his November 16 email, Southwood's November 18 email

attaching the draft of Schedule 1 called it "the permanent Bay to Nortel transfer."[24]

44.    In his deposition, Dr. Case admitted that Mr. Southwood's November 16 email

"implies that anything that was happening during those three years could continue in perpetuity,

and all derivative works thereof and all revisions and updates."[25]  But he then tried to argue that

the November 16 email actually was not referring to Schedule 1.  Then, trying yet another tack,

he argued that the meaning and effect of Schedule 1 later changed radically from what Mr.

Southwood's email described.  But Mr. Southwood admitted in his deposition that he is not

aware of making any suggestion that Schedule 1 would work differently from what he described

in his November 16 email.[26]  And the written record, including the draft of Schedule 1 that Mr.

Southwood sent to Mr. Hyslop less than 48 hours after his November 16 email, confirms there

---

[22]    Ex. D-76A, Email from J. Southwood to D. Hyslop, Nov. 16, 1999 (SNMP_NCA_00105106).

[23]    Exs. D-183.01 & D-183.02 Email from J. Southwood to D. Hyslop re: Here is the permanent Bay to Nortel transfer. It will come in printed form with the other schedules and yesterday's revised corporate license, attaching a draft Schedule 1A between Nortel Networks Corporation and SNMP Research International, Inc., Nov. 18, 1999 (SNMP_NCA_00105154)

[24]    *Id.*

[25]    Case Dep. 214:18-25, Jan. 11, 2017.

[26]    Southwood Dep. 48:23-50:4, Dec. 8, 2016.

was no such change.  There certainly would have been no reason to think that the language in Schedule 1 providing that it would terminate after three years would somehow have a radically different meaning and effect than what Mr. Southwood specifically explained.

45.     Still further, Dr. Case of Inc. described Schedule 1 in writing to James Reeves, who was in charge of the BayStack group at Nortel, in a manner that belies the arguments International is making now.  Reeves had been responsible for originally incorporating SNMP Research's software into the BayStack switches at Bay Networks and he continued to be in charge of the BayStack group at Nortel when Schedule 1 was being executed.[27]  Case and Reeves had worked together extensively over the years, and Dr. Case confirmed in his deposition that they had become friends.[28]  Writing to Reeves, Case refers to "Schedule 1 [as] the document that grandfathers the [B]ay licenses over to the new [N]ortel master agreement" and assures him "I was correct when I told you the cost is $0."[29]

46.     Dr. Case's description is fully consistent with the proper reading of Schedule 1: that it "grandfathers the [B]ay licenses over to the new [N]ortel master agreement," so that the BayStack/ES/ERS switches can continue using the SNMP Research software, and that there would be no additional cost.  But according to the new and baseless arguments International is making in this lawsuit, the reality was radically different:  the BayStack/ES/ERS switches would be stripped of the right to use the SNMP Research software after three years, and the cost would not be zero but instead allegedly would be tens of millions of dollars in royalties.

---

[27]     *See* Case Dep. 56:8-58:22, 59:23-60:20, Jan. 11, 2017;  Case Dep. 433:3-14, Mar. 30, 2017.

[28]     *See* Case Dep. 433:3-14.

[29]     *See* Ex. D-77A, Email from J. Reeves to J. Case, May 15, 2000 (SNMP_NUS_00065616).  Their email exchange reflects their friendly relationship, as Dr. Case congratulates Reeves on his recent promotion and Reeves asks about Case's planned move to a new house.

47.     Of course, Dr. Case's email did not say any such thing.  Nor did he or anyone else acting on behalf of either International or Inc. ever say any such thing—either then, or at the end of Schedule 1's three-year term, or at any other time before International asserted this baseless claim for the first time in a proof of claim in 2011.

48.     Moreover, if International actually had held the understanding of Schedule 1 that it now claims, Dr. Case surely would have said something to his friend James Reeves at the end of Schedule 1's three-year term.  After all, according to what International is now arguing, the BayStack/ES/ERS switches that Reeves was responsible for became infringing at that point.  But Case said nothing to Reeves; nor did he or anyone else from International or Inc. say to anyone at Nortel—either then or at any other time—that the BayStack/ES/ERS switches were stripped of their right to use the software covered by Schedule 1 in June 2003 and became infringing thereafter.  The fact that nobody ever said any such thing is consistent with the proper understanding of Schedule 1—that the right to use the software continued on through the life of these products; and it is flatly contrary to the new interpretation International is proffering now.

**B.     International's Actions Further Confirm Schedule 1's Proper Meaning**

49.     Still further, International's own actions after Schedule 1 was executed emphatically confirm Schedule 1's actual meaning and effect—and they contradict International's new argument that products covered by Schedule 1 lost the right to use the designated SNMP Research software at the end of Schedule 1's three-year term in June 2003. As noted, for years after Schedule 1's June 2003 termination date, International repeatedly renewed an annual Software Service Agreement ("SSA") with Nortel for the software covered

by Schedule 1.[30]  In doing so, International provided updated versions of the software covered by

Schedule 1 to the Nortel group responsible for the BayStack/ES/ERS switches (referred to as the

"Bay" group).[31]

50.    This was no casual conduct on International's part.  The SSA is a binding

contract, and year after year—long beyond June 2003—International renewed with Nortel the

SSA that covered the Schedule 1 software.  International charged and collected from Nortel

thousands of dollars each year for the renewed SSA.  And in exchange for those payments,

International provided to Nortel for its use the updated versions of the software covered by

Schedule 1—which is the software incorporated into the BayStack/ES/ERS switches.  Nor were

these repeated renewals of the SSA any accident on International's part.  To the contrary,

International actively pursued and solicited Nortel to renew the SSA year after year.[32]

51.    International's repeated renewal of the SSA squarely contradicts the argument it

now presents to the Court: that Schedule 1 "went poof" in June 2003 (to use Dr. Case's words)

and Nortel no longer had any rights to use the software covered by Schedule 1.  In addition, even

apart from Schedule 1, International's repeated yearly renewals of the SSA—in which it

collected payment from Nortel and in exchange provided to Nortel for its use updated versions of

the software covered by Schedule 1—provides an independent contractual basis for Nortel's

continued use of the software.

52.    As noted, even International's own representative, John Southwood, had to admit

in his deposition that this course of conduct by International is squarely "inconsistent" with

---

[30]    *See* Exs. D-81, D-95, D-96, D-97, D-98, D-99, D-291, D-101, D-100, SSA Renewal Invoices
(NNC0511483; NNC0511480; NNC0510289; NNC0510305; NNC0510391; SNMP_NUS_00074512;
SNMP_NUS_00077236; NNC0510569; NNC0510627).

[31]    *Id.*

[32]    *See, e.g.*, Ex. D-82, Email from K. White to L. Branch, Dec. 1, 2003 (SNMP_NUS_00073733); Ex. D-83,
Email from L. Branch to J. Mead, Apr. 27, 2005 (SNMP_NUS_00077235).

International's current claims about Schedule 1's meaning and effect.[33] And International's proposed licensing expert, David Tollen, likewise admitted that International's renewal of the SSA, year after year, plainly "wasn't consistent" with the new interpretation of Schedule 1 that International is proffering now.[34]

### C.    International's "New Schedules" Argument Does Not Help It

53.    Seeking to distract from the problems with its interpretation of Schedule 1, International offers up an alternative argument: that there was a "two-part bargain" in which the Bay Networks royalty buy out would continue in perpetuity, but only if Nortel executed *another* schedule in which it would pay a modest license fee and obtain the royalty buy out benefit. That argument suffers from multiple fundamental problems.

54.    First, Schedule 1 says nothing about any need (or ability) to enter into new schedules to obtain the Bay Networks royalty buy out benefit. International is trying to inject something into Schedule 1 that simply is not there.

55.    Second, Dr. Case asserts that there was no commitment on International's part to allow Nortel to obtain the Bay Networks royalty buy out in perpetuity by executing a new schedule.[35] Instead, he contends that a new schedule would be available only if he felt like agreeing to one. Thus, International's claim that there was some "two-part bargain" is contradicted by Dr. Case's own testimony.

56.    Third, while Nortel and International executed four other schedules that received a royalty buy out benefit, they all involved something new: an SNMP Research software product that was not covered by Schedule 1; and/or a Nortel product or project that was not entirely a

---

[33]    Southwood Dep., 118:11-12, 119:11-:18, 120:20-121:6, Dec. 8, 2016.

[34]    Ex. D-203, Tollen Report ¶¶ 68-72, Feb. 10, 2017.

[35]    *See* Case Dep. 73:4-74:8, Jan. 11, 2017.

legacy Bay Networks product; and/or a group at Nortel that was not a legacy Bay Networks group. None of these other schedules addressed the circumstances of the BayStack/ES/ERS switches: a legacy Bay Networks product belonging to a legacy Bay Networks group using only SNMP Research software covered by the Bay Networks License and therefore fully covered by Schedule 1.

57.     Schedule 1 granted rights to specific SNMP Research software products for specific operating systems:

| SNMP Research Product | Operating System |
| --- | --- |
| EMANATE | Windows NT, Solaris, VxWorks |
| Asynchronous Request Library | Solaris, HP-UX, AIX, and Windows NT |
| BRASS | Solaris |

58.     By contrast, all four of the new schedules that International points to included something different, namely an SNMP Research software-operating system combination that was not covered by Schedule 1:

| Schedule | SNMP Research Product[36] | Operating System |
| --- | --- | --- |
| 12 | BRASS | Windows NT |
| 14 | Cross Development Tools | Solaris 2.x |
| 20 | BRASS | Windows NT |
| 37 | EPIC | VxWorks |

59.     That all these new schedules involved a new development project using new software is evidenced by the fact that SNMP Research first sent the software covered by these

---

[36]     Schedule 12 also included EMANATE on Windows NT and Schedule 14 also included EMANATE on VxWorks.

23

schedules to the relevant Nortel groups under "evaluation licenses." Under an evaluation
license, SNMP Research would send software to a Nortel group to use for a limited time to allow
the group to test and evaluate the software in connection with a new development project. By
contrast, the BayStack group at Nortel already possessed and was using the software covered by
Schedule 1: they had received it and incorporated it into the BayStack switches years earlier, in
the Bay Networks days.

60.    In addition to covering new software, each of these new schedules also applied to
a new group at Nortel, none of which was a legacy Bay Networks group. Bay Networks was
based in two locations: Santa Clara, California and Billerica, Massachusetts. And the Bay
Networks License was limited to those two locations. By contrast, Schedules 14 and 37 applied
to groups in Simi Valley, California and Schedules 12 and 20 applied to groups in Richardson,
Texas. The Simi Valley group was derived from Micom, a company that Nortel acquired in
1996, two years before the Bay acquisition. As Dr. Case himself testified, "Nortel acquired
Mycom [*sic*] directly. So how in the world could a Mycom [*sic*] product have come from Bay
Networks?"[37] Similarly, Dr. Case confirmed that the Richardson, Texas facility was not a Bay
Networks location.[38]

61.    As part of its "new schedules" argument, International points to an email from
John Southwood in August 2003 to Pierre Tremblay at Nortel, who was just beginning to take on
responsibility for the relationship with International. The email refers to one of the new
schedules, Schedule 12, and describes it as part of an understanding that Southwood had with
Dave Hyslop, Tremblay's predecessor. But, the portion of the email to which International cites
is addressing Schedule 12—not Schedule 1. And in the portion that does address Schedule 1,

---

[37]    Case Dep. 84:11-12, Jan. 11, 2017.

[38]    Case Dep. 603:4-23, Mar. 31, 2017.

24

International describes it as providing that Nortel "has a royalty buy out" on the software covered under Schedule 1. That statement, made in August 2003, is fully consistent with the fact that Schedule 1's royalty buy out continued beyond June 2003 for those products and projects that were covered by Schedule 1.

62.    Further, the description of Schedule 1 in the August 2003 email is directly inconsistent with what International argues now: that no benefits whatsoever existed under Schedule 1 after June 2003. If that truly had been International's understanding at the time, Southwood would have said that Schedule 1 was dead and accordingly no product could possibly be covered by it in June 2003. But neither Southwood nor anyone else at International said any such thing.

63.    Finally, International's "new schedules" argument cannot overcome its own actions and statements that directly addressed Schedule 1. As discussed, International repeatedly renewed the SSA for the software covered by Schedule 1 long after June 2003. And International formally stated in a letter to Nortel's BayStack group in January 2006 (again, long after June 2003) that Nortel continues to have an ongoing right to use the software covered by Schedule 1 pursuant to the "paid-up royalties' license previously established by Bay Networks" and incorporated into Schedule 1. As both John Southwood and International's licensing expert had to admit, the record of these actions and statements are squarely inconsistent with the so-called "new schedules" argument.[39]

---

[39]    Southwood Dep. 118:11-12, 119:11-:18, 120:20-121:6, Dec. 8, 2016; Ex. D-203, Tollen Rebuttal Report ¶¶ 68-72, Feb. 10, 2017.

**D.    International Confirmed Yet Again Schedule 1's Proper Meaning In a Formal Letter In 2006**

64.    If there could be any remaining doubt about Schedule 1's actual meaning and effect, it would be eliminated by a formal letter that International issued to Nortel in January 2006—long after Schedule 1's three-year term ended—that expressly confirmed Nortel's ongoing right to use the software covered by Schedule 1 pursuant to the "paid-up royalties' license previously established by Bay Networks" and incorporated into Schedule 1.[40]

65.    The background of the January 2006 letter is that a member of the group at Nortel responsible for the BayStack/ES/ERS switches wrote to John Southwood at International, noting that his group was using SNMP Research software and requesting confirmation of their license to this software so that they could work together with a company called ▉▉▉▉, to which James Reeves had moved, which was also an International licensee.[41]   In response, Mr. Southwood did not react with surprise that a group working on former Bay Networks products was still using SNMP Research software after June 2003.  Just the opposite:  he wrote that he "*was pleased to learn that it was the 'old Bay license' incorporated into the Nortel license*" that this group was working under.[42]

66.    Mr. Southwood then issued a formal letter on behalf of International confirming Nortel's ongoing right to use the software covered by Schedule 1:

> Nortel Networks has a license with SNMP Research International
> for EMANATE® sources running on Windows, Solaris, and
> VxWorks as referenced under Nortel Schedule 1.  That schedule

---

[40]    Ex. D-7A, Schedule 1A, June 20, 2000 (NNC0024690).

[41]    Ex. D-84, Email from N. La-Anyane to J. Southwood, Jan. 16, 2006 (SNMP_NUS_00078544).

[42]    Ex. D-85, Email from J. Southwood to G. Foster, Jan. 27, 2006 (SNMP_NUS_00113554) (emphasis supplied).

26

incorporates the paid-up royalties' license previously established
by Bay Networks.[43]

67.     International's formal letter could not be clearer in confirming that Nortel

continued to have the ongoing right to use the software covered by Schedule 1—which is exactly

what the BayStack/ES/ERS group at Nortel was doing.  For International now to insist that

Schedule 1 means something radically different—that Nortel's ongoing use of this software in

the BayStack/ES/ERS switches actually constituted infringement after June 2003—is not merely

meritless.  It goes beyond the bounds of fair argument.

## IV.     THE RECORD OF THE PARTIES' CONDUCT AND STATEMENTS ALSO ESTABLISHES AN IMPLIED-IN-FACT CONTRACT

68.     Even if the Court were to read Schedule 1 as International urges, International's

attempt to establish that the products and projects covered by Schedule 1 suddenly became

infringing after June 2003 must fail because the parties' conduct and communications establish

an implied-in-fact contract running from the end of Schedule 1's three-year term.  Specifically,

the parties' conduct establishes that they continued to operate on the basis that Nortel retained

the right to use the software covered by Schedule 1 after June 2003.[44]

69.     "[I]t is well settled in New York that '[w]hen an agreement expires by its terms,

if, without more, the parties continue to perform as theretofore, an implication arises that they

have mutually assented to a new contract containing the same provisions as the old.'" *N. Am.*

*Hyperbaric Ctr. v. City of New York*, 604 N.Y.S.2d 56, 57 (1st Dep't 1993) (quoting *Martin v.*

*Campanaro*, 156 F.2d 127, 129 (2d Cir. 1946)) (second alteration in original); *Richmor Aviation,*

*Inc. v. Sportsflight Air, Inc.*, 918 N.Y.S.2d 806, 808-09 (3rd Dep't 2011) ("[E]vidence that the

---

[43]     Ex. D-78A, Fax from N. Knowles to N. La-Anyane, Jan. 31, 2006 at SNMP_NUS_00092085
(SNMP_NUS_00092083).

[44]     In the alternative, the same communications and conduct described in this section would bar any
infringement claim, under the doctrines of equitable and/or promissory estoppel, with respect to the products
covered by Schedule 1.  Nortel reserves the right to assert the estoppel issue at an appropriate stage of this case.

parties continued to perform after [the contract's] expiration in substantially the same manner as they had performed during the initial term of the contract supports . . . [the] conclusion that the terms of the original contract continued to apply to the parties' subsequent agreement"); *Harco Nat'l Ins. Co. v. Arch Speciality Ins. Co.*, 2008 WL 1699755, at *6 (S.D.N.Y. 2008), *aff'd*, 328 F. App'x 678 (2d Cir. 2009) ("Where the parties continue to do business after the expiration of a contract as though the same contract terms apply, New York Courts will construe their actions as extending the terms of the original contract.").

70.     Here, the parties continued to perform on the basis that Nortel had an ongoing right to use the software covered by Schedule 1, beyond the end of its three-year term. First, as noted, the parties repeatedly renewed the SSA relating to the SNMP Research software and the former Bay products covered by Schedule 1 for years after 2003. International continued to send invoices to the same address for the same amount covering the same software that is covered by Schedule 1. Nortel paid those invoices and, in return, it received updated versions of the software covered by Schedule 1. The parties' conduct in connection with the yearly renewal of the SSA unequivocally demonstrates that the parties intended and understood that Nortel's right to use the software covered by Schedule 1 continued beyond June 2003.

71.     A similar pattern of conduct led the court in *Harco* to find an implied-in-fact contract. *Harco*, 2008 WL 1699755, at *5-6. There, the court concluded that a vehicle lease agreement remained in effect past its expiration date because the parties continued to perform as though the lease had not expired. As the court explained, "[the lessee] continued to issue [the lessor] the same invoices as though the contract was still in effect, and [the lessor] paid them and operated as though the contract had been extended." *Id.* at *6. On that basis, the court

28

"infer[red] from the parties' actions that the lease was extended according to the terms of the original agreement." *Id.* at *6.

72.     Beyond the clear inference to be drawn from the parties' conduct in repeatedly renewing the annual SSA, International also expressly confirmed in writing that Schedule 1 remained in effect after June 2003.  As discussed above, in January 2006, a group at Nortel working on former Bay Networks products reached out to John Southwood, the International representative who negotiated Schedule 1, for confirmation that they had a license to SNMP Research software so that they could partner with another company also using that software.  In response, Mr. Southwood confirmed in a formal letter that "Nortel Networks *has a license* with SNMP Research International for [SNMP Research's product] *as referenced under Nortel Schedule 1*.  That schedule incorporates the paid-up royalties' license previously established by Bay Networks."[45]

73.     Thus, Nortel made clear to International that it was continuing to use the software covered by the Schedule 1 royalty buy out in connection with former Bay Networks products, and International confirmed that it had a license to do so.  Also relevant is what International did not say:  International never communicated to Nortel that it believed the royalty buy out rights conferred by Schedule 1 had ended or that Nortel lacked the ongoing right to use the software covered by Schedule 1.  *See Richmor Aviation*, 918 N.Y.S.2d at 808 (affirming a finding of an implied-in-fact contract in part where "neither party said or did anything that would repudiate an essential term of the written contract").

74.     In sum, even if International could succeed in its argument that the benefits of the royalty buy out under Schedule 1 did not extend beyond June 2003 (which it cannot do, as

---

[45]     Ex. D-78A, Fax from N. Knowles to N. La-Anyane, Jan. 31, 2006 at SNMP_NUS_00092085 (SNMP_NUS_00092083) (emphasis supplied).

discussed above), International and Nortel continued to operate on the basis that the buy out

remained in place, establishing an implied-in-fact agreement to that effect.

## CONCLUSION

75.     For the reasons set forth above, and as will be further demonstrated at the hearing,

the U.S. Debtors respectfully request that the Court confirm that Schedule 1 conferred a lifetime

royalty buy out for existing products and any development projects originating from Bay

Networks that emerged during its three year term or in the alternative, that the parties' conduct

established an implied in fact contract to that effect.

Dated: May 4, 2017
       Wilmington, Delaware

                                        Respectfully submitted,

                                        CLEARY GOTTLIEB STEEN & HAMILTON LLP

                                        Lisa M. Schweitzer (admitted *pro hac vice*)
                                        David H. Herrington (admitted *pro hac vice*)
                                        One Liberty Plaza
                                        New York, New York  10006
                                        Telephone: (212) 225-2000
                                        Fax: (212) 225-3999

                                        -and-

                                        MORRIS, NICHOLS, ARSHT & TUNNELL LLP


                                        __/s/ Tamara K. Minott_____
                                        Derek C. Abbott (No. 3376)
                                        Andrew R. Remming (No. 5120)
                                        Tamara K. Minott (No. 5643)
                                        Andrew J. Roth-Moore (No. 5988)
                                        1201 North Market Street
                                        P.O. Box 1347
                                        Wilmington, Delaware 19801
                                        Telephone: (302) 658-9200
                                        Facsimile: (302) 658-3989

                                        *Counsel for the Debtors*
                                        *and Debtors in Possession*