IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NORTEL NETWORKS INC., *et al.* | ) | Case No. 09-10138(KG) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | **Re Dkt. No: 18009** |

## OPINION RE CLAIM OF WILLIAM A. OWENS

Introduction[1]

The Court has the difficult task of deciding largely from a paper record whether the claimant, William A. Owens ("Mr. Owens"), has the right to recover on his claim for his "Special Pension Arrangement" against not just the Canadian Estate, but against both the Canadian Estate and United States Estate. Mr. Owens' claim (Claim No. 2506) is in the amount of $2,278,679. If he is entitled to his claim against both estates, Mr. Owens will receive all or nearly all of the pension he has claimed. The Canadian Debtors initially objected to Mr. Owens' claim but have represented that they will withdraw their objection if the Court disallows Mr. Owens claim against the U.S. Debtors.

The difficulty in making the decision is that at the Hearing which the Court held on June 13, 2017, no one testified who had actual knowledge of what the Canadian Debtors and Mr. Owens agreed or intended with regard to the hiring of Mr. Owens or the Special Pension Arrangement to which Mr. Owens agreed at the termination of Mr.

---

[1] In this cross-border bankruptcy, among the Debtors are Canadian companies (the "Canadian Debtors") and companies in the United States (the "U.S. Debtors"). The Court will refer to their respective estates as the "Canadian Estate" and the "U.S. Estate."

Owens' employment. No one who was involved when the Canadian Debtors hired Mr. Owens and then engaged in the Special Pension Arrangement –- especially including Mr. Owens –- testified at the Hearing which was evidentiary in nature.[2] Such testimony would have been very helpful. The Court must therefore rely heavily on the documents the parties introduced at the Hearing in arriving at its decision, with very limited assistance from the second-hand testimony provided.

Facts

Mr. Owens began working for Nortel Networks Corporation ("NNC") and Nortel Networks Limited ("NNL"), both Canadian Debtors, on April 27, 2004. *See* Letter Agreement, dated August 31, 2004, from L.R. Wilson, Chairman of the Board of NNC, to William A. Owens, President and Chief Executive Officer of NNC and NNL (the "Retention Agreement"), Debtors' Exhibit ("DX __") 1, page 1. The Retention Agreement specifically identifies Mr. Owens in his official capacity with NNC and NNL. He did not begin working as a laborer, clerk, researcher or salesman. Instead, NNC and NNL employed Mr. Owens as President and Chief Executive Officer. *Id.* The job would "include responsibility for leading all functions and operations of the Company," with

---

[2] The witnesses at the Hearing were Ms. Mary Cilia who administers claims for the U.S. Debtors, and Mr. Vincent Travagliato who is Mr. Owens' tax and estate lawyer. Neither witness was involved at the time that the Debtors (Canadian) hired Mr. Owens or Mr. Owens terminated his employment. The witnesses therefore had no knowledge of the parties' expectations for the Special Pension Arrangement.

"the Company" defined as NNC and NNL. *Id.* Mr. Owens' salary was $1,000,000 per year, plus incentives. *Id.*

Mr. Owens was also eligible for certain additional pension benefits, known as "Special Pension Benefits." *Id.*, page 3. The Retention Agreement made it clear that "the Company," defined to be NNC and NNL, "will arrange to pay you a monthly pension benefit following your retirement." *Id.*

Mr. Owens worked as President and CEO for NNC and NNL until his "employment relationship with the Corporation [ceased] on November 18, 2005." *See* Letter Agreement, dated November 21, 2005, between "Nortel" and Mr. Owens (the "Termination Agreement") DX 3, page 1. It is in the Termination Agreement where the entities responsible for the Special Pension Arrangement becomes muddled.

The Termination Agreement is confounding. It is in letter form and is addressed to Mr. Owens as "Vice Chairman and Chief Executive Officer, Nortel Networks Corporation and Nortel Networks Limited," in Ontario. It is unclear why the Termination Agreement refers to Mr. Owens as "Vice Chairman" and not "President." Yet, in the same Termination Agreement, the term "Corporation" is defined as:

> Nortel Networks Inc., its parent, subsidiaries, affiliates (including, but not limited to, Nortel Networks Corporation and Nortel Networks Limited), predecessors, successors and assigns and all past and present officers, directors, employees and agents (in their individual and representative capacities only) of Nortel Networks Inc., its parent, subsidiaries, affiliates and assigns, in every case individually and collectively.

3

DX 3, page 1.  In addition, the Termination Agreement provides that "[t]his Agreement shall be governed by the laws of North Carolina," *Id.*, page 11, and is signed by "Nortel Networks Inc., By: William J. Donovan, SVP Human Resources." *Id.*, page 12.  No one ever explained to the Court why Nortel Networks Inc. ("NNI"), a U.S. Debtor, was included in the Termination Agreement.  The Court can only speculate that NNI's involvement stems from its responsibility for the human resources of the entire Nortel operation or because Mr. Owens was a citizen of the United States.  The Court's speculation is, however, irrelevant to the dispute because there is no evidence that Mr. Owens worked for anyone other than NNC and NNL, the Canadian Debtors.

In a Form 8-K, dated December 1, 2005, filed with the Securities and Exchange Commission (DX 4), NNC wrote that it, NNC, "entered into a letter agreement (the "Agreement") with William A. Owens, former Vice-Chairman and Chief Executive Officer of [NNC] and Nortel Networks Limited ("NNL")."  The Form 8-K, nearly contemporaneous with the Termination Agreement, confirmed that NNC and NNL were responsible for the terms of the Termination Agreement.

Debtors point to other documents.  First and foremost is the letter, dated May 3, 2006, from Eleanor Adonyi, Nortel Executive Compensation, to Ms. Patricia Morris at the Nortel Pension Service Center, in which Ms. Adonyi wrote:

> Mr. Owens resides in the US, and was paid from the US payroll when he was active, but the special pension arrangement is to be paid from Canada (Canadian pension payroll), out of general revenues, and charged fully to the Canadian company.

4

DX5, Attachment 1. Then there are the following: Exhibit DX 6 is the Canadian Form NR4 (similar to Form W-2 in the United States) for 2006 showing payment to Mr. Owens of Canadian $1,470,449.88 which contains handwritten notes with the exchange rate (.88206) to U.S. Dollars; DX 7 is the Canadian Form NR4 for 2007 showing payment to Mr. Owens of Canadian $1,277,328.38; and there is also, as part of DX 7, Form NR4 showing payment to Mr. Owens of Canadian $1,283,203.40 for 2008. Debtors filed for bankruptcy at the beginning of 2009 and as such there were no further payments to Mr. Owens.

Mr. Owens introduced several exhibits at the Hearing. The first exhibit, Owens 1, is a Schedule 14A for Nortel Networks Corporation, i.e., NNC. The Schedule 14A discusses Mr. Owens' pension but speaks of NNC and NNL and does not provide a basis for a claim against the U.S. Debtors. Owens 1, page 51/100. A second exhibit, Owens 3, consists of a series of W-2 forms, Corrected Wage and Tax Statements and the previously referenced Canadian NR4 forms. While some of the forms in Owens 3 make reference to NNI as employer, the fact remains that it was NNC and NNL who employed Mr. Owens as their President and Chief Executive Officer, not NNI.

Analysis

The law requires a claimant against a bankrupt estate to allege facts which, if true, support a finding that the debtor is liable to the claimant. *In re Allegheny Int'l, Inc.*, 954 F. 2d 167, 173 (3d Cir. 1992). A claim is afforded *prima facie* validity under such

circumstances and requires the party disputing the claim, i.e., the debtor, to produce evidence which negates the *prima facie* validity. *Id.* at 173. If the debtor or objecting party produces the negating evidence, the burden shifts back to the claimant to prove the validity of the claim by a preponderance of the evidence, with the burden of persuasion always on the claimant. *Id.*

The facts show that Mr. Owens may be entitled to his claim against the Canadian Estate, but not against the U.S. Estate. The Court does not understand, and there was no explanation given, why NNI appears in the Termination Agreement when it is NNC and NNL who agreed to pay Mr. Owens his Special Pension Arrangement. It may be true as he repeatedly argued that Mr. Owens was a special employee, but it is clear from the Retention Agreement that Mr. Owens was a special employee of NNC and NNL, not of NNI. There was no evidence presented at the Hearing by Mr. Owens that he ever did any work for NNI, not any. The basis for the Court's decision that the Special Pension Arrangement was the obligation of the Canadian Debtors (NNC and NNL) is just that: Mr. Owens was an employee of NNC and NNL, and NNI has no responsibility for the obligations of the affiliated Canadian Debtors NNC and NNL. *See*, *e.g.*, *Listokin Trust v. Lothian Oil Incorporated* (*In re Lothian Oil Incorporated*), 650 F.3d 539, 541 (5th Cir. 2011) (proof of claim filed against chapter 11 debtors based on a contractual obligation between creditor and non-debtor entity was correctly disallowed because creditor's services did not benefit debtors); *Alsohaibi v. Arcapita Bank B.S.C.(c)*, (*In re Arcapita Bank B.S.C.(c)*), 508

6

B.R. 814, 819 (S.D.N.Y. 2014) (investor's claim based on investments in nondebtor entities not allowed); *In re Fed.-Mogul Glob., Inc.*, 438 B.R. 787, 788 (Bankr. D. Del. 2010) (claim disallowed for which debtor was not responsible).  The facts show that NNI is the wrong entity for Mr. Owens to file a claim against.

The evidence reveals that Mr. Owens went to work for NNC and NNL as President and Chief Executive Officer in Ontario, Canada.  DX 1, page 2, DX 3, page 1.   Although the Retention Agreement makes reference to Mr. Owens being "an employee of Nortel Networks, Inc. ("NNI"), the Company's principal U.S. operating subsidiary," it is perfectly clear that Mr. Owens' work was for NNC and NNL alone, not for NNI.  Accordingly, Mr. Owens' claim in the United States will be disallowed contingent upon the withdrawal of the objection to his claim by the Canadian Debtors.[3]

Lastly, the U.S. Debtors argue that all of the other employees' claims were limited to allowance in either the United States or Canada, not both.  The Court does not premise its decision on this fact.  Had the U.S. Debtors and the Canadian Debtors both been obligated to Mr. Owens, his claim might have been allowed against both Estates.  Only the Canadian Debtors were obligated.

---

[3] The lawyer for the Canadian Monitor appeared at the Hearing and announced that the Monitor would withdraw the objection to Mr. Owens' claim in Canada if the Court denied his claim in the United States.

Conclusion

The Court's review of the facts and the law cause it to conclude that upon the Canadian Monitor's withdrawal of the Objection to Mr. Owens' claim against the Canadian Estate, it must sustain the objection to Mr. Owens' claim against the U.S. Debtors. The Court will issue an Order in conformity with this Opinion.

Dated:  June 20, 2017

_Kevin Gross_
KEVIN GROSS, U.S.B.J.