# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ------------------------------------------------------------X | | Chapter 11 |
| *In re* | : | |
| | : | Case No. 09-10138 (KG) |
| Nortel Networks Inc., *et al.,*[1] | : | |
| | : | Jointly Administered |
|    Wind-Down Debtors and Debtor-In- | : | |
|    Possession. | : | |
| | : | |
| | : | |
| ----------------------------------------------------------- X | | |

## DEBTORS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION FOR  SUMMARY JUDGMENT

---

[1]     The Wind-Down Debtors in these chapter 11 cases, along with the last four digits of each Wind-Down Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567), and Nortel Networks (CALA) Inc. (4226).  Nortel Networks India International Inc. (8667) remains a Debtor-In-Possession. Contact information for all Debtors and their petitions are available at http://dm.epiq11.com/nortel.

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Ackoff-Ortega v. Windswept Pac. Entm't Co.,
120 F. Supp. 2d 273 (S.D.N.Y. 2000)...................................................................... 7

Celotex Corp. v. Catrett,
477 U.S. 317 (1986)................................................................................................ 6

Chesapeake Energy Corp. v. Bank of N.Y. Mellon Trust Co.,
773 F.3d 110 (2d Cir. 2014)................................................................................... 7

Chorman v. Foamex Int'l, Inc. (In re Foamex Int'l Inc.),
491 B.R. 100 (Bankr. D. Del. 2013) ...................................................................... 6

Enter. Energy Corp. v. United States (In re Columbia Gas Sys. Inc.),
50 F.3d 233 (3d Cir. 1995)..................................................................................... 7

Joseph v. Feit (In re Liberty Brands, LLC),
476 B.R. 443 (Bankr. D. Del. 2012) ...................................................................... 7

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
475 U.S. 574 (1986)................................................................................................ 7

Michaels v. New Jersey,
222 F.3d 118 (3d Cir.2000)..................................................................................... 7

Robeson Indus. Corp. v. Hartford Accident & Indem. Co.,
178 F.3d 160 (3d Cir.1999)..................................................................................... 7

Varela v. Eclipse Aviation Corp. (In re AE Liquidation, Inc.),
522 B.R. 62 (Bankr. D. Del. 2014) ........................................................................ 6–7


**Rules and Statutes**

Fed. R. Civ. P. 56(a) ............................................................................................... 6


**Other Authorities**

The Legal 500 (2010). *Nortel Networks (Netas) Acquisition by OEP* [Press Release].
Retrieved from http://www.legal500.com/firms/14006-paksoy/press_releases/12513...... 4

Nortel Networks Inc. ("NNI") and certain of its affiliates, as wind-down debtors and debtor-in-possession, respectively, in the above-captioned case (collectively, the "Debtors"), submit this memorandum of law in support of the Debtors' Motion for Summary Judgment pursuant to Federal Rule of Bankruptcy Procedure 7056 (the "Motion").  In support of the Motion, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1.      Netas Telekomunikasyon A.S. ("Netas"), a former subsidiary of Nortel Networks International Finance and Holdings B.V. ("NNIF"), an EMEA Debtor, has asserted claims against NNI for payment for software development and support services that Netas purports to have provided to the Nortel group prior to the Petition Date.  Separate from, and in addition to, the fact that such services were not provided to, and did not inure to the benefit of, NNI or any other Debtor and thus should be disallowed, any claim that Netas may have had against any Debtor was expressly released in 2013 by the terms of the Agreement Settling US Claims Litigation between and among the Debtors and, among others, the EMEA Debtors, including NNIF [D.I. 12618-3] (the "EMEA Settlement Agreement"), attached hereto as Exhibit A.  The Court has recently affirmed the broad scope and applicability of the releases contained in that agreement,[2] and should do so once again here.  As the EMEA Debtors argued in the context of that dispute, and as the Court then agreed, the releases contained in the EMEA Settlement Agreement are broad and unambiguous, and are intended to resolve all of the existing and potential claims that could be asserted by any releasing party against any of the other parties to the agreement, including the Debtors.  By nature of its being a former subsidiary of NNIF, Netas

---

[2]      See Memorandum Opinion, SNMP Research International, Inc., and SNMP Research, Inc. v. Nortel Networks Inc., et al., and Avaya Inc., Adv. No 11-53454 (KG) (the "SNMP Adversary").

is a releasing party under the EMEA Settlement Agreement and released its claims against the

Debtors under that agreement.  Accordingly, the Debtors request that the Court grant summary

judgment in their favor and disallow Netas' claims.

## NATURE AND STAGE OF THE CASE

2.      On January 14, 2009 (the "Petition Date"), the Debtors, other than Nortel

Networks (CALA) and Nortel Networks India International Inc., filed voluntary petitions for

relief under chapter 11 of the Bankruptcy Code.[3]

3.      Also on the Petition Date, the Debtors' ultimate corporate parent Nortel Networks

Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL", and

together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their

Canadian affiliates (collectively, the "Canadian Debtors")[4] filed an application with the Ontario

Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement

Act (Canada) (the "CCAA"), seeking relief from their creditors.  The Canadian Court appointed

Ernst & Young Inc. as the monitor of the Canadian Debtors (the "Monitor").  Also on the

Petition Date, the High Court of England and Wales placed 19 of Nortel's European affiliates,

including Nortel Networks UK Limited ("NNUK") and certain of its affiliates located in Europe,

the Middle East and Africa (collectively, the "EMEA Debtors")[5] into administration under the

---

[3]      These cases are consolidated for procedural purposes only.  Nortel Networks (CALA) and Nortel Networks India International Inc. each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 14, 2009 and July 26, 2016, respectively, each of which was consolidated and is being jointly administered with the other Debtors' chapter 11 cases for procedural purposes [D.I. 1098; D.I. 17090] (the captioned cases together, the "Chapter 11 Cases").

[4]      The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

[5]      The EMEA Debtors include the following entities:  Nortel Networks UK Limited, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel

control of court-appointed administrators and foreign representatives (the "Joint

Administrators").

4.      On September 10, 2009, Netas Telekomunikasyon A.S ("Netas") filed two proofs

of claim in the Debtors' bankruptcy proceedings against NNI, asserting claims in the amounts of

$14,261,663.01 (Claim No. 8038) and $87,760.50 (Claim No. 8037) (together, the "Netas

Claims").  Although Netas asserted in such proofs of claim that a portion of the Netas Claims

was entitled to priority as an administrative expense pursuant to section 503(b)(9) of the

Bankruptcy Code, Netas has since confirmed to the Court and to the Debtors that Netas does not

seek priority status for its claims and that the Netas Claims are asserted as general unsecured

claims.[6]  In support of the Netas Claims, Netas attached certain invoices and purchase orders that

appear to have been exchanged between NNI and Netas from 2007 to 2009 relating to services

purportedly provided by Netas to the Nortel group prior to the Petition Date.[7]

5.      On March 10, 2017, following a thorough review of their books and records, the

Debtors filed the *Debtors' Forty-Seventh Omnibus Objection (Substantive) to Certain Claims*

*Pursuant to 11 U.S.C. § 502, Fed. R. Bankr. P. 3007 and Del. L.R. 3007-1 (Non-Debtor Liability*

*Claims, Modified, Reclassified and Allowed Claims, No-Basis and Released Claims, No-Basis*

*Equity Claims, No-Basis Retiree Claims and Redundant Claims)* [D.I. 18009] (the "Objection").

Through the Objection, the Debtors sought disallowance of, among others, the Netas Claims on

---

Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

[6]      See Response and Objection of Netas Telekomunikasyon A.S. to Debtors' Forty-Seventh Omnibus Objection (Substantive) to Certain Claims Pursuant to 11 U.S.C. § 502, Fed. R. Bankr. P. 3007 and Del. L.R. 3007-1 (Non-Debtor Liability Claims, Modified, Reclassified and Allowed Claims, No-Basis and Released Claims, No-Basis Equity Claims, No-Basis Retiree Claims and Redundant Claims) [D.I. 18098] (the "Response"), ¶ 10.

[7]      Although certain of the invoices attached to the Netas Claims are dated after the Petition Date, Netas has confirmed that the purported services covered by the invoices and purchase orders were rendered prior to the Petition Date.  Response, ¶ 9.

the grounds that the Debtors' books and records do not support the validity of the Netas Claims as against any of the Debtors.

6.      On April 4, 2017, Netas filed the Response in support of the validity of the Netas Claims.  Through the Response, Netas argued that the certain invoices and purchase orders attached to the Netas Claims establish that Netas provided software development and support services to NNI prior to the Petition Date and therefore Netas has valid claims against the NNI estate for such services.  Response, ¶¶ 1, 24.

7.      After Netas filed the Response, the Debtors met and conferred with Netas and agreed to a scheduling order to govern the claims dispute, which order was approved by the Court [D.I. 18288] and authorized the Debtors to file this Motion.

## STATEMENT OF RELEVANT UNDISPUTED FACTS

8.      Until December 2010, Netas was an affiliate — specifically, a direct subsidiary — of NNIF, one of the EMEA Debtors.[8]  Prior to that date and the Petition Date, Netas entered into that certain Master Technology Development and Technical Support Agreement (as amended, the "Master Agreement"), dated July 7, 1997, with Northern Telecom Limited ("Northern Telecom"), the predecessor to NNL, on behalf of itself and its affiliates.  Under the Master Agreement, Netas agreed to provide certain services to Northern Telecom, including hardware and software product development and technical support.  The invoices and purchase orders attached to Netas' proofs of claim, which constitute the sole support for the Netas Claims, appear to have been issued pursuant to the Master Agreement.  NNI is neither a signatory nor a listed party to the Master Agreement. The Debtors have neither identified nor received from Netas any information regarding services provided to NNI or how any such services benefitted NNI, other

---

[8]      On December 22, 2010, NNIF sold its 53.13% stake in Netas to One Equity Partners, a private equity partnership. See The Legal 500 (2010).  *Nortel Networks (Netas) Acquisition by OEP* [Press Release].  Retrieved from http://www.legal500.com/firms/14006-paksoy/press_releases/12513.

than having received copies of the invoices from Netas.  Moreover, no revenue or other proceeds arising from any product developed, sold or related to such invoices or purchase orders were paid to or shared with NNI or its U.S. affiliates.  Netas' position that NNI could somehow be burdened with a liability relating to such products, but not benefit from the revenue arising from them, is untenable.

9.      On January 7, 2014, the Court entered an order approving the EMEA Settlement Agreement [D.I. 12785].  As the Debtors represented to the Court in seeking approval of the EMEA Settlement Agreement, that agreement was a comprehensive resolution of substantial claims asserted against the Debtors by a number of the parties to the EMEA Settlement Agreement, including the EMEA Debtors.  The accord embodied by the EMEA Settlement Agreement resulted from extensive negotiations, broad discovery and the parties' steadfast efforts to reach a binding and final resolution and release of the various claims disputes among the parties.[9]

10.     To that end, the EMEA Settlement Agreement released *all* claims other than those expressly preserved under the EMEA Settlement Agreement.  In particular, Section 4.3 of the EMEA Settlement Agreement constitutes a broad release by each of the EMEA Debtors and their former affiliates and subsidiaries of any and all claims, liabilities, and obligations against the Debtors, and nowhere in the EMEA Settlement Agreement are the Netas Claims preserved.

Section 4.3 provides:

> Subject to Sections 4.1 and 4.2, on the Effective Date, and without the need for additional documentation or the entry of any additional orders, ***each of the EMEA Debtors***, each of the EMEA Non-Filed Entities, NNOCL, the Liquidator

---

[9]      See Debtors' Mot. for Entry of an Order Pursuant to 11 U.S.C. §§ 105, 363, 503(b) and 507(a)(2) and Bankruptcy Rules 6004(h) and 9019 Approving the U.S. Claims Litig. Settlement Agreement by and among the Debtors, the Creditors' Committee, the Joint Administrators, the EMEA Debtors, Nortel Networks Optical Components Ltd., Nortel Telecom France SA, the Liquidator, the French Liquidator, the UK Pension Parties, and Certain Affiliates, dated December 17, 2013 [D.I. 12618] (the "EMEA Settlement Motion"), ¶¶ 1, 27.

in her representative capacity, and the Joint Administrators, in their representative capacities, *and* (to the extent under the control of the Liquidator or the Joint Administrators (as the case may be)) ***the respective current and former affiliates, subsidiaries***, employees, officers, directors, agents, advisors, attorneys, representatives, successors and assigns ***of the foregoing***, ***release and forever discharge the US Interests*** and their employees, officers, directors, agents, advisors, attorneys, successors and assigns (but for greater certainty not including any member of the Nortel Group other than the US Entities) ***from any and all liability for claims***, ***defenses, demands, liabilities, obligations, damages, actions, contribution, subrogation, causes of action, setoffs, recoupments, costs and expenses (including, without limitation, attorneys' or other fees or expenses),*** the foregoing terms to be construed as broadly as possible and to include the definition of "claim" provided in Section 101(5) of the Bankruptcy Code, ***whether known or unknown, past or present, fixed or contingent, liquidated or unliquidated, which each of the EMEA Debtors, each of the EMEA Non-Filed Entities, NNOCL, the Liquidator in her representative capacity, and the Joint Administrators in their representative capacities, now have, had, may have had or hereafter may have however so arising***, including, but not limited to, claims arising from or related to the US EMEA Claims or the facts and circumstances that were alleged to provide a basis for the US EMEA Claims (the "US EMEA Releases"). (emphasis added).

## ARGUMENT

11.     By this Motion, the Debtors seek summary judgment with respect to the disallowance of the Netas Claims because such claims were released pursuant to the plain language of Section 4.3 of the EMEA Settlement Agreement.

12.     The Court should grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), incorporated by Fed. R. Bankr. P. 7056. See also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chorman v. Foamex Int'l, Inc. (In re Foamex Int'l Inc.), 491 B.R. 100, 105 (Bankr. D. Del. 2013). "The movant bears the burden of establishing that no genuine dispute as to any material fact exists." Varela v. Eclipse Aviation Corp. (In re AE Liquidation, Inc.), 522 B.R. 62, 66 (Bankr. D. Del. 2014) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585 n.10 (1986)). "Once the moving party has established its prima facie case, the party opposing summary judgment must go beyond the pleadings and

point to specific facts showing there is a genuine issue of fact for trial." Joseph v. Feit (In re Liberty Brands, LLC), 476 B.R. 443, 449 (Bankr. D. Del. 2012) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Matsushita, 475 U.S. at 585–86; Michaels v. New Jersey, 222 F.3d 118, 121 (3d Cir.2000); Robeson Indus. Corp. v. Hartford Accident & Indem. Co., 178 F.3d 160, 164 (3d Cir.1999)).

13.     Here, based on the undisputed material facts, the Netas Claims were released pursuant to Section 4.3 of the EMEA Settlement Agreement.  By the express terms of that agreement, any claims of Netas — a former subsidiary of NNIF — as against the Debtors were released.  Netas cannot dispute the plain language of the EMEA Settlement Agreement and its effect on the Netas Claims.  As a result, there is no genuine dispute as to any material fact and the Debtors are entitled to summary judgment.

14.     The EMEA Settlement Agreement is governed by New York law.[10]  Under New York law, settlement agreements "are construed according to traditional precepts of contract construction." Enter. Energy Corp. v. United States (In re Columbia Gas Sys. Inc.), 50 F.3d 233, 238 (3d Cir. 1995); see also Ackoff-Ortega v. Windswept Pac. Entm't Co., 120 F. Supp. 2d 273, 282 (S.D.N.Y. 2000) (same).  "[W]hen the terms of a written contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract." Chesapeake Energy Corp. v. Bank of N.Y. Mellon Trust Co., 773 F.3d 110, 114 (2d Cir. 2014) (quoting Howard v. Howard, 740 N.Y.S.2d 71, 71 (N.Y. App. Div. 2002)); see also Ackoff-Ortega, 120 F. Supp. 2d at 282 ("[A]lthough the intent of the parties is paramount in deciding the effect of a release, where the terms of a release are unambiguous such intent

---

[10]     "[The] Settlement Agreement shall be governed and construed in accordance with the laws of the State of New York without giving effect to the conflict of laws principles thereof." EMEA Settlement Agreement § 8.7.

must be discerned from the four corners of the document rather than from extrinsic

evidence.").

15.     Examination of Section 4.3 of the EMEA Settlement Agreement clearly and

unambiguously shows that the Netas Claims were released and plainly were not carved out of the

release in Section 4.3, or otherwise preserved.  Netas was a "former subsidiary" of an EMEA

Debtor, and the EMEA Settlement Agreement provides for the release of claims for "any and all

liability" of former subsidiaries of any EMEA Debtor as against the Debtors arising at any time.

To the extent Netas attempts to argue that only claims held by the EMEA Debtors, not their

former subsidiaries, are released under the EMEA Settlement Agreement, the Netas Claims are

properly viewed as *de facto* claims of the EMEA Debtors.  Following the sale of Netas to One

Equity Partners, the EMEA Debtors insisted that the proceeds from such sale be excluded from

the allocation of the larger sale proceeds on the grounds that the Debtors did not have any

interest in Netas.  Where the EMEA Debtors have retained the benefit of their position – namely,

the entirety of the sale proceeds attributable to Netas – on the ground that the Netas business was

separate from the other Nortel businesses and the Debtors held no interest in Netas, that position

should similarly be respected in disallowing claims asserted against the Debtors by Netas, where

such claims must be seen as an attempt by the EMEA Debtors to divert claims towards other

affiliates, while keeping all profits and upside for themselves.  To find otherwise would put NNI

in the position of being responsible for the cost to create a benefit that inured solely to other

Nortel affiliates.

16.     Moreover, even if the Court finds ambiguity as to the scope of the release

contained in the EMEA Settlement Agreement (which it should not), the parties' intent was

unambiguously to exchange broad releases as part of the comprehensive settlement of the issues

resolved by that agreement, and to include the Netas Claims, of which the parties were all fully aware at the time, in such release.  That intent is clearly manifested in the Debtors' motion seeking approval of the EMEA Settlement Agreement, by which the Debtors unequivocally represented to the Court that the EMEA Settlement Agreement resolved all claims between and among the Debtors, the EMEA Debtors and a number of other parties, including former affiliates and subsidiaries of the EMEA Debtors.[11]

17.     That intent is also demonstrated by representations made by the EMEA Debtors to the Court in the context of a recent adversary proceeding in these Chapter 11 Cases in which the scope of the releases contained in the EMEA Settlement Agreement was at issue.[12]  There, in response to a third-party complaint filed by the Debtors, the EMEA Debtors argued that the releases contained in the EMEA Settlement Agreement are unambiguous and are sufficiently broad to preclude the claims asserted against them by the Debtors, and the Court agreed.[13]  In doing so, the EMEA Debtors confirmed that the parties releasing claims under the EMEA Settlement Agreement "did not preserve the right to assert <u>any</u> form of liability against one another" and that through the EMEA Settlement Agreement, "the parties chose to mutually release all claims without exception – to wipe the slate clean *vis-à-vis* one another."[14]

18.     As a result, it is clear that the intention of the parties to the EMEA Settlement Agreement was to exchange broad mutual releases and to release all claims that any releasing party had or could have against any other party.  The purposeful inclusion of "former subsidiaries" as releasing parties leaves no doubt that the Netas Claims were released pursuant to

---

[11]     <u>See</u> EMEA Settlement Motion, ¶¶ 1, 27.

[12]     <u>See</u> EMEA Debtors' Memorandum of Law in Support of the Joint Administrators' Motion for Judgment on the Pleadings, SNMP Adversary, No. 11-53454 [Adv. D.I. 364].

[13]     Memorandum Opinion, dated May 2, 2016, SNMP Adversary, No. 11-53454 [Adv. D.I. 408].

[14]     EMEA Debtors' Memorandum of Law in Support of the Joint Administrators' Motion for Judgment on the Pleadings, SNMP Adversary, No. 11-53454 [Adv. D.I. 364], ¶ 19.

the EMEA Settlement Agreement and therefore should be disallowed as a matter of law. To read the release otherwise would require ascribing no meaning to the phrase "former subsidiaries," or would require adding words to the plain contractual language to carve out the Netas claims and give a different meaning to the plain agreement among the parties.

*[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]*

## CONCLUSION

19.     The Debtors respectfully request that this Court (i) grant summary judgment in

favor of the Debtors and disallow the Netas Claims; and (ii) grant such other and further relief as

it deems just and proper.

Dated:  June 30, 2017             CLEARY GOTTLIEB STEEN & HAMILTON LLP
           Wilmington, Delaware

James L. Bromley (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

                 - and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP


    */s/ Tamara K. Minott*
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Tamara K. Minott (No. 5643)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Wind-Down Debtors
and Debtor-in-Possession*