## **Exhibit A**

**Master Technology Development and Technical Support Agreement**

**Law Department**
8200 Dixie Road, Suite 100
Brampton, ON  L6T 5P6
Canada

Director, Licensing & Technology Contracts
Doc 18335-1    Filed 06/30/17    Page 2 of 37

Direct Tel. 905 863-1151/ Fax 8431

VIA COURIER

# NØRTEL
## NORTHERN TELECOM

October 9, 1997

Mr. Ahmet Orel
Northern Electric Telekomunikasyon A.S.
Alemdag Caddesi Umraniye
81244
Istanbul, Turkey

Dear Mr. Orel:

**Re:    Master Technology Development and Technical Support Agreement between
Northern Telecom Limited and NETAS - Northern Electric Telekomunikasyon A.S.**

It is my pleasure to enclose herewith a fully executed duplicate original copy of the above-noted agreement.

On behalf of Nortel, I would like to take this opportunity to thank you for your support and cooperation in making this agreement possible.

Yours very truly,

Yalcin Suer
YS/gw
Enc.

# MASTER TECHNOLOGY DEVELOPMENT AND TECHNICAL SUPPORT AGREEMENT

## BETWEEN

## NORTHERN TELECOM LIMITED

## AND

## NETAS - NORTHERN ELECTRIC TELEKOMUNIKASYON A.S.

# INDEX

| SECTION | DESCRIPTION | PAGE |
|---------|-------------|------|
| 1. | Definitions | 1 |
| 2. | Undertaking to Perform Services | 4 |

**Part I:**   **Development Services**

| | | |
|---------|-------------|------|
| 3. | Performance of Development Services | 4 |
| 4. | Progress Reporting | 5 |
| 5. | Delivery of Developed Items | 5 |
| 6. | Acceptance of Developed Items | 6 |
| 7. | Development Support and Design Responsibility | 6 |
| 8. | Payment for Development Services | 7 |

**Part II:**   **Support Services**

| | | |
|---------|-------------|------|
| 9. | Performance of Support Services | 7 |
| 10. | Delivery of Modified Items | 7 |
| 11. | Acceptance of Modified Items | 8 |
| 12. | Payment for Support Services | 8 |

**Part III:**   **General Provisions Relating to Development and Support Services**

| | | |
|---------|-------------|------|
| 13. | Furnishing of Supplied Items | 8 |
| 14. | Captive Office Grant of Access | 10 |
| 15. | Additional Technical Assistance | 11 |
| 16. | Intellectual Property | 11 |

i

| 17. | Confidentiality | 13 |
| 18. | Warranties | 14 |
| 19. | Indemnity | 16 |
| 20. | Infringement | 16 |
| 21. | Insurance | 17 |
| 22. | Termination and Term | 18 |
| 23. | Force Majeure | 18 |
| 24. | General | 19 |

# MASTER TECHNOLOGY DEVELOPMENT AND TECHNICAL SUPPORT AGREEMENT

THIS AGREEMENT is made as of the 7th day of July, 1997;

BETWEEN:

> **NORTHERN TELECOM LIMITED**, a corporation duly incorporated under the laws of Canada, having its executive offices at 8200 Dixie Road, Suite 100, Brampton, Ontario, Canada, on behalf of itself and its Affiliates (hereinafter **"Nortel"**);

AND:

> **NETAS - NORTHERN ELECTRIC TELEKOMUNIKASYON A.S.**, a corporation organized under the laws of Turkey, having its principal place of business at Alemdag Caddesi, Umraniya, 81244, Istanbul, Turkey (hereinafter **"Netas"**).

WHEREAS Nortel produces telecommunications equipment and has entered into a technology license agreement with Netas whereby Nortel has licensed certain of its proprietary technology to Netas; and

WHEREAS Netas is capable of developing and supporting certain Items for Nortel and has agreed to do so on the terms and conditions set forth herein;

NOW THEREFORE, in consideration of the mutual promises contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## 1.   DEFINITIONS

1.1   As used in this Agreement and the Schedules attached hereto, unless otherwise defined:

(a)   **"Affiliate"** shall mean a corporation or other legal entity which a Party hereto, or its parent, effectively controls, directly or indirectly, through the ownership or control of shares or other ownership interest in the corporation or other legal entity and shall include: (i) a corporation or other legal entity which effectively controls, directly or indirectly, through the ownership or control of shares or other ownership interest, a Party hereto; and (ii) a third party which has entered into an agreement, now or in the future, with Northern Telecom Limited or one of its Affiliates to manufacture, in modified or unmodified form, products based upon designs owned by Northern Telecom Limited or its Affiliate, and to lease, sell, sublicense or otherwise distribute, directly or indirectly

through distributors, such products under its own brand names or those of Northern Telecom Limited or its Affiliate;

(b)    **"Confidential Information"** shall have the meaning set forth in Section 17.1 hereof;

(c)    **"Design Support Prime"** shall mean certain of the responsibilities to be performed by Netas as are further described in Section 7.1;

(d)    **"Design Support Transfer Date"** shall mean that date set forth in the Gate Schedule for delivery of the Gate Deliverable entitled "Design Sustaining Plan";

(e)    **"Developed"** when used to modify Hardware, Software, Documentation, Products and Items shall mean such Hardware, Software, Documentation, Products and Items, if any, developed by Netas pursuant to this Agreement and described in Parts I, II and III of Schedule B;

(f)    **"Development Services"** shall mean the activities of Netas during a Term which result in the development of any Developed Items pursuant to this Agreement and any Set of Schedules;

(g)    **"Development Specifications"** shall mean those specifications set forth in Part VIII of Schedule B;

(h)    **"Documentation"** shall mean that documentation set forth in Part III of Schedule B, and Part III of Schedule C;

(i)    **"Dollars"** or **"$"** shall mean lawful money of the United States of America;

(j)    **"FOB Point"** shall mean the loading dock set forth in Part XIII of Schedule B or Part XI of Schedule C as applicable;

(k)    **"Gate"** shall mean, with respect to a Set of Schedules, a periodic review of certain Development Services as set forth in the Gate Procedure described in Part VI of Schedule B, at which time Netas shall have completed the Development Services therein described in a manner acceptable to Nortel as further specified in the Gate Procedure;

(l)    **"Gate Deliverable"** shall mean a deliverable item required in connection with any Gate as such deliverable item is further identified in Parts IV, V and VI of Schedule B;

(m)    **"Gate Procedure"** shall mean that procedure set forth in Part VI of Schedule B;

(n)    **"Gate Schedule"** shall mean the timetable set forth in Part V of Schedule B setting forth dates on which Gates are to be passed in accordance with the Gate Procedure applicable to that Set of Schedules;

(o)     **"Hardware"** shall mean the equipment, if any, described in Part I of Schedule B, and in Part I of Schedule C;

(p)     **"Intellectual Property Rights"** shall mean all patents, copyrights, industrial designs, integrated circuit topography rights, semi-conductor and mask work rights, trademarks, moral rights, Confidential Information, trade secrets, know-how, inventions and processes, and all intangible rights and privileges of a nature similar to any of the foregoing, in every case in any part of the world and whether or not registered, and shall include all applications and granted registrations in respect of any of the same;

(q)     **"Items"** shall mean Hardware, Software and Documentation;

(r)     **"Modified"**, when used to modify Hardware, Software, Documentation, Products, and Items, shall mean such Supported Hardware, Supported Software, Supported Documentation, Supported Products, and Supported Items, if any, as modified as a result of the performance of Support Services with respect to a given Set of Schedules;

(s)     **"Product"** shall mean the aggregate of the Hardware and the Software;

(t)     **"Services"**, with respect to a Set of Schedules, shall mean both Development Services and Support Services;

(u)     **"Set of Schedules"** shall mean a set of schedules in the form set forth as Appendix A hereto which shall have been completed and executed by the Parties in accordance with this Agreement, provided that references in this Agreement to a specific Schedule shall mean that Schedule as it is contained in a Set of Schedules;

(v)     **"Software"** shall mean those computer programs (including fixed coded instructions permanently resident in Hardware), if any, set forth in Part II of Schedule B and Part II of Schedule C;

(w)     **"Supplied"**, when used to modify Technical Information, Software, Equipment and Items, shall mean that Technical Information, Software, Equipment and Items, if any, supplied by Nortel to Netas as set forth in Parts I, II and III of Schedule D;

(x)     **"Supported"**, when used to modify Hardware, Software, Documentation, Products and Items, shall mean such Hardware, Software, Documentation, Products and Items, if any, set forth in Parts I through IV of Schedule C which are the objects of the Support Services with respect to a given Set of Schedules;

(y)     **"Support Services"** shall mean those services set forth in Part V of Schedule C;

(z)     **"Support Specifications"** shall mean those specifications set forth in Part VII of Schedule C;

(aa)    **"Technical Information"** shall mean that information set forth in Part I of Schedule D;

(ab)   **"Term"**, with respect to a Set of Schedules, shall mean that period commencing on the date of execution by the Parties of the Set of Schedules and terminating on the Design Support Transfer Date with respect to Development Services, or the Support Termination Date with respect to Support Services; and

(ac)   **"Work Product"** shall have the meaning set forth in Section 16.1 hereof.

1.2    References in this Agreement to another agreement shall mean such agreement as executed by the applicable parties thereto and all amendments thereto, unless otherwise explicitly stated.

## 2.    UNDERTAKING TO PERFORM SERVICES

2.1    From time to time Nortel may request Netas to perform certain Development Services and/or Support Services.  In order to effect the undertaking to perform such Services, the Parties shall, in each instance, complete a Set of Schedules in the form set forth in Appendix A.

2.2    Each Set of Schedules shall be numbered consecutively, and shall be signed by an authorized signatory of each of the Parties.  The Parties may amend any undertaking to provide Development Services or Support Services by amending the applicable Set of Schedules and having such amended Set of Schedules signed by an authorized signatory of each of the Parties.

2.3    The performance of the Services shall be subject to the provisions set forth in this Agreement.  The Parties may add to, delete from, or modify this Agreement with respect to a Set of Schedules by setting forth such additions, deletions or modifications in Schedule A.  In the case of a discrepancy between this Agreement and Schedule A, the latter shall prevail.

## Part I:    Development Services

## 3.    PERFORMANCE OF DEVELOPMENT SERVICES

3.1    During the Term with respect to a Set of Schedules, Netas shall perform the applicable Development Services in conformance with the Development Specifications and any other requirements set forth in Schedule B.

3.2    In performance of its obligations hereunder, any information or materials, including without limitation semiconductor components and items of software, used by Netas, other than information or materials developed by it or supplied to it by Nortel, shall only be used in such cases where Netas has obtained the prior written consent of Nortel so to do.

3.3    Netas shall not be responsible for obtaining any government, customer or certification body approvals, and/or certificates in connection with the performance of its obligations hereunder with respect to the Developed Items, other than compliance with any applicable import requirements and compliance with any third party or other requirements set forth in Part

VII of Schedule B.  Netas shall provide reasonable assistance with respect to the acquisition by Nortel of such listing, approvals or certificates including, without limitation, furnishing information and test results covering the Developed Items and any changes, improvements or other modifications thereto and allowing Nortel to inspect Netas' premises at agreed times.

4.    **PROGRESS REPORTING**

4.1    If so requested by Nortel, Netas shall provide a monthly or as requested up-to-date summary report of its progress in its performance of the Development Services.  In addition, Netas shall meet with representatives of Nortel as frequently as may be necessary in order to review the status of any such Development Services and to test and demonstrate prototypes and to discuss problems encountered by Netas in performing the Development Services.  Such meetings shall be scheduled by Netas to serve the needs of Nortel but not so as to inconvenience, or place unreasonable demands upon, the operations of Netas.  Where such meetings unreasonably inconvenience or place unreasonable demands upon the operations of Netas, Netas shall so notify Nortel and the Parties shall negotiate additional payment reflecting the situation, recognizing that meetings referred to in the preceding sentence are normally included in the price for Services hereunder.

5.    **DELIVERY OF DEVELOPED ITEMS**

5.1    Developed Hardware shall be delivered by the delivery dates set forth in Parts I and V of Schedule B to the FOB Point.  Developed Software shall be made available to Nortel as specified by Nortel in accordance with the delivery dates set forth in Parts II and V of Schedule B and Developed Documentation shall be made available to Nortel as specified by Nortel in accordance with the delivery dates set forth in Parts III and V of Schedule B.

5.2    Netas shall furnish to Nortel each Gate Deliverable on the dates set forth in the Gate Schedule applicable to such Gate Deliverable so that (a) Nortel may (i) review fully such Gate Deliverable, (ii) notify Netas of any failure of such Gate Deliverable to meet acceptance criteria established by Nortel for such Gate Deliverable and (iii) identify other matters such as, but not limited to, interdependencies of Gate Deliverables, and (b) Netas may correct to Nortel's satisfaction any failure notified in accordance with Section 5.2 (a)(ii) and address to Nortel's satisfaction any other matters identified in accordance with Section 5.2 (a)(iii) on or prior to the applicable date set forth in the Gate Schedule.

5.3    Any Developed Software delivered hereunder shall be readily demonstrable to Nortel and shall have a complete and functional source code listing.

5.4    Any Developed Documentation with respect to Developed Hardware furnished hereunder shall be complete to the extent that Nortel may thereby manufacture such Developed Hardware.



6.    **ACCEPTANCE OF DEVELOPED ITEMS**

6.1    Following each delivery of Developed Items, Nortel shall determine whether such Developed Items comply with the Development Specifications and the requirements set forth in Schedule B of the relevant Set of Schedules and shall notify Netas in writing of instances of non-compliance, within the time period set forth in Part XI of such Schedule B. Nortel's failure to provide such notice shall be deemed to be notice of Nortel's acceptance of such Developed Items. In the event Nortel notifies Netas of instances of non-compliance within the time period set forth in Part XI of Schedule B, Netas shall correct all defects which resulted in such instances of non-compliance and shall deliver the corrected Developed Items to Nortel within the time period set forth in Part XII of such Schedule B, failing which Nortel may terminate this Agreement or the relevant Set of Schedules pursuant to Section 22.2.

6.2    Nortel's rights of warranty and acceptance pursuant to any other agreement shall not constitute a waiver of any warranty or acceptance right hereunder and *vice versa*.

7.    **DEVELOPMENT SUPPORT AND DESIGN RESPONSIBILITY**

7.1    Until the Design Support Transfer Date with respect to a Set of Schedules, Netas shall perform certain responsibilities characterized by the Parties as **"Design Support Prime"** which shall consist of the following:

(a)    performance of the support and test responsibilities with respect to the applicable Gate Deliverables;

(b)    identification of problems and resolution of problems identified by Netas or Nortel through the problem reporting system as may be set forth in Part X of the applicable Schedule B;

(c)    furnishing of support as reasonably requested in writing by Nortel with respect to manufacturing Developed Items, provided such support shall only be provided in exceptional circumstances and only to the extent such support is agreed upon in writing by the Parties;

(d)    participation in first piece evaluations and furnishing of required changes in the time periods applicable to "First Piece Evaluations" or "Tool Made Samples" as such terms are defined in the applicable Gate Procedure;

(e)    performance of such additional responsibilities as may be set forth in Part IX of such Schedule B; and

(f)    performance of any other responsibilities subsequently agreed by the Parties in writing.

8.    **PAYMENT FOR DEVELOPMENT SERVICES**

8.1    Nortel shall pay to Netas the amounts set forth in Part XIV of Schedule B for performance by Netas of Development Services pursuant to this Agreement. Such amounts shall be payable at the times specified in Part XIV of Schedule B. Except for any obligations of either Party pursuant to Sections 19, 20, 21, or 22, no other amounts shall be payable for Development Services hereunder by either Party. Nortel shall have no obligations to reimburse Netas for any expenses incurred by Netas in performing the Development Services pursuant to this Agreement.

## Part II:    Support Services

9.    **PERFORMANCE OF SUPPORT SERVICES**

9.1    During the Term with respect to a Set of Schedules, Netas shall perform the applicable Support Services in conformance with the applicable Support Specifications and any other requirements set forth in Schedule C.

9.2    In performance of its obligations hereunder, any information or materials, including without limitation semiconductor components and items of software, used by Netas, other than information or materials developed by it or supplied to it by Nortel, shall only be used in such cases where Netas has obtained the prior written consent of Nortel so to do.

9.3    Netas shall not be responsible for obtaining any government, customer or certification body approvals, and/or certificates in connection with the performance of its obligations hereunder with respect to Modified Items, other than compliance with any applicable import requirements and compliance with any third party or other requirements set forth in Part VI of Schedule C. Netas shall provide reasonable assistance with respect to the acquisition by Nortel of such listing, approvals or certificates including, without limitation, furnishing information and test results covering the Modified Items and any changes, improvements or other modifications thereto and allowing Nortel to inspect Netas' premises at agreed times.

10.    **DELIVERY OF MODIFIED ITEMS**

10.1    Modified Hardware shall be delivered as set forth in Part V of Schedule C to the FOB Point set forth in Part XII of Schedule C with respect to that Set of Schedules. Modified Software and Modified Documentation shall be made available to Nortel in accordance with Part V of Schedule C with respect to that Set of Schedules.

10.2    Any Modified Software delivered hereunder shall be readily demonstrable to Nortel and shall have a complete and functional source code listing.

10.3    Any Modified Documentation with respect to Modified Hardware furnished hereunder shall be complete to the extent that Nortel may thereby manufacture such Modified Hardware.

11. **ACCEPTANCE OF MODIFIED ITEMS**

11.1   In the event Netas' performance of Support Services results in the furnishing of Modified Items, Nortel shall determine whether such Modified Items comply with the Support Specifications and the other requirements set forth in Schedule B of the relevant Set of Schedules and shall notify Netas in writing of instances of non-compliance, within the time period set forth in Part IX of such Schedule C. Nortel's failure to provide such notice shall be deemed to be notice of Nortel's acceptance of such Modified Items. In the event Nortel notifies Netas of instances of non-compliance within the time period set forth in Part IX of Schedule C, Netas shall correct all defects which resulted in such instances of non-compliance and shall deliver the corrected Developed Items to Nortel within the time period set forth in Part X of such Schedule C, failing which Nortel may terminate this Agreement or the relevant Set of Schedules pursuant to Section 22.2.

11.2   Nortel's rights of warranty and acceptance pursuant to any other agreement shall not constitute a waiver of any warranty or acceptance right hereunder and *vice versa*.

12. **PAYMENT FOR SUPPORT SERVICES**

Nortel shall pay to Netas the amounts set forth in Part XII of Schedule C for performance by Netas of Support Services pursuant to this Agreement. Such amounts shall be payable at the times specified in Part XII of Schedule C. Except for any obligations of either Party pursuant to Sections 19, 20, 21, or 22, no other amounts shall be payable for Support Services hereunder by either Party. Nortel shall have no obligations to reimburse Netas for any expenses incurred by Netas in performing the Support Services pursuant to this Agreement.

### Part III:   General Provisions Relating to Development and Support Services

13. **FURNISHING OF SUPPLIED ITEMS**

13.1   Nortel shall provide to Netas the applicable Supplied Items listed in Parts I through III of Schedule D at the location set forth in Part V of Schedule D and pursuant to the timetables set forth in the "Date to be Furnished" columns of Parts I through III of Schedule D. Any failure by Nortel to meet the dates set forth in such timetables and any consequent delay by Netas shall not be considered a breach hereunder.

13.2   Nortel, to the extent of its legal right to do so, hereby grants to Netas, subject to the terms and conditions of this Section 13 and Section 16, a personal, non-transferable, non-assignable, indivisible, non-exclusive right to use the Supplied Items solely for purposes of performing Netas' obligations pursuant to this Agreement.

13.3    Nothing contained herein shall transfer, or be deemed to transfer, or to contemplate transfer of, any rights in or to the Supplied Items, other than those rights specifically granted herein, and in particular but without restricting the generality of the foregoing, Nortel does not in any way transfer any right, title or interest in or to the Supplied Items, or any element constituting a portion thereof to Netas, other than the limited right of Netas to use the Supplied Items as described above.

13.4    Netas shall not permit any lien or encumbrance of any nature whatsoever to attach to any of the Supplied Items or any portion thereof, except those arising out of the acts or omissions of Nortel. Netas shall not remove or permit the removal of any tag, marking or legend placed by Nortel on any Supplied Items or in any information accessible as a result of any use of any Supplied Items. Netas shall take such further actions as Nortel may reasonably require in order to protect and preserve Nortel's interest in the Supplied Items.

13.5    Unless otherwise permitted under existing technology licenses or other agreements in writing, Netas shall not sell, lease, license, assign or otherwise transfer any Developed Items, Modified Items or Work Product arising out of Netas' use of the Supplied Items except to Nortel in accordance with this Agreement.

13.6    Supplied Items provided to Netas pursuant to Section 13.1 shall be in the form then in use by Nortel. Nortel shall be under no obligation to develop or to produce any new or unavailable versions of the Supplied Items. Netas shall maintain and update the Supplied Items to current Nortel levels but only to the extent Netas receives funds so allocated hereunder or under separate agreement. The method by and media on which the Supplied Items shall be furnished shall be at the sole discretion of Nortel.

13.7    In the event the Supplied Items require installation at Netas' site, such installation shall be performed solely at Netas' cost and expense. Installation of any such Supplied Items shall be performed in accordance with procedures made known by Nortel to Netas. A representative of Netas shall receive training in the use of Supplied Items as set forth in Part IV of Schedule D.

13.8    All risk of loss to any Supplied Items shall pass to Netas upon delivery to Netas at the location specified in Part V of Schedule D. Thereafter, in the event of any loss or destruction of any Supplied Items, Netas shall pay to Nortel the then-current charges of Nortel to replace such Supplied Items. Such risk of loss to any Supplied Items shall remain with Netas until such Supplied Items are returned.

13.9    Netas acknowledges that the Supplied Items are and shall continue to be the exclusive property of Nortel or Nortel's suppliers and shall be protected as Confidential Information pursuant to Section 17.

13.10   At the expiration of the applicable Term and upon written notice by Nortel, any Supplied Items shall, at Nortel's election, (a) be returned at Netas' expense to a location specified by Nortel, and shall be in the same condition as they were when supplied hereunder, ordinary wear and tear excepted, or (b) be erased or destroyed at the Netas' expense. In either case the Parties

shall negotiate and allocate the expenses between the Parties, the results of which shall be indicated in writing.

13.11   Nothing in this Section 13 shall be construed as requiring Nortel to disclose Supplied Items or to grant rights under license, or to render any technical assistance which would violate any confidentiality undertakings or which would violate any present or future law or decree of any government or governmental officer or agency, and nothing contained herein shall require disclosure by Nortel of any Supplied Items which would increase or impose any obligations on Nortel with respect to third parties.

## 14.    **CAPTIVE OFFICE GRANT OF ACCESS**

14.1    Nortel may permit Netas to access certain equipment and software, designated by Nortel as a captive office at Nortel's facility as set forth in Part VI of Schedule D (hereinafter **"Captive Office"**) solely for the purpose of testing Developed Products and Modified Products and for no other purpose whatsoever.  At the convenience of Nortel, Netas may reserve time to access the applicable Captive Office as specified in Part VII of Schedule D.  Netas shall be solely responsible for testing such Developed Products and Modified Products and for all results thereof.

14.2    Netas shall follow the procedures set forth by Nortel in order to obtain access to the Captive Office.  Nortel reserves the right to schedule Netas' access so as not to interrupt the usual business activity and/or use of the Captive Office by Nortel, and Nortel further reserves the right to interrupt Netas' access to the Captive Office at any time and for any reason it deems necessary.  Netas shall supply all personnel, equipment and information necessary to conduct the test of the Developed Products and Modified Products.

14.3    Netas hereby acknowledges that any Captive Office and any Supplied Items used by Netas for testing Developed Products and/or Modified Products are provided by Nortel solely for the purpose of simulating the operation of certain of Nortel's equipment and software in an operating environment.  Nortel makes no warranties or representations of any nature whatsoever that the conditions under which such equipment and software would be operated in an operating environment will be similar to the way in which it is operated in such Captive Office.  Nortel makes no warranties or representations of any nature whatsoever that the manner in which the Developed Products and/or Modified Products interface with such equipment and software will be similar to the way in which they will interface with Nortel's equipment and software in an operating environment.  Further, Nortel makes no warranties or representations of any nature with respect to any technical assistance which may be provided to Netas in connection with its use of Test Items.

14.4    Nothing in this Section 14 shall limit, in any manner, the right of Nortel to discontinue or change the design or characteristics of the equipment and software comprising the Captive Office at any time without notice or liability.



15.    **ADDITIONAL TECHNICAL ASSISTANCE**

15.1    Upon Nortel's written request, Netas shall provide additional technical assistance beyond that which it is obliged to provide elsewhere herein. Such assistance shall be provided at a location designated by Nortel in writing. Such assistance shall be provided by Netas after the applicable Design Support Transfer Date or Support Termination Date at rates as set forth in Schedule E with respect to that Set of Schedules. The Parties acknowledge that Netas may not be capable of providing additional technical assistance in every instance due to limitations of its resources. In such instances the Parties shall negotiate for a reallocation of Netas' work load, the results of which shall be agreed in writing.

16.    **INTELLECTUAL PROPERTY**

16.1    All Intellectual Property Rights in Developed Items, Modified Items, Supported Items, Supplied Items, Gate Deliverables and all other works or creations arising out of the performance of Services pursuant to this Agreement (hereinafter collectively, **"Work Product"**) shall be the sole property of Nortel. All Intellectual Property Rights first conceived, developed or reduced to practice by or on behalf of either Party or both Parties in the course of performing Services pursuant to this Agreement shall be the sole property of Nortel. Except to the extent expressly set forth herein, Nortel grants no rights whatsoever in, to or under such Intellectual Property Rights to Netas. Nortel may freely use, enjoy, license or otherwise dispose of any and all such Intellectual Property Rights and all related rights, titles and interests therein in its sole discretion.

16.2    Except as specifically set out herein, each Party shall retain all right, title and interest in, to and under their respective Intellectual Property Rights which existed prior to the commencement of the Services or which were first conceived, developed and reduced to practice independently of performing Services pursuant to this Agreement. Except as expressly set forth herein, each Party may freely use, enjoy, license or otherwise dispose of any and all of such Intellectual Property Rights in its sole discretion.

16.3    If any Intellectual Property Rights of Nortel would necessarily be infringed by Netas in performing Services pursuant to this Agreement, then to that extent only Nortel hereby grants to Netas a non-exclusive non-transferable royalty-free license to use such Intellectual Property Rights in the course of performing such Services.

16.4    Unless otherwise agreed in writing prior to performing any Services pursuant to a Set of Schedules, if any Intellectual Property Rights of Netas are incorporated in, or infringed through the use of, the Work Product associated with the Set of Schedules, then Netas shall forthwith assign all of its right, title and interest in, to and under such Intellectual Property Rights to Nortel. If any Intellectual Property Rights of Netas are used in the performance of Services pursuant to a Set of Schedules, Netas hereby grants to Nortel and its Affiliates a non-exclusive perpetual royalty-free license to use such Intellectual Property Rights in the manufacture, use, provision and sale of the Work Product associated with the Set of Schedules, or any other products or services based thereon, and to sublicense purchasers thereof to use any such Intellectual Property Rights.

16.5     Nortel shall have the sole right to exploit the Work Product and all Intellectual Property Rights first conceived, developed or reduced to practice by or on behalf of either Party or both Parties in the course of performing Services pursuant to this Agreement, including, without limitation, the sole right to determine how the Work Product and such Intellectual Property Rights will be protected (such as by patent, trademark, copyright or other registration or by secrecy) and the manner in which the Work Product and such Intellectual Property Rights will be exploited.  Nortel shall be the owner of all resulting patent, trademark, copyright and other registrations and of all resulting trade secrets.  In furtherance of the foregoing Netas shall:

(a)      provide all assistance considered reasonably necessary by Nortel for the protection and exploitation of the Work Product and such Intellectual Property Rights, including, without limitation, the prompt disclosure to Nortel of all inventions, improvements and discoveries reasonably connected to the performance of the Services;

(b)      execute promptly all documents considered necessary by Nortel to perfect, protect and exploit the Work Product and such Intellectual Property Rights and its proprietary interest therein, including, without limitation assignments of patent rights and copyrights with respect to the Work Product and such Intellectual Property Rights required to give full effect to the provisions set forth in this Section 16;

(c)      not commit any acts which would result in the loss of rights or disclosure of the Work Product and/or such Intellectual Property Rights to third parties; and

(d)      cause its directors, officers and employees to do all acts which are necessary for the performance of the obligations set forth in Subsections (a) through (c) above;

provided Nortel shall reimburse Netas for reasonable and actual expenses incurred by Netas pursuant to the provisions of this Section 16.5 in meeting Nortel's requests.

16.6     Except with respect to the rights granted to Nortel pursuant to Section 16.4, and except with respect to Nortel's sole right to exploit the Work Product as set forth in Section 16.5,

(a)      nothing in this Agreement shall operate to create, in favor of Nortel, an interest in or right to any Intellectual Property Rights or goods owned by Netas or in which Netas has an interest, prior to the start of the performance of the Services; and

(b)      where Netas acquires any right, title and interest in, to and under Intellectual Property Rights and goods for its own account, such right, title or interest shall not by operation of this Agreement be altered or diminished in any way.

16.7     Nothing in this Agreement shall be construed as conferring upon Netas:

(a)      any right to use, in advertising, publicity or otherwise, any name, trade-name or trademark, or any contraction, abbreviation or simulation thereof of Nortel; or

(b)     by implication, estoppel or otherwise any rights other than those necessary to perform
the Services as explicitly set forth herein.

## 17.     **CONFIDENTIALITY**

17.1     The Parties acknowledge that in anticipation of or in the course of performing Services
pursuant to this Agreement, Nortel may disclose to Netas certain technical, business, marketing,
product or financial information proprietary to Nortel (hereinafter **"Confidential
Information"**).  Nortel shall use its reasonable efforts to ensure that, at the time of disclosure,
Confidential Information in written form is marked "confidential", "proprietary", or "restricted",
or the like and that, where disclosed orally, Confidential Information is presented as being
proprietary and confidential.  Notwithstanding the immediately foregoing, Confidential
Information shall include any information disclosed hereunder that would be understood by the
Parties, exercising reasonable business judgment, to be confidential, whether or not so marked or
presented.

17.2     Confidential Information is, and shall continue to be, the exclusive property of, and
constitutes a trade secret of, Nortel.

17.3     Netas recognizes that the provisions respecting Confidential Information shall apply
notwithstanding the language in which such information may be expressed or reproduced.  Netas
shall not make or have made or permit to be made any copies or translations of the Confidential
Information except those copies or translations which are necessary for use hereunder by Netas
and all such copies or translations shall, upon reproduction by Netas, contain the same
proprietary and confidentiality notices or legends which appear on the Confidential Information
provided pursuant hereto.

17.4     During the applicable Term, and for a period of fifteen (15) years thereafter, all
Confidential Information (i) shall be maintained in confidence and used by Netas only for the
purposes of this Agreement, (ii) shall not be disclosed to any third party without the prior
written consent of Nortel, (iii) shall be disclosed by Netas only to those of its employees with a
need to know and who are bound by an obligations of confidence no less stringent than those set
forth herein for Netas, and (iv) shall be protected with the same degree of care as Netas normally
uses in the protection of its own confidential and proprietary information of a similar form, but
in any event with no less than reasonable care.

17.5     The restrictions provided in this Section 17 shall not apply in respect of Confidential
Information which:

(a)     is already known by Netas at the time of its disclosure by Nortel as is evidenced by
Netas' documents existing at the date of disclosure;

(b)     is or becomes part of the public domain without breach of this Agreement by Netas;

(c)     is obtained by Netas from a third party under conditions properly permitting its disclosure to others;

(d)     is independently developed by Netas without recourse to any Confidential Information disclosed under this Agreement; and

(e)     is disclosed in response to a valid order of a court or other governmental body or any political subdivisions thereof, but only to the extent and for the purpose of such order and only if Netas, to the extent possible, first notifies Nortel of such order and permits and reasonably assists Nortel in seeking an appropriate protective order.

17.6    Netas acknowledges that in the event of a breach of the provisions of this Section, Nortel's damages would be difficult to ascertain and would provide an inadequate remedy. Nortel, therefore, in addition to being able to exercise any other legal remedies available to it, shall be entitled to injunctive relief to enforce the provisions of this Section.

17.7    Upon completion of the Services with respect to a Set of Schedules or earlier termination of this Agreement or that Set of Schedules, all Confidential Information of Nortel with respect to that Set of Schedules shall be returned to Nortel except as may otherwise be agreed to in writing by Nortel.

17.8    In the event Netas provides to Nortel any information which Netas identifies in writing as confidential or proprietary or the like, including, but not limited to, business plans of Netas related to the Services, the provisions with respect to confidentiality set forth in Sections 17.1 through 17.7 shall apply equally as to Nortel with respect to such information.  For the avoidance of doubt, this section 17.8 shall not alter the allocation of Intellectual Property Rights in Article 16.

18.    **WARRANTIES**

18.1    Netas warrants that the Services shall be performed in a highly skilled manner and shall fully and strictly conform to the Development Specifications, Support Specifications, and the requirements set forth in the applicable Schedules.

18.2    Netas warrants that all delivered Developed Products and Modified Products can be manufactured, tested and installed by Nortel in accordance with all its manufacturing, installation and testing processes free from any additional charges or fees, including, without limitation, additional fees charged by Netas and third party license fees.

18.3    If any of the warranties in Sections 18.1 and 18.2 are breached, Nortel may, at its option, require Netas (a) to reimburse Nortel for all sums expended by Nortel to remedy such breaches on its own, or (b) to promptly remedy such breaches at Netas' own cost and expense.

18.4    Netas warrants that all delivered Developed Software and Modified Software shall be free from defects affecting such Software's operation or performance and shall conform to the applicable Development Specifications and Support Specifications.

18.5    If any of the warranties in Section 18.4 are breached, Nortel's sole remedy and Netas' sole obligation under the said warranties shall be for Netas to correct any such defect or failure to conform in accordance with the applicable procedure specified by Nortel.  Nortel shall specify to Netas the priority level for each defect or failure to conform.  Corrections of defects and failures to conform identified by Nortel at any time up to the Design Support Transfer Date or the Support Termination Date, as applicable, shall be made free of charge by Netas.  Corrections of defects and failures to conform identified by Nortel after such dates shall be made at rates set forth in the applicable Schedule E.  The Parties acknowledge that Netas may not be capable of providing corrections in every instance due to limitation of its resources.  In such instances the Parties shall negotiate for a reallocation of Netas' work load, the results of which shall be agreed in writing.

18.6    The warranties and remedies set forth above constitute the only warranties of Netas with respect to the Services and any Developed Items and Modified Items provided under this Agreement and are Nortel's only remedies in the event such warranties are breached.  They are in lieu of all other warranties, written or oral, statutory, express or implied, including, without limitation, any warranty of merchantability or fitness for a particular purpose (except with respect to patent infringement which is addressed in Section 20).

18.7    Netas represents and warrants that by January 1, 1998, all Developed Software and Modified Software shall (i) process date and time related data without causing any processing interruptions, abnormal terminations, or changes in performance characteristics, and (ii) shall process and manipulate all date and time related functions correctly.  Without limiting the generality of the foregoing, all Items shall:

(a)    correctly handle date and time related data before, during and after January 1, 2000, including but not limited to accepting date and time input, providing date and time output, and performing ongoing operations on dates and times and portions of dates and times including, but not limited to, calculating, comparing and sequencing of dates and times (in both forward and backward operations spanning century boundaries);

(b)    correctly handle leap year calculations including, but not limited to, identification of leap years, interval calculations (in both forward and backward operations spanning century boundaries), day-in-year calculations, day-of-the-week calculations, and week-of-the-year calculations);

(c)    correctly handle all two digit date and time related input in a manner that resolves ambiguity as to century in a disclosed, defined and predetermined manner; and

(d)    correctly store, retrieve and provide output of all date and time data in a manner that is unambiguous as to century.

18.8    Netas shall immediately notify Nortel of any and all date or time related bugs, errors or deficiencies in the Developed Software or Modified Software.  For the purpose of problem resolution, any such date or time related bugs, errors or deficiencies shall be deemed (as established by the appropriate license or support agreement) to be bugs, errors or deficiencies of the highest priority level, and shall be resolved according to the procedures provided for such priority level.

18.9    Any provisions of this Agreement that tend to limit or eliminate the liability of Netas shall have no application with respect to the year 2000 compliance warranty set out above.

## 19.    **INDEMNITY**

19.1    Each Party (hereinafter the **"Indemnifying Party"**) shall indemnify and save harmless the other Party (hereinafter the **"Indemnitee"**) and its employees, officers and directors from and against any and all fines, penalties, losses, costs, damages, injuries, claims, expenses or liabilities as a result of injury to or death of any person, or damage to, loss of or destruction of any property arising out of, resulting from or in connection with the Indemnifying Party's performance of this Agreement or caused by the negligence or willful misconduct of the Indemnifying Party, a contractor or an agent of the Indemnifying Party, or their employees (hereinafter, individually and collectively **"Liabilities"**).  For clarity, the provisions of this Section 19 shall not apply to cases of intellectual property infringement.

19.2    Upon request of an Indemnitee, the Indemnifying Party shall, at no cost or expense to such Indemnitee, defend or settle any claim for Liabilities and any suit or other legal proceeding asserting such a claim, and the Indemnifying Party shall pay any reasonable costs and attorneys' fees that may be incurred by such Indemnitee in connection with any such claim, suit or proceeding.

19.3    The Indemnitee shall as soon as practicable notify the Indemnifying Party of the assertion of any claim for Liabilities of which the Indemnitee is aware and the Indemnifying Party shall (a) keep the Indemnitee subject to any such claim fully informed as to the progress of such defense, and (b) afford such Indemnitee, each at its own expense, an opportunity to participate fully with the Indemnifying Party in the defense or settlement of any such claim, but the Indemnifying Party shall have sole control of any such settlement or defense.

19.4    Netas shall indemnify and save Nortel harmless against all fines, penalties, losses, costs, damages, injuries, claims or expenses (including, without limitation, reasonable attorneys' fees) arising out of any breach of any obligations with respect to third party information and materials, except where Nortel has issued its prior written consent pursuant to Sections 3.2 and 9.2.

## 20.    **INFRINGEMENT**

20.1    Nortel shall have the sole right to sue (in its own name or in Netas' name but at Nortel's expense) for infringement of any Intellectual Property Right of Nortel contemplated in Section

16, and the sole right to control the defense or settlement of any infringement suit which is brought against Nortel with respect to any such right. Netas shall cooperate with Nortel in the prosecution or defense of any such infringement suit, and shall make available such of Netas' records as Nortel deems necessary in connection therewith. If requested by Nortel, Netas shall make its representatives available to testify in any such suit, but Nortel shall reimburse Netas for all reasonable expenses it incurs with respect to accommodations, meals and lodging and travel with respect to this activity.

20.2    Netas shall upon demand pay to Nortel all litigation costs, including, without limitation, reasonable attorneys' fees and court costs, incurred by Nortel in connection with any suit alleging infringement of any third party's Intellectual Property Rights which is brought against Nortel arising from Nortel's and its Affiliates' manufacture, sale, use or exploitation of the Work Product. Netas shall, at Nortel's option, pay or reimburse Nortel for the payment of all settlement payments approved by Netas and any damages awarded against Nortel which result from any such suit.

20.3    Netas' obligations pursuant to Sections 20.1 and 20.2 with respect to any infringement suit brought against Nortel shall not apply with respect to any claim which arises solely out of any design or special instruction furnished by Nortel.

21.    **INSURANCE**

21.1    Netas represents and warrants that it is a party to a comprehensive general liability insurance policy with an insurance company operating in Turkey and that such policy includes third party liability coverage protecting Nortel and its Affiliates against loss, liability or expense due to bodily injury, death or property damage arising out of this Agreement or Products delivered hereunder, to the extent such loss, liability or expense is not due to the negligence of Nortel or its Affiliates. Netas further represents and warrants that such policy has a combined single limit of a minimum of two million dollars ($2,000,000.00), provides coverage worldwide, and is not restricted to occurrences in the country of the insurance company or Netas. Netas represents and warrants that Nortel and its Affiliates are named as additional insureds under such insurance policy.

21.2    Nortel may upon sixty (60) days written notice increase the foregoing minimum amount in order to comply with Nortel's obligations to any customer of any Products provided any such increase shall not exceed an amount equal to one hundred percent (100%) of the applicable minimum amounts and shall be subject to the availability of such insurance in the Turkish market.

21.3    Such policy shall be endorsed to be primary insurance and shall provide that it will not be canceled or altered without at least thirty (30) days prior written notice to Nortel. Not later than ten (10) days following the execution of this Agreement, Netas shall furnish Nortel with a certificate of such insurance and evidence that the premiums therefor have been paid. Maintenance of such insurance and the performance by Netas of its obligations under this Section shall not relieve Netas of liability under the indemnity provisions set forth in this Agreement.

22.    **TERMINATION AND TERM**

22.1    In the event of material breach of this Agreement by either Party which the breaching Party fails to correct within thirty (30) days after receipt by it of written notification thereof, the non-breaching Party shall have the right at its option to terminate this Agreement and/or the Set of Schedules to which the breach particularly pertains and to exercise all remedies under applicable law.  Each Party shall cooperate with the other in every reasonable way to facilitate the remedy of such breach or default within that thirty (30) day period.

22.2    Notwithstanding the above, in the event Netas delivers any Developed Products or Modified Products which are not accepted by Nortel pursuant to Sections 6 or 11 respectively, Nortel may elect to terminate the associated Set of Schedules upon payment to Netas of its reasonable out of pocket direct expenses actually incurred in the performance of the Development Services and to receive all Gate Deliverables with respect to that Set of Schedules in their then-current form, provided that in the event Nortel does not so elect, the Parties shall negotiate in good faith terms and conditions with respect to Gate Deliverables and any payment by Nortel to Netas therefor.  Whether or not Nortel has elected to receive such Gate Deliverables, upon any such termination of a Set of Schedules, there shall be no continuing obligations between the Parties with respect to that Set of Schedules, except those which survive this Agreement as set forth in Section 22.4 below.

22.3    Nortel may, upon thirty (30) days prior written notice, terminate for its convenience (a) this Agreement, including all Sets of Schedules the performance of which are executory, (b) a given Set of Schedules or (c) this Agreement after the Services with respect to all executory Sets of Schedules have been performed.  In any such event, Netas shall be entitled to be reimbursed hereunder for any Services as set forth in all applicable Schedule G's.

22.4    Notwithstanding any termination hereunder, Sections 16, 17, 18, 19, 20, 21, 24.3, 24.7 and 24.9 of this Agreement shall survive termination.  Except as otherwise provided herein, each Set of Schedules shall remain in force for its Term and the provisions of this Agreement shall survive with respect to such Set of Schedules.

22.5    This Agreement shall commence on the date of execution.  This Agreement shall terminate five (5) years from the date of its commencement but thereafter shall be automatically renewed for successive periods of one (1) year, unless terminated as set forth herein.

23.    **FORCE MAJEURE**

23.1    As used herein, **"Force Majeure"** shall mean:

(a)    fire, explosion, epidemic, hailstorm, tornado, cyclone, earthquake, flood or power failure;

(b)    war, revolution, civil commotion, acts of public enemies, blockade or embargo;

(c)     any law, order, proclamation, regulation, ordinance, demand or requirement of any government or any subdivision, authority, or representative of any such government;

(d)     labor difficulties, including, without limitation, strikes, slowdowns, picketing or boycotts; and

(e)     any other circumstances which are beyond the reasonable control of the Party affected, and which may include the inability to obtain materials, including, without limitation, any failure by Nortel to supply as agreed any necessary components, materials, information or services which Nortel has agreed to supply under this Agreement or an associated Set of Schedules or separate agreement.

23.2     Either Party shall be excused from any delay or failure in performance hereunder caused by reason of any occurrence of any Force Majeure event.

23.3     Either Party shall notify the other Party in writing within ten (10) days after becoming aware of the occurrence of any Force Majeure event which may cause any delay or failure on the part of such Party to perform its obligations hereunder.

23.4     In the event a Force Majeure event persists beyond ninety (90) days, Nortel may terminate for convenience pursuant to Section 22.3 but without the obligation to make any payment with respect to such termination.

## 24.     **GENERAL**

24.1     This Agreement shall not be assigned by Netas or performed under subcontract, except with Nortel's prior written consent.  In the event such consent is not given within ten (10) days of receipt of Netas' request for such consent, Nortel's consent shall be deemed to have been given.

24.2     Netas recognizes that it is performing this Agreement as an independent contractor with no power to bind Nortel.  In no event shall Netas' employees be deemed to be employees of Nortel.  Nothing in this Agreement shall be construed as establishing or implying any partnership between the Parties hereto, and nothing in this Agreement shall be deemed to constitute either of the Parties hereto as the agent of the other Party or authorize either Party to incur any expenses on behalf of the other Party or to commit the other Party in any way whatsoever, without obtaining the other Party's prior written consent.

24.3     In the event any disagreement shall arise between the Parties, whether as to the interpretation or operation of this Agreement, or any rights and obligations thereunder, such disagreement shall be finally settled in London, England under the Rules of Conciliation and Arbitration of the International Chamber of Commerce by one arbitrator appointed in accordance with the said Rules.

24.4     All notices required or permitted to be given hereunder shall be in writing and shall be deemed given when delivered in person, or sent by facsimile, to the addresses set forth in

Schedule F.  Notices given pursuant to this paragraph shall be deemed to have been received ten (10) business days after mailing if given by mail, and one (1) business day after sending if given by cable, telegram, telecopy, and upon delivery if given by hand.  Either Party may change its address at any time by giving fifteen (15) days prior written notice to the other Party as provided above.

24.5    This Agreement, together with all applicable Sets of Schedules, constitutes the entire agreement between the Parties with respect to its subject matter and shall be binding on them and on their representatives and successors and shall inure to their respective benefits.  Any amendment, or alternative or supplementary provisions, must be made in writing and duly executed by an authorized representative or agent of each of the Parties hereto.

24.6    The failure in any one or more instances of a Party

(a)      to insist upon performance of any of the terms, covenants or conditions of this Agreement; or

(b)      to exercise any right or privilege in this Agreement

shall not be deemed to be a permanent waiver of any such rights.

24.7    Netas acknowledges the confidential nature of this Agreement and shall not discuss, advertise or otherwise publicize this Agreement, any Set of Schedules and/or its association with Nortel without the prior written consent of Nortel.  Netas shall inform its personnel of this obligation and shall obtain their undertaking to observe this obligation.

24.8    Netas warrants that there are no Turkish government approvals required to enter into this Agreement or to perform its obligations set forth herein, including, without limitation, performing the Services and furnishing the Developed Items and Modified Items to Nortel outside of Turkey.

24.9    This Agreement shall be construed under and governed by the laws of the Province of Ontario, except for its rules with respect to conflicts of laws, and the federal laws of Canada applicable therein.  The invalidity of any provision of this Agreement shall not affect the validity of any other provision thereof.

24.10   Nothing in this Agreement shall be construed as requiring either Party to disclose technical information or software or to render any technical assistance, which would violate any confidentiality undertakings which it has towards third persons or which would violate any present or future law or decree of any government or governmental officer or agency, and nothing contained herein shall require the disclosure of technical information or software which would increase or impose any obligations on Nortel with respect to third parties.

24.11   The United Nations' Convention on Contracts for the International Sale of Goods (Vienna 1980) shall not apply to this Agreement, the Appendix hereto, any Development Services or Support Services provided hereunder, or any dispute arising thereto.

IN WITNESS WHEREOF, the Parties hereto have signed and executed this Agreement on the date first above mentioned.

| NORTHERN TELECOM LIMITED | NORTHERN ELECTRIC TELEKOMUNIKASYON A.S. |
|---|---|
| By: _(Signature)_ | By: _(Signature)_ |
| Name: G.A. SAKUS | Name: CEM OZIL |
| Title: PRES. TECHNOLOGY, NORTEL | Title: GR. DIRECTOR MAN. ENG. |
| Date: Oct 6/97 | Date: July 7, 1997. |
| By: _(Signature)_ | By: _(Signature)_ |
| Name: Nicholas J. DeRoma | Name: Ahmet OREL |
| Title: Vice President & Deputy General Counsel | Title: VP. Corporate Secretary |
| Date: Oct. 6, 1997 | Date: July 7, 1997 |

## APPENDIX A

### SET OF SCHEDULES

This Set of Schedules number _____ is made as of this ___ day of _____ 199_ pursuant to and subject to the provisions of the Master Technology Development and Technical Support Agreement Between NORTHERN TELECOM LIMITED and NORTHERN ELECTRIC TELEKOMUNIKASYON A.S., dated the_____ day of _____ 1997.

*EXAMPLE*

Schedule A

Additions, Deletions or Modifications to the
Master Technology Development and Technical Support Agreement

**References to the following documents shall mean their then-current versions from time to time in the form and content agreed to by the personnel listed opposite their name:**

|  | **Authorized Personnel by title** |  |
|---|---|---|
| **Document** | **Netas** | **Northern Telecom** |
| **Off stream Plan** |  |  |
| **Plan of Record** |  |  |
| **BCSI Control Document** |  |  |

Nortel and Netas hereby agree to amend the Master Technology Development and Technical Support Agreement solely with respect to this Set of Schedules as follows:

*EXAMPLE*

<u>Schedule B</u>

<u>Development Services</u>

I.      Developed Hardware

        *reference to BCSi*

II.     Developed Software

        Refer to BCS38i Sections 5 and 2

III.    Developed Documentation [separate by Phases, if applicable]

        Refer to BCS38i Section 14

IV.     Gate Deliverables

V       Gate Schedules

VI.     Gate Procedure *Standard Gate Procedure document should be identified*

VII.    Third party Requirements

VIII.   Development Specifications

IX.     Netas shall perform the following additional responsibilities until the Design Support Transfer Date:

X.      Netas shall identify and resolve problems identified by Netas or Nortel through the following problem reporting system:  <u>PRS with CSR</u>.

XI.     Nortel shall notify Netas of non-compliance of Developed Items to the Specifications within 90 days of receipt of such Development Items.

XII.    Netas shall correct any defects in Developed Items within 30 days of receipt of notice by Nortel of such defects.

XIII.   FOB Point:

*EXAMPLE*

XIV.    Payment for Development Services

Nortel shall pay Netas as follows .... *e.g. list in detail the payments and payment milestones*

*EXAMPLE*

Schedule C

Support Services

I.      Supported Hardware

*reference to a section of a document describing support obligations in terms of the target Hardware*

II.     Supported Software

*reference to a section of a document describing support obligations in terms of the target Software*

III.    Supported Documentation

*reference to a section of a document describing support obligations in terms of the target Documentation*

IV.     Supported Products

*as above*

V.      Description of Support Services:

as above

VI.     Third Party Requirements

VII.    Support Specifications

| Document Identification | Description and specific provisions |
|---|---|
|  |  |
|  |  |
|  |  |

VIII.   Support Services Termination Date:

IX.     Nortel shall notify Netas of non-compliance of Modified Items to the Specifications within 90 days of receipt of such Development Items.

*EXAMPLE*

X.    Netas shall correct any defects in Modified Items within 30 days of receipt of notice by Nortel of such defects.

XI.    FOB Point:

XII.    Payment for Support Services

Nortel shall pay Netas as follows …. *e.g. list in detail all payments and payment milestones*

*EXAMPLE*

Schedule D

Supplied Items and Captive Office

I.     Technical Information

| Technical Information | Description and specific provisions | Date to be furnished |
|---|---|---|
|  |  |  |
|  |  |  |

II.    Supplied Software

| Supplied Software identification | Description and specific provisions | Date to be furnished |
|---|---|---|
|  |  |  |
|  |  |  |

III.   Supplied Equipment

| Supplied Equipment identification | Description and specific provisions | Date to be furnished |
|---|---|---|
|  |  |  |
|  |  |  |

IV.    Nortel shall provide training in the use of Supplied Items to Netas.  Such training shall be as follows: _____,

V.     The Supplied Items listed herein shall be furnished to Netas at _____.

*EXAMPLE*

VI.    Netas shall be permitted to access the Captive Office of Nortel located at

_____.

VII.    Netas shall be permitted to access the Captive Office in _____ (__) hour segments.

*EXAMPLE*

<u>Schedule E</u>

<u>Technical Support Rate</u>

     Manager R&D $_____ per day
     S/W Engineer  $_____ per day

The above daily technical support rates include any overtime charges, but to not include airfare costs, per diem expenses, or any local tax liability.

These Technical Support rates are current and may vary upon written advance notice.  However, the said rates will not exceed the applicable rates concurrently used by Nortel.

*EXAMPLE*

Schedule F

Notices

Netas:                            _____
                                  _____
                                  _____
        Facsimile No:             _____
                                  _____

Nortel:                           _____
                                  _____
                                  _____
        Facsimile No:             _____
                                  _____

*EXAMPLE*

<u>Schedule G</u>

<u>Termination for Convenience</u>

In the event Nortel elects to terminate this Set of Schedules pursuant to Section 22.3, Nortel shall pay to Netas a termination for convenience fee as follows:

IN WITNESS WHEREOF, the Parties hereto have signed and executed this Set of Schedules No. ___ on the date first above mentioned.

**NORTHERN TELECOM LIMITED**         **NORTHERN ELECTRIC TELEKOMUNIKASYON A.S.**

By: _____         By: _____
        (Signature)                             (Signature)

Name: _____         Name: _____

Title: _____         Title: _____

Date: _____         Date: _____