## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | |
| | ) | Chapter 11 |
| Nortel Networks Inc., *et al.,* | ) | Case No. 09-10138 (KG) |
| | ) | (Jointly Administered) |
| Debtors.[1] | ) | **Related to Docket Nos. 18020, 18086, 18118, 18309** |
| SNMP Research International, Inc. | ) | |
| and SNMP Research, Inc., | ) | |
| Plaintiffs, | ) | |
| | ) | Adv. Proc. No. 11-53454 (KG) |
| v. | ) | **Related to Adv. Docket Nos. 540, 542, 547, 605** |
| | ) | |
| Nortel Networks Inc., *et al.,* | ) | |
| Defendants. | ) | |

## SNMP RESEARCH, INC.'S AND SNMP RESEARCH INTERNATIONAL, INC.'S AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING SCHEDULE 1 ISSUE

**OF COUNSEL**
Richard S. Busch, Esq.
**King & Ballow Law Offices**
315 Union Street, Suite 1100
Nashville, TN 37201
(615) 259-3456 (Phone)
(615) 726-5417 (Fax)
rbusch@kingballow.com

-and-

John L. Wood, Esq.
**Egerton, McAfee, Armistead & Davis, P.C.**
900 S. Gay Street
Knoxville, TN 37902
(865) 546-0500 (Phone)
(865) 525-5293 (Fax)
jwood@emlaw.com

**COLE SCHOTZ P.C.**
Norman L. Pernick (No. 2290)
Nicholas J. Brannick (No. 5721)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
(302) 651-2002 (Phone)
(302) 652-3117 (Fax)
npernick@coleschotz.com
nbrannick@coleschotz.com

-and-

G. David Dean, Esq.
300 E. Lombard Street, Suite 1450
Baltimore, MD 21202
(410) 230-0660 (Phone)
(410) 230-0667 (Fax)
ddean@coleschotz.com

*Counsel for SNMP Research, Inc. and SNMP Research International, Inc.*

Dated: June 21, 2017

---

[1] In addition to Nortel Networks Inc., the debtors in these Chapter 11 cases are: Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc.; Nortel Networks (CALA) Inc.; and Nortel Networks India International Inc.

# TABLE OF CONTENTS

Page

THE SCHEDULE 1 ISSUE .......................................................................................................1

JUDICIAL NOTICE .................................................................................................................2

FINDINGS OF FACT ..............................................................................................................2

    A.    Background of SNMP Research ..................................................................2

    B.    Background of Bay License and Nortel's Acquisition of Bay Networks ...................................................................................................3

    C.    Software Service Agreements with SynOptics and Bay .............................5

    D.    Nortel's Acquisition of Bay Networks ......................................................6

    E.    Step One of the Negotiation: The First Temporary License Agreement between SNMP Research and Nortel ........................................8

    F.    The Parties Continued To Work On The Master License And Schedule 1A. ...............................................................................................9

    G.    The Nortel Master License Agreement .....................................................14

    H.    Schedule 1A. .............................................................................................16

    I.    There is No Question that Schedule 1A Terminated as of June 20, 2003 ..........................................................................................................18

    J.    The Parties' Actions Before the Controversy Arose Evidence Their Understanding of the Agreement, and the Need for Nortel to Enter into Schedules for Particular Products to Have Any Ongoing Rights. ......................................................................................................20

    K.    Mr. Southwood's Contemporaneous Reflection of Nortel's Rights under Schedule 1A. ...................................................................................22

    L.    Mr. Southwood's 2006 Email. ..................................................................23

    M.    SNMP Research's Renewals of the SSAs .................................................24

    N.    The Schedule 1A Agreement Was More than Fair to Nortel....................25

    O.    SNMP Research was Unaware that Nortel Used and Distributed SNMP Research Software under Schedule 1A after June 20, 2003. .........28

53651/0001-14606174v2

P.    The Custom and Practice Testimony from Mr. Tollen and Dr. Razgaitis....................................................................................................29

CONCLUSIONS OF LAW ...........................................................................................32

II.    Nortel's Right to Use or Distribute the SNMP Research Software in all Products under Schedule 1A Terminated on June 20, 2003. .................................32

Q.    The Nortel License Provides that New York Law Governs Its Interpretation...........................................................................................33

R.    The Parties Intended the Word "Terminate" to End all Rights under Schedule 1A. ....................................................................................34

III.    The Parties' Conduct Does Not Create an Implied License. .................................49

S.    The U.S. Debtors' Implied-in-Fact Argument Fails as a Matter of Law ..........................................................................................................49

i.    The Parties Operated under an Existing Contract on the Same Subject. ...........................................................................................49

ii.    The Purported Agreement is Unenforceable under the Statute of Frauds. .............................................................................................51

iii.    SNMP Research Received No Bargained-For Consideration for Extending or Renewing Nortel's Rights under Schedule 1A............54

T.    There is No Evidence of Mutual Assent to Create an Implied-in-Fact Contract. ............................................................................................56

CONCLUSION....................................................................................................................58

SNMP Research, Inc. ("SNMPR") and SNMP Research International, Inc. ("SNMPRI") (together, "SNMP Research"), by their undersigned counsel, and pursuant to the Court's request, hereby submit the following proposed Findings of Fact and Conclusions of Law in connection with the portion of the joint hearing held on May 11-12, 2017 (the "Hearing") concerning Schedule 1A[1] of the License Agreement between Nortel and SNMPRI dated December 23, 1999 (the "Nortel License").[2]

### THE SCHEDULE 1 ISSUE

2.      The narrow issue before the Court concerning Schedule 1A is "whether the SNMP Research Software was licensed for use or distribution under Schedule 1A of the Nortel License . . . with respect to any products after June 20, 2003."[3]  The relevant provision of Schedule 1A provides that:

> This **_Schedule_** and **_the license_** in regard to the Development Software and Run-Time Software **_shall terminate_** and be of **_no further effect_** after a period of **_three years_** from the last date that this Schedule is executed below.

**Ex. P-30.08** (emphasis added).

---

[1] SNMP Research's Hearing Exhibit 30.08 (hereinafter, **Ex. P-30.08**). Unless otherwise noted, all references and citations to exhibits will refer to those exhibits admitted at the Hearing. All citations to Hearing testimony will follow the form "Hearing Tr. at Page:Line-Page:Line."

[2] These Proposed Findings and Conclusions are being filed under seal pursuant to section V.F of the *Stipulation and Agreement Governing Production, Exchange and Filing of Confidential Materials* [Adv. D.I. 237-1]. SNMP Research expects to propose minimal redacts, after consultation with the U.S. Debtors, to maximize the Court's ability to rely on them in a public order/decision.

[3] Scheduling Order Concerning Motion to Amend Proofs of Claim and Schedule 1 Issue [D.I. 18020; Adv. D.I. 540] ("Scheduling Order").  In confirming this narrow issue, the Scheduling Order provides that, "the Hearing shall not include consideration of what products might be covered by Schedule 1[A] if the Court were to determine that any license rights under Schedule 1[A] did not terminate on June 20, 2003." *Id.*

## JUDICIAL NOTICE

3.      SNMP Research requests this Court take judicial notice that the word "terminate" is commonly defined to mean "to end" or "to conclude."[4]

## FINDINGS OF FACT

### A.      Background of SNMP Research

4.      Dr. Jeffrey Case is the founder, owner, and Chief Technical Officer of SNMPR. Hearing Tr. at 214:2-9, and co-creator of the SNMP protocol.  Hearing Tr. at 217:12-218:11. Dr. Case's wife, Mary Case, is the owner and CEO of SNMPRI.  Hearing Tr. at 214:10-14.  Mrs. Case and Dr. Case are the only individuals who have authority to enter into contracts on behalf of SNMP Research.  Hearing Tr. at 267:6-15.

5.      SNMPR is in the business of creating and producing software for Internet management based upon the Internet Standard Management Framework and the Simple Network Management Protocol ("SNMP").  Hearing Tr. at 215:13-19.  SNMPRI is involved in licensing SNMP Research software (the "Software") to customers, focusing on sales, marketing, and distribution.  Hearing Tr. at 215:13-24.

6.      At all relevant times, Dr. Case was heavily involved with both SNMPR and SNMPRI on a day-to-day basis.  Hearing Tr. at 100:11-15.  Before retiring in September of 2015 after approximately 25 years at SNMP Research, Mr. John Southwood was the VP of sales for SNMPRI.  Hearing Tr. at 96:17-97-7. Mr. Southwood would go to Dr. Case for approval if a particular negotiation involved matters that were out of the ordinary.  Hearing Tr. at 98:18-22; 237:15-238:3.

---

[4] Black's Law Dictionary (10th ed. 2014). The Court may take judicial notice of dictionary definitions. Fed. R. Evid. 201; *Azoplate Corp. v. Silverlith, Inc.*, 367 F. Supp. 711, 731 (D. Del. 1973); *aff'd*, 506 F.2d 1050 (3d Cir. 1974), *cert. denied*, 421 U.S. 914, 43 L. Ed. 2d 780, 95 S. Ct. 1572 (1975); *Buczek v. Continental Cas. Ins. Co.*, 378 F.3d 284, 291 (3d Cir. 2004); *Deutsch v. U.S.*, 67 F.3d 1080, 1085-86 (3d Cir. 1995).

2

7.      SNMP Research's customers include a number of original equipment manufacturers such as Nortel[5] ███████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████. Hearing Tr. at 221:2-22. SNMP Research ████████████████████████████. Hearing Tr. at 221:223-222:2.

8.      SNMP Research provides customers with an implementation of SNMP required to perform SNMP management.  Hearing Tr. at 218:17-22. SNMP Research's business is the creation and the licensing of its Software to customers.  Hearing Tr. at 215:13-24; 261:22-262:24.

**B.      Background of Bay License and Nortel's Acquisition of Bay Networks**

9.      In 1994, SNMPR licensed portions of its Software to a company by the name of SynOptics, which later merged with a company known as Wellfleet, to form Bay Networks ("Bay").  Hearing Tr. at 303:22-304:1. Some of SNMP Research's earlier licenses, such as the one with SynOptics, were location-based, meaning that they granted development rights at a particular location(s).  Hearing Tr. at 104:3-8.

10.     SNMP Research consented to the transfer of the SynOptics agreement to Bay following the merger.[6] **Ex. P-22**. Bay thus succeeded to the rights and obligations contained in the SynOptics license agreement dated June 27, 1994, as amended (hereinafter, the "Bay License").  **Ex. P-20**; **P-21; P-22**; Hearing Tr. at 102:12-103:3.

---

[5] "Nortel," as used herein, means the debtors in these bankruptcy cases (the "U.S. Debtors"), along with their affiliates, some of which are in insolvency proceedings in other parts of the world.

[6] Bay was a customer of SNMP Research that, *inter alia*, manufactured switches and routers.  Hearing Tr. at 101:7-14. Pursuant to Amendment 2 to the Bay License, the parties confirmed the transfer of rights and responsibilities as licensor from SNMPR to SNMPRI, and the transfer of rights and responsibilities as licensee from SynOptics to Bay. **Ex. P-22**.

11.     Under the Bay License, SNMP Research granted to Bay non-exclusive, ***non-transferable*** (Hearing Tr. at 105:23-106:5), worldwide, limited licenses to, among other things, use and distribute the Software, subject to certain restrictions contained therein.  **Ex. P-20** at ¶¶ 2-3.

12.     The Bay License was broad and allowed for the use and distribution of certain Software in certain Bay Products[7] developed at a given location, provided for a license fee, and contained royalty provisions.  Hearing Tr. at 104:3-15; 105:23-106:4; 106:10-107:6; 225:14-226:5; **Ex. P-20**, Attachment A and C.

13.     SNMP Research licenses two main types of products to its customers: (1) manager components (for the purposes of this dispute, primarily portions of the Asynchronous Request Library family of products ("ARL")); and (2) an agent component (for the purposes of this dispute, primarily portions of an SNMP Research product family called EMANATE).  Hearing Tr. at 105:1-3; 226:6-227:11; 310:23-311:1. SNMP Research sometimes provided customers separate options to buy-out future royalty payments for each of the separate components.  Hearing Tr. at 251:19-252:7. In the case of Bay, the buyout for the EMANATE products was exercised and paid for, Hearing Tr. at 310:4-11, and annual royalty lease payments were being made on the ARL products.  Hearing Tr. at 138:3-11; 251:19-252:22; **Ex. P-22**.

14.     The Bay License was fully integrated and could only be modified by a signed writing by both parties, specifically providing: "[t]his License Agreement supersedes all prior agreements and understandings, oral or written, between the parties related to the subject matter hereof and is intended by the parties as the complete and exclusive statement of the terms of the License Agreement between the parties. ***This License Agreement shall not be modified, except***

---

[7] Defined in paragraph 39.

*by written agreement signed by both of the parties hereto*."  **Ex. P-20** at ¶ 22 (emphasis added).

Additionally, the Bay License has an anti-waiver provision. **Ex. P-20** at ¶ 15.

15.     The Bay License was governed by California law. **Ex. P-20** at ¶ 26.

**C.     Software Service Agreements with SynOptics and Bay**

16.     SNMP Research's software service agreements ("SSAs") grant maintenance services on the Software, including providing upgrades, answering technical questions, and other support.  Hearing Tr. at 207:10-16. SNMP Research and SynOptics had previously entered into an SSA effective June 27, 1994 ("1994 SSA"). **Ex. P-23**. The 1994 SSA remained in effect for a term of one year from the effective date and is "evergreen" in the sense that it automatically extended each year for a one-year term unless terminated by the parties. **Ex. P-23** at ¶ 1; Hearing Tr. at 269:9-270:18.

17.     In 1997, SNMP Research and Bay entered into a separate SSA ("1997 SSA"). Hearing Tr. at 229:16-23; **Ex. P-24**. The 1994 SSA was for certain agent software licensed under the Bay License. **Exs. P-20, P-24.**  The 1997 SSA was for certain manager software licensed under Amendment 2 to the Bay License. **Exs. P-22, P-24**.

18.     SNMP Research's SSAs with Bay were, by their terms, separate from the license agreements.  Hearing Tr. at 207:17-19; 230:11-231; 10("…I would read it by separate agreement or agreements."); **P-23** at ¶ 5; **P-24** at ¶ 5.

19.     SNMP Research's SSAs do not grant any license rights.  Hearing Tr. at 230:7-231:10; **Exs. P-20 at ¶ 4; P-23** at ¶ 5; **P-24** at ¶ 5; **P-30** at ¶ 8, Schedule B (example); **P-30.03** at ¶ 2.  According to the terms and conditions of the SSA, use of the updates, improvements, and enhancements is "governed by the terms and conditions of the License Agreement with the Customer." **Ex. P-23** at ¶ 5.

20.     Similarly, the Nortel SSAs are not incorporated into the Nortel License. **Ex. P-**

**30** at ¶ 8. The Nortel License also provides that the SSAs are separate agreements.[8]

###### D.   Nortel's Acquisition of Bay Networks

21.     In September 1998, Bay was acquired by Northern Telecom.   Hearing Tr. at 109:1-6.  The acquisition took the form of a reverse triangular merger.  *See* **Ex. P-71** (*Schedule 14A Definite Proxy Statement Filed by Bay Networks, Inc. with Securities and Exchange Commission*, p. 4 (Filed as of July 27, 1998).

22.     By the middle of 1999, Mr. Dave Hyslop, an employee in Nortel's software acquisition department, was responsible for negotiating license agreements with SNMP Research.   Hearing Tr. at 126:6-15; 235:10-20).   On May 28, 1999, at Mr. Hyslop's request, SNMP Research sent Mr. Hyslop a copy of the Bay License and its amendments.  **Ex. P-25**; **P-20**; **P-21**; **P-22**.

23.     In an e-mail to SNMP Research dated June 21, 1999, Mr. Hyslop acknowledged Nortel's use of the Software without a license following the Bay acquisition, and requested that SNMP Research formally assign the Bay License to Nortel.  Hearing Tr. at 109:14-20; 110:5-16; **Ex. P-26**. Mr. Hyslop said:

> In going through the reams of documentation in the SNMP RI file, it occurred to me that the SNMP RI – Bay agreement should be formally assigned to Nortel as Nortel has been operating as though it were the licensee since the Nortel acquisition of Bay last September.  To formalize that arrangement, I've prepared and attach a copy of an assignment agreement for SNMP RI's approval and signature.  Any queries, please call.

**Ex. P-26**; Hearing Tr. at 109:14-111:2.

---

[8] Paragraph 8 of the Nortel License states that "support" is a separate agreement that is not incorporated into the Nortel License. ("The Specified Entity, upon entry into a Schedule A with SNMP, may contract for support services with SNMP under the provisions of a separate support agreement, an example of which is appended hereto as Schedule B.  Each Schedule B so entered into is a separate agreement that is not made a part of this Agreement.").

24.     As noted in the e-mail text, Mr. Hyslop attached a proposed Memorandum of Agreement under which the rights under the Bay License would transfer to all of Nortel without additional cost.  **Ex. P-27**; Hearing Tr. at 111:4-112:11. Mr. Hyslop argued that, shortly before the acquisition, Bay exercised a royalty buyout, and Nortel wanted to receive some benefit from that buyout.  Hearing Tr. at 134:23-135:9; 245:11-247:21.

25.     SNMP Research rejected Mr. Hyslop's proposed assignment.  Hearing Tr. at 111:21-112:11. SNMP Research explained to Nortel that it was not willing to allow Nortel to obtain the benefit of the Bay License or the royalty buyout in the Bay License without restrictions, as Mr. Hyslop was requesting, because SNMP Research wanted to maintain a bright line between the broad rights of the old Bay agreement and the product-specific rights of the new master license the parties were in the midst of negotiating.  Hearing Tr. at 245:8-246:22.

26.     Specifically, Dr. Case responded to Mr. Hyslop by pointing out that the Bay License was ***non-transferable***.  Hearing Tr. at 245:11-246:2. SNMP Research includes the non-transferability language in its licenses so that a larger company cannot acquire the SNMP Research customer, and then expand the license to a broader range of products never intended by the license.  Hearing Tr. at 112:1-11; 154:24-155:13.  SNMP Research also explained to Mr. Hyslop that it was concerned that the lines between Bay and Nortel products would "blur over time," and that accepting Nortel's original proposal would allow Nortel to argue later that Nortel products were royalty-free Bay Products when they were actually developed after Nortel's acquisition of Bay.  Hearing Tr. at 154:24-155:13; 196:14-199:4; **Exs. P-57; P-58**.

27.     Mr. Hyslop and Nortel were thus fully aware of SNMP Research's concerns and agreed to address them through subsequent negotiations.  Hearing Tr. at 156:20-157:11; 245:8-

7

247:21.  In this regard, Dr. Case stated that he was willing to find a compromise position that would be fair to both parties.  Hearing Tr. at 245:11-247:21; **Ex. P-20** at ¶¶ 2-3. [9]

E.      **Step One of the Negotiation: The First Temporary License Agreement between SNMP Research and Nortel**

28.      SNMP Research and Nortel began the negotiations over whether to allow any assignment of the Bay License in steps.  The first step was to enter into a "Temporary License Agreement" that gave Nortel the right to continue distributing the Bay Products until November 1, 1999, under the terms of the Bay License.  **Ex. P-28; P-29**; Hearing Tr. at 113:11-24; 151:6-12.

29.      An original draft of the Temporary License Agreement was prepared by Dr. Case and Mr. Hyslop, and was sent by Mr. Southwood to Mr. Hyslop.  **Ex. P-28**; Hearing Tr. at 114:4-14.  Mr. Hyslop only requested one change: the addition of a second signature line for Nortel Networks.  **Ex. P-29**; Hearing Tr. at 116:23-117:18. He made no substantive edits.  Hearing Tr. at 116:23-117:13. Nortel executed the Temporary License Agreement and returned it.  Hearing Tr. at 120:6-13; 124:15-19; 233:14:18.

30.      While SNMP Research is unable to locate an executed copy of the Temporary License Agreement, both Dr. Case and Mr. Southwood testified that the parties executed the agreement.  Hearing Tr. at 120:6-13; 124:15-19; 233:14:18. SNMP Research and its outside counsel went to exhaustive lengths to locate the executed copy, but, despite these efforts, were unable to do so.  Hearing Tr. at 231:17-234:15.

31.      There are two emails, dated November 17 and 18 respectively, sent by Mr. Southwood to Mr. Hyslop, reference that the Temporary License Agreement expired on

---

[9] In similar circumstances, other companies, in the shoes of SNMP Research, often hold-up those licensees using software to obtain an exorbitant price, or an otherwise unfair deal.  Hearing Tr. at 562:14-563:15. According to expert witness David Tollen, SNMP Research did not do so here.  Hearing Tr. at 562:14-563:15.

November 1, 1999. **Ex. P-39**; **P-81**; Hearing Tr. at 120:20-121:8; 123:21-124:19; 151:6-12. There is no evidence contradicting the statements in those emails, or contradicting the fact that the Temporary License Agreement was signed.

32.     The Temporary License Agreement provided that Nortel would have no right to distribute the Bay Products any further once the Temporary License Agreement expired on November 1, 1999. **Ex. P-29**; Hearing Tr. at 115:23-116:16. Specifically, the Temporary License Agreement provides: "SNMPRI hereby grants Nortel a temporary assignment of the License Agreement, which temporary assignment shall terminate on November 1, 1999. Upon the termination of this temporary assignment, Nortel shall have no further rights under the License Agreement." **Ex. P-29**. The parties thus agreed that Nortel would have no further rights under the Bay License Agreement as of November 1, 1999. Hearing Tr. at 256:14-258:22; **Ex. P-29**.

**F.      The Parties Continued To Work On The Master License And Schedule 1A.**

33.     Even before the parties began discussing what to do with the Bay License, they had been discussing entering into a master license agreement concerning all of the products Nortel was distributing containing SNMP Research Software. Hearing Tr. at 112:12-22. These global licensing discussions continued during the parties' negotiations involving the Bay License. Hearing Tr. at 112:12-113:17.

34.     As the parties continued to work on these issues, they met face-to-face at SNMP Research's facility in October of 1999 to negotiate what ultimately became the master license agreement (the "Nortel License"), including what would become Schedule 1A to the Nortel License. Hearing Tr. at 126:16-127:9; 133:9-134:12; 235:21-4.

35.     That meeting was attended by Mr. Hyslop on behalf of Nortel, Hearing Tr. at 126:12-21, and Mr. Southwood, Dr. Case, and SNMP Research attorney Rick Barnes. Hearing

9

Tr. at 127:7-9; 236:5-17; **Ex. P-35**.  Catherine Grant, Nortel's counsel, was also involved but was not physically present.  Hearing Tr. at 136:16-21; 236:5-17; *see also* **Ex. P-36**.

36.     Only two individuals who participated in the conversations and negotiations between SNMP Research and Nortel appeared live at the Hearing—Dr. Jeff Case and Mr. John Southwood.  Hearing Tr. at 95:7-12; 213:19-214:1.  There were three main topics of discussion at the October 1999 meeting: (1) markups to the main body of the proposed master license agreement, i.e., the Nortel License; (2) review of the projects on a project-by-project basis; and (3) the Bay License.  Hearing Tr. at 237:15-238:15.[10]

37.     With respect to what would become the Nortel License, the parties agreed that it would move from a location-based license to a product-based license.  Hearing Tr. at 113:5-10; **Ex. P-30**.

38.     The parties also agreed that what would become the Nortel License would require entry into specific schedules governing Nortel's use and distribution rights for particular products.  Hearing Tr. at 241:20-242:9.  Schedules were needed because the Nortel License required that, for any Nortel project or product to be licensed, it must be evidenced on a schedule, which would identify the Nortel entity, project or product name, and operating system, as applicable, as part of this "a la carte" licensing arrangement.  *See* **Ex. P-30** at ¶¶ 1.17, 2.1(a), (c)); Hearing Tr. at 240:21-242:9. Regarding the Bay License, the parties specifically discussed and agreed that Nortel would have a temporary, three-year right to continue distributing Bay Products, but that its license right would terminate thereafter, and only those Bay Projects or Products that had been separately placed on schedules during that three-year period would be

---

[10] While Dr. Case was not present at all times during the two-day meeting, he was present and led the meeting while the parties discussed the terms that would eventually become Schedule 1A. Hearing Tr. at 132:11-133:8; 237:10-238:15.

able to continue to be distributed thereafter using SNMP Research Software.  Hearing Tr. at 135:10-136:3; 151:13-152:17; 245:8-249:14.

39.     The parties also agreed that a "Bay Product" was a project or product that had been in development at Bay (a project), or had been turned into a product by being distributed by Bay.  Hearing Tr. at 135:10-135:22.

40.     The parties further agreed that Nortel would pay license fees, maintenance fees, and royalties for any project or product that was placed on a schedule, but on projects or products identified as coming from Bay, i.e., the Bay Products, royalties did not have to be paid.  Hearing Tr. at 135:10-22; 247:22-248:24.

41.     The mechanism for declaring Bay Products specifically on separate schedules allowed Nortel to receive the benefit of the Bay royalty buyout for products shipped by Bay or in development at Bay prior to September of 1998, which benefited Nortel, while prohibiting Nortel from using the broad Bay License on new projects or products that did not exist at Bay Networks.  Hearing Tr. at 247:22-249:14.

42.     Dr. Case agreed to this three-year term because three years of a royalty lease is about the same price as a royalty buyout, so it addressed Nortel's concern that it get some benefit from the royalty buy out purchased by Bay.  Hearing Tr. at 245:11-247:21.

43.     Dr. Case also believed that this agreement created the bright line SNMP Research wanted between the broad rights of the old Bay License, and the product-specific rights of what would become the Nortel License, by making it clear that Bay Products were only allowed to be distributed royalty-free for three years, unless the Bay Product was identified on a schedule and a license and maintenance fee was paid.  Hearing Tr. at 245:11-248:24. In other words, after those three years, what would become Schedule 1A would terminate and be of no further effect. Hearing Tr. at 257:13-258:22.

11

44.    At the time of the meeting, SNMP Research was still owed a ▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇ for ARL royalties.  Hearing Tr. at 252:23-253:12.

45.    The requirement that Bay Products be placed on schedules and the three-year period to place Bay Products on schedules was discussed between SNMP Research and Mr. Hyslop of Nortel during the two-day meeting.  Hearing Tr. at 249:1-18.

46.    In follow up to the October 1999 meeting, Mr. Hyslop prepared a list of products that needed to be on schedules in order to be licensed.  Hearing Tr. at 136:22-137:7; **Exs. P-36**; **P-37**.  Mr. Hyslop sent Mr. Southwood a preliminary list of products on November 3, 1999, in the form of a spreadsheet, which differentiated between Bay and Nortel products.  Hearing Tr. at 136:22-138:2; **Exs. P-36**; **P-37**. The spreadsheet attached to Mr. Hyslop's email identified twenty-eight (28) products, the SNMP Research software required by those products, and the individuals inside Nortel responsible for those products; six of these products were identified as Bay Products in Column 1.  **Ex. P-37**; Hearing Tr. at 140:6-142:1.

47.    SNMP Research took Mr. Hyslop at his word that the products identified as "Bay" were actually products that had been developed or distributed at Bay, and thus qualified as a "Bay Product."  Hearing Tr. at 142:2-21; 344:20-24; 347:7-19.

48.    On November 15, 1999, Mr. Hyslop sent Mr. Southwood an email containing correspondence that Mr. Hyslop intended to send to the individuals inside Nortel who were responsible for the Nortel products on the spreadsheet, and which explained the purpose of the new Nortel License.  **Ex. P-38**; Hearing Tr. at 143:5-145:10. In this correspondence, Mr. Hyslop explained the purpose of "Bay" in Column 1:

> Column 1 divides the requirements into "Bay" and "NT" requirements. Those identified as "Bay" products are subject to the in place Bay-SNMP RI agreement (which has been assigned by Bay to Nortel), i.e. had the Bay-Nortel merger never occurred, Bay would have been entitled to deploy these products royalty free.

12

**Ex. P-38**; Hearing Tr. at 144:7-145:5.

49.     Mr. Hyslop went on in that email to discuss the need to identify, license, and pay for Bay Products "on a 'Bay' product by 'Bay' product basis …"  Hearing Tr. at 145:6-146:13; **Ex. P-38**.  Nortel products would have the additional obligation to pay run-time royalties. Hearing Tr. at 145:6-146:13; **Ex. P-38**.

50.     Mr. Southwood responded to this e-mail on November 16, 1999 with some corrections.  **Ex. P-39/D-76C**. Mr. Southwood said that Mr. Hyslop had the deal pretty well described based upon Mr. Hyslop's reference "[t]hat Bay [products] would on a product-by-product basis license, pay license fees, have the royalty buy-out available to them and sign the schedule," and that Nortel products would "have schedules with license fees, per-product royalty obligations, and then sign that."  Hearing Tr. at 150:3-17; **Ex. P-39**. Mr. Southwood did feel, however, that the email needed more explanation because it did not include the three-year window that Bay had to declare its products.  Hearing Tr. at 147:18-23.

51.     Mr. Southwood did not mention the need to schedule Bay Products in his email because he believed that was reflected in Mr. Hyslop's e-mail, and because it was something that had been discussed many times between the parties.  Hearing Tr. at 154:15-23.[11]

52.     Mr. Hyslop identified products in his spreadsheet as Bay Products for them to receive separate schedules, which were needed to have a license after three years and to take advantage of the prior royalty buyout.  Hearing Tr. at 185:19-186:8; *see* **Ex. P-30** at ¶¶ 2.1(a), (c).

---

[11] Even though he was not a party to this email exchange, Dr. Case was asked about Mr. Southwood's November 16 email during his deposition. While Nortel designated Dr. Case's initial testimony, which was given without the benefit of being allowed to review Mr. Hyslop's initial November 15 email to which Mr. Southwood was responding, later in the deposition Dr. Case provided full and clarifying testimony on these emails when given the opportunity to review Mr. Hyslop's November 15 email.  March 31, 2017 Case Deposition Transcript at 868:18-869:5, 878:3-12, 881:12-882:7, 884:14-24, 885:8-887:9.

53.     By e-mail dated November 18, 1999, Mr. Southwood transmitted to Mr. Hyslop the first and only draft of Schedule 1A to the Nortel License.  *See* **Exs. P-40; P-41**; Hearing Tr. at 176:11-177:14.

54.     On November 25, 1999, Mr. Hyslop sent an internal email reflecting that Bay Products require a separate license: "PS Brian: note that the Bay buy out is a buy out for royalties only, and Bay must still, ***on a product by product basis***, get the right to use the Emanate source code."  **Ex. P-42**; Hearing Tr. at 165:4-21 (emphasis added).  The point that Bay Products needed a license on a product by product basis was discussed, and agreed to, between Mr. Southwood and Mr. Hyslop during negotiations.   Hearing Tr. at 149:22-150:17; 154:15-23;165:22-166:4.

### G.     *The Nortel Master License Agreement*

55.     SNMP Research and Nortel then entered into the Nortel License on December 23, 1999. **Ex. P-30**; Hearing Tr. at 112:12-22; 235:10-235:17.

56.     It was the practice of SNMP Research and Nortel to enter into formal, written agreements, including schedules.  *See, e.g.*, **Exs. P-30** through **P-30.64**; **P-31**. During their course of business, SNMP Research and Nortel entered into well over fifty formal, written agreements, including schedules.  Hearing Tr. at 186:18-23.

57.     Absent schedules being entered into between the parties, the Nortel License licensed nothing.  Hearing Tr. at 172:6-18; 242:1-9. The sections of the Nortel License requiring these schedules are found in Sections 1.17 and 2.1 of the Nortel License.  Hearing Tr. at 242:1-9; **Ex. P-30** at ¶¶ 1.17, 2.1.

58.     The Nortel License and certain schedules were fully executed on December 23, 1999. **Ex. P-30**; Hearing Tr. at 169:1-4.  The Nortel License granted internal use rights to the applicable Nortel Specified Entity "a non-exclusive, non-transferable, worldwide license for

14

Development Software specified in the relevant Schedule A" for internal research and development.  Hearing Tr. at 242:13-244:15; **Ex. P-30** at ¶ 2.1(a).

59.     The Nortel License also granted binary redistribution rights to the Nortel Specified Entity (listed on the relevant Schedule A), "a non-exclusive, non-transferable, worldwide license to directly or indirectly … distribute Run-Time Software to End Users." Hearing Tr. at 242:13-244:15; **Ex. P-30** at ¶ 2.1(c).

60.     As discussed below, Schedule 1A defines Development Software and Run-Time Software on the first page of Schedule 1A, and the associated rights terminate three years after Schedule 1A's execution.  *See* **Ex. P-30.08**.

61.     Mr. Pierre Tremblay—the supplier relationship manager at Nortel responsible for the SNMP Research relationship after Mr. Hyslop's departure, Tremblay Dep. at 8:11-10:2—testified that the purpose of the Nortel License was

> to set forth the terms under which Nortel can use the SNMP Research technology in its products. So the main agreement or the general legal framework and business framework and then each schedule specifies a specific case where Nortel [] received permission to use the SNMP Research technology in a specific Nortel product and the business rules around that.

Tremblay Dep. at 70:11-71:6.

62.     The Nortel License, including its Schedules A, could only be modified by a signed writing by both parties, specifically: "The attached Schedules A, as may be modified in accordance with the terms herein, form part of this Agreement. This Agreement may only be modified by an instrument in writing mutually agreed upon and executed by each Party's duly authorized representatives."  **Ex. P-30** at ¶ 9.4.

63.     New York law governs the Nortel License and Schedule 1A to the Nortel License. **Exs. P-30** at ¶ 9.11; **P-30.08**.

64.    The main body of the Nortel License is the second time the parties confirmed that the Bay License had no effect.  Hearing Tr. at 256:14-257:12.  The Nortel License contains an anti-waiver provision.  **Ex. P-30** at ¶ 9.8.

H.    **Schedule 1A.**

65.    The Nortel License contained a template licensing schedule.  **Ex. P-30** at pp. 18-19; Hearing Tr. at 240:21-241:19. Schedule 1A was drafted by SNMP Research's counsel, Rick Barnes, based upon the parties' discussions on October 5 and 6, 1999, sent to Mr. Hyslop, and ultimately fully executed without a single change on June 20, 2000.  **Ex. P-30.08**; Hearing Tr. at 235:21-236:13; 249:19 -250:16.

66.    Schedule 1A provided Nortel with two license rights: (1) the limited right to develop certain products using the Software (the Development Software rights); and (2) the limited right to distribute certain Nortel products containing the Software (the Run-Time Software rights).  **Ex. P-30.08** at p. 1.  By its terms, Schedule 1A licensed Nortel's use of the Development Software and distribution of the Run-Time Software in "[a]ll products of units and projects originating from what was Bay Networks."  **Ex. P-30.08**.[12]

67.    The capitalized terms "Development Software" and "Run-Time Software" in Schedule 1A are defined in the body of the Nortel License.  **Ex. P-30** at ¶¶ 1.6, 1.16.  The license grants relating to Nortel's authorized use and distribution of Development Software and Run-Time Software are set forth in paragraphs 2.1(a) and (c) of the Nortel License, respectively. Hearing Tr. at 242:13-244:15.

---

[12] As noted above, what Bay Products are covered by Schedule 1A under this language is not within the scope of the Schedule 1 Issue.  Moreover, if the Court rules in favor of SNMP Research on the Schedule 1 Issue, then this issue becomes entirely moot for purposes of trial, because no products would be covered by Schedule 1A after June 20, 2003, and SNMP Research is not seeking any damages prior to then.

68.     "Development Software" is defined, in relevant part, as "all or any part of any Source Code or Binary Code software product of SNMP, identified in the one or more Schedules A attached hereto and all Updates of any such product, under any name whatsoever." **Ex. P-30** at ¶ 1.6. "Run-Time Software" is defined as "Binary Code which is developed by or for the Specified Entity, and which is derived from Development Software and which is integrated with a Nortel Networks Product." **Ex. P-30** at ¶ 1.16.

69.     "Source Code" is defined as "software and associated Documentation and materials in a form in which the program logic is readily understandable by a human being." **Ex. P-30** at ¶ 1.18. "Binary Code" is defined as "the code resulting from the translation or processing of Source Code by a computer into machine language or intermediate code and which is suitable for execution or interpretation by a computer." **Ex. P-30** at ¶ 1.1. "Specified Entity" is defined as "one or all of the licensed entities specified in the relevant Schedules A attached hereto." **Ex. P-30** at ¶ 1.20.

70.     The "Royalties" section on Page 1 of Schedule 1A states: "As described in the agreements and amendments thereto between SNMP and Bay Networks and its predecessor entities." **Ex. P-30.08**. The royalty does not say "zero" because, as discussed above, SNMP Research was still owed money under the Bay License for annual ARL royalty lease payments. Hearing Tr. at 251:19-253:3; **Ex. P-38**. For the three-year term of Schedule 1A, Nortel owed whatever royalties it would have owed under the Bay License. *Id.*

71.     Schedule 1A provides that, "[t]his Schedule supersedes all of the prior agreements between SNMP and Bay Networks and its predecessor entities … and all such agreements are hereby terminated by execution of this Schedule." **Ex. P-30.08** at p. 2; Hearing Tr. at 255:16-24. Mr. Pierre Tremblay, a former Nortel employee, was asked the purpose of this paragraph, and responded "basically to sever any history between what happened at BayStack so we were kind

17

of clean slate going forward, nothing from before applies. This is a brand new go-forward plan."

Tremblay Dep. at 89:11-20.

72.     By its terms, the Nortel License and Schedule 1A, superseded all prior license agreements and all rights granted thereunder.  *See* **Exs. P-30 and P-30.08**; Hearing Tr. at 255:16-257:12.

73.     The Schedule 1A portion of the License Agreement was the third time the parties confirmed that the Bay License was of no effect.   Hearing Tr. at 256:14-257:12; 582:19-583:18.[13]

**I.     There is No Question that Schedule 1A Terminated as of June 20, 2003.**

74.     By the terms of Schedule 1A, Nortel's rights to develop and distribute the Software under Schedule 1A were expressly limited to three years.  The termination language of Schedule 1A specifically provides that:

> This ***Schedule*** and ***the license*** in regard to the Development Software and Run-Time Software ***shall terminate*** and be of ***no further effect*** after a period of ***three years*** from the last date that this Schedule is executed below.

Hearing Tr. at 256:1-13; **Ex. P-30.08** at p. 2 (emphasis added).

75.     Under custom and practice, according to SNMP Research's expert Mr. Tollen, "it would be hard to imagine anyone, in my experience, from a junior contract manager at a software start-up to the general counsel of Apple concluding that that does anything other than simply terminate everything."  Hearing Tr. at 554:15-22.

76.     As Mr. Tollen explained: (1) "Schedule 1A has a simple termination clause saying [] that it shall terminate and be of no further effect after three years" Hearing Tr. at 551:6-

---

[13] Indeed, on May 15, 2000, believing that Nortel still had not executed Schedule 1A, Dr. Case wrote to Nortel to advise that, until executed, Nortel was distributing the Bay Products without a license **Ex. D-077A**, thus confirming the agreement of the parties that the Bay License had previously been terminated following the expiration of the Temporary License Agreement.

18

23; and (2) if such language was not sufficient to terminate an agreement "countless contracts out there that are meant to terminate everything have been done wrong."  Hearing Tr. at 551:24-552:2; 554:15-22.

77.    As noted above, Schedule 1A was fully executed on June 20, 2000, **Ex. P-30.08** at p. 2; thus, Schedule 1A terminated on June 20, 2003.  Hearing Tr. at 177:15-18. The three-year termination was discussed during the negotiations between SNMP Research and Nortel, as well as stated expressly in Schedule 1A.  Hearing Tr. at 177:15-23; 256:10-257:12.

78.    The words "lifetime" or "perpetuity" are not found in Schedule 1A.  **Ex. P-30.08**.

79.    Schedule 1A contains no carve-out for particular products from the termination provision.  **Ex. P-30.08**.

80.    Mr. Tremblay testified that the purpose of the above termination clause was to show that "[t]his specific schedule has a lifespan of three years, after which it terminates." Tremblay Dep. at 89:21-25.  When asked if anything was licensed under Schedule 1A after its three-year termination date, Mr. Tremblay testified, "[a]s contemplated in Schedule 1A that was executed here, this specific schedule was effectively terminated three years after its effective date and the associated license would be terminated."  Tremblay Dep. at 90:4-90:7.

81.    As noted above, Mr. Southwood and Mr. Hyslop discussed that Nortel would have no Software rights with respect to products that were not placed on schedules after the three-year termination of Schedule 1A.  Hearing Tr. at 177:24-178:8; 240:21-242:9. Dr. Case and Mr. Hyslop had similar discussions.   Hearing Tr. at 256:10-257:12. There were no discussions to the contrary.  Hearing Tr. at 255:1-9.

82.    Upon the termination of Schedule 1A, Nortel had no rights under Schedule 1A, and Nortel's only rights would be under other schedules that were executed.  Hearing Tr. at

19

257:13-258:22. Mr. Hyslop understood that *all* rights under Schedule 1A terminated after three years.  Hearing Tr. at 249:1-14; 258:23-259:16.

83.   SNMP Research and Nortel never discussed extending the Schedule 1A termination date, or otherwise altering the June 20, 2003 termination.  Hearing Tr. at 200:25-201:10; 207:3-6; 266:12-23. Additionally, SNMP Research at no time received consideration for waiving the three-year termination expressly provided for in Schedule 1A.  Hearing Tr. at 200:24-201:10; 266:24-267:5.

**J.    The Parties' Actions Before the Controversy Arose Evidence Their Understanding of the Agreement, and the Need for Nortel to Enter into Schedules for Particular Products to Have Any Ongoing Rights.**

84.   Nortel obtained additional schedules before Schedule 1A terminated for products that it stated originated at Bay, which SNMP Research licensed to Nortel royalty-free.  Hearing Tr. at 179:16-186:8; **Exs. P-30.18**; **P-30.20**.  For each schedule for a product that was shipped by or in development at Bay prior to September of 1998, Nortel had to pay license and maintenance fees, but did not have to pay royalties.  Hearing Tr. at 247:22-248:24.

85.   Mr. Southwood prepared schedules based on the spreadsheet Mr. Hyslop provided.  For all of the products labeled "Bay" in Column 1, Mr. Southwood, relying on Mr. Hyslop's representations, prepared schedules requiring license and maintenance fees but did not charge for royalties.  *See, e.g.*, **Exs. P-30.18; P-30.20**; Hearing Tr. at 180:18-186:6.

86.   Messrs. Hyslop and Southwood continued to work on schedules granting licenses for products after the Nortel License and its Schedule 1A were signed.  Hearing Tr. at 186:9-187:10. In September of 2000, four months after Schedule 1A was signed, Mr. Hyslop asked Mr. Southwood for a license for an old "Bay" product.  Hearing Tr. at 187:11-188:8. In response, Mr. Southwood prepared Schedule 20 but mistakenly included a charge for royalties.  Hearing Tr. at 188:3-188:8. On September 21, 2000, Mr. Hyslop responded:

20

> John, I believe you are mistaken in including royalty charges on the attached Schedule 20. Your [sic] will recall that back in December 1999 the old "Bay" operations/products were "grand fathered" as far as royalty payments were concerned in recognition of a previous "bay buy-out" for those products. This was documented in Schedule 12 signed back in December 1999. Therefore, please modify Schedul [sic] 20 to duplicate the wording in Schedul [sic] 12 under the royalties section….

**Ex. P-51**; Hearing Tr. at 188:14-189:9. This e-mail confirms that Mr. Hyslop fully understood that all Bay distributed products had to become covered by a separate schedule during the three-year period to be licensed at the end of that period, even if the license was royalty-free. Hearing Tr. at 189:6-19.

87.    The Royalties section of Schedule 12 states: "[a]s portions of the former Bay Networks, the royalty buy out previously exercised by Bay Networks applies to this transaction." **Ex. P-30.18**.

88.    Nortel's election to enter into schedules, and pay the associated fees, is consistent with Mr. Hyslop's understanding that products that originated at Bay needed to obtain and pay for licenses but received credit for the royalty buyout as specified in his November 25, 1999 email, so long as the products were eligible for the royalty buyout and in fact declared on schedules during the three-year period of Schedule 1A. **Ex. P-42**; Hearing Tr. at 263:3-264:21.[14]

---

[14] At the hearing, Nortel highlighted the fact that Mr. Southwood did not ultimately require Nortel to enter into a schedule on proposed Schedule 16A in the spring of *2000. See, e.g.*, Hearing Tr. at 455:9-470:21. However, there is a simple explanation for this: Mr. Southwood, in accordance with the terms of Schedule 1A, did in fact initially prepare Schedule 16A, and transmitted it to Nortel. Hearing Tr. at 531:21-533:15; **Ex. D-256.07**. Mr. Southwood sent Schedule 16A in light of the requirement that for the old Bay Products, Nortel was required to enter into schedules. Hearing Tr. at 529:13-20. Nortel responded by stating that it was changing the Software in that product from ARL to BRASS, and therefore it would need a new schedule to reflect licensing the BRASS product. Hearing Tr. at 531:12-532:12. Mr. Southwood then prepared a new schedule for the BRASS product and transmitted it to Nortel. **Ex. D-256.03**; Hearing Tr. at 531:12-532:17. The total cost for BRASS was quoted at over ▮▮▮▮. **Ex. D-259** at 2. While Nortel later advised it was not changing to BRASS, and did not execute that schedule, it still had three years to distribute their product royalty-free and without having to either schedule it or pay the license and maintenance fees. Hearing Tr. at 461:9-14; 532:13-533:15; 541:18-542:6. Since Nortel had those three years to do so, and would only have to place it on a schedule and pay those fees if it were distributing the product after those three years, there was no need to do so in the Spring of 2000, and the issue fell off of Mr. Southwood's radar. Hearing Tr. at 532:18-533:15; 541:18-542:6.

21

**K.**    **Mr. Southwood's Contemporaneous Reflection of Nortel's Rights under Schedule 1A.**

89.    By 2003, Mr. Hyslop's responsibilities at Nortel shifted to the aforementioned Pierre Tremblay.  Hearing Tr. at 189:20-190:9. In August 2003, after Schedule 1A had expired, Mr. Tremblay and Mr. Southwood along with Martha Hopper (an employee of SNMP Research) began an exercise to understand the status of each schedule in the Nortel License.  Hearing Tr. at 190:1-9.

90.    With respect to Schedule 1A, which had recently terminated by its own terms, Pierre Tremblay represented: "I still haven't found anything that fits this description but to be honest, I have not looked very hard."  **Ex. P-58**; Hearing Tr. at 194:21-195:10; Tremblay Dep. at 94:8-95:2. In Mr. Tremblay's deposition, when asked about this statement, he stated: "[a]t that time when I made the comment, I couldn't find any product that somebody in R&D or product line management could confirm was from BayStack and included SNMP Research software." Tremblay Dep. at 95:6-13.

91.    In explaining why Schedule 12 had a royalty buyout, more than five years before Nortel's bankruptcy filing or any thought of litigation, Mr. Southwood wrote the following:

> By the way Pierre, this is a good time to mention an informal agreement reached by Dave Hyslop and me during license negotiations.  In the years before Nortel purchased Bay, Bay was one of SNMPRI's better customers including the exercise of several royalty buy outs. Since we were negotiating with Nortel at about the same time that Nortel purchased Bay, Dave indicated that Nortel wanted some benefit from those previous royalty buy outs.  Since those royalty buy outs were not product specific, SNMPRI responded by saying that the lines between the former Bay and the former Nortel were going to blur over time, and the result would be that all of Nortel would get a royalty free license if we extended the benefits into the Nortel license.  **The compromise was that the benefits of the Bay royalty arrangement would extend to portions of the former Bay who established schedules over the following three years (2000, 2001, 2002). SNMPRI agreed as long as all schedules would be product specific.  Dave was certain to declare whether a particular transaction was associated with Bay or Nortel, and I have a column on the spreadsheet that I use that**

**indicates Dave's comments.**   You may find that you also have a copy of that spreadsheet.

Hearing Tr. at 196:14-199:4; Tremblay Dep. at 91:2-92:19; **Exs. P-57**; **P-58** (emphasis added).

Mr. Tremblay never expressed a contrary understanding.  Hearing Tr. at 199:5-7.

 **L.** **Mr. Southwood's 2006 Email.**

92. On January 16, 2006, Nana La-Anyane of Nortel asked Mr. Southwood for a letter verifying that Nortel had a license to the Software in the ████████████ product because ████████████████ would not agree to allow Nortel to have access to the Software without the letter.   **Ex. P-60**; Hearing Tr. at 202:15-203:16. On January 24, 2006, Mr. Southwood wrote that he could not locate a license at Nortel corresponding to the ██████████ product.  **Ex. P-60** ("I'm stuck at the moment because I'm wanting to locate the Nortel Schedule that you are using for your project."); Hearing Tr. at 203:5-204:1.

93. Mr. Southwood "explained that the products that had been under Schedule 1 were not the same as the ones that ████████ had licensed."  Hearing Tr. at 203:23-204:1.

94. Mr. Southwood then sent a letter to advise Nortel that it needed to sign a new schedule, Schedule 71, to have a license for the source code from ██████████████.  **Ex. P-59**; Hearing Tr. at 204:19-205:17. Mr. Southwood correctly concluded that Nortel did not have a license to the software ██████████████ was using because it was not covered by Schedule 1A, Hearing Tr. at 203:17-204:1, but mistakenly indicated that Nortel had a license under Schedule 1A when he was explaining that the Software was not covered by Schedule 1A.  Hearing Tr. at 205:13-206:9.

95. At the time of this letter, in 2006, Mr. Southwood dealt with more than a thousand potential transactions, and was rarely working with Nortel given that Nortel dried up as a source of new licenses.  Hearing Tr. at 206:10-20.

96.     Mr. Southwood, in 2006, had simply forgotten about the terms of Schedule 1A, including the June 20, 2003 termination date.  Hearing Tr. at 206:18-20.  He does not believe he went back at that time and studied the termination date within Schedule 1A.  Hearing Tr. at 521:4-522:14.  Mr. Southwood did not need to do so because use of the Software was not covered by Schedule 1A; thus, whether Schedule 1A had expired was not relevant to the issue Nortel asked him to address.  Hearing Tr. at 520:18-521:14.

M.     *SNMP Research's Renewals of the SSAs*

97.     Mr. Southwood would attempt to sell SSAs at the time of an original license, but, after that, would leave it up to another department at SNMP Research to renew the SSAs. Hearing Tr. at 208:4-11. Mr. Southwood was not responsible for renewing the SSAs.  Hearing Tr. at 208:9-11.

98.     The SSAs were renewed by the department at SNMP Research that deals with software service renewals, and this department had no knowledge (nor reason to have knowledge) of Schedule 1A or its contents.  Hearing 208:15-23; 210:2-9; 269:9-270:18.

99.     Lori Branch was the clerk at SNMP Research responsible for SSA renewals and knows nothing about SNMP Research's licenses, or the rights thereunder.   Hearing Tr. at 208:15-23; 269:9-270:23; 511:12-20. Ms. Branch lacked authority to grant licenses of the SNMP Research Software.  Hearing Tr. at 267:6-15.

100.    Importantly, as noted above, SNMP Research's SSAs are separate from license agreements, Hearing Tr. at 207:17-19; **Ex. P-20** at ¶ 4, and SSAs, by their very terms, do not grant any license rights whatsoever.  Hearing Tr. at 230:7-231:10; **Exs. P-23** at ¶ 5; **P-24** at ¶ 5. "Updates, improvements, and enhancements will be treated as components of the licensed Program and their use will be governed by the terms and conditions of the License Agreement with the Customer."  **Exs. P-23** at ¶ 5; **P-24** at ¶ 5.  Moreover, the SSA invoices on which the

24

U.S. Debtors rely did not even mention Schedule 1A or any particular SynOptics or Bay product. Hearing Tr. at 208:1-3; 209:4-12; 511:12-20; **Ex. P-23**; **D-97**. [15]

### N.    The Schedule 1A Agreement Was More than Fair to Nortel.

101.    As mentioned above, the Schedule 1A arrangement was the result of a fair compromise in response to Nortel's initial request that SNMP Research assign Nortel the full benefit of the ***non-transferable*** Bay License.  Hearing Tr. at 245:11-247:21.

102.    SNMP Research did not agree to Nortel's request because it could not risk Nortel arguing later that products developed at Nortel were covered by the original Bay royalty buyout. **Ex. P-29**; Hearing Tr. at 115:23-116:16.

103.    It was critical for SNMP Research to avoid that result, and, at the time, Mr. Southwood and Dr. Case very clearly communicated SNMP Research's concern that the difference between Nortel and Bay Products would blur over time if the Bay license were transferred without restriction.  Hearing Tr. at 154:24-155:14; 245:11-247:21.

104.    As noted, the compromise was to provide Nortel a temporary, three-year license during which time Nortel could enjoy the benefit of the Bay License.  Hearing Tr. at 245:11-247:21. Nortel would have those three years to separately license the Bay Products and pay a license and maintenance fee in order to be able to continue distributing those products after the termination date of Schedule 1A.  Hearing Tr. at 245:11-247:21. Dr. Case testified that such an arrangement was not just fair, but incredibly generous to Nortel.  Hearing Tr. at 259:20-261:21.

105.    While SNMP Research wanted to make sure it was paid fairly for new Nortel products, SNMP Research was willing to give credit for the Bay royalty buyout for applicable existing Bay Products so long as Nortel obtained separate schedules for those covered products

---

[15] The version of Software (15.3.1.15) used in the infringing products was shipped to Nortel in 2002. September 15, 2016 Fitzgerald Deposition Transcript at 117:16-21, 118:24-119:21; **Ex. D-162** at 2.

during the three-year period of Schedule 1A (which Nortel in fact did for several products). Hearing Tr. at 245:11-247:21; 247:21-248:24. There was thus a clear mechanism for Nortel to obtain licenses for products **before** Schedule 1A terminated.

106.    The U.S. Debtors want to have this Court believe that no reasonable company in Nortel's position would have agreed to a license that would terminate without a mechanism for renewal or future use after it terminated, because the products would have the Software embedded in them. *See generally* Testimony of Dr. Razgaitis.

107.    However, the Nortel License specifically contemplates the integration of schedules. **Ex. P-30**. Thus, the parties did create a mechanism for Nortel to obtain licenses for the Bay Products. Absent Schedule 1A,[16] or another schedule, Nortel had no right to use the Software in any Bay product, so there were no rights to be stripped. Hearing Tr. at 241:20-242:9. In other words, the Bay License was non-transferable, and the license rights under the Bay License that were granted under the Temporary License Agreement had already expired prior to Schedule 1A's execution. **Ex. P-29**. Schedule 1A gave an additional (more than) three-year period for Nortel to make other arrangements. Hearing Tr. at 245:11-247:21; 247:21-248:24. Bay Products

108.    Mr. Tollen, an expert on customs and practices in the software licensing industry, testified that the parties' agreement makes commercial sense for Nortel because, in the aftermath of the Bay acquisition it had a problem: Nortel could not keep distributing the products it got from Bay without a license from SNMP Research. Hearing Tr. at 562:14-563:15. SNMP Research's reasonable response to Nortel's self-created predicament was to grant Nortel a free, three-year temporary license, which could be converted into permanent licenses for products

---

[16] And the Temporary License Agreement for a brief period ending on November 1, 1999.

Nortel elected to declare in separate schedules, and pay the limited license and support fees. Hearing Tr. at 562:14-563:15.

109.    SNMP Research clearly, and extensively, discussed this with Mr. Hyslop, and Nortel ultimately agreed to this arrangement.   Hearing Tr. at 249:7-18. Dr. Case testified that, based upon his conversations with Mr. Hyslop, both parties understood that Schedule 1A did not grant any rights after three years.   Hearing Tr. at 257:13-259:1.

110.    Indeed, Nortel exercised those rights four times when it asked for and received royalty-free schedules for products that Nortel represented to SNMP Research for Bay Products covered by Schedule 1A.   *See* **Exs. P-30.18**; **P-30.20**; **P-30.21; P-30.33; P-36**; **P-37**. For new Nortel products not covered by Schedule 1A, if Nortel had asked for licenses as they should have, SNMP Research would have sold them licenses at the price book price.   Hearing Tr. at 261:22-262:24; March 31, 2017 Case Deposition Transcript at 958:5-13.

111.    The U.S. Debtors' fairness argument ignores the fact that there is nothing in the record indicating that SNMP Research ever tried to charge Nortel more than its standard pricing for anything, before or after Schedule 1A terminated.   Had Nortel done the right thing in 2003 and told SNMP Research that its Software was being used in unlicensed products—rather than denying that the Software was in the products—SNMP Research likely would have offered a reasonable license based on its standard per copy royalty for unit sales.   Hearing Tr. at 261:22-262:24.

112.    The fact that Nortel failed to declare a number of products in separate schedules, and pay the limited license and support fees, is not inherently "unfair"—it is simply a fact.

**O.    SNMP Research was Unaware that Nortel Used and Distributed SNMP Research Software under Schedule 1A after June 20, 2003.**

113.    SNMP Research and Nortel had an extensive relationship aside from the Schedule 1A products.  Hearing Tr. at 385:21-386:1. In April 2003, Dr. Case visited Nortel as part of other meetings in the Santa Clara, California area to revive the relationship with Nortel and build new opportunities for SNMP Research software in Nortel's products.   Hearing Tr. at 383:6-384:13. While Dr. Case was aware that Nortel was using the Software in numerous scheduled products, Hearing Tr. at 385:11-20, he was unaware in April, or June, of 2003, of any unscheduled products that would have fallen under Schedule 1A that had not been properly scheduled by Nortel.   Hearing Tr. at 268:8-13; 318:6-21; 386:7-11. In fact, Dr. Case left the Nortel meeting with the impression that it did not go well and feeling as if he had lost the business.  Hearing Tr. at 383:6-384:24; **Ex. D-215**.   Based on correspondence in 2001, Dr. Case was under the impression that BayStack was using a competitor called Envoy for new products.  Hearing Tr. at 392:7-393:2; **Ex. D-215**. Also, John Seligson, one of the former Nortel engineers, that worked on several Baystack products in 2003, testified that Dr. Case did not know what products Mr. Seligson was working on.  September 30, 2016 Seligson Deposition Transcript at 136:24-137:2, 137:6,7, 138:24-139:1, 139:5,6.

114.    If Dr. Case would have been informed in April of 2003 that there *were* Schedule 1A products distributing SNMP Research Software, he would have responded, "What?," and would have been in cognitive dissonance when Mr. Tremblay in August of 2003 stated that there are *no* Schedule 1A products being distributed by Nortel with SNMP Research Software. Hearing Tr. at 386:16-387:6. Had Dr. Case known that Nortel was distributing Schedule 1A products with SNMP Research Software, he would have inquired into this inconsistency upon hearing of Mr. Tremblay's statement.  Hearing Tr. at 386:16-387:6. Dr. Case did not make such

28

an inquiry because he had no knowledge that Nortel was distributing products subject to Schedule 1A with the Software, and concluded that SNMP Research had priced itself out of the market.  Hearing Tr. at 386:16-387:11.

115.    SNMP Research accepted Nortel's representation and reasonably believed that any products previously licensed under Schedule 1A were using competitors' software, no longer being distributed, or licensed under a separate schedule, and did not press the matter further. Hearing Tr. at 268:8-269:8.[17]

116.    Even up to and through Nortel's asset sale to Avaya Inc. ("Avaya") in these bankruptcy cases in late 2009, Nortel was continuing to represent to Dr. Case that the ES and ERS products did not contain SNMP Research Software.  Hearing Tr. at 270:24-271:6. After the Avaya sale, Dr. Case specifically asked Michel Cote whether SNMP Research Software was in the ERS products and Mr. Cote assured Dr. Case that it was not, and that the ERS products used other third-party software.  Hearing Tr. at 271:7-272:21.

## P.    The Custom and Practice Testimony from Mr. Tollen and Dr. Razgaitis.

117.    Dr. Razgaitis, the U.S. Debtors' custom and practice expert, testified that he could point to no language in Schedule 1A that supports his proposed interpretation of the agreement. Hearing Tr. at 437:9-15. Dr. Razgaitis testified that industry custom and practice is to negotiate licensing agreements carefully, especially the scope of license rights and the cost associated with use of those rights, such that the language of the agreement expresses the intent of the parties. Hearing Tr. at 437:16-438:2.

---

[17] The only Bay Product that was thereafter disclosed by Nortel was Optivity.  **Ex. P-30.51.**  Nortel disclosed this to SNMP Research in 2004.  Even though this disclosure was after Schedule 1A terminated, for purposes of customer relations, Mr. Southwood allowed Nortel to place that Bay Product on a Schedule so that it was properly licensed. Hearing Tr. At 200:19-23

118.   Dr. Razgaitis also testified that in his experience license agreements are heavily negotiated and carefully crafted.  Hearing Tr. at 438:3-7. Dr. Razgaitis also testified that the subject of termination is an important consideration and that parties would or should spell out such termination rights clearly in their agreement.  Hearing Tr. at 438:8-14.

119.   Dr. Razgaitis claims that the business relationship between the parties would require Schedule 1A to specify what Nortel can do after June 2003 and what Nortel can do with SNMP Research's Software.  Hearing Tr. at 444:23-445:6. However, Dr. Razgaitis's purported criticism ignores that Schedule 1A is part of the Nortel License, and that the Nortel License requires the return or destruction of the Software.  Hearing Tr. at 445:7-446:16; **Ex. P-30** at ¶ 6.4.   The parties thus understood how to draft a survival clause where survival of rights was intended.

120.   Dr. Razgaitis' testimony also ignores that the Nortel License contemplates the entering into of Schedules that would allow for the distribution of specific products.  **Ex. P-30**.

121.   Dr. Razgaitis was offered as an expert in the field of intellectual property licensing Hearing Tr. at 407:16-408:4, not *software* licensing. Despite a number of potential sources, the only treatise, textbook, or scholarly journal cited by Dr. Razgaitis to support his purported "custom and practice" in software licensing is Brian G. Brunsvold, D. Patrick O'Reilley, and D. Brian Kacedon, *Drafting **Patent** License Agreements* (6th ed. 2009)), which does not have a single chapter or section regarding software licensing.  Hearing Tr. at 446:17-447:17 (emphasis added). Mr. Tollen testified that he owns a copy *Drafting Patent License Agreements* and considers it a great book, but that book has nothing to do with *software* licensing.  Hearing Tr. at 563:17-565:8. SNMP Research's expert witness, Mr. Tollen, is the author of *The Tech Contracts Handbook: Cloud Computing Agreements, **Software Licenses**, and Other IT Contracts for Lawyers and Businesspeople*, published by the American Bar

30

Association, which focuses on software licenses and similar contracts.  Hearing Tr. at 549:7-22; 564:8-565:8 (emphasis added).

122.    Mr. Tollen was offered as an expert in ***software*** licensing.  Hearing Tr. at 549:23-550:5. Mr. Tollen is an attorney specializing in software licenses and related technology contracts, and teaches lawyers and other individuals to draft software licenses and technology contracts.  Hearing Tr. at 546:10-20.

123.    Mr. Tollen testified that, according to industry custom and practice, "[i]n this business, when you terminate a license and write 'shall terminate,' it is all terminated.  And when you go the next mile and write 'and shall be of no further effect,' it just couldn't be clearer."  Hearing Tr. at 559:21-560:15.

124.    Mr. Tollen "agree[s] strongly with one point [Dr. Razgaitis] made, which is that there is no text in Schedule 1A that supports [Dr. Razgaitis's] argument that it is a perpetual license or a partial termination. That was true."   Hearing Tr. at 557:6-13. Dr. Razgaitis's assertion regarding an "absence of a termination provision" in Schedule 1A was "baffling" to Mr. Tollen.  Hearing Tr. at 565:9-20.

53651/0001-14606174v2

## CONCLUSIONS OF LAW

125.    The parties' arguments in support of their respective positions may be boiled down to two questions.  The first is whether Nortel had the right to use and distribute the Software after June 20, 2003 under the terms of Schedule 1A itself.  If the answer to this question is no, then the second question is whether the parties agreed to an implied-in-fact perpetual license permitting Nortel to use and distribute the Software in the Bay Products covered by Schedule 1A after June 20, 2003.[18]  For the reasons discussed in the sections below, the Court holds that Nortel had no rights to use or distribute the Software under Schedule 1A itself, and the parties did not thereafter create an implied-in-fact agreement.

## II.    Nortel's Right to Use or Distribute the SNMP Research Software in all Products under Schedule 1A Terminated on June 20, 2003.

126.    The Court is being asked to interpret Schedule 1A of the Nortel License.  The relevant portion of Schedule 1A provides that:

> This ***Schedule*** and ***the license*** in regard to the Development Software and Run-Time Software ***shall terminate*** and be of ***no further effect*** after a period of ***three years*** from the last date that this Schedule is executed below (emphasis added).

**Ex. P-30.08** (emphasis added).

127.    The Court notes as a preliminary matter that, prior to the Hearing, SNMP Research moved to exclude extrinsic evidence on the Schedule 1A issue, arguing that Schedule 1A is clear and unambiguous on its face.  The Court denied that motion, finding that consideration of extrinsic evidence at the Hearing was appropriate. May 2, 2017 Hearing Tr. at

---

[18] As noted above, what specific products are covered by Schedule 1A was not within the scope of the Hearing. That issue only becomes relevant if any products are licensed by the express written contract or an implied-in-fact contract after June 20, 2003.  Because the Court holds that no products can be covered by the terms of Schedule 1A, and there is not implied-in-fact license, it is not necessary to conduct a further hearing on the question of what specific products are covered by Schedule 1A, as none are.

125:7-128:19.[19] After considering this evidence, in tandem with the terms of Schedule 1A itself, the Court now concludes that the parties intended and agreed that Nortel's rights with respect to all products under Schedule 1A terminated on June 20, 2003.

**Q.    *The Nortel License Provides that New York Law Governs Its Interpretation.***

128.    The parties do not dispute, and the Court agrees, that the Nortel License provides that New York law governs its interpretation.  May 2, 2017 Hearing at 121:18-19; **Ex. P-30** at ¶ 9.11.  Schedule 1A is part of the Nortel License.  **Exs. P-30** at ¶ 9.4; **P-30.08**.

129.    "Under New York law, '[t]he fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent.'" *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004) (citing *Greenfield v. Phillies Records, Inc.,* 98 N.Y.2d 562, 569, 750 N.Y.S.2d 565, 780 N.E.2d 166 (2002); *see also Record Club of Am., Inc. v. United Artists Records, Inc.,* 890 F.2d 1264, 1271 (2d Cir. 1989) (applying New York contract law and stating "[t]he objective of contract interpretation is to give effect to the expressed intentions of the parties.").

130.    The Court should "look first to the contract as the best source of evidence for the intentions of the parties."  *Great Earth Int'l Franchising Corp. v. Milks Dev.*, 311 F. Supp. 2d

---

[19] At the May 2 hearing, the U.S. Debtors primarily contended that Schedule 1A was ambiguous because of language in the "Royalties" section that states "as described in the agreements and amendments thereto between SNMP and Bay Networks and its predecessor entities."  May 2, 2017 Hearing at 55:17-57:7; 58:15-60:1; 71:3-73:5. The U.S. Debtors contended that this reference meant that the parties were incorporating Bay's royalty buy out of the "Bay Products" and were intending for those products to be able to be distributed royalty free forever.  May 2, 2017 Hearing at 54:12-55:4; 55:17-57:7; 58:15-60:1; 71:3-73:5.  The U.S. Debtors further contended that the parties would have written "zero" in the Royalty section of Schedule 1A if they only intended to grant a three-year royalty free right to use the "Bay Products."  May 2, 2017 Hearing at 55:17-57:7; 58:15-60:1; 71:3-73:5.  At the May 11 and 12 trial, however, Dr. Case testified that the referenced language was included in Schedule 1A because annual payments were still being made on the ARL products under the Bay License at the time Schedule 1A was negotiated, and this money was still owed.  Hearing Tr. at 252:23-253:12.  Thus, the cost for Schedule 1A was not "zero."  Hearing Tr. at 252:23-253:12.  Dr. Case further explained that this reference had absolutely nothing to do with Nortel's right to distribute any products after June 20, 2003.  Hearing Tr. at 251:13-253:12.  The U.S. Debtors did not offer any testimony or documentary evidence that contradicted this testimony, and the ARL payment referenced by Dr. Case was thereafter made by Nortel on February 17, 2000.  **Ex. D-161**.

419, 433 (S.D.N.Y. 2004). "The best evidence of what parties to a written agreement intend is what they say in their writing." *Benihana of Tokyo, Inc. v. Benihana*, Inc., 59 F. Supp. 3d 654, 660 (D. Del. 2014), aff'd, 622 F. App'x 169 (3d Cir. 2015) (quoting *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569, 750 N.Y.S.2d 565, 780 N.E.2d 166 (2002)). *See also Zorbas v. United States Tr. Co., N.A.*, 48 F. Supp. 3d 464, 474 (E.D.N.Y. 2014) ("[T]he best evidence of what parties to a written contract intend is what they say in their writing") (quoting *Gary Friedrich Enterprises, LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 313 (2d Cir. 2013) (alteration, citation and internal quotation marks omitted)).

131.    Moreover, "courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include. Hence, courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." *In re Allegiance Telecom, Inc.*, 356 B.R. 93, 99 (Bankr. S.D.N.Y. 2006) (quoting *Vt. Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475, 807 N.E.2d 876, 775 N.Y.S.2d 765, 767 (2004)).

**R.    The Parties Intended the Word "Terminate" to End all Rights under Schedule 1A.**

1.  **The Language of Schedule 1A Supports SNMP Research**

132.    The primary issue in dispute in this matter is the meaning of the word "terminate" in the *context* of Schedule 1A.  The parties do not dispute the meaning of the word "terminate" itself.  Indeed, this would not be fertile ground for debate, as courts interpreting the word "terminate"[20] have given it its plain meaning; the Court of Chancery once explained, "[t]he word needs no construction. Terminate means terminate—to end." *Jefferson Chem. Co. v. Mobay*

---

[20] As noted previously, Black's Law Dictionary defines terminate quite clearly—"1. To put an end to; to bring to an end. 2. To end; to conclude." Black's Law Dictionary (10th ed. 2014).

*Chem. Co.*, 267 A.2d 635, 637 (Del. Ch. 1970).  *See also DDS Partners, LLC v. Celenza*, 6

A.D.3d 347, 348 (N.Y. App. Div. 2004) ("The plain and ordinary meaning of the word terminate

is 'to bring to an end; put an end to') (citing *The Random House College Dictionary*, Revised

Edition [1980]); *Hamden v. Total Car Franchising Corp.*, 548 F. App'x 842, 846 (4th Cir. 2013)

(termination means "both the act of ending something and the end of something in time or

existence; conclusion or discontinuance.").  And this Court has taken judicial notice of this

dictionary definition.

133.    Instead, the debate centers on what rights "ended" on June 20, 2003.  SNMP

Research argues very simply that "terminate" in the context of Schedule 1A means that *all* rights

under Schedule 1A terminated on June 20, 2003.  On the other hand, the U.S. Debtors advance a

more nuanced argument: that Nortel's rights to any existing products covered by Schedule 1A

continued indefinitely, while all that terminated on June 20, 2003 was Nortel's right to use and

distribute the Software with respect to any *new* Nortel products after that date.  The Court finds

that the language of Schedule 1A simply does not support the U.S. Debtors' position.

134.    While the Court previously held that extrinsic evidence is proper, like any other

contract dispute, the place to start in evaluating the parties' intentions is nonetheless the language

of the agreement itself.  Specifically, the Nortel License, and its Schedule 1A, grants Nortel the

right to use the Software for Development, and separately for redistribution to third parties

(identified as "Run-Time).  Hearing Tr. at 242:13-244:15; **Ex. P-30** at ¶ 2.1(a),(c). Schedule 1A

then states specifically that those rights: "shall terminate and be of no further effect after three

years from the last date that this Schedule is executed below." Schedule 1A further states that,

"[t]his Schedule supersedes all of the prior agreements between SNMP and Bay Networks and its

predecessor entities as referenced above and all such agreements are hereby terminated by

execution of this Schedule."  The agreements "referenced above" are the Bay License.  Hearing at 255:16-257:12.

135.    Thus, under this plain and unambiguous language, the Court finds that Nortel simply had no distribution rights with respect to "all products of units and projects originating from what was Bay Networks" after "three years from the last date that [Schedule 1A was] executed."  There is simply no support at all in this agreement for the argument of the U.S. Debtors that Schedule 1A only required licenses after its expiration for new products created after the expiration of Schedule 1A.

136.    The Court also notes the use of the phrase "and be of no further effect" following the word "terminate."  This phrase strongly suggests that "terminate" means to end *all* rights granted under Schedule 1A to the relevant Software rights (i.e., the Development Software and Run-Time Software mentioned in Schedule 1A and specifically defined in the body of the Nortel License).

137.    The Court also finds significant the absence of any language in Schedule 1A reserving any rights upon termination.  Just as significant is the express survival clause in the body of the Nortel License itself, of which Schedule 1A is a part.  That clause states that "the following provisions shall survive termination of this Agreement: Definitions, Title and Protection, Confidentiality, Fees and Payments, and Limitation of Liability."  **Ex. P-30** at ¶ 6.6. The parties thus explicitly contemplated and knew how to describe what license rights would survive the termination or expiration of the Nortel License, **Ex. P-30** at ¶ 6.5, but did not do so with respect to any of the Bay Products that fell under Schedule 1A.

138.    As mentioned briefly in footnote 19, the only actual language relied on by the U.S. Debtors in Schedule 1A is the language under "Royalties" referencing the prior Bay

36

agreements. The U.S. Debtors contend that this reference means that the Bay Products enjoyed a perpetual license beyond the expiration of Schedule 1A. The Court rejects this argument.

139.    The uncontroverted testimony at the Hearing confirmed that the reference to the Bay License in the "Royalties" section of Schedule 1A was not intended to confer any rights under the Bay License at all to Nortel. Instead, as confirmed by Dr. Case's testimony, the reason why the "Royalties" section of Schedule 1A mentioned the Bay License is because Nortel owed an annual fee for ARL royalties and Nortel later elected to exercise a buyout. Hearing Tr. at 251:13-253:12. The Court is satisfied that Dr. Case's testimony sufficiently explains why the Royalties section of Schedule 1A referred to the Bay License instead of inserting a specific stand-alone price.

140.    The Court is also satisfied that Nortel's agreement to pay SNMP Research amounts still owed by Bay was made in exchange for the three-year license contained in Schedule 1A. Any other interpretation would contradict SNMP Research's express rejection of Nortel's initial proposal for an unconditional assignment of the Bay License. In other words, had SNMP Research intended to grant Nortel the same license rights as those under the Bay License through an "incorporation" of the Bay License itself, SNMP Research would have simply signed the initial proposal Nortel sent and there would have been no need for the three-year language in Schedule 1A or the months of negotiations that followed the initial proposal.

141.    Finally, even if the Court were to accept the U.S. Debtors' argument that the reference to the Bay License royalty buyout had legal significance, the Court would conclude that the Bay License royalty buyout did not grant independent license rights. In other words, incorporation of a royalty buyout is not the same as incorporation of the associated license rights. A royalty buyout is simply a payment for amounts owed. The U.S. Debtors appear to argue that

37

the royalty buyout section of Amendment 2 to the Bay License contains perpetual license grant license language, and thus the Court should infer that license grant into Schedule 1A.

142.    This leap of faith, however, is unsupported by any evidence that the parties intended for any license rights from the Bay License to transfer as part of Schedule 1A.  Indeed, it is contrary to the uncontradicted evidence confirming that the Bay License was terminated not once, but at least three times, including in Schedule 1A itself, and that SNMP Research had already expressly rejected Nortel's offer to transfer the Bay License rights unconditionally.

143.    Moreover, even if the Court were to conclude that the license rights mentioned in the same section as the royalty buyout in Amendment 2 to the Bay License were made a part of Schedule 1A, those license rights do the U.S. Debtors no good here, as confirmed by Dr. Case's testimony.  The license rights in Amendment 2 were for SNMP Research's ARL product (not its EMANATE product).  Nortel's use of the ARL product is not even at issue in this dispute, so to the extent the license grant in Amendment 2 could possibly be read into Schedule 1A, it would not change the outcome.  Nortel still would have lacked a license for the relevant SNMP Research Software product at issue in this matter (i.e., EMANATE).

## 2.    The Extrinsic Evidence Supports SNMP Research

144.    Notwithstanding the foregoing, the Court allowed the U.S. Debtors the opportunity to submit extrinsic evidence based upon their arguments at the May 2nd hearing (see footnote 19 *supra*). [21]   After considering all of the evidence, however, the Court finds that it does not overcome the language of Schedule 1A.

145.    Namely, as opposed to the Nortel License, the Bay License states that it is governed by California law.  **Ex. P-20** at ¶ 26.  Nortel acquired Bay through a "reverse triangular

---

[21] The Court understands that SNMP Research disagrees with the holding on the motion to exclude.

merger." *See* **Ex. P-71** (*Schedule 14A Definite Proxy Statement Filed by Bay Networks, Inc. with Securities and Exchange Commission*, p. 4 (Filed as of July 27, 1998).

146.    Under California law, the Bay License was therefore not transferrable to Nortel without SNMP Research's consent. *See Netbula, LLC v. BindView Dev. Corp.*, 516 F. Supp. 2d 1137, 1150 (N.D. Cal. 2007) ("The crucial inquiry is whether the law governing the [] license agreement would consider  [] reverse triangular mergers to constitute a transfer or assignment of [the licensee's] assets or license rights."); *SQL Sols., Inc. v. Oracle Corp.*, 1991 WL 626458, at *3 (N.D. Cal. Dec. 18, 1991) ("California courts have consistently recognized that an assignment or transfer of rights *does* occur through a change in the legal form of ownership of a business" and therefore held that "a transfer of rights under the [a]greement *did* occur" in a reverse triangular merger); *Trubowitch v. Riverbank Canning Co.*, 30 Cal. 2d 335, 344-45 (Cal. 1947) ("[I]f an assignment results merely from a change in the legal form of ownership of a business, its validity depends upon whether it offects [sic] the interests of the parties protected by the nonassignability of the contract.").

147.    In addition to case law, California statutory law confirms that a reverse triangular merger is the type of transaction that results in a change in control and thus an improper transfer of the non-transferable Bay License. *See* Cal. Corp. Code § 1107 ("Examples of mergers **that do not result in a change of ownership** are mergers between any of the following: (1) a corporation and its wholly owned subsidiary; (2) a corporation and the wholly owned subsidiary of that corporation's wholly owned subsidiary; or (3) two wholly owned subsidiaries of the same parent corporation.") (emphasis added).

148.    The testimony of SNMP Research's custom and practice expert, David Tollen, further supports the non-transferable nature of the Bay License.  He testified that in the industry "when you use 'nontransferable,' you are saying you can't give it to anyone else, including an

acquirer. And if you want to say you can give your license to an acquirer, you write a specific exception, "may be transferred in case of a merger or acquisition of all or substantially all assets.' I can almost rattle off the language. That's what you do. It is not there in the Bay license." Hearing Tr. at 581:12-582:18.

149. As a result, Nortel did not have a license to use the Software in the Bay Products at the time negotiations commenced. This is quite significant because Nortel thus lacked an appropriate license *at the time* the parties initiated discussions. This explains why Nortel would agree to a three-year temporary license and why it was imminently fair that Nortel would have no right to distribute the Bay Products at all without it, and this allowed them three years to become properly licensed.[22]

150. The Court also finds that the communications between the parties support SNMP Research's interpretation of Schedule 1A. Dr. Case and Mr. Southwood provided unrebutted testimony regarding their conversations with Mr. Hyslop. They both explained that the parties discussed, and understood, that all of Nortel's distribution rights with respect to the "Bay

---

[22] The Temporary License Agreement also terminated all of Bay's rights under the Bay License, Hearing Tr. at 256:14-258:22, and the Court finds that the evidence confirms that the Temporary License Agreement was signed by the parties. For example, Mr. Southwood referenced the November 1, 1999 expiration of the Temporary License Agreement in two separate e-mails to Mr. Hyslop, and Mr. Hyslop did not challenge these statements. **Exs. P-39**; **P-81**. Furthermore, believing that Schedule 1A had not yet been signed by Nortel, on May 15, 2000, Dr. Case wrote to Nortel saying that Nortel was distributing the Bay Products without a license until Schedule 1A is signed. **Ex. D-077A**. Nortel did not contradict this position. Dr. Case's and Mr. Southwood's unrebutted testimony also confirms that the Temporary License Agreement was signed. Hearing Tr. at 120:20-121:8; 123:21-124:19; 151:6-12. The Court is satisfied that SNMP Research undertook a diligent search for the signed Temporary License Agreement sufficient to satisfy the best evidence rule. Accordingly, the Court will accept extrinsic evidence of its execution and holds that the unsigned version of the Temporary License Agreement admitted into evidence was signed by the parties. *See United States ex rel. Magid v. Wilderman*, No. 96-CV-4346, 2004 U.S. Dist. LEXIS 17494, at *13-14 (E.D. Pa. Aug. 18, 2004) ("[A] party seeking to admit a secondary writing as evidence of the original must convince the court that he or she made a reasonable, diligent, and unsuccessful search for the original.") (citing *Burt Rigid Box, Inc. v. Travelers Prop. & Cas. Corp.*, 302 F.3d 83, 91-92 (2d Cir. 2002); *Cartier v. Jackson*, 59 F.3d 1046, 1048 (10th Cir. 1995); *United States v. McGaughey*, 977 F.2d 1067, 1071 (7th Cir. 1992)).

Products" (i.e., products that were distributed by Bay prior to the acquisition, or projects in the lab at Bay but not yet released as a product at the time of the acquisition), would terminate at the conclusion of Schedule 1A unless any such product was separately licensed by being placed on a schedule during the term of Schedule 1A, and the license and maintenance fee paid.  Hearing Tr. at 135:10-136:3;  151:13-152:17;  240:21-242:9;  245:8-249:18;  263:3-264:21. There was no conflicting testimony.

151.    The Court finds that Nortel's internal e-mails fully support SNMP Research's testimony in this regard.  For example, in a November 25, 1999 email, David Hyslop wrote internally at Nortel: "P.S. Brian: note that the Bay buy out is a buy out for royalties only, and Bay must still, on a product by product basis, get the right to use the Emanate source code."  Not only did Mr. Southwood testify that this statement was consistent with his discussions with Mr. Hyslop,  Hearing at 165:4-166:4, but, under New York law, even uncommunicated subjective understanding of a contract is admissible extrinsic evidence.  See *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Properties, LLC*, 467 F.3d 107, 126 (2d Cir. 2006) ("[W]ith respect to a negotiated agreement, a party's subjective understanding, while not controlling, may shed light on the state of those negotiations and could bear on that party's objective actions."); *see also Deakins Holding PTE Ltd. v. NewNet Inv. Grp. LLC*, No. 2:14-cv-02036-CAS(SHx), 2015 U.S. Dist. LEXIS 14162, at *12 (C.D. Cal. Feb. 4, 2015) (quoting *SR Int'l Bus. Ins. Co.*) (applying New York law). "The better reading of New York law, and certainly the Second Circuit's interpretation of New York law on this point, is that extrinsic evidence of subjective intent is admissible if a contract term is ambiguous." *Constellation Power Source, Inc. v. Select Energy, Inc.*, 467 F. Supp. 2d 187, 209 (D. Conn. 2006) (citing *Walk-In Medical Centers, Inc. v. Breuer Capital Corp.*, 818 F.2d 260, 263 (2d Cir. 1987)) (internal citations omitted); *Rudman v. Cowles*

41

*Commc'ns*, 30 N.Y.2d 1, 11, 280 N.E.2d 867, 330 N.Y.S.2d 33 (1972); *accord U.S. Fire Ins.*, 949 F.2d at 571.

152.   The Court also finds that e-mails exchanged between the parties further supports SNMP Research's testimony. For example, on November 15, 1999, Mr. Hyslop forwarded to Mr. Southwood an internal email he wrote in which he explained to Nortel personnel that "Bay" Products had to be paid for on a "`Bay' product by `Bay' product basis" for use of the Emanate Software for development licenses, while Nortel products also had the obligation to pay run time royalties). **Ex. P-38**; Hearing Tr. at 143:5-146:13.

153.   Moreover, immediately after Schedule 1A terminated, and years before litigation, Mr. Southwood explained in very clear terms the structure of the deal to Mr. Hyslop's replacement, Pierre Tremblay, in a manner entirely consistent with SNMP Research's testimony at trial; namely, that Schedule 1A terminated on June 20, 2003, and that Nortel needed to enter into other schedules during the term of Schedule 1A to continue having any license rights with respect to products that were previously covered by Schedule 1A.  Hearing Tr. at 196:14-199:7. The Court finds significant that Mr. Tremblay noted in the parties' e-mail exchange, which occurred shortly after Schedule 1A terminated, that he was not aware of any use of the Software by Nortel with respect to any products that had been covered by Schedule 1A.  **Ex. P-58**; Hearing Tr. at 194:21-195:10; Tremblay Dep. at 94:8-95:13.

154.   The Court also finds that Mr. Hyslop's emailing of a chart to Mr. Southwood on November 3, 1999, identifying the Bay and Nortel products separately, for the purposes of placing those products on schedules, undermines the U.S. Debtors' argument that the only products needing to be scheduled for use after the expiration of Schedule 1A were new products. If Nortel believed that it would never be required to obtain separate product-specific license schedules for Bay Products after the execution of Schedule 1A, it would have made no sense for

Mr. Hyslop to prepare and circulate that chart in the first place identifying products as either "Bay" or "NT."

155.    The Court also finds compelling that Nortel did in fact request and obtain schedules for products that Nortel believed and represented were covered under Schedule 1A. While the U.S. Debtors now argue that certain of those schedules did not actually relate to Bay Products, the U.S. Debtors' position misses the point entirely.   It is irrelevant whether the schedules Nortel obtained were actually for products covered by Schedule 1A.   Nortel represented that they were, and SNMP Research relied on those representations in preparing the schedules needed for such products to be licensed.   Hearing Tr. at 142:2-21; 344:20-24; 347:7-19.   If Nortel did not have to obtain licenses for Bay Products, then Nortel would have never requested and obtained schedules under the guise that they were relating to Bay Products under Schedule 1A.   This action by Nortel unequivocally confirms that it understood not only that Schedule 1A was going to expire in three years, but also that any products covered under it needed to be separately scheduled at some point prior to June 20, 2003 to be properly licensed after such expiration.

156.    The Court does not find persuasive the points of extrinsic evidence primarily relied upon by Nortel.[23]   First, with respect to Schedule 16 referenced above in footnote 14, Nortel had more than three years to enter into a schedule for the ARL product in Optivity if it was going to be distributed after the expiration of Schedule 1A, so the failure to enter into Schedule 16 in April, 2000 does not provide meaningful support for Nortel.   Indeed, that Mr.

---

[23] The U.S. Debtors discussed document D-149 during opening argument but elected not to question either Dr. Case or Mr. Southwood about this document.  The Court finds the U.S. Debtors independent interpretation of this document unhelpful and will not consider any argument related to D-149.  The Court also notes that the U.S. Debtors designated various statements from John Mead regarding what is licensed under the Nortel License.  Mead Deposition Transcript at 178:4 – 181:11.  The Court declines to consider these statements because Mr. Mead admits he has never even seen the Nortel License or discussed it with anyone. Mead Deposition Transcript at 237:11-24, 239:5-19.

43

Southwood twice sent a proposed Schedule 16, and only withdrew it the first time because Nortel advised it was changing the SNMP Research product, shows that he understood the need for Nortel to enter into a schedule for that Bay product to have rights after the expiration of Schedule 1A. Hearing Tr. at 461:9-14; 529:13-20; 531:12-533:15; 541:18-542:6. Indeed, in 2004, shortly after the expiration of Schedule 1A, Nortel advised SNMP Research that it was still distributing the Optivity Bay Product, and entered into a new schedule for the ARL product in Optivity that was originally to be licensed under Schedule 16. **Ex. P -30.51.** While this Schedule was technically entered into shortly after the termination of Schedule 1A, Mr. Southwood explained that he did so for purposes of customer relations, Hearing Tr. At 200:19-23, and the Nortel License contains an anti-waiver provision. **Ex. P-30 at ¶ 9.8.** The Court also finds that this event supports SNMP Research because it shows the entering into of a schedule for a Bay Product.

157. Next, while the U.S. Debtors point to Mr. Southwood's response to Mr. Hyslop's November 15 email as supporting them, **Ex. P-59**, Mr. Southwood fully explained at trial his response and why he did not reference in the response the need of Nortel to enter into schedules. Hearing Tr. at 203:17-204:1; 204:19-206:20; 521:4-522:14. Finally, the Court does not find that there is anything in the documents surrounding Dr. Case's visit to Nortel in the spring of 2003 that supports Nortel. Dr. Case explained at trial that, in the spring of 2003, Nortel was still using his Software in various products other than the Schedule 1A products, and he left his meeting with Nortel believing that Nortel had phased out the Software out of the Schedule 1A products at Nortel. Hearing Tr. at 268:8-269:8; 386:16-387:11]. He also previously understood from an email in 2001 that Nortel was transitioning to a competitor on new products. Hearing Tr. at 392:7-393:2; **Ex. D-215**. Thus, it did not come as a surprise to him when, just a few months later, Pierre Tremblay advised SNMP Research that there were no Schedule 1A products that he

44

could locate that were still being distributed by Nortel.  Hearing Tr. at 383:6-387:11. Also, John

Seligson, one of the former Nortel engineers, that worked on several Baystack products in 2003,

testified that Dr. Case did not know what products Mr. Seligson was working on.  September 30,

2016 Seligson Deposition Transcript at 136:24-137:2, 137:6,7, 138:24-139:1, 139:5,6.

### 3. The Custom and Practice Testimony of The Expert Witnesses Support SNMP Research

158.    In addition to the factual record, the Court finds the testimony of SNMP

Research's expert witness, David Tollen, persuasive in considering custom and practice on the

key interpretation issue before the Court.  Mr. Tollen testified that, according to industry custom

and practice, "[i]n this business, when you terminate a license and write 'shall terminate,' it is all

terminated.  And when you go the next mile and write 'and shall be of no further effect,' it just

couldn't be clearer."  Hearing Tr. at 559:21-560:15. The Court accepts Mr. Tollen's opinion that

the parties prepared the termination provisions of Schedule 1A consistent with the intention that

all rights under Schedule 1A would end on June 20, 2003 without exception.  As for the

testimony of the U.S. Debtors' expert, Dr. Richard Razgaitis, while the Court appreciates his

testimony, it does not find it particularly helpful to the contract interpretation issue before the

Court.  Dr. Razgaitis in fact *admitted* that he could not identify any language in Schedule 1A that

supported his opinion. Hearing Tr. at 437:9-15.

159.    Instead, Dr. Razgaitis relied on the supposed absence of language in Schedule 1A.

Mr. Tollen testified, however, that, had the parties intended to carve-out or reserve rights upon

termination, that language would have been drafted into Schedule 1A.  Dr. Razgaitis counters by

essentially arguing that SNMP Research's interpretation makes no sense, because no party in

Nortel's position would have negotiated a license without expressly specifying what happens on

termination in the contract.  The U.S. Debtors focused on this argument heavily in opening and

45

closing remarks, analogizing SNMP Research's software to a thread in a suit that is not all that valuable but is difficult to remove once in place.

160.    The Court declines to accept Dr. Razgaitis's view of custom and practice, for multiple reasons.  First, it appears that Dr. Razgaitis's opinion was premised, at least in part, on the faulty assumption that Nortel had rights under the Bay License when it originally negotiated Schedule 1A, Hearing Tr. at 439:13-442:23; 581:12-582:18, and that therefore Nortel would have never put itself in the situation of potentially being without license rights in existing products.  But, as mentioned above, Nortel was already without license rights at the onset of negotiations.  While Dr. Razgaitis attempted to retract his reliance on the Bay License, it is clear that his initial opinion relied heavily on this notion, Hearing Tr. at 439:13-442:23; 581:12-582:18, putting the basis of his opinion at odds with the facts.

161.    Second, this opinion ignores the fact that the Nortel License does discuss what happens upon termination, Hearing Tr. at 445:7-446:16; **Ex. P-30** at ¶ 6.4, and also contemplates the entering into of schedules. Hearing Tr. at 172:6-18; 242:1-9; **Ex. P-30** at ¶¶ 1.17, 2.1.

162.    Third, even if his opinion was properly grounded, the Court finds that, if Nortel wanted to ensure that license rights were reserved after June 20, 2003, it would have needed to place those rights in Schedule 1A.  It is difficult to surmise whether the inclusion of such a clause would have changed the negotiations in hindsight, or whether SNMP Research would have accepted such a material change at all, but the Court is simply not willing to read into Schedule 1A such a material term that was excluded from the agreement, especially given the total absence of any extrinsic factual testimony confirming that the parties intended to include such a provision in Schedule 1A.

163.    To read such a material term into the agreement without evidence sufficient for reformation would not only contradict custom and practice, it would fly in the face of well-

established contract interpretation law. *See generally U.S. Bank, N.A. v. UBS Real Estate Sec. Inc.*, 205 F. Supp. 3d 386, 412-13 (S.D.N.Y. 2016) ("[C]ourts may not by construction add or excise terms, nor distort the meanings of those used and thereby make a new contract for the parties under the guise of interpreting the writing.") (citing *ACE Sec. Corp. v. DB Structured Products, Inc.*, 25 N.Y.3d 581, 597, 15 N.Y.S.3d 716, 36 N.E.3d 623 (2015) (quoting *Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475, 807 N.E.2d 876, 775 N.Y.S.2d 765 (2004))). *Wall St. Sys. Swed. AB v. Hertz Glob. Holdings, Inc.*, No. 14-cv-7819 (KBF), 2015 WL 158887 (S.D.N.Y. Jan. 13, 2015) ("[A] court may not write into a contract conditions the parties did not insert by adding or exercising terms under the guise of construction, nor may it construe the language in such a way as would distort the contract's apparent meaning.") (citations omitted).

164.    It would also contradict case law specifically on the issue of survival of contract provisions on contract termination. In construing a collective bargaining agreement that expired in 2003, the Supreme Court found that the Sixth Circuit erred in its reasoning that the benefits extended beyond expiration of the agreement, in part because the Sixth Circuit failed "to consider the traditional principle that courts should not construe ambiguous writings to create lifetime promises." *M & G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926, 936 (2015) (holding that Court of Appeals had erred in determining that an employer "had promised to provide lifetime contribution-free health care benefits for them, their surviving spouses, and their dependents" as part of a collective bargaining agreement that expired in 2000) (*citing* 3 A. Corbin, Corbin on Contracts § 553, p. 216 (1960) (explaining that contracts that are silent as to their duration will ordinarily be treated not as "operative in perpetuity" but as "operative for a reasonable time" (internal quotation marks omitted))). In analyzing the contract at issue, the

Supreme Court found that, "when a contract is silent as to the duration of retiree benefits, a court may not infer that the parties intended those benefits to vest for life." *Id*. at 937.

165.    Similarly, the New York state court in *Bajan Grp., Inc. v. Consumers Interstate Corp.*, 28 Misc. 3d 1227(A) (N.Y. Sup. Ct. 2010) held that an anti-competition clause did not survive termination because there was no express provision stating that the clause survived. Specifically, the court held that:

> There is nothing in the plain language of the parties' Agreement that obliges Bajan to refrain from competition following the termination of the Agreement or otherwise manifests a mutual intention to take this covenant ***outside of the general rule that contractual obligations do not survive the termination of the agreement in which they are contained.*** Indeed, ***in the one instance*** where the parties intended to impose obligations that would survive the termination of the Agreement, ***they said so expressly***.

*Id*. at *8 (emphasis added).

166.    In the present case, not only is there no survival clause in Schedule 1A reserving any license rights after the termination date, but, as mentioned above, the Nortel License itself in fact contains a survival clause.  **Ex. P-30** at ¶ 6.6.  Because the survival clause does not mention the continuation of any license rights for Nortel for any Bay Products under Schedule 1A after June 20, 2003, like the case law described above, the absence of any provision expressly stating that Nortel had the ongoing right to use or distribute the Software in any specific Bay Products requires the Court to hold that the right to do so terminated as to all such products on June 20, 2003.

167.    For these reasons, the Court holds that "terminate" in the context of Schedule 1A means that all of Nortel's rights to use and distribute the Software in all products covered by Schedule 1A ended on June 20, 2003.  The failure to include any reservation clause in Schedule 1A is fatal to Nortel's position, and nothing in the factual record explains Nortel's failure to negotiate a reservation clause.

53651/0001-14606174v2

### III.    The Parties' Conduct Does Not Create an Implied License.

168.    Because Schedule 1A did not extend any license rights to Nortel as to any products beyond June 20, 2003, the Court must now address the U.S. Debtors' alternative argument that the parties' created an implied-in-fact perpetual license in the products covered by Schedule 1A.  In support of this argument, the U.S. Debtors focus on two events: (a) the post-termination shipment and payment for updates of the Software under the 1994 SSA; and (b) a 2006 letter from Mr. Southwood to Nortel dealing with ███████████, in which certain incorrect statements about Schedule 1A were made.

### S.    *The U.S. Debtors' Implied-in-Fact Argument Fails as a Matter of Law*

169.    Before addressing the merits of whether those events give rise to a perpetual implied-in-fact contract for the reasons discussed immediately below, the Court is of the opinion that the U.S. Debtors' implied-in-fact argument fails as a matter of law for three independent threshold legal reasons.

### i.    *The Parties Operated under an Existing Contract on the Same Subject.*

170.    The Court rejects the notion that a perpetual license should be implied when the parties executed a limited license in the form of Schedule 1A.  Generally, "no implied in fact contract can be found when . . . the parties have an express agreement dealing with the same subject."  *HCB Contractors v. Rouse Assoc.*, No. 91-5350, 1992 U.S. Dist. LEXIS 17443, at *16 (E.D. Pa. Oct. 26, 1992) (quoting *Matter of Penn Cent. Transp. Co.*, 831 F.2d 1221, 1229 (3d Cir. 1987)); *Baldwin v. EMI Feist Catalog, Inc.*, 805 F.3d 18, 28 (2d Cir. 2015) (citing 17B C.J.S. *Contracts* § 597) (noting that a contract replaces a previous one concerning the same subject matter if the "subsequent contract either explicitly rescinds the earlier instrument[] or deals with the subject matter . . . so comprehensively as to be complete within itself.") (emphasis added); *Grenawalt v. AT&T Mobility, LLC*, 937 F. Supp. 2d 438, 458 (S.D.N.Y. 2013).

49

171.    More specifically, "a contract may not be implied in fact from the conduct of the

parties where it appears that they intended to be bound only by a formal written agreement."

*Valentino v. Davis*, 703 N.Y.S.2d 609, 612 (N.Y. App. Div. 2000) (citing (22 N.Y. Jur. 2d,

Contracts, § 7 at 34); *see also Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 861 F.

Supp. 2d 344 (S.D.N.Y. 2012).   The Second Circuit has established a four factor test to

determine whether parties intended to be bound only by a written contract: "(1) whether there

has been an express reservation of the right not to be bound absent a writing, (2) whether there

has been partial performance of the alleged contract, (3) whether all of the terms of the contract

have been agreed upon and (4) whether the contract concerns complex and substantial business

matters that would not ordinarily be the subject of an oral agreement."  *Mellencamp v. Riva

Music Ltd.*, 698 F. Supp. 1154, 1166 (S.D.N.Y. 1988) (*citing Winston v. Mediafare

Entertainment Corp.,* 777 F.2d 78, 80 (2d Cir. 1985); *R.G. Group, Inc. v. Horn & Hardart Co.*,

751 F.2d 69, 74 (2d Cir. 1984)).

172.    All four factors weigh heavily in favor of a finding that the parties intended to be

bound only by the terms of Schedule 1A.  Regarding the first factor (express reservation not to

be bound absent a writing), the Nortel License expressly prohibits modifications to the Nortel

License absent a signed writing.  *See* **Ex. P.-30** at ¶ 9.4.  As to the second factor, there has been

no partial performance regarding *renewing, extending, or otherwise continuing* Nortel's rights

under Schedule 1A. Regarding the third factor, it is clear that all of the terms of Schedule 1A

were agreed upon, and there are no specific terms of any alleged implied-in-fact contract upon

which the parties agreed.

173.    As to the fourth factor, the implicit agreement proposed by the U.S. Debtors

implicates a substantial business matter that would ordinarily not be subject to an oral agreement.

Indeed, not only was Schedule 1A a writing entered into after extensive negotiation, but there is

no evidence in the record that SNMP Research ever granted Nortel or any other customer a license orally or through conduct.  When the relationship between two contracting parties had been mainly governed by contracts, courts should refuse to find an implied contract that encompassed the terms of the prior written contract. *See, e.g.*, *Kap Jeung Tang v. Jinro Am., Inc.*, No. CV-03-6477 (CPS)(CLP), 2008 U.S. Dist. LEXIS 70488, at *18-19 (E.D.N.Y. Sep. 3, 2008) ("While plaintiff and defendants did have a long relationship, plaintiff's argument ignores the fact that the bulk of that relationship ***had been governed by contracts***, which either expired by their terms or permitted termination upon notice following the expiration of the term of the contract.").

174.    Because the Court has already held that Nortel's rights as to all products under Schedule 1A terminated on June 30, 2003, the Court is unwilling to imply what effectively would be an extension of that agreement, particularly in light of the provision of the Nortel License requiring that all modifications to the Nortel License must be in writing and application of the legal principles above.  **Ex. P-30** at ¶ 9.4 ("This Agreement may only be modified by an instrument in writing mutually agreed upon and executed by each Party's duly authorized representatives.").

*ii.    The Purported Agreement is Unenforceable under the Statute of Frauds.*

175.    The second independent threshold legal reason the U.S. Debtors' implied-in-fact argument fails is that the purported implied-in-fact contract is unenforceable under the statute of frauds.  "Under New York law, the Statute of Frauds is an available defense even against implied-in-fact contract claims." *Ellis v. Provident Life & Accident Ins. Co.*, 3 F. Supp. 2d 399, 409 (S.D.N.Y. 1998), *aff'd sub nom. Ellis v. Provident Life & Acc. Ins. Co.*, 172 F.3d 37 (2d Cir. 1999) (*citing American Fed. Group. Ltd. v. Rothenberg,* 136 F.3d 897, 910 (2d Cir. 1998)).  The Statute of Frauds is statutorily enshrined in N.Y. Gen. Oblig. Law § 5-701 and expressly

51

includes any agreement which "[b]y its terms is not to be performed within one year from the making thereof or the performance of which is not to be completed before the end of a lifetime." N.Y. Gen. Oblig. Law § 5-701(a)(1). New York courts have also made clear that a "contract of indefinite duration . . . is not by its terms performable within a year—and hence must be in writing." *Kalfin v. U.S. Olympic Comm.*, 209 A.D.2d 279, 280 (N.Y. App. Div. 1994) (*quoting Zupan v. Blumberg*, 2 N.Y.2d 547, 550 (1957)).[24]

176.    New York courts have also repeatedly held that § 5-701 applies to licenses of software. *See Al-Bawaba.com, Inc. v. Nstein Techs. Corp.*, 25 Misc. 3d 1245(A) (N.Y. Sup. Ct. 2009) (applying § 5-701 to alleged oral contract for three-year software license); *Morgenweck v. Vision Capital Advisors, LLC*, No. 08 CV 02969 BSJ, 2010 WL 9478990, at *3 (S.D.N.Y. June 3, 2010), *aff'd*, 410 F. App'x 400 (2d Cir. 2011) (applying § 5-701 to alleged license); *Kargo, Inc. v. Pegaso PCS, S.A. de C.V.*, No. 05 Civ. 10528 (CSH)(DFE), 2008 WL 4579758, at *5 (S.D.N.Y. Oct. 14, 2008) (same). Under § 5-701, for a writing or group of writings to satisfy the statute of frauds, it "must designate the parties, identify and describe the subject matter, and state all the essential and material terms of the agreement." *Dickson v. Mitchell*, 87 A.D.2d 697, 698 (N.Y. App. Div. 1982). *See* also Dorman v. Cohen, 413 N.Y.S.2d 377, 378-79, 66 A.D.2d 411, 412 (1st Dep't 1979) (emphasis added) (the writings "must state the entire contract with reasonable definiteness and certainty, so that the substance thereof will appear from the writing *without any resort to parol evidence*.").

---

[24] The same is true under both Tennessee and California laws, to the extent they might be applied to the implied-in-fact contract issue. *See Hopewell Baptist Church v. Se. Window Mfg. Co., LLC*, No. E2000-02699-COA-R3CV, 2001 WL 708850, at *6 (Tenn. Ct. App. June 25, 2001) (holding that alleged implied-in-fact contract was barred by statute of frauds); *Westside Estate Agency, Inc. v. Randall*, 6 Cal. App. 5th 317, 328 (Cal. Ct. App. 2016) (explaining that "the statute of frauds applies to *any* 'agreement'" under Cal. Civ. Code § 1624(a) and that "[w]ere we to accept Westside's arguments [that the statute of frauds does not apply to the breach of an implied-in-fact contract], we would be empowering brokers to evade the statute of frauds by the mere expedient of calling their claims for the breach of an unwritten agreement for a commission by some other name.").

177.    Finally, the doctrine of partial performance does not apply to a contract which is not to be performed within one year from the making thereof. *Valentino v. Davis,* 270 A.D.2d 635, 637 (N.Y.App. Div. 2000) ("The [New York] Court of Appeals has recently clarified that the doctrine of partial performance cannot save contracts governed by General Obligations Law § 5-701.") (citing *Messner Vetere Berger McNamee Schmetterer Euro RSCG Inc. v. Aegis Grp. PLC,* 93 N.Y.2d 229, 234, n. 1 (1999) (explaining that while partial performance is an exception to the Statute of Frauds for real property transactions under N.Y. Gen. Oblig. Law § 5-703, no such exception exists for § 5-701)). "It is well settled that part performance by one party does not take a contract that cannot be performed within one year of its making out of the statute of frauds-unless the contract is one relating to a transaction in real estate, which is not the case here." Gentile v. Conley, 636 F. Supp. 2d 246, 255 (S.D.N.Y. 2009).

178.    Here, the U.S. Debtors have not identified any writing signed by SNMP Research, let alone a writing signed by a duly authorized representative of SNMP Research, that sets forth the material terms of an extension of Nortel's license rights beyond the three-year temporary period.  As for the renewals of software services, they were evidenced by *unsigned* purchase orders and certainly did not contain any suggestion of a license regarding Schedule 1A.  Indeed, the purchase orders on which the U.S. Debtors rely do not even refer to Schedule 1A or Bay Products at all.  The Court cannot infer that the purchase orders constituted sufficient writings to satisfy the statute of frauds.

179.    The only other post-June 20, 2003 document on which the U.S. Debtors base their implied-in-fact argument is a letter from Mr. Southwood in 2006 regarding ███████.  The purpose of the letter, however, was to explain to Nortel why the software used by ███████ was not licensed by Nortel.  That Mr. Southwood failed to realize that Schedule 1A had terminated in connection with advising why the product was not a Schedule 1A product, simply does not create

any rights in Schedule 1A that did not otherwise exist.  But significant to the issue of the statute of frauds, the letter does not contain the material terms for a license grant.  Indeed, there was not even minimal license grant language in the letter.  The letter in no way even purported to grant Nortel additional rights beyond those in Schedule 1A.  In fact, as the testimony confirmed, Mr. Southwood would not have even been authorized to sign such a license grant in the first place. For these reasons, neither the software service renewal purchase order nor the 2006 letter can satisfy the statute of frauds.  Accordingly, the U.S. Debtors' implied-in-fact argument fails.

> iii.    *SNMP Research Received No Bargained-For Consideration for Extending or Renewing Nortel's Rights under Schedule 1A.*

180.    The third independent threshold legal reason the U.S. Debtors' implied-in-fact contract argument fails is because there is no evidence of adequate and proper consideration.  An implied contract, though not in writing, "still requires such elements as consideration [and] mutual assent."  *Maas v. Cornell Univ.,* 94 N.Y.2d 87, 93-94, 721 N.E.2d 966, 699 N.Y.S.2d 716 (1999) (*citing* 1 Williston, Contracts § 1:5, at 22).  Under New York law, "[a]ll contracts must be supported by consideration, consisting of a benefit to the promisor or a detriment to the promisee." *Coleman v. Sys. Dialing LLC*, No. 15cv3868 (DLC), 2016 U.S. Dist. LEXIS 79421, at *8 (S.D.N.Y. June 17, 2016) (citing *Beitner v. Becker*, 34 A.D.3d 406, 824 N.Y.S.2d 155, 156 (2006)).

181.    Section 71 of the Restatement (Second) of Contracts relates the familiar legal sense of the term "consideration": "(1) To constitute consideration, a performance or a return promise *must be bargained for*. (2) A performance or return promise is bargained for *if it is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise*." *Hipsky v. Allstate Ins. Co.*, 304 F. Supp. 2d 284, 289 n.6 (D. Conn. 2004) (citing 1 Restatement (Second), Contracts § 71, p. 172 (1981))(emphasis in original); *see also Calamita v.*

54

*Tradesmen's National Bank*, 135 Conn. 326, 332, 64 A.2d 46 (1949) ("'consideration must actually be bargained for as the exchange for the promise'"); accord *State v. Sostre*, 261 Conn. 111, 123, 802 A.2d 754 (2002) ("[T]o constitute consideration, a performance or a return promise must be bargained for")).

182.    It is an undisputed fact that there was never a bargain between the parties regarding an extension or renewal of Schedule 1A.  In fact, it was the lack of such negotiations or discussions that forced the U.S. Debtors to rely on an implied-in-fact argument in attempt to overcome a clear termination provision.  Additionally, as noted above, SNMP Research at no time received consideration for waiving or extending the three-year termination expressly provided for in Schedule 1A.  Hearing Tr. at 200:25-201:10; 206:21-207:2; 266:24-267:5.

183.    The SSA renewals and 2006 Southwood e-mail cited by the U.S. Debtors as purported evidence of an implied contract each fail to be supported by sufficient consideration. In terms of the SSA renewals, SNMP Research *did not* receive consideration from Nortel specifically related to the extension of Nortel's rights under Schedule 1A. The U.S. Debtors' suggestion that Nortel's renewals of the SSA (and the payments thereunder) somehow extended or renewed Nortel's rights under an extraneous agreement is akin to purchasing an extended warranty on a leased car with a fully paid up lease, and, upon expiration of the lease, claiming that the extended warranty grants an implied contract to renew or extend the lease at no additional charge.  Hearing at 269:9-270:15. To the extent the SSA renewal payments were to constitute consideration, such payments were consideration under an existing and separate SSA and thus cannot serve as separate, bargained-for consideration for an indefinite license renewal. In other words, the parties did not explicitly or implicitly "bargain for" consideration in the form of SSA renewal payments in exchange for an indefinite license renewal.

53651/0001-14606174v2

184.    Moreover, the 2006 letter from Mr. Southwood by its very nature lacks consideration.  This letter simply incorrectly acknowledged rights of the parties that did not exist under Schedule 1A.  There was no negotiation of such rights through the discussions leading up to the 2006 letter, nor is there any evidence that Nortel gave or promised anything to SNMP Research in exchange for Mr. Southwood's incorrect factual acknowledgment of the terms of Schedule 1A itself.  Indeed, as noted, it was made in connection with Mr. Southwood advising why Nortel did not have a license.  As such, even if the parties were not subject to another agreement on the same subject, and the U.S. Debtors could satisfy the statute of frauds, there is no consideration or consideration substitute that could form the basis of an implied-in-fact contract.

## T.    *There is No Evidence of Mutual Assent to Create an Implied-in-Fact Contract.*

185.    Although the U.S. Debtors' implied-in-fact argument must fail as a matter of law for the reasons discussed above, the Court will address the substance of the U.S. Debtors' argument that an implied-in-fact contract exists on the merits.  A basic tenet of contract law is that, for a contract to be formed, there must be a meeting of the minds (i.e., mutual assent).  Mutual assent "must be inferred from the facts and circumstances of each case, including such factors as the specific conduct of the parties, industry custom, and course of dealing."  *Tang v. Jinro Am., Inc.*, No. CV-03-6477CPS CLP, 2008 WL 4163183, at *4 (E.D.N.Y. Sept. 4, 2008) (*citing Nadel v. Play-By-Play Toys & Novelties, Inc.,* 208 F.3d 368, 376 n.5 (2d Cir. 2000)).

186.    Applying that principle here, there is no evidence that the parties understood that Nortel's license rights would be extended.  There were no conversations or communications whatsoever concerning this issue, no discussion or agreement about it terms, or what triggered it, or the start date for it.  As such, there could not be mutual assent to something never discussed.

187.     With respect to the points raised by the U.S. Debtors, the Court notes that the software services were renewed under an SSA.  The Court finds that the SSA is, by its terms, an entirely separate agreement. Hearing Tr. at 207:17-19; **Exs. P-23** at ¶ 5; **P-24** at ¶ 5.  SNMP Research's SSAs provide no license rights whatsoever, Hearing Tr. at 230:7-231:10; *see* **Exs. P-23; P-24**, and the Court can find no authority to support a claim that the extension of one agreement can serve to create an implied-in-fact agreement on a separate agreement.  There is also no evidence that the Software shipped after 2003 was even used in the infringing products. In fact, the version of Software (15.3.1.15) used in the infringing products was shipped to Nortel in 2002. September 15, 2016 Fitzgerald Deposition Transcript at 117:16-21, 118:24-119:21; **Ex. D-162** at 2.

188.     Mr. Southwood's 2006 letter also cannot support any mutual assent.   Mr. Southwood wrote it as part of explaining why Nortel did not have a license for a particular product.  That he also, incorrectly, purported to describe the terms of Schedule 1A, cannot serve as mutual assent for extending Schedule 1A when the parties were not discussing extending Schedule 1A, and it was not the point of his letter.

189.     Finally, and perhaps most importantly, the parties' prior course of dealings also must lead to the Court to reject the U.S. Debtors' implied-in-fact contract argument.  There is not only no evidence of a single instance in which SNMP Research agreed to a license grant through an SSA, but no history of licensing products orally or by conduct.  The parties entered into written agreements, and written schedules (more than 50 written schedules in fact), and heavily negotiated what became Schedule 1A.  The law simply does not allow the Court to disregard this history, and find that a heavily negotiated document became extended through conduct when there is not a single conversation, email or document even referencing any intention to do so.

53651/0001-14606174v2

## CONCLUSION

190.    For these reasons, the Court finds that Nortel's rights under the terms of Schedule 1A terminated as to all products on June 20, 2003, and that no implied-in-fact license was created thereafter.


June 21, 2017

**OF COUNSEL**

Richard S. Busch, Esq.
**King & Ballow Law Offices**
315 Union Street, Suite 1100
Nashville, TN 37201
(615) 259-3456 (Phone)
(615) 726-5417 (Fax)
rbusch@kingballow.com


-and-

John L. Wood, Esq.
**Egerton, McAfee, Armistead & Davis, P.C.**
900 S. Gay Street
Knoxville, TN 37902
(865) 546-0500 (Phone)
(865) 525-5293 (Fax)
jwood@emlaw.com

**COLE SCHOTZ P.C.**

*/s/ Nicholas J. Brannick*
Norman L. Pernick (No. 2290)
Nicholas J. Brannick (No. 5721)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
(302) 651-2002 (Phone)
(302) 652-3117 (Fax)
npernick@coleschotz.com
nbrannick@coleschotz.com

-and-

G. David Dean, Esq.
300 E. Lombard Street, Suite 1450
Baltimore, MD 21202
(410) 230-0660 (Phone)
(410) 230-0667 (Fax)
ddean@coleschotz.com

*Counsel for SNMP Research, Inc. and SNMP Research International, Inc.*

53651/0001-14606174v2

**APPENDIX 1**

# I.    SNMP'S OBJECTIONS TO NORTEL'S DESIGNATIONS
## A.  Dr. Jeffrey Case, January 11, 2017

*159:22-160:7*

Objection: Privilege

Argument: This line of questions encompasses conversations that Dr. Case had with his attorneys, including what he discussed with them regarding an expert report.  Dr. Case did not provide any input on the Ratner Report to Mr. Ratner directly.  Rather, Dr. Case discussed the Ratner Report with counsel.  Conversations with attorneys are privileged.  Furthermore, Fed. R. Civ. P. 26(b)(4)(B) provides that rule 26(b)(3)(A) and (B) "protect drafts of any report or disclosure…regardless of the form in which the draft is recorded."  Rule 26(b)(3)(A) provides that a party "may not discover document and tangible things that are prepared…for trial by or for another party or its representative."  The drafts of Mr. Ratner's report are privileged.  Any comments that Dr. Case made on those drafts were in the course of preparing Mr. Ratner's report.  Therefore, this line of questioning and the resulting answers should be disregarded by this Court because Dr. Case's communications with his attorneys are privileged, and because the Federal Rules shield drafts of expert reports from discovery.

*212:16-218:21*

Objections: Lack of foundation/personal knowledge, relevance, cumulative

Argument: The questions about **Exhibit D-76A** relate to an email from John Southwood to Dave Hyslop.  Dr. Case did not send or receive this email.  Accordingly, he does not have personal knowledge of the email.  Under FRE 602, a witness must have personal knowledge of the matters.  Dr. Case did not testify that he had any personal knowledge about this email. Even if Dr. Case had personal knowledge of the exhibit, in his testimony Dr. Case relates that the exhibit is not representative of the agreement to the parties.  Dr. Case even stated later in his deposition that the agreement referred to in **D-76A** would be an "apples-to-oranges" comparison if compared to Schedule 1A of the Nortel Master License Agreement ("Schedule 1").  *See* 858:21-861:24.  Dr. Case also testified that this email was referring in many places to the Master Software License between SNMP Research and Nortel, as opposed to Schedule 1.  *See* 867:4-868:6.  Consequently, it has no bearing on the Schedule 1 issue or SNMP's Motion to Amend. Irrelevant evidence is excluded under FRE 402.

Furthermore, Dr. Case's testimony about this document is cumulative.  John Southwood testified about this document during the hearing on this issue, rendering Dr. Case's testimony cumulative. A court "may exclude relevant evidence" when its probative value is "substantially outweighed by a danger of…needlessly presented cumulative evidence."  FRE 403.  Anything that Dr. Case could have testified about this document would have already been addressed by John Southwood's testimony.  For all of these reasons, this line of questioning and the resulting answers should be disregarded by this Court.

**B.  Dr. Jeffrey Case, March 30, 2017**

*431:3-432:12*

Objections: Lack of Foundation/personal knowledge

Argument: This line of questioning attempts to invoke a conversation between Dr. Case and James Reeves wherein Dr. Case informed James Reeves that a schedule was needed for products under "the document that grandfathers the Bay license over to the new Nortel master agreement" because said document "would only be good for three years."  Dr. Case responded that he did not have a recollection of any such conversation.  Accordingly, he has no personal knowledge of the matter of which Mr. Herrington was questioning him.  Under FRE 602, a witness must have personal knowledge of the matters at bar.  Dr. Case did not have any personal knowledge of such a request.  Accordingly, Mr. Herrington's questions and the subsequent answer must be stricken.

**C.  John Mead**

*140:4-9*

Objection: Relevance

Arguments: The question relates to whether Avaya began to remove SNMP Research software from the ERS products. The removal of software has no bearing on whether the SNMP Research Software was licensed after June 20, 2003 under Schedule 1 or whether the Court should grant SNMP Research's Motion to Amend.  It is irrelevant to the issues before the Court.  FRE 402 states that irrelevant evidence is inadmissible.  Accordingly, the question and the subsequent answers should be disregarded by the Court.

*141:13-16*

Objection: Relevance

Arguments: The question relates to Avaya's removal of SNMP Research software from the ERS 4000. The removal of software has no bearing on whether the SNMP Research Software was licensed after June 20, 2003 2003 under Schedule 1 or whether the Court should grant SNMP Research's Motion to Amend.  It is irrelevant to the issues before the Court.  FRE 402 states that irrelevant evidence is inadmissible.  Accordingly, the question and the subsequent answers should be disregarded by the Court.

*145:13-147:14*

Objection: Relevance

Arguments: The question relates to Avaya's removal of SNMP Research software from the ERS 4000. The removal of software has no bearing on whether the SNMP Research Software was licensed after June 20, 2003 2003 under Schedule 1 or whether the Court should grant SNMP Research's motion to amend. It is irrelevant to the issues before the Court. FRE 402 states that irrelevant evidence is inadmissible. Accordingly, the question and the subsequent answers should be disregarded by the Court.


*173:23-177:20*

Objection: Relevance

Arguments: The questions relate to the operating software in the Baystack products and relate to **Exhibit D-94**. The removal of software has no bearing on whether the SNMP Research Software was licensed after June 20, 2003 2003 under Schedule 1 or whether the Court should grant SNMP Research's motion to amend. It is irrelevant to the issues before the Court. Furthermore, the Court has clarified that "the Hearing shall not include consideration of what products might be covered by Schedule 1 if the Court were to determine that any license rights under Schedule 1 did not terminate on June 20, 2003." D.I. #540, ¶ 1. Therefore, any such topics are beyond the scope of the Hearing. The particular operating software in the Baystack products has no bearing on the issues before this Court as the parties agreed in advance. FRE 402 states that irrelevant evidence is inadmissible. Accordingly, the question , the subsequent answers,and **D-94** should be disregarded by the Court.

*178:4-180:20*

Objection: Lack of personal knowledge

Arguments: The initial question asks Mr. Mead to testify to his understanding of **Exhibiti D-287**'s reference to a "non-royalty third-party software." Mr. Mead testified that he did not have an understanding of that phrase, and that he would have to speculate about its meaning. Mr. Mead never testified that he has any familiarity with the document itself. Under FRE 602, a witness must have personal knowledge of the matters about which they testify. Mr. Mead's testimony did not establish that he had any personal knowledge of the contents of the document. The line of questions also continued to ask Mr. Mead for answers to questions to which he testified he already could not answer. Accordingly, the question , the subsequent answers,and **D-287** should be disregarded by the Court..


*183:6-187:4*

Objection: Relevance

Arguments: This line of questioningbased upon **Exhibit D-89, D-207 and, D-289**, concerns Nortel's rebranding of the Baystack products and what specific products fall within the Baystack family. The Court is considering the Schedule 1 issue as well as SNMP Research's Motion to

Amend.  The Court has stated that "the Hearing shall not include consideration of what products might be covered by Schedule 1 if the Court were to determine that any license rights under Schedule 1 did not terminate on June 20, 2003."  D.I. #540, ¶ 1.  Any testimony about rebranding products or Mr. Mead's understanding of what products are under the Baystack brand is irrelevant to the issues before the Court and beyond the scope of the Hearing.  FRE 402 states that irrelevant evidence is inadmissible.  Accordingly, the Court should not consider the questions, the resulting testimony, or **Exhibits D-89, D207, and D-289**.

*191:22-193:14*

Objection: Relevance

Arguments: This line of questioning concerns the operating software contained within the Baystack products.  The Court is considering the Schedule 1 issue as well as SNMP Research's Motion to Amend.  The Court has clarified that "the Hearing shall not include consideration of what products might be covered by Schedule 1 if the Court were to determine that any license rights under Schedule 1 did not terminate on June 20, 2003."  D.I. #540, ¶ 1.  Any testimony regarding the software in the Baystack products is irrelevant to these issues and goes against the Court's order.  FRE 402 states that irrelevant evidence is inadmissible.  Accordingly, the Court should not consider this testimony.

*198:3-199:2*

Objection: Lack of foundation/Personal knowledge

Arguments: This line of questioning concerns whether an SNMP document, a software service agreement relates to the operating software in the Baystack products.  The document is an invoice from SNMP Research International addressed to John Seligson.  Mr. Mead did not testify that he was familiar with the document, nor did he even identify it.  The testimony does not establish that he had personal knowledge of the document.  Under FRE 602, a witness must have personal knowledge of the matters about which they testify.  Accordingly, the Court should not consider this testimony.

*199:15-23*

Objection: Lack of foundation/Personal knowledge

Arguments: This line of questioning concerns a document attached to an Avaya Response to Interrogatories.  Mr. Mead testified that he had never seen the chart presented to him before.  *See* 68:3-69:8. Furthermore, while his team did collect some of the information in the chart, there is no testimony that he personally gathered any of the data.  *See* 70:10-22.    Under FRE 602, a witness must have personal knowledge of the matters about which they testify.  Mr. Mead has no knowledge of the document.  Accordingly, the Court should not consider this testimony.

*229:15-232:25*

Objection: Improper examination, relevance, cumulative

Argument: SNMP objects to the questioning from 229:15-22 and 230:2-9 on the grounds of vagueness.  The court may control an examination of a witness to "make [the] procedures effective for determining the truth."  FRE 611(a); (a)(1).  In this case, the questioning is not effective for determining the truth because it attempts to incorporate a myriad of facets into the making of a switch product into a single sentence, resulting in a vague question.  Furthermore, this entire section relates to the SNMP Research software and its removal from certain products. The removal of software has no bearing on whether the SNMP Research Software was licensed after June 20, 2003 or whether the Court should grant SNMP Research's motion to amend.  It is irrelevant to the issues before the Court.  FRE 402 states that irrelevant evidence is inadmissible. Finally, this testimony was already elicited earlier in Mr. Mead's deposition, rendering it cumulative.  A court "may exclude relevant evidence" when its probative value is "substantially outweighed by a danger of…needlessly presented cumulative evidence."  FRE 403. Accordingly, the Court should not consider this testimony.


*233:4-234:21*

Objection: Lack of foundation, relevance, cumulative

Arguments: This line of questioning relates to the removal of software from a product after a company has lost its license to software, including the repercussions of doing so.  The questions also related to Mr. Mead's knowledge of what a software vendor might do if a developer does not have the right to its products.  Mr. Mead did not testify that he has any knowledge of what a software vendor might do in such a situation.  He was asked to speculate.  Under FRE 602, a witness must have personal knowledge of the matters about which they testify.  Furthermore, the issues before this Court are the Schedule 1 issue and the Motion to Amend.  The removal of software has no bearing on whether the SNMP Research Software was licensed after June 20, 2003 or whether the Court should grant SNMP Research's motion to amend.  It is irrelevant to the issues before the Court.  FRE 402 states that irrelevant evidence is inadmissible.  Finally, the testimony is cumulative, as testimony on the removal of software had been elicited earlier in the deposition.  A court "may exclude relevant evidence" when its probative value is "substantially outweighed by a danger of…needlessly presented cumulative evidence."  FRE 403. Accordingly, the Court should not consider this testimony.


*260:17-264:25*

Objections: Incomplete document, Hearsay, exhibit not produced in discovery, relevance

Argument: This entire line of questioning relates to the release and sales dates of certain Baystack products, and relies on **Exhibit D-121**.  The issues before this Court are the Schedule 1 issue and SNMP Research's Motion to Amend.  When certain products were released by Nortel is wholly irrelevant to the issue at bar.  FRE 402 bars irrelevant evidence.  Even if the evidence were relevant, the exhibits upon which the questions rely were not produced to SNMP Research prior to the deposition.  Under FRE 403, the court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of…unfair prejudice."  Because neither exhibit was produced to SNMP Research prior to the deposition, SNMP Research was unfairly prejudiced by the introduction of both exhibits.  Exhibit 137 is also hearsay, as it contains statements made outside of court, if it is being offered for the truth of the matter asserted.  Hearsay is inadmissible under FRE 802.  Finally, Mr. Herrington admitted that Exhibit 138 was an incomplete document during the deposition.  Presenting an incomplete document would result in unfair prejudice and would also mislead a finder of fact, rendering Exhibit 138 inadmissible under FRE 403.  For all of these reasons, the Court should disregard this designation and **D-121** from which the questions arise.

### D.  John Seligson

*132:24-133:12*

Objection: Requires authentication or identification, relevance

Arguments: The document on which the questioning relies is never identified by the witness.  The witness merely acknowledges the date of the document.  Furthermore, the questioning in this passage relates to whether Nortel products included the ERS products.   The Court has clarified that "the Hearing shall not include consideration of what products might be covered by Schedule 1 if the Court were to determine that any license rights under Schedule 1 did not terminate on June 20, 2003."  D.I. #540, ¶ 1.  Whether certain ERS products were Nortel products is beyond the scope of the issue before this Court and is, therefore, irrelevant.  FRE 402 states that irrelevant evidence is inadmissible.  Accordingly, the Court should not consider this testimony.

## II.    SNMP RESEARCH'S RESPONSES TO THE US DEBTORS' OBJECTION TO SNMP'S DESPOSITION DESIGNATIONS
### A.    Pierre Tremblay October 18, 2016

*8:24-9:16*

Objections: FRE 401, 402, 403

Response: This testimony deals with how Mr. Tremblay managed Nortel's relationships with certain 3rd-party software vendors, including SNMP Research.  Nortel objects to this testimony on the grounds of relevance.  This testimony is foundation in establishing that Mr. Tremblay worked with SNMP Research during his tenure at Nortel, and, therefore, it is relevant and should be admitted.

*10:7-16*

Objections: FRE 401, 402, 403

Response: This testimony deals with Mr. Tremblay's role in assuring that product teams were aware of the scope of their software licenses and reported their use so that fees could be paid appropriately. Nortel objects on the grounds of relevance. The testimony reveals that Mr. Tremblay was responsible for understanding the scope of software licenses that Nortel had. Accordingly, it is foundational testimony and is therefore relevant.

*70:22-71:6*

Objections: FRE 401, 402, 403, 602, 701; FRCP 26(a)(2), improper expert testimony

Response: In this section of the deposition, Mr. Tremblay identifies the Nortel Master License Agreement and states its purpose. Nortel objects to this testimony on relevance grounds. Mr. Tremblay testified that he was the manager of Nortel's relationship with SNMP Research. Accordingly, he would be aware of the document that controlled the relationship between the parties. His identification of the document and his understanding of that document are absolutely relevant to the issues at bar. Nortel also objects on the basis of a lack of personal knowledge. Again, Mr. Tremblay testified the agreement was what he was given to manage. He is familiar with it and its purpose. Any objections on the basis of a lack of personal knowledge are unfounded.

Nortel also objects on the grounds that Mr. Tremblay's testimony improperly offers an opinion. Mr. Tremblay did not offer an opinion in his testimony. Rather, he merely testified to the purpose of the document as he understood it in the context of his position at Nortel and Nortel's relationship with SNMP. No opinion is being offered, therefore, FRE 701 does not apply. Even if Mr. Tremblay is offering an opinion, it is an opinion that meets the requirements of FRE 701. FRE 701 allows for a witness not testifying as an expert to offer an opinion if that opinion is "rationally based on the witness's perception," the opinion is "helpful to clearly understanding the witness's testimony or to determining a fact issue," and the opinion is "not based on scientific, technical, or other specialized knowledge…." Mr. Tremblay managed the relationship between SNMP Research and Nortel. His statements are clearly based upon his perception. His understanding of the nature of the Nortel License Agreement, which includes Schedule 1, goes directly to the issue before this Court. Mr. Tremblay's statements regarding the License Agreement do not rely on any scientific, technical, or other specialized knowledge. He is merely testifying from his experience in working with Nortel and managing the relationship between Nortel and SNMP Research. Accordingly, Mr. Tremblay's testimony, if considered an opinion, is still a proper lay opinion under FRE 701.

Furthermore, "[i]t is well-settled that '[t]he modern trend favors the admission of [lay] opinion testimony, provided that it is well found on personal knowledge and susceptible to specific cross-

examination." *Ghee v. Marten Transp., Ltd.,* 570 Fed. Appx. 228, 231 (3d Cir. 2014). "Where, as here, a lay witness's opinion testimony 'is based on sufficient experience or specialized knowledge' and 'a sufficient connection' exists between 'such knowledge and experience and the lay opinion,' that opinion should be admitted because it 'may be fairly considered to be rationally based on the perception of the witness and truly helpful to the jury.'" *Id.* (quoting *Asplundh Mfg. Div. v. Benton Harbor Eng'g.,* 57 F.3d 1190, 1193 (3d Cir. 1995)). Mr. Tremblay's statements are all based on his personal knowledge through his position with Nortel and working with SNMP Research. His opinions are not grounded in any "scientific, technical, or other specialized knowledge." Even if they were grounded in specialized knowledge, there is a sufficient connection between Mr. Tremblay's handling of the Nortel-SNMP relationship to the Nortel License Agreement that his opinions are admissible as lay opinions.

Finally, Nortel objects to Mr. Tremblay's testimony on the ground that he was not disclosed as an expert. As discussed, however, Mr. Tremblay's opinions are all that of a lay witness. Because he is not offering any sort of expert testimony, he would not need to be disclosed as an expert witness. This renders Nortel's objection on the disclosure grounds moot.

For all the foregoing reasons, the Court should overrule Nortel's objections and admit this testimony.

*89:7-90:7*

Objections: FRE 401, 402, 403, 602, 701; FRCP 26(a)(2), improper expert testimony

Response: This testimony is in regards to Schedule 1, specifically Mr. Tremblay's understanding of various provisions of Schedule 1. Nortel first objects to this testimony on relevance grounds. Mr. Tremblay was the point person for the Nortel-SNMP Research relationship. He had the responsibility of managing the scope of Nortel's use of the software licensed from SNMP Research. An issue before this Court is "whether the SNMP Research Software was licensed for use or distribution under Schedule 1…with respect to any products after June 20, 2003…." D.I. #540, ¶ 1. Nortel's understanding of Schedule 1's operation is at the very heart of this issue. Accordingly, Mr. Tremblay's testimony is relevant to the issue.

Nortel also objects on the basis of a lack of personal knowledge. Again, Mr. Tremblay testified the agreement was what he was given to manage. He is familiar with it and its purpose. His job required him to be aware of Schedule 1. Any objections on the basis of a lack of personal knowledge are unfounded. Nortel also objects on the grounds that Mr. Tremblay's testimony improperly offers an opinion. Mr. Tremblay did not offer an opinion in his testimony. Rather, he merely testified to the purpose of the document as he understood it in the context of his position at Nortel and Nortel's relationship with SNMP. No opinion is being offered, therefore, FRE 701 does not apply.

Even if Mr. Tremblay is offering an opinion, it is an opinion that meets the requirements of FRE 701 for lay opinions. FRE 701 allows for a witness not testifying as an expert to offer an opinion if that opinion is "rationally based on the witness's perception," the opinion is "helpful to clearly understanding the witness's testimony or to determining a fact issue," and the opinion is "not based on scientific, technical, or other specialized knowledge…." Mr. Tremblay managed the relationship between SNMP Research and Nortel. His statements are clearly based upon his perception. His understanding of the nature of the Nortel License Agreement, which includes Schedule 1, goes directly to the issue before this Court. Mr. Tremblay's statements regarding the License Agreement do not rely on any scientific, technical, or other specialized knowledge. He is merely testifying from his experience in working with Nortel and managing the relationship between Nortel and SNMP Research. Accordingly, Mr. Tremblay's testimony, if considered an opinion, is still a proper lay opinion under FRE 701.

Furthermore, "[i]t is well-settled that '[t]he modern trend favors the admission of [lay] opinion testimony, provided that it is well found on personal knowledge and susceptible to specific cross-examination." *Ghee v. Marten Transp., Ltd.,* 570 Fed. Appx. 228, 231 (3d Cir. 2014). "Where, as here, a lay witness's opinion testimony 'is based on sufficient experience or specialized knowledge' and 'a sufficient connection' exists between 'such knowledge and experience and the lay opinion,' that opinion should be admitted because it 'may be fairly considered to be rationally based on the perception of the witness and truly helpful to the jury.'" *Id.* (quoting *Asplundh Mfg. Div. v. Benton Harbor Eng'g.,* 57 F.3d 1190, 1193 (3d Cir. 1995)). Mr. Tremblay's statements are all based on his personal knowledge through his position with Nortel and working with SNMP Research. His opinions are not grounded in any "scientific, technical, or other specialized knowledge." Even if they were grounded in specialized knowledge, there is a sufficient connection between Mr. Tremblay's handling of the Nortel-SNMP relationship to Schedule 1 that his opinions are admissible as lay opinions.

Finally, Nortel objects to Mr. Tremblay's testimony on the ground that he was not disclosed as an expert. As discussed, however, Mr. Tremblay's opinions are all that of a lay witness. Because he is not offering any sort of expert testimony, even if his lay opinions are based on specialized experience, he would not need to be disclosed as an expert witness. This renders Nortel's objection on the disclosure grounds moot.

For all the foregoing reasons, the Court should overrule Nortel's objections and admit this testimony.


*95:6-13*

Objections: FRE 401, 402, 403

Response: Mr. Tremblay's testimony regards whether Mr. Tremblay was aware of any products under Schedule 1 as of August 12, 2003. Nortel objects on relevance grounds. This testimony is relevant because it goes to the parties' understanding of Schedule 1 and when it ended. Mr. Tremblay's testimony reveals that the parties understood that Schedule 1 was supposed to

terminate on June 20, 2003, which is why he should not have been able to find any products licensed under Schedule 1 in August of 2003. Accordingly, the testimony is relevant to the issue before the Court, and the objection should be overruled.

## B.  John Mead

*28:5-28:23*

Objections: FRE 401, 402, 403

Response: Mr. Mead's testimony relates to the value of SNMP in a product. Nortel has objected on relevance grounds. SNMP is seeking to amend its proof of claim to include damages on pre-petition damages regarding the ES and ERS products. Mr. Mead's testimony is relevant because it goes to whether SNMP Research has a claim for more extensive pre-petition damages than SNMP Research was previously aware. Accordingly, it is relevant and should be admitted.


*80:14-81:9*

Objections: FRE 401, 402, 403

Response: Mr. Mead's testimony relates to whether he was tasked with identifying third-party software in the ES and ERS products prior to their sale to Avaya. Nortel objects on relevance grounds. SNMP is seeking to amend its proof of claim to include damages on pre-petition damages regarding the ES and ERS products. Mr. Mead's testimony is relevant because it goes to whether SNMP Research has a claim for more extensive pre-petition damages than SNMP Research was previously aware based upon discovery. Mr. Mead's testimony was taken on September 28, 2016, almost a year after SNMPRI filed its fifth amended proof of claim. Mr. Mead's testimony gave SNMP Research more information about Nortel's use of the Software after the fifth amended proof of claim was filed. Accordingly, this testimony is relevant and Nortel's objections should be overruled.


*86:8-86:9; 86:16*

Objections: FRE 401, 402, 403

Response: This portion of the transcript only contains a statement by Mr. Busch introducing an exhibit and that exhibit being marked for identification. Nortel objects on relevance grounds. However, this testimony is only a statement by an attorney and the fact that the exhibit was marked for identification. Because there is neither a question or testimony in these portions of the transcript, Nortel cannot be objecting to anything.

If, however, Nortel is objecting to the use or introduction to the document labelled Exhibit 101 in Mr. Mead's testimony, that document is relevant to an issue before the Court, and, therefore, is admissible. The document contains a list of a 3rd-party software that Nortel used in its products prior to the sale of its businesses. The documents make mention of using SNMP Research's

Software in certain products, namely the ES and ERS products. This document is relevant because it demonstrates information that SNMP Research did not previously have when it filed its fifth amended proof of claim, and goes to whether SNMP Research should be allowed to amend its claim because it discovered more wrongdoing on the part of Nortel after it filed its last proof of claim. Accordingly, this testimony is relevant and Nortel's objections should be overruled.

*88:1-89:10*

Objections: FRE 401, 402, 403

Response: Mr. Mead's testimony, and the document about which he is testifying, are regarding **D-288**, which detailed the 3rd-party software used by Nortel in its products, including the ES and ERS products. Nortel objects to this testimony on grounds of relevance. This document is relevant because it demonstrates information that SNMP Research did not previously have when it filed its fifth amended proof of claim, and goes to whether SNMP Research has a claim for more extensive pre-petition damages than SNMP Research had previously thought. Accordingly, this testimony is relevant and Nortel's objections should be overruled.

*90:2-90:5*

Objections: FRE 401, 402, 403

Response: Mr. Mead's testimony, and the document about which he is testifying, are regarding Exhibit 101 in his deposition, which detailed the 3rd-party software used by Nortel in its products, including the ES and ERS products. Nortel objects to this testimony on grounds of relevance. This document is relevant because it demonstrates information that SNMP Research did not previously have when it filed its fifth amended proof of claim, and goes to whether SNMP Research has a claim for more extensive pre-petition damages than SNMP Research had previously thought. Accordingly, this testimony is relevant and Nortel's objections should be overruled.

### III. SNMP RESEARCH'S OBJECTIONS TO THE US DEBTORS' COUNTER-DESIGNATIONS
#### A. Pierre Tremblay October 18, 2016

*84:12-84:15*: Lack of foundation/personal knowledge

*85:14-85:24*: Lack of relevance; lack of foundation/personal knowledge

*87:20-88:3*: Lack of relevance; lack of foundation/personal knowledge

*88:10-89:3*: Lack of relevance

*90:18-91:1*: None

*92:20-93:2*: Lack of foundation/personal knowledge

*151:4-11*: Lack of relevance

*152:6-153:15*: Lack of relevance

*156:6-157:19*: Lack of relevance, attorney-client privilege

*181:20-182:2*: Lack of relevance, lack of foundation/personal knowledge, attorney-client privilege, wasteful/confusing

## B.  John Mead September 28, 2016

*81:13-82:3*: None

*220:15-223:25*: Improper examination (mischaracterizes testimony, calls for speculation)