## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------------X

In re                         :      Chapter 11

Nortel Networks Inc., *et al.*,[1]     :      Bankr. Case No. 09-10138 (KG)

             Debtors.     :      (Jointly Administered)

------------------------------------------------------- X

SNMP Research International, Inc.

and

SNMP Research, Inc.,            :      Adv. Proc. No. 11-53454 (KG)

           Plaintiffs,

v.

Nortel Networks Inc., *et al.*,

          Defendants.

------------------------------------------------------- X

## U.S. DEBTORS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

---

[1]     In addition to Nortel Networks Inc., the debtors in these Chapter 11 cases are: Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc. and Nortel Networks (CALA) Inc. Additional information regarding the Debtors can be found in their respective Chapter 11 petitions, which are available at http://chapter11.epiqsystems.com/nortel.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ v

INTRODUCTION ......................................................................................... 1

PROPOSED FINDINGS OF FACT ............................................................... 2

I.    OVERVIEW OF THE PARTIES' DISPUTE AND THE EVIDENCE
PRESENTED ....................................................................................... 2

    A.    The Parties' Dispute....................................................................... 2

    B.    The Evidence Presented At The May 11-12 Hearing .................................... 4

II.    SCHEDULE 1'S TERMS AND THE PARTIES' STATEMENTS AND
ACTIONS CONCERNING IT CONFIRM THAT IT CONFERS A ROYALTY
BUY OUT ON ALL PRODUCTS AND PROJECTS ORIGINATING FROM
BAY NETWORKS THAT EXISTED DURING ITS THREE-YEAR TERM ...... 5

    A.    Schedule 1's Provisions Reflect Its Purpose To Confer The Royalty
Buy Out Of The Bay Networks License On Products And Projects In
Existence During Its Term ......................................................................... 5

    B.    International's Negotiator Confirmed That Schedule 1 Would Confer
The Royalty Buy Out On All Products And Projects In Existence
During Its Three-Year Term ...................................................................... 9

    C.    A Contemporaneous Email From Case Further Confirms Schedule 1's
Meaning ...................................................................................................... 12

    D.    International Confirmed Nortel's Right To Use The Schedule 1
Software After June 2003 By Repeatedly Renewing The Software
Service Agreement Under Which It Provided Updated Versions Of
The Software ............................................................................................... 13

    E.    In August 2003, After The End Of Schedule 1's Three-Year Term,
International Stated That Nortel "Has" A Royalty Buy Out Under
Schedule 1 .................................................................................................. 18

    F.    In 2006, International Confirmed Again, In An Email And A Formal
Letter,  That Nortel Had An Ongoing Right To Use The Software
Covered By Schedule 1............................................................................... 20

    G.    International Never Suggested To Nortel That It Would Lose Rights
To Use The Schedule 1 Software At The End Of Schedule 1's Three-
Year Term ................................................................................................... 25

III.   THE PARTIES' CONDUCT CONCERNING OPTIVITY FURTHER CONFIRMS THE MEANING AND EFFECT OF SCHEDULE 1 ...................... 34

    A.    International Confirmed In 2000 That Nortel Did Not Need A New Schedule For The Optivity Group To Continue Using ARL Under Schedule 1 ................................................................................................ 36

    B.    International Confirmed Again In 2004—After The End Of Schedule 1's Three-Year Term—That The Optivity Group Continued To Have The Right To Use ARL Under Schedule 1 ................................................ 41

IV.   INTERNATIONAL'S "NEW SCHEDULES" ARGUMENT DOES NOT HELP IT AVOID THE MEANING AND EFFECT OF SCHEDULE 1 ......................... 44

    A.    The "New Schedules" Involved Software Not Covered By Schedule 1 .... 46

    B.    The "New Schedules" Involved Development Projects That Needed To Obtain Development Software And Pay A License Fee For It ............. 47

    C.    The "New Schedules" Involved Development Projects That Needed To Set Up Software Service Agreements For Their Newly Acquired Software ...................................................................................................... 55

    D.    The Emails International Cites Do Not Support Its "New Schedules" Argument ................................................................................................... 56

V.   THE EVIDENCE OF LICENSING CUSTOM AND PRACTICE OFFERED BY DR. RICHARD RAZGAITIS FURTHER CONFIRMS SCHEDULE 1'S MEANING AND EFFECT ................................................................................... 58

    A.    Dr. Razgaitis Has Extensive Experience In Technology Licensing ........... 58

    B.    Custom And Practice Concerning Embedded Software Teaches That The Parties Would Not Expect Nortel To Lose All Rights Under Schedule 1 In June 2003 ............................................................................ 60

    C.    International's Effort To Undermine Dr. Razgaitis's Testimony Through The Testimony Of David Tollen Fails ......................................... 63

        1.    The Majority Of Tollen's Testimony Is An Inappropriate Attempt To Tell The Court How To Interpret The Text Of Schedule 1 ....... 63

        2.    Tollen's View Is Not Supported By Any Written Agreement Between the Parties ......................................................................... 64

        3.    Tollen's Argument Ignores The Facts Concerning The New Schedules And Fails To Address International's Treatment Of Optivity ........................................................................................... 65

        4.      Tollen's Contention That Razgaitis Has Conflated Patent
Licensing And Software Licensing Is Incorrect ............................  66

D.     Dr. Razgaitis's Opinion Does Not Depend On The Transferability Of
The Bay Networks License To Nortel, And In Any Event The Record
Shows That Nortel Did Assert That It Had Rights Under The Bay
Networks License .........................................................................................  67

VI.   ALTERNATIVELY, THE PARTIES' CONDUCT AND STATEMENTS
AFTER JUNE 2003 ESTABLISHED AN IMPLIED-IN-FACT CONTRACT .....  71

PROPOSED CONCLUSIONS OF LAW ...........................................................................  73

VII.  NORTEL'S UNDERSTANDING OF SCHEDULE 1 IS CORRECT:
SCHEDULE 1 CONFERS A ROYALTY BUY OUT ON THOSE PRODUCTS
AND PROJECTS IN EXISTENCE DURING ITS THREE-YEAR TERM ..........  73

A.     Schedule 1 Is Ambiguous ............................................................................  73

B.     Schedule 1's Provisions Support Nortel's Reading Of The Agreement .....  75

C.     The Parties' Interactions Support Nortel's Interpretation Of Schedule 1 ...  81

        1.      International Confirmed Schedule 1's Meaning And Effect Before
It Was Signed ...................................................................................  82

        2.      The May 2000 Email From Case To Reeves Further Confirms
Schedule 1's Meaning .......................................................................  85

        3.      International's Repeated Renewal Of The SSA Covering The
Schedule 1 Software After June 2003 Further Confirms Nortel's
Ongoing Right To Use That Software .............................................  86

        4.      International Confirmed In August 2003, After The End Of
Schedule I's Three-Year Term, That Nortel Had An Ongoing
Royalty Buy Out Under Schedule 1 .................................................  87

        5.      In January 2006, International Expressly Confirmed To The Nortel
BayStack Group That They Had An Ongoing Right To Use The
Schedule 1 Software .......................................................................  88

        6.      International Never Said To Nortel That Its Right To Use SNMP
Research Software Would Be Stripped Away At The End Of
Schedule 1's Three-Year Term ........................................................  90

        7.      The Parties' Conduct In A Parallel Situation—The Optivity
Group's Use Of ARL—Confirmed That Nortel's Rights Under
Schedule 1 Continued After June 2003 ...........................................  92

D.      International's "New Schedules" Argument Is Baseless ............................ 93

E.      The Expert Evidence Concerning Custom and Practice Supports
        Nortel's Understanding Of Schedule 1 ........................................................ 94

VIII.   ALTERNATIVELY, THE PARTIES' CONDUCT AND STATEMENTS
        ESTABLISH AN IMPLIED-IN-FACT CONTRACT .......................................... 95

CONCLUSION ............................................................................................................. 98

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander & Alexander Servs., Inc. v. These Certain Underwriters at*
*Lloyd's, London,*
136 F.3d 82 (2d Cir. 1998)......................................................................... *passim*

*Bajan Grp., Inc. v. Consumers Interstate Corp.,*
2010 WL 3341456 (N.Y. Sup. Ct. 2010)............................................................ 76

*Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch,*
*Pierce, Fenner & Smith Inc.,*
232 F.3d 153 (2d Cir. 2000)........................................................................... 82

*DDS Partners, LLC v. Celenza,*
6 A.D.3d 347 (N.Y. App. Div. 2004) ................................................................. 78

*Dev. Specialists, Inc. v. Peabody Energy Corp.*
*(In re Coudert Bros.),*
487 B.R. 375 (S.D.N.Y. 2013)........................................................................ 74

*Evans v. Famous Music Corp.,*
807 N.E.2d 869 (N.Y. 2004)........................................................................... 82

*Faulkner v. Nat'l Geographic Soc'y,*
452 F. Supp. 2d 369 (S.D.N.Y. 2006)....................................................86-87, 88, 90

*Former S'holders v. Browning-Ferris Indus.,*
2005 WL 2820594 (Cal. Ct. App. 2005) ............................................................. 70

*Hamden v. Total Car Franchising Corp.,*
548 F. App'x 842 (4th Cir. 2013) ..................................................................... 79

*Harco Nat'l Ins. Co. v. Arch Specialty Ins. Co.,*
2008 WL 1699755 (S.D.N.Y. 2008),
*aff'd,* 328 F. App'x 678 (2d Cir. 2009)............................................................ 96, 97

*Intesa Sanpaolo, S.p.A. v. Credit Agricole Corp. & Inv. Bank,*
2013 WL 4856199 (S.D.N.Y. 2013).................................................................. 75

*Jefferson Chem. Co. v. Mobay Chem. Co.*,
267 A.2d 635 (Del. Ch. 1970)........................................................................... 78

*Jobim v. Songs of Universal, Inc.*,
732 F. Supp. 2d 407 (S.D.N.Y. 2010).............................................................. 82

*Last Time Beverage Corp. v. F & V Distrib. Co., LLC*,
951 N.Y.S.2d 77 (N.Y. App. Div. 2012) ......................................................... 82

*Laureate Educ., Inc. v. Ins. Co. of Pennsylvania*,
2014 WL 1345888 (S.D.N.Y. 2014)................................................................. 75

*M&G Polymers USA, LLC v. Tackett*,
135 S. Ct. 926 (2015)........................................................................................ 76

*Marathon Asset Mgmt., LP v. Angelo Gordon & Co, LP*
*(In re Energy Future Holdings Corp.)*,
2017 WL 1170830 (D. Del. 2017) .................................................................... 74

*Martilet Mgmt. Servs., Inc. v. Bailey*,
2013 WL 5420966 (S.D.N.Y. 2013)................................................................. 81

*Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*,
643 N.E.2d 504 (N.Y. 1994).............................................................................. 81

*N. Am. Hyperbaric Ctr. v. City of New York*,
604 N.Y.S.2d 56 (N.Y. App. Div. 1993) .......................................................... 96

*Nat'l Union Fire Ins. Co. of Pittsburg v. Beelman Truck Co.*,
203 F. Supp. 3d 312, 322 (S.D.N.Y. 2016)...................................................... 75

*New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*,
442 F.3d 101 (2d Cir. 2006)........................................................................ 75, 82

*Nycal Corp. v. Inoco PLC*,
988 F. Supp. 296 (S.D.N.Y. 1997).................................................................... 86

*Prior v. Innovative Commc'ns Corp.*,
207 F. App'x 158 (3d Cir. 2006) ................................................................. 81-82

*Richmor Aviation, Inc. v. Sportsflight Air, Inc.*,
918 N.Y.S.2d 806 (N.Y. App. Div. 2011) ................................................... 96, 98

*Sbarra v. Totolis*,
191 A.D.2d 867 (N.Y. App. Div. 1993) ............................................................. 75

*Serdarevic v. Centex Homes, LLC*,
760 F. Supp. 2d 322 (S.D.N.Y. 2010)................................................................. 74

*SQL Sols., Inc. v. Oracle Corp.*,
1991 WL 626458 (N.D. Cal. 1991) ..................................................................... 70

*Sutton v. E. River Sav. Bank*,
435 N.E.2d 1075 (N.Y. 1982)............................................................................. 81

*Torres v. Major Auto. Grp.*,
2014 WL 4802985 (E.D.N.Y. 2014).................................................................... 75

*Zucker v. Waldmann*,
2015 WL 390192 (N.Y. Sup. Ct. 2015)............................................................... 75

**Other Authorities**

Brian G. Brunsvold et al., *Drafting Patent License Agreements* 1 n.1 (7th ed. 2012) ....... 67

Williston on Contracts § 32.11 (4th ed. 2017)................................................... 81

## INTRODUCTION

1.      Upon agreement by the parties and order of the Court, the Court held a two-day

trial on May 11 and 12, 2017 to "address the underlying merits issue of whether the SNMP

Research Software was licensed for use or distribution under Schedule 1A ("Schedule 1") of the

Nortel License with respect to any products after June 20, 2003 (the "Schedule 1 Issue")."  Adv.

D.I. 540.[2]

2.      The Schedule 1 Issue was bifurcated and tried separately from all other issues

pursuant to Fed. R. Bankr. P. 7042(b) and Fed. R. Civ. P. 42(b), in order to make a determination

concerning the Schedule 1 Issue for purposes of the Adversary Proceeding captioned *SNMP*

*Research International, Inc. and SNMP Research, Inc. v. Nortel Networks, Inc., et al.*, Adv. Proc.

No. 11-53454 (KG), the proofs of claim filed by SNMP Research International, Inc.

("International") and, if applicable, the relief sought by SNMP Research, Inc. ("Inc.") and

International in their Motion to Amend (D.I. 17432).

3.      Before the May 11-12 hearing, plaintiff International moved on April 10, 2017 to

exclude 1) extrinsic evidence concerning the Schedule 1 Issue; and 2) the testimony of the

Nortel's expert Dr. Richard Razgaitis.  Adv. D.I. 542.  Nortel opposed the motion (Adv. D.I.

547), and International filed a reply.  Adv. D.I. 552.  After hearing argument by the parties on the

motion to exclude during a hearing held on May 2, 2017, the Court denied International's motion

in its entirety.  Order re Mot. to Exclude, May 4, 2017 (Adv. D.I. 560).  In so ruling, the Court

concluded that Schedule 1 was ambiguous.  *Id.*; May 2 Tr. 120:1-130:16.

---

[2]      As discussed at the May 11-12, 2017 hearing, the parties are submitting their deposition designations and counter-designations to the Court in writing.  In accordance with the Court's direction, Nortel has appended to its Proposed Findings of Fact and Conclusions of Law as Appendix A a table setting forth the bases for its objections to certain of International's deposition designations.  Trial Tr. 285:10-13.

4.     The Court has subject matter jurisdiction to consider the Schedule 1 Issue and the issues tried during the May 11-12 hearing pursuant to 28 U.S.C. § 1334 and venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The matters addressed during the May 11-12 hearing are core proceedings pursuant to 28 U.S.C. § 157(b)(2).

## PROPOSED FINDINGS OF FACT[3]

### I.     OVERVIEW OF THE PARTIES' DISPUTE AND THE EVIDENCE PRESENTED

#### A.     The Parties' Dispute

5.     The parties' dispute concerns Schedule 1, an agreement between International and Nortel Networks Corporation, the ultimate parent company, on behalf of itself and its various subsidiaries, including Nortel Networks Inc.  Schedule 1 refers to and incorporates terms of an earlier license between International and Bay Networks (the "Bay Networks License"), a company that Nortel acquired in 1998.

6.     The Bay Networks License provided for a royalty buy out on all Bay Networks products, permitting the use of the designated SNMP Research software for the entire life of any product line created by Bay Networks.  Schedule 1 applies to "[a]ll products of units and projects originating from what was Bay Networks," and serves to incorporate terms of the Bay Networks License into the master license agreement between Nortel and International.  Specifically, Schedule 1 incorporates its license to the designated SNMP Research software and its royalty provisions, which as noted, provide for a royalty buy out.  Schedule 1 also includes language providing that it has a three-year term.

7.     Nortel's understanding is that Schedule 1 confers the royalty buy out of the Bay Networks License on "[a]ll products of units and projects originating from what was Bay

---

[3]     To the extent any proposed finding of fact is more appropriately considered as a conclusion of law, the U.S. Debtors request that the Court consider it as such; and to the extent a proposed conclusion of law is more appropriately considered as a finding of fact, the U.S. Debtors request that the Court consider it as such.

Networks" in existence during its three-year term.  Specifically, any existing products and any development projects originating from Bay Networks that emerged during Schedule 1's three-year term would receive the royalty buy out.  New development projects that were begun after the three-year termination date would not be covered by Schedule 1 and so would need to address royalties on their own.

8.     For its part, International contends that the three-year term of Schedule 1 means not only that development projects begun after the three-year term would not be covered, but also that any existing products and projects that had been covered by the Bay Networks License and Schedule 1 would lose their right to use the designated SNMP Research software at the three-year mark, so as to become infringing after that date.  International also contends that there was an "unwritten agreement" under which Nortel could obtain the lifetime royalty buy out for products covered by Schedule 1, but that Nortel would need to execute yet another schedule in order to obtain that benefit.  International maintains that if Nortel did not execute such a new schedule, then products covered by the Bay Networks License and Schedule 1—including in particular the BayStack/ES/ERS[4] switches that are the subject of International's principal claims in this matter—would become unlicensed and infringing at the end of Schedule 1's three-year term on June 20, 2003.

9.     In addition to their dispute concerning the meaning and effect of Schedule 1, the parties also have a related dispute.  New York law provides that when parties continue to operate on the basis that a contract is still operative after its nominal termination date, they create an implied-in-fact agreement that continues in effect.  Nortel's position is that even if Schedule 1 could be read as International now proposes, the parties' actions, including in particular

---

[4]     These switches originally were sold under the "BayStack" name and later were rebranded with the "ES" and "ERS" names.  Ex. D-89.  Accordingly, they will be referred to here as the "BayStack/ES/ERS" switches.

International's repeated conduct and statements after the June 2003 expiration of Schedule 1, established an implied-in-fact contract confirming Nortel's ongoing right to use the Schedule 1 software beyond the end of Schedule 1's three-year term.  International disputes this contention.

**B.      The Evidence Presented At The May 11-12 Hearing**

10.      Before addressing specific evidence bearing on the proper interpretation of Schedule 1, it is helpful to summarize the two basic types of fact evidence presented by the parties in the hearing on May 11-12, 2017.  First, there is the contemporaneous written record of the parties' negotiations concerning Schedule 1, as well as the contemporaneous written record of the parties' conduct and statements concerning Schedule 1 after it was signed.  This contemporaneous, "real-time" evidence is especially important, because Schedule 1 was negotiated and finalized more than 17 years ago.  Moreover, this documentary evidence memorializes what the parties said to each other about Schedule 1's meaning and effect, and how they conducted themselves under Schedule 1, years before the current litigation arose.

11.      Second, there is the oral testimony of two individuals, John Southwood (International's point person for the negotiation of Schedule 1) and Jeffrey Case (an employee and owner of Inc.).  As noted, Schedule 1 was negotiated and finalized more than 17 years ago.  And other important actions and statements reflecting the parties' understanding and performance under Schedule 1 took place more than a decade ago.  Testimony that attempts to recall and describe these events that occurred so many years ago is not as reliable as the contemporaneous documentary record of the parties' actions and statements.  Further, while the written record was created at a time when there was no dispute between the parties, the oral testimony at the hearing is being offered in the context of litigation.  In particular, Case owns Inc., which is attempting to pursue a damages claim for more than $96 million against the BayStack/ES/ERS switches that depends on the argument that these products were no longer

4

covered by Schedule 1 after the end of Schedule 1's three-year term in June 2003.[5]  And

Southwood was a long-time employee of Inc. and then International, who recently retired from

International.

12.    In weighing the evidence, as discussed below, oral testimony that is inconsistent

with the contemporaneous written record of the parties' negotiations and performance under

Schedule 1 cannot be considered credible.  At a minimum, where the contemporaneous written

record and the oral testimony conflicts, or where the oral testimony seeks to explain away the

written record, the contemporaneous written record carries greater probative weight and cannot

be trumped by oral testimony offered more than 17 years after the fact in the context of litigation.

## II.    SCHEDULE 1'S TERMS AND THE PARTIES' STATEMENTS AND ACTIONS CONCERNING IT CONFIRM THAT IT CONFERS A ROYALTY BUY OUT ON ALL PRODUCTS AND PROJECTS ORIGINATING FROM BAY NETWORKS THAT EXISTED DURING ITS THREE-YEAR TERM

13.    The terms of Schedule 1 and the relevant evidence concerning its meaning and

effect confirm Nortel's understanding of the agreement:  that Schedule 1 confers the royalty buy

out of the Bay Networks License on "[a]ll products of units and projects originating from what

was Bay Networks" in existence during its three-year term.  Ex. D-7C at 1.  Schedule 1's terms

point to this conclusion.  And the parties' statements and actions concerning Schedule 1, both

before and after it was executed, are consistent with and reinforce this meaning and effect.

### A.    Schedule 1's Provisions Reflect Its Purpose To Confer The Royalty Buy Out Of The Bay Networks License On Products And Projects In Existence During Its Term

14.    The provisions of Schedule 1, considered as a whole and in harmony, reflect its

purpose of conferring the royalty buy out of the Bay Networks License on "[a]ll products of units

---

[5]        According to plaintiffs, Case has invested "millions and millions" of dollars in this litigation.  Inc. and International's Reply in Further Support of Mot. to Amend ¶ 52 (D.I. 18069).

and projects originating from what was Bay Networks" in existence during its three-year term.
*Id.*

15.     The Bay Networks License provided for a royalty buy out as to certain designated

SNMP Research software for use in any Bay Networks products.  Specifically, it provided for a

royalty buy out for SNMP Research's "EMANATE" software for ▮▮▮▮▮▮ and a royalty buy

out for SNMP Research's "Asynchronous Request Libraries" (or "<u>ARL</u>") for ▮▮▮▮▮.  Ex. D-2

at 15, 19; Ex. D-4 at 1-2.

16.     Bay Networks purchased the royalty buy out for EMANATE, which was used in

an Ethernet switch product that was known as "BayStack" at Bay Networks and continued to be

sold by Nortel after it acquired Bay Networks in 1998.  Ex. D-2 at 19; Ex. D-79A at 2; Trial Tr.

298:19-299:10; 315:19-22; Mead Dep. 173:23-177:20; 183:6-187:4; 191:22-192:25.[6]  In 2004,

the BayStack/ES/ERS switches were rebranded with the names "ES" and "ERS" and so will be

referred to here as "BayStack/ES/ERS switches."  Ex. D-89; Mead Dep. 183:6-187:4.  The

EMANATE software was used to assist in developing a software agent for the BayStack/ES/ERS

switches that provided functionality compliant with the SNMP Protocol—which is just one of

hundreds of features in these products.  Trial Tr. 310:12-311:11; Mead Dep. 220:15-223:25.

17.     The ARL software was used in a set of products called "Optivity" that was

developed and sold by Bay Networks and continued to be sold by Nortel after it acquired Bay

Networks.   Trial Tr. 315:23-316:5; Case Dep. 67:21-69:15.  Nortel completed the purchase of

the royalty buy out for ARL in February 2000, more than a year after it had acquired Bay

Networks.  Ex. D-4 at 2-3; Ex. D-80 at 1; Ex. D-79A at 2, 8.

---

[6]        To be precise, the BayStack products used software that is a subset of EMANATE, referred to as
EMANATE/Lite.

18.     By purchasing the royalty buy outs, Bay Networks and later Nortel obtained the right to "distribute in perpetuity an unlimited number of binary copies" of the designated SNMP Research software.  Ex. D-2 at 19; Ex. D-4 at 2; Trial Tr. 308:11-310:7.

19.     Nortel acquired Bay Networks, Inc. in 1998.  Ex. P-71.  Nortel signed Schedule 1 on December 20, 1999, and International signed it on June 20, 2000.  Ex. D-7C at 2.  Schedule 1 is a schedule to the master license agreement that Nortel and International executed on December 23, 1999.  Ex. D-6A.

20.     Schedule 1 incorporates the Bay Networks License and its royalty buy out in several key provisions.

21.     First, the "Specified Product or Project" section identifies the products and projects to be covered by Schedule 1:  "All products of units and projects originating from what was Bay Networks."  Ex. D-7C at 1.

22.     Second, the "Development Software" and "Run-Time Software" sections refer to the Bay Networks License to identify the specific SNMP Research software that was covered by the royalty buy out under the Bay Networks License and would likewise be covered by Schedule 1, including EMANATE and ARL.  *Id.*

23.     Third, the "Royalties" section refers to and incorporates the royalty provisions of the Bay Networks License, stating:  "As described in the agreements and amendments thereto between SNMP and Bay Networks and its predecessor entities."  *Id.*  As noted, the Bay Networks License provided for a royalty buy out for the designated SNMP Research software, EMANATE and ARL.

24.     Schedule 1 also includes the following language in a section titled "Additional Conditions" so as to provide for a three-year term:

This Schedule supersedes all of the prior agreements between SNMP and Bay Networks and its predecessor entities as referenced above, and all such agreements are hereby terminated by execution of this Schedule.

This Schedule and the license in regard to the Development Software and Run-Time Software shall terminate and be of no further effect after a period of three years from the last date that this Schedule is executed below.

Ex. D-7C at 2.

25.     In sum, Schedule 1 identifies the products and projects to be covered; it refers to and incorporates the Bay Networks License with respect to the SNMP Research software to be covered and the royalty buy out that is to be conferred; and it provides that it will terminate after three years.  Thus, the provisions of Schedule 1, taken as a whole, provide that "[a]ll products of units and projects originating from what was Bay Networks" in existence during the three-year term will receive a lifetime royalty buy out in accordance with the Bay Networks License.

26.     As noted, the Court has already ruled that Schedule 1 is capable of being construed in more than one way and therefore cannot be deemed unambiguous.  Order re Mot. to Exclude, May 4, 2017 (Adv. D.I. 560); May 2 Tr. 120:1-130:16.  As outlined above, the better and more appropriate reading of Schedule 1, giving effect to all of its provisions, is that it confers the royalty buy out of the Bay Networks License on "[a]ll products of units and projects originating from what was Bay Networks" in existence during its three-year term.  In other words, Schedule 1's three-year term means that any existing products and any development projects originating from Bay Networks that emerged during those three years would take advantage of the lifetime royalty buy out until the products aged out of the marketplace. Conversely, new products or projects brought on line after the three-year termination date would not receive the royalty buy out and so would need to address royalties on their own.

8

**B.** **International's Negotiator Confirmed That Schedule 1 Would Confer The Royalty Buy Out On All Products And Projects In Existence During Its Three-Year Term**

27.     The understanding of Schedule 1 outlined above was expressly confirmed shortly before Schedule 1 was signed by International's point person in the negotiations, John Southwood.  Trial Tr. 452:3-7.  Specifically, Southwood confirmed that Schedule 1 provides that all Bay Networks "products and development projects for the next three years will take advantage of the lifetime royalty buy out until their products have aged out of the marketplace." Ex. D-76C at 1;  Trial Tr. 510:2-6.

28.     Southwood did so in a November 16, 1999 email to Nortel's lead negotiator, Dave Hyslop.  Southwood's email was a response to a request from Hyslop to review and approve a memo that would be sent to various constituents at Nortel, and Southwood made clear in providing his comments that he understood "everyone's expectations are [being] fixed for all time."  Ex. D-76C at 1.  Southwood thus understood the importance of what he was writing and knew that Nortel would rely on his explanation of the parties' agreement.

29.     Referring to Schedule 1, Southwood stated as follows:

> I told [the lawyer preparing Schedule 1] that the royalty buy out would expire in three years. . . . By expire I mean that new products/projects brought on line after three years would address royalties on their own merit.  Current Bay products and development projects for the next three years will take advantage of the lifetime royalty buy out until their products have aged out of the marketplace.

Ex. D-76C at 1.

30.     It is clear that Southwood's email is referring to Schedule 1, which he describes as the "final Bay transfer to Nortel."  *Id.*  Similarly, a few days earlier, Southwood stated that "we are going to use Schedule 1A as the permanent Bay to Nortel license transfer."  Ex. D-182. ("Schedule 1" and "Schedule 1A" refer to the same agreement.)  And when Southwood sent

9

Nortel the draft of Schedule 1 on November 18, less than 48 hours after his November 16 email quoted above, he again called Schedule 1 "the permanent Bay to Nortel transfer."  Ex. D-183.01; Ex. D-183.02.

31.     Moreover, Southwood's email reflects that, in negotiating Schedule 1, the parties were focused on the royalty buy out that it would confer.  In discussing Schedule 1, the language from Southwood's email quoted above refers to the "royalty buy out" and explains what it means to provide that the "royalty buy out" would expire in three years.  Ex. D-76C at 1.

32.     Thus, Southwood's email explained and confirmed Schedule 1's meaning and effect, including the effect of providing that it would terminate or "expire" after three years:

> 1)   "Current Bay products and development projects for the next three years will take advantage of the lifetime royalty buy out until their products have aged out of the marketplace," and

> 2)   "[N]ew products/projects brought on line after three years would address royalties on their own merit"—that is, they would not receive the benefit of Schedule 1's lifetime royalty buy out.  *Id.*[7]

33.     Southwood's contemporaneous written explanation of Schedule 1, and what it means for Schedule 1 to expire or terminate in three years, is the same as Nortel's understanding of Schedule 1.  And it is directly contrary to the interpretation that International is now offering, which is that products and projects covered by Schedule 1 would be stripped of their right to use the SNMP Research software at the end of Schedule 1's three-year term.

34.     Further, International's proposed interpretation is contrary to the very fact that Schedule 1 confers a "royalty buy out" on the products it covers, a point that also is confirmed

---

[7]      In his deposition, Jeffrey Case, the owner and founder of Inc., also confirmed that Southwood's November 16 email "implies that anything that was happening during those three years could continue in perpetuity, and all derivative works thereof and all revisions and updates."  Case Dep. 214:18-25.

by Southwood's November 16 email.  The purpose of a royalty buy out is to confer on a product

line the right to use the designated software throughout its lifetime.  As provided in the Bay

Networks License and incorporated into Schedule 1, a royalty buy out confers the right to

"distribute in perpetuity an unlimited number of binary copies" of the designated SNMP

Research software.  Ex. D-2 at 19; Ex. D-4 at 2; Trial Tr. 308:11-310:7.  And Southwood's email

confirms that the point of a royalty buy out is that a product line will have a "lifetime" right to

use the software, which will remain in place until the product line has "aged out of the

marketplace."  Ex. D-76C at 1.

35.    Given this purpose of a royalty buy out, it does not make sense for International to

contend that the royalty buy out conferred by Schedule 1 would be extinguished after three years.

Instead, the purpose of providing that Schedule 1 will terminate after three years is to define

which products and projects would receive the royalty buy out:  those product lines in existence

during the three-year term would receive the royalty buy out, and those development projects

begun after the three-year term would not receive the royalty buy out.  Again, Southwood's

November 16, 1999 email expressly confirms this meaning and effect.  Ex. D-76C at 1.

36.    Further, there is no suggestion in the record that the parties changed their

agreement concerning Schedule 1 following Southwood's November 16 email.  To the contrary,

Southwood's email noted that he had communicated the same understanding of Schedule 1 to

International's counsel, Rick Barnes, who was "crafting" the schedule's text.  Ex. D-76C at 1.

Less than 48 hours later (on November 18, 1999), Southwood sent Hyslop the draft of Schedule

1—with exactly the same content as the final signed version.  Ex. D-183.01; Ex. D-183.02.

37.    In sum, the contemporaneous explanation of International's point person in the

negotiations, John Southwood, confirms Schedule 1's meaning and effect:  that "current Bay

11

products and development projects for the next three years will take advantage of the lifetime royalty buy out until their products have aged out of the marketplace." Ex. D-76C at 1. This is the same meaning and effect that Nortel understands Schedule 1 to have.

**C.    A Contemporaneous Email From Case Further Confirms Schedule 1's Meaning**

38.    The meaning of Schedule 1 outlined above is further reflected and confirmed in an email that Case sent in May 2000 to James Reeves, who had been in charge of the BayStack group at Bay Networks and continued to be in charge of the same group at Nortel. Ex. D-77A. Reeves had been responsible for originally incorporating SNMP Research's software into the BayStack/ES/ERS switches at Bay Networks, and he and Case had worked together extensively over the years in that context, becoming friends in the process. Trial Tr. 298:19-299:11; 300:2-18; 310:12-22; Case Dep. 56:8-59:2; 59:23-60:23; 433:3-14. Their email exchange itself reflects their friendly relationship: they recount their meeting at a recent trade show, and Case congratulates Reeves on his recent promotion, while Reeves asks about Case's planned move to a new house. Ex. D-77A.

39.    In his email to Reeves, Case refers to "Schedule 1 [as] the document that grandfathers the Bay licenses over to the new Nortel master agreement" and assures him "I was correct ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆" *Id.* Case's description is consistent with the reading of Schedule 1 outlined above: that it "grandfathers the Bay licenses over to the new Nortel master agreement," so that the BayStack/ES/ERS switches for which Reeves was responsible would be able to continue using the SNMP Research software, and that there would be no additional cost.

40.    Further, there is nothing in Case's email to Reeves that is consistent with the interpretation of Schedule 1 that International is offering now: that the BayStack/ES/ERS switches would be stripped of the right to use the SNMP Research software after three years, and

that, according to the claims of International and Inc. in this lawsuit, the cost of obtaining a new

license would be tens of millions of dollars.

41.     Still further, if the interpretation of Schedule 1 that International offers now were

to be accepted, that would mean the BayStack/ES/ERS switches for which Reeves was

responsible became infringing at the end of Schedule 1's three-year term in June 2003.  If Case

actually had held that understanding, he surely would have said something to Reeves before June

2003, as Case conceded.  Trial Tr. 319:2-18; Case Dep. 393:10-394:2.  Given Case's friendship

with Reeves and others in the BayStack team at Nortel, he had every opportunity to say

something if he actually had believed that the BayStack/ES/ERS switches would become

infringing in June 2003.

42.     In fact, the record demonstrates that Case actually met with Reeves and the

BayStack group in April 2003, just before the end of Schedule 1's three-year term, and that Case

described SNMP Research in the meeting invitation as the group's "supplier of source code for

SNMP-based network management."  Ex. D-243.  But, as discussed further in Section II.G

below, Case did not say anything to Reeves or anyone else to suggest that in June 2003 Nortel

would be stripped of the right to use the SNMP Research software, or that the BayStack/ES/ERS

switches would become infringing.  Nor did anyone else at International or Inc. say any such

thing to anyone at Nortel.

**D.     International Confirmed Nortel's Right To Use The Schedule 1 Software
After June 2003 By Repeatedly Renewing The Software Service Agreement
Under Which It Provided Updated Versions Of The Software**

43.     For years after Schedule 1's June 2003 termination date, International repeatedly

confirmed Nortel's ongoing right to use the software covered by Schedule 1 by renewing an

annual Software Service Agreement ("SSA") with Nortel covering the software licensed under

Schedule 1.  Ex. D-171; Ex. D-79A at 8-9; Ex. D-81; Ex. D-95; Ex. D-96; Ex. D-97 at 1; Ex. D-

13

98 at 1; Ex. D-99; Ex. D-83 at 2; Ex. D-101 at 1; Ex. D-100 at 1.  Under the SSA, International

provided updated versions of the Schedule 1 software and support for that software to the Nortel

group responsible for the BayStack/ES/ERS switches (referred to as the "Bay" group at Nortel),

and International collected thousands of dollars in payments from Nortel in return.  *Id.*; Trial Tr.

513:19-514:4.

44.     International actively pursued and solicited Nortel to renew the SSA.  Ex. D-82 at

2-3; Ex. D-83 at 1 (emails from International to the BayStack group asking it to renew the SSA).

And for each renewal, International manually sent Nortel an invoice under which it charged and

collected from Nortel thousands of dollars each year.  Ex. D-81; Ex. D-95; Ex. D-96; Ex. D-97 at

1; Ex. D-98 at 1; Ex. D-99; Ex. D-83 at 2; Ex. D-101 at 1; Ex. D-100 at 1.

45.     The repeated annual renewal of the SSA for the Schedule 1 software after June

2003 is consistent with Nortel's understanding of Schedule 1:  it confirmed that Nortel continued

to have the right to use the Schedule 1 software in the BayStack/ES/ERS switches after Schedule

1's three-year term.  And this course of conduct that repeatedly confirmed Nortel's ongoing right

to use the Schedule 1 software is directly contrary to International's argument that Nortel lost the

right to use that software in June 2003.

46.     Given that this conduct contradicts International's current argument concerning

Schedule 1, International now claims it was a "mistake" to repeatedly renew the SSA after June

2003.  Trial Tr. 269:22-270:1 (Case contending that "we shouldn't have done it.  That was a

mistake.").  As an initial matter, even if one were to credit International's claim that it made a

"mistake," that would not help it because, as discussed below in the Conclusions of Law, only

the parties' objective manifestations to one another concerning the meaning of a contract are

relevant.  Here, the objective manifestations of International to Nortel in repeatedly renewing the

SSA for the Schedule 1 software confirmed Nortel's ongoing right to use the Schedule 1

software after June 2003.  International's current claim that it secretly and subjectively harbored

a belief that Nortel did ***not*** have the right to use the Schedule 1 software after June 2003, even if

it could be credited, would be irrelevant.[8]

47.     Further, it is not credible for International to try to dismiss a consistent course of

conduct as a "mistake" years after the fact, simply because that conduct is contrary to its

litigation argument.  This is especially true given that International's renewal of the SSA and

confirmation of Nortel's ongoing right to use the software covered by Schedule 1 is consistent

with the terms of Schedule 1, with Southwood's explanation of Schedule 1's meaning and effect

before it was signed, with Case's description of Schedule 1, and with other evidence discussed

below, including Southwood's express statement in a formal letter in January 2006—years after

June 2003—that Nortel continued to have the right to use the software covered by Schedule 1.

48.     At trial, International also offered the speculation that the International employees

responsible for the SSA may have been unaware of the terms of Schedule 1 or of the connection

between the SSA and Schedule 1, but this was not corroborated by any objective or

contemporaneous evidence or by any testimony from these individuals.  To the contrary, there is

no dispute that the SSA that was repeatedly renewed after June 2003 was for the same

---

[8]     International's counsel also offered the irrelevant contention (without providing any evidentiary support) that Nortel did not choose to incorporate into its products the updated versions of the software it received in the years after 2003 but instead continued using an earlier version.  Trial Tr. 657:20-658:14.  This is irrelevant for two reasons.  First, under the SSAs, International provided its customers not only with updated versions of the software but also with access to technical support.  Trial Tr. 207:10-16.  And as Southwood conceded, even if a customer chooses to continue using a particular version of the software rather than applying an upgrade, it may wish to continue renewing an SSA because "the value they were receiving" was "access to support" and "the value they [get] from the upgrade was just to know they had it available if they wanted it."  Trial Tr. 516:7-23.  As Southwood also acknowledged, it would make no sense for a customer who was not using software at all to continue paying for renewals of the SSA for the software.  Trial Tr. 514:13-517:11.  Second, and more fundamental, is that the question here is whether Nortel had the ***right*** to use the software covered by Schedule 1 after June 2003.  Regardless of whether Nortel chose to incorporate any particular updated version of software into its products, the fact that International repeatedly renewed the SSA for the Schedule 1 software, and provided Nortel with updated versions of the Schedule 1 software for it to use if it wished, plainly confirms Nortel's ***right*** to use that software.

EMANATE software covered by Schedule 1, as confirmed by comparing Schedule 1 to the SSA invoices. *Compare* Ex. D-7A *with* Ex. D-81; Ex. D-95, Ex. D-96, Ex. D-97 at 1, Ex. D-98, Ex. D-99, Ex. D-83 at 2, Ex. D-101 at 1, Ex. D-100 at 1. And Southwood's testimony confirmed that the SSA applied to the software covered by Schedule 1:

> Q. [T]he software covered by this SSA is the same software covered under Schedule 1; correct?
>
> A. It was actually the same software covered under the Bay license.
>
> Q. Exactly.
>
> A. But at this point it was under Schedule 1.
>
> Q. Exactly. It was incorporated into the Nortel agreement under Schedule 1.
>
> A. Yes.

Trial Tr. 512:11-21.

49.     That the SSA was for the software covered by Schedule 1 and was associated with Schedule 1 is also confirmed by International's own records. First, each invoice under the SSA had the Customer ID "Bay" and was directed to "Nortel (was Bay)." Ex. D-81; Ex. D-95; Ex. D-96; Ex. D-97 at 1; Ex. D-98 at 1; Ex. D-99; Ex. D-83 at 2; Ex. D-101 at 1; Ex. D-100 at 1.

50.     Second, International's own records establish its awareness that the SSA was associated with Schedule 1. International maintained a list of Nortel contacts who were associated with Schedule 1, Ex. D-150 at 2, and the SSA renewals were directed to Nortel employees on this list. For example, the Schedule 1 contact list includes John Mead and Nana La-Anyane, *id.*, who were members of the BayStack group at Nortel. Trial Tr. 311:8-312:11; Case Dep. 59:23-60:23; Ex. D-85; Mead Dep. 193:2-14. The "Customer PO" and an email sent by International about the 2005 SSA invoice went to Mead and La-Anyane. Ex. D-83.

16

Similarly, Emerson Monte Thwing, a Nortel employee whom International contacted in November 2003 about renewing the SSA and who was listed as the "Customer PO" for the 2004 SSA (Ex. D-98 at 2; Ex. D-99), is also listed on International's Schedule 1 contact list.  Ex. D-150 at 2.  Thus, International's own records reflect that the SSA renewals were associated with Schedule 1.

51.     Moreover, regardless of International's claim in this litigation that it made a mistake in repeatedly renewing the SSAs, there is no basis to suggest that Nortel believed there was any mistake.  To the contrary, this consistent course of conduct confirms Nortel's understanding that it continued to have the right to use this software in the BayStack/ES/ERS switches after June 2003 and that International shared that understanding.  It would not make sense for Nortel to have continued paying thousands of dollars per year for software, or for International to have continued shipping software to Nortel, if Nortel had no right to use that software.  Trial Tr. 433:15-24, 517:3-11.

52.     Indeed, it is remarkable for International, after having repeatedly renewed the SSA and confirmed Nortel's right to use the Schedule 1 software, and having collected the thousands of dollars Nortel paid for those renewals, to now claim that this was all a mistake on its part.  And it is even more egregious for International to claim that the result of this purported "mistake" on its part is that Nortel should be deemed to have committed infringement by using the same type of software that International was supplying to it, and that International is now entitled to pursue a claim for tens of millions of dollars on this theory.

53.     For all of the reasons above, the parties' consistent conduct in renewing the SSA for the software covered by Schedule 1 confirms Nortel's ongoing right to use that software in the BayStack/ES/ERS switches following the end of Schedule 1's three-year term.  Further, as

discussed below in the Conclusions of Law, the parties' course of conduct also serves to

establish an implied in fact agreement under which Nortel had the ongoing right to use the

Schedule 1 software in the BayStack/ES/ERS switches.

     **E.**     **In August 2003, After The End Of Schedule 1's Three-Year Term, International Stated That Nortel "Has" A Royalty Buy Out Under Schedule 1**

54.     In August 2003, after the end of Schedule 1's three-year term, International

confirmed in writing that Nortel "***has***" a royalty buy out under Schedule 1. This confirmation

came as part of an email exchange beginning in July 2003 between Pierre Tremblay, a Nortel

employee who was just becoming involved in the relationship with International, and

International employees John Southwood and Martha Hopper. Ex. D-158.01; Ex. 158.02.

Tremblay was reviewing the license agreement between Nortel and International and its various

schedules and seeking to learn about their status. Trial Tr. 190:1-9; Tremblay Dep. 90:18-91:1.

55.     In that context, in August 2003—after the end of Schedule 1's three-year term—

Hopper made the following statement about Schedule 1 in an email to Tremblay: "According To

John [Southwood], as I understood him, BAY ***has*** a Royalty-BuyOut on EMANATE Sources on

WinNT, Solaris, and VxWorks as well as Asynchronous Request Libraries on Solaris, HP-UX,

AIX and WinNT." Ex. D-158.02 at 1 (emphasis supplied). Given that this statement was made

months after the end of Schedule 1's three-year term, the reference to Schedule 1 as continuing

to provide a royalty buy out is directly contrary to the argument International is proposing now:

that the royalty buy out was extinguished in June 2003 and any existing products and projects

covered by Schedule 1 were stripped of their right to use the Schedule 1 software.

56.     At trial, Southwood tried to dismiss this statement as yet another "mistake."

Specifically, he claimed that Hopper did not "understand [him] correctly." Trial Tr. 195:11-

196:1. But even though the email exchange with Tremblay continued after this statement was

made, there is no record of any attempt by Southwood to retract or correct this statement concerning Schedule 1.  And if Southwood actually had believed that Hopper had mischaracterized Schedule 1, but implausibly stayed silent, this subjective belief would in any event be irrelevant because Southwood did not express it to Nortel.

57.    Southwood also contended at trial that statements he made about a different schedule, Schedule 12, were intended to explain the true meaning and effect of Schedule 1.  Trial Tr. 195:11-196:4.  Those statements are discussed below, in the context of International's argument about four "new schedules" (including Schedule 12) that involve very different circumstances from Schedule 1 and the BayStack/ES/ERS switches.  *See* Section IV.D, *infra*.   In any event, given that the purpose here is to ascertain the meaning and effect of Schedule 1, statements about a different schedule cannot trump the statement that International made specifically about Schedule 1: Nortel "has" a royalty buy out under Schedule 1.

58.    Further, International's claim that this statement about Schedule 1 was a "mistake" is contradicted by the fact that the statement is consistent with International's other statements and actions concerning Schedule 1, including:  1) Southwood's November 1999 email to Hyslop (Ex. D-76C); 2) Case's May 2000 email to Reeves (Ex. D-77A); 3) International's conduct thereafter, including International's repeated renewal of the SSA (Ex. D-171; Ex. D-79A at 8-9; Ex. D-81; Ex. D-95; Ex. D-96; Ex. D-97 at 1; Ex. D-98 at 1; Ex. D-99; Ex. D-83 at 2; Ex. D-101 at 1; Ex. D-100 at 1); and 4) as will be discussed in the next section, the statements by Southwood in an email exchange and formal letter that International issued to Nortel in January 2006.

**F.      In 2006, International Confirmed Again, In An Email And A Formal Letter, That Nortel Had An Ongoing Right To Use The Software Covered By Schedule 1**

59.      In January 2006—long after Schedule 1's three-year term ended—International expressly confirmed yet again, in a formal letter from John Southwood issued on International's letterhead, Nortel's ongoing right to use the software covered by Schedule 1.  Ex. D-78A at 3. International's letter affirmed that "Nortel **has** a license" to the software covered by Schedule 1 and that Schedule 1 "incorporates the paid-up royalties' license previously established by Bay Networks."  *Id.* (emphasis supplied).  And in an email exchange leading up to the letter, Southwood likewise confirmed that he was "pleased" that the BayStack group at Nortel was operating under "the 'old Bay license' incorporated into the Nortel license" through Schedule 1. Ex. D-85 at 1.

60.      The background of the January 2006 letter is that Nana La-Anyane of the BayStack group sent an email to Southwood, noting that the group was using SNMP Research software and requesting a letter confirming its license to do so.  Ex. D-84.  The BayStack group intended to provide the letter to another SNMP Research licensee, called ████████████, so that they could begin a new development project together.  *Id.*[9]  La-Anyane's email stated that the BayStack group "recently struck a partnership with ██████████.  They are using the SNMP Research engine in their code, ***and so are we***."  *Id.* at 1 (emphasis supplied).  In a subsequent email in the exchange, Gregory Foster, a colleague of La-Anyane, noted again that the BayStack group at Nortel was using SNMP Research's software.  Ex. D-85 at 1.

61.      In response to the request from the BayStack group, Southwood did not say or suggest that the group had lost the right to use the SNMP Research software after the end of

---

[9]      As Case explained, James Reeves, who had formerly been responsible for the BayStack/ES/ERS products at Bay and Nortel, had moved to ██████ and wished to collaborate with his former BayStack colleagues.  In Case's words, "it was so that James Reeves could work with James Reeves's progeny."  Case Dep. 182:20-24.

Schedule 1's three-year term.  Just the opposite:  he wrote that he was "***pleased***" that "it was the

'old Bay license' incorporated into the Nortel license" that the BayStack group was operating

under.  *Id.* at 1 (emphasis supplied).  Moreover, Southwood noted that before making his

comments, he had conducted "research" on the various schedules executed between Nortel and

International, which of course included Schedule 1.  *Id.*

62.    Southwood then issued a formal letter on behalf of International confirming

Nortel's ongoing right to use the software covered by Schedule 1:

> Nortel Networks has a license with SNMP Research International
> for EMANATE® sources running on Windows, Solaris, and
> VxWorks as referenced under Nortel Schedule 1.  That schedule
> incorporates the paid-up royalties' license previously established
> by Bay Networks.

Ex. D-78A at 3.

63.    International's statement in this formal January 2006 letter that "Nortel ***has*** a

license" to the software "under Nortel Schedule 1," which "incorporates the paid-up royalties'

license previously established by Bay Networks," is dispositive in itself.  And it is consistent

with everything else the parties said and did concerning Schedule 1:  the terms of Schedule 1,

including its incorporation of the royalty provisions of the Bay Networks License (Ex. D-7-C);

Southwood's November 16, 1999 email confirming Schedule 1's meaning and effect (Ex. D-

76C); Case's May 2000 email to Reeves describing Schedule 1 (Ex. D-77A); Hopper's August

2003 email concerning what Southwood told her about Schedule 1 (Ex. D-158.01; Ex. 158.02);

and International's repeated renewals of the SSA under which it provided updated versions of the

Schedule 1 software, long after June 2003.  Ex. D-171; Ex. D-79A at 8-9; Ex. D-81; Ex. D-95;

Ex. D-96; Ex. D-97 at 1; Ex. D-98 at 1; Ex. D-99; Ex. D-83 at 2; Ex. D-101 at 1; Ex. D-100 at 1

64.    In response to this definitive statement confirming Nortel's ongoing right to use

the Schedule 1 software in the BayStack/ES/ERS switches following the end of Schedule 1's

three-year term, International has nothing to offer except to claim that this was yet another "mistake." *See, e.g.*, Trial Tr. 206:2-9 (Southwood claiming it was a "mistake" when he wrote in his January 2006 letter that Nortel has a license under Schedule 1). As outlined above and also discussed below in the Conclusions of Law, International's "mistake" argument cannot help it. What matters in construing a contract is the parties' objective manifestations to each other. A party's claim years later, in the context of litigation, that it secretly held a subjective view that was the exact opposite of what it expressly stated to the other party cannot qualify as competent or probative evidence. *See also* ¶¶ 247-48, *infra*.

65.     Moreover, as a factual matter, for International to claim more than a decade after the fact that these statements in January 2006 must have been a "mistake" is not credible. First of all, as discussed, the statements in the letter and email are consistent with everything else the parties said and did concerning Schedule 1. International cannot credibly claim that all of these various statements and actions on its part, all of which consistently confirm Nortel's understanding of Schedule 1 and contradict International's proposed interpretation, are "mistakes." And, again, it is egregious on International's part that it not only seeks to excuse all of these consistent, deliberate actions and statements confirming Nortel's ongoing right to use the Schedule 1 software as being "mistakes" on its part, but also demands that, despite its "mistakes," the Court should deem Nortel an infringer, hold it liable and award International tens of millions of dollars in damages.

66.     Second, even with respect to Southwood's January 2006 statements, there would be not one mistake on Southwood's part, but two:  1) the email in which he stated he was "pleased" that the BayStack group was operating under "the 'old Bay license' incorporated into the Nortel license" via Schedule 1 (Ex. D-85 at 1) and 2) the formal letter on International's

letterhead in which he stated that "Nortel *has* a license" to the software "under Nortel Schedule 1," which "incorporates the paid-up royalties' license previously established by Bay Networks." Ex. D-78A at 3.  It is not credible to contend that these two separate statements were both mistakes—and that Southwood's actual belief was the exact opposite of what he said in these two separate instances—rather than accepting them as mutually consistent statements of the parties' understanding of Schedule 1.

67.    And, third, Southwood's email itself states that, before providing his observations and the formal letter he issued on behalf of International, he had performed the "necessary research" concerning the schedules at issue.  Ex. D-85 at 1.

68.    International also tries to discount the importance of Southwood's 2006 letter on the ground that the letter went on to note that the license held by Nortel under Schedule 1 did not cover the specific software variation licensed by ▇▇▇▇, which was EMANATE/Lite on the QNX platform, and so Nortel would need to execute a new schedule if it wished to license the QNX platform software that ▇▇▇▇ was using.  *See, e.g.*, International's Pre-Hearing Br. ¶ 38 (Adv. D.I. 566); Trial Tr. 205:2-6.  This is irrelevant for several reasons.  First, it is undisputed that the software used in the BayStack/ES/ERS switches is covered by Schedule 1.  Trial Tr. 315:9-316:5, 354:2-7; Case Dep. 408:14-17.  That the software Nortel was using under Schedule 1 is different from the software that was licensed by ▇▇▇▇ (i.e., EMANATE/Lite on the QNX platform) has no bearing on this suit.

69.    Second, Southwood necessarily had to assess the rights that Nortel did have under Schedule 1 in order to determine how it compared to the specific software variation that ▇▇▇▇ had licensed.  And, as expressed in his emails and letter, Southwood confirmed that Nortel did have rights to SNMP Research's EMANATE software on the operating systems covered by

Schedule 1.  Thus, Southwood's statement that "Nortel Networks has a license with SNMP Research International for EMANATE® sources running on Windows, Solaris, and VxWorks as referenced under Nortel Schedule 1" is not a minor or ancillary point, but rather an essential part of his response to the BayStack group's query.  Indeed, it is the very first sentence of his 2006 letter.

70.     Third, after the Nortel BayStack group made clear that it was already using the software covered by Schedule 1, Southwood responded that he was "pleased" that it was operating under "the 'old Bay license' incorporated into the Nortel license" via Schedule 1 (Ex. D-85 at 1); and then he went on to expressly confirm Nortel's ongoing right to use the Schedule 1 software in his formal letter.  Ex. D-78A at 2.  If Southwood actually had held the understanding that Nortel lost its right to use the Schedule 1 software at the end of Schedule 1's three-year term, he surely would have—and certainly, should have—said so.  Instead, he said exactly the opposite, confirming Nortel's ongoing right to use the Schedule 1 software.  And, again, even if Southwood's after-the-fact claim that his actual belief was exactly the opposite of what he stated could be credited, it would be his actual statement—his objective manifestation to Nortel—that would govern.

71.     In sum, the formal letter issued by International in January 2006, and the statements by Southwood in the email exchange leading up to that letter, confirm that Nortel's right to use the software covered by Schedule 1 in products such as the BayStack/ES/ERS switches continued after the end of Schedule 1's three-year term.  Further, the express confirmation of Nortel's continued right to use the Schedule 1 software, together with the repeated yearly renewals of the SSA for the Schedule 1 software, also serves to establish an implied-in-fact agreement providing the ongoing right to use that software.

24

### G. International Never Suggested To Nortel That It Would Lose Rights To Use The Schedule 1 Software At The End Of Schedule 1's Three-Year Term

72.     Schedule 1's meaning and effect is confirmed not only by the parties' affirmative conduct and statements outlined above, but also by the fact that International never said or suggested to Nortel what it is contending now:  that Nortel would be stripped of the right to use the Schedule 1 software in existing products and projects at the end of Schedule 1's three-year term, such that the BayStack/ES/ERS switches would become infringing after that date.

73.     As discussed, when the Nortel group responsible for the BayStack/ES/ERS switches discussed their license with John Southwood in January 2006, he never suggested that they had lost the right to use the Schedule 1 software in June 2003.  He stated exactly the opposite:  that he was "*pleased*" that "it was the 'old Bay license' incorporated into the Nortel license" that the BayStack group was operating under.  Ex. D-85 at 1.  And then he issued a letter on behalf of International that expressly confirmed Nortel's ongoing right to use the software covered by Schedule 1.  Ex. D-78A at 3.

74.     Similarly, as also discussed above, when Jeff Case wrote about Schedule 1 to his friend James Reeves, who was responsible for the BayStack/ES/ERS switches at Bay Networks and then at Nortel, Case never suggested that the BayStack/ES/ERS switches would lose the right to use the Schedule 1 software at the end of Schedule 1's three-year term, such that Reeves would either need to pay for another license or become an infringer.  Instead, he wrote that "Schedule 1 [is] the document that grandfathers the Bay licenses over to the new Nortel master agreement," so that the BayStack/ES/ERS switches could continue using the SNMP Research software that was licensed under the Bay Networks license."  Ex. D-77A.  And Case assured Reeves that ██████████ *Id.*

75.     The conflict between the interpretation of Schedule 1 that International proposes now, and its actions and inactions at the relevant time, is especially important during the period leading up to the end of Schedule 1's three-term in June 2003.  If the interpretation of Schedule 1 that International offers now were accepted, that would mean the BayStack/ES/ERS switches for which Reeves was responsible became infringing in June 2003.  If Case actually had held that understanding, he surely would have said something to Reeves before June 2003, as Case himself conceded.  Trial Tr. 319:2-18; Case Dep. 393:10-394:2.

76.     Given Case's friendship and contacts with Reeves and others in the BayStack team at Nortel, he certainly had the opportunity to say something.  In fact, the record demonstrates that Case actually met with Reeves and the BayStack team in April 2003, just before the end of Schedule 1's three-year term, and Case described SNMP Research in the meeting invitation as the BayStack group's "supplier of source code for SNMP-based network management."  Ex. D-243.  But Case did not say anything to Reeves or anyone else to suggest that in the month after next Nortel would be stripped of the right to use the SNMP Research software, such that BayStack/ES/ERS switches would become infringing.  Nor did anyone else at International or Inc. say any such thing to anyone at Nortel.

77.     In assessing the fact that neither Case nor anyone else from International or Inc. suggested to Nortel that it would lose the right to use the Schedule 1 software in the BayStack/ES/ERS switches in June 2003, the following facts are significant.

78.     First, it is undisputed that Case had known that the BayStack/ES/ERS switches were using the Schedule 1 software and were covered by Schedule 1 when it was signed.  Trial Tr. 315:9-316:5, 354:2-7; Case Dep. 408:14-17.

79.     Second, it is undisputed that the BayStack/ES/ERS switches were continuing to use the Schedule 1 software as of the end of Schedule 1's three-year term in June 2003 and beyond.  Ex. D-71 at 5 (International's Second Amended Proof of Claim stating that "[i]n 2004 the Debtors used the SNMP-Bay Software in all of the 20 different product lines then produced as part of the Bay Stack product lines."); *id.* at 58.

80.     Third, Case had an extensive and friendly relationship with James Reeves, who as noted was responsible for the BayStack/ES/ERS switches both at Bay Networks and at Nortel— including in the period leading up to the end of Schedule 1's three-year term in June 2003 and through 2004.  Trial Tr. 298:19-299:11, 299:18-300:1, 300:2-18, 310:12-22; Case Dep. 56:8-59:2, 59:23-60:23, 433:3-14; Ex. D-71 at 57-58; Ex. D-77A; Ex. D-215; Ex. D-220; Ex. D-240; Ex. D-242.  Case himself was involved in the efforts by Reeves and his team to incorporate SNMP Research software into the BayStack/ES/ERS switches at Bay Networks, and described pulling "all-nighters" at the Great America Parkway offices where the BayStack group was located.  Trial Tr. 299:5-17; Case Dep. 60:4-9.  And Reeves was a continuing advocate for the use of SNMP Research's software at Nortel.  For example, he contacted Case in May 2001 to let him know of his efforts to persuade another product group at Nortel to adopt SNMP Research's software.  Ex. D-215.  (As noted, this software relates to just one of the hundreds of features in the products at issue.)

81.     Fourth, Case also was familiar with, and had contacts with, other members of the BayStack team, including John Mead, Nana La-Anyane and John Seligson.  Trial Tr. 310:12-313:24; Case Dep. 59:23-60:23, 182:2-183:3; Mead Dep. 193:2-14; D-232; D-233; D-234; D-235; D-237.

82.     Fifth, as noted above, Case met with Reeves and with the BayStack team in person in April 2003—just before the end of Schedule 1's three-year term in June 2003.  The meeting resulted from an invitation that La-Anyane, at the request of Reeves and Mead, extended to Case to make a presentation to the "Nortel-BayStack Team."  Ex. D-243 (subject line of email referring to "Presentation to [the] Nortel-BayStack Team").  In accepting the invitation, Case suggested language to describe his presentation that expressly confirmed that SNMP Research continued to be the BayStack team's "supplier of source code for SNMP-based network management."  Ex. D-243; Trial Tr. 324:6-325:20.  In fact, when Case returned back to his office, he reported on his visit to Nortel and Nortel's continued use of SNMP Research software, describing Nortel's celebration of the 50 millionth Ethernet port sold during the Interop trade show he attended.  Ex. D-221.

83.     Yet it is undisputed that during all this time, and with all of these contacts with James Reeves and the group responsible for the BayStack/ES/ERS switches in the period leading up to the end of Schedule 1's three-year term, Case never said anything to suggest that Nortel would lose the right to use the Schedule 1 software in these products or that they would become infringing after June 2003.

84.     Case's attempt to explain away the fact that he did not do so has shifted over time.  In his deposition, he claimed that in the 2003 time frame he had lost touch with Reeves and the BayStack group:  asserting that Reeves purportedly had left Nortel; that the BayStack switches were no longer being sold under the "BayStack" name; that Case had stopped going to trade shows where he would have encountered Nortel and the BayStack switches; and that "it all went dark" at the Great America Parkway office where Reeves and the BayStack team were located.  Trial Tr. 320:19-321:23, 322:4-13.

28

85.     The record demonstrates that none of this was true.  Reeves was still with Nortel and responsible for the BayStack team throughout 2003 and 2004.  Trial Tr. 321:20-23; *see also* Ex. D-71 at 57.  In fact, International submitted in support of its proof of claim a declaration from James Reeves in which he affirmed that he was employed by Nortel and responsible for the BayStack/ES/ERS switches through 2004, and that the BayStack/ES/ERS switches continued to use SNMP Research's software during this entire period.  Ex. D-71 at 57-58.  And the rebranding of the BayStack/ES/ERS switches did not occur until late 2004.  Mead Dep. 183:23-185:3; Ex. D-89.

86.     Case's claim that his contacts with the BayStack group's offices at Great America Parkway "all went dark" in 2003 was likewise untrue.  As noted, in April 2003 Case in fact met with Reeves and gave a presentation to the Nortel-BayStack team.  Trial Tr. 323:4-10; Ex. D-243; Ex. D-138.  And Case himself prepared an invitation for the meeting that identified SNMP Research as the supplier of SNMP software to this team:

> Dr. Jeff Case from SNMP Research will be here on _fill in date, place, time_.  ***SNMP Research continues to be our supplier of source code for SNMP-based network management***. …

Ex. D-243 (emphasis supplied); Trial Tr. 324:6-325:20.

87.     Case's draft email invitation thus confirmed that he understood that SNMP Research continued to be the BayStack group's "supplier of source code for SNMP-based network management" as of April 2003.  Ex. D-243.  Case's presentation also demonstrated the length and importance to International of its relationship with Nortel and Bay Networks, stating among other things that "Nortel has been a customer for over a decade – since the days of Wellfleet, SynOptics, and Northern Telecom" and that "[o]ur companies have always had an excellent relationship."  Ex. D-138 at 3; *see also* Trial Tr. 327:12-329:8.

88.     The record also demonstrates that Case's claim that he had stopped attending trade shows in 2003 was untrue.  After presenting to the BayStack group, Case traveled to the Interop convention in Las Vegas, where he observed Nortel celebrating the 50 millionth Ethernet port sold.  Trial Tr. 330:21-331:11; Ex. D-221 at 2.  Case admitted that he was with Reeves in the Nortel booth and that the celebration involved the BayStack/ES/ERS switches.  Trial Tr. 332:7-9, 340:20-24, 342:2-5, 332:7-12.  And, again, when Case returned to SNMP Research after his trip, he reported to his team on his meetings with Nortel and his observation of their celebration at the Interop trade show.  Ex. D-221.  The meeting minutes state:

> Jeff also met with  . . . Nortel in CA.  Nortel had just celebrated the first profitable quarter in some time.  . . .  Nortel was also celebrating the 50 millionth ethernet port sold during Interop. They are all managed by SNMP.

*Id.* at 2.

89.     At trial, confronted with this record, Case no longer claimed that he had lost touch with Reeves and the BayStack group and Nortel in 2003.  Instead, he claimed he had formed the belief as of the spring of 2003 that Reeves and the BayStack group had removed the SNMP Research software from the BayStack/ES/ERS switches.  Trial Tr. 268:8-13.  It is undisputed that this was untrue:  the BayStack/ES/ERS switches were continuing to use the Schedule 1 software as of the end of Schedule 1's three-year term in June 2003 and beyond.  Ex. D-71 at 5, 58.

90.     And the contemporaneous record outlined above directly contradicts Case's claim that he believed in the spring of 2003 that Nortel had removed the SNMP Research software from the BayStack/ES/ERS switches.  As just one example, the contemporaneous record demonstrates that Case was invited to give a presentation to the "Nortel-BayStack team" in April 2003, and the language that Case himself proposed for the invite stated:  "***SNMP Research***

***continues to be our supplier of source code for SNMP-based network management*.**" Ex. D-243 (emphasis supplied); Trial Tr. 324:6-325:20.  Thus, Case's claim that he believed the BayStack/ES/ERS switches no longer used the SNMP Research software is squarely contradicted by the record.

91.     Further, even if it were credible for Case to claim he was unsure whether the BayStack/ES/ERS switches were continuing to use the Schedule 1 software in the period leading up to June 2003, he would be expected at a minimum to inquire whether they were doing so. Again, this is especially evident given that he met with Reeves and the BayStack team in April 2003, and therefore plainly had an opportunity to ask.

92.     Case also admitted that it would have been a matter of concern to him if in fact James Reeves, who was an advocate for SNMP Research within Nortel, had decided to remove SNMP Research's software from the BayStack/ES/ERS switches:

> Q.  And it would have been a matter of some concern if James Reeves, your advocate within Nortel, actually had decided to pull your software out of his BayStack products; correct?
>
> A.  Yes.

Trial Tr. 393:8-12.

93.     Thus, if Case actually had believed Reeves had removed the SNMP Research software from the BayStack/ES/ERS switches, he surely would have asked Reeves about that decision.  And, again, it is undisputed that the answer to the question would have been that, of course, the BayStack/ES/ERS switches were continuing to use the SNMP Research software.

94.     In sum, if Case actually had held the belief that Nortel lost the right to use the Schedule 1 software in the BayStack/ES/ERS switches in June 2003, he would have said something to Reeves at the time, as Case himself now admits.  Trial Tr. 319:2-18.  The attempt by Case to excuse the fact that he did not so is inconsistent with, and is not credible in light of,

31

the contemporaneous documentary record.  Further, at a minimum, it is undisputed that neither

Case nor anyone else acting for International or Inc. ever suggested at the time that Schedule 1's

three-year term ended, or afterwards, that Nortel had lost the right to use the Schedule 1 software

in the BayStack/ES/ERS switches.

95.    As a further point, Case's testimony concerning his purported belief that Nortel

was no longer using SNMP Research software in the BayStack/ES/ERS switches as of spring

2003 is simply not credible.  In response to his counsel's question, he testified as follows:

> Q.  In the 2003 timeframe, after the expiration of Schedule 1A, did
> you know whether Nortel was shipping BayStack products with
> SNMP Research software in them?
>
> A.  I not only didn't know that they were; I was told that they
> weren't.

Trial Tr. 268:8-13.

96.    Case did not identify who supposedly told him this; nor did his counsel ask.

Instead, they simply represented to the Court that someone at Nortel had told Case that the

BayStack/ES/ERS switches were not using SNMP Research software.

97.    It was left to cross-examination to expose the truth.  When asked by Nortel's

counsel what statement he was referring to, Case claimed he was referring to an email exchange

in August 2003 between Pierre Tremblay of Nortel and John Southwood and Martha Hopper of

International.  Trial Tr. 292:2-20; Ex. D-158.01; Ex. D-158.02 at 1.  This email exchange is

discussed above in Section II.E and also below in Section IV.D.  Tremblay, who was an

employee of Nortel Canada and was based in Brampton, Ontario, was just getting involved in the

relationship between Nortel and International at the time.  Tremblay Dep. 7:20-25; Ex. D-132 at

4.  He had not had any involvement in Schedule 1, or with the Bay Networks License, or with the

BayStack group, which was located in Santa Clara, California.  And of course the BayStack

group had its own direct relationship and line of communication with International, dating back

to the Bay Networks era, as reflected by the communications between them discussed above.

98.     In the email exchange that Case admitted on cross-examination he was referring

to, Tremblay was reviewing the various schedules to the master license agreement between

Nortel and International and asking Southwood and Hopper questions about them.  Ex. D-158.02

at 1.  Case's reference to this email exchange as if it involved him—describing it as what "I was

told"—is itself misleading, because Case was not included or involved in the email exchange at

all.  More serious is Case's misrepresentation of what Tremblay actually said.  In reference to

Schedule 1, Tremblay merely remarked:  "Schedule 1A covers 'All products of units and

projects originating from what was Bay Networks.'  I still haven't found anything that fits this

description but to be honest, I have not yet looked very hard."  Ex. D-158.02 at 1.

99.     This was the purported "statement" that Case was referencing in his testimony on

direct, in response to the question of whether he knew if the BayStack/ES/ERS switches were

using SNMP Research software, when he represented to the Court:  "I not only didn't know that

they were; *I was told that they weren't*."  Trial Tr. 268:8-13 (emphasis supplied).  Simply

reading the Tremblay email shows that Case's testimony misrepresents it.  Tremblay merely

referred to the description of products covered by Schedule 1, with which he had no

involvement, and said, "I still haven't found anything that fits this description *but to be honest, I

have not yet looked very hard*."  Ex. D-158.02 at 1 (emphasis supplied).

100.     And, again, the email exchange was not a statement or representation to Case at

all.  He was not even involved.  For Case to have given the Court the impression that a

representation was made to him that the BayStack/ES/ERS switches were not using the SNMP

33

Research software, with the truth being revealed only on cross-examination, is highly
disingenuous.

101.    Case's testimony is especially disingenuous in light of his own knowledge and
involvement with the BayStack group at the relevant time.  Again, in April 2003—just weeks
before the end of Schedule 1's three-year term—he actually met with James Reeves and gave a
presentation to the "Nortel-BayStack" team.  And in the invitation that he himself proposed for
the presentation to the Nortel-BayStack team, he wrote:  "***SNMP Research continues to be our
supplier of source code for SNMP-based network management***."  Ex. D-243 (emphasis
supplied).

102.    If Case actually had held the interpretation of Schedule 1 that he proffers now,
which would mean the BayStack/ES/ERS switches were about to become infringing when he
met with Reeves and the BayStack team in April 2003, that would have (and should have) been
the time to say something.  The fact that he said no such thing contradicts his claim that he
actually held such an understanding of Schedule 1.  For Case to try to evade that conclusion by
giving the Court the impression that the reason he had not said anything is that he had been
affirmatively told that the BayStack/ES/ERS switches were not using the SNMP Research
software—only to have it revealed on cross-examination that he actually was referring to an
email from Pierre Tremblay that said no such thing and in any event dated from August 2003,
months after the critical period of the end of Schedule 1's three-year term—goes beyond the
bounds of fair advocacy.

## III.    THE PARTIES' CONDUCT CONCERNING OPTIVITY FURTHER CONFIRMS THE MEANING AND EFFECT OF SCHEDULE 1

103.    In addition to the record outlined above concerning the use of the SNMP
Research EMANATE software in the BayStack/ES/ERS switches, the record concerning a

parallel situation—Nortel's use of SNMP Research's "Asynchronous Request Libraries" or ARL software in the Optivity products—further confirms the same meaning and effect of Schedule 1: that products and projects covered by Schedule 1 would receive a royalty buy out for the life of the product line.  In addition, this record wholly contradicts SNMP Research's "New Schedules" argument discussed below in Section IV.

104.    The circumstances surrounding the Optivity group's use of ARL parallel the BayStack group's use of EMANATE.  As noted above, the Bay Networks License covered two SNMP Research software products:  EMANATE and ARL.  Ex. D-2 at 15; Ex. D-4 at 1.  Bay Networks used EMANATE in the BayStack/ES/ERS switches, and it used ARL in a set of products called "Optivity."  Trial Tr. 310:12-311:11, 315:23-316:5; Mead Dep. 220:15-223:25; Case Dep. 67:21-69:15.  The Bay Networks License provided for a royalty buy out for both EMANATE and ARL, which was exercised and paid for.  Ex. D-2; Ex. D-4; Ex. D-79A at 2; Ex. D-80.  (As noted, Nortel paid the final amounts due on the ARL royalty buy out after it purchased Bay Networks.)  Ex. D-4; Ex. D-79A at 2; Ex. D-80.  Schedule 1 in turn incorporated the Bay Networks License and royalty buy out for EMANATE and ARL.  Ex. D-7C.

105.    During the 1999-2000 period, when Nortel and International were negotiating and eventually executing Schedule 1 and the master license agreement, the Optivity group's use of ARL was included on a list of items to be covered by the parties.  The parties initially considered executing an additional schedule (which was to be Schedule 16) for the use of ARL in the Optivity products, but then they recognized that this was already covered by Schedule 1.  Accordingly, they agreed Optivity's use of ARL would be covered going forward under Schedule 1, and that no new schedule was needed.  This confirms the parties' understanding concerning Schedule 1, and it directly refutes International's argument, discussed below in

35

Section IV, that a product would need an additional schedule in order to receive the lifetime royalty buy out.

106.    In addition, the parties had occasion to revisit Optivity's coverage under Schedule 1 in April 2004, nearly a year after the end of Schedule 1's three-year term. The Optivity group contacted John Southwood at International to request an additional software feature for ARL: compatibility with a protocol called IPv6. In addressing that request, Southwood confirmed again—long after the end of Schedule 1's three-year term—that Optivity's use of the ARL product continued to be covered by Schedule 1. Southwood expressly stated that Nortel had a license to ARL "under the old Bay license completed before Nortel purchased Bay" and that "the old license is incorporated into the current license under [S]chedule 1." Ex. D-271 at 2.

107.    Thus, like the record discussed above concerning the use of the SNMP Research EMANATE software in the BayStack/ES/ERS switches, the record concerning the use of ARL in the Optivity products confirms the meaning and effect of Schedule 1 and refutes the new interpretation of Schedule 1 that International is proposing now.

108.    The facts concerning the use of ARL in the Optivity products are set out in more detail below.

**A.    International Confirmed In 2000 That Nortel Did Not Need A New Schedule For The Optivity Group To Continue Using ARL Under Schedule 1**

109.    As noted above, Nortel and International discussed in 1999 and 2000 whether the Optivity group needed to execute a new schedule in order to continue using and distributing SNMP Research's ARL software and ultimately concluded that this was not necessary in light of the rights granted with respect to ARL under the Bay Networks License and Schedule 1.

110.    The relevant communications began on November 3, 1999 when Dave Hyslop (of Nortel) sent John Southwood (of International) an email attaching a spreadsheet of projects and

products that were using (or proposed to use) SNMP Research software.  Ex. D-159.01; Ex. D-159.02.  The spreadsheet identified each project/product as either "Bay" or "NT" (i.e., Nortel).  One of the products identified as "Bay" was the "Optivity Suite of Products," which used ARL on the Solaris, Windows NT, HP-UX and AIX operating systems.  Ex. D-159.02.

111.    Later that month, Southwood sent Hyslop a draft of Schedule 16, which would have covered the use in the "Optivity Suite of products" of ARL on the Solaris, Windows NT, HP-UX and AIX operating systems.  Ex. D-256.06; Ex. D-256.07.  The draft schedule included a provision stating, "The Per-Copy royalties are waived under the royalty buy out option previously paid by Bay."  Ex. D-256.07 at 2.

112.    On March 8, 2000, Southwood discussed the proposed Schedule 16 with Vicky Allen, a Nortel employee, and they recognized that Schedule 16 was not needed.  Southwood wrote an email to Allen the same day memorializing the conversation:

> It was good to speak to you today.  We determined that the current Schedule 16 issued for ARL duplicates the transaction completed in 1997 between Bay and SNMPRI.  And so, we concluded that this Schedule 16 should be retired.

Ex. D-258 at 4; *see also* Trial Tr. 456:17-458:9.

113.    Allen also wrote an email memorializing what she and Southwood had discussed and agreed upon.  Ex. D-257.  She sent her email to Hyslop and others at Nortel, and Hyslop forwarded it to Southwood with his comments.  *Id*.

114.    Allen first summarized her confirmation with Southwood that Optivity was covered by Schedule 1:  "Per the new agreement between Nortel and SNMP, which was signed at the end of 1999, there is a Schedule 1 which covers all previous Bay Agreements.  With this, our separate Bay agreement with SNMP Research for Optivity products is covered here."  *Id*. at 1.  Hyslop agreed: "Yes that is true."  *Id*.

115.    Second, Allen summarized her confirmation with Southwood that no new schedule was needed for Optivity:  "Per the Schedule 16A and B, these are not needed per above, as we have already paid the dev/runtime fees for the SNMP ARL product back in 97."  *Id.* Hyslop again agreed and confirmed to Southwood that Schedule 16 could be used for another transaction because it was not needed for Optivity:  "OK, John lets therefore have Schedule 16 marked as 'available for re-use.'"  *Id.*

116.    Third, Allen recounted her discussion with Southwood that "[p]er the ARL product, we have completed the royalty buy out," and noted further that "I'm having legal send SNMP a letter stating this, and requesting that SNMP acknowledge in writing."  Ex. D-257 at 1. Nortel sent this letter to International on March 17, 2000, which stated in relevant part:

> On February 17, 2000, Nortel Networks submitted a check in the amount of ███ made payable to SNMP Research International, Inc. ("SNMP").  This amount constituted the full and complete satisfaction on any amounts owed by Nortel Networks to SNMP, including any and all royalties, past, present or future, in connection with the SNMP software licensed by Nortel Networks, as set forth in the software license agreement entered into between the parties on June 20, 1994, including the amendments thereto.

Ex. D-161.[10]

117.    Finally, Allen summarized her confirmation with Southwood that the Optivity group would continue with the maintenance agreement—i.e., the Software Service Agreement or "SSA"—that was already in place under the Bay Networks License.  She stated: "As we will continue to use the SNMP ARL product, we will continue to pay maintenance, ███ ███████████ stated in the Bay agreement."  Ex. D-257 at 1.  The SSA for ARL, which had been executed by International and Bay Networks in 1997, provided for software upgrades and

---

[10]    The "license agreement entered into between the parties on June 20, 1994" is the original license agreement between SynOptics Communications Inc. and SNMP Research, Inc.  Ex. D-1.  This license agreement was transferred to Bay Networks under Amendment 2, which also licensed ARL.  Ex. D-4.

service.  Ex. D-251.  And, like the SSA for the EMANATE software used in the

BayStack/ES/ERS switches as discussed above, it was renewable on an annual basis.  *Id.*  These

payments were, like Nortel's payments to renew the EMANATE SSA, tracked by SNMP

Research under the "Bay" Customer ID.  Ex. D-79A at 8-9; Ex. D-175; Ex. D-176; Ex. D-177;

Ex. D-178; Ex. D-179.  Thus, the SSA for ARL was handled in the same way as the SSA for the

EMANATE software used in the BayStack/ES/ERS switches.

118.    Southwood's "Sales & Marketing Phone Call Notes" from his phone call with

Allen on March 8, 2000, which he made in real time during the conversation, also confirm the

substance of their conversation.  Ex. D-195; Trial Tr. 468:6-21; 472:5-16.  Consistent with his

and Allen's emails, Southwood wrote "kill schedule 16A + B / Already finished in transaction in

1997" and "Licensed ARL previously."  Ex. D-195.

119.    To summarize, the contemporaneous record demonstrates that the parties

discussed and agreed that the use of ARL in Optivity was covered by Schedule 1 and therefore

would continue forward under Schedule 1, and that no new schedule was needed.

120.    In addition to their discussion of ARL's coverage under Schedule 1, Allen and

Southwood also discussed the possibility of the Optivity group licensing another SNMP

Research product, called BRASS.  Ex. D-195; Ex. D-257; Ex. D-258; Trial Tr. 743:18-22.  Allen

asked Southwood to present a proposal for the potential addition of BRASS.  Ex. D-257 at 1.

Southwood then prepared a quote and a revised version of Schedule 16 that would have covered

BRASS.  Ex. D-258 at 4;  Ex. D-256.02; Ex. D-256.03.  After receiving the quote, the Optivity

group decided not to license BRASS and to continue with ARL instead, as Allen informed

Southwood:  "I just received word from our Optivity engineering group that we have changed

our minds wrt [with regards to] our interest in licensing the BRASS libraries.  Therefore, there is

39

no need to add this info to a new schedule within the current Nortel/SNMP contract.  We will be staying with the ARL product." Ex. D-259.

121.    Thus, the parties never executed any version of Schedule 16 for Optivity's use of ARL, and instead they agreed that Optivity's use of ARL would continue under Schedule 1. Trial Tr. 473:23-474:15; Ex. D-259.  International never suggested to Nortel that a new schedule would be necessary for the Optivity group to continue using ARL after the end of Schedule 1's three-year term.  Trial Tr. 461:17-24, 475:17-476:1.

122.    The record therefore establishes that, like the BayStack group, the Optivity group: 1) had a license and a royalty buy out with respect to the necessary SNMP Research software, first under the Bay Networks License and then under Schedule 1; 2) had already obtained under the Bay Networks License, after paying a license fee, the necessary development code from SNMP Research; and 3) had an existing Software Service Agreement.  Accordingly, Nortel was entitled to continue using ARL in the Optivity products under Schedule 1, just as it was entitled to continue using EMANATE in the BayStack/ES/ERS switches.

123.    Southwood admitted that he had not been shown the documentary record concerning Optivity's use of ARL when he was being prepared to testify for trial.  Trial Tr. 456:17-457:13.  Unable to reconcile this clear record with International's new argument that a new schedule was needed in order to receive the royalty buy out benefit of Schedule 1, he admitted he was "mystified."  Trial Tr. 500:18-501:7.

124.    International's counsel sought to lead Southwood into suggesting that his agreement that no new schedule was needed for Optivity's use of ARL was based on the fact that the Optivity group had requested a proposal for BRASS.  Trial Tr. 529:13-532:3.  But the contemporaneous record refutes any such argument.  The email exchanges discussed above show

that Southwood confirmed the Optivity group's right to use ARL under Schedule 1 and that no new schedule was needed, regardless of anything to do with BRASS.  Ex. D-258 at 4; Ex. D-257. And when the Optivity group notified Southwood that it decided to continue with ARL and not add BRASS, Southwood made no suggestion whatsoever that anything had changed from his earlier confirmation that ARL was covered by Schedule 1 and no new schedule was needed.  Ex. D-259.

125.    Moreover, as discussed in the next section, Southwood confirmed yet again in 2004 that the Optivity group continued to have the right to use ARL under Schedule 1.

**B.    International Confirmed Again In 2004—After The End Of Schedule 1's Three-Year Term—That The Optivity Group Continued To Have The Right To Use ARL Under Schedule 1**

126.    In April 2004, nearly a year after the end of Schedule 1's three-year term, International again confirmed that the Optivity group had the ongoing right to use the ARL software under Schedule 1.

127.    The discussion in April 2004 arose when the Optivity group reached out to International to inquire about adding an additional discrete feature:  support for the newest version of an internet communications standard called the Internet Protocol ("IP"), referred to as IPv6, which expanded the number of addresses that could be assigned to networked devices.  Ex. D-271; Trial Tr. 477:4-478:13.  The group had been using IPv4, the previous version of the protocol, and wanted to check on adding compatibility with IPv6 to the ARL software incorporated into Optivity.  Ex. D-271 at 2.

128.    In the email exchanges concerning this issue, Pierre Tremblay of Nortel, who became involved in the relationship with International in the 2003 timeframe and so was not involved with Schedule 1 or the earlier discussions about Optivity's use of ARL, raised a question as to which schedule covered the use of ARL in the Optivity products.  *Id.*  Southwood

41

explained that it was covered by Schedule 1.  In doing so he noted that he had reviewed the

license and various schedules, and stated with respect to the Optivity group's license to ARL:

> [W]here is the ARL?  We found it under the old Bay license
> completed before Nortel purchased Bay, but the old license is
> incorporated into the current license under schedule 1.

*Id.* at 2.

129.    Southwood's statement in April 2004—nearly a year after the end of Schedule 1's

three-year term—that Nortel had a license to ARL "under the old Bay license completed before

Nortel purchased Bay" and that "***the old license is incorporated into the current license under***

***Schedule 1***" emphatically confirms Nortel's understanding of Schedule 1:  that a product or

project covered by Schedule 1, such as the BayStack/ES/ERS switches and the Optivity

products, received a lifetime royalty buy out right to use the Schedule 1 software.  *Id.* (emphasis

supplied).

130.    Southwood's express written confirmation, nearly a year after the end of Schedule

1's three-year term, of Optivity's ongoing right to use the SNMP Research ARL software

covered by Schedule 1 matches, and reinforces, his express written confirmation in his formal

letter from January 2006 of Nortel's ongoing right to use the SNMP Research EMANATE

software in the BayStack/ES/ERS switches.  *Id.*; Ex. 78A at 3.  And both statements are

consistent with all of the other evidence discussed above concerning Schedule 1's meaning and

effect.

131.    Moreover, as with the record concerning Southwood's discussions with the

BayStack group in January 2006, Southwood's statement about Optivity in April 2004 is

important for what he does ***not*** say:  he does not say that, since Schedule 1 "terminated" nearly a

year earlier in June 2003, the Optivity group's use of ARL is unlicensed and infringing.  To the

contrary, he confirms the existing license to ARL under Schedule 1.

42

132.    As with other documentary evidence that refutes its argument, International tried to offer testimony—more than 13 years after the events—to explain away the contemporaneous written record.  International's counsel and Southwood suggested that International may have accepted Optivity's use of ARL only because the Optivity group was considering executing a new schedule that would add the feature of IPv6 compatibility.  Trial Tr. 199:10-200:23.  But the written record says no such thing.  Again, Southwood's April 2004 email expressly stated that Nortel has a license to ARL "under the old Bay license completed before Nortel purchased Bay" and that "the old license is incorporated into the current license under Schedule 1."  Ex. D-271 at 2.  He did *not* say or suggest that Nortel's right to use ARL ended in June 2003 or that Optivity would need a new schedule for its ongoing use of ARL.

133.    Further, he specifically stated that IPv6 is an optional add-on feature, stating that "[t]here is a separate licensing fee since IPv6 is considered optional."  *Id.*  And when Southwood prepared Schedule 60 covering ARL "with IPv6," the only charge was for the "License Fee for development tools" of ▮▮▮▮ to account for the addition of optional IPv6 support.  Ex. D-52 at 1; Trial Tr. 486:21-487:3.

134.    Still further, Southwood's emails concerning the Optivity group's potential addition of IPv6 support—including his emails to Case—specifically stated that the Optivity group already had a license for ARL.  In an April 15, 2004 email to Case, for example,  he noted that "[t]hey already have licensed ARL/Solaris."  Ex. D-272 at 1.  The same email stated that Nortel has a license to ARL "under the old Bay license completed before Nortel purchased Bay" and that "the old license is incorporated into the current license under Schedule 1."  *Id.* at 2.  Case never registered any disagreement with this statement.  Similarly, in a later email to Case, after the parties had executed Schedule 60, Southwood reported that he had "sold a license to

43

Nortel to add IPv6 to *previously licensed ARL (old Bay license)* on three operating systems."

Ex. D-283 (emphasis supplied).  Thus, the record makes clear that Nortel's ongoing right to use

ARL under Schedule 1 plainly did not depend on whether it ultimately chose to execute another

schedule for the optional IPv6 feature.

135.    In sum, the record concerning the use of ARL in Optivity confirms that the parties

understood that Nortel continued to have the right to use the software covered by Schedule 1

after June 2003.  Further, this evidence is consistent with, and reinforces, all the other evidence

discussed above that establishes the same conclusion.

## IV.    INTERNATIONAL'S "NEW SCHEDULES" ARGUMENT DOES NOT HELP IT AVOID THE MEANING AND EFFECT OF SCHEDULE 1

136.    Evidently hoping to deflect attention from the clear and consistent record

concerning Schedule 1, International offers an argument that involves schedules other than

Schedule 1:  International contends that, to receive a lifetime royalty buy out under Schedule 1,

Nortel needed to execute yet another schedule, and it points to four other schedules as purported

support.  *See, e.g.*, International's Pre-Hearing Br. ¶ 17 (Adv. D.I. 566); Trial Tr. 566:8-567:4.

Here, too, International's argument has shifted over time.  It initially argued that any benefit of

Schedule 1 simply "went poof" at the end of its three-year term.  *See, e.g.*, Ex. D-71 at 5.  Later,

it suggested Nortel could have obtained a royalty buy out under Schedule 1 if it executed yet

another schedule, a "new" schedule, but when Jeff Case was asked at his deposition whether

there was an obligation on International's part to agree to such a new schedule, he insisted the

answer was "sometimes yes; sometimes no."  Case Dep. 73:4-74:8.  And then at trial, Case

opined that International was obligated to agree to such a new schedule providing a lifetime

royalty buy out for any product or project covered by Schedule 1.  Trial Tr. 248:9-17; 249:1-6.[11]

But regardless of the form it takes, International's "new schedules" argument cannot avoid the

meaning and effect of Schedule 1.

137.    International's argument finds no support in the text of Schedule 1 or in any

statement or action concerning it.  Schedule 1 says nothing about any need (or ability) to enter

into new schedules to obtain the benefit of the royalty buy out it confers.  Ex. D-7C; Trial Tr.

568:5-11.  Nor is there any communication concerning Schedule 1 that says or suggests that, in

order to receive the royalty buy out benefit, Nortel would need to execute another schedule.  As

even International's proffered licensing expert concedes, there is no communication

contemporaneous with Schedule 1's negotiation or signing that memorializes the purported

"two-part bargain" (that Schedule 1 would serve to extinguish the royalty buy out of the Bay

Networks License but that Nortel could obtain the royalty buy out by executing another

schedule) on which International's "new schedules" argument is based. Trial Tr. 568:21-569:14,

580:19-581:7.

138.    Thus, International's argument depends on ignoring everything the parties said

and did concerning Schedule 1 and pointing instead to other schedules.  As a threshold matter,

arguments about other schedules cannot possibly trump the evidence concerning Schedule 1

itself.  As outlined above, every one of the parties' actions and statements concerning Schedule 1

confirmed Nortel's ongoing right to use the Schedule 1 software for products and projects

covered by Schedule 1 after the end of Schedule 1's three-year term.  This result flows from the

fact that Schedule 1 conferred the royalty buy out of the Bay Networks License on the products

and projects it covered, as confirmed multiple times—including by Southwood's November 16,

---

[11]    Case is the owner of Inc., a separate company from International.  Trial Tr. 214:7-9.  Neither Case nor Inc. is a party to Schedule 1 or the master license agreement.  Ex. D-7C at 2 and Ex. D-6A at 14.  Case does not own any part of International and is not an employee of International.  Trial Tr. 214:10-14, 216:1-9.

1999 email (Ex. D-76C) and his express statements in April 2004 (Ex. D-271 at 2) and January

2006 (Ex. D-85; Ex. D-78A) confirming Nortel's ongoing right to use the Schedule 1 software.

139.    In any event, even considered on its own terms, International's "new schedules"

argument fails.  The record concerning the four "new schedules" that International points to

demonstrates that they all involved projects fundamentally different from the BayStack/ES/ERS

switches and Optivity products, which were legacy Bay Networks products developed by legacy

Bay Networks groups using only SNMP Research software covered by the Bay Networks

License and therefore fully covered by Schedule 1.  The four new schedules addressed different

circumstances:  1) they involved SNMP Research software that was not covered by Schedule 1;

2) they involved new development projects that did not already have, and so needed to pay for,

the SNMP Research development software; and 3) they involved projects for which no Software

Service Agreement was in place.  Each of these points is discussed further below.

### A.    The "New Schedules" Involved Software Not Covered By Schedule 1

140.    The four new schedules on which International relies to support its new schedules

argument (12, 14, 20 and 37, collectively the "New Schedules") each involved an SNMP

Research software product that was not covered by Schedule 1.  *See* Ex. D-17; Ex. D-19; Ex. D-

20; Ex. D-32.[12]

141.    Schedule 1 granted rights to specific SNMP Research software products for

specific operating systems, Ex. D-7C:

---

[12]      Another potential new schedule that was contemplated was for a project referred to as "Falcon and
Baystack 450."  However, it was never signed and, even if it had been signed, it would have added something new,
namely EPIC on VxWorks and Nucleus, as well as EMANATE on Nucleus.  Ex. D-66.

**Table 1 – SNMP Research Software Covered By Schedule 1**

| SNMP Research Product | Operating System |
|---|---|
| EMANATE | Windows NT, Solaris, VxWorks |
| Asynchronous Request Library | Solaris, HP-UX, AIX, and Windows NT |
| BRASS | Solaris |

142.    By contrast, all four of the New Schedules included something different:  a combination of SNMP Research software and an operating system for which it was to be used that was not covered by Schedule 1:

**Table 2 – SNMP Research Software Covered By The New Schedules**

| Schedule | SNMP Research Product[13] | Operating System | Trial Exhibit |
|---|---|---|---|
| 12 | BRASS | Windows NT | D-17 |
| 14 | Cross Development Tools | Solaris 2.x | D-19 |
| 20 | BRASS | Windows NT | D-20 |
| 37 | EPIC | VxWorks | D-32 |

143.    Given that these schedules included software that was not covered by Schedule 1, they obviously could not be simply covered by that schedule and instead would need a separate schedule.

**B.    The "New Schedules" Involved Development Projects That Needed To Obtain Development Software And Pay A License Fee For It**

144.    Each of the four New Schedules involved a development project that needed to obtain "development software" and therefore needed to pay a "license fee" for that development software.  To appreciate this point, it is important to understand the difference under the Nortel-

---

[13]        Schedule 12 also included EMANATE on Windows NT and Schedule 14 also included EMANATE on VxWorks.

International license agreement between:  1) "Development Software" for which a "License Fee" is paid; and 2) "Run-Time Software," for which "Royalties" are paid.  As explained in the license agreement, "Development Software" is defined as "all or any part of any Source Code or Binary Code software product of SNMP [Research]."  Ex. D-6A at 1-2.  It is the software that a development group obtains from SNMP Research and uses to develop the software that will be integrated into a product.  The payment that is made for "Development Software" is a one-time payment called a "License Fee."  *See id.* at 6 (explaining in a section titled "License Fees and Royalties" that "license fees [are] for Development Software."); Trial Tr. 105:11-22, 106:15-107:2, 462:12-463:3.  As Southwood noted, "[t]he license fee was paid at the time of the original transaction and the execution of the license and was associated with the delivery of our development tools to our customer."  Trial Tr. 106:22-107:2.

145.    By contrast, "Run-Time Software" is defined in the license agreement as "Binary Code which is developed by or for the Specified Entity, and which is derived from Development Software and which is integrated with a Nortel Networks Product."  Ex. D-6 at 2.  Thus, "Run-Time Software" is the software that is created from (or "derived from") the SNMP Research Development Software and that is actually integrated into a product, such as the BayStack/ES/ERS switches.  Trial Tr. 105:11-22, 106:15-107:6.  And as the license agreement explains, "Royalties" are what is paid for "Run-Time Software."  Ex. D-6A at 2 ("royalties [are] for Run-Time Software.").  Royalties can take the form of a royalty buy out, such as provided under the Bay Networks License and Schedule 1, a royalty lease, or per copy royalties.  Ex. D-2 at 19; Ex. D-4 at 1-2.[14]

---

[14]      As International's licensing expert explained the distinction, license fees covered "internal use and development of the software," and royalties were "fees on distribution." Ex. D-203 at 5.

146.    Bay Networks had already obtained the Development Software covered by the Bay Networks License and, correspondingly, by Schedule 1, and had paid the license fees for it. Specifically, for the EMANATE development software that was used by the BayStack group, Bay Networks paid a license fee of ███████████. Ex. D-2 at 15; Ex. D-79A at 2.  And Bay Networks paid a license fee of ███████████ for the ARL development software used by the Optivity group.  Ex. D-4 at 1; Ex. D-79A at 2.  Thus, in contrast to the projects covered by the New Schedules discussed below, there was no need to obtain or pay for the development software used by the BayStack and Optivity groups because that had already occurred.

147.    The fact that the development software had already been paid for and provided was specifically cited in the parties' discussion in May 2000 that confirmed that the Optivity group did not need to execute a new schedule.  The email from Vicky Allen summarizing her discussion and agreement with John Southwood (which was sent to Dave Hyslop and Southwood) stated that, "there is a Schedule 1 which covers all previous Bay Agreements" and accordingly a new schedule (which was to be Schedule 16) was "not needed" because "we have already paid the dev/runtime fees for the SNMP ARL product back in 97."  Ex. D-257 at 1.  At the hearing, Southwood confirmed that "dev" fees referenced here are the license fees that were paid for development software.  Trial Tr. 462:12-463:3.

148.    Thus, the Optivity group, like the BayStack group, had already obtained the development software and paid the license fees for it.  By contrast, the New Schedules involved development projects that needed to obtain, and pay the license fee for, the development software.  This is reflected by the fact that these new development projects began by obtaining the development software on a trial basis under "evaluation licenses."  *See* Ex. D-184; Ex. D-300; Ex. D-306 (Schedule 12); *see also* Ex. D-303; Ex. D-305 (Schedule 20); *see also* Ex. D-

189; Ex. D-301; Ex. D-201; Ex. D-302 (Schedules 14 and 37).  Under an evaluation license,

SNMP Research would send development software to a Nortel group to use for a limited time to

allow the group to test and evaluate the software in connection with a potential new development

project.  Trial Tr.  493:15-494:2.  Evaluation licenses thus were a way for groups to get

temporary access to software that they did not already have.  Trial Tr.  493:15-19.

149.    Because the groups executing New Schedules needed to obtain the SNMP

Research development software, they had to pay license fees for this new software.  As discussed

above, and as Southwood confirmed, license fees are fees a customer pays to obtain development

software for development purposes at the initial stage of development.  Trial Tr. 462:12-463:3;

*see also* Ex. D-6A at 6; Ex. D-203 at 5.

150.    That the New Schedules were executed so that the development projects could

obtain, and pay for, the development software is reflected in the New Schedules themselves, as

the only payment to be made (other than the maintenance fee, as discussed below) is for the

"License Fee for development tools."  Ex. D-17; Ex. D-19; Ex. D-20; Ex. D-32.  And, again, the

BayStack and Optivity groups used EMANATE and ARL Development Software that had

already been obtained and paid for under the Bay Networks License and was covered by

Schedule 1, and so there was no need to execute a new schedule.

151.    At trial, International cited three emails by Dave Hyslop of Nortel as if they

supported its argument.  But in fact they all confirm the distinction between obtaining and paying

for development software (also called "source code"), which the groups involved with the New

Schedules needed to do, and paying royalties, which was covered by the royalty buy out.

152.    First, International points to a November 15, 1999 email from Hyslop to

Southwood in which Hyslop asks Southwood to review a memo that will be sent to others at

Nortel.  The relevant portion states:

> "Column 1 divides the requirements into "Bay" and "NT" ["NT"
> refers to Nortel] requirements.  Those identified as "Bay" products
> are subject to the in place Bay-SNMP RI agreement (which has
> been assigned by Bay to Nortel); i.e. had the Bay-Nortel merger
> never occurred, Bay would have been entitled to deploy these
> products royalty free.*  However, if any of these product
> development groups require source code development licenses
> (e.g. source code for Emanate or license fees for other SNMP RI
> software which will not be embedded into the Bay product), they
> must be paid for on a "Bay" product by "Bay" product basis as per
> the terms of the existing Bay-SNMP RI agreement.  Products
> identified as "NT" products in Column 1 will have to pay for both
> the development source code (and, if any, other non-embedded
> SNMP RI tools) and also pay runtime royalties.

Ex. P-39.

153.    The second sentence refers to the fact that Bay-related products will receive the

benefit of the royalty buy out—i.e., they can be deployed "royalty free."  The following sentence

then explains that *if* any of these development groups needs to obtain SNMP Research

development software, they will need to pay for it.  It states:  "However, *if* any of these product

development groups require source code development licenses (e.g. source code for Emanate or

license fees for other SNMP RI software which will not be embedded into the Bay product), they

must be paid for . . . ."  *Id.* (emphasis supplied).  As discussed, that was exactly the situation with

the four New Schedules:  each one involved a new project that did not have, and so needed to

obtain and pay for, SNMP Research development software; and so they executed a schedule

under which they did so.  And, as also discussed, this was *not* the case for the BayStack and

Optivity groups:  they were using development software that they had already acquired and paid

for.

154.    Second, International points to an internal email from Hyslop to a group working

on a project called "VIPER." Ex. D-159.02; Ex. P-42.[15]  VIPER was an "NT" (i.e., Nortel)

project, and so would "have to pay for both the development source code . . . and also pay

runtime royalties." Ex. P-39.  Consistent with this understanding, Hyslop wrote:

> ***You have been identified as having a need to have a copy of***
> ***SNMP RI's Emanate source code; i.e. you are developing an***
> ***embedded application*** using one of the VxWorks, Vertex, pSOS or
> Chorus real time operating systems. . . . Emanate source code is
> normally priced at ████████, but SNMP will significantly
> discount this price ████████████ range provided that we
> order several copies, so there are significant savings to be realized
> by pooling the separate Nortel product requirements for Emanate
> source code. . . . Please respond as soon as possible if you have the
> funds in hand (1999 Nortel funding) to acquire Emanate source
> code.

Ex. P-42 (emphasis supplied).

155.    Thus, as reflected in the italicized text, Hyslop's email confirms that a

development group that needs to have a copy of development source code will need to pay the

license fee for it.

156.    The email also includes a sentence after the email's body, in which Hyslop wrote:

"PS Brian: note that the Bay buy out is a buy out for royalties only, and Bay must still, on a

product by product basis, get the right to use the Emanate source code." Ex. P-42.  It is not clear

who "Brian" is, as there is no one by that name included in the email.  But in any event, the

sentence is exactly consistent with the point already discussed above and reflected in the

---

[15]    Exhibit P-42 was admitted at trial only subject to Nortel's reservations that 1) because it is an internal
Nortel email, it is not an objective manifestation of the parties' intentions and is thus irrelevant to the interpretation
of Schedule 1; and 2) the testimony that International attempted to elicit from Southwood concerning this email is
incompetent because Southwood cannot opine on the meaning of an email that he neither wrote nor received.  Trial
Tr. 157:16-161:24.  The Court confirmed that an internal email such as this would not be probative of the parties'
mutual understanding because it was not shared with International.  Trial Tr. 154:7-9.  The same point applies to P-
43, another internal email cited by International.  In any event, as discussed, these emails do not support
International's position.  If anything, they support Nortel's position.

italicized portion of this email quoted above:  if a development group needed to obtain

development software, it would need to pay the license fee to acquire it.  Again, that was true of

the four New Schedules, and it was not true of the BayStack and Optivity groups.

157.     Third, International points to an email regarding Schedule 5, in which Hyslop

states:

> The items that you are buying in Schedule 5 . . . are items that both
> Preside and the OPS group, would have to buy whether or not
> these SNMP RI products are required to develop either new
> Preside products or Optivity products.  It is true that Bay, under the
> Bay - SNMP RI agreement has a "buy-out", but that "buy-out" is
> restricted solely to royalties for deployed Optivity products; the
> buy-out does not cover the SNMP RI products required to develop
> the Optivity products.

Ex. P-43 at 1.

158.     International focuses on the last sentence and suggests that it somehow supports

its argument.  International's Pre- Hearing Br. ¶¶ 4-5, 21 (Adv. D.I. 566).  But the email makes

the very same point as already discussed:  the buy-out covers royalties, and it does not cover the

fee for acquiring the SNMP Research development software required to develop products.  Ex.

P-43 at 1.  Indeed,  Southwood confirmed exactly this point at trial:

> I would comment that at the very end of the paragraph, where he
> says, "The buy out does not cover SNMP RI products required to
> develop the Optivity products," that's a reference to our license
> fees, not to our royalty obligations.

Trial Tr. 168:19-24.

159.     Thus, the email confirms that the license fee is paid when a development project

needs to acquire SNMP Research development software code to develop products.  Trial Tr.

168:17-24; 462:12-463:3; 206:22-107:2.  Again, the four New Schedules were for development

projects that needed to acquire and pay for development software.  And the BayStack and

Optivity groups did not need to do so.

160.    In sum, these emails certainly do not support International's arguments.  To the contrary, they confirm and highlight the distinction between the circumstances giving rise to the New Schedules, on the one hand, and the facts concerning the BayStack and Optivity groups on the other.

161.    As yet further confirmation that the New Schedules involved new development projects, instead of legacy Bay Networks projects developed by legacy Bay Networks groups such as the BayStack and Optivity groups that were covered by the royalty buy out in Schedule 1, each of the New Schedules involved a project developed by a group that was not located at either of the legacy Bay Networks locations, i.e., Santa Clara, California and Billerica, Massachusetts.  Trial Tr. 303:16-304:1; *see also* Trial Tr. 304:2-5, 346:8-11 (Case testifying that the Bay Networks License was limited to those two locations).  Schedules 14 and 37 applied to a group in Simi Valley, California, Ex. D-19; Ex. D-32, and Schedules 12 and 20 applied to a group in Richardson, Texas, Ex. D-17; Ex. D-20.  The Simi Valley group was derived from Micom, a separate company unrelated to Bay Networks, that Nortel acquired.  Trial Tr. 344:13-15; Case Dep. 84:11-12; *see also* Trial Tr. 344:3-15, 345:1-5.  Similarly, Case confirmed that the Richardson, Texas facility was not a Bay Networks location and that Bay Networks had not made voice over IP products like those covered by Schedules 12 and 20.  Case Dep. 603:4-23; Trial Tr. 347:20-348:9.  So, while the groups involved in these schedules evidently were working on Bay-related projects, they involved new development projects that, as discussed, would need to execute a new schedule so that they could acquire and pay for the development software they would be using.

C.    **The "New Schedules" Involved Development Projects That Needed To Set Up Software Service Agreements For Their Newly Acquired Software**

162.    Yet another distinction between the New Schedules and the BayStack and Optivity groups is that the New Schedules involved development projects that needed to set up Software Service Agreements or SSAs for their newly acquired software.  As discussed, the New Schedules included software that was not covered by the Bay Networks License and Schedule 1, and that the development projects needed to acquire (and pay for).  Accordingly, they needed to set up SSAs for their projects as well.

163.    This is reflected in the New Schedules, as they each provided for the payment of a "Yearly Maintenance Fee," which is the payment for the first year of the SSA.  Ex. D-17 at 1; Ex. D-19 at 1; Ex. D-20 at 1; Ex. D-32 at 1.  These payments are also reflected in International's "customer ledger."  Schedule 12 was associated with the Customer ID "NORTEL0018", Ex. D-79A at 13; Ex. D-186; Schedule 20 was associated with the Customer ID "NORTEL0032," Ex. D-79A at 19; Ex. D-254; Schedule 37 was initially associated with the Customer ID "NORTEL0019," Ex. D-79A at 14; Ex. D-253; and Schedule 14 was associated with the Customer ID "NORTEL0014" (payments for the SSA associated with Schedule 37 were also subsequently moved to that Customer ID), Ex. D-79A at 12, 14; Ex. D-252; Ex. D-255.

164.    By contrast, as discussed above, the BayStack and Optivity groups had already acquired their development software and initiated an SSA under the Bay Networks License.  Accordingly, they had no need to execute a new schedule do so.  Instead, they simply proceeded under the existing SSAs.

165.    Again, this point is specifically noted in the email exchange between Vicky Allen, Dave Hyslop and John Southwood that explains and confirms why Optivity would continue forward under Schedule 1 and its existing SSA, and had no need to execute a new schedule.  Ex.

55

D-257.  Allen's email states: "As we will continue to use the SNMP ARL product, we will

continue to pay maintenance, per the ███████ fee stated in the Bay agreement."  *Id.* at 1.  The

same was true for the SSA for the EMANATE software used by the BayStack group.  Reflecting

this understanding, payments for these SSAs, which covered the software licensed under the Bay

Networks License and Schedule 1, were tracked in International's customer ledger under the

"Bay" Customer ID.  Ex. D-79A at 8-9.

166.    In sum, the record demonstrates that the projects covered by the New Schedules

were fundamentally different from the BayStack/ES/ERS switches (and the Optivity products).

Indeed, these facts serve to highlight why the BayStack/ES/ERS switches (and the Optivity

products) were fully covered by Schedule 1 and had no need of a new schedule.

**D.      The Emails International Cites Do Not Support Its "New Schedules"
        Argument**

167.    International cites a handful of emails as purported support of its "new schedules"

argument, but they do not help it.  Instead, they are consistent with Nortel's understanding of

Schedule 1.

168.    First, International cites the three emails by Dave Hyslop that are addressed in the

preceding section.  Ex. P-39; Ex. P-42; Ex. P-43.  As shown, these emails confirm and highlight

why the New Schedules were appropriate for the development projects they covered and why no

new schedule was needed for the BayStack group's use of the EMANATE software in the

BayStack/ES/ERS switches.

169.    Second, International points to an August 2003 email exchange between Pierre

Tremblay of Nortel and John Southwood and Martha Hopper of International, which has also

been discussed above in Section II.E.  Here, too, it is ironic that International would cite this

email, because International's statement concerning Schedule 1 supports Nortel's understanding

of Schedule 1 and contradicts International's.  In particular, International stated that, under

Schedule 1, "BAY *has* a Royalty-BuyOut on EMANATE Sources."  Ex. D-158.02 at 1

(emphasis supplied).  This email exchange occurred in August 2003, months after the end of

Schedule 1's three-year term.  Thus, if International actually had held the understanding of

Schedule 1 that it proposes now, it would have said that any right to use software covered by

Schedule 1 was extinguished in June 2003 and so that schedule should be considered "dead."

But International said no such thing.  Instead it said that Nortel/Bay "*has* a Royalty-BuyOut on

EMANATE Sources" under Schedule 1.  *Id.*

170.    International seeks to ignore that clear statement, and instead it points to a

sentence about one of the New Schedules, Schedule 12.  In that portion, Southwood refers to

what he describes as his understanding with Dave Hyslop concerning new schedules.  Ex. D-

158.02 at 3.  Tremblay, being new to the relationship and not having been involved with

Schedule 1 or any of the New Schedules, had no basis to respond to Southwood's statement.

Nor was there anything for him to say or do in response to Southwood's statement—i.e., this was

not an "actionable" statement.  In any event, the statement refers to Schedule 12 and therefore

cannot trump the parties' statements and actions concerning Schedule 1, including the statement

about Schedule 1 in the very same document.  Further, as demonstrated above, the circumstances

concerning Schedule 12 and the other New Schedules are fundamentally different from those

concerning the BayStack group and the BayStack/ES/ERS switches.

171.    If there were any doubt about International's actual understanding of Schedule 1,

it would be dispelled by the record of its statements and actions directly concerning Schedule 1

in the period *after* this August 2003 exchange, including:  1) Southwood's express confirmation

in April 2004 that Nortel has the ongoing right to use the ARL software under Schedule 1,

because that software was licensed "under the old Bay license completed before Nortel purchased Bay" and "the old license is incorporated into the current license under [S]chedule 1" (Ex. D-271 at 2); 2) International's repeated renewals of the SSA with Nortel covering the Schedule 1 software in the years following 2003 (Ex. D-171; Ex. D-79A at 8-9; Ex. D-81; Ex. D-95; Ex. D-96; Ex. D-97 at 1; Ex. D-98 at 1; Ex. D-99; Ex. D-83 at 2; Ex. D-101 at 1; Ex. D-100 at 1); and 3) Southwood's express statement in January 2006 to the BayStack group that he was "pleased" they were operating under "the 'old Bay license' incorporated into the Nortel license" via Schedule 1, Ex. D-85 at 1, and his formal letter stating that Nortel "has a license . . . under Nortel Schedule 1 [which] incorporates the paid-up royalties' license previously established by Bay Networks," Ex. D-78A at 3.

## V.  THE EVIDENCE OF LICENSING CUSTOM AND PRACTICE OFFERED BY DR. RICHARD RAZGAITIS FURTHER CONFIRMS SCHEDULE 1'S MEANING AND EFFECT

172.    Nortel's licensing expert Dr. Richard Razgaitis provided straightforward testimony based on his knowledge of custom and practice in the technology licensing industry, which—consistent with the record and International's repeated actions and course of dealing with Nortel—establishes that it would be contrary to custom and practice for International and Nortel to have agreed to an arrangement under which Nortel would lose its rights to distribute the SNMP Research software in existing products covered by Schedule 1 in June 2003.

### A.    Dr. Razgaitis Has Extensive Experience In Technology Licensing

173.    Dr. Razgaitis has over 30 years of experience negotiating, drafting and executing technology licenses, as well as working with the underlying technology that has been the subject matter of such licenses.  Trial Tr. 404:9-12.  He holds a Ph.D. in mechanical engineering and thermofluid sciences from Southern Methodist University, an M.B.A. from Ohio State

University, an M.Sc. in aerospace engineering from the University of Florida and a B.Sc. in Aeronautical and Astronautical Engineering from the University of Illinois.  Trial Tr. 396:11-19.

174.    From 1965-69, Dr. Razgaitis worked as an engineer responsible for rocket system and propulsion system analysis for the Apollo Space Program, which included work in FORTRAN software programming.  Trial Tr. 396:24-397:10; Ex. D-204 ¶ 10.  Dr. Razgaitis has also taught as a professor of mechanical engineering for thirteen years at the University of Portland and Ohio State University.  Trial Tr. 397:13-15; Ex. D-204 ¶ 9.

175.    From 1981-85, Dr. Razgaitis was Principal Research Scientist at Battelle Memorial Institute, a 6,000-person research and development organization.  Trial Tr. 397:15-398:4; Ex. D-204 ¶ 6.  In 1985, the focus of Dr. Razgaitis's responsibilities at Battelle transitioned to technology licensing, when he became Director of Technology and, subsequently, Vice President of Commercial Development.  Trial Tr. 398:8-399:6.  Dr. Razgaitis managed technology licensing negotiations at Battelle until 1995, including by identifying licensing opportunities, negotiating agreements, drafting licenses and developing term sheets.  Trial Tr. 399:11-20, 400:17-18.  The underlying technology Dr. Razgaitis licensed during his time at Battelle included, but was not limited to, computer-aided design software and database software. Trial Tr. 400:8-13.

176.    From 1995-98, Dr. Razgaitis served as Vice President of Technology Licensing at Bellcore, a telecommunications software company.  Ex. D-204 ¶ 5; Trial Tr. 401:8-17.  In that role, he supervised a licensing team and also worked to identify licensing opportunities, pursue potential licensees and draft term sheets related to Bellcore's proprietary software.  Trial Tr. 401:18-403:1.

177.    Since 1998, Dr. Razgaitis has been working as a technology/IP licensing consultant.  Trial Tr. 403:13-21; Ex. D-204 ¶ 4.  In this capacity, he has advised companies on opportunity discovery, licensing strategy and valuation.  Ex. D-204 ¶ 4; Trial Tr. 403:22-404:8.

178.    Since 1985, Dr. Razgaitis has been a member of the Licensing Executive Society (the "LES"), a leading international organization of licensing professionals, and has held several leadership positions at LES.  Trial Tr. 406:4-16; Ex. D-204 ¶ 12.  He is also a founder and president of the Licensing Foundation, Inc., which was established by LES to promote education about IP licensing, and in 2011, received the Barnes Award from the LES for his education and mentorship contributions to the licensing industry.  Trial Tr. 406:19-24; Ex. D-204 ¶¶ 12, 19. Dr. Razgaitis is also the author of four books and three book chapters on technology and IP valuation, licensing strategy and licensing negotiations.  Ex. D-204 ¶ 13.

**B.      Custom And Practice Concerning Embedded Software Teaches That The Parties Would Not Expect Nortel To Lose All Rights Under Schedule 1 In June 2003**

179.    Dr. Razgaitis testified at trial that, in light of the integration of SNMP Research's software into Nortel's BayStack/ES/ERS switches, it would be contrary to custom and practice for the parties to agree to a license that stripped Nortel's rights to distribute that software on a specified date without 1) providing a mechanism for Nortel to extend those rights at a known price; and 2) imposing an obligation on Nortel to return or destroy the SNMP Research software if it no longer had the right to use the software in its switches.  Schedule 1, however, contains no such provisions.

180.    John Mead, a software engineer who worked on the BayStack/ES/ERS switches at Bay Networks, Nortel and Avaya, testified that the BayStack/ES/ERS switches were based on a common code base called the "BayStack operating system software," or "BoSS."  Mead Dep. 174:8-9, 174:25-175:5, 183:6-19, 193:2-3.  Mead further testified that, prior to Nortel's

acquisition of Bay Networks, SNMP Research's software was integrated into BoSS and, as a

result, was incorporated into each of the BayStack/ES/ERS switches. Mead Dep. 176:25-177:20,

232:6-14. Mead explained that SNMP Research's software touched on a number of different

components of BoSS. Mead Dep. 229:18-230:22.

181.    As a result, to remove SNMP Research's software from BoSS and from the

BayStack/ES/ERS switches would be extremely arduous, *id.* 145:13-146:25, 230:13-231:12,

233:4-12, not because of the importance or value of the SNMP Research software, but merely

because it is woven into the core codebase and would be difficult to disentangle, *id.* 230:13-

231:12, 233:4-12. In fact, when Avaya removed SNMP Research's software from the

BayStack/ES/ERS switches in 2013, the entire process took two and a half years. Mead Dep.

140:4-9, 141:13-16, 146:4-8. Mr. Mead also testified that the same time-consuming process

would have been required had Nortel lost its rights to use SNMP Research software in its

switches prior to the line of business sale to Avaya. Mead Dep. 233:4-12.

182.    As Dr. Razgaitis explained, given the integration of SNMP Research software

into the BayStack/ES/ERS switches, it would be contrary to custom and practice for Nortel and

International to have agreed to an arrangement where Nortel would lose its rights under Schedule

1 to distribute SNMP Research software in its switches in June 2003. Trial Tr. 420:14-421:12,

426:20-427:5, 430:2-6.

183.    Specifically, an agreement that would strip Nortel of its rights to distribute SNMP

Research software in the BayStack/ES/ERS switches in June 2003 would result in a "cliff" that

would leave Nortel with "terrible options." Trial Tr. 420:23-421:5, 421:9-12. In such a scenario,

Nortel would have been "mortally worried" about the untenable choice of "hav[ing] to stop

selling the product or . . . hav[ing] to have some kind of an emergency program of reconfiguring

in a way that won't violate some other third-party agreement." Trial Tr. 421:5-9, 422:5-8.

184.    To avoid this dilemma, Nortel would have needed "absolute clarity and absolute

certainty about what it could do to extend its rights" beyond the date on which it could

potentially lose its rights to use SNMP Research's software in its switches. Trial Tr. 427:1-5.

Schedule 1, however, contains no provisions explaining how, if it were read as stripping Nortel

of the right to use the software in existing products (as International contends), Nortel could

extend those rights or at what price. Ex. D-7C; Trial Tr. 427:24-428:2.

185.    Given the absence of such language, Dr. Razgaitis explained that International's

argument "that June 20 of '03 meant the termination of the licensing rights" would be contrary to

custom and practice, because a licensee in Nortel's position would need "the certainty that they

could get subsequent rights . . . and the terms of those rights." Trial Tr. 429:24-430:6.

186.    Dr. Razgaitis further testified that it would be entirely inconsistent with custom

and practice for Nortel and International to rely (as International now suggests) on an informal,

unwritten agreement that might permit Nortel to extend its royalty buy-out to use SNMP

Research software in products covered by Schedule 1 by executing new schedules. Trial Tr.

430:19. That is because Nortel would have needed its right to extend its license to use SNMP

Research software in its existing BayStack/ES/ERS switches to be specified in writing:

> [T]o have an informal arrangement would make no sense. You
> would want to have business certainty, because you would be
> faced otherwise with the possibility that the informal arrangement
> changed, that the parties change, the licensor changed, they
> changed their strategy. People change, people leave, people get
> acquired.

Trial Tr. 431:5-12.

187.    In addition, the absence of language in Schedule 1 requiring certification by Nortel that it had removed SNMP Research software from its products in June 2003 and/or providing for the destruction or return of SNMP Research software, if it no longer had the right to use that software, further contradicts International's argument.  Trial Tr. 426:4-15.  Dr. Razgaitis explained that, as a matter of custom and practice, such language would be necessary if the parties had to ensure International that its software was not "floating around" a company that had no right to use it.  Trial Tr. 426:16-19.

### C.    International's Effort To Undermine Dr. Razgaitis's Testimony Through The Testimony Of David Tollen Fails

188.    International's effort to undermine Dr. Razgaitis's opinions through the testimony of David Tollen fails for several reasons.  First, Tollen inappropriately attempts to tell the Court how to read Schedule 1's text.  Second, Tollen's argument that Nortel was required to execute new schedules in order to extend its rights under Schedule 1 is not supported by, and is contradicted by, contemporaneous documentary evidence.  Third, Tollen's opinion disregards evidence that contradicts his arguments.  Finally, Tollen's suggestion that Dr. Razgaitis has confused software licensing concepts with patent licensing concepts mischaracterizes Dr. Razgaitis's analysis and relies on a basic misunderstanding of one of his sources.

### 1.    The Majority Of Tollen's Testimony Is An Inappropriate Attempt To Tell The Court How To Interpret The Text Of Schedule 1

189.    Tollen's testimony consisted principally of an inappropriate attempt to read the text of Schedule 1 and tell the Court what the text means.  *See, e.g.*, Trial Tr. 550:24-551:18, 559:21-560:10; *see also* Trial Tr. 560:11-15 (Tollen, an attorney, citing his legal experience as the basis for his opinion).  Indeed, the Court sustained an objection to some of this testimony, excluding it as inappropriate subject matter for an expert on industry custom and practice.  Trial Tr. 552:16-19.  As the Court put it: "I don't think he testified about custom and practice.  I think

63

he opined on the legal issue, whether there was a termination after three years." Trial Tr. 552:16-19.

190.    In addition, Tollen's argument is contrary to the Court's May 2, 2017 ruling that Schedule 1 is ambiguous.  May 2 Tr. 123:11-13.  Indeed, Tollen's reading of Schedule 1 suffers from the same flaws as International's own reading, including that it takes the language from the "Additional Conditions" section of Schedule 1 out of context and ignores the fact that key provisions of Schedule 1 incorporate the royalty buy out from the Bay Networks License.  *See* Section II.A, *supra*.  Thus, his opinion is neither competent nor correct and is instead contrary to the Court's own prior determinations.

### 2.    Tollen's View Is Not Supported By Any Written Agreement Between the Parties

191.    Under Tollen's proposed interpretation of Schedule 1, Nortel would lose all rights to use the covered SNMP Research software after June 2003 unless it executed a new schedule. Trial Tr. 555:5-18.  However, as Tollen admits, Schedule 1 says nothing about any need (or ability) to enter into other schedules.  Further, Tollen was forced to admit that there is *no* contemporaneous writing signed by the parties that memorializes any need by Nortel to execute new schedules to extend its rights under Schedule 1 beyond June 2003 or any ability to do so. Trial Tr. 568:5-569:14.

192.    Confronted with the November 16, 1999 email from Southwood to Hyslop concerning the meaning and effect of Schedule 1, which does not mention any need (or ability) to execute new schedules, Tollen was forced into implausible interpretative gymnastics.  The relevant text of Southwood's email states:

> Rick Barnes, our counsel, is crafting the final Bay transfer to
> Nortel based on the previous term which expired Nov. 1.  I told
> him that the royalty buy out would expire in three years.  I thought
> we agreed to that in our conference room.

> By expire I mean that new products/projects brought on line after
> three years would address royalties on their own merit.  Current
> Bay products and development projects for the next three years
> will take advantage of the lifetime royalty buy out until their
> products have aged out of the marketplace.

Ex. D-76C at 1.

193.    Tollen's argument depends on the assertion that the parties only memorialized the

first paragraph of the above-quoted language in Schedule 1 and that the second paragraph refers

to something different, a purported "informal arrangement" between the parties concerning the

execution of new schedules.  Trial Tr. 577:13-579:1.  The argument that the first and second

paragraphs are referring to different things makes no sense.  In the first paragraph Southwood

states that International's counsel is drafting the "final Bay transfer to Nortel" (which as

discussed is Schedule 1) and says, "I told him the royalty buyout would expire in three years."

The second paragraph then explains what Southwood means in the first paragraph by "expire,"

stating "By expire I mean  . . . ."  Tollen's suggestion that the first paragraph refers to Schedule 1

but the second paragraph does not, and that it instead refers to some other agreement, cannot be

squared with what the text actually says.  Further, Southwood's email says nothing about a

purported intention to memorialize only part of his description in Schedule 1 and leave the rest to

an unwritten and informal understanding.  Nor does it say anything about any need (or ability) on

Nortel's part to execute new schedules.  Trial Tr. 579:2-581:2.  Tollen's theory is therefore

contradicted by the documentary record.

### 3.    Tollen's Argument Ignores The Facts Concerning The New Schedules And Fails To Address International's Treatment Of Optivity

194.    Tollen also claims that the New Schedules the parties executed during Schedule

1's three-year term support his reading of that document.  Trial Tr. 555:15-17.

195.    But as discussed above in Section IV, International's argument—and Tollen's—is defeated by the fact that the New Schedules involved new development projects in circumstances fundamentally different from the Nortel BayStack group's use of the EMANATE software covered by Schedule 1.  Specifically, the New Schedules involved software not covered by Schedule 1 and development projects that 1) did not already have, and so needed to acquire and pay for, the necessary development software; and 2) did not have in place, and so needed to establish, a Software Service Agreement for the software they were acquiring.  *See* Section IV, *supra*.  Tollen evidently had not been made aware of these facts concerning the New Schedules. In any event, he does not attempt to reconcile them with his argument, or even address them at all.

196.    Similarly, as discussed above in Section III, the record concerning the Optivity group's use of ARL under Schedule 1, which perfectly parallels the BayStack group's use of EMANATE under Schedule 1, demonstrates why—as International expressly confirmed at the time—there was no need for a new schedule for a group that, like both the Optivity and BayStack groups, was using software covered by Schedule 1; had already acquired and paid for the development software they were using; and already had in place an SSA from the Bay Networks License that they continued to operate under.  *See* Section III, *supra*.   Here, too, Tollen evidently was not made aware of these facts that contradict his arguments.  In any event, he said nothing about them.

### 4.    Tollen's Contention That Dr. Razgaitis Has Conflated Patent Licensing And Software Licensing Is Incorrect

197.    Tollen argued that Dr. Razgaitis was somehow "confused between patent licensing and software licensing," suggesting that Dr. Razgaitis's opinions are not valid outside of the patent licensing context.  Trial Tr. 563:22-24.  Contrary to Tollen's testimony, Dr.

Razgaitis's opinions do not depend on the legal framework at issue, nor are they specific to the patent law regime.  Rather, his testimony is grounded in licensing practices and business principles in the software industry, as well as the realities of software engineering.  *See, e.g.*, Trial Tr. 420:23-421:12, 426:4-427:5, 429:23-430:6, 430:21-431:19.  Specifically, Dr. Razgaitis's principal point is that it would be inconsistent with basic licensing custom and practice for a licensee to enter into an agreement under which it would lose the right to use software that has been integrated into an existing product line, without also including in that agreement a mechanism to continue those rights going forward.

198.    In any event, Tollen based his testimony on the false contention that one of the sources Dr. Razgaitis consulted, a treatise by Brian Brunsvold, deals exclusively with patent licensing and not software licensing.  Trial Tr. 564:21-565:4.  In fact, the first footnote on the first page of that book explicitly refutes that contention, stating:

> The reader should not assume that references in this work to
> "license agreements" or various cognates of "license" are limited
> to patent license transactions. . . . [S]uch terms are used to broadly
> refer to intellectual property transactions and related contracts . . . .

Brian G. Brunsvold et al., *Drafting Patent License Agreements* 1 n.1 (7th ed. 2012).

### D.    Dr. Razgaitis's Opinion Does Not Depend On The Transferability Of The Bay Networks License To Nortel, And In Any Event The Record Shows That Nortel Did Assert That It Had Rights Under The Bay Networks License

199.    International also sought to challenge Dr. Razgaitis's opinion at trial by claiming it was based on a purportedly inaccurate "premise" that after Nortel acquired Bay Networks, it automatically inherited the right to continue using SNMP Research software under the Bay Networks License.  Trial Tr. 26:1-11.  International contends this premise would be inaccurate because the Bay Networks License is non-transferable.  Trial Tr. 25:1-26:11.

200.    To begin, Dr. Razgaitis's opinion and analysis do not depend on the rights, if any, that Nortel acquired under the Bay Networks License. Nor does Nortel's understanding of Schedule 1 depend on such a premise. Rather, as Dr. Razgaitis explained, a company that has integrated licensed software into its existing product lines would not enter into an agreement under which it would lose the right to use that software, without also including in the agreement an established mechanism to continue that right going forward. *See* Section V.B, *supra*. This would be true regardless of any rights the licensee has or does not have going into the agreement. If the agreement is going to set a date on which the licensee no longer has rights to use software that has been integrated into existing products, it also needs to have a corollary provision establishing a framework for extending those rights going forward—and would not simply rely on the good will of the licensor or some informal, unwritten agreement. Thus, the linchpin of International's argument is wrong.

201.    In any event, the record makes clear that Nortel believed it retained rights under the Bay Networks License and made this clear to International. Indeed, it was Nortel that first raised this issue. Nearly nine months after the acquisition, Hyslop pointed out to Southwood that it had "occurred to [him] that the SNMP RI – Bay agreement should be formally assigned to Nortel as Nortel has been operating as though it were the licensee since the Nortel acquisition of Bay last September." Ex. D-155.01. Hyslop attached a draft "Memorandum of Agreement" to his email that would formally assign the Bay Networks License to Nortel. Ex. D-155.01; Ex. D-155.02.

202.    The contemporaneous record reflects that International was considering the issue, but there is no statement in which it clearly expressed a disagreement with Nortel's position. *See* Ex. D-208; Ex. D-209; Ex. D-144. On August 9, 1999, Southwood faxed to Hyslop a draft of a

"Temporary License Agreement," which would have assigned the Bay Networks License to

Nortel until November 1, 1999.  Ex. D-87.  A week later, Hyslop emailed Southwood to make

clear, again, that Nortel continued to believe its "rights to use SNMP products set out in the

[International] – Bay agreement are paid up rights."  Ex. D-86.  Hyslop's email also notes that

International was still considering the issue and had not expressed a contrary view.  *Id.*  This

contradicts International's suggestion that when Southwood sent a draft of a Temporary License

Agreement a week earlier, this must have meant that "Nortel knew . . . it had no rights from the

Bay license and needed an assignment."  Trial Tr. 26:12-14.

203.     International claims the Temporary License Agreement was signed, but has not

produced any signed copy of it – despite extensive efforts to find such a copy if one existed.

Trial Tr. 233:14-18, 234:23.  A November 16 email from Southwood to Hyslop refers to a

November 1 term, which would have been the end date under the draft Temporary License

Agreement, but Hyslop did not confirm the accuracy of that reference.  And again, as noted, a

week after Southwood faxed a proposed draft of the temporary license on August 9, Hyslop

wrote an email to make clear that Nortel believed it already had paid-up rights under the Bay

Networks License.  There is no documentary evidence to suggest that Nortel's view on this

subject ever changed or even that International held a contrary view.

204.     Further, if a Temporary License Agreement had been executed, one would expect

Schedule 1 to refer to it.  But it does not.  To the contrary, Schedule 1 itself indicates that both

parties believed that rights persisted under the Bay Networks License, as it states that Schedule 1

will supersede and terminate the Bay Networks license (and of course will also incorporate the

key provisions of the Bay Networks License), without any reference to a Temporary License

Agreement.  D-7C at 2.

69

205.    Against this documentary evidence, Case claims that at a meeting in October 1999 with Hyslop he allegedly "told [Nortel] that the SynOptics-Bay agreement was nontransferable and that they had no rights under the SynOptics-Bay agreement."  Trial Tr. 245:23-246:2.  However, Case's testimony is not supported by Southwood's contemporaneous "activity report" from this meeting, which describes Southwood's meeting with Hyslop and mentions that Case merely "stopp[ed] in" at one point.  Ex. D-249.  In any event, neither Case nor Southwood claimed in testimony that Hyslop or anyone else from Nortel agreed with International's position.  *See* Trial Tr. 134:23-135:9, 245:23-246:4.  Instead, both testified that Nortel pushed back and demanded "some benefit flowing from those royalty buy-outs that [it had] paid just recently."  Trial Tr. 135:4-6, 246:2-4.

206.    International also offers legal arguments about this issue, including by pointing to a decision concerning California law (*SQL Sols., Inc. v. Oracle Corp.*, 1991 WL 626458 (N.D. Cal. 1991)) that the California Court of Appeal has made clear "[o]bviously . . . has no precedential value."  *Former S'holders v. Browning-Ferris Indus.*, 2005 WL 2820594, at *5 (Cal. Ct. App. 2005).  But there is no evidence that the parties ever discussed these legal arguments at all.

207.    At most, whether Nortel continued to have rights to distribute SNMP Research software in products covered by the Bay Networks License was a business point for discussion. Schedule 1 can therefore be read as a compromise between the parties' positions:  just as Southwood explained in his November 16 email, the Bay Networks royalty buy out would extend to "[a]ll products of units and projects originating from what was Bay Networks" that were in existence during its three-year term, while development projects begun after that period would not receive the royalty buy out.  Ex. D-76C at 1.

70

## VI.    ALTERNATIVELY, THE PARTIES' CONDUCT AND STATEMENTS AFTER JUNE 2003 ESTABLISHED AN IMPLIED-IN-FACT CONTRACT

208.    For the reasons set forth in the preceding sections, it is clear that Schedule 1 conferred a lifetime royalty buy out on "[a]ll products of units and projects originating from what was Bay Networks" that existed during its three-year term, and further, that this buy out was not stripped away at the end of this term.  *Id.*  However, even if International's interpretation of Schedule 1 were to be accepted, and all rights granted thereunder nominally terminated on June 20, 2003, the parties' conduct and statements show that they continued to perform after this date on the basis that the products covered by Schedule 1 continued to be covered by the a lifetime royalty buy out.  As discussed more fully in Section VIII of the Conclusions of Law, the parties' conduct and statements therefore established an implied-in-fact contract extending the royalty buy out for products covered by Schedule 1 beyond the three-year mark—that is, until they had aged out of the marketplace.

209.    First, in January 2006, after the BayStack team had reached out to International requesting a letter confirming that it was a licensee of SNMP Research software, Southwood responded in an email that he was "pleased . . . that it was the 'old Bay license' incorporated into the Nortel license" that the BayStack group was operating under.  Ex. D-85 at 1.  He then issued a formal letter on behalf of International confirming Nortel's ongoing right to use the software covered by Schedule 1, which stated:

> Nortel Networks has a license with SNMP Research International for EMANATE® sources running on Windows, Solaris, and VxWorks as referenced under Nortel Schedule 1.  That schedule incorporates the paid-up royalties' license previously established by Bay Networks.

Ex. D-78A at 3.

210.    Second, International repeatedly renewed the SSA with Nortel covering the EMANATE software licensed under Schedule 1 after June 2003, confirming Nortel's ongoing right to use the software.  Ex. D-171; Ex. D-79A at 8-9; Ex. D-81; Ex. D-95; Ex. D-96; Ex. D-97 at 1; Ex. D-98 at 1; Ex. D-99; Ex. D-83 at 2; Ex. D-101 at 1; Ex. D-100 at 1.  Under the SSA, International provided updated versions of the Schedule 1 software and support for that software to the BayStack group, and International collected thousands of dollars in payments from Nortel each year in return.  Ex. D-171; Ex. D-79A at 8-9; Ex. D-81; Ex. D-95; Ex. D-96; Ex. D-97 at 1; Ex. D-98 at 1; Ex. D-99; Ex. D-83 at 2; Ex. D-101 at 1; Ex. D-100 at 1; Trial Tr. 513:19-514:4. In addition, International actively pursued and solicited Nortel to renew the SSA.  Ex. D-82; Ex. D-83 at 1 (emails from International to the BayStack group asking it to renew the SSA). International's conduct clearly communicated to Nortel that it had an ongoing right to use the software covered by the SSA and Schedule 1 and Nortel's continued payment of the fee necessary to renew the SSA clearly communicated to International that it understood it had the right to use that software.

211.    Third, despite Case's close business and personal relationships with Reeves and the BayStack team, *see* ¶¶ 80-81, *supra*, neither he nor anyone at International ever told anyone at Nortel that the BayStack/ES/ERS switches would become infringing when Schedule 1's three-year term ended.  Nor, after June 20, 2003 had passed, did anyone at International ever suggest to anyone at Nortel that the BayStack/ES/ERS switches were now infringing.  Rather, as discussed, International continually reaffirmed Nortel's ongoing right to use the software licensed under Schedule 1.

212.    Fourth, in connection with the Optivity group's use of SNMP Research's ARL software—a situation that matches in all material respects the BayStack group's use of SNMP

Research's EMANATE software—Southwood confirmed in 2004 that Optivity's use of the ARL product continued to be covered by Schedule 1.  He expressly stated that Nortel had a license to ARL "under the old Bay license completed before Nortel purchased Bay" and that "the old license is incorporated into the current license under [S]chedule 1."  Ex. D-271 at 2.

213.    In sum, both parties' conduct and statements after June 20, 2003 show that they continued to perform on the basis that the legacy Bay Networks products covered by Schedule 1 still enjoyed a lifetime royalty buy out with respect to the designated SNMP Research software. Therefore, as discussed in Section VIII below, even if International's interpretation of Schedule 1 were to be accepted, an implied-in-fact contract was created which confirmed that the lifetime royalty buy out for the products covered by Schedule 1 was not extinguished at the end of Schedule 1's three-year term.

## PROPOSED CONCLUSIONS OF LAW

214.    As noted below, the interpretation of an ambiguous contract, which the Court has found Schedule 1 to be, is ordinarily a question of fact.  The above Findings of Fact set forth in detail the factual basis supporting the Court's conclusions concerning the meaning and effect of Schedule 1.  While some of these factual findings will be summarized and highlighted below, the Court's ruling relies on, and incorporates, the entirety of the factual findings.

**VII.    NORTEL'S UNDERSTANDING OF SCHEDULE 1 IS CORRECT: SCHEDULE 1 CONFERS A ROYALTY BUY OUT ON THOSE PRODUCTS AND PROJECTS IN EXISTENCE DURING ITS THREE-YEAR TERM**

**A.    Schedule 1 Is Ambiguous**

215.    Under New York law, the first step in interpreting a contract is answering "the threshold question of whether the terms of the contract are ambiguous."  *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London*, 136 F.3d 82, 86 (2d Cir. 1998). "An ambiguity exists where the terms of a contract could suggest 'more than one meaning when

73

viewed objectively by a reasonably intelligent person who has examined the context of the entire

integrated agreement and who is cognizant of the customs, practices, usages and terminology as

generally understood in the particular trade or business.'"  *Id.* (quoting *Lightfoot v. Union*

*Carbide Corp.*, 110 F.3d 898, 906 (2d Cir.1997)); *see also Dev. Specialists, Inc. v. Peabody*

*Energy Corp.* (*In re Coudert Bros.*), 487 B.R. 375, 380 (S.D.N.Y. 2013) ("[I]n analyzing

contractual text, a court need not turn a blind eye to context."  (citation omitted)).

216.    "Ambiguity with respect to the meaning of contract terms can arise either from

the language itself or from inferences that can be drawn from this language.  Hence, only where

the language and the inferences to be drawn from it are unambiguous may a district court

construe a contract as a matter of law . . . ."  *Alexander & Alexander Servs. Inc.*, 136 F.3d at 86

(quoting *Cable Sci. Corp. v. Rochdale Vill., Inc.*, 920 F.2d 147, 151 (2d Cir.1990)) (citation

omitted).  To conclude that contractual language is unambiguous, a Court must find that "it has a

definite and precise meaning, unattended by danger of misconception in the purport of the

[contract] itself, and concerning which there is no reasonable basis for a difference of opinion."

*Serdarevic v. Centex Homes, LLC*, 760 F. Supp. 2d 322, 329 (S.D.N.Y. 2010) (alteration in

original) (quoting *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir.1989));

*see also Marathon Asset Mgmt., LP v. Angelo Gordon & Co, LP (In re Energy Future Holdings*

*Corp.)*, 2017 WL 1170830, at *4 (D. Del. 2017).

217.    Applying these principles, the Court concluded at a hearing on May 2, 2017 that

Schedule 1 is ambiguous.  Order re Mot. to Exclude, May 4, 2017 (Adv. D.I. 560); May 2 Tr.

120:1-130:16.  The Court is therefore free to consider both the agreement's text and "any

available extrinsic evidence to ascertain the meaning intended by the parties during the formation

of the contract."  *Alexander & Alexander Servs., Inc.*, 136 F.3d at 86.  Because "the contract is

ambiguous and relevant extrinsic evidence as to its meaning is available, its interpretation is a question of fact for the factfinder." *New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101, 111 (2d Cir. 2006).

218.    The Court concludes that both Schedule 1's provisions and the available extrinsic evidence support Nortel's understanding of the agreement: that any existing products and any development projects originating from Bay Networks that emerged during Schedule 1's three-year term would take advantage of the lifetime royalty buy out until the products aged out of the marketplace.

B.    **Schedule 1's Provisions Support Nortel's Reading Of The Agreement**

219.    Schedule 1 specifically refers to and incorporates the Bay Networks License.[16]

Accordingly, interpreting the meaning of Schedule 1 requires consideration of the Bay Networks

---

[16]    International contends that Schedule 1 did not incorporate the Bay Networks License, but International's argument is based on a misapplication of New York's standard for incorporation by reference. Under New York law, a document is incorporated by reference into a contract where (1) the contract identifies the document to be incorporated "beyond all reasonable doubt," and (2) the parties clearly knew of and assented to the incorporated terms. *Laureate Educ., Inc. v. Ins. Co. of Pennsylvania*, 2014 WL 1345888, at *7 (S.D.N.Y. 2014) (quoting *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1201 (2d Cir.1996)).

Schedule 1's incorporation of the Bay Networks License meets both requirements.  First, Schedule 1 identifies the Bay Networks License beyond reasonable doubt by listing the specific documents (including their titles and dates of execution) that it comprises. Ex. D-7C at 1.  Second, that the parties knew of and assented to the incorporation of the Bay Networks License is evident from the plain text of Schedule 1:  Key sections of Schedule 1 (addressing "Run-Time Software," "Yearly Maintenance Fee" and "Royalties") are comprised solely of a cross-reference to terms "described in" the Bay Networks License. *Id.*  Thus, those sections of Schedule 1 are entirely dependent on the Bay Networks License and would be unintelligible without it. *See Sbarra v. Totolis*, 191 A.D.2d 867, 870 (N.Y. App. Div. 1993).

In *Laureate Education*, for example, the court held that an insurance contract incorporated a statement of values document, even though the contract did not explicitly state that the statement of values was "incorporated" into the contract. 2014 WL 1345888, at *7.  Rather, the contract stated that the "premium for this policy is based upon the statement of values" and that the insurer's liability would equal the least of three figures, including "the total combined stated values . . . shown . . . on the latest statement of values." *Id.*  The court held that the insurance contract's language identified a specific document beyond reasonable doubt because there was "no competing reference at issue," and that the contract clearly established the parties' assent to the terms of the statement of values. *Id.*  Here, the terms of Schedule 1 are even more clear in incorporating the relevant provisions of the Bay Networks License.

The cases cited by International are distinguishable. *Zucker v. Waldmann*, 2015 WL 390192 at *5 (N.Y. Sup. Ct. 2015), *Nat'l Union Fire Ins. Co. of Pittsburg v. Beelman Truck Co.*, 203 F. Supp. 3d 312, 322 (S.D.N.Y. 2016), *Intesa Sanpaolo, S.p.A. v. Credit Agricole Corp. & Inv. Bank*, 2013 WL 4856199, at *3-4 (S.D.N.Y. 2013), and *Torres v. Major Auto. Grp.*, 2014 WL 4802985, at *8 (E.D.N.Y. 2014) all involved contracts that failed to

License and the rights it conferred.  The Bay Networks License provided royalty buy outs for SNMP Research's EMANATE and ARL products.  Bay Networks purchased the EMANATE buy out and Nortel completed the purchase of the ARL buy out in February 2000, more than a year after it had acquired Bay Networks.  Ex. D-4 at 3; Ex. D-80 at 1; Ex. D-79A at 2, 8.  By acquiring these buy outs, Bay Networks and later Nortel obtained the right to "distribute in perpetuity an unlimited number of binary copies" of the designated SNMP Research software.  Ex. D-2 at 19; Ex. D-4 at 2; Trial Tr. 308:11-310:7.[17]

220.    Schedule 1 ensured that the benefit of these royalty buy outs, which Bay Networks and Nortel obtained at significant cost, would be preserved for all products and projects originating from Bay Networks that existed when Schedule 1 was signed or that came into existence during its three-year term.  The specific provisions of Schedule 1 that implemented this result are as follows:

- The "Specified Product or Project" section identifies the products and projects that would receive this benefit as follows:  "[a]ll products of units and projects originating from what was Bay Networks."  Ex. D-7C at 1.

- The "Development Software" and "Run-Time Software" sections refer to the Bay Networks License to identify the specific SNMP Research software that was covered

---

identify the relevant terms of the separate documents that were purportedly incorporated into the contracts at issue. By contrast, it is clear from the face of Schedule 1 that the parties intended that specific terms of the Bay Networks License would serve as key parts of Schedule 1.  For example, the royalty provision of Schedule 1 expressly refers to and incorporates the royalty provision of the Bay Networks License.

[17]    International argues that its proposed interpretation of Schedule 1 is supported by a general rule against construing contracts in a way that imposes a lifetime obligation.  International's Pre-Hearing Br. ¶¶ 44-45 (Adv. D.I. 566).  As an initial matter, the Bay Networks License itself granted lifetime rights: the royalty buy out conferred the right to "distribute *in perpetuity* an unlimited number of binary copies" of the licensed software.  Ex. D-4 at 2 (emphasis supplied); Ex. D-2 at 19; Trial Tr. 308:11-310:7.  It makes no sense for International to claim such a royalty buy out violates some general rule.  Moreover, the cases International cites are distinguishable for a simple reason:  they address contracts that are "silent" as to the duration of an obligation.  *M&G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926, 937 (2015); *see also Bajan Grp., Inc. v. Consumers Interstate Corp.*, 2010 WL 3341456, at *7 (N.Y. Sup. Ct. 2010).  Schedule 1, on the other hand, was not silent as to duration:  it incorporated the royalty provisions of the Bay Networks License, Ex. D-7C at 1, which provided a right "to distribute in perpetuity an unlimited number of binary copies."  Ex. D-4 at 2.  In fact, the Supreme Court's opinion in *Tackett* supports upholding a lifetime obligation when it is expressly provided for in the agreement at issue, as is the case here. 135 S. Ct. at 937 ("Indeed, we have already recognized that a collective-bargaining agreement [may] provid[e] in explicit terms that certain benefits continue after the agreement's expiration." (alterations in original) (citations omitted)).

by the royalty buy out under the Bay Networks License and would likewise be covered by Schedule 1, including EMANATE. *Id.*

- The "Royalties" section likewise refers to the Bay Networks License, stating: "As described in the agreements and amendments thereto between SNMP and Bay Networks and its predecessor entities." As noted, the Bay Networks agreements provided for a royalty buy out as to the designated SNMP Research software, including EMANATE. *Id.*

- The "Additional Conditions" section states as follows:

    This Schedule supersedes all of the prior agreements between SNMP and Bay Networks and its predecessor entities as referenced above, and all such agreements are hereby terminated by execution of this Schedule.

    This Schedule and the license in regard to the Development Software and Run-Time Software shall terminate and be of no further effect after a period of three years from the last date that this Schedule is executed below. *Id.* at 2.

221.    The combined effect of these provisions, taken together and in harmony, is that "[a]ll products of units and projects originating from what was Bay Networks" in existence during Schedule 1's three-year term will receive a royalty buy out in accordance with the Bay Networks License so that they can use the designated SNMP Research software during the lifetime of the product line.

222.    This conclusion is consistent with the fact that Schedule 1 provides a royalty buy out for the products and projects it covers. Again, Schedule 1 refers to the royalty provisions of the Bay Networks License, which provide for a royalty buy out for the designated SNMP Research software. This meaning and effect is apparent from the provisions of Schedule 1 itself. And it also is confirmed by the November 16, 1999 email by John Southwood concerning Schedule 1, which states that the parties intended Schedule 1 to provide the "lifetime royalty buy out" to the products and projects it covers. Ex. D-76C at 1.

223.    And given that Schedule 1 serves to confer the lifetime royalty buy out on the products and projects it covers, providing that Schedule 1 will terminate after three years serves to define which products and projects would receive the royalty buy out:  those product lines in existence during the three-year term would receive the royalty buy out, and those development projects begun after the three-year term would not receive the royalty buy out.  Again, this conclusion follows from the provisions of Schedule 1 itself.  And the conclusion is expressly confirmed by Southwood's November 16, 1999 email that explains what is meant by providing that Schedule 1 will "expire" in three years.  Ex. D-76C at 1.

224.    International's proposed interpretation of Schedule 1 depends on plucking out of context language in the "Additional Conditions" section of the document.[18]  International contends the result of this language is that, after three years, any right to use the software covered by the Bay Networks License and Schedule 1 is stripped away from the legacy Bay Networks products and projects, such that these products' and projects' continued use of that software would become infringing.

225.    In addition to being inconsistent with the provisions of Schedule 1 and the parties' conduct and statements concerning Schedule 1, International's interpretation suffers from multiple serious flaws.  First, International violates the fundamental tenet of New York law that a contract must be considered from the perspective of a "reasonably intelligent person who has

---

[18]    International has identified three decisions standing for the proposition that terminate means terminate, i.e., to end.  *Jefferson Chem. Co. v. Mobay Chem. Co.*, 267 A.2d 635 (Del. Ch. 1970); *DDS Partners, LLC v. Celenza*, 6 A.D.3d 347 (N.Y. App. Div. 2004); *Hamden v. Total Car Franchising Corp.*, 548 F. App'x 842 (4th Cir. 2013).  As an initial matter, it is unclear what law the court applied in *Jefferson Chemical Company*, and *Hamden* expressly relied on Virginia law.  *Hamden*, 548 F. App'x at 845.  But in any event, the meaning of the word terminate is not a contested point.  It is common ground that terminate means to come to an end.  The question here is what is the meaning and effect of providing that Schedule 1 will terminate—i.e., come to an end or "expire"—after three years.  The Court concludes that meaning and effect of providing that Schedule 1 will terminate after three years is to define which products and projects would receive the royalty buy out:  those products and projects in existence during the three-year term would receive the royalty buy out.  As discussed, this conclusion follows from Schedule 1's provision.  And it is expressly confirmed by Southwood's November 16, 1999 email.  Ex. D-76C at 1.  And this meaning and effect is likewise confirmed by the parties' consistent actions and statements concerning Schedule 1.

examined the context of the ***entire*** integrated agreement." *Alexander & Alexander Servs.*, 136 F.3d at 86 (emphasis supplied). International asks the Court to disregard what Schedule 1 actually says and does in incorporating the royalty buy out of the Bay Networks License and to read the language in the "Additional Conditions" section in a vacuum, shorn of the proper context. Interpreting Schedule 1 in the way that International suggests would be clear error.

226.   Second, International's proposed new interpretation would lead to a drastic and unreasonable consequence: it would cause existing products and projects covered by Schedule 1 to be stripped of their right to use the SNMP Research software at the three-year mark, such that they would be purportedly infringing from that point onward. This would be unworkable for Nortel because it had incorporated the SNMP Research software into the core codebase of the BayStack/ES/ERS switches and to extricate this software from the core codebase would be difficult and time-consuming. Mead Dep. 145:13-146:25, 230:13-231:12, 233:4-12; Trial Tr. 420:14-422:8.[19]

227.   If the parties had intended Schedule 1 to strip existing products of their right to use SNMP Research software, they would have included in Schedule 1 a mechanism for extending the right to use the SNMP Research software in these products beyond the three-year mark, as Dr. Razgaitis testified. Trial Tr. 426:20-427:5, 429:18-430:6. For example, there would be a provision for an additional payment to be made to give these products the right to use the software until they aged out of the market, just as the Bay Networks License itself had provided. In the absence of such a provision, Nortel would face "a cliff" at the end of Schedule 1's three-year term and would be entirely at International's mercy. Trial Tr. 420:23-421:5,

---

[19]     This difficulty of extricating the software is not a measure of its importance or value; it is merely a reflection of the fact that the software is woven into the core codebase and so would be difficult to disentangle, in the same way it would be difficult to extricate thread of a particular color from a multicolor tweed jacket. Mead Dep. 231:14-232:4.

421:9-12.  As Dr. Razgaitis explained at trial, the fact that Schedule 1 lacks any mechanism for extending Nortel's rights beyond the end of its three-year term indicates, based on industry custom and practice, that the parties did not intend for these rights to be stripped away at the three-year mark.  Trial Tr. 429:18-430:6.

228.    By contrast, Nortel's reading of Schedule 1 would not lead to this unreasonable scenario.  Nortel's understanding is that Bay Networks products and projects that were in existence during Schedule 1's three-year term received the royalty buy out of the Bay Networks License, so that they would be able to use the software covered by Schedule 1 until they aged out of the market.  Any new project that Nortel began to develop after the three-year mark would, on the other hand, not be covered by Schedule 1.  In that circumstance, at the beginning of such a new development project, Nortel could decide whether it was interested in using SNMP Research software in the new development.  If so, it could discuss that possibility with International and seek to agree on mutually acceptable terms.  If not, it could develop its own implementation of the SNMP protocol or choose from among the offerings of other vendors.  Thus, under Nortel's reading of Schedule 1, neither party would be at the other's mercy after the termination of Schedule 1.

229.    Having considered "the context of the entire integrated agreement" from the perspective of "a reasonably intelligent person . . . who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business," it supports Nortel's interpretation of Schedule 1.  *Alexander & Alexander Servs., Inc.*, 136 F.3d at 86 (citation omitted).

230.    International's reading, by contrast, ignores key parts of Schedule 1, in particular the incorporation of the royalty buy out from the Bay Networks License, and would produce a

result that is both inequitable and commercially unreasonable.  The drastic and untenable

consequences that would be created by accepting International's proposed interpretation of

Schedule 1 would be incompatible with the goal of contract interpretation under New York law,

which "must be to accord the words of the contract their 'fair and reasonable meaning'" by

taking into account "not merely literal language, but whatever may be reasonably implied

therefrom." *Sutton v. E. River Sav. Bank*, 435 N.E.2d 1075, 1078 (N.Y. 1982) (citations

omitted).  "[P]arties to an agreement are presumed to act sensibly in regard to it and an

interpretation that produces an absurdly harsh result is to be avoided." *Martilet Mgmt. Servs.,

Inc. v. Bailey*, 2013 WL 5420966, at *3 (S.D.N.Y. 2013) (alteration in original) (citations

omitted); *see also* Williston on Contracts § 32.11 (4th ed. 2017) ("[I]nterpretations which render

the contract fair and reasonable are preferred to those which render the contract harsh or

unreasonable to one party.").  Therefore, "[a] court will endeavor to give the [contract]

construction most equitable to both parties instead of the construction which will give one of

them an unfair and unreasonable advantage over the other." *Metro. Life Ins. Co. v. Noble

Lowndes Int'l, Inc.*, 643 N.E.2d 504, 508 (N.Y. 1994) (second alteration in original) (citation

omitted).  Here, the Court concludes that the reading of Schedule 1 that is "most equitable to

both parties" is Nortel's.  This consideration, in addition to the other considerations discussed

above and below, supports Nortel's reading of Schedule 1.

### C.   The Parties' Interactions Support Nortel's Interpretation Of Schedule 1

231.   Having concluded that Schedule 1 is ambiguous, the Court "may accept any

available extrinsic evidence to ascertain the meaning intended by the parties during the formation

of the contract." *Alexander & Alexander Servs., Inc.*, 136 F.3d at 86.

232.   This includes evidence of 1) the parties' negotiations, *Prior v. Innovative

Commc'ns Corp.*, 207 F. App'x 158, 162 (3d Cir. 2006) (applying New York law, noting that the

parties' "course of negotiations" is proper extrinsic evidence); 2) correspondence between the parties, *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc*., 232 F.3d 153, 160 (2d Cir. 2000) (finding letters sent by the parties prior to the execution of an agreement to be probative extrinsic evidence); 3) the parties' course of performance under the contract, *Jobim v. Songs of Universal, Inc.,* 732 F. Supp. 2d 407, 416 (S.D.N.Y. 2010) (noting that proper "extrinsic evidence includes the contracting parties' course of performance"); *New Windsor Volunteer Ambulance Corps, Inc.*, 442 F.3d at 113 (affirming the district court's reliance on "the parties' course of conduct over the years in order to determine their intent"); and 4) expert evidence on custom and practice in the relevant industry, *Evans v. Famous Music Corp.*, 807 N.E.2d 869, 871, 873 (N.Y. 2004) (interpreting an ambiguous agreement based in part on expert testimony that where music publishers intend to share the benefit of foreign tax credits with songwriters, they include an express clause to that effect); *Last Time Beverage Corp. v. F & V Distrib. Co., LLC*, 951 N.Y.S.2d 77, 81-82 (N.Y. App. Div. 2012) (relying on expert testimony that franchisors in the soft drink industry ordinarily give exclusive rights to distributors to distribute new soft drinks in their territory to aid in interpreting an ambiguous agreement).

233.     Here, the Court concludes that extrinsic evidence in each of these categories confirms that Nortel's interpretation of Schedule 1 is correct.

### 1.     International Confirmed Schedule 1's Meaning And Effect Before It Was Signed

234.     As discussed in Section II.B above, John Southwood, International's point person in the negotiations, expressly explained and confirmed Schedule 1's meaning—including, specifically, the meaning and effect of providing that Schedule 1 would terminate in three years—shortly before it was signed.  Southwood did so in an email to Nortel's lead negotiator,

Dave Hyslop.  This was no casual comment:  Southwood made clear in his email that he

understood that "everyone's expectations are [being] fixed for all time."  Ex. D-76C at 1.

235.    Referring to Schedule 1—which he described as the "final Bay transfer to

Nortel"—Southwood stated the following:

> I told [the lawyer preparing Schedule 1] that the royalty buy out
> would expire in three years. . . . By expire I mean that new
> products/projects brought on line after three years would address
> royalties on their own merit.  Current Bay products and
> development projects for the next three years will take advantage
> of the lifetime royalty buy out until their products have aged out of
> the marketplace.

*Id.*

236.    Thus, Southwood's email explained and confirmed Schedule 1's meaning and

effect, including the effect of providing that it would terminate or "expire" after three years:

1) "Current Bay products and development projects for the next three years will

   take advantage of the lifetime royalty buy out until their products have aged

   out of the marketplace," and

2) "[N]ew products/projects brought on line after three years would address

   royalties on their own merit"—that is, they would not receive the benefit of

   Schedule 1's lifetime royalty buy out.  *Id.*

237.    Southwood's email is consistent with the provisions of Schedule 1, which, as

noted in the previous section, confer the royalty buy out of the Bay Networks License on "[a]ll

products of units and projects originating from what was Bay Networks" that existed during

Schedule 1's three-year term.  *Id.*

238.    Southwood noted in his email that he had communicated the same understanding

of Schedule 1 to International's counsel, Rick Barnes, who was "crafting" the schedule's text,

that he was providing to Nortel.  *Id.*  Less than 48 hours later, Southwood sent Hyslop a draft of

Schedule 1, which has exactly the same content as the final signed version.  Ex. D-183.01; Ex. D-183.02.  As in his November 16 email, Southwood's November 18 email attaching the draft of Schedule 1 called it "the permanent Bay to Nortel transfer."  Ex. D-183.01; Ex. D-183.02.

239.    Southwood's email is important in two respects.  First, it confirms that Schedule 1's purpose is to confer the lifetime royalty buy out on the products and projects it covers.  Southwood's email refers to the "buy out" and the "lifetime royalty buy out."  Ex. D-76C at 1.  Given that Schedule 1 confers a lifetime royalty buy out, it makes no sense for International to contend that the products and projects it covers would be stripped of their right to use the designated software after three years.  That is directly antithetical to the meaning and purpose of a lifetime royalty buy out, which is to confirm a right to use the software for the lifetime of the product line.  And once it is apparent that Schedule 1 confers a royalty buy out, the meaning and effect of saying Schedule 1 will terminate after three years becomes clear:  those products and projects that are covered by Schedule 1, because they exist or come into existence during that three years, will receive the lifetime royalty buy out; those development projects that are begun after the three years will not receive it.

240.    Second, Southwood's explanation of what it means to provide that Schedule 1 will expire goes to the heart of International's argument.  International contends that because Schedule 1 says it will terminate and be of no further effect after three years, that must mean that any product or project it covers will lose its right to use the SNMP Research software at that the three-year mark.  In essence, International contends "terminate means terminate," and so Schedule 1 must be interpreted in the way it urges.  But Southwood's email explicitly explains what is meant by saying that Schedule 1 will terminate—i.e., "expire"—in three years.

241.    Southwood first says that the parties agreed "that the royalty buy out would expire in three years."  And what does saying it will "expire in three years" mean?  Southwood explains:  "By expire I mean that new products/projects brought on line after three years would address royalties on their own merit.  Current Bay products and development projects for the next three years will take advantage of the lifetime royalty buy out until their products have aged out of the marketplace."  Ex. D-76C at 1.  After having expressly explained what is meant by saying that Schedule 1 would expire or terminate in three years, it is meritless, and indeed disingenuous, for International to represent to the Court that it means something fundamentally different and to pursue a claim against Nortel for tens of millions of dollars on that basis.

### 2.    The May 2000 Email From Case To Reeves Further Confirms Schedule 1's Meaning

242.    As discussed above in the Findings of Fact, the email that Jeffrey Case sent to James Reeves of Nortel further confirms Schedule 1's meaning and effect.  *See* Section II.C, *supra*.  Writing to Reeves in May 2000, Case referred to "Schedule 1 [as] the document that grandfathers the Bay licenses over to the new Nortel master agreement" and assured him "I was correct when I told you that ▮▮▮▮▮▮  Ex. D-77.

243.    Case's description is fully consistent with Nortel's reading of Schedule 1:  that it "grandfathers the Bay licenses over to the new Nortel master agreement," so that the BayStack/ES/ERS switches can continue using the SNMP Research software, and that there would be no additional cost.

244.    Case's email is also important for what he did not say to Reeves.  There is no suggestion that, as International contends now, Schedule 1 would serve to strip the BayStack/ES/ERS switches of the right to use the SNMP Research software after three years, and that the cost of obtaining an ongoing right to use the software would not be zero but instead

would be tens of millions of dollars.  Case said no such thing in this email.  Nor did he say any

such thing at any time, including during the period leading up to the end of Schedule 1's three-

year term.  Nor did anyone else acting for International or Inc. say any such thing to anyone at

Nortel at any time.

### 3. International's Repeated Renewal Of The SSA Covering The Schedule 1 Software After June 2003 Further Confirms Nortel's Ongoing Right To Use That Software

245.    As discussed in Section II.D above, International's repeated renewal of the SSA

covering the Schedule 1 software for years after June 2003 further confirms Nortel's ongoing

right to use that software.

246.    As also discussed in Section II.D above, International seeks to evade the impact

of this consistent and repeated course of conduct confirming Nortel's ongoing right to use the

Schedule 1 software by claiming it was a "mistake" on International's part.  Trial Tr. 269:22-

270:1 (Case contending that "we shouldn't have done it.  That was a mistake.").  As set forth

above, this claim of a purported mistake simply is not credible as a factual matter.  *See* Section

II.D, *supra*.

247.    And as a legal matter, even if it were credible for International to claim that its

conduct was a "mistake" and that it subjectively held a different understanding of Schedule 1

than the one implied by its conduct, that would not help it.  It is black letter New York law that

"when resolving disputes concerning the meaning of ambiguous contract language, unexpressed

subjective views have no proper bearing.  Only the parties' objective manifestations of intent are

considered."  *Nycal Corp. v. Inoco PLC*, 988 F. Supp. 296, 302 (S.D.N.Y. 1997); *see also*

*Faulkner v. Nat'l Geographic Soc'y*, 452 F. Supp. 2d 369, 377-78 (S.D.N.Y. 2006) ("[O]nly

objective manifestations of intent are relevant under New York law. . . . [S]tatements of

86

subjective intention uncommunicated to the other contracting party are immaterial in construing the terms of the contract." (citations omitted).)

248.    "Unlike the subjective intent or *post hoc* conclusions of contracting parties, the parties' course of dealing throughout the life of a contract is highly relevant to determining the meaning of the terms of the agreement." *Faulkner*, 452 F. Supp. 2d at 381.  In fact, "[a]s the Supreme Court has explained, '[g]enerally speaking, the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence.'" *Id.*  (second alteration in original) (quoting *Old Colony Trust Co. v. Omaha*, 230 U.S. 100, 118 (1913)).

249.    These principles are directly applicable here.  By repeatedly renewing the SSA for the Schedule 1 software for years after June 2003, under which International provided Nortel with updated versions of the Schedule 1 software and in return collected thousands of dollars from Nortel, International confirmed Nortel's ongoing right to use that software.  International's attempt now to claim it harbored a different "subjective intent" and its effort to offer a "*post hoc*" excuse for its conduct is irrelevant.  *Id.*  Rather, it is "the parties' course of dealing throughout the life of a contract [that] is highly relevant to determining the meaning of the terms of the agreement."  *Id.*

### 4.    International Confirmed In August 2003, After The End Of Schedule 1's Three-Year Term, That Nortel Had An Ongoing Royalty Buy Out Under Schedule 1

250.    As discussed in Section II.E above, International stated in August 2003, after the end of Schedule 1's three-year term, that Nortel had an ongoing royalty buy out under Schedule 1.  This confirmation came as part of an email exchange beginning in July 2003 between Pierre Tremblay, a Nortel employee who was just becoming involved in the relationship with International, and International employees John Southwood and Martha Hopper.  Ex. D-158.01;

Ex. 158.02.  Tremblay was reviewing the license agreement between Nortel and International

and its various schedules and seeking to learn about their status.  Trial Tr. 190:1-9; Tremblay

Dep. 90:18-91:1.

251.    In that context, Hopper made the following statement about Schedule 1 in an

August 2003 email to Tremblay:  "According To John [Southwood], as I understood him, BAY

**has** a Royalty-BuyOut on EMANATE Sources on WinNT, Solaris, and VxWorks as well as

Asynchronous Request Libraries on Solaris, HP-UX, AIX and WinNT."  Ex. D-158.02 at 1

(emphasis supplied).  Given that this statement was made months after the end of Schedule 1's

three-year term, the reference to Schedule 1 as continuing to provide a royalty buy out is directly

contrary to the argument International is proposing now:  that the royalty buy out was

extinguished in June 2003 and any existing products and projects covered by Schedule 1 were

stripped of their right to use the Schedule 1 software.

252.    At trial, Southwood contended this was yet another "mistake," claiming that

Hopper did not "understand [him] correctly."  Trial Tr. 195:11-196:1.  As with International's

other claims of "mistake," this claim is not credible as a factual matter.  *See* Section II.E, *supra*.

And, again, as a legal matter, International's contention that it harbored a subjective

understanding that was the opposite of what it objectively manifested to Nortel is simply not

relevant.  *See, e.g., Faulkner*, 452 F. Supp. 2d at 377-78.

### 5.    In January 2006, International Expressly Confirmed To The Nortel BayStack Group That They Had An Ongoing Right To Use The Schedule 1 Software

253.    As discussed in Section II.F above, in a formal letter that Southwood issued under

International letterhead to Nortel in January 2006—long after Schedule 1's three-year term

ended—International confirmed that "Nortel **has** a license" to the software covered by Schedule

1 and that Schedule 1 "incorporates the paid-up royalties' license previously established by Bay

Networks." Ex. D-78A at 3.  And in the email exchange leading up to it, Southwood stated that

he was "pleased" that the BayStack group at Nortel was operating under "the 'old Bay license'

incorporated into the Nortel license" through Schedule 1.  Ex. D-85 at 1.

254.    For purposes of the issue being addressed here, this exchange is powerfully

probative.  In the exchange, the Nortel BayStack group made clear to International that they were

continuing to use the SNMP Research software.  Ex. D-84 at 1 (stating that ███████████ is

"using the SNMP Research engine in their code, ***and so are we***." (emphasis supplied)); *see also*

Ex. D-85 at 1 (referring to the BayStack group).  Nortel obviously understood it was acting

appropriately, and it clearly was not hiding anything from International.  ██████ had asked

Nortel to provide a letter confirming its license, and so the Nortel BayStack group asked John

Southwood at International to provide the letter.  Ex. D-84 at 1.

255.    If International actually had held the understanding of Schedule 1 that it urges on

the Court now, its response would have been that Nortel has no right to use the Schedule 1

software, that those rights were extinguished in June 2003, and that Nortel is now infringing.  It

said no such thing.  Instead, it said the opposite.  Southwood stated that he was "***pleased***" that the

BayStack group at Nortel was operating under "the 'old Bay license' incorporated into the Nortel

license" through Schedule 1.  Ex. D-85 at 1 (emphasis supplied).

256.    And Southwood then issued the formal letter on International's letterhead

confirming Nortel's ongoing right to use the software covered by Schedule 1:

> Nortel Networks has a license with SNMP Research International
> for EMANATE® sources running on Windows, Solaris, and
> VxWorks as referenced under Nortel Schedule 1.  That schedule
> incorporates the paid-up royalties' license previously established
> by Bay Networks.

Ex. D-78A at 3.

257.    International thus formally confirmed in the January 2006 letter that "Nortel **has** a license" to the software "under Nortel Schedule 1," which "incorporates the paid-up royalties' license previously established by Bay Networks." *Id.* (emphasis supplied).

258.    Here, again, International claims it made yet another "mistake." *See, e.g.*, Trial Tr. 206:2-9 (Southwood claiming his letter was a "mistake"). It simply is not credible for International to contend that this was a purported mistake. *See* Section II.F, *supra*. And in the aggregate, it borders on the absurd for International to contend that this January 2006 letter, and the statements in the email exchange leading up to, and all of its other actions and statements concerning Schedule 1—all of which are consistent with each other, all of which confirm Nortel's understanding of Schedule 1, and all of which refute International's proposed interpretation—should be dismissed as "mistakes." For International to attempt to make that representation to the Court goes beyond the bounds of fair advocacy.

259.    And as a legal matter, again, even if International's claim of mistake could be believed, it would not matter. Nortel's BayStack group came to International and confirmed they were continuing to use the SNMP Research software; and International confirmed Nortel's ongoing right to do so under Schedule 1. For International to claim that it secretly held a subjective understanding of Schedule 1 that was exactly the opposite of what it represented to Nortel is irrelevant. *See, e.g., Faulkner*, 452 F. Supp. 2d at 377-78.

### 6.    International Never Said To Nortel That Its Right To Use SNMP Research Software Would Be Stripped Away At The End Of Schedule 1's Three-Year Term

260.    As discussed in Section II.G above, the meaning and effect of Schedule 1 is confirmed not only by what International said and did concerning Schedule 1, but also by what it did not say:  it never suggested to Nortel that its right to use SNMP Research software under Schedule 1 would be stripped away at the end of Schedule 1's three-year term.

90

261.    As discussed, this point is especially compelling with respect to the fact that Case never said any such thing to Nortel. Case had extensive and longstanding contacts with the BayStack group, including through James Reeves, his friend and the head of the group until 2004. But he never suggested that the BayStack/ES/ERS switches for which Reeves was responsible would become infringing in June 2003.

262.    This was not for lack of an opportunity. In addition to his longstanding relationship and contacts with Reeves and others at Nortel, Case actually met with Reeves and gave a presentation to the "Nortel-BayStack team" in April 2003—just two months before the end of Schedule 1's three-year term. In the invitation that Case prepared for his presentation to the Nortel-BayStack team, Case touted the fact that SNMP Research continued to be the BayStack group's "supplier of source code for SNMP-based network management." Ex. D-243. And it would make no sense for the BayStack team to invite Case in for an update presentation if his software was not being used in their product. Still further, in the presentation itself, Case praised the longstanding relationship between International and Nortel. Ex. D-138 at 3.

263.    After presenting to the BayStack group, Case traveled to the Interop convention in Las Vegas, where he observed Nortel celebrating the 50 millionth Ethernet port sold, joining Reeves in the Nortel booth. Trial Tr. 330:21-331:11; 332:7-9, 340:20-24, 342:2-5; Ex. D-221 at 2. After returning to his office, he reported on his meetings with Nortel and their celebration at the Interop convention:

> Jeff also met with . . . Nortel in CA. Nortel had just celebrated the
> first profitable quarter in some time. . . . Nortel was also
> celebrating the 50 millionth ethernet port sold during Interop.
> They are all managed by SNMP.

Ex. D-221 at 2.

264.    In the face of all this, Case actually contends that he had formed a belief that Reeves and the BayStack group had removed the SNMP Research software from the BayStack/ES/ERS switches.  This is not credible.  Moreover, even if it were credible that Case was unsure about whether these products continued to use SNMP Research software, it is not credible that he would not have inquired—especially given that, as he admitted, it would have been a matter of concern if Reeves, his friend and advocate, had decided to remove his software from the BayStack products.

265.    Moreover, at a minimum, the record demonstrates that the Nortel BayStack group understood it was appropriately using the SNMP Research software.  Nortel was not hiding anything.  It invited Case into its offices for a presentation to the BayStack team, with Case himself describing SNMP Research as the team's supplier of software for SNMP-based network management.  The fact that Case never suggested that the BayStack group would lose the right to use that software two months later, and that no one from International or Inc. ever made such a suggestion to Nortel, is compelling evidence that the parties did not have such an understanding.

**7.    The Parties' Conduct In A Parallel Situation—The Optivity Group's Use Of ARL—Confirmed That Nortel's Rights Under Schedule 1 Continued After June 2003**

266.    As explained in Section III above, the parties' interactions in connection with a parallel situation, namely the Optivity Group's use of SNMP Research's ARL software, demonstrate that the parties both believed Nortel retained the right to use SNMP Research software in products covered by Schedule 1 after June 2003.

267.    Like the BayStack/ES/ERS switches, Optivity was a legacy Bay Networks product that used software covered by the Bay Networks License and subsequently Schedule 1. Around the same time that the parties were negotiating Schedule 1 and the master license agreement, the parties discussed the possibility of entering into a new schedule (tentatively

numbered Schedule 16), which would have covered Optivity's use of ARL.  However, in a conversation that he subsequently memorialized in an email, Southwood confirmed that such a schedule was unnecessary because it would "duplicate[] the transaction completed in 1997 between Bay and SNMPRI," i.e., Amendment 2 to the Bay Networks License, which granted Bay Networks the right to use and distribute ARL.  Ex. D-258 at 4; Section III, *supra*.  And in 2004, after the end of Schedule 1's three-year term, Southwood again confirmed that the Optivity group had rights to ARL under "the old Bay license completed before Nortel purchased Bay" and that "the old license is incorporated into the current license under [S]chedule 1."  Ex. D-271 at 2.

268.    Thus, the parties' interactions in a situation parallel to the use of SNMP Research's EMANATE software in the BayStack/ES/ERS switches demonstrate that Nortel's understanding of Schedule 1 is correct.  Schedule 1 conferred the lifetime royalty buy out from the Bay Networks License on "[a]ll products of units and projects originating from what was Bay Networks" that existed during its three-year term, including both the BayStack/ES/ERS switches and the Optivity product.  Ex. D-7C at 1.

### D.    International's "New Schedules" Argument Is Baseless

269.    As discussed in Section IV above, International's fallback argument that Nortel could obtain the Bay Networks License royalty buy out that was incorporated into Schedule 1, but only if it executed another schedule, is also meritless.  Among other reasons, an argument that involves pointing to schedules other than Schedule 1 cannot trump the evidence concerning Schedule 1 itself, including its provisions and the parties' consistent course of conduct and statements concerning it.

270.    Moreover, the four new schedules to which International points addressed different circumstances:  1) they involved SNMP Research software that was not covered by

Schedule 1; 2) they involved new development projects that did not have the SNMP Research

development software, and therefore needed to pay a license fee to acquire it; and 3) they

involved projects for which no Software Service Agreement ("SSA") was in place. *See* Section

IV, *supra*. None of these circumstances applied to the BayStack group's use of EMANATE or

to the Optivity group's use of ARL, which International confirmed was also covered by Schedule

1 without any need to execute a new schedule. Rather, the BayStack and Optivity groups were

using software covered by Schedule 1; they had already acquired and paid for the development

software; and they already had in place an SSA for the software they were using, which they

continued operating under. *Id.* Thus, International's "new schedules" argument, like its other

arguments, is meritless.

      E.     **The Expert Evidence Concerning Custom And Practice Supports Nortel's Understanding Of Schedule 1**

     271.    As discussed in Section V above, Dr. Razgaitis, who has extensive experience in

software and other intellectual property licensing, has testified that International's interpretation

of Schedule 1 is not consistent with industry custom and practice. If, as International contends,

Schedule 1 acted to strip away Nortel's rights to use and distribute SNMP Research software

with legacy Bay Networks products and projects at the three-year mark, custom and practice

would require that it include provisions 1) indicating how and at what cost Nortel could extend

its rights beyond the three-year mark; and 2) requiring Nortel, in the event it did not extend its

rights, to return or destroy the SNMP Research software in its possession. Clarity as to how

Nortel could extend its rights would have been particularly important here because SNMP

Research's EMANATE was integrated into the BayStack operating system software (i.e., BoSS)

that ran the BayStack/ES/ERS switches and would have been difficult and time-consuming to

remove and replace. As Dr. Razgaitis explained based on industry custom and practice, the

absence of these provisions from Schedule 1 indicates that it was not intended to strip away Nortel's right to use SNMP Research software in June 2003.

272.    International attempted at trial to undermine Dr. Razgaitis's opinions through the testimony of its proposed licensing expert, David Tollen, but, as explained in Section V.C above, this attempt fails.  Much of Tollen's testimony was an inappropriate attempt to instruct the Court on the proper reading of Schedule 1.  The remainder was an unconvincing defense of International's "new schedules" argument, which was undermined by 1) Tollen's failure to recognize that the projects covered by the four new schedules are not comparable to the BayStack/ES/ERS switches, 2) his complete disregard of International's determination that the Optivity products—which *are* comparable to the BayStack/ES/ERS switches—did not need a new schedule and 3) his tortured and implausible reading of Southwood's November 16, 1999 email, which does not mention any need to enter into new schedules in order for "[c]urrent Bay products and development projects . . . [to] take advantage of the lifetime royalty buy out until their products have aged out of the marketplace."  Ex. D-76C at 1.

## VIII.  ALTERNATIVELY, THE PARTIES' CONDUCT AND STATEMENTS ESTABLISH AN IMPLIED-IN-FACT CONTRACT

273.    Even if the Court were to read Schedule 1 as International urges, International's attempt to establish that the products and projects covered by Schedule 1 became infringing after June 2003 would fail, as discussed in Section VI above, because the parties' conduct and communications established an implied-in-fact contract confirming Nortel's ongoing right to use the Schedule 1 software beyond the end of Schedule 1's three-year term.  Specifically, the Court concludes that the parties' conduct establishes that they continued to operate on the basis that Nortel retained the right to use and distribute the software covered by Schedule 1 after June 2003 in connection with products and projects covered by Schedule 1.

274.    "[I]t is well settled in New York that '[w]hen an agreement expires by its terms, if, without more, the parties continue to perform as theretofore, an implication arises that they have mutually assented to a new contract containing the same provisions as the old.'"  *N. Am. Hyperbaric Ctr. v. City of New York*, 604 N.Y.S.2d 56, 57 (N.Y. App. Div. 1993) (second alteration in original) (quoting *Martin v. Campanaro*, 156 F.2d 127, 129 (2d Cir. 1946)); *Richmor Aviation, Inc. v. Sportsflight Air, Inc.*, 918 N.Y.S.2d 806, 808-09 (N.Y. App. Div. 2011) ("[E]vidence that the parties continued to perform after [the contract's] expiration in substantially the same manner as they had performed during the initial term of the contract supports . . . [the] conclusion that the terms of the original contract continued to apply to the parties' subsequent agreement");  *Harco Nat'l Ins. Co. v. Arch Specialty Ins. Co.*, 2008 WL 1699755, at *6 (S.D.N.Y. 2008), *aff'd*, 328 F. App'x 678 (2d Cir. 2009) ("Where the parties continue to do business after the expiration of a contract as though the same contract terms apply, New York Courts will construe their actions as extending the terms of the original contract.").

275.    Here, the parties continued to perform on the basis that Nortel had an ongoing right to use the software covered by Schedule 1, beyond the end of its three-year term.  First, as noted in Section II.D above, the parties repeatedly renewed the SSA relating to the SNMP Research software and the former Bay Networks products covered by Schedule 1 for years after 2003.  International continued to send invoices to the same address for the same amount covering the same software that is covered by Schedule 1.  Nortel paid those invoices and, in return, it received updated versions of the software covered by Schedule 1.  The parties' conduct in connection with the yearly renewal of the SSA unequivocally demonstrates that the parties

intended and understood that Nortel's right to use the software covered by Schedule 1 continued

beyond June 2003.

276.    A similar pattern of conduct led the court in *Harco* to find an implied-in-fact

contract. *Harco Nat'l Ins. Co.*, 2008 WL 1699755, at *5-6. There, the court concluded that a

vehicle lease agreement remained in effect past its expiration date because the parties continued

to perform as though the lease had not expired. As the court explained, "[the lessee] continued

to issue [the lessor] the same invoices as though the contract was still in effect, and [the lessor]

paid them and operated as though the contract had been extended." *Id.* at *6. On that basis, the

court "infer[red] from the parties' actions that the lease was extended according to the terms of

the original agreement." *Id.* at *6.

277.    International also expressly confirmed in writing that Schedule 1 remained in

effect after June 2003. As discussed in Section II.F above, in January 2006, a group at Nortel

working on former Bay Networks products reached out to John Southwood, the International

representative who negotiated Schedule 1, for confirmation that they had a license to SNMP

Research software so that they could partner with another company also using that software. In

response, Southwood confirmed in a formal letter that "Nortel Networks **has a license** with

SNMP Research International for [SNMP Research's product] *as referenced under Nortel*

*Schedule 1*. That schedule incorporates the paid-up royalties' license previously established by

Bay Networks." Ex. D-78 at 3 (emphasis supplied).[20]

278.    Thus, Nortel made clear to International that it was continuing to use the software

covered by the Schedule 1 royalty buy out in connection with former Bay Networks products,

---

[20]    International also confirmed in 2004 that Nortel had an ongoing right to use the Schedule 1 software, in connection with the Optivity group's right to continue distributing ARL. Southwood explained: "where is the [license for] ARL? We found it under the old Bay license completed before Nortel purchased Bay, but the old license is incorporated into the current license under Schedule 1." Ex. D-271 at 2.

and International confirmed that Nortel had the ongoing right to do so.  Also relevant is what International did not say:  as explained in Section II.G above, International never communicated to Nortel that it believed the royalty buy out rights conferred by Schedule 1 had ended or that Nortel lacked the ongoing right to use the software covered by Schedule 1.  *See Richmor Aviation, Inc.*, 918 N.Y.S.2d at 808 (affirming a finding of an implied-in-fact contract in part because "neither party said or did anything that would repudiate an essential term of the written contract").

279.    Therefore, the Court concludes that even if Schedule 1 could be interpreted in the way International now proposes, International and Nortel continued to operate on the basis that Nortel had the ongoing right to use the Schedule 1 software, establishing an implied-in-fact agreement to that effect.

## CONCLUSION

280.    The provisions of Schedule 1 strongly point to the conclusion that its meaning and effect is to confer a lifetime royalty buy out on "[a]ll products of units and projects originating from what was Bay Networks" that existed during its three-year term.  And the record of competent extrinsic evidence overwhelmingly confirms this meaning and effect.  Indeed, International's arguments to the contrary are not only without merit; in several instances they go beyond the bounds of reasonable advocacy.  Accordingly, the Court will rule in Nortel's favor concerning the meaning and effect of Schedule 1.  In addition, even if the Court had not ruled in Nortel's favor concerning the meaning and effect of Schedule 1, the record of the parties' conduct and statements after June 2003 would establish an implied-in-fact contract with the same effect:  to confirm Nortel's ongoing right to use the Schedule 1 software beyond the end of Schedule 1's three-year term in connection with "[a]ll products of units and projects originating from what was Bay Networks" that existed during those three years.

Dated: June 16, 2017
        Wilmington, Delaware

Respectfully submitted,

CLEARY GOTTLIEB STEEN & HAMILTON LLP

Lisa M. Schweitzer (admitted *pro hac vice*)
David H. Herrington (admitted *pro hac vice*)
One Liberty Plaza
New York, New York  10006
Telephone: (212) 225-2000
Fax: (212) 225-3999

-and-

MORRIS, NICHOLS, ARSHT & TUNNELL LLP


*/s/ Tamara K. Minott*
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Tamara K. Minott (No. 5643)
Andrew J. Roth-Moore (No. 5988)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors*
*and Debtors in Possession*