# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ----------------------------------------------------------X<br>*In re*<br><br>Nortel Networks Inc., *et al.*,[1]<br><br>              Debtors.<br><br>---------------------------------------------------------- X<br><br>SNMP Research International, Inc.<br><br>and<br><br>SNMP Research, Inc.,<br><br>              Plaintiffs,<br><br>v.<br><br>Nortel Networks Inc., *et al.*,<br><br>              Defendants.<br><br>---------------------------------------------------------- X | Chapter 11<br><br>Bankr. Case No. 09-10138 (KG)<br><br>(Jointly Administered)<br><br>**Related to Docket Nos. 18446, 18455, 18462**<br><br><br>**Reply Deadline: October 30, 2017**<br>**Hearing Date: November 15, 2017**<br><br><br><br>Adv. Proc. No. 11-53454 (KG)<br><br>**Related to Adv. Docket Nos. 622, 624, 625** |

## U.S. DEBTORS' MEMORANDUM OF LAW
## IN OPPOSITION TO MOTION TO RECONSIDER SCHEDULE 1 OPINION

---

[1]     In addition to Nortel Networks Inc., the debtors in these Chapter 11 cases are:  Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc. and Nortel Networks (CALA) Inc.  Additional information regarding the Debtors can be found in their respective Chapter 11 petitions, which are available at http://chapter11.epiqsystems.com/nortel.

**TABLE OF CONTENTS**

| | Page |
|---|---:|
| TABLE OF AUTHORITIES | ii |
| PRELIMINARY STATEMENT | 1 |
| ARGUMENT | 5 |
| I. INTERNATIONAL'S RECONSIDERATION REQUEST IS MERITLESS | 5 |
|     A. The Court's Construction Of The Meaning And Effect Of Schedule 1's Termination Was Plainly Within The Scope Of The May 2017 Trial | 6 |
|     B. The Court's Construction Of The Meaning And Effect Of Schedule 1's Termination Was Also Plainly Correct | 10 |
| II. THE SCHEDULE 1 OPINION CANNOT BE CERTIFIED AS A FINAL JUDGMENT | 14 |
| CONCLUSION | 16 |

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Above the Belt, Inc. v. Mel Bohannan Roofing, Inc.*,
99 F.R.D. 99 (E.D. Va. 1983) ............................................................................... 6

*Am. Motorists Ins. Co. v. Levolor Lorentzen, Inc.*,
879 F.2d 1165 (3d Cir. 1989) ............................................................................. 14

*Anthius v. Colt Indus. Operating Corp.*,
971 F.2d 999 (3d Cir. 1992) ............................................................................... 15

*Apeldyn Corp. v. Samsung Elecs. Co., Ltd.*,
693 F. Supp. 2d 399 (D. Del. 2010) .................................................................... 14

*Brambles USA, Inc. v. Blocker*,
735 F. Supp. 1239 (D. Del. 1990) ........................................................................ 6

*Elliott v. Archdiocese of N.Y.*,
682 F.3d 213 (3d Cir. 2012) ............................................................................... 15

*In re Hechinger Inv. Co. of Del.*,
303 B.R. 18 (D. Del. 2003) ................................................................................... 6

*In re New Century TRS Holdings, Inc.*,
2014 WL 2446823 (Bankr. D. Del. 2014) ............................................................ 5

*In re Nortel Networks Inc.*,
2017 WL 3141906 (Bankr. D. Del. 2017) ............................................................ 5

*Sawka v. Healtheast, Inc.*,
989 F.2d 138 (3d Cir. 1993) ................................................................................. 5

*Sussex Drug Prods. v. Kanasco*,
920 F.2d 1150, 1153 (3d Cir. 1990) .............................................................. 14, 15

*United States v. Fiorelli*,
337 F.3d 282 (3d Cir. 2003) ................................................................................. 5

The U.S. Debtors submit this memorandum of law in opposition to SNMP Research's Motion To Reconsider Order And Accompanying Opinion With Respect To The Schedule 1 Issue (Adv. D.I. 625) ("Int'l Br."), filed by SNMP Research International, Inc. ("International") and SNMP Research, Inc. ("Inc.") (collectively, "SNMP Research").[2]

## PRELIMINARY STATEMENT

1. The question addressed in the May 11-12, 2017 trial (the "May 2017 Trial") was "whether the SNMP Research Software was licensed for use or distribution under Schedule 1A of the Nortel License ('Schedule 1') with respect to any products after June 20, 2003 (the 'Schedule 1 Issue')." Scheduling Order Concerning Motion to Amend Proofs of Claim and Schedule 1 Issue ¶ 1 (Adv. D.I. 540) (the "Scheduling Order"). The Court's answer to that question was yes: "Schedule 1 confers a lifetime royalty buy out on '[a]ll products of units and projects originating from what was Bay Networks' that existed during its three-year term." Opinion at 86 (Adv. D.I. 622) (the "Schedule 1 Opinion").

2. Specifically, both parties asked the Court to address and determine what it meant to provide that Schedule 1 would "terminate" after three years. As International itself stated in its Proposed Findings of Fact and Conclusions of Law: "The primary issue in dispute in this matter is the meaning of the word 'terminate' in the context of Schedule 1A." Am. Proposed Findings Of Fact And Conclusions Of Law Regarding Schedule 1 Issue (Adv. D.I. 610) ¶ 132. International argued that "'terminate' in the context of Schedule 1A means that all rights under Schedule 1A terminated on June 20, 2003." *Id.* ¶ 133. And International expressly understood that Nortel's position is that the meaning and effect of providing that Schedule 1A would

---

[2] Because International is party to Schedule 1, and Inc. is not, we refer to this motion for reconsideration as International's motion.

terminate on June 20, 2003 was that "Nortel's rights to any existing products covered by Schedule 1A continued indefinitely, while all that terminated on June 20, 2003 was Nortel's right to use and distribute the Software with respect to any new Nortel products after that date." *Id.*;[3] *see also* Trial Tr. 32:19-34:19.

3. The Court agreed with Nortel's understanding. And as the Court observed, this understanding was expressly confirmed by International's chief negotiator, John Southwood, in an email he sent to Nortel just before Schedule 1 was finalized. The Court thus concluded as follows:

> The purpose of providing that Schedule 1 would terminate after three years was to define which products and projects would receive the royalty buy out. Product lines in existence during the three-year term would receive the royalty buy out, and those development projects begun after the three-year term would not, which Southwood's November 16, 1999 email confirms. Ex. D-76C at 1.

Schedule 1 Op. at 13.

4. This determination is manifestly within the scope of the issue the parties asked the Court to address. Again, International itself expressly confirmed that the primary issue before the Court was the meaning of "terminate" in Schedule 1, and it expressly recognized that Nortel's position was that Schedule 1's termination date served to define which products and projects would receive the royalty buy out: those in existence or begun before the termination date would receive the royalty buy out, and those development projects begun after that date would not. For International now to claim that this issue and the Court's ruling on it was somehow outside the scope of the Schedule 1 hearing is utterly meritless.

---

[3] While International's description of Nortel's position only mentioned products, Schedule 1 expressly covers both products *and* projects in existence or begun during its three-year term.

2

5. The issue reserved for the subsequent trial is to take the Court's construction of Schedule 1 and apply it to Nortel's products to determine which ones fit within Schedule 1. This is what is meant by the Scheduling Order's statement that "the Hearing shall not include consideration of what products might be covered by Schedule 1 if the Court were to determine that any license rights under Schedule 1 did not terminate on June 20, 2003." Scheduling Order ¶ 1. Specifically, the Court will address at the trial beginning on November 29, 2017 (the "November 2017 Trial") whether the BayStack/ES/ERS switches are covered by Schedule 1. Nortel believes the answer is yes. The Nortel-International license agreement defines a "product" that is covered by a given schedule (including Schedule 1) with a broad and expansive formulation that encompasses "*any enhancement, replacement, modification or evolution* of such Nortel Networks Product." Ex. D-6A § 1.12 (emphasis supplied). The BayStack/ES/ERS models are all the same core Ethernet switch product and fit easily within the license's broad definition of "product" and the scope of Schedule 1.

6. International apparently plans to argue to the contrary on the theory that every particular "model" of the BayStack/ES/ERS switches was a different "product," such that if a model was first sold after June 2003, then it should be considered a new and different "product" that is not covered by Schedule 1. For example, if an "ERS 4500" was launched or in development before June 2003 and a new variation, the "ERS 4510," was first sold after June 2003, International would argue that the ERS 4510 is a different product and is not covered by Schedule 1. We believe such an argument by International will lose, because it ignores both the license's broad definition of "product" and the fact that the BayStack/ES/ERS models are all the same core Ethernet switch product.

3

7.      The important point for purposes of International's motion for reconsideration is simply that this question of which products are within the coverage of Schedule 1 is what was reserved for the subsequent trial. International asked that this issue be separated from the May 2017 Trial and deferred for the later trial so that technical experts who would testify about this issue would not have to travel to Wilmington twice: once to appear at the May 2017 Trial and again at the subsequent trial to address other technical issues. Nortel agreed to that proposal.

8.      Thus, the May 2017 Trial addressed what rights (if any) continued under Schedule 1 after June 2003, and in particular what it meant to provide that Schedule 1 would "terminate" in June 2003. The Court properly addressed and answered that question in the Schedule 1 Opinion, just as the parties asked it to do. For International now to contend in its motion to reconsider that the Court's ruling was outside the scope of what the parties asked it to address is utterly meritless. This is yet another instance of SNMP Research burdening the Court with its baseless arguments, and forcing the U.S. Debtors to incur substantial expense to address them. The Court should deny the motion, and at the conclusion of the case it should award the U.S. Debtors the legal fees and expenses they have been forced to incur as a result of SNMP Research's unreasonable claims.

9.      The Court should likewise deny International's alternative request that the Schedule 1 Opinion be certified as a final judgment. International's request is impermissible for the simple reason that the Schedule 1 Opinion does not dispose of any of International's claims for relief and so could not possibly qualify for certification under Rule 54(b) as a final judgment. And even if it could qualify, International cannot demonstrate that this is one of the rare circumstances in which a Rule 54(b) certification is justified. The appeal of the Schedule 1 Opinion must wait until after the November 2017 Trial.

**ARGUMENT**

I. **INTERNATIONAL'S RECONSIDERATION REQUEST IS MERITLESS**

10. "A motion for reconsideration is an extraordinary remedy which upsets the finality of a decision and therefore should be granted only sparingly." *In re Nortel Networks Inc.*, 2017 WL 3141906, at *1 (Bankr. D. Del. 2017) (Gross, J.); *see also In re New Century TRS Holdings, Inc.*, 2014 WL 2446823, at *1 (Bankr. D. Del. 2014) ("Motions for reconsideration should be granted sparingly because of the interests in finality and conservation of scarce judicial resources." (internal quotation marks and citation omitted)).[4] Here, International asks for reconsideration of the Schedule 1 Opinion on the sole basis that the Court purportedly decided an issue outside the agreed scope of the May 2017 Trial. Int'l Br. ¶¶ 12-14. Because the Court's ruling plainly was within the scope of the issue the parties asked it to address, International's argument is meritless and cannot justify the "extraordinary remedy" of reconsideration.[5]

---

[4] International points to Federal Rules of Civil Procedure 59(e) and 60(b) as supporting its motion for reconsideration, Int'l Br. ¶ 12, but neither applies here. Federal Rule 59(e) permits "[a] motion to alter or amend a judgment," but the Schedule 1 Opinion is not a "judgment." *See* Section II, *infra*. Federal Rule 60(b) provides several grounds on which a court may relieve a party from an order, but the majority are plainly irrelevant, Fed. R. Civ. P. 60(b)(2)-(5), and the remainder do not apply under the circumstances here. Rule 60(b)(1) covers "mistake, inadvertence, surprise, or excusable neglect," but it is unavailable because alleged "legal error, without more does not warrant relief." *United States v. Fiorelli*, 337 F.3d 282, 288 (3d Cir. 2003) (internal citations omitted). Even if the Court went beyond the Schedule 1 Issue (and it did not), this would be mere legal error. Rule 60(b)(6), a catchall provision, is no more useful because relief under this provision "may only be granted under extraordinary circumstances where, without such relief, an extreme and unexpected hardship would occur." *Sawka v. Healtheast, Inc.*, 989 F.2d 138, 140-41 (3d Cir. 1993) (citation omitted). There are no "extraordinary circumstances" here. International may appeal the Schedule 1 Opinion after the Court resolves the claims in this case following the trial in November.

[5] International cites two decisions for the proposition that the Court should grant its motion on the theory that the Schedule 1 Opinion is "outside of the adversarial issues presented by the parties." Int'l Br. ¶ 13. Neither decision helps it. In *Brambles USA, Inc. v. Blocker*, 735 F. Supp. 1239, 1240 (D. Del. 1990), the plaintiff made no allegation that the court had made a decision "outside of the adversarial issues presented by the parties." As a result, the court neither applied nor explained this standard (which it merely quoted from an Eastern District of Virginia

### A. The Court's Construction Of The Meaning And Effect Of Schedule 1's Termination Was Plainly Within The Scope Of The May 2017 Trial

11. The issue before the Court at the May 2017 Trial was "whether the SNMP Research Software was licensed for use or distribution under Schedule 1A of the Nortel License ('Schedule 1') with respect to any products after June 20, 2003." Scheduling Order ¶ 1. Both parties agreed that deciding this issue required the Court to determine the meaning and effect of the language in Schedule 1 providing that it would "terminate" three years after it was executed. As International itself stated in its pre-trial brief, "[t]he Schedule 1 Issue boils down to interpreting the meaning of the ordinary word 'terminate,' . . . ." SNMP Research, Inc.'s And SNMP Research International, Inc.'s Pre-Hearing Brief On Schedule 1 Issue (Adv. D.I. 566) ¶ 2. International argued in its pre-trial brief and at trial that "**[a]ll** of Nortel's rights under Schedule 1A to use and distribute the Software in **any** product ended . . . ." on June 20, 2003. *Id.* ¶ 42 (emphasis in original); *see also* Trial Tr. 36:4-7.

12. By contrast, Nortel explained in its pre-trial brief and at trial that: "Schedule 1 provided for a three-year term, so that any existing products and any development projects originating from Bay Networks that emerged during those three years would take advantage of the lifetime royalty buy out until the products aged out of the marketplace," while "[n]ew products/projects brought on line after the three-year termination date would need to address royalties on their own merit." U.S. Debtors' Pre-Hearing Brief With Respect To Schedule 1 (Adv. D.I. 563) ¶ 3; *see also* Trial Tr. 56:7-18. Both parties therefore understood and

---

decision that itself used this language without support or citation, *see Above the Belt, Inc. v. Mel Bohannan Roofing, Inc.*, 99 F.R.D. 99, 101 (E.D. Va. 1983)). In any event, the court rejected the plaintiff's motion. *Brambles*, 735 F. Supp. at 1239. The decision in *In re Hechinger Inv. Co. of Del.*, 303 B.R. 18 (D. Del. 2003), is similarly unhelpful to International because the court acknowledged that it had granted a form of relief that neither party had requested. *Id.* at 23. Here, both parties expressly sought a ruling on the issue that the Court decided in the Schedule 1 Opinion, namely the meaning and effect of "terminate" in Schedule 1.

acknowledged that the meaning and effect of "terminate" in Schedule 1 was the primary focus of the May 2017 Trial.

13. Following the trial, International again confirmed the primacy of this issue in its Proposed Findings of Fact and Conclusions of Law: "The primary issue in dispute in this matter is the meaning of the word 'terminate' in the context of Schedule 1A." Am. Proposed Findings Of Fact And Conclusions Of Law Regarding Schedule 1 Issue (Adv. D.I. 610) ¶ 132. International again set forth its argument: "that 'terminate' in the context of Schedule 1A means that all rights under Schedule 1A terminated on June 20, 2003." *Id.* ¶ 133. And International described Nortel's position: "the U.S. Debtors advance a more nuanced argument: that Nortel's rights to any existing products covered by Schedule 1A continued indefinitely, while all that terminated on June 20, 2003 was Nortel's right to use and distribute the Software with respect to any new Nortel products after that date." *Id.*;[6] *see also* Trial Tr. 32:19-34:19. As discussed, this is exactly the issue the Court addressed, and it ruled that Nortel's understanding was right.

14. Nortel framed the debate in the same terms in its Proposed Findings of Fact and Conclusions of Law and reiterated its position on the meaning of "terminate" numerous times throughout this submission. For example, Nortel explained that "the purpose of providing that Schedule 1 will terminate after three years is to define which products and projects would receive the royalty buy out: those product lines in existence during the three-year term would receive the royalty buy out, and those development projects begun after the three-year term would not receive the royalty buy out." U.S. Debtors' Proposed Findings Of Fact And Conclusions Of Law (Adv. D. I. 604) ¶ 35; *id.* ¶¶ 223 & n.18, 239, 241. Thus, both parties

---

[6]   While International's description of Nortel's position only mentioned products, Schedule 1 expressly covers both products *and* projects in existence or begun during its three-year term.

7

expressly asked the Court to rule on what it meant for Schedule 1 to "terminate" and understood the choices before the Court.[7]

15. The Court determined that Nortel's understanding of the meaning and effect of "terminate" in Schedule 1 was correct, and further noted that (as discussed below) this understanding was expressly supported by a pre-signing email from John Southwood of International. The Court ruled:

> The purpose of providing that Schedule 1 would terminate after three years was to define which products and projects would receive the royalty buy out. Product lines in existence during the three-year term would receive the royalty buy out, and those development projects begun after the three-year term would not, which Southwood's November 16, 1999 email confirms. Ex. D-76C at 1.

Schedule 1 Op. at 13. The Court's ruling on the meaning of "terminate" in Schedule 1 goes to the very core of the Schedule 1 Issue, and was plainly within the agreed scope of the May 2017 Trial.

16. The Court similarly explained its construction of Schedule 1, including the meaning and effect of the three-year termination date, as follows:

> The appropriate reading of Schedule 1, giving effect to all of its provisions, is that it confers the royalty buy out of the Bay Networks License on "[a]ll products of units and projects originating from what was Bay Networks" in existence during its three-year term. Schedule 1's three-year term means that any existing products and any development projects originating from Bay Networks that emerged during those three years would have the lifetime royalty buy out until the products aged out of the

---

[7] Had International believed the Court was being asked to rule on an issue outside the agreed scope of the May 2017 Trial, it could have raised this objection in its pre-trial brief, at the trial itself, in its Proposed Findings of Fact and Conclusions of Law or in its response to Nortel's Proposed Findings of Fact and Conclusions of Law. That International never did so, and only voiced this complaint after receiving the Court's ruling, reflects that International's real objection is to the substance of the Schedule 1 Opinion, not its scope. International's unhappiness with the ruling obviously is not a proper basis for a motion for reconsideration.

8

> marketplace. Conversely, new products or projects brought on line after the three-year termination date would not receive the royalty buy out.

*Id.* at 11.

17. The Court's ruling plainly was within the scope of what the parties asked it to address. And, again, International itself made clear that the Court was being asked to address the meaning and effect of "terminate" in Schedule 1. Am. Proposed Findings Of Fact And Conclusions Of Law Regarding Schedule 1 Issue (Adv. D.I. 610) ¶ 132. And International described Nortel's position on this issue. *Id.* ¶ 133. International's claim that the Court's ruling was outside the scope of what the parties asked it to address is wholly baseless.

18. Further, International wrongly claims that the Court's ruling addresses the "follow-up issue" of "exactly what products were covered by Schedule 1A," and thus "could preclude SNMP Research from presenting evidence on certain products before the start of [the November 2017] trial." Int'l Br. ¶¶ 4, 7. International's argument is misguided, most importantly because the Court expressed no view in the Schedule 1 Opinion on "exactly what products were covered by Schedule 1A." Int'l Br. ¶ 4. The Schedule 1 Opinion does not identify specific Nortel products that are within Schedule 1's scope, nor does it rule others out. That determination remains to be made at the November 2017 Trial.[8]

---

[8] In its motion to reconsider, International quotes a statement by Nortel's counsel at the May 2017 Trial that "the question of what products are covered by Schedule 1 and what is considered a new product" is not "an issue for this proceeding." Int'l Br. ¶ 2. Nortel's counsel made this statement as part of an objection to a question from International's counsel to John Southwood about whether "two products such as . . . a BayStack 450 or a BayStack 325" would require separate licenses. Trial Tr. 172:24-173:15. This statement is entirely consistent with the fact that the question reserved for the November 2017 Trial is what specific Nortel products are covered by Schedule 1. The statement in no way suggests that the issue the Court addressed in the Schedule 1 Opinion, including what it meant for Schedule 1 to "terminate" on June 20, 2003, was not properly before it.

19. In sum, the Court neither exceeded the scope of the issue before it nor restricted International's ability to present its case in full at the November 2017 Trial. International's motion to reconsider is meritless and should be denied.

### B. The Court's Construction Of The Meaning And Effect Of Schedule 1's Termination Was Also Plainly Correct

20. While the points outlined above suffice to show why International's motion for reconsideration should be denied, it also bears emphasis that the Court's construction of Schedule 1 was plainly right, and the contrary interpretations that International seeks to argue through its reconsideration motion are wrong.

21. International is coy in its motion papers as to precisely how it wishes the Court change its construction of Schedule 1. At the May 2017 Trial and in its Proposed Findings of Fact and Conclusions of Law, International contended that Schedule 1 should be interpreted to apply only to products and projects in existence in September 1998, *i.e.*, when Nortel acquired Bay Networks. Am. Proposed Findings Of Fact And Conclusions Of Law Regarding Schedule 1 Issue (Adv. D.I. 610) ¶ 41 (claiming that Schedule 1 would apply only to "products shipped by Bay or in development at Bay prior to September of 1998"); *see also id.* ¶ 39 (claiming that "[t]he parties . . . agreed that a 'Bay Product' was a project or product that had been in development at Bay (a project), or had been turned into a product by being distributed by Bay"); Trial Tr. at 135:13-22 (arguing that Schedule 1 would apply "[i]f Bay had a product in the field before the acquisition, or if they had a development project moving toward creating a product before the acquisition").

22. However, in its motion to reconsider, International takes a different tack and appears to suggest instead that Schedule 1 covered only products and projects in existence on the date it was executed. Int'l Br. ¶ 6 (asking that the Court "reserve for trial in November any

ruling on . . . whether development projects started at Nortel after Schedule 1A was executed were covered by the terms of Schedule 1A"). Whatever International's true position, the Court has already decided that Schedule 1 "confers the royalty buy out of the Bay Networks License on '[a]ll products of units and projects originating from what was Bay Networks' in existence during its three-year term." Schedule 1 Op. at 11. That International is unhappy with the Court's decision is obviously not a proper basis for a motion to reconsider.

23. Further, both of International's proposed alternatives are wrong, and the Court's construction is right. Indeed, the Court's construction of "terminate" in the Schedule 1 Opinion is exactly what John Southwood, International's own lead negotiator, communicated to Dave Hyslop, his counterpart at Nortel, in his November 16, 1999 email:

> I told [the lawyer preparing Schedule 1] that the royalty buy out would expire in three years. … By expire I mean that new products/projects brought on line after three years would address royalties on their own merit. Current Bay products and development projects for the next three years will take advantage of the lifetime royalty buy out until their products have aged out of the marketplace.

Ex. D-76C at 1.

24. The Court correctly found that Southwood's email "explicitly explain[ed] what is meant by saying that Schedule 1 will terminate—i.e., 'expire'—in three years." Schedule 1 Op. at 72. And, as the Court further explained, "Southwood's email reflects that, in negotiating Schedule 1, the parties were focused on the royalty buy out that it would confer" and that "[i]n discussing Schedule 1, the language from Southwood's email . . . explains what it means . . . to provide that the 'royalty buy out' would expire in three years." *Id.* at 12. In particular, any products and projects originating from Bay Networks in existence during this period would "take advantage of the lifetime royalty buy out until their products . . . aged out of the marketplace." Ex. D-76C at 1. By contrast, "new products/projects brought on line after three years would

11

address royalties on their own merit"—that is, they would not receive the benefit of the lifetime royalty buy out. *Id.*; *see also* Schedule 1 Op. at 12-13.

25. Thus, as noted, the Court's construction of the meaning and effect of "termination" in Schedule 1 is completely consistent with its chief negotiator's own explanation of that meaning and effect before Schedule 1 was signed:

> The purpose of providing that Schedule 1 would terminate after three years was to define which products and projects would receive the royalty buy out. Product lines in existence during the three-year term would receive the royalty buy out, and those development projects begun after the three-year term would not, which Southwood's November 16, 1999 email confirms. Ex. D-76C at 1.

Schedule 1 Op. at 13.

26. In its motion for reconsideration, International has the audacity to argue yet again that the Court should disregard Southwood's express statement of Schedule 1's meaning and effect, made at exactly the time the parties were negotiating and signing the agreement, and instead adopt testimony that International offers now, more than 17 years after the fact, in its effort to contradict the contemporaneous written record. Int'l Br. ¶ 18. But this is exactly what the Court has already addressed and decided following the May 2017 Trial. As the Court properly concluded in the Schedule 1 Opinion, the contemporaneous record overwhelmingly supports its ruling. Schedule 1 Op. at 8 ("It is possible that . . . Case and Southwood forgot the facts that follow. The facts clearly show that SNMPRI's allegations with respect to Schedule 1 are wrong. Instead, the Court believes that whether deliberate or not they are seeking to take advantage of Nortel's bankruptcy trouble. The facts overwhelmingly support the Court's view."); *see also id.* (SNMP Research's proffered "testimony many years after events is not as reliable as the contemporaneous documentary record of parties' actions and statements.").

27. Still further, as the Court also found, the parties' conduct and International's own statements after Schedule 1 was executed, and before this litigation began, support the Court's ruling concerning the meaning and effect of the word "terminate" in Schedule 1 and defeat International's contrary interpretation that it meant all of Nortel's rights went "poof" in June 2003. This includes International's repeated renewal of the Software Service Agreement covering the software licensed under Schedule 1 after June 20, 2003 and Nortel's payment of thousands of dollars for each renewal, *id.* at 15-17, as well as Southwood's express statement in a formal letter in January 2006—years after June 2003—that Nortel continued to have the right to use the software covered by Schedule 1. *Id.* at 18.[9]

28. Again, the record overwhelmingly supports the Court's construction of the meaning and effect of "terminate" in Schedule 1 and entirely contradicts International's contrary interpretation.[10] More fundamentally for purposes of International's motion to reconsider, the Court has already properly addressed and resolved this issue. International's effort to reopen the Court's ruling through this motion for reconsideration is improper and should be rejected.

---

[9] This evidence also supports the Court's conclusion that, even if Schedule 1 could be interpreted as meaning that all rights to use the Schedule 1 software were extinguished in June 2003, as International argued, the fact that "SNMPRI and Nortel continued to operate on the basis that Nortel had the ongoing right to use the Schedule 1 software, establish[es] an implied-in-fact agreement to that effect." Schedule 1 Op. at 85.

[10] International's contrary interpretation suffers from additional flaws. First, the Court has already rejected International's argument that Schedule 1's three-year term was a grace period during which Nortel was required to execute additional schedules to confer a lifetime buy out on specified products. Schedule 1 Op. at 35-47. If instead, as International now appears to argue, the parties intended to have Schedule 1 confer the lifetime royalty buy out on products and projects in existence when it was signed or when Nortel had acquired Bay Networks (more than a year before Schedule 1 was signed), there would be no need to provide for a subsequent termination date at all because the universe of covered products would already be fixed. Second, if the parties had intended Schedule 1 to cover only products and projects in existence as of a certain date, rather than allowing for developments occurring during its three-year term, they could simply have listed those products in the schedule.

13

## II. THE SCHEDULE 1 OPINION CANNOT BE CERTIFIED AS A FINAL JUDGMENT

29. In addition to rejecting International's motion to reconsider, the Court should deny International's alternative request to certify the Schedule 1 Opinion as a "final judgment" for appellate review under Federal Rule 54(b). For a ruling to be eligible for certification as a "final judgment" for purposes of Rule 54(b), "[i]t must be a 'judgment' in the sense that it is a decision on a cognizable claim for relief, and it must be 'final' in the sense that it is 'an ultimate disposition of an individual claim entered in the course of a multiple claims action.'" *Apeldyn Corp. v. Samsung Elecs. Co., Ltd.*, 693 F. Supp. 2d 399, 408 (D. Del. 2010) (quoting *Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 7 (1980)); *Am. Motorists Ins. Co. v. Levolor Lorentzen, Inc.*, 879 F.2d 1165, 1171 (3d Cir. 1989) (same). Because the Schedule 1 Opinion does not meet either of these criteria, it is not eligible to be certified under Federal Rule 54(b).

30. First, the Schedule 1 Opinion is not a "judgment." International contends that the Schedule 1 Opinion "would result in denial of SNMP Research's claims as to certain significant Nortel products." Int'l Br. ¶ 17. But the Schedule 1 Opinion, on its own, does not constitute a decision on liability with respect to ***any*** products (though, of course, it may ultimately contribute to a finding that the BayStack/ES/ERS switches were licensed). As explained above, the Court has yet to address or decide which specific Nortel products are covered under its construction of Schedule 1—an issue that is reserved for the November 2017 Trial. Until that occurs, none of International's claims can be considered resolved.

31. Second, the Schedule 1 Opinion is not "final." A decision of the district court is final where it ends "the litigation on the merits and leav[es] nothing for the court to do but execute the judgment." *Sussex Drug Prods. v. Kanasco, Ltd.*, 920 F.2d 1150, 1153 (3d Cir. 1990) (quoting *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 275 (1988)).

Again, the Schedule 1 Opinion does not end litigation on the merits with respect to any Nortel products, let alone any of International's claims. The Schedule 1 Opinion answers the question the parties asked the Court to address. The Court did not apply its construction of Schedule 1 to specific Nortel products and projects. It remains for the parties to present evidence at the November 2017 Trial on this subject. As a result, there obviously is more for the Court to do than "execute the judgment." *Id.*

32.     Finally, even for rulings that do qualify as a "final judgment" for purposes of Rule 54(b), certification under Rule 54(b) remains discretionary and exceptional. *Id.* ("[T]he district court must exercise its discretion to determine that the matter is 'ready for appeal . . . tak[ing] into account judicial administrative interests as well as the equities involved.'"); *see also Elliott v. Archdiocese of N.Y.*, 682 F.3d 213, 220 (3d Cir. 2012) ("Certification of a judgment as final under Rule 54(b) is the exception, not the rule, to the usual course of proceedings in a district court."). There is no basis for the Court to exercise its discretion in this case in favor of certifying its Schedule 1 ruling for a piece-meal appeal.

33.     The Third Circuit has emphasized that the burden is on the party seeking final certification to convince the district court that the particular circumstances merit the exercise of discretion in its favor under Rule 54(b). *Anthius v. Colt Indus. Operating Corp.*, 971 F.2d 999, 1003 (3d Cir. 1992) (quoting *Allis-Chalmers Corp. v. Phila. Elec. Co.*, 521 F.2d 360, 365 (3d Cir. 1975)). In making the assessment, the district court must balance the competing factors present in the case to determine whether it is in the interest of sound judicial administration and policy to certify the judgment as final. *Id.*

34.     The Court's Schedule 1 Opinion does not give rise to the type of circumstance that would merit immediate and piece-meal appellate review. This case was filed approximately

15

six years ago and a trial on the remaining issues in this case—including which products are covered by Schedule 1—has already been scheduled and is set to begin on November 29. International will have the opportunity to appeal the Schedule 1 Opinion following the November 2017 Trial. To delay the trial and resolution of this case with a premature appeal of the Schedule 1 Opinion would not be in the interest of "sound judicial administration and policy," but would instead delay the resolution of this years old matter (as well as delay the distribution to creditors of the tens of millions of dollars that Nortel has reserved for SNMP Research's overreaching claims).[11]

## CONCLUSION

35. For the foregoing reasons, the Court should deny International's motion to reconsider as well as its alternative request that the Schedule 1 Opinion be certified as a final judgment under Federal Rule 54(b). Further, following the conclusion of this case or at any other time the Court considers appropriate, the U.S. Debtors will seek recovery of the attorney's fees and expenses they have been forced to incur in addressing this motion and other unreasonable and meritless claims and arguments that SNMP Research has advanced.

---

[11] As the Court is aware, in connection with the confirmation of Nortel's plan of reorganization in January 2017, Nortel agreed to reserve funds in an amount in excess of SNMP Research's claims, in exchange for SNMP Research's commitment to resolve its claims "as promptly as reasonably possible." *See* Confirmation Order ¶ 93, *In re Nortel Networks Inc.*, 09-10138 (Bankr. D. Del. Jan. 24, 2017) (D.I. 17795) (reserving distributions made on alleged $85 million prepetition claim amount and $57.2 million of potential administrative claims). Now that the Court has ruled against SNMP Research on both the motion to amend and the Schedule 1 Issue, the disparity between the amount that Nortel has reserved and any prospective recovery by SNMP Research has grown substantially, making any further delay in the distribution of these funds to creditors all the more unwarranted.

Dated: October 16, 2017
Wilmington, Delaware

Respectfully submitted,

CLEARY GOTTLIEB STEEN & HAMILTON LLP

Lisa M. Schweitzer (admitted *pro hac vice*)
David H. Herrington (admitted *pro hac vice*)
One Liberty Plaza
New York, New York  10006
Telephone: (212) 225-2000
Fax: (212) 225-3999

-and-

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

   */s/ Tamara K. Minott*
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Tamara K. Minott (No. 5643)
Andrew J. Roth-Moore (No. 5988)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors
and Debtors in Possession*