**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

-----------------------------------------------------------X
 : 
*In re* : Chapter 11
 : 
Nortel Networks Inc., *et al.*,[1] : Case No. 09-10138 (KG)
 : 
    Wind-Down Debtors and Debtor-In- : Jointly Administered
    Possession. : 
 : 
------------------------------------------------------ : 
 : 
*In re* : Chapter 11
 : 
Nortel Networks India International Inc. : Case No. 16-11714 (KG)
 : 
                      Debtor. : Jointly Administered
 : 
-----------------------------------------------------------X  Hearing date: December 6, 2017, 10:00 AM (ET)
                                                               Objections due: November 29, 2017, 4:00 PM (ET)

**NORTEL NETWORKS INDIA INTERNATIONAL INC.'S**
**MOTION FOR AN ORDER AUTHORIZING INTERIM**
**DISTRUBTIONS TO HOLDERS OF ALLOWED GENERAL UNSECURED CLAIMS**

      Nortel Networks India International Inc. ("NNIII"), as debtor and debtor-in-possession in the above-captioned case, hereby moves this Court (the "Motion") for the entry of an order substantially in the form attached hereto as Exhibit A (the "Order"), pursuant to section 105(a) of title 11 of the United States Code (the "Bankruptcy Code"), authorizing NNIII to make an interim distribution to holders of allowed general unsecured claims against NNIII, as well as

---

[1]     The wind-down debtors in these chapter 11 cases, along with the last four digits of each wind-down debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567), Nortel Networks (CALA) Inc. (4226). Nortel Networks India International Inc. (8667) remains a debtor-in-possession. Contact information for the Debtors and their petitions are available at http://dm.epiq11.com/nortel.

holders of claims listed as undisputed, liquidated or noncontingent on NNIII's schedules, all of which are listed on <u>Exhibit 1</u> to the Order (collectively, the "<u>Allowed General Unsecured Claims</u>"), in the aggregate amount of $15 million, on or after the date 30 days following the date of entry of the Order, as more fully described herein.  In support of this Motion, NNIII respectfully represents as follows:

## JURISDICTION AND VENUE

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2. NNIII consents to the entry of final orders or judgments by the Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

3. The statutory basis for the relief requested herein is section 105(a) of the Bankruptcy Code.

## BACKGROUND

**A. The Nortel Bankruptcy**

4. On January 14, 2009 (the "<u>Nortel Petition Date</u>"), Nortel Networks Inc. ("<u>NNI</u>") and certain of its affiliates (the "<u>Wind-Down Debtors</u>"), with the exception of Nortel Networks (CALA) Inc.,[2] filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>"), which cases are consolidated for procedural purposes only.  On January 26, 2009, the Office of the United States Trustee for the District of Delaware (the "<u>U.S. Trustee</u>") appointed the Official

---

[2] Nortel Networks (CALA) Inc. filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 14, 2009, which was consolidated and is being jointly administered with the Wind-Down Debtors' chapter 11 cases for procedural purposes [D.I. 1098].

2

Committee of Unsecured Creditors (the "Committee") in respect of the Wind-Down Debtors [D.I.s 141, 142].[3]

5.  Also on the Nortel Petition Date, the Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[4] commenced a proceeding with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada), seeking relief from their creditors and a monitor, Ernst & Young Inc., was appointed by the Canadian Court. Also on the Nortel Petition Date, the High Court of England and Wales placed nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors"),[5] into administration under the control of individuals from Ernst & Young LLP.

6.  On July 26, 2016, NNIII filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, which was consolidated and is being jointly administered with the Wind-Down Debtors' chapter 11 cases for procedural purposes only [D.I. 17090]. On August 16, 2016, the Bankruptcy Court entered an order (the "Bar Date Order") fixing the bar date as 4:00 p.m. (prevailing Eastern time) on September 19, 2016, for filing proofs of claim against NNIII (the "General Bar Date") and January 23, 2017, for filing proofs of claim by governmental

---

[3]  The order appointing the Committee was made applicable to NNIII's case by order dated August 16, 2016, No. 15-cv-624 [D.I. 7].

[4]  The Canadian Debtors include the following entities: NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

[5]  The EMEA Debtors include the following entities: Nortel Networks UK Limited, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

entities against NNIII (the "Governmental Bar Date", and together with the General Bar Date, the "Bar Dates").  NNIII provided notice of the Bar Dates to all known Creditors of NNIII, including the Indian governmental bodies responsible for taxation in India (the "Indian Taxing Authorities"), and published notice of the same in THE WALL STREET JOURNAL for both U.S. and Asia distribution.  Both Bar Dates have passed and only four proofs of claim were filed against NNIII – one filed by NNL, two filed by the Pension Benefit Guaranty Corporation (the "PBGC"), one of which was consensually withdrawn, and one filed by Harris County, Texas, which claim was withdrawn.

7. As a result, the only claims that exist against NNIII are held by: (a) the PBGC, (b) NNL and (c) NNI, which was exempt from the deadlines established in the Bar Date Order and was not required to file a proof of claim.  NNL holds an allowed claim against NNIII in the amount of $17,695,762.84, which claim was allowed in connection with the approval of the Settlement and Plans Support Agreement dated October 12, 2016 between and among the Debtors, the Canadian Debtors, the EMEA Debtors and certain other parties [D.I. 17589] ("SPSA").  The PBGC holds an allowed claim against each of NNIII and each Wind-Down Debtor in the amount of $624,601,972.00, on a joint and several basis, subject to a cap of $565 million on the PBGC's right to receive distributions on such allowed claims (collectively, the "PBGC Claims").  The PBGC Claims arise from the termination of the Nortel Networks Retirement Income Plan and were allowed pursuant to a claims stipulation agreement between the PBGC and the Debtors, dated December 20, 2016, approved by the Court on January 6, 2017 [D.I. 17679].  In addition, NNI holds an allowed general unsecured claim against NNIII in the amount of $53,663,414.00 pursuant to the SPSA.  Over the course of the Wind-Down Debtors' bankruptcy cases, NNI has also, from time to time, incurred costs for professional fees and other

administrative expenses on behalf of NNIII, for which amounts NNI and NNIII have agreed (i) NNIII will make adequate reservation and (ii) NNI will be reimbursed.

8. On December 1, 2016, the Wind-Down Debtors filed their *First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain of its Affiliated Debtors* [D.I. 17501] (as subsequently amended, the "Plan"). An amended version of the Plan was filed with the Bankruptcy Court on January 23, 2017 [D.I. 17763]. On January 24, 2017, the Bankruptcy Court confirmed the Plan [D.I. 17795]. Among other things, the Plan integrates and implements the SPSA, which resolves all appeals and controversies regarding the dispute among the various Nortel entities as to the allocation of the proceeds of the sale of Nortel's business units and other assets to various purchasers. Also on January 24, 2017, the Canadian Court approved the Canadian Plan, which similarly implements the SPSA. The Plan became effective and was substantially consummated on May 8, 2017.

9. Because NNIII did not commence its chapter 11 case until July 2016, and the Bar Dates did not pass until January 2017, the Plan did not include a chapter 11 plan for NNIII. As further explained below, to date, NNIII has not filed a disclosure statement or proposed chapter 11 plan and continues to be a debtor-in-possession.

**B. The NNIII Indian Tax Appeals Litigation**

10. Since prior to the commencement of NNIII's chapter 11 case, NNIII has been involved in certain disputes with the Indian Taxing Authorities relating to tax obligations allegedly owed by NNIII. Prior to the Petition Date, in 2006 and 2007, the Indian Taxing Authorities made tax demands against NNIII in the approximate aggregate amount of

approximately $8.8 million[6] for NNIIII's assessment years 2003-04, 2004-05 and 2005-06 (the "Initial Demand Years"), on the alleged grounds that NNIII was subject to Indian income tax because it conducted business in India and therefore maintained a "permanent establishment" in India.  NNIII does not believe that it ever maintained a "permanent establishment" in India, never paid Indian corporate income taxes, and vigorously asserted its rights in India.

11.     Subsequently, in each of 2011, 2012 and 2014, the Indian Taxing Authorities made further demands in respect of assessment years 2006-07, 2008-09, 2009-10, and 2010-11 (the "Subsequent Demand Years" and, collectively with the Initial Demand Years, the "Demand Years").  In total, the Indian Tax Authorities made tax demands on NNIII of approximately $19.5 million (collectively, the "Indian Tax Demands").

12.     In 2006, NNIII hired Ernst & Young, India ("EY India") to represent it in appealing the Indian Tax Demands and has been actively litigating these appeals since that time (the "Indian Tax Appeal Litigation").  During the course of the Indian Tax Appeal Litigation, NNIII made certain partial payments at various times, under protest, with respect to the Indian Tax Demands in the aggregate amount of approximately $776,000 in order to obtain stays of certain of the Indian Tax Demands during the appeals process (the "NNIII Stay Payments"). NNIII stopped making such stay payments in 2012, at which time the Indian Taxing Authorities sought to collect the total outstanding tax demands by attaching NNIII's only asset in India, an approximately $19.5 million obligation owed to NNIII by Nortel Networks India Private Ltd. ("NNIPL"), an indirect Indian subsidiary of NNL (the "NNIPL Receivable").

---

[6]     Although all tax demands and related payments were originally denominated in Indian Rupees, for ease of reference, they are denominated herein in U.S. Dollars, using an exchange rate of USD 0.015521 to 1 INR (which was the exchange rate as of July 27, 2017).

13. In February 2013, NNIPL paid the Indian Taxing Authorities $6.8 million (the "NNIPL Stay Payment", and together with the NNIII Stay Payments, the "Stay Payments") in order to avoid the direct attachment of NNIPL's cash assets.

14. On May 4, 2016, the High Court of India (India's second highest court) ruled in favor of NNIII in respect of the Initial Demand Years and assessment year 2008-09, finding that, among other things, NNIII did not have a "permanent establishment" in India and was not liable for any Indian corporate taxes for such years (the "High Court Decision"). The Indian Taxing Authorities did not file an appeal of the High Court Decision to India's Supreme Court prior to the expiration of the statutory appeal period. Consequently, NNIII sought a refund of the Stay Payments relating to those years pursuant to the High Court Decision. In addition, NNIII requested that the Income Tax Appellate Tribunal hearing the tax appeals with respect to assessment years 2006-07, 2007-08 and 2009-10, apply the High Court Decision to resolve those appeals in NNIII's favor.

15. On February 28, 2017, NNIII received a partial payment of the Stay Payments in the amount of approximately $921,375. Subsequently to such payment, however, the Indian Taxing Authorities filed a late appeal of the High Court Decision to India's Supreme Court (the "Supreme Court Appeal"), which was accepted by the Indian Supreme Court over NNIII's objection that the appeal was untimely because the appeal period had passed. Accordingly, the Indian Tax Appeals Litigation is not final with respect to any of the Indian Tax Demands, and NNIII is still pursuing a successful conclusion of the Indian Tax Appeal Litigation and a refund of the outstanding Stay Payments in the amount of approximately $8.3 million, which includes the refund of the Stay Payments (net of taxes) as well as accrued interest on such refund amounts as of June 2017.

16. The Indian Taxing Authorities were timely served with notice of the commencement of NNIII's chapter 11 case and the Bar Dates and did not file a proof of claim as required by the Bar Date Order. Therefore, the Indian Taxing Authorities have waived any potential right to seek any recovery from NNIII whatsoever as to any refunded Stay Payments obtained by NNIII or otherwise. Moreover, NNIII firmly believes that the Indian Taxing Authorities have no such right, even in the event the High Court Decision is reversed, because the common law "Revenue Rule" doctrine serves as an independent bar to the Indian Taxing Authorities' ability to collect any additional funds from NNIII.

17. Under the Revenue Rule, courts generally abstain from enforcing foreign tax judgments or unadjudicated tax claims asserted by foreign sovereigns. Although the Revenue Rule can be specifically overridden by treaty, the bilateral tax treaty in force between the United States and India does not contain any mechanism for enforcing foreign tax judgments between the two nations. Although the United States and India are both parties to a multilateral treaty on administrative assistance in tax matters which addresses cross-border enforcement matters, in its ratification instrument, the United States *expressly excluded* the enforcement provisions of that multilateral treaty, and therefore has no obligation under such provisions. Accordingly, there is no mechanism for the Indian Taxing Authority to enforce Indian tax judgments in the United States, and the Indian Taxing Authority has no authority to seek a recovery from NNIII in this bankruptcy.

**RELIEF REQUESTED**

18. By this Motion, NNIII respectfully requests that the Bankruptcy Court enter an order, substantially in the form of Exhibit A attached hereto, authorizing a pro rata interim distribution in the aggregate amount of $15 million to holders of the Allowed General Unsecured Claims..

**BASIS FOR RELIEF**

19. NNIII, like much of the Nortel experience, presents a unique situation. NNIII has three creditors and a litigation asset which, unfortunately, will be best pursued by NNIII as a debtor-in-possession rather than as a reorganized and liquidating entity. Therefore, NNIII submits that a substantial interim distribution to general unsecured creditors will benefit NNIII's estates and its creditors by avoiding delays in making distributions to creditors, while NNIII continues to litigate the Indian Tax Appeals and pursues strategic options to bring such litigation to an effective conclusion.

20. At this time, NNIII believes it is in its best interests to continue the Indian Tax Appeal Litigation, given that it believes that it is entitled to a refund of $8.3 million (plus any subsequently accrued interest), and the estimated cost of continuing to pursue that litigation is comparatively low relative to potential recoveries. However, the time it will take to complete the Indian Tax Appeals is uncertain, and could take several years.

21. NNIII currently has significant assets on hand, including $33.8 million in cash or cash equivalents, no continued operations other than the pursuit of the Indian Tax Appeal Litigation, and only three creditors, all with claims that have been allowed or are undisputed. In light of the uncertainty as to the timing of the resolution of the Indian Tax Appeal Litigation, a pre-plan interim distribution is the best available option for NNIII to distribute its excess assets to its creditors without the delays and potential issues that otherwise could be associated with the development and confirmation of a plan. As such, NNIII has concluded that while it remains in bankruptcy, making an interim distribution to its creditors and continuing to litigate the Indian Tax Appeal Litigation will maximize the value of NNIII's estate for the benefit of its creditors while balancing creditors' interests in prompt distributions.

22. There is no prohibition in the Bankruptcy Code on the making of a pre-confirmation distribution to general unsecured creditors. This is particularly true where there is no risk of diminution of creditor claims recoveries, as is the case here. Furthermore, section 105(a) of the Bankruptcy Code provides that the Bankruptcy Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code. 11 U.S.C. § 105(a). An interim distribution in the aggregate amount of $15 million is "necessary and appropriate" here because it would ensure that NNIII's creditors receive distributions promptly and expeditiously while allowing NNIII to develop a strategy for its continued pursuit of the Indian Tax Appeal Litigation, which NNIII expects will result in additional funds being made available for future distribution to creditors.

23. NNIII has determined that there are more than sufficient estate funds to make an interim distribution to its general unsecured creditors in the proposed aggregate amount. At present, NNIII holds approximately $33.8 million in cash or cash equivalents. The proposed distribution will leave approximately $18.8 million in NNIII's estate, an ample amount to (i) fund NNIII's defense in the Indian Tax Appeal Litigation; (ii) pay the Indian Taxing Authorities the portion of the Indian Tax Demands, including estimated penalties and interest, that NNIII would be required to pay in the highly unlikely event that the High Court Decision is reversed, NNIII is not successful in further litigating the Indian Tax Appeals, *and* NNIII's other arguments, discussed above, with respect to its obligation to pay the Indian Tax Demands are unsuccessful;[7] and (iii) pay administrative expense claims, trustee fees, and other miscellaneous expenses necessary to manage its estate.

---

[7] In conjunction with EY India, NNIII estimates such amount to be no more than approximately $15.7 million after taking into account the Stay Payments and other related amounts discussed above. NNIII's reservation of funds is being suggested only in an abundance of caution and should not be construed as an admission in any way that any funds are due to the Indian Tax Authorities.

24. Moreover, the proposed interim distribution complies with the priority of distribution set forth in the Bankruptcy Code. Bankruptcy Code § 507 sets forth a priority scheme in which junior classes of creditors may not receive any distributions unless senior classes of creditors receive payment in full on their claims. Here, NNIII has no secured claims or other senior creditors that will be prejudiced by an interim distribution to holders of general unsecured claims. In addition, after the proposed distribution is made, a substantial cushion will be available to satisfy any administrative expense claims, and there is no set of reasonably foreseeable circumstances that would result in insufficient estate funds to pay in full holders of all administrative expense claims. Therefore, an interim distribution to holders of general unsecured claims complies with § 507's requirement that junior creditors only receive distributions on their claims if senior creditors receive payment in full.

25. In the chapter 7 context, courts frequently authorize interim distributions when appropriate to serve the best interests of a bankrupt estate and its creditors pursuant to section 726 of the Bankruptcy Code. See, e.g., In re Harbor Fin. Group, Inc., 303 B.R. 124, 129-30 (Bankr. N.D. Tex. 2003) (describing the court's prior authorization of interim pro rata distributions on unsecured claims); In re Griffin Trading Co., 270 BR. 883, 904 (Bankr. N.D. Ill. 2001) (authorizing interim pro rata distributions on timely filed unsecured customer and non-customer claims), aff'd, 270 B.R. 905 (N.D. Ill. 2001); In re Energy Coop., Inc., 173 B.R. 363, 372 (N.D. Ill. 1994) (authorizing interim pro rata distributions on unsecured claims); see also In re LAN Assoc. XI, L.P., 192 F.3d 109, 113 (3rd Cir. 1999) (noting that the bankruptcy court had authorized interim distributions); In re Columbia Ribbon & Carbon Mfg. Co., Inc., 54 B.R. 714, 716 n.4, 720 (Bankr. S.D.N.Y. 1985) (acknowledging that interim distributions may be made).

26. While pre-plan interim distributions are less common in the chapter 11 context, it is appropriate here because NNIII is not a reorganizing chapter 11 debtor, and, like the Wind-Down Debtors, some of which were dissolved promptly after effectiveness of the Plan, intends to distribute all of its assets to its creditors and dissolve following confirmation of a chapter 11 plan. Accordingly, NNIII has a limited need to retain assets, and only needs sufficient assets to complete its wind-down. Therefore, the question facing the NNIII estate is more akin to a chapter 7 context than a chapter 11 one – namely, when, not if, all of the debtor's assets will be distributed to creditors. Like many chapter 7 trustees, NNIII has concluded that an interim distribution to its general unsecured creditors serves the best interests of NNIII's estate and its creditors. An interim distribution here shall distribute assets to NNIII's creditors in as timely a manner as possible, while leaving sufficient funds for NNIII to manage its estate and continue to litigate the Indian Tax Appeal Litigation, which, if successful, will result in more funds being available for distribution to creditors.

27. This Court previously approved an interim distribution in NNI's chapter 11 case to holders of allowed or scheduled administrative, priority and secured claims against NNI.[8] Like that interim distribution, NNIII's proposed interim distribution would be made from available cash on hand, does not prejudice the debtor's estate or its other creditors, and avoids unnecessary delay in making distributions. Moreover, just as NNI's interim distribution did, the proposed distribution to NNIII's creditors strikes an appropriate balance among the interests in advancing these cases and making distributions to creditors, maximizing the value of the estate, and avoiding undue prejudice to the estate and its stakeholders.

---

[8] *See* Order Authorizing The Payment of Certain NNI Administrative, Priority and Secured Creditors' Claims, and Denying Other Relief [D.I. 16894]. That distribution was approved in response to the agreement between NNI and Liquidity Solutions, Inc. ("LSI"), a holder of allowed administrative, priority and unsecured claims against NNI, resolving LSI's initial motion to compel NNI to make an interim distribution [D.I. 16877].

28. For all of the foregoing reasons, NNIII believes that the relief requested herein is in the best interests of NNIII's estate and creditors, and is consistent with the Bankruptcy Code. Accordingly, NNIII respectfully submits that this Motion should be granted.

## NOTICE

29. Copies of this Motion for Interim Distribution are being served by overnight delivery, hand delivery and/or email to (i) counsel to the Monitor; (ii) counsel to the Canadian Debtors; (iii) the NNI plan administrator and its counsel; (iv) counsel to the PBGC; (v) the U.S. Trustee; and (vi) the general service list established in this Chapter 11 Case. Accordingly, NNIII submits that under the circumstances no other or further notice is necessary.

## NO PRIOR REQUEST

30. No prior request for the relief sought herein has been made to this or any other court.

[*Remainder of Page Intentionally Left Blank*]

WHEREFORE, NNIII respectfully requests that the Court enter the Order, substantially in the form attached hereto as Exhibit A, authorizing NNIII to make an interim distribution to holders of the Allowed General Unsecured Claims in the aggregate amount of $15 million on or after the date 30 days following the date of the Order.

Dated: October 31, 2017
Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

   */s/ Tamara K. Minott*
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Tamara K. Minott (No. 5643)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for Nortel Networks India International Inc.*