## Appendix A

**Chapter 11 Plan of Nortel Networks India International Inc.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------------X
:
*In re*                               :      Chapter 11
:
Nortel Networks Inc., *et al.*,[1]       :      Case No. 09-10138 (CSS)
:
           Wind-Down Debtors.       :      Jointly Administered
:
:
:
-----------------------------------------------------------X
:
*In re*                               :      Chapter 11
:
Nortel Networks India International Inc.     :      Case No. 16-11714 (CSS)
:
           Debtor-In-Possession.      :      Jointly Administered
:
:
:
-----------------------------------------------------------X

## CHAPTER 11 PLAN OF
## NORTEL NETWORKS INDIA INTERNATIONAL INC.[2]

**Lisa M. Schweitzer, Esq. (admitted *pro hac vice*)**
**CLEARY GOTTLIEB STEEN & HAMILTON**
**LLP**
**One Liberty Plaza**
**New York, NY 10006**

**Derek C. Abbott, Esq. (No. 3376)**
**Andrew R. Remming, Esq. (No. 5120)**
**MORRIS, NICHOLS, ARSHT &**
**TUNNELL LLP**
**1201 North Market Street, 18th Floor**
**P.O. Box 1347**
**Wilmington, DE 19899**

*Attorneys for the Debtors and*
*Debtor-in-Possession*       Dated: July 20, 2021

---

[1]     The Wind-Down Debtors in these chapter 11 cases, along with the last four digits of each Wind-Down Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620) and Nortel Networks (CALA) Inc. (4226). Contact information for the Former Debtors and their petitions are available at http://dm.epiq11.com/nortel.

[2]     This Plan is only a Chapter 11 Plan for Nortel Networks India International Inc. The First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain of Its Affiliated Debtors [D.I. 17763] was confirmed on January 24, 2017 and went effective on May 8, 2017.

# TABLE OF CONTENTS

**Page**

## ARTICLE 1.
### DEFINITIONS, INTERPRETATION AND RULES OF CONSTRUCTION

| | | |
|---|---|---|
| 1.1 | **Scope of Definitions** | 2 |
| 1.2 | **Definitions** | 2 |
| 1.3 | **Rules of Interpretation** | 15 |
| 1.4 | **Exhibits to this Plan** | 16 |
| 1.5 | **Computation of Time** | 17 |

## ARTICLE 2.
### TREATMENT OF UNCLASSIFIED CLAIMS

| | | |
|---|---|---|
| 2.1 | **Administrative Expense Claims** | 17 |
| 2.2 | **Statutory Fees** | 18 |
| 2.3 | **Professional Claims** | 18 |
| 2.4 | **Priority Tax Claims** | 18 |

## ARTICLE 3.
### CLASSIFICATION OF CLAIMS AND INTERESTS

| | | |
|---|---|---|
| 3.1 | **Summary of Classifications** | 18 |
| 3.2 | **Classification and Treatment of Claims Against and Interests** | 19 |

## ARTICLE 4.
### TREATMENT OF CLAIMS AGAINST AND INTERESTS IN NNIII

| | | |
|---|---|---|
| 4.1 | **Class 1 – Priority Non-Tax Claims.** | 19 |
| 4.2 | **Class 2 – Secured Claims** | 20 |
| 4.3 | **Class 3 – General Unsecured Claims.** | 20 |
| 4.4 | **Class 4 – Interests.** | 21 |

## ARTICLE 5.
### ACCEPTANCE OR REJECTION OF THE PLAN

| | | |
|---|---|---|
| 5.1 | **Impaired Classes of Claims and Interests Entitled to Vote** | 21 |
| 5.2 | **Acceptance by an Impaired Class** | 21 |
| 5.3 | **Presumed Acceptances by Unimpaired Classes** | 21 |
| 5.4 | **Elimination of Vacant Classes; Deemed Acceptance by Non-Voting Classes.** | 21 |
| 5.5 | **Conversion or Dismissal of the Chapter 11 Case** | 22 |
| 5.6 | **Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code** | 22 |

**TABLE OF CONTENTS**
(continued)

**Page**

ARTICLE 6.
IMPLEMENTATION OF THE PLAN

**6.1**  **General Settlement of Claims and Interests**................................................22

**6.2**  **Plan Administrator.**................................................22

**6.3**  **Intercompany Account Settlement**................................................24

**6.4**  **Settlement of Intercompany Claims and Other Matters**................................................24

**6.5**  **Administrative Expense Contribution and Quarterly Administrative Wind-Down Reimbursement Payments**................................................24

**6.6**  **Closing of Chapter 11 Case**................................................24

ARTICLE 7.
THE SETTLEMENT AND PLANS SUPPORT AGREEMENT

**7.1**  **SPSA**................................................25

**7.2**  **Cooperation**................................................25

**7.3**  **Settlement of Allocation Dispute**................................................25

**7.5**  **Estate Administration**................................................25

**7.6**  **No Double-Recovery**................................................25

**7.7**  **Post-Petition Date Interest**................................................25

**7.8**  **Resolution of Certain Claims**................................................25

**7.9**  **Book Intercompany Claims**................................................26

**7.10**  **Remaining Assets and Other Proceeds**................................................26

**7.11**  **Debtor Disputes**................................................26

**7.12**  **SPSA Releases**................................................27

ARTICLE 8.
CORPORATE FORM AND ACTION

**8.1**  **NNIII Corporate Form and Vesting**................................................27

**8.2**  **Dissolution of Wind-Down NNIII**................................................27

**8.3**  **Post-Effective Date Management.**................................................27

**8.4**  **Corporate Existence**................................................28

**8.5**  **Certificate of Incorporation or Certificate of Formation**................................................28

**8.6**  **Wind-Down**................................................28

**8.7**  **Other Corporate Action**................................................28

**TABLE OF CONTENTS**
(continued)

**Page**

ARTICLE 9.
TREATMENT OF EXECUTORY CONTRACTS

**9.1** **Previous Assumption, Assignment and Rejection** ........................................ 29

**9.2** **Rejection** ...................................................................................................... 29

**9.3** **Approval of Rejection; Rejection Damages Claims Bar Date** ................. 29

**9.4** **Pre-existing Obligations to NNIII under Executory Contracts** ............... 29

ARTICLE 10.
PROVISIONS REGARDING VOTING AND DISTRIBUTIONS UNDER THE PLAN

**10.1** **Voting of Claims** .......................................................................................... 29

**10.2** **Nonconsensual Confirmation** ..................................................................... 29

**10.3** **Distributions of Creditor Proceeds** ............................................................ 30

**10.4** **Minimum Distribution and Manner of Payment** ...................................... 30

**10.5** **Limitation on Recovery** ............................................................................... 30

**10.6** **Distributions Free and Clear** ...................................................................... 30

**10.7** **Delivery of Distributions and Undeliverable Distributions** ..................... 31

**10.8** **Withholding and Reporting Requirements** ............................................... 31

**10.9** **Time Bar to Cash Payment Rights** ............................................................. 31

**10.10** **Distribution Record Date** ........................................................................... 32

**10.11** **Allocation of Distributions** ......................................................................... 32

ARTICLE 11.
PROCEDURES FOR TREATING DISPUTED CLAIMS

**11.1** **Objections** .................................................................................................... 32

**11.2** **No Distributions Pending Allowance** ......................................................... 33

**11.3** **Estimation of Claims** ................................................................................... 33

**11.4** **Resolution of Disputed Claims** ................................................................... 33

**11.5** **No Interest** .................................................................................................... 33

**11.6** **No Amendments to Claims** .......................................................................... 33

**11.7** **No Late-Filed Claims** .................................................................................. 33

ARTICLE 12.
CONDITIONS PRECEDENT

**12.1** **Conditions to the Effective Date** ................................................................ 34

iii

# TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| **12.2** | **Waiver of Conditions** | 34 |
| **12.3** | **Notice of Effective Date** | 35 |
| **12.4** | **Dismissal or Conversion** | 35 |

## ARTICLE 13.
## EFFECT OF CONFIRMATION

| | | |
|---|---|---|
| **13.1** | **Binding Effect; Plan Binds All Holders of Claims and Interests.** | 35 |
| **13.2** | **Release and Discharge of NNIII and Wind-Down NNIII.** | 35 |
| **13.3** | **Release and Discharge of the Plan Released Parties** | 36 |
| **13.4** | **SPSA Releases** | 37 |
| **13.5** | **Exculpation and Limitation of Liability** | 38 |
| **13.6** | **Injunction on Claims** | 39 |
| **13.7** | **Terms of Injunctions or Stays** | 39 |
| **13.8** | **Retention of Litigation Claims and Reservation of Rights.** | 39 |
| **13.9** | **Retention of Rights** | 40 |
| **13.10** | **Vesting** | 40 |

## ARTICLE 14.
## RETENTION OF JURISDICTION

## ARTICLE 15.
## MISCELLANEOUS PROVISIONS

| | | |
|---|---|---|
| **15.1** | **Effectuating Documents and Further Transactions** | 42 |
| **15.2** | **Authority to Act** | 42 |
| **15.3** | **Amendment or Modification of the Plan** | 43 |
| **15.4** | **Administrative Expense Claims Reserve** | 43 |
| **15.5** | **Fees and Expenses** | 43 |
| **15.6** | **Revocation or Withdrawal of the Plan** | 43 |
| **15.7** | **Insurance Preservation** | 43 |
| **15.8** | **Exemption from Certain Transfer Taxes** | 43 |
| **15.9** | **Subordinated Claims** | 44 |
| **15.10** | **Cross-Border Protocol and Cross-Border Claims Protocol** | 44 |
| **15.11** | **Governing Law** | 44 |
| **15.12** | **No Admissions** | 44 |

# TABLE OF CONTENTS
(continued)

**Page**

**15.13**  **Severability of Plan Provisions** ........................................................................ 44

**15.14**  **Successors and Assigns** ................................................................................... 44

**15.15**  **Defenses with Respect to Unimpaired Claims** ............................................... 45

**15.16**  **Section 1125(e) Good Faith Compliance** ........................................................ 45

**15.17**  **No Injunctive Relief** ......................................................................................... 45

**15.18**  **Payment of Statutory Fees** .............................................................................. 45

**15.19**  **Saturday, Sunday or Legal Holiday** ............................................................... 45

**15.20**  **Reservation of Rights** ...................................................................................... 45

**15.21**  **Post-Effective Date Rule 2002 Notice List** .................................................... 45

**15.22**  **Right to Abandon and Dispose of Debtor Property, Books & Records** .................. 45

**15.23**  **Notices** .............................................................................................................. 46

**TABLE OF CONTENTS**

<u>PLAN EXHIBITS</u>

| Exhibit A | Settlement and Plans Support Agreement |
|---|---|
| Exhibit B | Plan Administration Agreement |
| Exhibit C | List of Directors and Officers of Wind-Down NNIII |
| Exhibit D | Amended By-Laws and Organizational Documents of Wind-Down NNIII |

## INTRODUCTION

Nortel Networks India International Inc. ("NNIII") proposes this Chapter 11 Plan of NNIII (the "Plan") for the resolution and satisfaction of all Claims against and Interests in NNIII.  NNIII is the proponent of this Plan within the meaning of section 1129 of the Bankruptcy Code.  All capitalized terms not defined in this introduction have the meanings ascribed to them in Article 1 of this Plan.

Under section 1125(b) of the Bankruptcy Code, a vote to accept or reject the Plan may not be solicited from holders of Claims and/or Interests until such time as the Disclosure Statement relating to the Plan is approved by the Bankruptcy Court.  NNIII URGES ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  To the extent, if any, that the Disclosure Statement is inconsistent with the Plan, the Plan will govern.  No solicitation materials, other than the Disclosure Statement and any schedules, exhibits and other documents attached thereto or referenced therein or otherwise enclosed with the Disclosure Statement served by NNIII on interested parties, have been authorized by NNIII or the Bankruptcy Court for use in soliciting acceptances of the Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019 and Article 15 of this Plan, NNIII expressly reserves the right to alter, amend, modify, revoke or withdraw this Plan, one or more times, prior to its substantial consummation.

## ARTICLE 1.
## DEFINITIONS, INTERPRETATION AND RULES OF CONSTRUCTION

**1.1    Scope of Definitions.**  For the purposes of this Plan, except as expressly provided or unless the context otherwise requires, all capitalized terms not otherwise defined shall have the meanings ascribed to them in this Article 1 of the Plan.  Any term used in this Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, respectively.

**1.2    Definitions.**  The following terms (which appear in the Plan as capitalized terms) shall have the meanings ascribed to them in this Article 1 of the Plan.

"**9019 Approval Order**" means the Order Approving Settlement and Plans Support Agreement dated January 24, 2017 [D.I. 17794], which approves the entry into the SPSA by NNIII and the Former Debtors.

"**Abandonment and Disposal Procedures Order**" means the Order (I) Approving Procedures for the Abandonment, Disposal, or Destruction of Specified Hard Copy Documents and Electronic Data; (II) Waiving Compliance with Certain Retention Laws and Ordinances; and (III) Granting Related Relief dated December 15, 2015 [D.I. 16389].

"**Administrative Expense Claim**" means any right to payment for any cost or expense of administration of the Chapter 11 Case asserted or arising under sections 503(b), 507(a)(2) or 507(b) of the Bankruptcy Code up to and including the Effective Date, including, to

the extent allowable under such sections, any (i) actual and necessary cost or expense of preserving NNIII's Estate or operating the business of NNIII arising on or after the Petition Date, (ii) payment to be made under this Plan to cure a default under an executory contract or unexpired lease that is assumed pursuant to section 365 of the Bankruptcy Code, (iii) compensation or reimbursement of expenses of Professionals arising on or after the Petition Date, to the extent allowed by the Bankruptcy Court under section 330(a) or section 331 of the Bankruptcy Code and (iv) fees or charges assessed against NNIII's Estate under section 1930, chapter 123 of title 28 of the United States Code.

"**Administrative Expense Claims Bar Date**" means the deadline for filing an Administrative Expense Claim, other than a Professional Claim, which Claims must be Filed so as to be actually received by the Bankruptcy Court on or before 5:00 p.m., prevailing Eastern Standard Time, on the date that is the first Business Day that is thirty (30) days following the Effective Date, unless otherwise ordered by the Bankruptcy Court.

"**Administrative Expense Claims Reserve**" has the meaning set forth in Section 15.4 of this Plan.

"**Affiliate**" shall have the meaning as set forth in section 101(2) of the Bankruptcy Code.

"**Allocation Dispute**" means certain litigation before the Canadian Court and the Bankruptcy Court in which the allocation of the Sale Proceeds is at issue.

"**Allocation Proceeds**" means the Sale Proceeds allocated to each of (a) NNIII and the Former Debtors, collectively, and (b) the Foreign Affiliate Debtors, as provided for under Section 2(c) of the SPSA.

"**Allowed**" means, with reference to any Claim against NNIII, (a) any Claim allowed hereunder, (b) any Claim that is not a Disputed Claim, (c) any Claim that is compromised, settled or otherwise resolved pursuant to the authority granted to NNIII pursuant to a Final Order of the Bankruptcy Court or under Article 11 of the Plan or (d) any Claim that, if it is a Disputed Claim, has been allowed by a Final Order; *provided*, *however*, that Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claims" hereunder. Unless otherwise specified herein or by order of the Bankruptcy Court, "Allowed Administrative Expense Claim" or "Allowed Claim" shall not, for any purpose under the Plan, include interest on such Administrative Expense Claim or Claim from and after the Petition Date.

"**Allowed Book Intercompany Claims**" means the pre-filing claims between and among the companies comprising the Nortel Group in the amounts recorded in their books and records, as set out in Annex L to the SPSA.

"**Allowed Claim**" means any Claim that is Allowed in accordance with the Plan.

"**Assets**" means all "property" of NNIII's Estate, as defined in section 541 of the Bankruptcy Code, and all Causes of Action that have been or may be commenced by NNIII or its

authorized representative for the benefit of NNIII's Estate, unless modified pursuant to the Plan or a Final Order.

"**Available Cash**" means (a) all Cash of NNIII, including, without limitation, the Cash realized from its business operations, the sale or other disposition of its Assets, the Residual Assets Proceeds, the interest earned on invested funds, Cash on hand, recoveries from Litigation Claims and from any other source or otherwise, *less* (b) the amount of Cash estimated and reserved by NNIII and the Plan Administrator in accordance with the Plan Administration Agreement to (i) adequately fund the reasonable and necessary projected costs to carry out the provisions of the Plan on and after the Effective Date, including, without limitation, any fees and expenses incurred by Professionals, (ii) pay holders of all Disputed Claims the amount such holders would be entitled to receive under the Plan if all such Disputed Claims were to become Allowed Claims, (iii) pay all fees payable under section 1930, chapter 123 of title 28 of the United States Code, (iv) pay all other amounts required to be paid to manage and/or liquidate NNIII's Assets on and after the Effective Date and (v) pay holders of Allowed Administrative Expense Claims, Priority Tax Claims and Priority Non-Tax Claims in accordance with the Plan.

"**Bankruptcy Code**" means title 11 of the United States Code, as in effect on the Petition Date and as thereafter amended, as applicable in the Chapter 11 Case.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware or any other court of the United States having jurisdiction over the Chapter 11 Case.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Case, and the local and chambers rules of the Bankruptcy Court, as in effect on the Petition Date and as thereafter amended.

"**Business Day**" means any day (other than a Saturday, Sunday or legal holiday, as such term is defined in Bankruptcy Rule 9006(a)) on which banks are open for general business in New York City, New York, U.S.A. and Toronto, Ontario, Canada, and also, when used in connection with the Plan provisions related to the SPSA, in London, England and Paris, France.

"**Business Line Sales**" means the sales of various Nortel Group business lines, as identified on Annex A to the SPSA. For the avoidance of doubt, the Business Line Sales do not include the Iceberg Sale.

"**Canadian Court**" means any and all of the CCAA Court, the Ontario Court of Appeal, the Supreme Court of Canada or any other court of competent jurisdiction overseeing the Canadian Proceedings (including any appeals) from time to time.

"**Canadian Debtors**" means NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation, Nortel Networks International Corporation, Nortel Communications Inc., Architel Systems Corporation and Northern Telecom Canada Limited.

"**Canadian Estate**" means the Canadian Debtors as substantively consolidated in accordance with the SPSA.

"**Canadian Plan**" means the CCAA plan of compromise or arrangement (including any exhibits, annexes and schedules thereto) for the Canadian Debtors filed in the CCAA Court on November 30, 2016 that, among other things, effectuates the settlement consistent with the terms of the SPSA, as it was sanctioned by the CCAA Court on January 30, 2017, and as it may be modified or supplemented in accordance with its terms.

"**Canadian Proceedings**" means the proceedings that were commenced before the CCAA Court pursuant to the CCAA on or after January 14, 2009 in respect of the Canadian Debtors.

"**Cash**" means legal tender accepted in the United States of America for the payment of public and private debts, currently denominated in United States Dollars.

"**Cash Management Order**" means the Order of the Bankruptcy Court, pursuant to sections 345, 363(c)(l), 364(a) and 503(b)(1) of the Bankruptcy Code, approving NNIII's continued use of the Cash Management System (as defined therein), entered as to the Former Debtors by the Bankruptcy Court on January 15, 2009 [D.I. 58] and made applicable to NNIII by order dated August 16, 2016, No. 16-11714 [D.I. 7], as amended or supplemented.

"**Causes of Action**" means, without limitation, any and all actions, causes of action, controversies, liabilities, obligations, rights, suits, damages, judgments, claims and demands whatsoever, whether known or unknown, reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to or during the course of the Chapter 11 Case through the Effective Date.

"**CCAA**" means the Companies' Creditors Arrangement Act, R.S.C. 1985, c C-36.

"**CCAA Court**" means the Ontario Superior Court of Justice (Commercial List).

"**CFSA**" means the Final Canadian Funding and Settlement Agreement among, inter alia, certain of the Canadian Debtors, the Monitor and certain of the Former Debtors, dated December 23, 2009, approved by order of the Bankruptcy Court on January 21, 2010 [D.I. 2347].

"**Chapter 11 Case**" means the chapter 11 case of NNIII pending before the Bankruptcy Court under Case No. 16-11714 and jointly administered with the Former Debtors' chapter 11 cases under Case No. 09-10138 (KG).

"**Claim**" means a right of an Entity against NNIII, whether or not asserted or Allowed, as defined in section 101(5) of the Bankruptcy Code and as construed pursuant to section 102(2) of the Bankruptcy Code.

"**Claims Agent**" means Epiq Bankruptcy Solutions, LLC, the claims and noticing agent retained in the Chapter 11 Case, or any successor thereto.

"**Claims Objection Deadline**" has the meaning set forth in Section 11.1 of this Plan.

"**Claims Register**" means the official register of Claims against, and Interests in, NNIII, maintained by the Claims Agent.

"**Class**" means a group of Claims or Interests as classified in a particular class under the Plan pursuant to section 1122 of the Bankruptcy Code.

"**Collateral**" means any property or interest in property of NNIII's Estate subject to a Lien to secure the payment of a Claim, which Lien is not subject to avoidance or otherwise invalid and unenforceable under the Bankruptcy Code or applicable non-bankruptcy law.

"**Confirmation**" means entry of the Confirmation Order by the Bankruptcy Court.

"**Confirmation Date**" means the date on which the Bankruptcy Court enters the Confirmation Order on its docket, within the meaning of Bankruptcy Rules 5003 and 9021.

"**Confirmation Hearing**" means the duly noticed hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code, including any continuances thereof.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which order shall be in form and substance satisfactory to NNL and the Monitor, acting reasonably.

"**Consummation**" means the occurrence of the Effective Date.

"**Creditor**" means any Entity that holds a Claim against NNIII.

"**Creditor Proceeds**" means (a) Available Cash plus (b) any non-Cash proceeds (including, without limitation, any securities or other interests) of any sale of Residual Assets.

"**Cross-Border Claims Protocol**" means the Cross-Border Claims Protocol originally approved by the Bankruptcy Court and CCAA Court on or about September 16, 2010, as the same has been amended, with the approval of both the Bankruptcy Court and the CCAA Court, from time to time.

"**Cross-Border Protocol**" means the Cross-Border Protocol originally approved by the Bankruptcy Court and the CCAA Court on or about January 14, 2009, as the same has been amended, with the approval of both the Bankruptcy Court and the CCAA Court, from time to time.

"**Debtor Releasing Parties**" means NNIII and each of its representatives, agents, successors and assigns.

"**Deficiency Claim**" means, with respect to any Claim secured by a Lien on any interest of NNIII in property having a value of less than the Allowed amount of such Claim (after

taking into account other Liens of higher priority in such property), the portion of such Claim equal to the difference between (a) the Allowed amount of the Claim and (b) the Allowed amount of the secured portion of such Claim (which Allowed secured amount may be set pursuant to this Plan).

"**Disbursing Agent**" means the Plan Administrator or any party designated by NNIII to serve as its disbursing agent under the Plan.

"**Disclosure Statement**" means the written disclosure statement that relates to this Plan Filed in the Chapter 11 Case by NNIII, including the schedules and exhibits attached thereto, as it may be amended, modified or supplemented from time to time, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

"**Disputed Claim**" means a Claim that NNIII has Scheduled as "disputed," "contingent" or "unliquidated," or as to which a proof of claim has been Filed or deemed Filed as contingent or as to which an objection has been or may be timely Filed by NNIII or any other party in interest entitled to do so, which objection, if timely Filed, has not been withdrawn or has not been overruled or denied by a Final Order.

"**Distribution**" means any payment or transfer made under the Plan.

"**Distribution Date**" means any date on which a Distribution is made in accordance with the Plan, including the Initial Distribution Date, an Interim Distribution Date and the Final Distribution Date.

"**Distribution Record Date**" means the record date for the purposes of making Distributions under the Plan on account of Allowed Claims, which date shall be the Confirmation Date.

"**Effective Date**" means the date selected by NNIII that is the first Business Day on which all conditions to the Effective Date set forth in Article 12 of the Plan have been satisfied with respect to NNIII or, if waivable, waived pursuant to Section 12.2 hereof, provided that no stay of the Confirmation Order is in effect.

"**EMEA Debtors**" means, collectively, NNUK, Nortel Networks (Ireland) Limited, Nortel Networks NV (in administration), Nortel Networks SpA (in administration), Nortel Networks BV (in administration), Nortel Networks Polska Sp z.o.o. (in administration), Nortel Networks Hispania SA (in administration), Nortel Networks (Austria) GmbH (in administration), Nortel Networks s.r.o. (in administration), Nortel Networks Engineering Service Kft (in administration), Nortel Networks Portugal SA (in administration), Nortel Networks Slovensko, s.r.o. (in administration), Nortel Networks Romania SRL (in administration), Nortel GmbH (in administration), Nortel Networks OY (in administration), Nortel Networks AB (in administration), Nortel Networks International Finance & Holding BV (in administration) and Nortel Networks France S.A.S. (in administration), but, for the avoidance of doubt, for purposes of the Plan, does not include NNSA.

"**EMEA Non-Filed Entities**" means, collectively, Nortel Networks AS, Nortel Networks AG, Nortel Networks South Africa (Pty) Limited, Nortel Networks (Northern Ireland) Limited (in liquidation) and Nortel Networks Optical Components Limited (in liquidation).

"**Entity**" means an entity as defined in section 101(15) of the Bankruptcy Code.

"**Estate**" means, with regard to NNIII, the estate that was created by the commencement by NNIII of its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code, and shall be deemed to include, without limitation, any and all rights, powers and privileges of NNIII and any and all Assets and interests in property, whether real, personal or mixed, rights, Causes of Action, avoidance powers or extensions of time that NNIII or its Estate shall have had as of the Petition Date, or which such Estate acquired after the commencement of the Chapter 11 Case, whether by virtue of sections 541, 544, 545, 546, 547, 548, 549 or 550 of the Bankruptcy Code or otherwise.

"**Exculpated Party**" means each of (a) NNIII, (b) Wind-Down NNIII and (c) the U.S. Principal Officer, and with respect to each of the foregoing, any of their respective directors, officers, employees, members, attorneys, consultants, accountants, advisors, agents and other professionals (each acting solely in such capacity), and, collectively, all of them.

"**File**" or "**Filed**" means file or filed on the docket of the Bankruptcy Court or its authorized designee in the Chapter 11 Case.

"**Final Distribution Date**" means the date upon which the Plan Administrator or Disbursing Agent makes a final Distribution on account of all Allowed Claims against NNIII, including Allowed Administrative, Priority Non-Tax, Priority Tax, Other Secured Claims and General Unsecured Claims.  As determined by the Plan Administrator, the Final Distribution Date shall be a date (a) which is after the liquidation into Cash of all Residual Assets of Wind-Down NNIII (other than those Residual Assets abandoned by Wind-Down NNIII), if any, and the collection of other sums due or otherwise remitted or returned to NNIII's Estate and (b) on which there remain no Disputed Claims against NNIII.

"**Final Order**" means an order (a) as to which the fourteen-day appeal period under Bankruptcy Rule 8002(a) has passed or has been waived by the Bankruptcy Court and (b) that has not been reversed, stayed, superseded or vacated or, to the extent it has been stayed, such stay has expired.

"**Foreign Affiliate Debtors**" means each of (a) the Canadian Debtors, (b) the EMEA Debtors and (c) NNSA.

"**Foreign Proceeding**" means, collectively, the Canadian Proceedings, the French Main Proceeding, the French Secondary Proceeding, the Israeli Administration Proceedings, the U.K. Proceedings and any other insolvency or similar proceeding filed after the Petition Date in a jurisdiction other than the United States involving an Affiliate of NNIII or the Former Debtors.

"**French Court**" means the judge appointed in the French Secondary Proceeding, the Versailles Commercial Court, any court hearing appeals therefrom and any other court of competent jurisdiction overseeing the French Secondary Proceeding from time to time.

"**French Secondary Proceeding**" means the secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No. 1346/2000 on Insolvency Proceedings in the Republic of France that was commenced before the French Court on May 28, 2009 in respect of NNSA.

"**General Unsecured Claims**" means all Unsecured Claims against NNIII.

"**Global Debtors**" means NNIII, the Former Debtors and the Foreign Affiliate Debtors.

"**Governmental Unit**" shall have the meaning assigned to such term in section 101(27) of the Bankruptcy Code.

"**Holder**" means a Person or Entity holding a Claim or Interest.

"**Iceberg Amendment Fee**" means the $5 million from the Iceberg Sale Proceeds previously agreed by NNIII, the Former Debtors and each of the Foreign Affiliate Debtors to be funded directly as follows: $2.8 million to NNI and $2.2 million to NNUK, prior to any other agreed upon allocation of the Sale Proceeds.

"**Iceberg Escrow Account**" means the escrow account established to hold the Iceberg Sale Proceeds and the Iceberg Amendment Fee.

"**Iceberg Sale**" means the sale of the residual intellectual property remaining after the Business Line Sales, which intellectual property was sold to a consortium in July 2011.

"**Iceberg Sale Proceeds**" means that portion of the Sale Proceeds generated from the Iceberg Sale.

"**IFSA**" means the Interim Funding and Settlement Agreement, dated as of June 9, 2009, entered into among various of the SPSA Parties, as approved by the CCAA Court on June 29, 2009 and by the Bankruptcy Court on June 29, 2009 [D.I. 993].

"**Impaired**" shall have the meaning assigned to such term in section 1124 of the Bankruptcy Code when used with reference to a Claim or an Interest.

"**Indian Tax Appeal Litigation**" means the litigation between NNIII and the Indian Taxing Authorities pending before India's Supreme Court with respect to tax obligations allegedly owed by NNIII.

"**Indian Taxing Authorities**" means the Indian governmental bodies responsible for taxation in India.

"**Initial Distribution Date**" means the date as determined by NNIII upon which the initial distributions of property under this Plan will be made to holders of Allowed Claims, which date shall be within sixty (60) days of the Effective Date or as soon thereafter as practicable.

"**Intellectual Property**" means any and all intellectual property rights in any jurisdiction including, without limitation, rights in or to any of the following: (a) Trademarks; (b) Patents and inventions (whether or not patentable); (c) copyrights and works of authorship of any type in any medium; (d) mask works; (e) trade secrets, know-how and confidential information; (f) databases, including, without limitation, computerized databases and compilations; (g) software and computer programs and (h) domain names and Internet protocol addresses, including, in each case, any applications or registrations for any of the foregoing.

"**Intercompany Claim**" means any Claim against NNIII asserted by its Affiliates other than an Administrative Expense Claim, a Priority Non-Tax Claim, a Secured Claim or a Subordinated Claim.

"**Intercompany Administrative Expense Claim**" means any Administrative Expense Claim against NNIII asserted by any Former Debtor.

"**Interest(s)**" means shares of common stock, preferred stock, other forms of ownership interest or any interest or right to convert into such an equity or ownership interest or acquire any equity or ownership interest, including, without limitation, vested and/or unvested restricted stock units, contingent stock awards, contingent equity awards, performance stock units and stock options or restricted stock awards granted under management ownership plans, stock incentive plans or employee incentive plans, in each case, in NNIII that was in existence immediately prior to or on the Petition Date.

"**Interim Compensation Order**" means the Order under 11 U.S.C. §§ 105(a) and 331, Fed. R. Bankr. P. 2016 and Del. Bankr. L.R. 2016-2 Establishing Procedures for Interim Compensation and Reimbursement of Fees and Expenses for Professionals and Official Committee Members entered by the Bankruptcy Court as to the Former Debtors on February 4, 2009 [D.I. 222] and made applicable to NNIII by order dated August 16, 2016 [D.I. 7].

"**Interim Distribution**" means the quarterly Distributions of Creditor Proceeds made by the Disbursing Agent to holders of Allowed Claims against a Debtor.

"**Interim Distribution Date**" means any date on which an Interim Distribution is made, which dates shall be June 30th and December 31st of each year.

"**IP Addresses**" means internet protocol addresses registered in the name of a Canadian Debtor or a corporate predecessor thereto.

"**Israeli Administration Proceedings**" means the administration proceedings of Nortel Networks Israel (Sales and Marketing) Limited and its subsidiaries commenced on January 19, 2009 pursuant to the Israeli Companies Law, 1999, and the regulations relating thereto for a stay of proceedings.

"**Lien**" means a charge against, interest in or other encumbrance upon property to secure payment of a debt or performance of an obligation.

"**Litigation Claims**" means all claims, rights and Causes of Action of any Debtor or its Estate of every kind or nature whatsoever, whether arising prior to, during or after the

Chapter 11 Case (including, without limitation, Intellectual Property enforcement rights and all rights, claims and Causes of Action arising under sections 544 through 551 of the Bankruptcy Code, except for any Released Claims).

"**M&A Costs**" means the fees and expenses incurred in connection with the Sales.

"**M&A Cost Reimbursement**" means the reimbursement of certain of the M&A Costs, which amounts shall be reimbursed from the Iceberg Escrow Account as follows: $20 million to the Former Debtors and $35 million to the Canadian Debtors.

"**Monitor**" means Ernst & Young Inc. in its capacity as the court-appointed monitor in the Canadian Proceedings.

"**NNC**" means Nortel Networks Corporation, a Canadian Debtor.

"**NNI**" means Nortel Networks Inc., a Delaware corporation.

"**NNI Confirmation Order**" means the January 24, 2017 order of the Bankruptcy Court confirming the NNI Plan pursuant to section 1129 of the Bankruptcy Code as applicable to each of the Former Debtors [D.I. 17795].

"**NNI Plan**" means the First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain of its Affiliated Debtors filed by the Former Debtors on January 23, 2017 [D.I. 17763], as it may be modified or amended in accordance with the terms of the NNI Plan.

"**NNI Plan Effective Date**" means May 8, 2017.

"**NNIII**" means Nortel Networks India International Inc., a Delaware corporation.

"**NNL**" means Nortel Networks Limited, a Canadian Debtor.

"**NNSA**" means Nortel Networks S.A. (in administration and in *liquidation judiciaire*).

"**NNUK**" means Nortel Networks U.K. Limited (in administration), an EMEA Debtor.

"**Non-Released Matters**" has the meaning set forth in Section 13.4.

"**Nortel Group**" means, collectively, NNC and all of its direct and indirect subsidiaries, whether current or former.

"**Notice of Assumption and Assignment**" means any notice of NNIII's intent to assume or assume and assign one or more executory contracts or unexpired leases, which notice shall be Filed by NNIII on the docket of the Bankruptcy Court in the Chapter 11 Case.

"**Ordinary Course Professional Order**" means the Order Authorizing NNIII to Retain and Employ Professionals Used in the Ordinary Course of Business *Nunc Pro Tunc* to the

Petition Date entered by the Bankruptcy Court on August 16, 2016 [D.I. 15], as may be amended, supplemented or modified from time to time.

"**Former Debtor(s)**" or "**Former Debtor(s)-in-Possession**" means each of the following entities, along with the last four digits of each Former Debtor's tax identification number: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567), and Nortel Networks (CALA) Inc. (4226).

"**Other Nortel Claim**" has the meaning set forth in Section 7.6.

"**Patents**" mean all national and multinational patents and utility models (petty patents), including, without limitation, all reissues, divisions, continuations, continuations-in-part, extensions and reexaminations thereof, and all rights therein provided by multinational treaties or conventions.

"**PBGC**" means the Pension Benefit Guaranty Corporation, a United States government corporation.

"**Person**" means an individual, a corporation, a limited liability company, a partnership, an association, a joint stock company, a joint venture, an unincorporated organization or a Governmental Unit as defined in section 101(41) of the Bankruptcy Code.

"**Petition Date**" means July 26, 2016.

"**Plan**" means the chapter 11 plan of NNIII, including without limitation, all exhibits, appendices and schedules hereto and thereto, either in its present form or as the same may be altered, amended, modified or supplemented from time to time in accordance with the provisions of the Plan or the Bankruptcy Code and Bankruptcy Rules.

"**Plan Administration Agreement**" means the agreement describing the powers, duties and rights of the Plan Administrator in administering the Plan, which agreement shall be in substantially the form attached hereto as <u>Exhibit B</u>.

"**Plan Administrator**" means Owl Hill Advisory LLC, retained, as of the Effective Date, by NNIII as the Person responsible for, among other things, the matters described in Section 6.2 hereof.

"**Plan Released Parties**" means the U.S. Principal Officer (solely in such individual's capacity as the U.S. Principal Officer of NNIII) and any of his respective directors, officers, employees, members, attorneys, consultants, accountants, advisors, agents and other professionals (each acting solely in such capacity), and, collectively, all of them.

"**Post-Effective Date Notice List**" has the meaning set forth in Section 15.21.

"**Priority Non-Tax Claim**" means any Claim, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment under section 507(a) of the Bankruptcy Code.

"**Priority Tax Claim**" means any Claim entitled to priority pursuant to sections 502(i) and 507(a)(8) of the Bankruptcy Code.

"**Pro Rata Share**" means, as at any Distribution Date, with respect to the holder of an Allowed Claim in any Class against NNIII, the product of (A/B) x C where:

A = the amount of the particular Allowed Claim;

B = the aggregate amount of all Allowed Claims in the Class; and

C = the total amount of Creditor Proceeds to be distributed to holders of Allowed Claims in such Class on the particular Distribution Date.

"**Professional**" means a Person (a) employed in the Chapter 11 Case pursuant to a Final Order in accordance with sections 327, 328 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to sections 327, 328, 329, 330 and 331 of the Bankruptcy Code, or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

"**Professional Claim**" means a Claim of a Professional for compensation for services rendered or reimbursement of costs, expenses or other charges incurred after the Petition Date and prior to and including the Effective Date.

"**Quarterly Administrative Wind-Down Reimbursement Payments**" has the meaning set forth in Section 6.5.

"**Rejected Contract**" means any executory contract that NNIII has rejected in accordance with Section 9.2 of this Plan

"**Relay**" means NNL's and NNTC's assets related to the wireless backhaul and multi-hop digital repeater/relay research development program, sold in June 2010.

"**Released Claim**" means any claim, right or Cause of Action of NNIII or its Estate released pursuant to the Plan, the Confirmation Order or the SPSA but does not include any claim, right or Causes of Action of any SPSA Party to enforce the SPSA.

"**Releases**" means the releases as set forth herein in Section 13.3.

"**Remaining Contract**" has the meaning set forth in Section 9.1.

"**Residual Assets**" means all Assets of Wind-Down NNIII from and after the Effective Date.

"**Residual Assets Proceeds**" means the net Cash proceeds of the Residual Assets and any income or proceeds therefrom.

"**Sale(s)**" means the Business Line Sales and the Iceberg Sale between 2009 and 2011.

"**Sale Proceeds**" means the remaining proceeds generated by the Sales, such amounts as set forth in Annex A of the SPSA, plus interest accrued thereon, less (i) US$55 million of M&A Cost Reimbursement and (ii) the Iceberg Amendment Fee.

"**Scheduled**" means as listed on the Schedules.

"**Schedules**" means the Schedules of Assets and Liabilities Filed by NNIII in accordance with section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as the same may be amended from time to time prior to the Effective Date in accordance with Bankruptcy Rule 1009.

"**Secured Claim**" means any Claim (a) to the extent reflected in the Schedules or upon a proof of claim to which NNIII has not objected as a "secured claim," which is secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

"**Security**" means any instrument issued by, or interest in, NNIII of the type described in section 101(49) of the Bankruptcy Code.

"**Server Access and Disposition Order**" means the Order Approving the Debtors' Entry into the Server Access and Disposition Agreement dated September 4, 2019 [D.I. 18751], which approves the entry into that certain Server Access and Disposition Agreement by NNIII and the Former Debtors.

"**Solicitation Procedures**" means the Bankruptcy Court-approved procedures related to soliciting votes on the Plan from holders of Claims entitled to vote on the Plan.

"**SPSA**" means that certain Settlement and Plans Support Agreement executed on October 12, 2016, a copy of which is attached hereto as Exhibit A.

"**SPSA Party**" means, individually, each of the signatories to the SPSA.

"**SPSA Released Parties**" means each Releasor (as defined in the SPSA) and each of their respective employees, officers, directors, agents, advisors, lawyers, successors and assigns and their directors and officers, both former and current, in their respective capacities as such.

"**SPSA Released Claims**" has the meaning set forth in Section 13.4.

"**Tax**" or "**Taxes**" means all net income, gross income, capital, value added, goods and services, gross receipts, ad valorem, transfer, profits, business, environmental, gaming,

franchise, excise, stamp, stamp duty reserve, customs, sales, use, employment, withholding, property, payroll and all other taxes, fees, duties, levies, assessments, deductions, withholdings or governmental charges, together with any interest, penalties, additions to tax, fines and similar amounts relating thereto, imposed or collected by or on behalf of any federal, state, local or foreign governmental authority on or from NNIII.

"**Trademarks**" means all trademarks, service marks, trade dress, logos, trade names, corporate names and business names, whether or not registered, together with all goodwill associated therewith, and including all common law rights and all rights therein provided by multinational treaties or conventions.

"**U.K. Proceedings**" means the administration proceedings of the EMEA Debtors and NNSA commenced on January 14, 2009 in the High Court of England and Wales, pursuant to the Insolvency Act 1986.

"**U.S. Principal Officer**" means John J. Ray III, who was appointed Principal Officer of NNIII pursuant to an order entered by the Bankruptcy Court on August 16, 2016.

"**U.S. Trustee**" means the Office of the United States Trustee for the District of Delaware.

"**Unimpaired**" means any Claim or Interest that is not Impaired.

"**Unsecured Claim**" means any Claim against NNIII, including, without limitation, (a) Claims arising from the rejection of executory contracts and unexpired leases, (b) Deficiency Claims and (c) Intercompany Claims, but excluding Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims and Secured Claims.

"**Wind-Down NNIII**" means NNIII on and after the Effective Date.

### 1.3    Rules of Interpretation.

1.      In the event of an inconsistency: (a) the provisions of the Plan shall control over the contents of the Disclosure Statement; and (b) the provisions of the Confirmation Order shall control over the contents of the Plan.

2.      For the purposes of the Plan:

(a)      unless the context requires otherwise, any reference in the Plan to a contract, instrument, release or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; *provided*, *however*, that any change to such form, terms or conditions that is material to a party to such document shall not be modified without such party's consent unless such document or this Plan expressly provide otherwise;

(b)      unless the context requires otherwise, any reference in the Plan to an existing document, exhibit or schedule Filed or to be Filed means such document, exhibit or

schedule, as it may have been or may be amended, modified or supplemented as of the Effective Date;

(c)    unless otherwise specified, all references in the Plan to "Sections," "Articles," "Exhibits" and "Schedules" are references to sections, articles, exhibits and schedules of or to the Plan;

(d)    the words "herein," "hereof," "hereto," "hereunder" and others of similar import refer to the Plan in its entirety rather than to only a particular portion of the Plan;

(e)    captions and headings are inserted for convenience of reference only and are not intended to be part or to affect interpretations of the Plan;

(f)    the words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation";

(g)    the definitions of terms herein shall apply equally to the singular and plural forms of the terms defined;

(h)    whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms;

(i)    the word "will" shall be construed to have the same meaning and effect as the word "shall"; and

(j)    unless the context requires otherwise, any reference herein to any Person shall be construed to include such Person's successors and assigns;

(k)    unless otherwise specified, the rules of construction set forth in section 102 of the Bankruptcy Code will apply to this Plan.

3.    Whenever a Distribution of property is required to be made on a particular date, the Distribution shall be made on such date or as soon as reasonably practicable thereafter.

4.    All Exhibits and Schedules to the Plan are incorporated into the Plan and shall be deemed to be included in the Plan, regardless of when they are Filed.

5.    Unless otherwise specified, all currency amounts are in U.S. Dollars.

**1.4    Exhibits to this Plan.**  All Exhibits are incorporated into and are a part of this Plan as if set forth in full herein.  Holders of Claims and Interests may obtain a copy of the Exhibits upon written request to NNIII.  The Exhibits may be inspected in the office of the clerk of the Bankruptcy Court or its designee during normal business hours, obtained by written request to counsel to NNIII or obtained on the website of the Claims Agent at http://dm.epiq11.com/nortel.

**1.5    Computation of Time.**  In computing any period of time prescribed or allowed by the Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply.

## ARTICLE 2.
## TREATMENT OF UNCLASSIFIED CLAIMS

**2.1    Administrative Expense Claims.**  Subject to the allowance procedures and deadlines provided herein, on or as soon as reasonably practicable after the later to occur of (a) the Effective Date, (b) the date on which an Administrative Expense Claim shall become an Allowed Claim and (c) to the extent an Allowed Administrative Expense Claim relates to a liability arising under another agreement incurred by NNIII in the ordinary course, the date such liability is owed in accordance with the terms and conditions of any agreement or course of dealing relating thereto and consistent with past practice, the Holder of an Allowed Administrative Expense Claim shall receive on account of its Allowed Administrative Expense Claim, and in full satisfaction, settlement and release of and in exchange for such Allowed Administrative Expense Claim, (a) Cash equal to the unpaid portion of such Allowed Administrative Expense Claim or (b) such other treatment as to which NNIII and the Holder of such Allowed Administrative Expense Claim have agreed upon in writing; *provided*, *however*, that Professional Claims shall be paid in accordance with Section 2.3.

A notice setting forth the Effective Date of the Plan and the Administrative Expense Claims Bar Date shall be (i) Filed on the Bankruptcy Court's docket and (ii) posted on NNIII's and the Former Debtors' case information website at http://dm.epiq11.com/nortel. Further notice of the Administrative Expense Claims Bar Date shall be provided as may be directed by the Bankruptcy Court.  All requests for payment of an Administrative Expense Claim that accrued on or before the Effective Date other than Administrative Expense Claims that have been paid or that relate to payment of Professionals must be Filed with the Claims Agent and served on counsel for NNIII by the Administrative Expense Claims Bar Date.  Absent further order of the Bankruptcy Court, any requests for payment of Administrative Expense Claims that are not properly Filed and served by the Administrative Expense Claims Bar Date shall not appear on the register of Claims maintained by the Claims Agent and shall be disallowed automatically without the need for any objection from NNIII or any action by the Bankruptcy Court.

NNIII and the Plan Administrator may settle Administrative Expense Claims in the ordinary course without further notice or Bankruptcy Court approval, in accordance with the Plan Administration Agreement, as applicable.  NNIII shall have the right to object to any Administrative Expense Claim within one hundred and eighty (180) days after the Administrative Expense Claims Bar Date, subject to further extensions that may be granted by the Bankruptcy Court.  Unless NNIII or Wind-Down NNIII object to a timely Filed and properly served Administrative Expense Claim, such Administrative Expense Claim shall be deemed Allowed in the amount requested. In the event that NNIII or Wind-Down NNIII object to an Administrative Expense Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court shall determine whether such Administrative Expense Claim should be allowed and, if so, in what amount.

**2.2    Statutory Fees.**  On or before the Effective Date, all fees due and payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid in full, in Cash.

**2.3    Professional Claims.**  Other than a Professional retained by NNIII pursuant to the Ordinary Course Professional Order, any entity seeking an award of the Bankruptcy Court of compensation for services rendered and/or reimbursement of expenses incurred through the Effective Date under sections 105(a), 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code shall File its final application for allowance of such compensation and/or reimbursement by no later than the first Business Day that is sixty (60) days after the Effective Date or such other date as may be fixed by the Bankruptcy Court and be paid by or on behalf of NNIII (a) in full and in Cash in the amounts Allowed upon the date the order granting such award becomes a Final Order, or as soon thereafter as practicable or (b) upon such other terms as may be mutually agreed upon by the claimant and NNIII.

Except as otherwise specifically provided in this Plan, on and after the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate, and, subject to the terms of the Plan Administration Agreement, the Plan Administrator may employ and pay any Professional for services rendered or expenses incurred after the Effective Date in the ordinary course to facilitate the wind down of Wind-Down NNIII and effectuate the Plan without any further notice to any party or action, order or approval of the Bankruptcy Court.

**2.4    Priority Tax Claims.**  With respect to each Allowed Priority Tax Claim, at the option of NNIII, the Holder of an Allowed Priority Tax Claim shall be entitled to receive, in full satisfaction, settlement and release of and in exchange for such Allowed Priority Tax Claim, (a) Cash in an amount equal to such Allowed Priority Tax Claim on the later of the Effective Date and the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as practicable, (b) treatment in accordance with section 1129(a)(9)(C) of the Bankruptcy Code or (c) such other treatment as to which NNIII and the Holder of such Allowed Priority Tax Claim have agreed upon in writing.  On the Effective Date, the Liens (if any) securing any Priority Tax Claims shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

## ARTICLE 3.
## CLASSIFICATION OF CLAIMS AND INTERESTS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims and Professional Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in this Article.

### 3.1    Summary of Classifications.

All Claims and Interests, other than Administrative Expense Claims, Priority Tax Claims and Professional Claims, are classified in the Classes set forth in this Article for all

purposes, including voting, Confirmation and Distributions under this Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest fits within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest fits within the description of such other Classes.  A Claim is also classified in a particular Class for the purpose of receiving Distributions under this Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released or otherwise satisfied prior to the Effective Date.

**3.2    Classification and Treatment of Claims Against and Interests in NNIII.**

The following chart designates the Classes of Claims against and Interests in NNIII and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code and (c) deemed to accept or reject the Plan:

| Class | Designation | Status | Entitlement to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| 2 | Secured Claims | Unimpaired | No (deemed to accept) |
| 3 | General Unsecured Claims | Impaired | Yes |
| 4 | Interests | Impaired | No (deemed to reject) |

**ARTICLE 4.**
**TREATMENT OF CLAIMS AGAINST AND INTERESTS IN NNIII**

Except to the extent that a Holder of an Allowed Claim against or Interest in NNIII agrees to a less favorable treatment, such Holder shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release and discharge of and in exchange for such Holder's Allowed Claim or Interest.  Unless otherwise indicated, the Holder of an Allowed Claim or Interest, as applicable, shall receive such treatment on the Effective Date, or as soon as reasonably practicable thereafter.

**4.1    Class 1 – Priority Non-Tax Claims.**

(a)    <u>Classification</u>.  Class 1 consists of all Priority Non-Tax Claims against NNIII.

(b)    <u>Impairment and Voting</u>.  Class 1 is Unimpaired by the Plan.  The Holders of Allowed Priority Non-Tax Claims in these Classes are not entitled to vote to accept or reject the Plan and are deemed to accept the Plan.

(c)    <u>Distributions</u>.  Except to the extent that the Holder of an Allowed Priority Non-Tax Claim in Classes 1 agrees to less favorable treatment or has been paid by or on

behalf of NNIII on account of such Allowed Priority Non-Tax Claim prior to the Effective Date, on the later of the Effective Date and the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is practicable, each Holder of an Allowed Priority Non-Tax Claim in Class 1 shall be paid by or on behalf of NNIII in Cash in the amount equal to the Allowed amount of such Priority Non-Tax Claim.

### 4.2    Class 2 – Secured Claims

(a)    <u>Classification</u>.  Class 2 consists of all Secured Claims against NNIII.

(b)    <u>Impairment and Voting</u>.  Class 2 is Unimpaired by the Plan.  The Holders of Allowed Secured Claims in Class 2 are not entitled to vote to accept or reject the Plan and are deemed to accept the Plan.

(c)    <u>Distributions</u>.  Except to the extent that the Holder of an Allowed Secured Claim agrees to less favorable treatment, each Holder of an Allowed Secured Claim in Class 2 shall be satisfied by, at the option of NNIII: (i) payment in Cash by or on behalf of NNIII in the amount equal to the Allowed amount of such Secured Claim on the later of the Effective Date and the date on which such Secured Claim becomes an Allowed Secured Claim; (ii) the Distribution of the sale or other disposition proceeds of the Collateral securing such Allowed Secured Claim; (iii) surrender of the Collateral securing such Allowed Secured Claim to the Holder of such Allowed Secured Claim or (iv) such treatment that leaves unaltered the legal, equitable and contractual rights to which the Holder of the Allowed Secured Claim is entitled.  In the event an Allowed Secured Claim is treated under clauses (i) through (iii) above, the Liens securing such Claim shall be deemed released and extinguished without further order of the Bankruptcy Court.

### 4.3    Class 3 – General Unsecured Claims.

(a)    <u>Classification</u>. Class 3 consists of all General Unsecured Claims against NNIII.

(b)    <u>Impairment and Voting</u>.  Class 3 is Impaired by the Plan.  Each Holder of an Allowed General Unsecured Claim in Class 3 is entitled to vote to accept or reject the Plan.

(c)    <u>Distributions</u>.  Each Holder of an Allowed General Unsecured Claim in Class 3 shall, on the Initial Distribution Date or the first Interim Distribution Date after the date such Claim becomes Allowed, receive its Pro Rata Share of the Creditor Proceeds as of the applicable Distribution Date from NNIII.  In accordance with Section 10.3 herein, the Disbursing Agent shall make periodic Interim Distributions of the remaining available Creditor Proceeds to Holders of Allowed General Unsecured Claims in Class 3 until the Final Distribution Date.

4.4     **Class 4 – Interests.**

(a)     <u>Classification</u>.  Class 4 consists of all Interests in NNIII that were in existence immediately prior to or on the Petition Date.

(b)     <u>Impairment and Voting</u>.  Class 4 is Impaired by the Plan.  The Holders of Interests in Class 4 are not entitled to vote to accept or reject the Plan and are deemed to have rejected the Plan.

(c)     <u>Distributions</u>.  NNI, as the only Holder of Interests in NNIII, is not expected to receive any Distributions on account of such Interests under the Plan.  On the Effective Date, all Interests in NNIII will continue to be held by NNI until the closing of its Chapter 11 Case, solely for Plan administrative purposes.  NNI shall receive no Distributions on account of such Interests until such time that all Allowed Claims in Classes 1 through 3 have been satisfied in full in accordance with the Bankruptcy Code and the Plan.  At such time, NNI will receive its Pro Rata Share of any remaining Creditor Proceeds from NNIII.

## ARTICLE 5.
## ACCEPTANCE OR REJECTION OF THE PLAN

**5.1     Impaired Classes of Claims and Interests Entitled to Vote.**

Holders of Claims in Class 3 are entitled to vote to accept or reject this Plan as provided above or as otherwise set forth in such order as may be entered by the Bankruptcy Court establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order(s) of the Bankruptcy Court.  The votes of Holders of Claims who are entitled to vote and yet abstain from voting, return a ballot with no boxes checked or return a ballot voting both to accept and reject the Plan will not be counted for purposes of accepting or rejecting the Plan.

**5.2     Acceptance by an Impaired Class.**

In accordance with section 1126(c) of the Bankruptcy Code and except as provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted this Plan if this Plan is accepted by the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in such Class that have timely and properly voted to accept or reject this Plan.

**5.3     Presumed Acceptances by Unimpaired Classes.**

Classes 1 and 2 are Unimpaired by this Plan.  Accordingly, under section 1126(f) of the Bankruptcy Code, Holders of such Claims are conclusively presumed to accept this Plan, and the votes of the Holders of such Claims will not be solicited.

**5.4     Elimination of Vacant Classes; Deemed Acceptance by Non-Voting Classes.**

(a)      Any Class of Claims or Interests that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Interest that is Allowed in an amount greater than zero (including temporarily Allowed under Bankruptcy Rule 3018) shall be considered vacant and deemed eliminated from this Plan for purposes of voting to accept or reject this Plan and for purposes of determining whether this Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

(b)      If no votes to accept or reject this Plan are received with respect to a Class that is solicited in accordance with the Solicitation Procedures (other than a Class that is deemed eliminated pursuant to the foregoing Section 5.4(a)), such Class shall be deemed to have voted to accept this Plan, unless the Bankruptcy Court, for cause, orders otherwise.

### 5.5      Conversion or Dismissal of the Chapter 11 Case.

If the requisite Classes do not vote to accept this Plan or the Bankruptcy Court does not confirm this Plan, NNIII reserves the right, subject to Section 15.6 hereof, to have its Chapter 11 Case dismissed or converted, or to liquidate or dissolve NNIII under applicable non-bankruptcy procedure or chapter 7 of the Bankruptcy Code.

### 5.6      Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code.

NNIII intends to request that the Bankruptcy Court confirm this Plan in accordance with section 1129(b) of the Bankruptcy Code with respect to any Impaired Class of Claims or Interests that rejects or is deemed to reject the Plan, where this Plan shall constitute a motion for such relief.

### ARTICLE 6.
### IMPLEMENTATION OF THE PLAN

### 6.1      General Settlement of Claims and Interests.

In accordance with the SPSA and the 9019 Approval Order, the terms of the SPSA are incorporated herein and entry of the Confirmation Order will constitute approval of the provisions of this Plan as a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to this Plan and the SPSA.

### 6.2      Plan Administrator.

(a)      Appointment.  Owl Hill Advisory LLC, shall serve as Plan Administrator for NNIII and Wind-Down NNIII pursuant to and in accordance with the provisions of the Plan, the SPSA and the Plan Administration Agreement.

(b)      Authority.  The Plan Administrator shall have the authority and right on behalf of NNIII and Wind-Down NNIII, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, the SPSA and the Plan Administration Agreement in accordance with the provisions therein.  These rights shall include, without limitation, the authority to: (i) except to the extent Claims have been previously allowed, control and effectuate the Claims reconciliation process, including to object to, seek to subordinate, compromise or settle any and all Claims against NNIII or Wind-Down

NNIII; (ii) make distributions on account of Allowed Claims, other remaining assets and appropriate fees and expenses in accordance with and subject to the terms of the Plan; (iii) exercise its reasonable business judgment to manage, liquidate or otherwise dispose of any remaining assets of NNIII or Wind-Down NNIII under the Plan and in accordance with applicable law as reasonably necessary to maximize Distributions to holders of Allowed Claims; (iv) prosecute all Causes of Action on behalf of NNIII or Wind-Down NNIII, elect not to pursue any Causes of Action and determine whether and when to compromise, settle, abandon, dismiss or otherwise dispose of any such Causes of Action, as the Plan Administrator may determine is in the best interests of NNIII or Wind-Down NNIII; (v) make payments to existing professionals who will continue to perform in their current capacities; (vi) retain professionals to assist in performing its duties under the Plan; (vii) maintain the books and records and accounts of NNIII and Wind-Down NNIII, as applicable, to effectuate the Plan; (viii) invest Cash of NNIII or Wind-Down NNIII, including any Cash proceeds realized from the liquidation of any assets of NNIII or Wind-Down NNIII, including any Causes of Action, and any income earned thereon; (ix) incur and pay reasonable and necessary expenses in connection with the performance of duties under the Plan, including the reasonable fees and expenses of professionals retained by the Plan Administrator; (x) administer the tax obligations of NNIII or Wind-Down NNIII, including filing tax returns, paying tax obligations and representing the interest and account of NNIII or its Estate or Wind-Down NNIII before any taxing authority in all matters, including, without limitation, any action, suit, proceeding or audit; (xi) prepare and file any and all informational returns, reports, statements, returns or disclosures relating to NNIII or Wind-Down NNIII that are required hereunder, by any Governmental Unit or applicable law; (xii) pay statutory fees in accordance with Section 15.18 of the Plan and (xiv) perform other duties and functions that are reasonable, necessary or appropriate for the implementation of the Plan.

(c)    Compensation of the Plan Administrator.  In addition to reimbursement for actual out-of-pocket expenses incurred by the Plan Administrator, the Plan Administrator shall be entitled to receive reasonable compensation for services rendered on behalf of NNIII and Wind-Down NNIII in an amount and on such terms as may be reflected in the Plan Administration Agreement.

(d)    No Liability of Plan Administrator.  The Plan Administrator will have no liability whatsoever for any acts or omissions to NNIII or Wind-Down NNIII or to Holders of Claims against or Interests in NNIII or Wind-Down NNIII other than for willful misconduct, fraud or breach of fiduciary duty by the Plan Administrator as determined by a Final Order, *provided, that*, the Plan Administrator shall have no liability for such acts or omissions if approved by the Bankruptcy Court.  Each of NNIII and Wind-Down NNIII shall indemnify and hold harmless the Plan Administrator for any losses, liabilities and costs incurred in such capacity to the fullest extent allowed by Delaware law.

(e)    Termination, Resignation and Removal of Plan Administrator. The duties, responsibilities and powers of the Plan Administrator shall terminate pursuant to the terms of the Plan Administration Agreement. The resignation and removal of the Plan Administrator shall occur pursuant to the terms of the Plan Administration Agreement.

(f)    Establishment of Reserves.  On the Effective Date, NNIII shall account for the Disputed Claims in such amounts, as agreed by NNIII and the Plan

Administrator, in accordance with the terms of the Plan Administration Agreement, as may be necessary to make sufficient future payments with respect to Disputed Claims as provided by the Plan.

(g)    Periodic Reporting of the Plan Administrator.  After the Effective Date, the Plan Administrator shall file periodic reports with the Bankruptcy Court regarding the status of the resolution of any remaining Disputed Claims and Distributions expected to be made pursuant to this Plan.

**6.3    Intercompany Account Settlement.**  Each of NNIII and Wind-Down NNIII will be entitled to transfer funds between itself and NNI consistent with the terms of the Cash Management Order.  Any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the ordinary course intercompany account settlement practices and will not violate the terms of this Plan.

**6.4    Settlement of Intercompany Claims and Other Matters.**  The Bankruptcy Court's entry of the 9019 Approval Order constituted the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the settlement that has been reached among the SPSA Parties with regard to (a) subject to the terms and conditions of the SPSA and the NNI Plan, (i) the Allocation Proceeds and (ii) the Intercompany Claims (including, for the avoidance of doubt, the Allowed Book Intercompany Claims) and (b) the other matters settled under the SPSA.  The 9019 Approval Order also constituted the Bankruptcy Court's finding that such settlement is: (1) in exchange for the good and valuable consideration provided by each of NNIII, the Former Debtors and the SPSA Parties; (2) a good-faith settlement and compromise of the claims released by NNIII and the Former Debtors; (3) in the best interests of NNIII, the Former Debtors, their Estates and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for hearing and (6) a bar to the assertion of any claim or Cause of Actions released pursuant to the SPSA.

**6.5    Administrative Expense Contribution and Quarterly Administrative Wind-Down Reimbursement Payments.**  From and after the Effective Date, NNI will bear various costs of administering and winding down NNIII's estate (including costs for professionals retained to assist with such administration or wind-down), and NNIII shall reimburse NNI quarterly for such costs in an amount not to exceed $100,000 (each payment, a "Quarterly Administrative Wind-Down Payment").  The payment of Quarterly Administrative Wind-Down Payments by NNIII to NNI shall continue until NNIII has been fully and finally liquidated and all costs and expenses related to such administration and wind-down have been incurred.  For the avoidance of doubt, NNI shall retain the right to assert Administrative Expense Claims against NNIII for any Priority Tax Claims that are asserted against and/or paid by NNI that reasonably could be allocated or attributable to NNIII, *provided* that the amount owed by NNIII to NNI in respect of Quarterly Administrative Wind-Down Reimbursement Payments and Priority Tax Claims shall be subject to a cap of $100,000 per quarter.

**6.6    Closing of Chapter 11 Case.**  After NNIII's Chapter 11 Case has been fully administered, the Plan Administrator shall File all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close NNIII's Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.  The Plan Administrator's

authority with respect to NNIII shall continue until such time as NNIII's Chapter 11 Case has been fully administered and closed.

## ARTICLE 7.
## THE SETTLEMENT AND PLANS SUPPORT AGREEMENT

7.1     **SPSA.**  Pursuant to the 9019 Approval Order, the Bankruptcy Court authorized NNIII's entry into the SPSA and approved the SPSA pursuant to sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019.  In the event of an inconsistency between the Plan and the SPSA, the SPSA shall govern. For the avoidance of doubt, the SPSA is and shall remain binding on NNIII and Wind-Down NNIII, whether prior to, on or after the Effective Date, and this Plan shall not in any way modify or be deemed to modify the SPSA.

7.2     **Cooperation.**  NNIII shall cooperate in the implementation of the SPSA in accordance with its cooperation provisions therein in furtherance of the execution and implementation of the SPSA.

7.3     **Settlement of Allocation Dispute.**  Pursuant to the resolution procedures of the IFSA, the SPSA Parties settled the Allocation Dispute on the terms set forth in the SPSA. As part of the integrated settlements contained in the SPSA, and subject to the terms and conditions thereof, NNIII has released any claims it may have for an entitlement to receive the Allocation Proceeds.

7.5     **Estate Administration.**  From the Confirmation Date to the Effective Date, NNIII will be administered by the U.S. Principal Officer.

7.6     **No Double-Recovery.**  In no circumstance shall a Creditor receive aggregate distributions from NNIII or Wind-Down NNIII and any other Entity in the Nortel Group on account of an Allowed Claim in excess of 100% of the amount of such Allowed Claim. In order to be eligible for any Distribution, a Creditor who holds an Allowed Claim against NNIII or Wind-Down NNIII and a related claim against any other Entity in the Nortel Group (an "Other Nortel Claim"), shall, upon the written request of NNIII or Wind-Down NNIII (which may be made from time to time), provide such information to NNIII or Wind-Down NNIII as it may reasonably request in respect of the Other Nortel Claim, including the amount in which the Other Nortel Claim has been allowed, the amount of distributions received or expected to be received on account of such Other Nortel Claim and any and all supporting documentation relating to the foregoing. Subject to further Order of the Bankruptcy Court, NNIII and Wind-Down NNIII are authorized to delay and/or withhold Distributions to Creditors holding Other Nortel Claims pending receipt of documentation acceptable to NNIII or Wind-Down NNIII, acting reasonably, to allow it to confirm that a Creditor has not and will not receive amounts on account of its Allowed Claim in excess of 100% of the amount of such Allowed Claim.

7.7     **Post-Petition Date Interest.**  No post-Petition Date interest (or make whole premium, no-call payment or similar claim accruing post-Petition Date) shall be included in any Allowed Claim, nor be paid on Allowed Claims by NNIII.

7.8     **Resolution of Certain Claims.**  Pursuant to the PBGC Settlement Agreement entered into by the PBGC, NNIII and the Former Debtors on December 20, 2016, the

PBGC was entitled to a single Allowed General Unsecured Claim against NNIII (and each of the Former Debtors) in the amount of $624,601,972, *provided* that the maximum aggregate distribution the PBGC was entitled to receive on its claims against NNIII and the Former Debtors was $565,000,000, and such claims were to be deemed paid in full upon NNIII and the Former Debtors having made aggregate distributions on account of the Allowed General Unsecured Claim in such amount.  In December 2018, the PBGC received the maximum allowed recovery of $565,000,000 on its claims against NNIII and the Former Debtors.  Accordingly, the PBGC's Allowed General Unsecured Claim against NNIII and any and all claims that have been or could have been asserted by the PBGC against NNIII are deemed paid in full, and the PBGC shall not have any further claims against NNIII or any of the Former Debtors.  The PBGC shall not be entitled to an Allowed Administrative Expense Claim or Priority Non-Tax Claim against NNIII or any of the Former Debtors.

> **7.9     Book Intercompany Claims.**  Allowed Book Intercompany Claims shall be included in the determination of the Allowed General Unsecured Claims against NNIII. Annex L to the SPSA shall be treated as the definitive position for all Allowed Book Intercompany Claims between the Nortel Group entities specified thereon.  Any and all other pre-filing books and records claims between (a) any of the Canadian Debtors, on the one hand, and (b) NNIII, on the other hand, that are not preserved specifically in the SPSA (including, without limitation, the claims referenced in Sections 4(b)(i) and 4(g) of the SPSA) are forever released and barred as of the NNI Plan Effective Date to the extent not previously released. Other than the Allowed Book Intercompany Claims, all pre-filing books and records claims, including any claims that NNIII now holds as a consequence of an assignment, between (i) any of the EMEA Debtors, NNSA or the EMEA Non-Filed Entities, on the one hand, and (ii) NNIII, on the other hand, are forever released and barred as of the Effective Date to the extent not previously released.  The SPSA Parties agreed and acknowledged that, as of October 12, 2016, there are no post-filing books and records claims owing between (1) any of the Canadian Debtors, on the one hand, and NNIII, the EMEA Debtors, NNSA and the EMEA Non-Filed Entities, on the other hand, and (2) NNIII, on the one hand, and any of the EMEA Debtors, NNSA and the EMEA Non-Filed Entities, on the other hand.

> **7.10     Remaining Assets and Other Proceeds.**  NNIII has the right to retain the value of its respective remaining assets, if any, and shall not be subject to any claims thereto by any other Global Debtor except those acknowledged in the SPSA.  NNIII releases any claims it has asserted or may assert or have as against (a) the proceeds held by the Canadian Debtors as "Restricted Cash" or "Unavailable Cash" (as noted in Monitor's reports to the CCAA Court), including in respect of the realization of the interests in LG-N, the Strandherd Lands, Relay and IP Addresses, and (b) the remaining IP Addresses, including any proceeds arising therefrom, to the extent not previously released.  For the avoidance of doubt, nothing in this Section 7.10 shall (i) prohibit the assertion of claims to enforce the SPSA and claims that are reserved in the SPSA (including, without limitation, the claims referenced in Section 4(b)(i) thereof) or (ii) affect NNIII's rights to receive distributions as a creditor of the various Global Debtors' estates.

> **7.11     Debtor Disputes.**  Notwithstanding the separate administration of the estates of the Canadian Debtors, the EMEA Debtors, NNSA, NNIII and the Former Debtors and of the EMEA Non-Filed Entities, NNIII shall work cooperatively and use reasonable efforts to implement the SPSA and the Plan in a tax efficient manner. NNIII shall, upon the written request

of a Global Debtor to NNIII and to the extent permitted by applicable local law and not inconsistent with the statutory duties of NNIII, reasonably cooperate with each request, including providing such documents, other information, access to current personnel and/or permission to communicate with former personnel as may reasonably be requested by the requesting Global Debtor, in connection with the preparation and filing of tax returns and responding to or contesting any challenges, inquiries, audits or other disputes by tax authorities in relation thereto; *provided*, *however*, that NNIII shall not be obligated to cooperate to the extent such requested cooperation would prejudice the interests of NNIII and all such cooperation shall conform to the requirements in Section 4(a)(v) of the SPSA.

**7.12    SPSA Releases.**  NNIII has entered into certain releases pursuant to the terms of the SPSA and Bankruptcy Rule 9019, the terms of which are incorporated herein.

# ARTICLE 8.
# CORPORATE FORM AND ACTION

### 8.1    NNIII Corporate Form and Vesting.

(a)    On the Effective Date, Wind-Down NNIII shall maintain its current corporate form, with all powers of a corporation under the laws of its state of incorporation and without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) under such applicable state law, for the purpose of effectuating all aspects of the Plan pertaining to Wind-Down NNIII.  From and after the Effective Date, until dissolved in accordance with this Plan or by the Plan Administrator, Wind-Down NNIII shall exist in order to effectuate all aspects of the Plan and wind down.

(b)    On the Effective Date, Wind-Down NNIII shall be vested with the Assets of NNIII as provided in Section 13.10 of the Plan.

### 8.2    Dissolution of Wind-Down NNIII.  The director of Wind-Down NNIII shall have the right to dissolve Wind-Down NNIII, after the occurrence of Wind-Down NNIII's Final Distribution Date, on or shortly following the Effective Date without the necessity for (i) any further approval by the board of directors or stockholders of Wind-Down NNIII of the dissolution or any plan of distribution, to the extent as such otherwise may be required by applicable law, and to the extent such shareholder approval may be required by applicable law such approval shall be deemed previously provided; or (ii) any other or further actions to be taken by or on behalf of Wind-Down NNIII or payments to be made in connection therewith, subject to the filing of a certificate of dissolution with the appropriate governmental authorities.

### 8.3    Post-Effective Date Management.

(a)    On the Effective Date, the board of directors of Wind-Down NNIII shall consist of one natural person selected by the Plan Administrator, which person may be the Plan Administrator or an employee or principal thereof, to serve as the board of directors of Wind-Down NNIII through the closing of Wind-Down NNIII's Chapter 11 Case in accordance with Section 6.6 of the Plan.

(b)     The current officers of NNIII shall continue to serve as the officers of Wind-Down NNIII in accordance with applicable non-bankruptcy law, any employment agreement with NNIII entered into after the Petition Date and NNIII's by-laws, as the same may be amended from time to time, through the closing of Wind-Down NNIII's Chapter 11 Case, unless an officer resigns or is removed by the board of directors of Wind-Down NNIII.

**8.4     Corporate Existence.**  After the Effective Date, the Plan Administrator may, in accordance with the Plan Administration Agreement, (a) maintain Wind-Down NNIII as a corporation in good standing until such time as all aspects of the Plan pertaining to Wind-Down NNIII have been completed or (b) subject to Section 8.2 of the Plan, dissolve Wind-Down NNIII or complete the winding up of Wind-Down NNIII (including, without limitation, transferring all or part of the Residual Assets of Wind-Down NNIII to a liquidating trust) at such time as the Plan Administrator considers appropriate and consistent with the implementation of the Plan pertaining to Wind-Down NNIII.

**8.5     Certificate of Incorporation or Certificate of Formation.**  As of the Effective Date, the certificate of incorporation and by-laws of Wind-Down NNIII shall be amended to satisfy the provisions of the Plan and the Bankruptcy Code and shall (a) include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code, and (b) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate the Plan and the transactions contemplated herein, in each case, without further action under applicable law, regulation, order or rule, including, without limitation, any action by the stockholders, managers or members of Wind-Down NNIII. The amended certificate of incorporation and by-laws of Wind-Down NNIII are attached herein as <u>Exhibit D</u>.

**8.6     Wind-Down.**  The Plan Administrator shall effectuate the monetization, wind-down and liquidation of Wind-Down NNIII's Residual Assets (it being understood that such may include the transfer of all or part of the Residual Assets of Wind-Down NNIII to one or more liquidating trusts within the meaning of Treas. Reg. §301.7701-4).

**8.7     Other Corporate Action.**  Without limiting the foregoing, in accordance with the requirements of the Plan and the terms of the Plan Administration Agreement, from and after the Effective Date, Wind-Down NNIII and the Plan Administrator may take any and all actions they deem appropriate in order to consummate the transactions contemplated herein, including, without limitation, to sell or otherwise dispose of any Residual Assets and wind up Wind-Down NNIII's affairs and, notwithstanding any provision contained in Wind-Down NNIII's articles of incorporation, articles of formation or by-laws to the contrary, Wind-Down NNIII shall not require the affirmative vote of Holders of Interests in order to take any corporate action, including to (a) compromise and settle Claims and Causes of Action of or against Wind-Down NNIII and its Estate and (b) dissolve, merge or consolidate with any other Entity.

## ARTICLE 9.
## TREATMENT OF EXECUTORY CONTRACTS

      **9.1**    **Previous Assumption, Assignment and Rejection.**  Any executory contracts and unexpired leases of NNIII that have not been assumed, assumed and assigned or rejected prior to the Confirmation Date or with respect to which NNIII has not otherwise Filed a Notice of Assumption and Assignment or obtained an order assuming, assuming and assigning or rejecting the contract or lease prior to the Confirmation Date (the "Remaining Contracts"), if any, shall be rejected pursuant to Section 9.2 of this Plan.

      **9.2**    **Rejection.**  Except for those executory contracts and unexpired leases that have been assumed, assumed and assigned or rejected pursuant to previous orders of the Bankruptcy Court, all executory contracts and unexpired leases of NNIII shall be rejected pursuant to section 365 and 1123(b)(2) of the Bankruptcy Code; *provided*, *however*, that nothing contained in this Article 9 shall constitute an admission by NNIII that any contract or lease is an executory contract or unexpired lease or that NNIII or its successors and assigns has any liability thereunder.

      **9.3**    **Approval of Rejection; Rejection Damages Claims Bar Date.**  The Confirmation Order shall constitute an order of the Bankruptcy Court approving the rejection of executory contracts and unexpired leases under Section 9.2 above pursuant to section 365 and 1123(b)(2) of the Bankruptcy Code as of the Effective Date.  Any Claim for damages arising from any such rejection must be Filed within thirty (30) days after the Effective Date, or such Claim shall receive no Distribution under the Plan or otherwise on account of such Claim.

      **9.4**    **Pre-existing Obligations to NNIII under Executory Contracts.**  Rejection or repudiation of any executory contract pursuant to the Plan or otherwise will not constitute a termination of pre-existing obligations owed to NNIII under such contracts.  In particular, notwithstanding any non-bankruptcy law to the contrary, Wind-Down NNIII expressly reserves and does not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by NNIII or Wind-Down NNIII, as applicable, from counterparties to any Rejected Contract.

## ARTICLE 10.
## PROVISIONS REGARDING VOTING AND DISTRIBUTIONS UNDER THE PLAN

      **10.1**    **Voting of Claims.**  Each Holder of an Allowed Claim in an Impaired Class of Claims that is entitled to vote on the Plan pursuant to Article 3 and Article 4 of the Plan shall be entitled to vote separately to accept or reject the Plan, as provided in the order entered by the Bankruptcy Court establishing procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order or orders of the Bankruptcy Court.

      **10.2**    **Nonconsensual Confirmation.**  If any Impaired Class of Claims entitled to vote on the Plan does not accept the Plan by the requisite majority provided in section 1126(c) of the Bankruptcy Code, NNIII reserves the right to amend the Plan in accordance with Section 15.3 of the Plan or to undertake to have the Bankruptcy Court confirm the Plan under

section 1129(b) of the Bankruptcy Code or both.  With respect to any Impaired Classes of Claims or Interests that are deemed to reject the Plan under any such amended Plan, NNIII shall request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code.

      **10.3**    **Distributions of Creditor Proceeds.**  After the satisfaction in full of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims and Allowed Secured Claims (to the extent the Plan Administrator determines, in accordance with the Plan Administration Agreement, that NNIII will pay such Allowed Secured Claim in Cash) against NNIII, the Disbursing Agent shall make a Distribution of Creditor Proceeds in accordance with the provisions of the Plan (a) to each Holder of an Allowed Claim as of the Distribution Record Date against NNIII, within sixty (60) days of the Effective Date, or as soon thereafter as practicable, and (b) to each Holder of an Allowed Claim that is allowed after the Effective Date against NNIII, in accordance with the Class priorities set forth in Article 4 herein and the provisions of Article 10 herein.  After the initial Distribution with respect to any Allowed Claim, the Disbursing Agent shall make Distributions of Creditor Proceeds in accordance with the Plan to Holders of Allowed Claims against NNIII on June 30th and December 31st of each year (each such Distribution, an "<u>Interim Distribution</u>") and on the Final Distribution Date.  Notwithstanding the foregoing, the Plan Administrator may determine in accordance with the terms of the Plan Administration Agreement to direct the Disbursing Agent (i) to make Distributions more frequently on dates other than the Interim Distribution dates or (ii) not to make an Interim Distribution if it determines that the costs of making such Interim Distribution would be disproportionate to the Distribution amount.  No Distributions shall be made on account of a claim that is not yet an Allowed Claim until the Plan Administrator (1) determines not to object to such Claim (or the time to object to Claims expires), (2) agrees with the Holder of such Claim to allow such Claim in an agreed upon amount or (3) objects to such Claim and such Claim is Allowed by a Final Order, during which time such Claim shall be treated as a Disputed Claim.

      **10.4**    **Minimum Distribution and Manner of Payment.**  No payment of Creditor Proceeds of less than $100 shall be made by NNIII to any Holder of an Allowed Claim against NNIII.  Such amounts shall be deemed redistributed to other Holders of Allowed Claims against NNIII and, accordingly, shall be distributed in accordance with the provisions of the Plan and the Bankruptcy Code.  Any payment of Cash made pursuant to the Plan may be made at the option of the Disbursing Agent either by check or by wire transfer.

      **10.5**    **Limitation on Recovery.**  Notwithstanding anything contained herein to the contrary, in the event that the sum of the Distributions of Creditor Proceeds and other Distributions with respect to an Allowed Claim hereunder as well as from other sources are in excess of one hundred percent (100%) of such Holder's Allowed Claim, then the Creditor Proceeds remaining to be distributed to such Holder in excess of such one hundred percent (100%) shall be deemed available for distribution to other Holders of Allowed Claims against NNIII and, accordingly, shall be distributed in accordance with the provisions of the Plan and the Bankruptcy Code.

      **10.6**    **Distributions Free and Clear.**  Except as otherwise provided herein, any Distributions under the Plan shall be free and clear of any Liens, Claims and encumbrances, and

no other Entity, including NNIII, Wind-Down NNIII and the Plan Administrator, shall have any interest, legal, beneficial or otherwise, in the Creditor Proceeds, Assets or Residual Assets once transferred to Holders of Allowed Claims pursuant to the Plan.

**10.7    Delivery of Distributions and Undeliverable Distributions.**
Distributions to Holders of Allowed Claims of NNIII shall be made at the address of each such Holder as set forth on the Schedules Filed, unless superseded by a new address as set forth (a) on a proof of claim Filed by a Holder of an Allowed Claim or (b) in another writing notifying the Claims Agent (at the address listed in Section I of the Disclosure Statement) of a change of address.  If any Holder's Distribution is returned as undeliverable, no further Distributions shall be made or notices delivered to such Holder on account of such Claim until the Claims Agent is notified in writing by such Holder of such Holder's current address, at which time all such Distributions shall be made to such Holder without interest; *provided* that such Distributions that are returned as undeliverable shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six (6) months after the Effective Date.  After such date, all unclaimed property or interests in property shall become the property of NNIII's Estate, without the need for a further order by the Bankruptcy Court (notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary), and the Claim of any Holder to such property or interest in property shall be discharged and forever barred.

**10.8    Withholding and Reporting Requirements.**  In connection with the Plan and all instruments issued in connection therewith and distributed thereon, NNIII, the Plan Administrator and the Disbursing Agent shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all Distributions under the Plan shall be subject to any such withholding or reporting requirements. Notwithstanding the above, each Holder of an Allowed Claim that is to receive a Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any Tax obligations imposed by any Governmental Unit, including income, withholding and other Tax obligations, on account of such Distribution.  The Disbursing Agent has the right, but not the obligation, to withhold a Distribution until such Holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such Tax obligations.  The Disbursing Agent may require, as a condition to receipt of a Distribution, that the Holder of an Allowed Claim complete and return a Form W-8 or W-9, as applicable to each such Holder, to the Disbursing Agent.  If the Disbursing Agent makes such a request and the Holder fails to comply before the date that is one hundred and eighty (180) days after the request is made, no further Distributions shall be made to such Holder on account of such Claim.  In such cases, the amount of such Distribution shall irrevocably revert to NNIII and such Claim shall be discharged and the Holder of such Claim shall be forever barred from asserting such Claim against NNIII, its Estate or its respective property.  Also, in such cases, any Cash held for Distributions on account of such Claim shall become the property of NNIII's Estate and distributed to other Holders of Allowed Claims against NNIII in accordance with the terms of the Plan and the Bankruptcy Code.

**10.9    Time Bar to Cash Payment Rights.**  Checks issued in respect of Allowed Claims shall be null and void if not negotiated within ninety (90) days after the date of issuance thereof.  Requests for reissuance of any check shall be made to the Plan Administrator by the Holder of the Allowed Claim to whom such check originally was issued.  Any claim in respect of

a voided check shall be made on or before thirty (30) days after the expiration of the ninety (90) day period following the date of issuance of such check.  Thereafter, the amount represented by such voided check shall irrevocably revert to NNIII's Estate, to be distributed to other Holders of Allowed Claims against NNIII in accordance with the terms of the Plan and the Bankruptcy Code, and any Claim in respect of such voided check shall be discharged and forever barred from assertion against NNIII, its Estate and its respective property, *provided* that at the discretion of the Plan Administrator, any such amounts may be escheated pursuant to applicable law.  In the case of any check issued in respect of an Allowed Claim that is returned as an undeliverable Distribution, such check shall be null and void if not negotiated within ninety (90) days after the date of issuance, and the Allowed Claim for which such Distribution was issued shall be discharged and forever barred pursuant to this Section 10.9 only after the time period to claim such undeliverable Distribution provided in Section 10.7 has passed.

**Setoffs and Recoupment.**  NNIII may, but shall not be required to, setoff against the payment of any Claim or other Distributions to be made pursuant to the Plan in respect of such Claim of any nature whatsoever that NNIII may have against the Holder of such Claim; *provided*, *however*, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by NNIII of any such claim NNIII may have against such Holder.

**10.10  Distribution Record Date.**  As of the close of business on the Distribution Record Date, the register for NNIII shall be closed and there shall be no further changes to the record holder of any of the Claims or Interests.  NNIII and the Plan Administrator shall have no obligation to recognize any transfer of any Claims or Interests occurring after the close of business on the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder only with those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

**10.11  Allocation of Distributions.**  Distributions to any Holder of an Allowed Claim shall be allocated first to the principal portion of any such Allowed Claim (as determined for federal income tax purposes) and, only after the principal portion of any such Allowed Claim is satisfied in full, to any portion of such Allowed Claim comprising interest (but solely to the extent that interest is an allowable portion of such Allowed Claim).

## ARTICLE 11.
## PROCEDURES FOR TREATING DISPUTED CLAIMS

**11.1  Objections.**  Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, as of the Effective Date, objections to, and requests for estimation of, all Claims against NNIII may be interposed and prosecuted only by the Plan Administrator, who shall consult with Wind-Down NNIII regarding the same.  Objections to and requests for estimation of Claims shall be Filed and served on the claimant on or before the first Business Day that is one hundred and eighty (180) days after the Effective Date (the "**Claims Objection Deadline**") or such later date as is established by the filing of a notice by Wind-Down NNIII or the Plan Administrator prior to the expiration of the then-current Claims Objection Deadline.

**11.2    No Distributions Pending Allowance.**  Notwithstanding any other provision hereof, if any portion of a Claim is a Disputed Claim, no Distribution shall be made on account of the disputed portion of such Claim unless and until such disputed portion of such Claim becomes Allowed.

**11.3    Estimation of Claims.**  The Plan Administrator may at any time request that the Bankruptcy Court estimate for any purpose including Distribution any contingent, unliquidated or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code or otherwise, regardless of whether NNIII previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection.

**11.4    Resolution of Disputed Claims.**  On and after the Effective Date, the Plan Administrator shall have the authority to compromise, settle or otherwise resolve or withdraw any objections to Claims and to compromise, enter into protocols for the resolution of, settle or otherwise resolve any Disputed Claims regardless of whether such Claims are in a Class or otherwise (at Wind-Down NNIII's or the Plan Administrator's sole discretion with or without Bankruptcy Court approval).  On and after the Effective Date, the Plan Administrator shall have the sole authority to administer and adjust the Claims Register to reflect any such settlements or compromises without further notice to or action, order or hearing of the Bankruptcy Court.

**11.5    No Interest.**  Holders of Disputed Claims shall not be entitled to interest if such Disputed Claim becomes an Allowed Claim.

**11.6    No Amendments to Claims.**  A Claim may be amended before the Confirmation Date only as agreed upon by NNIII and the Holder of such Claim or as otherwise permitted by the Bankruptcy Court, the Bankruptcy Rules or applicable law.  On or after the Confirmation Date, the Holder of a Claim (other than an Administrative Expense Claim or a Professional Claim) must obtain prior authorization from the Bankruptcy Court or Wind-Down NNIII to File or amend a Claim. Any new or amended Claim Filed after the Confirmation Date without such prior authorization will not appear on the Claims Register and will be deemed disallowed in full and expunged without any action required by NNIII or Wind-Down NNIII and without the need for any court order.

**11.7    No Late-Filed Claims**.  In accordance with section 502(b)(9) of the Bankruptcy Code, any entity that failed to File a proof of Claim by the applicable bar date set by the Bankruptcy Court in the Chapter 11 Case and was not otherwise permitted to File a proof of claim after the applicable bar date by a Final Order of the Bankruptcy Court is and shall be barred, estopped and enjoined from asserting any Claim against NNIII (a) in an amount that exceeds the amount, if any, that is identified in the Schedules on behalf of such entity as undisputed, noncontingent and liquidated or (b) of a different nature or a different classification than any Claim identified in the Schedules on behalf of such Entity.  NNIII and Wind-Down NNIII shall be entitled, for the purposes of Distributions, reserves and other similar purposes under this Plan, to treat all Claims Filed after the later of (a) the Effective Date and (b) the Claim's applicable bar date, as disallowed and expunged.

## ARTICLE 12.
## CONDITIONS PRECEDENT

**12.1    Conditions to the Effective Date.**  The following are conditions precedent to the Effective Date of the Plan:

(a)    All actions and agreements, instruments, certificates or other documents necessary to implement the terms and provisions of the Plan are effected or executed and delivered, as applicable, in form and substance satisfactory to NNIII.

(b)    All authorizations, consents and regulatory approvals, if any, required in connection with the consummation of the Plan are obtained and not revoked.

(c)    The amended organizational documents of Wind-Down NNIII shall have been filed with the applicable authorities of its jurisdiction of incorporation or formation in accordance with such jurisdiction's applicable laws.

(d)    All statutory fees then due to the U.S. Trustee shall have been paid in full by NNIII pursuant to the Plan.

(e)    The Confirmation Order shall have been entered by the Bankruptcy Court, and thereafter shall have become a Final Order.

(f)    The SPSA shall not have been terminated.

(g)    An order (or orders) recognizing the Confirmation Order shall have been granted by the CCAA Court in the proceedings commenced in respect of NNIII under section 18.6 of the CCAA.

(h)    The Indian Tax Appeal Litigation shall have been withdrawn with prejudice or otherwise finally resolved to the satisfaction of the U.S. Principal Officer in his sole discretion.

**12.2    Waiver of Conditions.**  Notwithstanding the foregoing, NNIII reserves its right to waive the occurrence of the conditions precedent to the Effective Date set forth in Section 12.1 of the Plan, other than Section 12.1(f) of the Plan.  Any such waiver may be given effect at any time, without notice, leave, hearing or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan, provided that notice of any such waiver shall promptly be provided to the SPSA Parties.  Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.  If NNIII decides that one of the conditions precedents to the Effective Date of its Plan cannot be satisfied and the occurrence or such condition is not waived or cannot be waived, then NNIII shall file a notice of the inability to satisfy such condition with the Bankruptcy Court.  The failure of NNIII to exercise any of the foregoing rights shall not be deemed a waiver of any other rights and each right shall be deemed an ongoing right that may be asserted at any time.

12.3    **Notice of Effective Date.**  Upon the occurrence of the Effective Date or as soon thereafter as is reasonably practicable, Wind-Down NNIII shall File with the Bankruptcy Court the "Notice of Effective Date" in a form reasonably acceptable to Wind-Down NNIII in its sole discretion, which notice shall constitute appropriate and adequate notice that the Plan has become effective; *provided*, *however*, that Wind-Down NNIII shall have no obligation to notify any Person.  The Plan shall be deemed to be effective as of 12:01 a.m., prevailing Eastern Standard Time, on the date of such filing.  A courtesy copy of the Notice of Effective Date may be sent by United States mail, postage prepaid (or at Wind-Down NNIII's option, by courier, facsimile or electronic mail) to those Persons who have Filed with the Bankruptcy Court requests for notices pursuant to Bankruptcy Rule 2002.

12.4    **Dismissal or Conversion.**  NNIII or Wind-Down NNIII reserve the right to dismiss or convert the Chapter 11 Case as necessary to effectuate the SPSA and the settlement contemplated therein or to wind down and cease operations. NNIII or Wind-Down NNIII shall coordinate with the SPSA Parties to make any required amendments or seek any required waivers to or under the SPSA in order to implement any such actions, subject to the SPSA Parties' rights under the SPSA.

## ARTICLE 13.
## EFFECT OF CONFIRMATION

### 13.1    Binding Effect; Plan Binds All Holders of Claims and Interests.

(a)    Except as otherwise provided in section 1141(d) of the Bankruptcy Code, on and after the Effective Date, the provisions of the Plan shall, and shall be deemed to, be binding on any Holder of a Claim against or Interest in NNIII and its respective successors and assigns, regardless of whether the Claim or Interest of such Holder is Impaired under the Plan and whether or not such Holder has voted or failed to vote to accept or reject the Plan.

(b)    Further, pursuant to section 1142 of the Bankruptcy Code and in accordance with the Confirmation Order, NNIII and any other necessary party shall execute, deliver and join in the execution or delivery (as applicable) of any instrument, document or agreement required to consummate the Plan, and to perform any other act, and the execution of documents contemplated in the Plan that are necessary for the consummation of the Plan and the transactions contemplated herein.

### 13.2    Release and Discharge of NNIII and Wind-Down NNIII.

**EFFECTIVE AS OF THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION, TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, THE HOLDERS OF CLAIMS AGAINST AND INTERESTS IN NNIII AND EACH OF SUCH HOLDERS' PREDECESSORS, SUCCESSORS, ASSIGNS AND EACH OF THEIR PRESENT AND FORMER OFFICERS, DIRECTORS, EMPLOYEES, CONSULTANTS AND AGENTS (ACTING IN SUCH CAPACITY) WILL BE DEEMED TO HAVE WAIVED, RELEASED, VOIDED AND DISCHARGED EACH OF NNIII AND WIND-DOWN NNIII FROM ANY AND ALL CLAIMS, OBLIGATIONS, DAMAGES, DEMANDS, DEBTS, RIGHTS, SUITS, JUDGMENTS OR LIABILITIES**

(OTHER THAN THE RIGHT TO ENFORCE NNIII'S OR WIND-DOWN NNIII'S OBLIGATIONS UNDER THIS PLAN, THE SPSA AND THE CONTRACTS, INSTRUMENTS, RELEASES, AGREEMENTS AND DOCUMENTS DELIVERED UNDER THIS PLAN), WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, THEN EXISTING OR THEREAFTER ARISING, IN LAW, EQUITY OR OTHERWISE, THAT ARE BASED IN WHOLE OR IN PART ON ANY ACT OR OMISSION, TRANSACTION, EVENT OR OTHER OCCURRENCE TAKING PLACE ON OR PRIOR TO THE EFFECTIVE DATE IN ANY WAY RELATING TO NNIII, THE CHAPTER 11 CASES, THE DISCLOSURE STATEMENT OR THE PLAN (INCLUDING, WITHOUT LIMITATION, THE SOLICITATION OF VOTES ON THE PLAN) THAT COULD HAVE BEEN ASSERTED BY THE HOLDERS OF CLAIMS AGAINST OR INTERESTS IN NNIII, IN THEIR INDIVIDUAL CAPACITIES OR ON BEHALF (WHETHER DIRECTLY OR DERIVATIVELY) OF NNIII, ITS ESTATE, WIND-DOWN NNIII, EACH OF THEIR PREDECESSORS, SUCCESSORS, ASSIGNS AND EACH OF THEIR PRESENT AND FORMER OFFICERS, DIRECTORS, EMPLOYEES, CONSULTANTS AND AGENTS (ACTING IN SUCH CAPACITY), IN EACH CASE WITHOUT FURTHER NOTICE TO OR ORDER OF THE BANKRUPTCY COURT, ACT OR ACTION UNDER APPLICABLE LAW, REGULATION, ORDER OR RULE OR THE VOTE, CONSENT OR AUTHORIZATION OR APPROVAL OF ANY PERSON.

        13.3     Release and Discharge of the Plan Released Parties.

        EFFECTIVE AS OF THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION, TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, THE HOLDERS OF CLAIMS AGAINST AND INTERESTS IN NNIII AND EACH OF SUCH HOLDERS' PREDECESSORS, SUCCESSORS, ASSIGNS AND EACH OF THEIR PRESENT AND FORMER OFFICERS, DIRECTORS, EMPLOYEES, CONSULTANTS AND AGENTS (ACTING IN SUCH CAPACITY) WHO: (I) EITHER VOTE TO ACCEPT THIS PLAN OR ARE PRESUMED TO HAVE VOTED FOR THIS PLAN UNDER SECTION 1126(F) OF THE BANKRUPTCY CODE OR (II) ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THIS PLAN AND ABSTAIN FROM VOTING AND DO NOT MARK THEIR BALLOTS TO INDICATE THEIR REFUSAL TO GRANT THE RELEASES PROVIDED HEREIN WILL BE DEEMED TO HAVE WAIVED, RELEASED, VOIDED AND DISCHARGED EACH OF THE PLAN RELEASED PARTIES FROM ANY AND ALL CLAIMS, OBLIGATIONS, DAMAGES, DEMANDS, DEBTS, RIGHTS, SUITS, JUDGMENTS OR LIABILITIES (OTHER THAN THE RIGHT TO ENFORCE THE PLAN RELEASED PARTIES' OBLIGATIONS UNDER THIS PLAN, THE SPSA AND THE CONTRACTS, INSTRUMENTS, RELEASES, AGREEMENTS AND DOCUMENTS DELIVERED UNDER THIS PLAN), WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, THEN EXISTING OR THEREAFTER ARISING, IN LAW, EQUITY OR OTHERWISE, THAT ARE BASED IN WHOLE OR IN PART ON ANY ACT OR OMISSION, TRANSACTION, EVENT OR OTHER OCCURRENCE TAKING PLACE ON OR PRIOR TO THE EFFECTIVE DATE IN ANY WAY RELATING TO NNIII,

**THE CHAPTER 11 CASE, THE DISCLOSURE STATEMENT, THE SPSA OR THE PLAN (INCLUDING, WITHOUT LIMITATION, THE SOLICITATION OF VOTES ON THE PLAN) THAT COULD HAVE BEEN ASSERTED BY THE HOLDERS OF CLAIMS AGAINST OR INTERESTS IN NNIII, IN THEIR INDIVIDUAL CAPACITIES OR ON BEHALF (WHETHER DIRECTLY OR DERIVATIVELY) OF NNIII, ITS ESTATE, WIND-DOWN NNIII, EACH OF THEIR PREDECESSORS, SUCCESSORS, ASSIGNS AND EACH OF THEIR PRESENT AND FORMER OFFICERS, DIRECTORS, EMPLOYEES, CONSULTANTS AND AGENTS (ACTING IN SUCH CAPACITY), IN EACH CASE WITHOUT FURTHER NOTICE TO OR ORDER OF THE BANKRUPTCY COURT, ACT OR ACTION UNDER APPLICABLE LAW, REGULATION, ORDER OR RULE OR THE VOTE, CONSENT OR AUTHORIZATION OR APPROVAL OF ANY PERSON.**

**NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS SECTION 13.3 OR SECTION 13.2 HEREOF, THE RELEASES SET FORTH ABOVE DO NOT RELEASE (I) ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, OR ANY DOCUMENT, INSTRUMENT OR AGREEMENT EXECUTED TO IMPLEMENT THE PLAN OR  (II) ANY OBLIGATIONS (WHETHER PRE- OR POST-EFFECTIVE DATE) UNDER THE NNI PLAN OR THE SPSA OR ANY DOCUMENT, INSTRUMENT OR ARGREEMENT EXECUTED TO IMPLEMENT THE NNI PLAN OR THE SPSA, AND EXCEPT AS OTHERWISE PROVIDED BY PRIOR OR SUBSEQUENT FINAL ORDER OF THE BANKRUPTCY COURT, NOTHING IN THIS SECTION 13.3 OR SECTION 13.2 SHALL OPERATE AS A WAIVER OR RELEASE OF (A) ANY PERSON (I) NAMED PRIOR TO THE EFFECTIVE DATE AS A DEFENDANT IN ANY ACTION COMMENCED BY OR ON BEHALF OF NNIII OR (II) ADJUDICATED PRIOR TO THE EFFECTIVE DATE BY A COURT OF COMPETENT JURISDICTION TO HAVE ENGAGED IN ACTS OF DISHONESTY OR WILLFUL MISCONDUCT DETRIMENTAL TO THE INTEREST OF NNIII OR (B) ANY CLAIM (I) WITH RESPECT TO ANY LOAN, ADVANCE OR SIMILAR PAYMENT BY NNIII TO ANY SUCH PERSON, (II) WITH RESPECT TO ANY CONTRACTUAL OBLIGATION OWED BY SUCH PERSON TO NNIII OR (III) RELATING TO SUCH PERSON'S KNOWING FRAUD, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT; AND *PROVIDED*, *FURTHER*, THAT THE FOREGOING IS NOT INTENDED, NOR SHALL IT BE CONSTRUED, TO RELEASE ANY OF NNIII'S CLAIMS THAT MAY EXIST AGAINST NNIII'S DIRECTORS AND OFFICERS LIABILITY INSURANCE; AND *PROVIDED*, *FURTHER*, THAT, NOTWITHSTANDING THE FOREGOING, ALL SUCH CLAIMS SHALL BE PRESERVED BY NNIII FOR SETOFF PURPOSES.**

13.4    **SPSA Releases.**

**UPON THE EFFECTIVE DATE, AS PROVIDED IN SECTION 8 OF THE SPSA AND IN CONSIDERATION FOR THE SETTLEMENTS PROVIDED FOR UNDER THE SPSA INCLUDING THE RELEASES GRANTED IN FAVOR OF NNIII UNDER THE SPSA, NNIII AND THE OTHER DEBTOR RELEASING PARTIES, TO THE EXTENT NOT PREVIOUSLY RELEASED PURSUANT TO THE 9019 APPROVAL ORDER OR OTHERWISE, SHALL BE DEEMED TO HAVE RELEASED**

**AND FOREVER DISCHARGED EACH OF THE OTHER SPSA RELEASED PARTIES FROM ANY AND ALL LIABILITY FOR CLAIMS, DEFENSES, DEMANDS, LIABILITIES, DAMAGES, ACTIONS, CONTRIBUTIONS, SUBROGATION, CAUSES OF ACTION, SETOFFS, RECOUPMENTS, COSTS AND EXPENSES (INCLUDING LAWYERS' OR OTHER FEES OR EXPENSES), THE FOREGOING TERMS TO BE CONSTRUED AS BROADLY AS POSSIBLE, WHETHER KNOWN OR UNKNOWN, PAST OR PRESENT, FIXED OR CONTINGENT, LIQUIDATED OR UNLIQUIDATED, WHICH ANY OF THE DEBTOR RELEASING PARTIES HAVE, HAD, MAY HAVE HAD OR HEREAFTER MAY HAVE HOWEVER SO ARISING OUT OF OR IN CONNECTION WITH THE ALLOCATION DISPUTE, ANY OTHER MATTERS RESOLVED UNDER THE SPSA OR ANY OTHER MATTER RELATING TO THE CHAPTER 11 CASES OR THE FOREIGN PROCEEDINGS OR THE NORTEL GROUP (COLLECTIVELY, AND EXCLUDING THE NON-RELEASED MATTERS, THE "SPSA RELEASED CLAIMS") AND UNDERTAKES, COVENANTS AND AGREES NOT TO MAKE ANY CLAIM, PARTICIPATE IN ANY PROCEEDING OR TAKE ANY ACTION AGAINST ANY OTHER PERSON OR ENTITY WHO WOULD AS A RESULT OF SUCH CLAIM, PROCEEDING OR ACTION HAVE A CLAIM FOR CONTRIBUTION OR INDEMNITY AGAINST ANY OF THE OTHER SPSA RELEASED PARTIES IN RELATION TO THE SPSA RELEASED CLAIMS, *PROVIDED HOWEVER*, THAT NNIII'S RIGHT TO OBJECT TO, OR ASSERT COUNTERCLAIMS FOR PURPOSES OF SETOFF AGAINST, CLAIMS MADE AGAINST IT BY DIRECTORS AND OFFICERS OF ANY ENTITY IN THE NORTEL GROUP IS NOT RELEASED OR IN ANY WAY COMPROMISED. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS PARAGRAPH, THE RELEASES SET FORTH ABOVE IN THIS SECTION 13.4 DO NOT CONSTITUTE A RELEASE, WAIVER OR DISCHARGE OF THE INTERCOMPANY CLAIMS SPECIFIED ON ANNEX L TO THE SPSA, ANY CLAIM BETWEEN OR AMONG ANY OF THE FORMER DEBTORS AND THEIR SUBSIDIARIES, OR ANY CLAIM TO ENFORCE THE TERMS OF THE SPSA, THE PLAN, THE NNI PLAN, THE CANADIAN PLAN AND ANY ORDER OF THE BANKRUPTCY COURT OR THE CCAA COURT RELATED THERETO (COLLECTIVELY, THE "NON-RELEASED MATTERS").**

13.5    Exculpation and Limitation of Liability.

**None of the Exculpated Parties shall have or incur any liability to any Entity for any act taken or omitted to be taken in connection with and subsequent to the commencement of the Chapter 11 Cases, the formulation, preparation, dissemination, implementation, solicitation of votes, confirmation or approval of the Plan or any compromises or settlements contained therein, the administration of the Plan or Distributions under the Plan, the Disclosure Statement and any ancillary documents related thereto or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan; *provided*, *however*, the foregoing provisions of this Section 13.5 shall not affect the liability of any Exculpated Party that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct, including, without limitation, fraud and criminal misconduct, and in all respects the Exculpated Parties shall be entitled to**

**reasonably rely upon the advice of counsel with respect to their duties and responsibilities under this Plan.**

13.6    **Injunction on Claims.**

**Except as otherwise expressly provided in the Plan, the Confirmation Order or such other order of the Bankruptcy Court that may be applicable, all Holders of Claims or other debt or liability that is treated under the Plan or Interest or other right of interest that is terminated or cancelled pursuant to the Plan are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or other debt or liability or Interest or other right of equity interest that is terminated or cancelled pursuant to the Plan against NNIII, NNIII's Estate or Wind-Down NNIII or any properties or interest in properties of NNIII or Wind-Down NNIII, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against NNIII, NNIII's Estate or Wind-Down NNIII or any properties or interest in properties of NNIII or Wind-Down NNIII, (c) creating, perfecting or enforcing any encumbrance of any kind against NNIII, NNIII's Estate or Wind-Down NNIII or any properties or interest in properties of NNIII or Wind-Down NNIII, (d) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from NNIII, NNIII's Estate or Wind-Down NNIII or any properties or interest in properties of NNIII or Wind-Down NNIII, (e) acting or proceeding in any manner that does not conform to or comply with the provisions of the Plan or (f) taking any actions to interfere with the implementation or consummation of the Plan, with respect to any such Claim or other debt or liability that is discharged or Interest or other right of equity interest that is terminated or cancelled pursuant to the Plan.**

13.7    **Terms of Injunctions or Stays.**  Unless otherwise provided in the Plan, the Confirmation Order or a separate order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Case under sections 105 and 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date shall remain in full force and effect until the Effective Date.  Upon the Effective Date, all injunctions or stays provided for in each Chapter 11 Case under sections 105 or 362 of the Bankruptcy Code, or otherwise, shall be lifted and of no further force or effect—being replaced, to the extent applicable, by the injunctions, discharges, releases and exculpations of this Article 13.

13.8    **Retention of Litigation Claims and Reservation of Rights.**

(a)    Except as expressly provided in the Plan, nothing contained in the Plan or in the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights with respect to Litigation Claims that NNIII, Wind-Down NNIII or the Plan Administrator may have or choose to assert on behalf of NNIII's Estate or Wind-Down NNIII under any provision of the Bankruptcy Code or any applicable non-bankruptcy law, including, without limitation, any and all claims against any Person or Entity, to the extent such Person or Entity asserts a cross-claim, counterclaim or claim for setoff that seeks affirmative relief against NNIII, its officers, directors or representatives.

(b)     Except as expressly provided in the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any Litigation Claim, right of setoff or other legal or equitable defense that NNIII had immediately prior to the Petition Date, against or with respect to any Claim.  NNIII, Wind-Down NNIII and the Plan Administrator shall have, retain, reserve and be entitled to assert all such Litigation Claims, rights of setoff and other legal or equitable defenses that NNIII had immediately prior to the Petition Date fully as if the Chapter 11 Case had not been commenced, and all of NNIII's legal and equitable rights respecting any Claim may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Case had not been commenced.

(c)     Except as expressly provided in the Plan, the Plan Administrator, shall, after the Effective Date, retain the rights of NNIII to prosecute any Litigation Claims that could have been brought by NNIII at any time.

**13.9     Retention of Rights.**  The Plan Administrator and Wind-Down NNIII shall retain the rights of NNIII to enforce all orders entered and relief granted in the Chapter 11 Case.

**13.10     Vesting.**  Except as otherwise expressly provided in the Plan or the SPSA, or any documents or instruments executed in accordance therewith, on the Effective Date, pursuant to section 1141(b) and section 1141(c) of the Bankruptcy Code, Wind-Down NNIII shall be vested with all of the Assets of NNIII's Estate free and clear of all Claims, Interests, Liens, encumbrances, charges and other interests of Creditors and Holders of Interests, and may operate free of any restrictions imposed by the Bankruptcy Code or by the Bankruptcy Court, including, without limitation, performing any contract or lease entered into or assumed by NNIII after the Petition Date.  NNIII shall continue as Debtor-in-Possession under the Bankruptcy Code until the Effective Date, and thereafter, subject to the terms of the Plan, Wind-Down NNIII may operate free of any restrictions imposed by the Bankruptcy Code or the Bankruptcy Court.

## ARTICLE 14.
## RETENTION OF JURISDICTION

Pursuant to sections 105 and 1142 of the Bankruptcy Code, and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising in, arising under or related to the Chapter 11 Case and this Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

(a)     Allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the allowance or priority of all Claims and Interests;

(b)     Hear and determine any and all Causes of Action against any Person and rights of NNIII and Wind-Down NNIII that arose before or after the Petition Date, including, but not limited to, the rights and powers of a trustee and Debtor-in-Possession against any Person whatsoever, including, but not limited to, all avoidance powers granted to NNIII

under the Bankruptcy Code and all Causes of Action and remedies granted pursuant to sections 502, 506, 510, 541, 542, 543, 544, 545, 547 through 551 and 553 of the Bankruptcy Code;

        (c)     Grant or deny any applications for allowance of compensation for Professionals authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or prior to the Effective Date; *provided*, *however*, that the payment of all fees and expenses of Wind-Down NNIII and the Plan Administrator incurred from and after the Effective Date, including counsel fees, shall be made in the ordinary course and without further notice or Bankruptcy Court approval;

        (d)     Resolve any matters relating to the assumption, assumption and assignment or rejection of any executory contract or unexpired lease to which NNIII is or was a party or with respect to which NNIII may be liable, including, without limitation, the determination of whether such contract is executory for the purposes of section 365 of the Bankruptcy Code, and hear, determine and, if necessary, liquidate any Claims arising therefrom;

        (e)     Enter orders approving Wind-Down NNIII's post-Confirmation sale or other disposition of Residual Assets upon motion by the Plan Administrator;

        (f)     Ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

        (g)     Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving NNIII that may be pending in the Chapter 11 Case on the Effective Date;

        (h)     Hear and determine matters concerning state, local or federal taxes in accordance with sections 346, 505, 1129 or 1146 of the Bankruptcy Code;

        (i)     Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and the Confirmation Order and all contracts, instruments, releases and other agreements or documents created in connection with this Plan, the Disclosure Statement or the Confirmation Order;

        (j)     Hear and determine any matters concerning the enforcement of the provisions of Article 13 of this Plan and any other exculpations, limitations of liability or injunctions contemplated by this Plan;

        (k)     Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or the Confirmation Order;

        (l)     Permit NNIII, to the extent authorized pursuant to section 1127 of the Bankruptcy Code, to modify the Plan, Confirmation Order or any agreement, contract, instrument release or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in the Plan or any agreement, contract, instrument, release or document created in connection with the Plan;

(m)     Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with respect to consummation, implementation or enforcement of the Plan or the Confirmation Order;

(n)     Enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings, including with respect to the Plan and the Confirmation Order, entered in connection with the Chapter 11 Case;

(o)     Hear and determine Causes of Action by or on behalf of NNIII or Wind-Down NNIII or the Plan Administrator;

(p)     Enter and enforce such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated, or Distributions pursuant to the Plan are enjoined or stayed;

(q)     Hear and determine all claims, rights or disputes arising under or in connection with the orders previously entered in the Chapter 11 Case;

(r)     Hear and determine any other matters that may arise in connection with or relating to the Plan, the Confirmation Order, the SPSA, the Plan Administration Agreement or any agreement, contract, instrument release or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

(s)     Enter any orders in aid of and resolve any matters relating to or arising under prior orders of the Bankruptcy Court; and

(t)     Enter a final decree closing the Chapter 11 Case.

## ARTICLE 15.
## MISCELLANEOUS PROVISIONS

**15.1    Effectuating Documents and Further Transactions.**  NNIII and Wind-Down NNIII and, on and after the Effective Date, the Plan Administrator shall be authorized to execute, deliver, file or record such contracts, instruments, releases, consents, certificates, resolutions, programs and other agreements or documents and take such acts and actions as may be reasonable, necessary or appropriate to effectuate, implement, consummate or further evidence the terms and conditions of this Plan, the Confirmation Order and any transactions described in or contemplated by this Plan, without the need for any approvals, authorization or consents except for those expressly required pursuant to the Plan.

**15.2    Authority to Act.**  All matters expressly provided for under this Plan that would otherwise require approval of the stockholders, security holders, officers, directors, partners, managers, members or other owners of NNIII or Wind-Down NNIII or one or more of the Former Debtors shall be deemed to have occurred and shall be in effect prior to, on or after the Effective Date (as appropriate) pursuant to the applicable law of the states in which NNIII or Wind-Down NNIII are formed, without any requirement of further vote, consent, approval, authorization or other action by such stockholders, security holders, officers, directors, partners,

managers, members or other owners of such entities or notice to, order of or hearing before the Bankruptcy Court.

**15.3    Amendment or Modification of the Plan.**  Subject to Section 6(c) of the SPSA and subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123 and 1125 of the Bankruptcy Code, NNIII reserves the right to alter, amend or modify the Plan at any time prior to the Confirmation Date but prior to the substantial consummation of the Plan.  Notwithstanding the foregoing, NNIII shall not alter, amend, withdraw, replace or modify the Plan in a manner that is inconsistent with its obligations under the SPSA.  A Holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claims of such Holder and is consistent with this Section 15.3.  For the avoidance of doubt, nothing in this Section 15.3 limits any SPSA Party's rights pursuant to Section 6(h) of the SPSA with respect to any proposed amendment, restatement, modification and/or supplement to the Plan.

**15.4    Administrative Expense Claims Reserve.**  On or before the Effective Date, NNIII shall reserve for an estimated amount for unpaid Professional Claims and any other Administrative Expense Claims that have not been Filed as of the Effective Date (the "Administrative Expense Claims Reserve").  The balance of the Cash held in the Administrative Expense Claims Reserve, if any, after all Professional Claims and Administrative Expense Claims have been paid, and Distributions made in accordance with the Plan, shall be available for Distribution to Holders of Allowed Claims, in accordance with the provisions of the Plan and the Confirmation Order.

**15.5    Fees and Expenses.**  From and after the Effective Date, Wind-Down NNIII shall, in the ordinary course and without the necessity for any approval by the Bankruptcy Court, pay the reasonable and necessary fees and expenses incurred by the Disbursing Agent and Plan Administrator in accordance with and from the funds provided for such use in this Plan.

**15.6    Revocation or Withdrawal of the Plan.**  Subject to the terms of the SPSA, NNIII reserves the right to revoke or withdraw the Plan prior to the Effective Date.  If NNIII revokes or withdraws the Plan, or if Confirmation does not occur or if the Plan does not become effective, then the Plan shall be null and void, and nothing contained in the Plan or Disclosure Statement shall: (a) constitute a waiver or release of any Claims by or against, or any Interests in, NNIII or any other Person; (b) constitute an admission of any fact or legal conclusion by NNIII or any other Entity or (c) prejudice in any manner the rights of NNIII in any further proceedings involving NNIII.

**15.7    Insurance Preservation.**  Nothing in the Plan, including any releases, shall diminish or impair the enforceability of any insurance policies or other policies of insurance that may cover insurance claims or other claims against NNIII or any other Person.

**15.8    Exemption from Certain Transfer Taxes.**  Pursuant to section 1146 of the Bankruptcy Code, any transfers from NNIII, Wind-Down NNIII or the Plan Administrator pursuant to, in furtherance of or in connection with this Plan shall not be subject to any stamp tax, recording tax, personal property tax, real estate transfer tax, sales tax, use tax, transaction

privilege tax, privilege taxes or other similar tax, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**15.9    Subordinated Claims.**  The allowance, classification and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, NNIII reserves the right for the Plan Administrator to re-classify any Allowed Claim or Interest in accordance with any contractual, legal or equitable subordination relating thereto.

**15.10   Cross-Border Protocol and Cross-Border Claims Protocol.**  The Cross-Border Protocol and Cross-Border Claims Protocol shall each remain in full force and effect in accordance with their respective terms.

**15.11   Governing Law.**  Unless a rule of law or procedure is supplied by (a) United States federal law (including the Bankruptcy Code and Bankruptcy Rules) or (b) an express choice of law provision in any agreement, contract, instrument or document provided for, or executed in connection with, the Plan, the rights and obligations arising under the Plan and any agreements, certificates, by-laws, releases, contracts, documents and instruments executed in connection with the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof.

**15.12   No Admissions.**  Notwithstanding anything herein to the contrary, nothing in the Plan shall be deemed as an admission by NNIII with respect to any matter set forth herein, including liability on any Claim.

**15.13   Severability of Plan Provisions.**  Subject to the terms of the SPSA, if, prior to Confirmation, any term or provision of the Plan that does not govern the treatment of Claims or Interests is held by the Bankruptcy Court to be invalid, void or unenforceable, at the request of NNIII the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a final judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**15.14   Successors and Assigns.**  This Plan shall be binding upon and inure to the benefit of NNIII and its successors and assigns, including, without limitation, Wind-Down NNIII.

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

**15.15    Defenses with Respect to Unimpaired Claims.**  Except as otherwise provided in this Plan, nothing shall affect the rights and legal and equitable defenses of NNIII, Wind-Down NNIII or the Plan Administrator with respect to any Unimpaired Claim, including all rights in respect of legal and equitable defenses to setoffs or recoupments against Unimpaired Claims.

**15.16    Section 1125(e) Good Faith Compliance.**  Confirmation of the Plan shall act as a finding by the Bankruptcy Court that NNIII and each of its representatives have acted in "good faith" under section 1125(e) of the Bankruptcy Code**.**

**15.17    No Injunctive Relief.**  Except as otherwise provided in the Plan or Confirmation Order, no Claim or Interest shall under any circumstances be entitled to specific performance or other injunctive, equitable or other prospective relief.

**15.18    Payment of Statutory Fees.**  All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court, shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Case is converted, dismissed or closed, whichever occurs first.

**15.19    Saturday, Sunday or Legal Holiday.**  If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

**15.20    Reservation of Rights**.  Except as expressly set forth herein, the Plan shall have no force or effect unless and until the Effective Date occurs.  Neither the filing of the Plan, any statement or provision contained herein, nor the taking of any action by NNIII or any Entity with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) NNIII with respect to the Holders of Claims or Interests or other parties-in-interest; or (2) any Holder of a Claim or Interest or other party-in-interest prior to the Effective Date.

**15.21    Post-Effective Date Rule 2002 Notice List**.  After the Effective Date, any Entity that, prior to the Effective Date, had requested from NNIII or the Claims Agent to receive notice in the Chapter 11 Case pursuant to Bankruptcy Rule 2002 must renew such request in writing to the Claims Agent in order to be included on the list of entities entitled to receive documents from Wind-Down NNIII pursuant to Bankruptcy Rule 2002 (the "**Post-Effective Date Notice List**").  On and after the Effective Date, Wind-Down NNIII is authorized to limit the list of entities receiving documents pursuant to Bankruptcy Rule 2002 to those entities that request to be included on the Post-Effective Date Notice List.

**15.22    Right to Abandon and Dispose of Debtor Property, Books & Records**.  After the Effective Date, notwithstanding any prior order of the Bankruptcy Court, the Plan Administrator shall give notice of a proposed abandonment or disposition of property by filing a notice on the docket of the Chapter 11 Case and delivering a copy of such notice to the Canadian

Debtors and the Monitor; *provided*, *however*, that the Plan Administrator shall be entitled to abandon, dispose of and/or destroy Records (as defined in the Abandonment and Disposal Procedures Order), without notice and without complying with any Retention Laws (as defined in the Abandonment and Disposal Procedures Order), in accordance with the terms of the Abandonment and Disposal Procedures Order and the Document Disposal Procedures (as defined in the Abandonment and Disposal Procedures Order) attached to the Abandonment and Disposal Procedures Order as Exhibit 1; *provided further*, *however*, that the destruction or other disposition of any Servers or Related Equipment (each as defined in the Server Access and Disposition Order) shall be governed by the Server Access and Disposition Order and NNIII shall only be required to provide written confirmation to the EMEA Debtors of such destruction or other disposition and the means of such destruction or other disposition.  The filing of a notice of abandonment or disposition on the docket pursuant to this Section 15.22 shall constitute good and sufficient notice, and no other or further notice of proposed abandonment or disposition is necessary.  If no party serves an objection within thirty (30) days of the posting of such notice, the Plan Administrator shall be authorized immediately to abandon or dispose of such property.

     **15.23   Notices.**  Any notice required or permitted to be provided under this Plan shall be in writing and served by either (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery or (c) reputable overnight delivery service, freight prepaid, to be addressed as follows:

<u>Counsel for NNIII</u>

     Cleary Gottlieb Steen & Hamilton LLP
     One Liberty Plaza
     New York, NY 10006
     (212) 225-3999 (facsimile)
     Attn:   Lisa M. Schweitzer, Esq.

         - and -

     Morris, Nichols, Arsht & Tunnell LLP
     1201 North Market Street, 18th Floor
     P.O. Box 1347
     Wilmington, DE 19899
     (302) 658-3989 (facsimile)
     Attn:   Derek C. Abbott, Esq.
           Andrew R. Remming, Esq.

<u>The Plan Administrator</u>

     Owl Hill Advisory LLC
     Attn:   John J. Ray, III
     c/o Counsel for the Plan Administrator

<u>Counsel for the Plan Administrator</u>

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
(212) 225-3999 (facsimile)
Attn:   Lisa M. Schweitzer, Esq.

Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street, 18th Floor
P.O. Box 1347
Wilmington, DE 19899
(302) 658-3989 (facsimile)
Attn:   Derek C. Abbott, Esq.
          Andrew R. Remming, Esq.

Dated: July 20, 2021.

**Nortel Networks India International Inc.**


By: _____
      Name:  John J. Ray, III
      Title:   Principal Officer