**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

-----------------------------------------------------------X
|  | : |  |
| *In re* | : | Chapter 11 |
|  | : |  |
| Nortel Networks Inc., *et al.*,[1] | : | Case No. 09-10138 (CSS) |
|  | : |  |
| Wind-Down Debtors. | : | Jointly Administered |
|  | : |  |
|  | : |  |
-----------------------------------------------------------X
|  | : |  |
| *In re* | : | Chapter 11 |
|  | : |  |
| Nortel Networks India International Inc. | : | Case No. 16-11714 (CSS) |
|  | : |  |
| Debtor-In-Possession. | : | Jointly Administered |
|  | : |  |
|  | : |  |
-----------------------------------------------------------X

**CHAPTER 11 PLAN OF
NORTEL NETWORKS INDIA INTERNATIONAL INC.[2]**

**Lisa M. Schweitzer, Esq. (admitted *pro hac vice*)**
**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
**One Liberty Plaza**
**New York, NY 10006**

**Derek C. Abbott, Esq. (No. 3376)**
**Andrew R. Remming, Esq. (No. 5120)**
**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
**1201 North Market Street, 18th Floor**
**P.O. Box 1347**
**Wilmington, DE 19899**

*Attorneys for the Debtors and
Debtor-in-Possession*          Dated: August 26, 2021

---

[1]     The Wind-Down Debtors in these chapter 11 cases, along with the last four digits of each Wind-Down Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620) and Nortel Networks (CALA) Inc. (4226).  Contact information for the Former Debtors and their petitions are available at http://dm.epiq11.com/nortel.

[2]     This Plan is only a Chapter 11 Plan for Nortel Networks India International Inc.  The First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain of Its Affiliated Debtors [D.I. 17763] was confirmed on January 24, 2017 and went effective on May 8, 2017.

# TABLE OF CONTENTS

**Page**

### ARTICLE 1.
### DEFINITIONS, INTERPRETATION AND RULES OF CONSTRUCTION

| | | |
|---|---|---|
| **1.1** | **Scope of Definitions** | 1 |
| **1.2** | **Definitions** | 1 |
| **1.3** | **Rules of Interpretation** | 14 |
| **1.4** | **Exhibits to this Plan** | 15 |
| **1.5** | **Computation of Time** | 16 |

### ARTICLE 2.
### TREATMENT OF UNCLASSIFIED CLAIMS

| | | |
|---|---|---|
| **2.1** | **Administrative Expense Claims** | 16 |
| **2.2** | **Statutory Fees** | 17 |
| **2.3** | **Professional Claims** | 17 |
| **2.4** | **Priority Tax Claims** | 17 |

### ARTICLE 3.
### CLASSIFICATION OF CLAIMS AND INTERESTS

| | | |
|---|---|---|
| **3.1** | **Summary of Classifications** | 17 |
| **3.2** | **Classification and Treatment of Claims Against and Interests** | 18 |

### ARTICLE 4.
### TREATMENT OF CLAIMS AGAINST AND INTERESTS IN NNIII

| | | |
|---|---|---|
| **4.1** | **Class 1 – Priority Non-Tax Claims.** | 18 |
| **4.2** | **Class 2 – Secured Claims** | 19 |
| **4.3** | **Class 3 – General Unsecured Claims.** | 19 |
| **4.4** | **Class 4 – Interests.** | 20 |

### ARTICLE 5.
### ACCEPTANCE OR REJECTION OF THE PLAN

| | | |
|---|---|---|
| **5.1** | **Impaired Classes of Claims and Interests Entitled to Vote** | 20 |
| **5.2** | **Acceptance by an Impaired Class** | 20 |
| **5.3** | **Presumed Acceptances by Unimpaired Classes** | 20 |
| **5.4** | **Elimination of Vacant Classes; Deemed Acceptance by Non-Voting Classes.** | 20 |
| **5.5** | **Conversion or Dismissal of the Chapter 11 Case** | 21 |
| **5.6** | **Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code** | 21 |

# TABLE OF CONTENTS
(continued)

**Page**

ARTICLE 6.
IMPLEMENTATION OF THE PLAN

**6.1**   **General Settlement of Claims and Interests** ................................................ 21

**6.2**   **Plan Administrator.** ................................................................................... 21

**6.3**   **Intercompany Account Settlement** ............................................................ 23

**6.4**   **Settlement of Intercompany Claims and Other Matters** ............................ 23

**6.5**   **Administrative Expense Contribution and Quarterly Administrative Wind-Down Reimbursement Payments** ................................................................ 23

**6.6**   **Closing of Chapter 11 Case** ...................................................................... 23

ARTICLE 7.
THE SETTLEMENT AND PLANS SUPPORT AGREEMENT

**7.1**   **SPSA** ......................................................................................................... 24

**7.2**   **Cooperation** .............................................................................................. 24

**7.3**   **Settlement of Allocation Dispute** ............................................................. 24

**7.5**   **Estate Administration** ............................................................................... 24

**7.6**   **No Double-Recovery** ................................................................................. 24

**7.7**   **Post-Petition Date Interest** ....................................................................... 24

**7.8**   **Resolution of Certain Claims** ................................................................... 24

**7.9**   **Book Intercompany Claims** ...................................................................... 25

**7.10**   **Remaining Assets and Other Proceeds** .................................................... 25

**7.11**   **Debtor Disputes** ........................................................................................ 25

**7.12**   **SPSA Releases** .......................................................................................... 26

ARTICLE 8.
CORPORATE FORM AND ACTION

**8.1**   **NNIII Corporate Form and Vesting** .......................................................... 26

**8.2**   **Dissolution of Wind-Down NNIII** ............................................................. 26

**8.3**   **Post-Effective Date Management.** .............................................................. 26

**8.4**   **Corporate Existence** .................................................................................. 27

**8.5**   **Certificate of Incorporation or Certificate of Formation** ......................... 27

**8.6**   **Wind-Down** ............................................................................................... 27

**8.7**   **Other Corporate Action** ........................................................................... 27

ii

**TABLE OF CONTENTS**
(continued)

**Page**

ARTICLE 9.
TREATMENT OF EXECUTORY CONTRACTS

**9.1**    **Previous Assumption, Assignment and Rejection** ........................................ 28

**9.2**    **Rejection** ................................................................................................... 28

**9.3**    **Approval of Rejection; Rejection Damages Claims Bar Date** ................... 28

**9.4**    **Pre-existing Obligations to NNIII under Executory Contracts** ................... 28

ARTICLE 10.
PROVISIONS REGARDING VOTING AND DISTRIBUTIONS UNDER THE PLAN

**10.1**    **Voting of Claims** ...................................................................................... 28

**10.2**    **Nonconsensual Confirmation** .................................................................. 28

**10.3**    **Distributions of Creditor Proceeds** ........................................................ 29

**10.4**    **Minimum Distribution and Manner of Payment** ..................................... 29

**10.5**    **Limitation on Recovery** .......................................................................... 29

**10.6**    **Distributions Free and Clear** .................................................................. 29

**10.7**    **Delivery of Distributions and Undeliverable Distributions** ..................... 30

**10.8**    **Withholding and Reporting Requirements** ............................................. 30

**10.9**    **Time Bar to Cash Payment Rights** .......................................................... 30

**10.10**    **Distribution Record Date** ....................................................................... 31

**10.11**    **Allocation of Distributions** ..................................................................... 31

ARTICLE 11.
PROCEDURES FOR TREATING DISPUTED CLAIMS

**11.1**    **Objections** ............................................................................................... 31

**11.2**    **No Distributions Pending Allowance** ...................................................... 32

**11.3**    **Estimation of Claims** ............................................................................... 32

**11.4**    **Resolution of Disputed Claims** ............................................................... 32

**11.5**    **No Interest** .............................................................................................. 32

**11.6**    **No Amendments to Claims** ..................................................................... 32

**11.7**    **No Late-Filed Claims** .............................................................................. 32

ARTICLE 12.
CONDITIONS PRECEDENT

**12.1**    **Conditions to the Effective Date** ............................................................ 33

iii

**TABLE OF CONTENTS**
(continued)

**Page**

| | | |
|---|---|---|
| **12.2** | **Waiver of Conditions** | 33 |
| **12.3** | **Notice of Effective Date** | 34 |
| **12.4** | **Dismissal or Conversion** | 34 |

ARTICLE 13.
EFFECT OF CONFIRMATION

| | | |
|---|---|---|
| **13.1** | **Binding Effect; Plan Binds All Holders of Claims and Interests.** | 34 |
| **13.2** | **Release of NNIII and Wind-Down NNIII.** | 34 |
| **13.3** | **Release and Discharge of the Plan Released Parties** | 35 |
| **13.4** | **SPSA Releases** | 36 |
| **13.5** | **Exculpation and Limitation of Liability** | 37 |
| **13.6** | **Injunction on Claims** | 38 |
| **13.7** | **Terms of Injunctions or Stays** | 38 |
| **13.8** | **Retention of Litigation Claims and Reservation of Rights.** | 38 |
| **13.9** | **Retention of Rights** | 39 |
| **13.10** | **Vesting** | 39 |

ARTICLE 14.
RETENTION OF JURISDICTION

ARTICLE 15.
MISCELLANEOUS PROVISIONS

| | | |
|---|---|---|
| **15.1** | **Effectuating Documents and Further Transactions** | 41 |
| **15.2** | **Authority to Act** | 41 |
| **15.3** | **Amendment or Modification of the Plan** | 42 |
| **15.4** | **Administrative Expense Claims Reserve** | 42 |
| **15.5** | **Fees and Expenses** | 42 |
| **15.6** | **Revocation or Withdrawal of the Plan** | 42 |
| **15.7** | **Insurance Preservation** | 42 |
| **15.8** | **Exemption from Certain Transfer Taxes** | 43 |
| **15.9** | **Subordinated Claims** | 43 |
| **15.10** | **Cross-Border Protocol and Cross-Border Claims Protocol** | 43 |
| **15.11** | **Governing Law** | 43 |
| **15.12** | **No Admissions** | 43 |

# TABLE OF CONTENTS
(continued)

**Page**

**15.13**  **Severability of Plan Provisions** ................................................................ 43

**15.14**  **Successors and Assigns** ........................................................................... 44

**15.15**  **Defenses with Respect to Unimpaired Claims** ........................................ 44

**15.16**  **Section 1125(e) Good Faith Compliance** ................................................. 44

**15.17**  **No Injunctive Relief** ............................................................................... 44

**15.18**  **Payment of Statutory Fees** ..................................................................... 44

**15.19**  **Saturday, Sunday or Legal Holiday** ....................................................... 44

**15.20**  **Reservation of Rights** ............................................................................. 44

**15.21**  **Post-Effective Date Rule 2002 Notice List** ............................................ 44

**15.22**  **Right to Abandon and Dispose of Debtor Property, Books & Records** ... 45

**15.23**  **Notices** ................................................................................................... 45

# TABLE OF CONTENTS

## PLAN EXHIBITS

| | |
|---|---|
| Exhibit A | Settlement and Plans Support Agreement |
| Exhibit B | Plan Administration Agreement |
| Exhibit C | List of Directors and Officers of Wind-Down NNIII |
| Exhibit D | Amended By-Laws and Organizational Documents of Wind-Down NNIII |

# INTRODUCTION

Nortel Networks India International Inc. ("NNIII") proposes this Chapter 11 Plan of NNIII (the "Plan") for the resolution and satisfaction of all Claims against and Interests in NNIII.  NNIII is the proponent of this Plan within the meaning of section 1129 of the Bankruptcy Code.  All capitalized terms not defined in this introduction have the meanings ascribed to them in Article 1 of this Plan.

Under section 1125(b) of the Bankruptcy Code, a vote to accept or reject the Plan may not be solicited from holders of Claims and/or Interests until such time as the Disclosure Statement relating to the Plan is approved by the Bankruptcy Court.  NNIII URGES ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  To the extent, if any, that the Disclosure Statement is inconsistent with the Plan, the Plan will govern.  No solicitation materials, other than the Disclosure Statement and any schedules, exhibits and other documents attached thereto or referenced therein or otherwise enclosed with the Disclosure Statement served by NNIII on interested parties, have been authorized by NNIII or the Bankruptcy Court for use in soliciting acceptances of the Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019 and Article 15 of this Plan, NNIII expressly reserves the right to alter, amend, modify, revoke or withdraw this Plan, one or more times, prior to its substantial consummation.

## ARTICLE 1.
## DEFINITIONS, INTERPRETATION AND RULES OF CONSTRUCTION

**1.1    Scope of Definitions.**  For the purposes of this Plan, except as expressly provided or unless the context otherwise requires, all capitalized terms not otherwise defined shall have the meanings ascribed to them in this Article 1 of the Plan.  Any term used in this Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, respectively.

**1.2    Definitions.**  The following terms (which appear in the Plan as capitalized terms) shall have the meanings ascribed to them in this Article 1 of the Plan.

"**9019 Approval Order**" means the Order Approving Settlement and Plans Support Agreement dated January 24, 2017 [D.I. 17794], which approves the entry into the SPSA by NNIII and the Former Debtors.

"**Abandonment and Disposal Procedures Order**" means the Order (I) Approving Procedures for the Abandonment, Disposal, or Destruction of Specified Hard Copy Documents and Electronic Data; (II) Waiving Compliance with Certain Retention Laws and Ordinances; and (III) Granting Related Relief dated December 15, 2015 [D.I. 16389].

"**Administrative Expense Claim**" means any right to payment for any cost or expense of administration of the Chapter 11 Case asserted or arising under sections 503(b), 507(a)(2) or 507(b) of the Bankruptcy Code up to and including the Effective Date, including, to

1

the extent allowable under such sections, any (i) actual and necessary cost or expense of preserving NNIII's Estate or operating the business of NNIII arising on or after the Petition Date, (ii) payment to be made under this Plan to cure a default under an executory contract or unexpired lease that is assumed pursuant to section 365 of the Bankruptcy Code, (iii) compensation or reimbursement of expenses of Professionals arising on or after the Petition Date, to the extent allowed by the Bankruptcy Court under section 330(a) or section 331 of the Bankruptcy Code and (iv) fees or charges assessed against NNIII's Estate under section 1930, chapter 123 of title 28 of the United States Code.

"**Administrative Expense Claims Bar Date**" means the deadline for filing an Administrative Expense Claim, other than a Professional Claim, which Claims must be Filed so as to be actually received by the Bankruptcy Court on or before 5:00 p.m., prevailing Eastern Standard Time, on the date that is the first Business Day that is thirty (30) days following the Effective Date, unless otherwise ordered by the Bankruptcy Court.

"**Administrative Expense Claims Reserve**" has the meaning set forth in Section 15.4 of this Plan.

"**Affiliate**" shall have the meaning as set forth in section 101(2) of the Bankruptcy Code.

"**Allocation Dispute**" means certain litigation before the Canadian Court and the Bankruptcy Court in which the allocation of the Sale Proceeds is at issue.

"**Allocation Proceeds**" means the Sale Proceeds allocated to each of (a) NNIII and the Former Debtors, collectively, and (b) the Foreign Affiliate Debtors, as provided for under Section 2(c) of the SPSA.

"**Allowed**" means, with reference to any Claim against NNIII, (a) any Claim allowed hereunder, (b) any Claim that is not a Disputed Claim, (c) any Claim that is compromised, settled or otherwise resolved pursuant to the authority granted to NNIII pursuant to a Final Order of the Bankruptcy Court or under Article 11 of the Plan or (d) any Claim that, if it is a Disputed Claim, has been allowed by a Final Order; *provided*, *however*, that Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claims" hereunder. Unless otherwise specified herein or by order of the Bankruptcy Court, "Allowed Administrative Expense Claim" or "Allowed Claim" shall not, for any purpose under the Plan, include interest on such Administrative Expense Claim or Claim from and after the Petition Date.

"**Allowed Book Intercompany Claims**" means the pre-filing claims between and among the companies comprising the Nortel Group in the amounts recorded in their books and records, as set out in Annex L to the SPSA.

"**Allowed Claim**" means any Claim that is Allowed in accordance with the Plan.

"**Assets**" means all "property" of NNIII's Estate, as defined in section 541 of the Bankruptcy Code, and all Causes of Action that have been or may be commenced by NNIII or its

authorized representative for the benefit of NNIII's Estate, unless modified pursuant to the Plan or a Final Order.

       "**Available Cash**" means (a) all Cash of NNIII, including, without limitation, the Cash realized from its business operations, the sale or other disposition of its Assets, the Residual Assets Proceeds, the interest earned on invested funds, Cash on hand, recoveries from Litigation Claims and from any other source or otherwise, *less* (b) the amount of Cash estimated and reserved by NNIII and the Plan Administrator in accordance with the Plan Administration Agreement to (i) adequately fund the reasonable and necessary projected costs to carry out the provisions of the Plan on and after the Effective Date, including, without limitation, any fees and expenses incurred by Professionals, (ii) pay holders of all Disputed Claims the amount such holders would be entitled to receive under the Plan if all such Disputed Claims were to become Allowed Claims, (iii) pay all fees payable under section 1930, chapter 123 of title 28 of the United States Code, (iv) pay all other amounts required to be paid to manage and/or liquidate NNIII's Assets on and after the Effective Date and (v) pay holders of Allowed Administrative Expense Claims, Priority Tax Claims and Priority Non-Tax Claims in accordance with the Plan.

       "**Bankruptcy Code**" means title 11 of the United States Code, as in effect on the Petition Date and as thereafter amended, as applicable in the Chapter 11 Case.

       "**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware or any other court of the United States having jurisdiction over the Chapter 11 Case.

       "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Case, and the local and chambers rules of the Bankruptcy Court, as in effect on the Petition Date and as thereafter amended.

       "**Business Day**" means any day (other than a Saturday, Sunday or legal holiday, as such term is defined in Bankruptcy Rule 9006(a)) on which banks are open for general business in New York City, New York, U.S.A. and Toronto, Ontario, Canada, and also, when used in connection with the Plan provisions related to the SPSA, in London, England and Paris, France.

       "**Business Line Sales**" means the sales of various Nortel Group business lines, as identified on Annex A to the SPSA.  For the avoidance of doubt, the Business Line Sales do not include the Iceberg Sale.

       "**Canadian Court**" means any and all of the CCAA Court, the Ontario Court of Appeal, the Supreme Court of Canada or any other court of competent jurisdiction overseeing the Canadian Proceedings (including any appeals) from time to time.

       "**Canadian Debtors**" means NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation, Nortel Networks International Corporation, Nortel Communications Inc., Architel Systems Corporation and Northern Telecom Canada Limited.

"**Canadian Estate**" means the Canadian Debtors as substantively consolidated in accordance with the SPSA.

"**Canadian Plan**" means the CCAA plan of compromise or arrangement (including any exhibits, annexes and schedules thereto) for the Canadian Debtors filed in the CCAA Court on November 30, 2016 that, among other things, effectuates the settlement consistent with the terms of the SPSA, as it was sanctioned by the CCAA Court on January 30, 2017, and as it may be modified or supplemented in accordance with its terms.

"**Canadian Proceedings**" means the proceedings that were commenced before the CCAA Court pursuant to the CCAA on or after January 14, 2009 in respect of the Canadian Debtors.

"**Cash**" means legal tender accepted in the United States of America for the payment of public and private debts, currently denominated in United States Dollars.

"**Cash Management Order**" means the Order of the Bankruptcy Court, pursuant to sections 345, 363(c)(l), 364(a) and 503(b)(1) of the Bankruptcy Code, approving NNIII's continued use of the Cash Management System (as defined therein), entered as to the Former Debtors by the Bankruptcy Court on January 15, 2009 [D.I. 58] and made applicable to NNIII by order dated August 16, 2016, No. 16-11714 [D.I. 7], as amended or supplemented.

"**Causes of Action**" means, without limitation, any and all actions, causes of action, controversies, liabilities, obligations, rights, suits, damages, judgments, claims and demands whatsoever, whether known or unknown, reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to or during the course of the Chapter 11 Case through the Effective Date.

"**CCAA**" means the Companies' Creditors Arrangement Act, R.S.C. 1985, c C-36.

"**CCAA Court**" means the Ontario Superior Court of Justice (Commercial List).

"**CFSA**" means the Final Canadian Funding and Settlement Agreement among, inter alia, certain of the Canadian Debtors, the Monitor and certain of the Former Debtors, dated December 23, 2009, approved by order of the Bankruptcy Court on January 21, 2010 [D.I. 2347].

"**Chapter 11 Case**" means the chapter 11 case of NNIII pending before the Bankruptcy Court under Case No. 16-11714 and jointly administered with the Former Debtors' chapter 11 cases under Case No. 09-10138 (KG).

"**Claim**" means a right of an Entity against NNIII, whether or not asserted or Allowed, as defined in section 101(5) of the Bankruptcy Code and as construed pursuant to section 102(2) of the Bankruptcy Code.

"**Claims Agent**" means Epiq Bankruptcy Solutions, LLC, the claims and noticing agent retained in the Chapter 11 Case, or any successor thereto.

"**Claims Objection Deadline**" has the meaning set forth in Section 11.1 of this Plan.

"**Claims Register**" means the official register of Claims against, and Interests in, NNIII, maintained by the Claims Agent.

"**Class**" means a group of Claims or Interests as classified in a particular class under the Plan pursuant to section 1122 of the Bankruptcy Code.

"**Collateral**" means any property or interest in property of NNIII's Estate subject to a Lien to secure the payment of a Claim, which Lien is not subject to avoidance or otherwise invalid and unenforceable under the Bankruptcy Code or applicable non-bankruptcy law.

"**Confirmation**" means entry of the Confirmation Order by the Bankruptcy Court.

"**Confirmation Date**" means the date on which the Bankruptcy Court enters the Confirmation Order on its docket, within the meaning of Bankruptcy Rules 5003 and 9021.

"**Confirmation Hearing**" means the duly noticed hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code, including any continuances thereof.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which order shall be in form and substance satisfactory to NNL and the Monitor, acting reasonably.

"**Consummation**" means the occurrence of the Effective Date.

"**Creditor**" means any Entity that holds a Claim against NNIII.

"**Creditor Proceeds**" means (a) Available Cash plus (b) any non-Cash proceeds (including, without limitation, any securities or other interests) of any sale of Residual Assets.

"**Cross-Border Claims Protocol**" means the Cross-Border Claims Protocol originally approved by the Bankruptcy Court and CCAA Court on or about September 16, 2010, as the same has been amended, with the approval of both the Bankruptcy Court and the CCAA Court, from time to time.

"**Cross-Border Protocol**" means the Cross-Border Protocol originally approved by the Bankruptcy Court and the CCAA Court on or about January 14, 2009, as the same has been amended, with the approval of both the Bankruptcy Court and the CCAA Court, from time to time.

"**Debtor Releasing Parties**" means NNIII and each of its representatives, agents, successors and assigns.

"**Deficiency Claim**" means, with respect to any Claim secured by a Lien on any interest of NNIII in property having a value of less than the Allowed amount of such Claim (after

taking into account other Liens of higher priority in such property), the portion of such Claim equal to the difference between (a) the Allowed amount of the Claim and (b) the Allowed amount of the secured portion of such Claim (which Allowed secured amount may be set pursuant to this Plan).

"**Disbursing Agent**" means the Plan Administrator or any party designated by NNIII to serve as its disbursing agent under the Plan.

"**Disclosure Statement**" means the written disclosure statement that relates to this Plan Filed in the Chapter 11 Case by NNIII, including the schedules and exhibits attached thereto, as it may be amended, modified or supplemented from time to time, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

"**Disputed Claim**" means a Claim that NNIII has Scheduled as "disputed," "contingent" or "unliquidated," or as to which a proof of claim has been Filed or deemed Filed as contingent or as to which an objection has been or may be timely Filed by NNIII or any other party in interest entitled to do so, which objection, if timely Filed, has not been withdrawn or has not been overruled or denied by a Final Order.

"**Distribution**" means any payment or transfer made under the Plan.

"**Distribution Date**" means any date on which a Distribution is made in accordance with the Plan, including the Initial Distribution Date, an Interim Distribution Date and the Final Distribution Date.

"**Distribution Record Date**" means the record date for the purposes of making Distributions under the Plan on account of Allowed Claims, which date shall be the Confirmation Date.

"**Effective Date**" means the date selected by NNIII that is the first Business Day on which all conditions to the Effective Date set forth in Article 12 of the Plan have been satisfied with respect to NNIII or, if waivable, waived pursuant to Section 12.2 hereof, provided that no stay of the Confirmation Order is in effect.

"**EMEA Debtors**" means, collectively, NNUK, Nortel Networks (Ireland) Limited, Nortel Networks NV (in administration), Nortel Networks SpA (in administration), Nortel Networks BV (in administration), Nortel Networks Polska Sp z.o.o. (in administration), Nortel Networks Hispania SA (in administration), Nortel Networks (Austria) GmbH (in administration), Nortel Networks s.r.o. (in administration), Nortel Networks Engineering Service Kft (in administration), Nortel Networks Portugal SA (in administration), Nortel Networks Slovensko, s.r.o. (in administration), Nortel Networks Romania SRL (in administration), Nortel GmbH (in administration), Nortel Networks OY (in administration), Nortel Networks AB (in administration), Nortel Networks International Finance & Holding BV (in administration) and Nortel Networks France S.A.S. (in administration), but, for the avoidance of doubt, for purposes of the Plan, does not include NNSA.

"**EMEA Non-Filed Entities**" means, collectively, Nortel Networks AS, Nortel Networks AG, Nortel Networks South Africa (Pty) Limited, Nortel Networks (Northern Ireland) Limited (in liquidation) and Nortel Networks Optical Components Limited (in liquidation).

"**Entity**" means an entity as defined in section 101(15) of the Bankruptcy Code.

"**Estate**" means, with regard to NNIII, the estate that was created by the commencement by NNIII of its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code, and shall be deemed to include, without limitation, any and all rights, powers and privileges of NNIII and any and all Assets and interests in property, whether real, personal or mixed, rights, Causes of Action, avoidance powers or extensions of time that NNIII or its Estate shall have had as of the Petition Date, or which such Estate acquired after the commencement of the Chapter 11 Case, whether by virtue of sections 541, 544, 545, 546, 547, 548, 549 or 550 of the Bankruptcy Code or otherwise.

"**Exculpated Party**" means each of (a) NNIII, (b) Wind-Down NNIII and (c) the U.S. Principal Officer, and with respect to each of the foregoing, any of their respective directors, officers, employees, members, attorneys, consultants, accountants, advisors, agents and other professionals (each acting solely in such capacity), and, collectively, all of them.

"**File**" or "**Filed**" means file or filed on the docket of the Bankruptcy Court or its authorized designee in the Chapter 11 Case.

"**Final Distribution Date**" means the date upon which the Plan Administrator or Disbursing Agent makes a final Distribution on account of all Allowed Claims against NNIII, including Allowed Administrative, Priority Non-Tax, Priority Tax, Other Secured Claims and General Unsecured Claims.  As determined by the Plan Administrator, the Final Distribution Date shall be a date (a) which is after the liquidation into Cash of all Residual Assets of Wind-Down NNIII (other than those Residual Assets abandoned by Wind-Down NNIII), if any, and the collection of other sums due or otherwise remitted or returned to NNIII's Estate and (b) on which there remain no Disputed Claims against NNIII.

"**Final Order**" means an order (a) as to which the fourteen-day appeal period under Bankruptcy Rule 8002(a) has passed or has been waived by the Bankruptcy Court and (b) that has not been reversed, stayed, superseded or vacated or, to the extent it has been stayed, such stay has expired.

"**Foreign Affiliate Debtors**" means each of (a) the Canadian Debtors, (b) the EMEA Debtors and (c) NNSA.

"**Foreign Proceeding**" means, collectively, the Canadian Proceedings, the French Main Proceeding, the French Secondary Proceeding, the Israeli Administration Proceedings, the U.K. Proceedings and any other insolvency or similar proceeding filed after the Petition Date in a jurisdiction other than the United States involving an Affiliate of NNIII or the Former Debtors.

"**French Court**" means the judge appointed in the French Secondary Proceeding, the Versailles Commercial Court, any court hearing appeals therefrom and any other court of competent jurisdiction overseeing the French Secondary Proceeding from time to time.

"**French Secondary Proceeding**" means the secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No. 1346/2000 on Insolvency Proceedings in the Republic of France that was commenced before the French Court on May 28, 2009 in respect of NNSA.

"**General Unsecured Claims**" means all Unsecured Claims against NNIII.

"**Global Debtors**" means NNIII, the Former Debtors and the Foreign Affiliate Debtors.

"**Governmental Unit**" shall have the meaning assigned to such term in section 101(27) of the Bankruptcy Code.

"**Holder**" means a Person or Entity holding a Claim or Interest.

"**Iceberg Amendment Fee**" means the $5 million from the Iceberg Sale Proceeds previously agreed by NNIII, the Former Debtors and each of the Foreign Affiliate Debtors to be funded directly as follows: $2.8 million to NNI and $2.2 million to NNUK, prior to any other agreed upon allocation of the Sale Proceeds.

"**Iceberg Escrow Account**" means the escrow account established to hold the Iceberg Sale Proceeds and the Iceberg Amendment Fee.

"**Iceberg Sale**" means the sale of the residual intellectual property remaining after the Business Line Sales, which intellectual property was sold to a consortium in July 2011.

"**Iceberg Sale Proceeds**" means that portion of the Sale Proceeds generated from the Iceberg Sale.

"**IFSA**" means the Interim Funding and Settlement Agreement, dated as of June 9, 2009, entered into among various of the SPSA Parties, as approved by the CCAA Court on June 29, 2009 and by the Bankruptcy Court on June 29, 2009 [D.I. 993].

"**Impaired**" shall have the meaning assigned to such term in section 1124 of the Bankruptcy Code when used with reference to a Claim or an Interest.

"**Indian Tax Appeal Litigation**" means the litigation between NNIII and the Indian Taxing Authorities pending before India's Supreme Court with respect to tax obligations allegedly owed by NNIII.

"**Indian Taxing Authorities**" means the Indian governmental bodies responsible for taxation in India.

"**Initial Distribution Date**" means the date as determined by NNIII upon which the initial distributions of property under this Plan will be made to holders of Allowed Claims, which date shall be within sixty (60) days of the Effective Date or as soon thereafter as practicable.

"**Intellectual Property**" means any and all intellectual property rights in any jurisdiction including, without limitation, rights in or to any of the following: (a) Trademarks; (b) Patents and inventions (whether or not patentable); (c) copyrights and works of authorship of any type in any medium; (d) mask works; (e) trade secrets, know-how and confidential information; (f) databases, including, without limitation, computerized databases and compilations; (g) software and computer programs and (h) domain names and Internet protocol addresses, including, in each case, any applications or registrations for any of the foregoing.

"**Intercompany Claim**" means any Claim against NNIII asserted by its Affiliates other than an Administrative Expense Claim, a Priority Non-Tax Claim, a Secured Claim or a Subordinated Claim.

"**Intercompany Administrative Expense Claim**" means any Administrative Expense Claim against NNIII asserted by any Former Debtor.

"**Interest(s)**" means shares of common stock, preferred stock, other forms of ownership interest or any interest or right to convert into such an equity or ownership interest or acquire any equity or ownership interest, including, without limitation, vested and/or unvested restricted stock units, contingent stock awards, contingent equity awards, performance stock units and stock options or restricted stock awards granted under management ownership plans, stock incentive plans or employee incentive plans, in each case, in NNIII that was in existence immediately prior to or on the Petition Date.

"**Interim Compensation Order**" means the Order under 11 U.S.C. §§ 105(a) and 331, Fed. R. Bankr. P. 2016 and Del. Bankr. L.R. 2016-2 Establishing Procedures for Interim Compensation and Reimbursement of Fees and Expenses for Professionals and Official Committee Members entered by the Bankruptcy Court as to the Former Debtors on February 4, 2009 [D.I. 222] and made applicable to NNIII by order dated August 16, 2016 [D.I. 7].

"**Interim Distribution**" means the quarterly Distributions of Creditor Proceeds made by the Disbursing Agent to holders of Allowed Claims against a Debtor.

"**Interim Distribution Date**" means any date on which an Interim Distribution is made, which dates shall be June 30th and December 31st of each year.

"**IP Addresses**" means internet protocol addresses registered in the name of a Canadian Debtor or a corporate predecessor thereto.

"**Israeli Administration Proceedings**" means the administration proceedings of Nortel Networks Israel (Sales and Marketing) Limited and its subsidiaries commenced on January 19, 2009 pursuant to the Israeli Companies Law, 1999, and the regulations relating thereto for a stay of proceedings.

"**Lien**" means a charge against, interest in or other encumbrance upon property to secure payment of a debt or performance of an obligation.

"**Litigation Claims**" means all claims, rights and Causes of Action of any Debtor or its Estate of every kind or nature whatsoever, whether arising prior to, during or after the

Chapter 11 Case (including, without limitation, Intellectual Property enforcement rights and all rights, claims and Causes of Action arising under sections 544 through 551 of the Bankruptcy Code, except for any Released Claims).

"**M&A Costs**" means the fees and expenses incurred in connection with the Sales.

"**M&A Cost Reimbursement**" means the reimbursement of certain of the M&A Costs, which amounts shall be reimbursed from the Iceberg Escrow Account as follows: $20 million to the Former Debtors and $35 million to the Canadian Debtors.

"**Monitor**" means Ernst & Young Inc. in its capacity as the court-appointed monitor in the Canadian Proceedings.

"**NNC**" means Nortel Networks Corporation, a Canadian Debtor.

"**NNI**" means Nortel Networks Inc., a Delaware corporation.

"**NNI Confirmation Order**" means the January 24, 2017 order of the Bankruptcy Court confirming the NNI Plan pursuant to section 1129 of the Bankruptcy Code as applicable to each of the Former Debtors [D.I. 17795].

"**NNI Plan**" means the First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain of its Affiliated Debtors filed by the Former Debtors on January 23, 2017 [D.I. 17763], as it may be modified or amended in accordance with the terms of the NNI Plan.

"**NNI Plan Effective Date**" means May 8, 2017.

"**NNIII**" means Nortel Networks India International Inc., a Delaware corporation.

"**NNL**" means Nortel Networks Limited, a Canadian Debtor.

"**NNSA**" means Nortel Networks S.A. (in administration and in *liquidation judiciaire*).

"**NNUK**" means Nortel Networks U.K. Limited (in administration), an EMEA Debtor.

"**Non-Released Matters**" has the meaning set forth in Section 13.4.

"**Nortel Group**" means, collectively, NNC and all of its direct and indirect subsidiaries, whether current or former.

"**Notice of Assumption and Assignment**" means any notice of NNIII's intent to assume or assume and assign one or more executory contracts or unexpired leases, which notice shall be Filed by NNIII on the docket of the Bankruptcy Court in the Chapter 11 Case.

"**Ordinary Course Professional Order**" means the Order Authorizing NNIII to Retain and Employ Professionals Used in the Ordinary Course of Business *Nunc Pro Tunc* to the

Petition Date entered by the Bankruptcy Court on August 16, 2016 [D.I. 15], as may be amended, supplemented or modified from time to time.

"**Former Debtor(s)**" or "**Former Debtor(s)-in-Possession**" means each of the following entities, along with the last four digits of each Former Debtor's tax identification number: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567), and Nortel Networks (CALA) Inc. (4226).

"**Other Nortel Claim**" has the meaning set forth in Section 7.6.

"**Patents**" mean all national and multinational patents and utility models (petty patents), including, without limitation, all reissues, divisions, continuations, continuations-in-part, extensions and reexaminations thereof, and all rights therein provided by multinational treaties or conventions.

"**PBGC**" means the Pension Benefit Guaranty Corporation, a United States government corporation.

"**Person**" means an individual, a corporation, a limited liability company, a partnership, an association, a joint stock company, a joint venture, an unincorporated organization or a Governmental Unit as defined in section 101(41) of the Bankruptcy Code.

"**Petition Date**" means July 26, 2016.

"**Plan**" means the chapter 11 plan of NNIII, including without limitation, all exhibits, appendices and schedules hereto and thereto, either in its present form or as the same may be altered, amended, modified or supplemented from time to time in accordance with the provisions of the Plan or the Bankruptcy Code and Bankruptcy Rules.

"**Plan Administration Agreement**" means the agreement describing the powers, duties and rights of the Plan Administrator in administering the Plan, which agreement shall be in substantially the form attached hereto as Exhibit B.

"**Plan Administrator**" means Owl Hill Advisory LLC, retained, as of the Effective Date, by NNIII as the Person responsible for, among other things, the matters described in Section 6.2 hereof.

"**Plan Released Parties**" means the U.S. Principal Officer (solely in such individual's capacity as the U.S. Principal Officer of NNIII) and any of his respective directors, officers, employees, members, attorneys, consultants, accountants, advisors, agents and other professionals (each acting solely in such capacity), and, collectively, all of them.

"**Post-Effective Date Notice List**" has the meaning set forth in Section 15.21.

"**Priority Non-Tax Claim**" means any Claim, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment under section 507(a) of the Bankruptcy Code.

"**Priority Tax Claim**" means any Claim entitled to priority pursuant to sections 502(i) and 507(a)(8) of the Bankruptcy Code.

"**Pro Rata Share**" means, as at any Distribution Date, with respect to the holder of an Allowed Claim in any Class against NNIII, the product of (A/B) x C where:

A = the amount of the particular Allowed Claim;

B = the aggregate amount of all Allowed Claims in the Class; and

C = the total amount of Creditor Proceeds to be distributed to holders of Allowed Claims in such Class on the particular Distribution Date.

"**Professional**" means a Person (a) employed in the Chapter 11 Case pursuant to a Final Order in accordance with sections 327, 328 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to sections 327, 328, 329, 330 and 331 of the Bankruptcy Code, or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

"**Professional Claim**" means a Claim of a Professional for compensation for services rendered or reimbursement of costs, expenses or other charges incurred after the Petition Date and prior to and including the Effective Date.

"**Quarterly Administrative Wind-Down Reimbursement Payments**" has the meaning set forth in Section 6.5.

"**Rejected Contract**" means any executory contract that NNIII has rejected in accordance with Section 9.2 of this Plan

"**Relay**" means NNL's and NNTC's assets related to the wireless backhaul and multi-hop digital repeater/relay research development program, sold in June 2010.

"**Released Claim**" means any claim, right or Cause of Action of NNIII or its Estate released pursuant to the Plan, the Confirmation Order or the SPSA but does not include any claim, right or Causes of Action of any SPSA Party to enforce the SPSA.

"**Releases**" means the releases as set forth herein in Section 13.3.

"**Remaining Contract**" has the meaning set forth in Section 9.1.

"**Residual Assets**" means all Assets of Wind-Down NNIII from and after the Effective Date.

"**Residual Assets Proceeds**" means the net Cash proceeds of the Residual Assets and any income or proceeds therefrom.

"**Sale(s)**" means the Business Line Sales and the Iceberg Sale between 2009 and 2011.

"**Sale Proceeds**" means the remaining proceeds generated by the Sales, such amounts as set forth in Annex A of the SPSA, plus interest accrued thereon, less (i) US$55 million of M&A Cost Reimbursement and (ii) the Iceberg Amendment Fee.

"**Scheduled**" means as listed on the Schedules.

"**Schedules**" means the Schedules of Assets and Liabilities Filed by NNIII in accordance with section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as the same may be amended from time to time prior to the Effective Date in accordance with Bankruptcy Rule 1009.

"**Secured Claim**" means any Claim (a) to the extent reflected in the Schedules or upon a proof of claim to which NNIII has not objected as a "secured claim," which is secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

"**Security**" means any instrument issued by, or interest in, NNIII of the type described in section 101(49) of the Bankruptcy Code.

"**Server Access and Disposition Order**" means the Order Approving the Debtors' Entry into the Server Access and Disposition Agreement dated September 4, 2019 [D.I. 18751], which approves the entry into that certain Server Access and Disposition Agreement by NNIII and the Former Debtors.

"**Solicitation Procedures**" means the Bankruptcy Court-approved procedures related to soliciting votes on the Plan from holders of Claims entitled to vote on the Plan.

"**SPSA**" means that certain Settlement and Plans Support Agreement executed on October 12, 2016, a copy of which is attached hereto as Exhibit A.

"**SPSA Party**" means, individually, each of the signatories to the SPSA.

"**SPSA Released Parties**" means each Releasor (as defined in the SPSA) and each of their respective employees, officers, directors, agents, advisors, lawyers, successors and assigns and their directors and officers, both former and current, in their respective capacities as such.

"**SPSA Released Claims**" has the meaning set forth in Section 13.4.

"**Tax**" or "**Taxes**" means all net income, gross income, capital, value added, goods and services, gross receipts, ad valorem, transfer, profits, business, environmental, gaming,

13

franchise, excise, stamp, stamp duty reserve, customs, sales, use, employment, withholding, property, payroll and all other taxes, fees, duties, levies, assessments, deductions, withholdings or governmental charges, together with any interest, penalties, additions to tax, fines and similar amounts relating thereto, imposed or collected by or on behalf of any federal, state, local or foreign governmental authority on or from NNIII.

"**Trademarks**" means all trademarks, service marks, trade dress, logos, trade names, corporate names and business names, whether or not registered, together with all goodwill associated therewith, and including all common law rights and all rights therein provided by multinational treaties or conventions.

"**U.K. Proceedings**" means the administration proceedings of the EMEA Debtors and NNSA commenced on January 14, 2009 in the High Court of England and Wales, pursuant to the Insolvency Act 1986.

"**U.S. Principal Officer**" means John J. Ray III, who was appointed Principal Officer of NNIII pursuant to an order entered by the Bankruptcy Court on August 16, 2016.

"**U.S. Trustee**" means the Office of the United States Trustee for the District of Delaware.

"**Unimpaired**" means any Claim or Interest that is not Impaired.

"**Unsecured Claim**" means any Claim against NNIII, including, without limitation, (a) Claims arising from the rejection of executory contracts and unexpired leases, (b) Deficiency Claims and (c) Intercompany Claims, but excluding Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims and Secured Claims.

"**Wind-Down NNIII**" means NNIII on and after the Effective Date.

### 1.3    Rules of Interpretation.

1.       In the event of an inconsistency: (a) the provisions of the Plan shall control over the contents of the Disclosure Statement; and (b) the provisions of the Confirmation Order shall control over the contents of the Plan.

2.       For the purposes of the Plan:

(a)      unless the context requires otherwise, any reference in the Plan to a contract, instrument, release or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; *provided*, *however*, that any change to such form, terms or conditions that is material to a party to such document shall not be modified without such party's consent unless such document or this Plan expressly provide otherwise;

(b)      unless the context requires otherwise, any reference in the Plan to an existing document, exhibit or schedule Filed or to be Filed means such document, exhibit or

schedule, as it may have been or may be amended, modified or supplemented as of the Effective Date;

(c)      unless otherwise specified, all references in the Plan to "Sections," "Articles," "Exhibits" and "Schedules" are references to sections, articles, exhibits and schedules of or to the Plan;

(d)      the words "herein," "hereof," "hereto," "hereunder" and others of similar import refer to the Plan in its entirety rather than to only a particular portion of the Plan;

(e)      captions and headings are inserted for convenience of reference only and are not intended to be part or to affect interpretations of the Plan;

(f)      the words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation";

(g)      the definitions of terms herein shall apply equally to the singular and plural forms of the terms defined;

(h)      whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms;

(i)      the word "will" shall be construed to have the same meaning and effect as the word "shall"; and

(j)      unless the context requires otherwise, any reference herein to any Person shall be construed to include such Person's successors and assigns;

(k)      unless otherwise specified, the rules of construction set forth in section 102 of the Bankruptcy Code will apply to this Plan.

3.      Whenever a Distribution of property is required to be made on a particular date, the Distribution shall be made on such date or as soon as reasonably practicable thereafter.

4.      All Exhibits and Schedules to the Plan are incorporated into the Plan and shall be deemed to be included in the Plan, regardless of when they are Filed.

5.      Unless otherwise specified, all currency amounts are in U.S. Dollars.

**1.4      Exhibits to this Plan.**  All Exhibits are incorporated into and are a part of this Plan as if set forth in full herein.  Holders of Claims and Interests may obtain a copy of the Exhibits upon written request to NNIII.  The Exhibits may be inspected in the office of the clerk of the Bankruptcy Court or its designee during normal business hours, obtained by written request to counsel to NNIII or obtained on the website of the Claims Agent at http://dm.epiq11.com/nortel.

      **1.5**     **Computation of Time.**  In computing any period of time prescribed or allowed by the Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply.

## ARTICLE 2.
## TREATMENT OF UNCLASSIFIED CLAIMS

      **2.1**     **Administrative Expense Claims.**  Subject to the allowance procedures and deadlines provided herein, on or as soon as reasonably practicable after the later to occur of (a) the Effective Date, (b) the date on which an Administrative Expense Claim shall become an Allowed Claim and (c) to the extent an Allowed Administrative Expense Claim relates to a liability arising under another agreement incurred by NNIII in the ordinary course, the date such liability is owed in accordance with the terms and conditions of any agreement or course of dealing relating thereto and consistent with past practice, the Holder of an Allowed Administrative Expense Claim shall receive on account of its Allowed Administrative Expense Claim, and in full satisfaction, settlement and release of and in exchange for such Allowed Administrative Expense Claim, (a) Cash equal to the unpaid portion of such Allowed Administrative Expense Claim or (b) such other treatment as to which NNIII and the Holder of such Allowed Administrative Expense Claim have agreed upon in writing; *provided*, *however*, that Professional Claims shall be paid in accordance with Section 2.3.

      A notice setting forth the Effective Date of the Plan and the Administrative Expense Claims Bar Date shall be (i) Filed on the Bankruptcy Court's docket and (ii) posted on NNIII's and the Former Debtors' case information website at http://dm.epiq11.com/nortel. Further notice of the Administrative Expense Claims Bar Date shall be provided as may be directed by the Bankruptcy Court.  All requests for payment of an Administrative Expense Claim that accrued on or before the Effective Date (other than Administrative Expense Claims that (1) have been paid, (2) relate to payment of Professionals, (3) are for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code or (4) are as specified in subparagraph (B) or (C) of section 503(b)(1) of the Bankruptcy Code and held by a Governmental Unit) must be Filed with the Claims Agent and served on counsel for NNIII by the Administrative Expense Claims Bar Date.  Absent further order of the Bankruptcy Court, any requests for payment of Administrative Expense Claims that are not properly Filed and served by the Administrative Expense Claims Bar Date shall not appear on the register of Claims maintained by the Claims Agent and shall be disallowed automatically without the need for any objection from NNIII or any action by the Bankruptcy Court.

      NNIII and the Plan Administrator may settle Administrative Expense Claims in the ordinary course without further notice or Bankruptcy Court approval, in accordance with the Plan Administration Agreement, as applicable.  NNIII shall have the right to object to any Administrative Expense Claim within one hundred and eighty (180) days after the Administrative Expense Claims Bar Date, subject to further extensions that may be granted by the Bankruptcy Court.  Unless NNIII or Wind-Down NNIII object to a timely Filed and properly served Administrative Expense Claim, such Administrative Expense Claim shall be deemed Allowed in the amount requested. In the event that NNIII or Wind-Down NNIII object to an Administrative Expense Claim, the parties may confer to try to reach a settlement and, failing

that, the Bankruptcy Court shall determine whether such Administrative Expense Claim should be allowed and, if so, in what amount.

      **2.2**    **Statutory Fees.**  On or before the Effective Date, all fees due and payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid in full, in Cash.

      **2.3**    **Professional Claims.**  Other than a Professional retained by NNIII pursuant to the Ordinary Course Professional Order, any entity seeking an award of the Bankruptcy Court of compensation for services rendered and/or reimbursement of expenses incurred through the Effective Date under sections 105(a), 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code shall File its final application for allowance of such compensation and/or reimbursement by no later than the first Business Day that is sixty (60) days after the Effective Date or such other date as may be fixed by the Bankruptcy Court and be paid by or on behalf of NNIII (a) in full and in Cash in the amounts Allowed upon the date the order granting such award becomes a Final Order, or as soon thereafter as practicable or (b) upon such other terms as may be mutually agreed upon by the claimant and NNIII.

      Except as otherwise specifically provided in this Plan, on and after the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate, and, subject to the terms of the Plan Administration Agreement, the Plan Administrator may employ and pay any Professional for services rendered or expenses incurred after the Effective Date in the ordinary course to facilitate the wind down of Wind-Down NNIII and effectuate the Plan without any further notice to any party or action, order or approval of the Bankruptcy Court.

      **2.4**    **Priority Tax Claims.**  With respect to each Allowed Priority Tax Claim, at the option of NNIII, the Holder of an Allowed Priority Tax Claim shall be entitled to receive, in full satisfaction, settlement and release of and in exchange for such Allowed Priority Tax Claim, (a) Cash in an amount equal to such Allowed Priority Tax Claim on the later of the Effective Date and the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as practicable, (b) treatment in accordance with section 1129(a)(9)(C) of the Bankruptcy Code or (c) such other treatment as to which NNIII and the Holder of such Allowed Priority Tax Claim have agreed upon in writing.  On the Effective Date, the Liens (if any) securing any Priority Tax Claims shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

## ARTICLE 3.
## CLASSIFICATION OF CLAIMS AND INTERESTS

      In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims and Professional Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in this Article.

      **3.1**    **Summary of Classifications.**

All Claims and Interests, other than Administrative Expense Claims, Priority Tax Claims and Professional Claims, are classified in the Classes set forth in this Article for all purposes, including voting, Confirmation and Distributions under this Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest fits within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest fits within the description of such other Classes.  A Claim is also classified in a particular Class for the purpose of receiving Distributions under this Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released or otherwise satisfied prior to the Effective Date.

> **3.2    Classification and Treatment of Claims Against and Interests in NNIII.**

The following chart designates the Classes of Claims against and Interests in NNIII and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code and (c) deemed to accept or reject the Plan:

| Class | Designation | Status | Entitlement to Vote |
|-------|-------------|--------|---------------------|
| 1 | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| 2 | Secured Claims | Unimpaired | No (deemed to accept) |
| 3 | General Unsecured Claims | Impaired | Yes |
| 4 | Interests | Impaired | No (deemed to reject) |

## ARTICLE 4.
## TREATMENT OF CLAIMS AGAINST AND INTERESTS IN NNIII

Except to the extent that a Holder of an Allowed Claim against or Interest in NNIII agrees to a less favorable treatment, such Holder shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release and discharge of and in exchange for such Holder's Allowed Claim or Interest.  Unless otherwise indicated, the Holder of an Allowed Claim or Interest, as applicable, shall receive such treatment on the Effective Date, or as soon as reasonably practicable thereafter.

> **4.1    Class 1 – Priority Non-Tax Claims.**

(a)    <u>Classification</u>.  Class 1 consists of all Priority Non-Tax Claims against NNIII.

(b)    <u>Impairment and Voting</u>.  Class 1 is Unimpaired by the Plan.  The Holders of Allowed Priority Non-Tax Claims in these Classes are not entitled to vote to accept or reject the Plan and are deemed to accept the Plan.

18

(c)     Distributions.  Except to the extent that the Holder of an Allowed Priority Non-Tax Claim in Classes 1 agrees to less favorable treatment or has been paid by or on behalf of NNIII on account of such Allowed Priority Non-Tax Claim prior to the Effective Date, on the later of the Effective Date and the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is practicable, each Holder of an Allowed Priority Non-Tax Claim in Class 1 shall be paid by or on behalf of NNIII in Cash in the amount equal to the Allowed amount of such Priority Non-Tax Claim.

**4.2     Class 2 – Secured Claims**

(a)     Classification.  Class 2 consists of all Secured Claims against NNIII.

(b)     Impairment and Voting.  Class 2 is Unimpaired by the Plan.  The Holders of Allowed Secured Claims in Class 2 are not entitled to vote to accept or reject the Plan and are deemed to accept the Plan.

(c)     Distributions.  Except to the extent that the Holder of an Allowed Secured Claim agrees to less favorable treatment, each Holder of an Allowed Secured Claim in Class 2 shall be satisfied by, at the option of NNIII: (i) payment in Cash by or on behalf of NNIII in the amount equal to the Allowed amount of such Secured Claim on the later of the Effective Date and the date on which such Secured Claim becomes an Allowed Secured Claim; (ii) the Distribution of the sale or other disposition proceeds of the Collateral securing such Allowed Secured Claim; (iii) surrender of the Collateral securing such Allowed Secured Claim to the Holder of such Allowed Secured Claim or (iv) such treatment that leaves unaltered the legal, equitable and contractual rights to which the Holder of the Allowed Secured Claim is entitled.  In the event an Allowed Secured Claim is treated under clauses (i) through (iii) above, the Liens securing such Claim shall be deemed released and extinguished without further order of the Bankruptcy Court.

**4.3     Class 3 – General Unsecured Claims.**

(a)     Classification. Class 3 consists of all General Unsecured Claims against NNIII.

(b)     Impairment and Voting.  Class 3 is Impaired by the Plan.  Each Holder of an Allowed General Unsecured Claim in Class 3 is entitled to vote to accept or reject the Plan.

(c)     Distributions.  Each Holder of an Allowed General Unsecured Claim in Class 3 shall, on the Initial Distribution Date or the first Interim Distribution Date after the date such Claim becomes Allowed, receive its Pro Rata Share of the Creditor Proceeds as of the applicable Distribution Date from NNIII.  In accordance with Section 10.3 herein, the Disbursing Agent shall make periodic Interim Distributions of the remaining available Creditor Proceeds to Holders of Allowed General Unsecured Claims in Class 3 until the Final Distribution Date.

4.4 **Class 4 – Interests.**

(a) <u>Classification</u>. Class 4 consists of all Interests in NNIII that were in existence immediately prior to or on the Petition Date.

(b) <u>Impairment and Voting</u>. Class 4 is Impaired by the Plan. The Holders of Interests in Class 4 are not entitled to vote to accept or reject the Plan and are deemed to have rejected the Plan.

(c) <u>Distributions</u>. NNI, as the only Holder of Interests in NNIII, is not expected to receive any Distributions on account of such Interests under the Plan. On the Effective Date, all Interests in NNIII will continue to be held by NNI until the closing of its Chapter 11 Case, solely for Plan administrative purposes. NNI shall receive no Distributions on account of such Interests until such time that all Allowed Claims in Classes 1 through 3 have been satisfied in full in accordance with the Bankruptcy Code and the Plan. At such time, NNI will receive its Pro Rata Share of any remaining Creditor Proceeds from NNIII.

## ARTICLE 5.
## ACCEPTANCE OR REJECTION OF THE PLAN

5.1 **Impaired Classes of Claims and Interests Entitled to Vote.**

Holders of Claims in Class 3 are entitled to vote to accept or reject this Plan as provided above or as otherwise set forth in such order as may be entered by the Bankruptcy Court establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order(s) of the Bankruptcy Court. The votes of Holders of Claims who are entitled to vote and yet abstain from voting, return a ballot with no boxes checked or return a ballot voting both to accept and reject the Plan will not be counted for purposes of accepting or rejecting the Plan.

5.2 **Acceptance by an Impaired Class.**

In accordance with section 1126(c) of the Bankruptcy Code and except as provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted this Plan if this Plan is accepted by the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in such Class that have timely and properly voted to accept or reject this Plan.

5.3 **Presumed Acceptances by Unimpaired Classes.**

Classes 1 and 2 are Unimpaired by this Plan. Accordingly, under section 1126(f) of the Bankruptcy Code, Holders of such Claims are conclusively presumed to accept this Plan, and the votes of the Holders of such Claims will not be solicited.

5.4 **Elimination of Vacant Classes; Deemed Acceptance by Non-Voting Classes.**

(a)     Any Class of Claims or Interests that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Interest that is Allowed in an amount greater than zero (including temporarily Allowed under Bankruptcy Rule 3018) shall be considered vacant and deemed eliminated from this Plan for purposes of voting to accept or reject this Plan and for purposes of determining whether this Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

(b)     If no votes to accept or reject this Plan are received with respect to a Class that is solicited in accordance with the Solicitation Procedures (other than a Class that is deemed eliminated pursuant to the foregoing Section 5.4(a)), such Class shall be deemed to have voted to accept this Plan, unless the Bankruptcy Court, for cause, orders otherwise.

### 5.5     Conversion or Dismissal of the Chapter 11 Case.

If the requisite Classes do not vote to accept this Plan or the Bankruptcy Court does not confirm this Plan, NNIII reserves the right, subject to Section 15.6 hereof, to have its Chapter 11 Case dismissed or converted, or to liquidate or dissolve NNIII under applicable non-bankruptcy procedure or chapter 7 of the Bankruptcy Code.

### 5.6     Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code.

NNIII intends to request that the Bankruptcy Court confirm this Plan in accordance with section 1129(b) of the Bankruptcy Code with respect to any Impaired Class of Claims or Interests that rejects or is deemed to reject the Plan, where this Plan shall constitute a motion for such relief.

### ARTICLE 6.
### IMPLEMENTATION OF THE PLAN

### 6.1     General Settlement of Claims and Interests.

In accordance with the SPSA and the 9019 Approval Order, the terms of the SPSA are incorporated herein and entry of the Confirmation Order will constitute approval of the provisions of this Plan as a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to this Plan and the SPSA.

### 6.2     Plan Administrator.

(a)     Appointment.  Owl Hill Advisory LLC, shall serve as Plan Administrator for NNIII and Wind-Down NNIII pursuant to and in accordance with the provisions of the Plan, the SPSA and the Plan Administration Agreement.

(b)     Authority.  The Plan Administrator shall have the authority and right on behalf of NNIII and Wind-Down NNIII, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, the SPSA and the Plan Administration Agreement in accordance with the provisions therein.  These rights shall include, without limitation, the authority to: (i) except to the extent Claims have been previously allowed, control and effectuate the Claims reconciliation process, including to object to, seek to subordinate, compromise or settle any and all Claims against NNIII or Wind-Down

NNIII; (ii) make distributions on account of Allowed Claims, other remaining assets and appropriate fees and expenses in accordance with and subject to the terms of the Plan; (iii) exercise its reasonable business judgment to manage, liquidate or otherwise dispose of any remaining assets of NNIII or Wind-Down NNIII under the Plan and in accordance with applicable law as reasonably necessary to maximize Distributions to holders of Allowed Claims; (iv) prosecute all Causes of Action on behalf of NNIII or Wind-Down NNIII, elect not to pursue any Causes of Action and determine whether and when to compromise, settle, abandon, dismiss or otherwise dispose of any such Causes of Action, as the Plan Administrator may determine is in the best interests of NNIII or Wind-Down NNIII; (v) make payments to existing professionals who will continue to perform in their current capacities; (vi) retain professionals to assist in performing its duties under the Plan; (vii) maintain the books and records and accounts of NNIII and Wind-Down NNIII, as applicable, to effectuate the Plan; (viii) invest Cash of NNIII or Wind-Down NNIII, including any Cash proceeds realized from the liquidation of any assets of NNIII or Wind-Down NNIII, including any Causes of Action, and any income earned thereon; (ix) incur and pay reasonable and necessary expenses in connection with the performance of duties under the Plan, including the reasonable fees and expenses of professionals retained by the Plan Administrator; (x) administer the tax obligations of NNIII or Wind-Down NNIII, including filing tax returns, paying tax obligations and representing the interest and account of NNIII or its Estate or Wind-Down NNIII before any taxing authority in all matters, including, without limitation, any action, suit, proceeding or audit; (xi) prepare and file any and all informational returns, reports, statements, returns or disclosures relating to NNIII or Wind-Down NNIII that are required hereunder, by any Governmental Unit or applicable law; (xii) pay statutory fees in accordance with Section 15.18 of the Plan and (xiv) perform other duties and functions that are reasonable, necessary or appropriate for the implementation of the Plan.

(c)     Compensation of the Plan Administrator.  In addition to reimbursement for actual out-of-pocket expenses incurred by the Plan Administrator, the Plan Administrator shall be entitled to receive reasonable compensation for services rendered on behalf of NNIII and Wind-Down NNIII in an amount and on such terms as may be reflected in the Plan Administration Agreement.

(d)     No Liability of Plan Administrator.  The Plan Administrator will have no liability whatsoever for any acts or omissions to NNIII or Wind-Down NNIII or to Holders of Claims against or Interests in NNIII or Wind-Down NNIII other than for willful misconduct, fraud or breach of fiduciary duty by the Plan Administrator as determined by a Final Order, *provided, that*, the Plan Administrator shall have no liability for such acts or omissions if approved by the Bankruptcy Court.  Each of NNIII and Wind-Down NNIII shall indemnify and hold harmless the Plan Administrator for any losses, liabilities and costs incurred in such capacity to the fullest extent allowed by Delaware law.

(e)     Termination, Resignation and Removal of Plan Administrator. The duties, responsibilities and powers of the Plan Administrator shall terminate pursuant to the terms of the Plan Administration Agreement. The resignation and removal of the Plan Administrator shall occur pursuant to the terms of the Plan Administration Agreement.

(f)     Establishment of Reserves.  On the Effective Date, NNIII shall account for the Disputed Claims in such amounts, as agreed by NNIII and the Plan

Administrator, in accordance with the terms of the Plan Administration Agreement, as may be necessary to make sufficient future payments with respect to Disputed Claims as provided by the Plan.

(g)    Periodic Reporting of the Plan Administrator.  After the Effective Date, the Plan Administrator shall file periodic reports with the Bankruptcy Court regarding the status of the resolution of any remaining Disputed Claims and Distributions expected to be made pursuant to this Plan.

**6.3    Intercompany Account Settlement.**  Each of NNIII and Wind-Down NNIII will be entitled to transfer funds between itself and NNI consistent with the terms of the Cash Management Order.  Any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the ordinary course intercompany account settlement practices and will not violate the terms of this Plan.

**6.4    Settlement of Intercompany Claims and Other Matters.**  The Bankruptcy Court's entry of the 9019 Approval Order constituted the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the settlement that has been reached among the SPSA Parties with regard to (a) subject to the terms and conditions of the SPSA and the NNI Plan, (i) the Allocation Proceeds and (ii) the Intercompany Claims (including, for the avoidance of doubt, the Allowed Book Intercompany Claims) and (b) the other matters settled under the SPSA.  The 9019 Approval Order also constituted the Bankruptcy Court's finding that such settlement is: (1) in exchange for the good and valuable consideration provided by each of NNIII, the Former Debtors and the SPSA Parties; (2) a good-faith settlement and compromise of the claims released by NNIII and the Former Debtors; (3) in the best interests of NNIII, the Former Debtors, their Estates and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for hearing and (6) a bar to the assertion of any claim or Cause of Actions released pursuant to the SPSA.

**6.5    Administrative Expense Contribution and Quarterly Administrative Wind-Down Reimbursement Payments.**  From and after the Effective Date, NNI will bear various costs of administering and winding down NNIII's estate (including costs for professionals retained to assist with such administration or wind-down), and NNIII shall reimburse NNI quarterly for such costs in an amount not to exceed $100,000 (each payment, a "Quarterly Administrative Wind-Down Payment").  The payment of Quarterly Administrative Wind-Down Payments by NNIII to NNI shall continue until NNIII has been fully and finally liquidated and all costs and expenses related to such administration and wind-down have been incurred.  For the avoidance of doubt, NNI shall retain the right to assert Administrative Expense Claims against NNIII for any Priority Tax Claims that are asserted against and/or paid by NNI that reasonably could be allocated or attributable to NNIII, *provided* that the amount owed by NNIII to NNI in respect of Quarterly Administrative Wind-Down Reimbursement Payments and Priority Tax Claims shall be subject to a cap of $100,000 per quarter.

**6.6    Closing of Chapter 11 Case.**  After NNIII's Chapter 11 Case has been fully administered, the Plan Administrator shall File all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close NNIII's Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.  The Plan Administrator's

authority with respect to NNIII shall continue until such time as NNIII's Chapter 11 Case has been fully administered and closed.

## ARTICLE 7.
## THE SETTLEMENT AND PLANS SUPPORT AGREEMENT

      **7.1**    **SPSA.**  Pursuant to the 9019 Approval Order, the Bankruptcy Court authorized NNIII's entry into the SPSA and approved the SPSA pursuant to sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019. In the event of an inconsistency between the Plan and the SPSA, the SPSA shall govern. For the avoidance of doubt, the SPSA is and shall remain binding on NNIII and Wind-Down NNIII, whether prior to, on or after the Effective Date, and this Plan shall not in any way modify or be deemed to modify the SPSA.

      **7.2**    **Cooperation.**  NNIII shall cooperate in the implementation of the SPSA in accordance with its cooperation provisions therein in furtherance of the execution and implementation of the SPSA.

      **7.3**    **Settlement of Allocation Dispute.**  Pursuant to the resolution procedures of the IFSA, the SPSA Parties settled the Allocation Dispute on the terms set forth in the SPSA. As part of the integrated settlements contained in the SPSA, and subject to the terms and conditions thereof, NNIII has released any claims it may have for an entitlement to receive the Allocation Proceeds.

      **7.5**    **Estate Administration.**  From the Confirmation Date to the Effective Date, NNIII will be administered by the U.S. Principal Officer.

      **7.6**    **No Double-Recovery.**  In no circumstance shall a Creditor receive aggregate distributions from NNIII or Wind-Down NNIII and any other Entity in the Nortel Group on account of an Allowed Claim in excess of 100% of the amount of such Allowed Claim. In order to be eligible for any Distribution, a Creditor who holds an Allowed Claim against NNIII or Wind-Down NNIII and a related claim against any other Entity in the Nortel Group (an "Other Nortel Claim"), shall, upon the written request of NNIII or Wind-Down NNIII (which may be made from time to time), provide such information to NNIII or Wind-Down NNIII as it may reasonably request in respect of the Other Nortel Claim, including the amount in which the Other Nortel Claim has been allowed, the amount of distributions received or expected to be received on account of such Other Nortel Claim and any and all supporting documentation relating to the foregoing. Subject to further Order of the Bankruptcy Court, NNIII and Wind-Down NNIII are authorized to delay and/or withhold Distributions to Creditors holding Other Nortel Claims pending receipt of documentation acceptable to NNIII or Wind-Down NNIII, acting reasonably, to allow it to confirm that a Creditor has not and will not receive amounts on account of its Allowed Claim in excess of 100% of the amount of such Allowed Claim.

      **7.7**    **Post-Petition Date Interest.**  No post-Petition Date interest (or make whole premium, no-call payment or similar claim accruing post-Petition Date) shall be included in any Allowed Claim, nor be paid on Allowed Claims by NNIII.

      **7.8**    **Resolution of Certain Claims.**  Pursuant to the PBGC Settlement Agreement entered into by the PBGC, NNIII and the Former Debtors on December 20, 2016, the

PBGC was entitled to a single Allowed General Unsecured Claim against NNIII (and each of the Former Debtors) in the amount of $624,601,972, *provided* that the maximum aggregate distribution the PBGC was entitled to receive on its claims against NNIII and the Former Debtors was $565,000,000, and such claims were to be deemed paid in full upon NNIII and the Former Debtors having made aggregate distributions on account of the Allowed General Unsecured Claim in such amount.  In December 2018, the PBGC received the maximum allowed recovery of $565,000,000 on its claims against NNIII and the Former Debtors.  Accordingly, the PBGC's Allowed General Unsecured Claim against NNIII and any and all claims that have been or could have been asserted by the PBGC against NNIII are deemed paid in full, and the PBGC shall not have any further claims against NNIII or any of the Former Debtors.  The PBGC shall not be entitled to an Allowed Administrative Expense Claim or Priority Non-Tax Claim against NNIII or any of the Former Debtors.

       **7.9**    **Book Intercompany Claims.**  Allowed Book Intercompany Claims shall be included in the determination of the Allowed General Unsecured Claims against NNIII. Annex L to the SPSA shall be treated as the definitive position for all Allowed Book Intercompany Claims between the Nortel Group entities specified thereon.  Any and all other pre-filing books and records claims between (a) any of the Canadian Debtors, on the one hand, and (b) NNIII, on the other hand, that are not preserved specifically in the SPSA (including, without limitation, the claims referenced in Sections 4(b)(i) and 4(g) of the SPSA) are forever released and barred as of the NNI Plan Effective Date to the extent not previously released. Other than the Allowed Book Intercompany Claims, all pre-filing books and records claims, including any claims that NNIII now holds as a consequence of an assignment, between (i) any of the EMEA Debtors, NNSA or the EMEA Non-Filed Entities, on the one hand, and (ii) NNIII, on the other hand, are forever released and barred as of the Effective Date to the extent not previously released.  The SPSA Parties agreed and acknowledged that, as of October 12, 2016, there are no post-filing books and records claims owing between (1) any of the Canadian Debtors, on the one hand, and NNIII, the EMEA Debtors, NNSA and the EMEA Non-Filed Entities, on the other hand, and (2) NNIII, on the one hand, and any of the EMEA Debtors, NNSA and the EMEA Non-Filed Entities, on the other hand.

       **7.10**    **Remaining Assets and Other Proceeds.**  NNIII has the right to retain the value of its respective remaining assets, if any, and shall not be subject to any claims thereto by any other Global Debtor except those acknowledged in the SPSA.  NNIII releases any claims it has asserted or may assert or have as against (a) the proceeds held by the Canadian Debtors as "Restricted Cash" or "Unavailable Cash" (as noted in Monitor's reports to the CCAA Court), including in respect of the realization of the interests in LG-N, the Strandherd Lands, Relay and IP Addresses, and (b) the remaining IP Addresses, including any proceeds arising therefrom, to the extent not previously released.  For the avoidance of doubt, nothing in this Section 7.10 shall (i) prohibit the assertion of claims to enforce the SPSA and claims that are reserved in the SPSA (including, without limitation, the claims referenced in Section 4(b)(i) thereof) or (ii) affect NNIII's rights to receive distributions as a creditor of the various Global Debtors' estates.

       **7.11**    **Debtor Disputes.**  Notwithstanding the separate administration of the estates of the Canadian Debtors, the EMEA Debtors, NNSA, NNIII and the Former Debtors and of the EMEA Non-Filed Entities, NNIII shall work cooperatively and use reasonable efforts to implement the SPSA and the Plan in a tax efficient manner. NNIII shall, upon the written request

of a Global Debtor to NNIII and to the extent permitted by applicable local law and not inconsistent with the statutory duties of NNIII, reasonably cooperate with each request, including providing such documents, other information, access to current personnel and/or permission to communicate with former personnel as may reasonably be requested by the requesting Global Debtor, in connection with the preparation and filing of tax returns and responding to or contesting any challenges, inquiries, audits or other disputes by tax authorities in relation thereto; *provided*, *however*, that NNIII shall not be obligated to cooperate to the extent such requested cooperation would prejudice the interests of NNIII and all such cooperation shall conform to the requirements in Section 4(a)(v) of the SPSA.

       **7.12    SPSA Releases.**  NNIII has entered into certain releases pursuant to the terms of the SPSA and Bankruptcy Rule 9019, the terms of which are incorporated herein.

**ARTICLE 8.**
**CORPORATE FORM AND ACTION**

       **8.1    NNIII Corporate Form and Vesting.**

       (a)    On the Effective Date, Wind-Down NNIII shall maintain its current corporate form, with all powers of a corporation under the laws of its state of incorporation and without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) under such applicable state law, for the purpose of effectuating all aspects of the Plan pertaining to Wind-Down NNIII.  From and after the Effective Date, until dissolved in accordance with this Plan or by the Plan Administrator, Wind-Down NNIII shall exist in order to effectuate all aspects of the Plan and wind down.

       (b)    On the Effective Date, Wind-Down NNIII shall be vested with the Assets of NNIII as provided in Section 13.10 of the Plan.

       **8.2    Dissolution of Wind-Down NNIII.**  The director of Wind-Down NNIII shall have the right to dissolve Wind-Down NNIII, after the occurrence of Wind-Down NNIII's Final Distribution Date, on or shortly following the Effective Date without the necessity for (i) any further approval by the board of directors or stockholders of Wind-Down NNIII of the dissolution or any plan of distribution, to the extent as such otherwise may be required by applicable law, and to the extent such shareholder approval may be required by applicable law such approval shall be deemed previously provided; or (ii) any other or further actions to be taken by or on behalf of Wind-Down NNIII or payments to be made in connection therewith, subject to the filing of a certificate of dissolution with the appropriate governmental authorities.

       **8.3    Post-Effective Date Management.**

       (a)    On the Effective Date, the board of directors of Wind-Down NNIII shall consist of one natural person selected by the Plan Administrator, which person may be the Plan Administrator or an employee or principal thereof, to serve as the board of directors of Wind-Down NNIII through the closing of Wind-Down NNIII's Chapter 11 Case in accordance with Section 6.6 of the Plan.

(b)    The current officers of NNIII shall continue to serve as the officers of Wind-Down NNIII in accordance with applicable non-bankruptcy law, any employment agreement with NNIII entered into after the Petition Date and NNIII's by-laws, as the same may be amended from time to time, through the closing of Wind-Down NNIII's Chapter 11 Case, unless an officer resigns or is removed by the board of directors of Wind-Down NNIII.

**8.4    Corporate Existence.**  After the Effective Date, the Plan Administrator may, in accordance with the Plan Administration Agreement, (a) maintain Wind-Down NNIII as a corporation in good standing until such time as all aspects of the Plan pertaining to Wind-Down NNIII have been completed or (b) subject to Section 8.2 of the Plan, dissolve Wind-Down NNIII or complete the winding up of Wind-Down NNIII (including, without limitation, transferring all or part of the Residual Assets of Wind-Down NNIII to a liquidating trust) at such time as the Plan Administrator considers appropriate and consistent with the implementation of the Plan pertaining to Wind-Down NNIII.

**8.5    Certificate of Incorporation or Certificate of Formation.**  As of the Effective Date, the certificate of incorporation and by-laws of Wind-Down NNIII shall be amended to satisfy the provisions of the Plan and the Bankruptcy Code and shall (a) include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code, and (b) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate the Plan and the transactions contemplated herein, in each case, without further action under applicable law, regulation, order or rule, including, without limitation, any action by the stockholders, managers or members of Wind-Down NNIII. The amended certificate of incorporation and by-laws of Wind-Down NNIII are attached herein as Exhibit D.

**8.6    Wind-Down.**  The Plan Administrator shall effectuate the monetization, wind-down and liquidation of Wind-Down NNIII's Residual Assets (it being understood that such may include the transfer of all or part of the Residual Assets of Wind-Down NNIII to one or more liquidating trusts within the meaning of Treas. Reg. §301.7701-4).

**8.7    Other Corporate Action.**  Without limiting the foregoing, in accordance with the requirements of the Plan and the terms of the Plan Administration Agreement, from and after the Effective Date, Wind-Down NNIII and the Plan Administrator may take any and all actions they deem appropriate in order to consummate the transactions contemplated herein, including, without limitation, to sell or otherwise dispose of any Residual Assets and wind up Wind-Down NNIII's affairs and, notwithstanding any provision contained in Wind-Down NNIII's articles of incorporation, articles of formation or by-laws to the contrary, Wind-Down NNIII shall not require the affirmative vote of Holders of Interests in order to take any corporate action, including to (a) compromise and settle Claims and Causes of Action of or against Wind-Down NNIII and its Estate and (b) dissolve, merge or consolidate with any other Entity.

## ARTICLE 9.
## TREATMENT OF EXECUTORY CONTRACTS

9.1    **Previous Assumption, Assignment and Rejection.**  Any executory contracts and unexpired leases of NNIII that have not been assumed, assumed and assigned or rejected prior to the Confirmation Date or with respect to which NNIII has not otherwise Filed a Notice of Assumption and Assignment or obtained an order assuming, assuming and assigning or rejecting the contract or lease prior to the Confirmation Date (the "Remaining Contracts"), if any, shall be rejected pursuant to Section 9.2 of this Plan.

9.2    **Rejection.**  Except for those executory contracts and unexpired leases that have been assumed, assumed and assigned or rejected pursuant to previous orders of the Bankruptcy Court, all executory contracts and unexpired leases of NNIII shall be rejected pursuant to section 365 and 1123(b)(2) of the Bankruptcy Code; *provided*, *however*, that nothing contained in this Article 9 shall constitute an admission by NNIII that any contract or lease is an executory contract or unexpired lease or that NNIII or its successors and assigns has any liability thereunder.

9.3    **Approval of Rejection; Rejection Damages Claims Bar Date.**  The Confirmation Order shall constitute an order of the Bankruptcy Court approving the rejection of executory contracts and unexpired leases under Section 9.2 above pursuant to section 365 and 1123(b)(2) of the Bankruptcy Code as of the Effective Date.  Any Claim for damages arising from any such rejection must be Filed within thirty (30) days after the Effective Date, or such Claim shall receive no Distribution under the Plan or otherwise on account of such Claim.

9.4    **Pre-existing Obligations to NNIII under Executory Contracts.**  Rejection or repudiation of any executory contract pursuant to the Plan or otherwise will not constitute a termination of pre-existing obligations owed to NNIII under such contracts.  In particular, notwithstanding any non-bankruptcy law to the contrary, Wind-Down NNIII expressly reserves and does not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by NNIII or Wind-Down NNIII, as applicable, from counterparties to any Rejected Contract.

## ARTICLE 10.
## PROVISIONS REGARDING VOTING AND DISTRIBUTIONS UNDER THE PLAN

10.1    **Voting of Claims.**  Each Holder of an Allowed Claim in an Impaired Class of Claims that is entitled to vote on the Plan pursuant to Article 3 and Article 4 of the Plan shall be entitled to vote separately to accept or reject the Plan, as provided in the order entered by the Bankruptcy Court establishing procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order or orders of the Bankruptcy Court.

10.2    **Nonconsensual Confirmation.**  If any Impaired Class of Claims entitled to vote on the Plan does not accept the Plan by the requisite majority provided in section 1126(c) of the Bankruptcy Code, NNIII reserves the right to amend the Plan in accordance with Section 15.3 of the Plan or to undertake to have the Bankruptcy Court confirm the Plan under

section 1129(b) of the Bankruptcy Code or both.  With respect to any Impaired Classes of
Claims or Interests that are deemed to reject the Plan under any such amended Plan, NNIII shall
request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the
Bankruptcy Code.

    **10.3    Distributions of Creditor Proceeds.**  After the satisfaction in full of
Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority
Non-Tax Claims and Allowed Secured Claims (to the extent the Plan Administrator determines,
in accordance with the Plan Administration Agreement, that NNIII will pay such Allowed
Secured Claim in Cash) against NNIII, the Disbursing Agent shall make a Distribution of
Creditor Proceeds in accordance with the provisions of the Plan (a) to each Holder of an Allowed
Claim as of the Distribution Record Date against NNIII, within sixty (60) days of the Effective
Date, or as soon thereafter as practicable, and (b) to each Holder of an Allowed Claim that is
allowed after the Effective Date against NNIII, in accordance with the Class priorities set forth
in Article 4 herein and the provisions of Article 10 herein.  After the initial Distribution with
respect to any Allowed Claim, the Disbursing Agent shall make Distributions of Creditor
Proceeds in accordance with the Plan to Holders of Allowed Claims against NNIII on June 30th
and December 31st of each year (each such Distribution, an "Interim Distribution") and on the
Final Distribution Date.  Notwithstanding the foregoing, the Plan Administrator may determine
in accordance with the terms of the Plan Administration Agreement to direct the Disbursing
Agent (i) to make Distributions more frequently on dates other than the Interim Distribution
dates or (ii) not to make an Interim Distribution if it determines that the costs of making such
Interim Distribution would be disproportionate to the Distribution amount.  No Distributions
shall be made on account of a claim that is not yet an Allowed Claim until the Plan
Administrator (1) determines not to object to such Claim (or the time to object to Claims expires),
(2) agrees with the Holder of such Claim to allow such Claim in an agreed upon amount or (3)
objects to such Claim and such Claim is Allowed by a Final Order, during which time such
Claim shall be treated as a Disputed Claim.

    **10.4    Minimum Distribution and Manner of Payment.**  No payment of
Creditor Proceeds of less than $100 shall be made by NNIII to any Holder of an Allowed Claim
against NNIII.  Such amounts shall be deemed redistributed to other Holders of Allowed Claims
against NNIII and, accordingly, shall be distributed in accordance with the provisions of the Plan
and the Bankruptcy Code.  Any payment of Cash made pursuant to the Plan may be made at the
option of the Disbursing Agent either by check or by wire transfer.

    **10.5    Limitation on Recovery.**  Notwithstanding anything contained herein to
the contrary, in the event that the sum of the Distributions of Creditor Proceeds and other
Distributions with respect to an Allowed Claim hereunder as well as from other sources are in
excess of one hundred percent (100%) of such Holder's Allowed Claim, then the Creditor
Proceeds remaining to be distributed to such Holder in excess of such one hundred percent
(100%) shall be deemed available for distribution to other Holders of Allowed Claims against
NNIII and, accordingly, shall be distributed in accordance with the provisions of the Plan and the
Bankruptcy Code.

    **10.6    Distributions Free and Clear.**  Except as otherwise provided herein, any
Distributions under the Plan shall be free and clear of any Liens, Claims and encumbrances, and

no other Entity, including NNIII, Wind-Down NNIII and the Plan Administrator, shall have any interest, legal, beneficial or otherwise, in the Creditor Proceeds, Assets or Residual Assets once transferred to Holders of Allowed Claims pursuant to the Plan.

**10.7    Delivery of Distributions and Undeliverable Distributions.** Distributions to Holders of Allowed Claims of NNIII shall be made at the address of each such Holder as set forth on the Schedules Filed, unless superseded by a new address as set forth (a) on a proof of claim Filed by a Holder of an Allowed Claim or (b) in another writing notifying the Claims Agent (at the address listed in Section I of the Disclosure Statement) of a change of address.  If any Holder's Distribution is returned as undeliverable, no further Distributions shall be made or notices delivered to such Holder on account of such Claim until the Claims Agent is notified in writing by such Holder of such Holder's current address, at which time all such Distributions shall be made to such Holder without interest; *provided* that such Distributions that are returned as undeliverable shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six (6) months after the Effective Date.  After such date, all unclaimed property or interests in property shall become the property of NNIII's Estate, without the need for a further order by the Bankruptcy Court (notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary), and the Claim of any Holder to such property or interest in property shall be discharged and forever barred.

**10.8    Withholding and Reporting Requirements.**  In connection with the Plan and all instruments issued in connection therewith and distributed thereon, NNIII, the Plan Administrator and the Disbursing Agent shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all Distributions under the Plan shall be subject to any such withholding or reporting requirements. Notwithstanding the above, each Holder of an Allowed Claim that is to receive a Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any Tax obligations imposed by any Governmental Unit, including income, withholding and other Tax obligations, on account of such Distribution.  The Disbursing Agent has the right, but not the obligation, to withhold a Distribution until such Holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such Tax obligations.  The Disbursing Agent may require, as a condition to receipt of a Distribution, that the Holder of an Allowed Claim complete and return a Form W-8 or W-9, as applicable to each such Holder, to the Disbursing Agent.  If the Disbursing Agent makes such a request and the Holder fails to comply before the date that is one hundred and eighty (180) days after the request is made, no further Distributions shall be made to such Holder on account of such Claim.  In such cases, the amount of such Distribution shall irrevocably revert to NNIII and such Claim shall be discharged and the Holder of such Claim shall be forever barred from asserting such Claim against NNIII, its Estate or its respective property.  Also, in such cases, any Cash held for Distributions on account of such Claim shall become the property of NNIII's Estate and distributed to other Holders of Allowed Claims against NNIII in accordance with the terms of the Plan and the Bankruptcy Code.

**10.9    Time Bar to Cash Payment Rights.**  Checks issued in respect of Allowed Claims shall be null and void if not negotiated within ninety (90) days after the date of issuance thereof.  Requests for reissuance of any check shall be made to the Plan Administrator by the Holder of the Allowed Claim to whom such check originally was issued.  Any claim in respect of

a voided check shall be made on or before thirty (30) days after the expiration of the ninety (90) day period following the date of issuance of such check.  Thereafter, the amount represented by such voided check shall irrevocably revert to NNIII's Estate, to be distributed to other Holders of Allowed Claims against NNIII in accordance with the terms of the Plan and the Bankruptcy Code, and any Claim in respect of such voided check shall be discharged and forever barred from assertion against NNIII, its Estate and its respective property, *provided* that at the discretion of the Plan Administrator, any such amounts may be escheated pursuant to applicable law.  In the case of any check issued in respect of an Allowed Claim that is returned as an undeliverable Distribution, such check shall be null and void if not negotiated within ninety (90) days after the date of issuance, and the Allowed Claim for which such Distribution was issued shall be discharged and forever barred pursuant to this Section 10.9 only after the time period to claim such undeliverable Distribution provided in Section 10.7 has passed.

**Setoffs and Recoupment.**  NNIII may, but shall not be required to, setoff against the payment of any Claim or other Distributions to be made pursuant to the Plan in respect of such Claim of any nature whatsoever that NNIII may have against the Holder of such Claim; *provided*, *however*, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by NNIII of any such claim NNIII may have against such Holder.

**10.10   Distribution Record Date.**  As of the close of business on the Distribution Record Date, the register for NNIII shall be closed and there shall be no further changes to the record holder of any of the Claims or Interests.  NNIII and the Plan Administrator shall have no obligation to recognize any transfer of any Claims or Interests occurring after the close of business on the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder only with those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

**10.11   Allocation of Distributions.**  Distributions to any Holder of an Allowed Claim shall be allocated first to the principal portion of any such Allowed Claim (as determined for federal income tax purposes) and, only after the principal portion of any such Allowed Claim is satisfied in full, to any portion of such Allowed Claim comprising interest (but solely to the extent that interest is an allowable portion of such Allowed Claim).

## ARTICLE 11.
## PROCEDURES FOR TREATING DISPUTED CLAIMS

**11.1   Objections.**  Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, as of the Effective Date, objections to, and requests for estimation of, all Claims against NNIII may be interposed and prosecuted only by the Plan Administrator, who shall consult with Wind-Down NNIII regarding the same.  Objections to and requests for estimation of Claims shall be Filed and served on the claimant on or before the first Business Day that is one hundred and eighty (180) days after the Effective Date (the "**Claims Objection Deadline**") or such later date as is established by the filing of a notice by Wind-Down NNIII or the Plan Administrator prior to the expiration of the then-current Claims Objection Deadline.

**11.2    No Distributions Pending Allowance.**  Notwithstanding any other provision hereof, if any portion of a Claim is a Disputed Claim, no Distribution shall be made on account of the disputed portion of such Claim unless and until such disputed portion of such Claim becomes Allowed.

**11.3    Estimation of Claims.**  The Plan Administrator may at any time request that the Bankruptcy Court estimate for any purpose including Distribution any contingent, unliquidated or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code or otherwise, regardless of whether NNIII previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection.

**11.4    Resolution of Disputed Claims.**  On and after the Effective Date, the Plan Administrator shall have the authority to compromise, settle or otherwise resolve or withdraw any objections to Claims and to compromise, enter into protocols for the resolution of, settle or otherwise resolve any Disputed Claims regardless of whether such Claims are in a Class or otherwise (at Wind-Down NNIII's or the Plan Administrator's sole discretion with or without Bankruptcy Court approval).  On and after the Effective Date, the Plan Administrator shall have the sole authority to administer and adjust the Claims Register to reflect any such settlements or compromises without further notice to or action, order or hearing of the Bankruptcy Court.

**11.5    No Interest.**  Holders of Disputed Claims shall not be entitled to interest if such Disputed Claim becomes an Allowed Claim.

**11.6    No Amendments to Claims.**  A Claim may be amended before the Confirmation Date only as agreed upon by NNIII and the Holder of such Claim or as otherwise permitted by the Bankruptcy Court, the Bankruptcy Rules or applicable law.  On or after the Confirmation Date, the Holder of a Claim (other than an Administrative Expense Claim or a Professional Claim) must obtain prior authorization from the Bankruptcy Court or Wind-Down NNIII to File or amend a Claim. Any new or amended Claim Filed after the Confirmation Date without such prior authorization will not appear on the Claims Register and will be deemed disallowed in full and expunged without any action required by NNIII or Wind-Down NNIII and without the need for any court order.

**11.7    No Late-Filed Claims**.  In accordance with section 502(b)(9) of the Bankruptcy Code, any entity that failed to File a proof of Claim by the applicable bar date set by the Bankruptcy Court in the Chapter 11 Case and was not otherwise permitted to File a proof of claim after the applicable bar date by a Final Order of the Bankruptcy Court is and shall be barred, estopped and enjoined from asserting any Claim against NNIII (a) in an amount that exceeds the amount, if any, that is identified in the Schedules on behalf of such entity as undisputed, noncontingent and liquidated or (b) of a different nature or a different classification than any Claim identified in the Schedules on behalf of such Entity.  NNIII and Wind-Down NNIII shall be entitled, for the purposes of Distributions, reserves and other similar purposes under this Plan, to treat all Claims Filed after the later of (a) the Effective Date and (b) the Claim's applicable bar date, as disallowed and expunged.

## ARTICLE 12.
## CONDITIONS PRECEDENT

**12.1    Conditions to the Effective Date.**  The following are conditions precedent to the Effective Date of the Plan:

(a)     All actions and agreements, instruments, certificates or other documents necessary to implement the terms and provisions of the Plan are effected or executed and delivered, as applicable, in form and substance satisfactory to NNIII.

(b)     All authorizations, consents and regulatory approvals, if any, required in connection with the consummation of the Plan are obtained and not revoked.

(c)     The amended organizational documents of Wind-Down NNIII shall have been filed with the applicable authorities of its jurisdiction of incorporation or formation in accordance with such jurisdiction's applicable laws.

(d)     All statutory fees then due to the U.S. Trustee shall have been paid in full by NNIII pursuant to the Plan.

(e)     The Confirmation Order shall have been entered by the Bankruptcy Court, and thereafter shall have become a Final Order.

(f)     The SPSA shall not have been terminated.

(g)     An order (or orders) recognizing the Confirmation Order shall have been granted by the CCAA Court in the proceedings commenced in respect of NNIII under section 18.6 of the CCAA.

(h)     The Indian Tax Appeal Litigation shall have been withdrawn with prejudice or otherwise finally resolved to the satisfaction of the U.S. Principal Officer in his sole discretion.

**12.2    Waiver of Conditions.**  Notwithstanding the foregoing, NNIII reserves its right to waive the occurrence of the conditions precedent to the Effective Date set forth in Section 12.1 of the Plan, other than Section 12.1(f) of the Plan.  Any such waiver may be given effect at any time, without notice, leave, hearing or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan, provided that notice of any such waiver shall promptly be provided to the SPSA Parties.  Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.  If NNIII decides that one of the conditions precedents to the Effective Date of its Plan cannot be satisfied and the occurrence or such condition is not waived or cannot be waived, then NNIII shall file a notice of the inability to satisfy such condition with the Bankruptcy Court.  The failure of NNIII to exercise any of the foregoing rights shall not be deemed a waiver of any other rights and each right shall be deemed an ongoing right that may be asserted at any time.

**12.3    Notice of Effective Date.**  Upon the occurrence of the Effective Date or as soon thereafter as is reasonably practicable, Wind-Down NNIII shall File with the Bankruptcy Court the "Notice of Effective Date" in a form reasonably acceptable to Wind-Down NNIII in its sole discretion, which notice shall constitute appropriate and adequate notice that the Plan has become effective; *provided*, *however*, that Wind-Down NNIII shall have no obligation to notify any Person.  The Plan shall be deemed to be effective as of 12:01 a.m., prevailing Eastern Standard Time, on the date of such filing.  A courtesy copy of the Notice of Effective Date may be sent by United States mail, postage prepaid (or at Wind-Down NNIII's option, by courier, facsimile or electronic mail) to those Persons who have Filed with the Bankruptcy Court requests for notices pursuant to Bankruptcy Rule 2002.

**12.4    Dismissal or Conversion.**  NNIII or Wind-Down NNIII reserve the right to dismiss or convert the Chapter 11 Case as necessary to effectuate the SPSA and the settlement contemplated therein or to wind down and cease operations. NNIII or Wind-Down NNIII shall coordinate with the SPSA Parties to make any required amendments or seek any required waivers to or under the SPSA in order to implement any such actions, subject to the SPSA Parties' rights under the SPSA.

## ARTICLE 13.
## EFFECT OF CONFIRMATION

**13.1    Binding Effect; Plan Binds All Holders of Claims and Interests.**

(a)    Except as otherwise provided in section 1141(d) of the Bankruptcy Code, on and after the Effective Date, the provisions of the Plan shall, and shall be deemed to, be binding on any Holder of a Claim against or Interest in NNIII and its respective successors and assigns, regardless of whether the Claim or Interest of such Holder is Impaired under the Plan and whether or not such Holder has voted or failed to vote to accept or reject the Plan.

(b)    Further, pursuant to section 1142 of the Bankruptcy Code and in accordance with the Confirmation Order, NNIII and any other necessary party shall execute, deliver and join in the execution or delivery (as applicable) of any instrument, document or agreement required to consummate the Plan, and to perform any other act, and the execution of documents contemplated in the Plan that are necessary for the consummation of the Plan and the transactions contemplated herein.

(c)    Pursuant to section 1141(d)(3) of the Bankruptcy Code, Confirmation will not discharge Claims against NNIII; *provided*, *however*, that no Holder of any Claim or Interest may, on account of such Claim or Interest, seek or receive any payment or other Distribution from, or seek recourse against, NNIII's Estate, Wind-Down NNIII and/or their respective successors, assigns and/or property, except as expressly provided in this Plan.

**13.2    Release of NNIII and Wind-Down NNIII.**

**EFFECTIVE AS OF THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION, TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, THE HOLDERS OF CLAIMS AGAINST AND INTERESTS IN NNIII AND EACH OF SUCH HOLDERS' PREDECESSORS, SUCCESSORS, ASSIGNS**

**AND EACH OF THEIR PRESENT AND FORMER OFFICERS, DIRECTORS, EMPLOYEES, CONSULTANTS AND AGENTS (ACTING IN SUCH CAPACITY) WILL BE DEEMED TO HAVE WAIVED, RELEASED AND VOIDED ANY AND ALL CLAIMS, OBLIGATIONS, DAMAGES, DEMANDS, DEBTS, RIGHTS, SUITS, JUDGMENTS OR LIABILITIES (OTHER THAN THE RIGHT TO ENFORCE NNIII'S OR WIND-DOWN NNIII'S OBLIGATIONS UNDER THIS PLAN, THE SPSA AND THE CONTRACTS, INSTRUMENTS, RELEASES, AGREEMENTS AND DOCUMENTS DELIVERED UNDER THIS PLAN) AGAINST NNIII AND WIND-DOWN NNIII, WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, THEN EXISTING OR THEREAFTER ARISING, IN LAW, EQUITY OR OTHERWISE, THAT ARE BASED IN WHOLE OR IN PART ON ANY ACT OR OMISSION, TRANSACTION, EVENT OR OTHER OCCURRENCE TAKING PLACE ON OR PRIOR TO THE EFFECTIVE DATE IN ANY WAY RELATING TO NNIII, THE CHAPTER 11 CASES, THE DISCLOSURE STATEMENT OR THE PLAN (INCLUDING, WITHOUT LIMITATION, THE SOLICITATION OF VOTES ON THE PLAN) THAT COULD HAVE BEEN ASSERTED BY THE HOLDERS OF CLAIMS AGAINST OR INTERESTS IN NNIII, IN THEIR INDIVIDUAL CAPACITIES OR ON BEHALF (WHETHER DIRECTLY OR DERIVATIVELY) OF NNIII, ITS ESTATE, WIND-DOWN NNIII, EACH OF THEIR PREDECESSORS, SUCCESSORS, ASSIGNS AND EACH OF THEIR PRESENT AND FORMER OFFICERS, DIRECTORS, EMPLOYEES, CONSULTANTS AND AGENTS (ACTING IN SUCH CAPACITY), IN EACH CASE WITHOUT FURTHER NOTICE TO OR ORDER OF THE BANKRUPTCY COURT, ACT OR ACTION UNDER APPLICABLE LAW, REGULATION, ORDER OR RULE OR THE VOTE, CONSENT OR AUTHORIZATION OR APPROVAL OF ANY PERSON.**

   **13.3  Release and Discharge of the Plan Released Parties.**

     **EFFECTIVE AS OF THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION, TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, THE HOLDERS OF CLAIMS AGAINST AND INTERESTS IN NNIII AND EACH OF SUCH HOLDERS' PREDECESSORS, SUCCESSORS, ASSIGNS AND EACH OF THEIR PRESENT AND FORMER OFFICERS, DIRECTORS, EMPLOYEES, CONSULTANTS AND AGENTS (ACTING IN SUCH CAPACITY) WHO: (I) EITHER VOTE TO ACCEPT THIS PLAN OR ARE PRESUMED TO HAVE VOTED FOR THIS PLAN UNDER SECTION 1126(F) OF THE BANKRUPTCY CODE OR (II) ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THIS PLAN AND ABSTAIN FROM VOTING AND DO NOT MARK THEIR BALLOTS TO INDICATE THEIR REFUSAL TO GRANT THE RELEASES PROVIDED HEREIN WILL BE DEEMED TO HAVE WAIVED, RELEASED, VOIDED AND DISCHARGED EACH OF THE PLAN RELEASED PARTIES FROM ANY AND ALL CLAIMS, OBLIGATIONS, DAMAGES, DEMANDS, DEBTS, RIGHTS, SUITS, JUDGMENTS OR LIABILITIES (OTHER THAN THE RIGHT TO ENFORCE THE PLAN RELEASED PARTIES' OBLIGATIONS UNDER THIS PLAN, THE SPSA AND THE CONTRACTS, INSTRUMENTS, RELEASES, AGREEMENTS AND DOCUMENTS DELIVERED UNDER THIS PLAN), WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT,**

**MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, THEN EXISTING OR THEREAFTER ARISING, IN LAW, EQUITY OR OTHERWISE, THAT ARE BASED IN WHOLE OR IN PART ON ANY ACT OR OMISSION, TRANSACTION, EVENT OR OTHER OCCURRENCE TAKING PLACE ON OR PRIOR TO THE EFFECTIVE DATE IN ANY WAY RELATING TO NNIII, THE CHAPTER 11 CASE, THE DISCLOSURE STATEMENT, THE SPSA OR THE PLAN (INCLUDING, WITHOUT LIMITATION, THE SOLICITATION OF VOTES ON THE PLAN) THAT COULD HAVE BEEN ASSERTED BY THE HOLDERS OF CLAIMS AGAINST OR INTERESTS IN NNIII, IN THEIR INDIVIDUAL CAPACITIES OR ON BEHALF (WHETHER DIRECTLY OR DERIVATIVELY) OF NNIII, ITS ESTATE, WIND-DOWN NNIII, EACH OF THEIR PREDECESSORS, SUCCESSORS, ASSIGNS AND EACH OF THEIR PRESENT AND FORMER OFFICERS, DIRECTORS, EMPLOYEES, CONSULTANTS AND AGENTS (ACTING IN SUCH CAPACITY), IN EACH CASE WITHOUT FURTHER NOTICE TO OR ORDER OF THE BANKRUPTCY COURT, ACT OR ACTION UNDER APPLICABLE LAW, REGULATION, ORDER OR RULE OR THE VOTE, CONSENT OR AUTHORIZATION OR APPROVAL OF ANY PERSON.**

**NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS SECTION 13.3 OR SECTION 13.2 HEREOF, THE RELEASES SET FORTH ABOVE DO NOT RELEASE (I) ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, OR ANY DOCUMENT, INSTRUMENT OR AGREEMENT EXECUTED TO IMPLEMENT THE PLAN OR  (II) ANY OBLIGATIONS (WHETHER PRE- OR POST-EFFECTIVE DATE) UNDER THE NNI PLAN OR THE SPSA OR ANY DOCUMENT, INSTRUMENT OR ARGREEMENT EXECUTED TO IMPLEMENT THE NNI PLAN OR THE SPSA, AND EXCEPT AS OTHERWISE PROVIDED BY PRIOR OR SUBSEQUENT FINAL ORDER OF THE BANKRUPTCY COURT, NOTHING IN THIS SECTION 13.3 OR SECTION 13.2 SHALL OPERATE AS A WAIVER OR RELEASE OF (A) ANY PERSON (I) NAMED PRIOR TO THE EFFECTIVE DATE AS A DEFENDANT IN ANY ACTION COMMENCED BY OR ON BEHALF OF NNIII OR (II) ADJUDICATED PRIOR TO THE EFFECTIVE DATE BY A COURT OF COMPETENT JURISDICTION TO HAVE ENGAGED IN ACTS OF DISHONESTY OR WILLFUL MISCONDUCT DETRIMENTAL TO THE INTEREST OF NNIII OR (B) ANY CLAIM (I) WITH RESPECT TO ANY LOAN, ADVANCE OR SIMILAR PAYMENT BY NNIII TO ANY SUCH PERSON, (II) WITH RESPECT TO ANY CONTRACTUAL OBLIGATION OWED BY SUCH PERSON TO NNIII OR (III) RELATING TO SUCH PERSON'S KNOWING FRAUD, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT; AND *PROVIDED*, *FURTHER*, THAT THE FOREGOING IS NOT INTENDED, NOR SHALL IT BE CONSTRUED, TO RELEASE ANY OF NNIII'S CLAIMS THAT MAY EXIST AGAINST NNIII'S DIRECTORS AND OFFICERS LIABILITY INSURANCE; AND *PROVIDED*, *FURTHER*, THAT, NOTWITHSTANDING THE FOREGOING, ALL SUCH CLAIMS SHALL BE PRESERVED BY NNIII FOR SETOFF PURPOSES.**

　　　　13.4　　SPSA Releases.

**UPON THE EFFECTIVE DATE, AS PROVIDED IN SECTION 8 OF THE SPSA AND IN CONSIDERATION FOR THE SETTLEMENTS PROVIDED FOR UNDER THE SPSA INCLUDING THE RELEASES GRANTED IN FAVOR OF NNIII UNDER THE SPSA, NNIII AND THE OTHER DEBTOR RELEASING PARTIES, TO THE EXTENT NOT PREVIOUSLY RELEASED PURSUANT TO THE 9019 APPROVAL ORDER OR OTHERWISE, SHALL BE DEEMED TO HAVE RELEASED AND FOREVER DISCHARGED EACH OF THE OTHER SPSA RELEASED PARTIES FROM ANY AND ALL LIABILITY FOR CLAIMS, DEFENSES, DEMANDS, LIABILITIES, DAMAGES, ACTIONS, CONTRIBUTIONS, SUBROGATION, CAUSES OF ACTION, SETOFFS, RECOUPMENTS, COSTS AND EXPENSES (INCLUDING LAWYERS' OR OTHER FEES OR EXPENSES), THE FOREGOING TERMS TO BE CONSTRUED AS BROADLY AS POSSIBLE, WHETHER KNOWN OR UNKNOWN, PAST OR PRESENT, FIXED OR CONTINGENT, LIQUIDATED OR UNLIQUIDATED, WHICH ANY OF THE DEBTOR RELEASING PARTIES HAVE, HAD, MAY HAVE HAD OR HEREAFTER MAY HAVE HOWEVER SO ARISING OUT OF OR IN CONNECTION WITH THE ALLOCATION DISPUTE, ANY OTHER MATTERS RESOLVED UNDER THE SPSA OR ANY OTHER MATTER RELATING TO THE CHAPTER 11 CASES OR THE FOREIGN PROCEEDINGS OR THE NORTEL GROUP (COLLECTIVELY, AND EXCLUDING THE NON-RELEASED MATTERS, THE "SPSA RELEASED CLAIMS") AND UNDERTAKES, COVENANTS AND AGREES NOT TO MAKE ANY CLAIM, PARTICIPATE IN ANY PROCEEDING OR TAKE ANY ACTION AGAINST ANY OTHER PERSON OR ENTITY WHO WOULD AS A RESULT OF SUCH CLAIM, PROCEEDING OR ACTION HAVE A CLAIM FOR CONTRIBUTION OR INDEMNITY AGAINST ANY OF THE OTHER SPSA RELEASED PARTIES IN RELATION TO THE SPSA RELEASED CLAIMS, *PROVIDED HOWEVER*, THAT NNIII'S RIGHT TO OBJECT TO, OR ASSERT COUNTERCLAIMS FOR PURPOSES OF SETOFF AGAINST, CLAIMS MADE AGAINST IT BY DIRECTORS AND OFFICERS OF ANY ENTITY IN THE NORTEL GROUP IS NOT RELEASED OR IN ANY WAY COMPROMISED. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS PARAGRAPH, THE RELEASES SET FORTH ABOVE IN THIS SECTION 13.4 DO NOT CONSTITUTE A RELEASE, WAIVER OR DISCHARGE OF THE INTERCOMPANY CLAIMS SPECIFIED ON ANNEX L TO THE SPSA, ANY CLAIM BETWEEN OR AMONG ANY OF THE FORMER DEBTORS AND THEIR SUBSIDIARIES, OR ANY CLAIM TO ENFORCE THE TERMS OF THE SPSA, THE PLAN, THE NNI PLAN, THE CANADIAN PLAN AND ANY ORDER OF THE BANKRUPTCY COURT OR THE CCAA COURT RELATED THERETO (COLLECTIVELY, THE "NON-RELEASED MATTERS").**

13.5    **Exculpation and Limitation of Liability.**

**None of the Exculpated Parties shall have or incur any liability to any Entity for any act taken or omitted to be taken in connection with and subsequent to the commencement of the Chapter 11 Cases, the formulation, preparation, dissemination, implementation, solicitation of votes, confirmation or approval of the Plan or any compromises or settlements contained therein, the administration of the Plan or Distributions under the Plan, the Disclosure Statement and any ancillary documents related thereto or any contract, instrument, release or other agreement or document**

**provided for or contemplated in connection with the consummation of the transactions set forth in the Plan;** *provided, however,* **the foregoing provisions of this Section 13.5 shall not affect the liability of any Exculpated Party that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct, including, without limitation, fraud and criminal misconduct, and in all respects the Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under this Plan.**

      **13.6    Injunction on Claims.**

      **Except as otherwise expressly provided in the Plan, the Confirmation Order or such other order of the Bankruptcy Court that may be applicable, all Holders of Claims or other debt or liability that is treated under the Plan or Interest or other right of interest that is terminated or cancelled pursuant to the Plan are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or other debt or liability or Interest or other right of equity interest that is terminated or cancelled pursuant to the Plan against NNIII, NNIII's Estate or Wind-Down NNIII or any properties or interest in properties of NNIII or Wind-Down NNIII, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against NNIII, NNIII's Estate or Wind-Down NNIII or any properties or interest in properties of NNIII or Wind-Down NNIII, (c) creating, perfecting or enforcing any encumbrance of any kind against NNIII, NNIII's Estate or Wind-Down NNIII or any properties or interest in properties of NNIII or Wind-Down NNIII, (d) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from NNIII, NNIII's Estate or Wind-Down NNIII or any properties or interest in properties of NNIII or Wind-Down NNIII, (e) acting or proceeding in any manner that does not conform to or comply with the provisions of the Plan or (f) taking any actions to interfere with the implementation or consummation of the Plan, with respect to any such Claim or other debt or liability that is discharged or Interest or other right of equity interest that is terminated or cancelled pursuant to the Plan.**

      **13.7    Terms of Injunctions or Stays.**  Unless otherwise provided in the Plan, the Confirmation Order or a separate order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Case under sections 105 and 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date shall remain in full force and effect until the Effective Date.  Upon the Effective Date, all injunctions or stays provided for in each Chapter 11 Case under sections 105 or 362 of the Bankruptcy Code, or otherwise, shall be lifted and of no further force or effect—being replaced, to the extent applicable, by the injunctions, discharges, releases and exculpations of this Article 13.

      **13.8    Retention of Litigation Claims and Reservation of Rights.**

      (a)    Except as expressly provided in the Plan, nothing contained in the Plan or in the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights with respect to Litigation Claims that NNIII, Wind-Down NNIII or the Plan Administrator may have or choose to assert on behalf of NNIII's Estate or Wind-Down NNIII under any provision

of the Bankruptcy Code or any applicable non-bankruptcy law, including, without limitation, any and all claims against any Person or Entity, to the extent such Person or Entity asserts a cross-claim, counterclaim or claim for setoff that seeks affirmative relief against NNIII, its officers, directors or representatives.

(b)    Except as expressly provided in the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any Litigation Claim, right of setoff or other legal or equitable defense that NNIII had immediately prior to the Petition Date, against or with respect to any Claim.  NNIII, Wind-Down NNIII and the Plan Administrator shall have, retain, reserve and be entitled to assert all such Litigation Claims, rights of setoff and other legal or equitable defenses that NNIII had immediately prior to the Petition Date fully as if the Chapter 11 Case had not been commenced, and all of NNIII's legal and equitable rights respecting any Claim may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Case had not been commenced.

(c)    Except as expressly provided in the Plan, the Plan Administrator, shall, after the Effective Date, retain the rights of NNIII to prosecute any Litigation Claims that could have been brought by NNIII at any time.

**13.9    Retention of Rights.**  The Plan Administrator and Wind-Down NNIII shall retain the rights of NNIII to enforce all orders entered and relief granted in the Chapter 11 Case.

**13.10    Vesting.**  Except as otherwise expressly provided in the Plan or the SPSA, or any documents or instruments executed in accordance therewith, on the Effective Date, pursuant to section 1141(b) and section 1141(c) of the Bankruptcy Code, Wind-Down NNIII shall be vested with all of the Assets of NNIII's Estate free and clear of all Claims, Interests, Liens, encumbrances, charges and other interests of Creditors and Holders of Interests, and may operate free of any restrictions imposed by the Bankruptcy Code or by the Bankruptcy Court, including, without limitation, performing any contract or lease entered into or assumed by NNIII after the Petition Date.  NNIII shall continue as Debtor-in-Possession under the Bankruptcy Code until the Effective Date, and thereafter, subject to the terms of the Plan, Wind-Down NNIII may operate free of any restrictions imposed by the Bankruptcy Code or the Bankruptcy Court.

## ARTICLE 14.
## RETENTION OF JURISDICTION

Pursuant to sections 105 and 1142 of the Bankruptcy Code, and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising in, arising under or related to the Chapter 11 Case and this Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

(a)    Allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the allowance or priority of all Claims and Interests;

(b)      Hear and determine any and all Causes of Action against any Person and rights of NNIII and Wind-Down NNIII that arose before or after the Petition Date, including, but not limited to, the rights and powers of a trustee and Debtor-in-Possession against any Person whatsoever, including, but not limited to, all avoidance powers granted to NNIII under the Bankruptcy Code and all Causes of Action and remedies granted pursuant to sections 502, 506, 510, 541, 542, 543, 544, 545, 547 through 551 and 553 of the Bankruptcy Code;

(c)      Grant or deny any applications for allowance of compensation for Professionals authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or prior to the Effective Date; *provided*, *however*, that the payment of all fees and expenses of Wind-Down NNIII and the Plan Administrator incurred from and after the Effective Date, including counsel fees, shall be made in the ordinary course and without further notice or Bankruptcy Court approval;

(d)      Resolve any matters relating to the assumption, assumption and assignment or rejection of any executory contract or unexpired lease to which NNIII is or was a party or with respect to which NNIII may be liable, including, without limitation, the determination of whether such contract is executory for the purposes of section 365 of the Bankruptcy Code, and hear, determine and, if necessary, liquidate any Claims arising therefrom;

(e)      Enter orders approving Wind-Down NNIII's post-Confirmation sale or other disposition of Residual Assets upon motion by the Plan Administrator;

(f)      Ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(g)      Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving NNIII that may be pending in the Chapter 11 Case on the Effective Date;

(h)      Hear and determine matters concerning state, local or federal taxes in accordance with sections 346, 505, 1129 or 1146 of the Bankruptcy Code;

(i)      Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and the Confirmation Order and all contracts, instruments, releases and other agreements or documents created in connection with this Plan, the Disclosure Statement or the Confirmation Order;

(j)      Hear and determine any matters concerning the enforcement of the provisions of Article 13 of this Plan and any other exculpations, limitations of liability or injunctions contemplated by this Plan;

(k)      Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or the Confirmation Order;

(l)      Permit NNIII, to the extent authorized pursuant to section 1127 of the Bankruptcy Code, to modify the Plan, Confirmation Order or any agreement, contract,

instrument release or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in the Plan or any agreement, contract, instrument, release or document created in connection with the Plan;

(m)    Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with respect to consummation, implementation or enforcement of the Plan or the Confirmation Order;

(n)    Enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings, including with respect to the Plan and the Confirmation Order, entered in connection with the Chapter 11 Case;

(o)    Hear and determine Causes of Action by or on behalf of NNIII or Wind-Down NNIII or the Plan Administrator;

(p)    Enter and enforce such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked vacated, or Distributions pursuant to the Plan are enjoined or stayed;

(q)    Hear and determine all claims, rights or disputes arising under or in connection with the orders previously entered in the Chapter 11 Case;

(r)    Hear and determine any other matters that may arise in connection with or relating to the Plan, the Confirmation Order, the SPSA, the Plan Administration Agreement or any agreement, contract, instrument release or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

(s)    Enter any orders in aid of and resolve any matters relating to or arising under prior orders of the Bankruptcy Court; and

(t)    Enter a final decree closing the Chapter 11 Case.

## ARTICLE 15.
## MISCELLANEOUS PROVISIONS

**15.1    Effectuating Documents and Further Transactions.**  NNIII and Wind-Down NNIII and, on and after the Effective Date, the Plan Administrator shall be authorized to execute, deliver, file or record such contracts, instruments, releases, consents, certificates, resolutions, programs and other agreements or documents and take such acts and actions as may be reasonable, necessary or appropriate to effectuate, implement, consummate or further evidence the terms and conditions of this Plan, the Confirmation Order and any transactions described in or contemplated by this Plan, without the need for any approvals, authorization or consents except for those expressly required pursuant to the Plan.

**15.2    Authority to Act.**  All matters expressly provided for under this Plan that would otherwise require approval of the stockholders, security holders, officers, directors, partners, managers, members or other owners of NNIII or Wind-Down NNIII or one or more of

the Former Debtors shall be deemed to have occurred and shall be in effect prior to, on or after the Effective Date (as appropriate) pursuant to the applicable law of the states in which NNIII or Wind-Down NNIII are formed, without any requirement of further vote, consent, approval, authorization or other action by such stockholders, security holders, officers, directors, partners, managers, members or other owners of such entities or notice to, order of or hearing before the Bankruptcy Court.

**15.3    Amendment or Modification of the Plan.**  Subject to Section 6(c) of the SPSA and subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123 and 1125 of the Bankruptcy Code, NNIII reserves the right to alter, amend or modify the Plan at any time prior to the Confirmation Date but prior to the substantial consummation of the Plan.  Notwithstanding the foregoing, NNIII shall not alter, amend, withdraw, replace or modify the Plan in a manner that is inconsistent with its obligations under the SPSA.  A Holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claims of such Holder and is consistent with this Section 15.3.  For the avoidance of doubt, nothing in this Section 15.3 limits any SPSA Party's rights pursuant to Section 6(h) of the SPSA with respect to any proposed amendment, restatement, modification and/or supplement to the Plan.

**15.4    Administrative Expense Claims Reserve.**  On or before the Effective Date, NNIII shall reserve for an estimated amount for unpaid Professional Claims and any other Administrative Expense Claims that have not been Filed as of the Effective Date (the "Administrative Expense Claims Reserve").  The balance of the Cash held in the Administrative Expense Claims Reserve, if any, after all Professional Claims and Administrative Expense Claims have been paid, and Distributions made in accordance with the Plan, shall be available for Distribution to Holders of Allowed Claims, in accordance with the provisions of the Plan and the Confirmation Order.

**15.5    Fees and Expenses.**  From and after the Effective Date, Wind-Down NNIII shall, in the ordinary course and without the necessity for any approval by the Bankruptcy Court, pay the reasonable and necessary fees and expenses incurred by the Disbursing Agent and Plan Administrator in accordance with and from the funds provided for such use in this Plan.

**15.6    Revocation or Withdrawal of the Plan.**  Subject to the terms of the SPSA, NNIII reserves the right to revoke or withdraw the Plan prior to the Effective Date.  If NNIII revokes or withdraws the Plan, or if Confirmation does not occur or if the Plan does not become effective, then the Plan shall be null and void, and nothing contained in the Plan or Disclosure Statement shall: (a) constitute a waiver or release of any Claims by or against, or any Interests in, NNIII or any other Person; (b) constitute an admission of any fact or legal conclusion by NNIII or any other Entity or (c) prejudice in any manner the rights of NNIII in any further proceedings involving NNIII.

**15.7    Insurance Preservation.**  Nothing in the Plan, including any releases, shall diminish or impair the enforceability of any insurance policies or other policies of insurance that may cover insurance claims or other claims against NNIII or any other Person.

**15.8    Exemption from Certain Transfer Taxes.**  Pursuant to section 1146 of the Bankruptcy Code, any transfers from NNIII, Wind-Down NNIII or the Plan Administrator pursuant to, in furtherance of or in connection with this Plan shall not be subject to any stamp tax, recording tax, personal property tax, real estate transfer tax, sales tax, use tax, transaction privilege tax, privilege taxes or other similar tax, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**15.9    Subordinated Claims.**  The allowance, classification and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, NNIII reserves the right for the Plan Administrator to re-classify any Allowed Claim or Interest in accordance with any contractual, legal or equitable subordination relating thereto.

**15.10    Cross-Border Protocol and Cross-Border Claims Protocol.**  The Cross-Border Protocol and Cross-Border Claims Protocol shall each remain in full force and effect in accordance with their respective terms.

**15.11    Governing Law.**  Unless a rule of law or procedure is supplied by (a) United States federal law (including the Bankruptcy Code and Bankruptcy Rules) or (b) an express choice of law provision in any agreement, contract, instrument or document provided for, or executed in connection with, the Plan, the rights and obligations arising under the Plan and any agreements, certificates, by-laws, releases, contracts, documents and instruments executed in connection with the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof.

**15.12    No Admissions.**  Notwithstanding anything herein to the contrary, nothing in the Plan shall be deemed as an admission by NNIII with respect to any matter set forth herein, including liability on any Claim.

**15.13    Severability of Plan Provisions.**  Subject to the terms of the SPSA, if, prior to Confirmation, any term or provision of the Plan that does not govern the treatment of Claims or Interests is held by the Bankruptcy Court to be invalid, void or unenforceable, at the request of NNIII the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a final judicial determination and shall provide that each term and provision of the Plan, as it may have been

altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**15.14   Successors and Assigns.**   This Plan shall be binding upon and inure to the benefit of NNIII and its successors and assigns, including, without limitation, Wind-Down NNIII. The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

**15.15   Defenses with Respect to Unimpaired Claims.**   Except as otherwise provided in this Plan, nothing shall affect the rights and legal and equitable defenses of NNIII, Wind-Down NNIII or the Plan Administrator with respect to any Unimpaired Claim, including all rights in respect of legal and equitable defenses to setoffs or recoupments against Unimpaired Claims.

**15.16   Section 1125(e) Good Faith Compliance.**   Confirmation of the Plan shall act as a finding by the Bankruptcy Court that NNIII and each of its representatives have acted in "good faith" under section 1125(e) of the Bankruptcy Code**.**

**15.17   No Injunctive Relief.**   Except as otherwise provided in the Plan or Confirmation Order, no Claim or Interest shall under any circumstances be entitled to specific performance or other injunctive, equitable or other prospective relief.

**15.18   Payment of Statutory Fees.**   All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court, shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Case is converted, dismissed or closed, whichever occurs first.

**15.19   Saturday, Sunday or Legal Holiday.**   If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

**15.20   Reservation of Rights**.   Except as expressly set forth herein, the Plan shall have no force or effect unless and until the Effective Date occurs.  Neither the filing of the Plan, any statement or provision contained herein, nor the taking of any action by NNIII or any Entity with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) NNIII with respect to the Holders of Claims or Interests or other parties-in-interest; or (2) any Holder of a Claim or Interest or other party-in-interest prior to the Effective Date.

**15.21   Post-Effective Date Rule 2002 Notice List**.   After the Effective Date, any Entity that, prior to the Effective Date, had requested from NNIII or the Claims Agent to receive notice in the Chapter 11 Case pursuant to Bankruptcy Rule 2002 must renew such request in writing to the Claims Agent in order to be included on the list of entities entitled to receive documents from Wind-Down NNIII pursuant to Bankruptcy Rule 2002 (the "**Post-Effective Date Notice List**").  On and after the Effective Date, Wind-Down NNIII is authorized to limit the list of entities receiving documents pursuant to Bankruptcy Rule 2002 to those entities that request to be included on the Post-Effective Date Notice List.

**15.22   Right to Abandon and Dispose of Debtor Property, Books & Records**. After the Effective Date, notwithstanding any prior order of the Bankruptcy Court, the Plan Administrator shall give notice of a proposed abandonment or disposition of property by filing a notice on the docket of the Chapter 11 Case and delivering a copy of such notice to the Canadian Debtors and the Monitor; *provided*, *however*, that the Plan Administrator shall be entitled to abandon, dispose of and/or destroy Records (as defined in the Abandonment and Disposal Procedures Order), without notice and without complying with any Retention Laws (as defined in the Abandonment and Disposal Procedures Order), in accordance with the terms of the Abandonment and Disposal Procedures Order and the Document Disposal Procedures (as defined in the Abandonment and Disposal Procedures Order) attached to the Abandonment and Disposal Procedures Order as Exhibit 1; *provided further*, *however*, that the destruction or other disposition of any Servers or Related Equipment (each as defined in the Server Access and Disposition Order) shall be governed by the Server Access and Disposition Order and NNIII shall only be required to provide written confirmation to the EMEA Debtors of such destruction or other disposition and the means of such destruction or other disposition.  The filing of a notice of abandonment or disposition on the docket pursuant to this Section 15.22 shall constitute good and sufficient notice, and no other or further notice of proposed abandonment or disposition is necessary.  If no party serves an objection within thirty (30) days of the posting of such notice, the Plan Administrator shall be authorized immediately to abandon or dispose of such property.

**15.23   Notices.**  Any notice required or permitted to be provided under this Plan shall be in writing and served by either (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery or (c) reputable overnight delivery service, freight prepaid, to be addressed as follows:

Counsel for NNIII

>        Cleary Gottlieb Steen & Hamilton LLP
>        One Liberty Plaza
>        New York, NY 10006
>        (212) 225-3999 (facsimile)
>        Attn:   Lisa M. Schweitzer, Esq.

>                - and -

>        Morris, Nichols, Arsht & Tunnell LLP
>        1201 North Market Street, 18th Floor
>        P.O. Box 1347
>        Wilmington, DE 19899
>        (302) 658-3989 (facsimile)
>        Attn:   Derek C. Abbott, Esq.
>                Andrew R. Remming, Esq.

The Plan Administrator

>        Owl Hill Advisory LLC
>        Attn:   John J. Ray, III

c/o Counsel for the Plan Administrator

<u>Counsel for the Plan Administrator</u>

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
(212) 225-3999 (facsimile)
Attn:  Lisa M. Schweitzer, Esq.

Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street, 18th Floor
P.O. Box 1347
Wilmington, DE 19899
(302) 658-3989 (facsimile)
Attn:  Derek C. Abbott, Esq.
          Andrew R. Remming, Esq.

Dated: August 26, 2021.

**Nortel Networks India International Inc.**


By: _____
     Name: John J. Ray, III
     Title:   Principal Officer

# **EXHIBIT A**

## **Settlement and Plans Support Agreement**

CONFIDENTIAL
FOR SETTLEMENT PURPOSES ONLY
SUBJECT TO FRE 408 AND ANALOGS IN ALL RELEVANT JURISDICTIONS
(**EXECUTION VERSION**)

## SETTLEMENT AND PLANS SUPPORT AGREEMENT

This **SETTLEMENT AND PLANS SUPPORT AGREEMENT** (together with all Annexes hereto, in each case as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof, this "**Settlement and Support Agreement**") is dated as of October 12, 2016 and entered into by and among: (i) the Canadian Debtors;[1] (ii) the Monitor; (iii) the U.S. Debtors; (iv) the EMEA Debtors; (v) the EMEA Non-Filed Entities; (vi) the Joint Administrators; (vii) NNSA; (viii) the NNSA Conflicts Administrator; (ix) the French Liquidator; (x) the Bondholder Group; (xi) the members of the CCC; (xii) the UCC; (xiii) the U.K. Pension Trustee; (xiv) the PPF; (xv) the Joint Liquidators and (xvi) the NNCC Bondholder Signatories (collectively, the "**Parties**" and each a "**Party**").

**WHEREAS**, NNC, NNL, NNI, NNSA and NNUK and various other members of the Nortel Group commenced insolvency proceedings as early as January 14, 2009 (collectively, the "**Nortel Insolvency Proceedings**");

**WHEREAS,** during the course of the Nortel Insolvency Proceedings various assets were sold and certain Sale Proceeds are held in the Existing Escrow Accounts pending either the agreement of the relevant parties or final CCAA Court and Bankruptcy Court decisions regarding the allocation of said proceeds;

**WHEREAS**, various of the Parties have or may have claims as against other Parties which are to be resolved in the context of the Nortel Insolvency Proceedings;

**WHEREAS**, certain of the Parties are parties to certain litigation before the Canadian Court and U.S. Court in which the allocation of the Sale Proceeds is at issue (the "**Allocation Dispute**");

**WHEREAS**, the CCAA Court and the Bankruptcy Court each issued separate decisions on or about May 12, 2015 and July 6, 2015 regarding the Allocation Dispute and such decisions remain subject to appeal in both jurisdictions (the "**Allocation Decisions**");

**WHEREAS**, the Parties acknowledge and agree that the ultimate outcome of continued litigation in relation to the Allocation Dispute and the potential claim matters among them is uncertain, that further appeals are likely, that the cost of such litigation is substantial and burdensome to each of the Parties and their respective constituencies and that settlement of such

---

[1] Capitalized terms not otherwise defined in the main body of this Settlement and Support Agreement shall have the meaning ascribed to them in Section 1 hereof.

matters is key to advancing the Nortel Insolvency Proceedings to facilitate distributions to creditors of the various Debtors' estates;

**WHEREAS,** the Parties desire to settle fully and finally the Allocation Dispute and key potential claims matters among them and each Party has concluded it is appropriate and in the best interest of each to enter into this Settlement and Support Agreement;

**WHEREAS,** the Parties wish to effectuate a full and final settlement of the Allocation Dispute and certain other matters in accordance with terms and conditions set forth herein (the "**Settlement**"); and

**WHEREAS**, to effect the Settlement, the Parties have agreed to enter into this Settlement and Support Agreement.

**NOW, THEREFORE**, in consideration of the foregoing and the promises, mutual covenants, and agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound, agrees as follows:

**Section 1. <u>Definitions</u>**

"**<u>Allocation Decisions</u>**" has the meaning set forth in the recitals hereto.

"**<u>Allocation Dispute</u>**" has the meaning set forth in the recitals hereto.

"**<u>Applicable FX Rate</u>**" has the meaning set forth in Section 7(g) hereof.

"**<u>Bankruptcy Code</u>**" means title 11 of the United States Code, as amended.

"**<u>Bankruptcy Court</u>**" means the United States Bankruptcy Court for the District of Delaware.

"**<u>Bankruptcy Rules</u>**" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases and the general, local and chambers rules of the Bankruptcy Court.

"**<u>Beddoes Court</u>**" means the High Court of Justice of England and Wales that has the power to provide directions to the U.K. Pension Trustee authorizing the U.K. Pension Trustee to execute and implement this Settlement and Support Agreement.

"**<u>Bondholder Group</u>**" means the ad hoc group of bondholders that hold notes issued and/or guaranteed by NNC, NNL, NNI, and NNCC, which on June 15, 2016, filed with the Bankruptcy Court a disclosure form under Bankruptcy Rule 2019, as such group may be constituted from time to time.

"**<u>Business Day</u>**" means any day (other than a Saturday, Sunday or legal holiday, as such term is defined in Bankruptcy Rule 9006(a)) on which banks are open for general business in all of New York City, New York, U.S.A.; Toronto, Ontario, Canada; London, England; and Paris France.

2

"**Buyer Escrow Accounts**" means the escrow accounts established pursuant to certain escrow agreements among certain Nortel Group entities, certain purchasers of Nortel assets and escrow agents governing the holding and release of certain amounts held in escrow in connection with such transactions as set forth on Annex B under the heading "Buyer Escrow Accounts."

"**Buyer Escrow Amount**" has the meaning set forth in Section 2(g) hereof.

"**CAD Claims**" has the meaning set forth in Section 4(n)(i) hereof.

"**Canadian Allocation**" has the meaning set forth in Section 2(c)(ii) hereof.

"**Canadian Court**" means any and all of the CCAA Court, the Ontario Court of Appeal, the Supreme Court of Canada or any other court of competent jurisdiction overseeing the Canadian Proceedings (including any appeals) from time to time.

"**Canadian Debtors**" means, collectively, NNC, NNL, Nortel Networks Global Corporation, Nortel Networks International Corporation, Nortel Networks Technology Corporation, Nortel Communications Inc., Architel Systems Corporation and Northern Telecom Canada Limited.

"**Canadian Escrow Account**" means the account with the Canadian Escrow Agent established pursuant to the Canadian Escrow Agreement to hold that portion of the Sale Proceeds to be converted into Canadian Dollars.

"**Canadian Escrow Agent**" means Royal Trust Corporation of Canada.

"**Canadian Escrow Agreement**" means that certain distribution escrow agreement, substantially in the form attached hereto as Annex K to be entered into among NNC, NNL, NNI, NNUK, the other existing Depositors under the relevant Existing Escrow Agreements, NNSA, the Monitor and the UCC to hold that portion of the Sale Proceeds to be converted into Canadian Dollars.

"**Canadian Escrow Release Order**" means an order issued by the CCAA Court authorizing and directing the release of the Sale Proceeds from the Escrow Accounts in the manner contemplated hereby.

"**Canadian Estate**" means the Canadian Debtors as substantively consolidated as contemplated herein.

"**Canadian Information Circular**" means the information circular to be provided to the Canadian Voting Creditors relating to the Canadian Plan as approved by the CCAA Court.

"**Canadian Meeting Order**" means an order of the CCAA Court granted pursuant to Section 4 and/or 5 of the CCAA that, among other things, authorizes the holding of a meeting or meetings of the Canadian Debtors' creditors for purposes of considering and voting upon the Canadian Plan and approves the Canadian Information Circular.

"**Canadian Pension Claim**" has the meaning set forth in Section 4(g)(i) hereof.

3

"**Canadian Plan**" means the CCAA plan of compromise or arrangement (including any exhibits, annexes and schedules thereto) for the Canadian Debtors that effectuates the Settlement, consistent with the terms of this Settlement and Support Agreement, as it may be modified or supplemented in accordance with its terms.

"**Canadian Proceedings**" means, collectively, those Nortel Insolvency Proceedings that were commenced before the CCAA Court pursuant to the CCAA on or after January 14, 2009 in respect of the Canadian Debtors.

"**Canadian Surplus Amount**" has the meaning set forth in Section 7(j)(i)(B).

"**Canadian Voting Creditors**" means creditors holding Proven Claims against the Canadian Debtors and such other creditors that are permitted to vote on the Canadian Plan.

"**Cascade Trust**" means the trust established pursuant to that certain Trust Indenture dated April 5, 2010 among NNL and NNI, as settlors, and John T. Evans, as trustee.

"**Cascade Trust Side Letter**" means the Trust Indenture Side Agreement, dated April 5, 2010, between NNL and NNI relating to the Cascade Trust.

"**CCAA**" means the Companies' Creditors Arrangement Act, R.S.C. 1985, c C-36.

"**CCAA Court**" means the Ontario Superior Court of Justice (Commercial List).

"**CCC**" means the ad hoc committee of creditors having claims only against the Canadian Debtors comprised of the former and disabled Canadian employees of the Canadian Debtors through their court-appointed representatives, Unifor, Morneau Shepell Ltd. as Administrator of Nortel's Canadian registered pension plans, the Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund and the court-appointed representatives of the current and transferred employees of the Canadian Debtors.

"**CFSA**" means the Final Canadian Funding and Settlement Agreement among, inter alia, certain of the Canadian Debtors, the Monitor and certain of the U.S. Debtors, dated December 23, 2009.

"**Chapter 11 Cases**" means the cases filed by the U.S. Debtors pursuant to Chapter 11 of the Bankruptcy Code.

"**Claims Procedure Order**" means the Claims Procedure Order entered by the CCAA Court dated July 30, 2009, as amended and restated on October 7, 2009.

"**Confirmation Order**" means an order of the Bankruptcy Court entered on the docket in the Chapter 11 Cases confirming the U.S. Plans.

"**Conversion Elections**" has the meaning set forth in Section 7(c)(i)(A) hereof.

"**Conversion Election Request**" has the meaning set forth in Section 7(c)(iii) hereof.

"**Converting Debtor**" has the meaning set forth in Section 7(i)(i) hereof.

4

"**Creditor Joinder**" means a joinder to this Settlement and Support Agreement, substantially in the form annexed hereto as Annex D.

"**Creditor's Maximum**" has the meaning set forth in Section 4(c)(i)(B) hereof.

"**Cross-Border Protocol**" means the Cross-Border Protocol originally approved by the Bankruptcy Court on or about January 14, 2009 and by the CCAA Court on January 14, 2009, as the same has been amended, as approved by both the Bankruptcy Court and the CCAA Court, from time to time.

"**Crossover Bondholder Fee Letter**" has the meaning set forth in Section 4(k) hereof.

"**Crossover Bondholders**" means beneficial owners of Crossover Bonds as of the earlier of (a) the date each such holder executes a Creditor Joinder or a Transferee Joinder; and (b) the record date that will be established under the U.S. Plans and the Canadian Meeting Order.

"**Crossover Bonds**" means those bonds issued pursuant to the indentures listed on Annex G hereto, but excluding the NNCC Bonds.

"**Crossover Bonds Claims**" means those Crossover Claims relating to the Crossover Bonds.

"**Crossover Claims**" has the meaning set forth in Section 4(c)(i) hereof.

"**Debtors**" means, collectively, the U.S. Debtors, the Canadian Debtors, the EMEA Debtors and NNSA.

"**Depositors**" has the meaning given to such term in the Escrow Agreements.

"**Disclosure Statements**" means, collectively, the U.S. Disclosure Statement and the Canadian Information Circular.

"**EDC**" means Export Development Canada.

"**EMEA Allocation**" has the meaning set forth in Section 2(c)(v) hereof.

"**EMEA Canada Settlement Agreement**" has the meaning set forth in Section 4(b)(i) hereof.

"**EMEA Canadian Claim**" has the meaning set forth in Section 4(b)(i) hereof.

"**EMEA Debtors**" means, collectively, NNUK, Nortel Networks (Ireland) Limited (in administration), Nortel Networks NV (in administration), Nortel Networks SpA (in administration), Nortel Networks BV (in administration), Nortel Networks Polska Sp z.o.o. (in administration), Nortel Networks Hispania SA (in administration), Nortel Networks (Austria) GmbH (in administration), Nortel Networks s.r.o. (in administration), Nortel Networks Engineering Service Kft (in administration), Nortel Networks Portugal SA (in administration), Nortel Networks Slovensko s.r.o. (in administration), Nortel Networks Romania SRL (in administration), Nortel GmbH (in administration), Nortel Networks OY (in administration), Nortel Networks AB (in administration), NNIF, and Nortel Networks France S.A.S. (in

administration), but does not include, for purposes of this Settlement and Support Agreement, NNSA.

"**EMEA Escrow Accounts**" means, collectively, the EMEA Sterling Escrow Account and the EMEA Euro Escrow Account.

"**EMEA Escrow Agreements**" means, collectively, the EMEA Sterling Escrow Agreement and the EMEA Euro Escrow Agreement.

"**EMEA Euro Escrow Account**" means the account with the EMEA Euro Escrow Agent that will be established pursuant to the EMEA Euro Escrow Agreement to hold that portion of the Sale Proceeds to be converted into Euros, in the event that the Euro Conversion Election is requested.

"**EMEA Euro Escrow Agent**" means the escrow agent named in the EMEA Euro Escrow Agreement, which escrow agent shall be reasonably acceptable to NNL, NNI, NNUK, NNSA, the other existing Depositors under the relevant Existing Escrow Agreements, the Monitor and the UCC.

"**EMEA Euro Escrow Agreement**" means the distribution escrow agreement, to be entered into among NNC, NNL, NNI, NNUK, NNSA the other existing Depositors under the relevant Existing Escrow Agreements, the Monitor and the UCC, to hold that portion of the Sale Proceeds to be converted into Euros in the event that the Euro Conversion Election is requested, which agreement shall be in a form reasonably acceptable to NNL, NNI, NNUK, NNSA, the other existing Depositors under the relevant Existing Escrow Agreements, the Monitor and the UCC.

"**EMEA Non-Filed Entities**" means, collectively, Nortel Networks AS, Nortel Networks AG, Nortel Networks South Africa (Pty) Limited, NNNI, and NNOCL.

"**EMEA (Non-NNSA/Non-NNUK) Allocation**" has the meaning set forth in Section 2(c)(iii) hereof.

"**EMEA (Non-NNSA/Non-NNUK) Debtors**" means, collectively, Nortel Networks (Ireland) Limited (in administration), Nortel Networks NV (in administration), Nortel Networks SpA (in administration), Nortel Networks BV (in administration), Nortel Networks Polska Sp z.o.o. (in administration), Nortel Networks Hispania SA (in administration), Nortel Networks (Austria) GmbH (in administration), Nortel Networks s.r.o. (in administration), Nortel Networks Engineering Service Kft (in administration), Nortel Networks Portugal SA (in administration), Nortel Networks Slovensko s.r.o. (in administration), Nortel Networks Romania SRL (in administration), Nortel GmbH (in administration), Nortel Networks OY (in administration), Nortel Networks AB (in administration), NNIF and Nortel Networks France S.A.S. (in administration), but does not include NNSA or NNUK.

"**EMEA Proceedings**" means, collectively, those Nortel Insolvency Proceedings that were commenced before the U.K. Court on or about January 14, 2009 in respect of the EMEA Debtors and NNSA, which, for the avoidance of doubt, excludes the French Secondary Proceeding.

"**EMEA Sterling Escrow Account**" means the account with the EMEA Sterling Escrow Agent that will be established pursuant to the EMEA Sterling Escrow Agreement to hold that portion of the Sale Proceeds to be converted into U.K. pounds Sterling, in the event that the Sterling Conversion Election is requested.

"**EMEA Sterling Escrow Agent**" means the escrow agent named in the EMEA Sterling Escrow Account, which agent shall be reasonably acceptable to NNL, NNI, NNUK, NNSA, the other existing Depositors under the relevant Existing Escrow Agreements, the Monitor and the UCC.

"**EMEA Sterling Escrow Agreement**" means the distribution escrow agreement to be entered into among NNC, NNL, NNI, NNUK, the other existing Depositors under the relevant Existing Escrow Agreements, the Monitor and the UCC, to hold that portion of the Sale Proceeds to be converted into U.K. pounds Sterling in the event the Sterling Conversion Election is requested, which agreement shall be in a form reasonably acceptable to NNL, NNI, NNUK, NNSA, the other existing Depositors under the relevant Existing Escrow Agreements, the Monitor and the UCC.

"**EMEA Surplus Amount**" has the meaning set forth at Section 7(k)(i)(B) hereof.

"**Escrow Accounts**" means, collectively, the Existing Escrow Accounts and the New Escrow Accounts.

"**Escrow Agents**" means the Existing Escrow Agents, the Canadian Escrow Agent, the EMEA Euro Escrow Agent and the EMEA Sterling Escrow Agent, as applicable.

"**Escrow Agreements**" means, collectively, the Existing Escrow Agreements and the New Escrow Agreements governing the Escrow Accounts.

"**Escrow Release Orders**" means, collectively, the Canadian Escrow Release Order and the U.S. Escrow Release Order.

"**Estate Fiduciaries**" has the meaning given to such term in the Escrow Agreements.

"**Euro Conversion Election**" has the meaning set forth in Section 7(c)(i)(A) hereof.

"**Existing Escrow Accounts**" means the escrow accounts established to hold the Sale Proceeds, as set forth on Annex B under the heading "Distribution Escrow Accounts."

"**Existing Escrow Agents**" means JPMorgan Chase Bank, N.A. and Citibank, N.A., as applicable, as escrow agents in respect of the Existing Escrow Accounts.

"**Existing Escrow Agreements**" means the agreements among the various Depositors, Estate Fiduciaries and the Escrow Agents governing the Existing Escrow Accounts, as set forth on Annex B under the heading "Distribution Escrow Accounts."

"**Final Allocation Amount**" has the meaning set forth in Section 7(h) hereof.

"**Final Allocation Determination**" has the meaning set forth in Section 7(h) hereof.

7

"**Final Order**" means (a) with respect to an order of a Canadian Court, an order: (i) as to which no appeal, leave to appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed (in cases in which there is a date by which such filing is required to occur, it being understood that with respect to an order issued by the CCAA Court, the time period for seeking leave to appeal shall be deemed to have elapsed on the date that is 22 days after the rendering of such order unless a motion has been made to extend such time period) or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all material respects without the possibility for further appeal thereon; (ii) in respect of which the time period for instituting or filing an appeal, leave to appeal, motion for rehearing or motion for new trial shall have expired (in cases in which such time period is capable of expiring, it being understood that with respect to an order issued by the CCAA Court, the time period for seeking leave to appeal shall be deemed to have elapsed on the date that is 22 days after the rendering of such order unless a motion has been made to extend such time period); and (iii) as to which no stay is in effect; or (b) with respect to an order of a U.S. Court, an order that has not been reversed, stayed, superseded or vacated or, to the extent it has been stayed such stay shall have expired.

"**First French Order**" has the meaning set forth in Section 15(p) hereof.

"**Flextronics**" means Flextronics Telecom Systems Ltd. or any affiliate thereof.

"**French Court**" means the judge appointed in the French Secondary Proceeding, the Versailles Commercial Court, any court hearing appeals therefrom and any other court of competent jurisdiction overseeing the French Secondary Proceeding from time to time.

"**French Liquidator**" means Maître Cosme Rogeau in his capacity as Liquidator for NNSA under the French Secondary Proceeding.

"**French Main Proceeding**" means the U.K. administration of NNSA commencing on January 14, 2009.

"**French Secondary Proceeding**" means the Nortel Insolvency Proceeding that was commenced before the French Court on May 28, 2009 in respect of NNSA.

"**French Supervisory Judge**" has the meaning set forth in Section 15(p) hereof.

"**HOC**" means Nortel Networks Pénzügyi Szolgáltató Korlátolt Felelősségű Társaság.

"**Iceberg**" means the residual intellectual property remaining following the Nortel Group business line sales, which intellectual property was sold to a consortium in July 2011.

"**Iceberg Amendment Fee**" means the U.S.$5 million[2] cumulative fee previously agreed by the Canadian Debtors, U.S. Debtors, EMEA Debtors and NNSA to be funded directly as follows:  U.S.$2.8 million to NNI, and U.S.$2.2 million to NNUK, all from the Iceberg Sale Proceeds prior to any other agreed upon allocation of the Sale Proceeds.

---

[2] All amounts in this Settlement and Support Agreement are expressed in U.S. Dollars unless expressly noted otherwise.

"**Iceberg Escrow Account**" means the escrow account established to hold the Iceberg Sale Proceeds and the Iceberg Amendment Fee, as set forth on Annex B.

"**Iceberg Sale**" means the sale of the Iceberg assets.

"**Iceberg Sale Proceeds**" means that portion of the Sale Proceeds generated from the Iceberg Sale.

"**IFSA**" means the Interim Funding and Settlement Agreement, dated as of June 9, 2009, entered into among various of the Parties, as approved by the CCAA Court on June 29, 2009 and by the Bankruptcy Court on June 29, 2009.

"**IP Addresses**" means internet protocol addresses registered in the name of a Canadian Debtor or a corporate predecessor thereto.

"**Joint Administrators**" means Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson and Stephen John Harris, as the administrators of all EMEA Debtors and NNSA except Nortel Networks (Ireland) Limited (in administration), and Alan Robert Bloom and David Martin Hughes as Administrators of Nortel Networks (Ireland) Limited (in administration).  To the extent that this Settlement and Support Agreement refers to the "Joint Administrators of NNSA" this means Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson, Stephen John Harris and the NNSA Conflicts Administrator.

"**Joint Liquidators**" means Richard Barker and Joseph Luke Charleton as joint liquidators of NNNI and Richard Barker and Samantha Keen as joint liquidators of NNOCL.

"**LG-N**" means LG-Nortel Co. Ltd., a Korean joint venture between NNL and LG Electronics.

"**M&A Cost Reimbursement**" means the reimbursement of certain costs related to fees and expenses incurred in connection with the sale of assets which generated the Sale Proceeds.

"**MEN**" means the Nortel Group business line known as Metro Ethernet Networks.

"**Monitor**" means Ernst & Young Inc. in its capacity as the court-appointed monitor in the proceedings commenced under the CCAA in respect of the Canadian Debtors.

"**Negative Converting Debtor**" has the meaning set forth at Section 7(i)(iv) hereof.

"**New Escrow Accounts**" means, collectively, the Canadian Escrow Account and the EMEA Escrow Accounts.

"**New Escrow Agreements**" means, collectively, the Canadian Escrow Agreement and the EMEA Escrow Agreements.

"**NNC**" means Nortel Networks Corporation, a Canadian Debtor.

"**NNCC**" means Nortel Networks Capital Corporation, a U.S. Debtor.

"**NNCC Bondholder Signatories**" means the holders of NNCC Bonds that execute this Settlement and Support Agreement.

"**NNCC Bondholders**" means holders of NNCC Bonds as of the record date that will be established under the U.S. Plans.

"**NNCC Bonds**" means those bonds issued by NNCC and guaranteed by NNL.

"**NNCC Bonds Claims**" means those Crossover Claims relating to the NNCC Bonds.

"**NNCC Bonds Trustee**" means Law Debenture Trust Company of New York, as indenture trustee for the NNCC Bonds.

"**NNI**" means Nortel Networks Inc., a U.S. Debtor.

"**NNIF**" means Nortel Networks International Finance & Holding B.V. (in administration), an EMEA Debtor.

"**NNL**" means Nortel Networks Limited, a Canadian Debtor.

"**NNNI**" means Nortel Networks (Northern Ireland) Limited (in liquidation), an EMEA Non-Filed Entity.

"**NNOCL**" means Nortel Networks Optical Components Limited (in liquidation), an EMEA Non-Filed Entity.

"**NNSA**" means Nortel Networks S.A. (in administration and in *liquidation judiciaire*).

"**NNSA Allocation**" has the meaning set forth in Section 2(c)(v) hereof.

"**NNSA Conflicts Administrator**" means Stephen Jonathan Taylor of Isonomy Limited as Conflicts Administrator solely in relation to NNSA.

"**NNSA Surplus Amount**" has the meaning set forth at Section 7(k)(iii)(B) hereof.

"**NNUK**" means Nortel Networks U.K. Limited (in administration), an EMEA Debtor.

"**NNUK Allocation**" has the meaning set forth in Section 2(c)(iv) hereof.

"**Non-Converting Debtor**" has the meaning set forth in Section 7(i)(ii) hereof.

"**Non-Released Matters**" has the meaning set forth in Section 8(i) hereof.

"**Nortel Group**" means, collectively, NNC and all of its direct and indirect subsidiaries, whether current or former.

"**Nortel Insolvency Proceedings**" has the meaning set forth in the recitals hereto.

"**Nortel U.S. Trade Claims Consortium**" means a group of creditors holding over U.S.$125 million in unsecured (non-funded debt) claims, including but not limited to trade

10

(supplier) claims, employee severance and pension claims against one or more of the U.S. Debtors.

"**Other Currencies**" has the meaning set forth in Section 7(a) hereof.

"**Participating Creditor**" means a creditor of any of the Debtors that (i) is a Party to this Settlement and Support Agreement; or (ii) delivers a Creditor Joinder or a Transferee Joinder.

"**Party**" and "**Parties**" have the meanings set forth in the recitals hereto.

"**PBGC**" means the Pension Benefit Guaranty Corporation, a United States government corporation.

"**Petition Date**" means January 14, 2009.

"**Person**" means a "person" as defined in Section 101(41) of the Bankruptcy Code.

"**Plans**" means, collectively, the U.S. Plans and the Canadian Plan.

"**Plans Effective Date**" means the first date that (i) all of the U.S. Plans, and (ii) the Canadian Plan are effective in accordance with their respective terms.

"**Positive Converting Debtor**" has the meaning set forth in Section 7(i)(iii) hereof.

"**PPF**" means the Board of the Pension Protection Fund, a statutory corporation established under the provisions of the Pensions Act 2004, whose principal place of business is Renaissance, 12 Dingwall Road, Croydon, United Kingdom, CRO 2NA.

"**PPI Settlement**" means that certain Settlement Agreement entered into between NNI and certain of the Crossover Bondholders dated July 24, 2014 as approved by the Bankruptcy Court on December 18, 2014.

"**Proceeding**" has the meaning set forth in Section 5(e).

"**Proven Claim**" shall, with respect to a claim against one or more of the Canadian Debtors, have the meaning ascribed to such term in the Claims Procedure Order, the Claims Resolution Order of the CCAA Court, dated September 16, 2010, the Compensation Claims Procedure Order of the CCAA Court, dated October 6, 2011, and the Intercompany Claims Procedure Order of the CCAA Court, dated July 27, 2012 and shall include the U.S. Canadian Claim, the Crossover Bondholders' Proven Claim, the NNCC Bondholders' Proven Claim, the EMEA Canadian Claim, the Canadian Pension Claim and the UKPI Canadian Claim.

"**Qualified Marketmaker**" has the meaning set forth in Section 6(j)(ii) hereof.

"**Relay**" means the June 2010 sale of NNL's and NNTC's assets related to the wireless backhaul and multi-hop digital repeater/relay research development program.

"**Released Claims**" has the meaning set forth in Section 8(b)(i) hereof.

"**Releases**" has the meaning set forth in Section 8(b)(ii) hereof.

11

"**Releasee**" has the meaning set forth in Section 8(b)(i) hereof.

"**Releasor**" has the meaning set forth in Section 8(b) hereof.

"**Remaining HOC Claim**" has the meaning set forth in Section 4(h) hereof.

"**Sale Proceeds**" means the remaining proceeds generated by the sales of various Nortel Group business lines and the Iceberg Sale between 2009 and 2011 plus interest accrued thereon such amounts being as currently set forth in Annex A hereto,[3] less (i) US$55 million of M&A Cost Reimbursement; and (ii) the Iceberg Amendment Fee.

"**Sanction Hearing**" means the hearing before the CCAA Court to consider sanction of the Canadian Plan.

"**Sanction Order**" means the order of the CCAA Court sanctioning the Canadian Plan and shall include, for the avoidance of doubt, any order of a Canadian Court affirming such order.

"**Settlement**" has the meaning set forth in the recitals hereto.

"**Settlement and Support Agreement**" has the meaning set forth in the recitals hereto.

"**Side Letters**" has the meaning set forth in Section 4(e) hereof.

"**SNMP**" has the meaning set forth in Section 4(f) hereof.

"**Sterling Conversion Election**" has the meaning set forth in Section 7(c)(i)(A) hereof.

"**Strandherd Lands**" means certain vacant lands of the Canadian Debtors in Ottawa, Ontario, sold in November 2009.

"**Surplus Amount**" has the meaning set forth at Section 7(i)(v) hereof.

"**T&T Claim**" means any and all claims made by Nortel Networks (CALA) Inc. in respect of customer receipts from Telecommunications Services of Trinidad and Tobago deposited into Nortel Networks International Corporation's bank account related to invoices issued to Telecommunications Services of Trinidad and Tobago by Nortel Networks (CALA) Inc.

"**Tax Disputes**" has the meaning set forth in Section 4(a)(v) hereof.

"**Third Circuit**" means the United States Court of Appeals for the Third Circuit.

"**Third Party Claims**" has the meaning set forth in Section 8(c) hereof.

"**Timetable**" has the meaning set forth in Section 9(b) hereof.

---

[3] The total Sale Proceeds available for allocation and distribution may differ from the amounts detailed in Annex A, as described in Section 2(d) hereto.

"**Termination Event**" has the meaning set forth in Section 10(a) hereof.

"**Transfer**" has the meaning set forth in Section 6(j)(i) hereof.

"**Transferee Joinder**" has the meaning set forth in Section 6(j)(i) hereof.

"**Transferor**" has the meaning set forth in Section 6(j)(i) hereof.

"**UCC**" means the Official Committee of Unsecured Creditors appointed pursuant to an order entered by the Bankruptcy Court on January 26, 2009, as the same may be constituted from time to time.

"**UKPI**" means, collectively, the U.K. Pension Trustee and the PPF.

"**UKPI Canadian Claim**" has the meaning set forth in Section 4(b)(i) hereof.

"**U.K. Court**" means the High Court of Justice of England and Wales in London, any court hearing appeals therefrom and any other court of competent jurisdiction overseeing the EMEA Proceedings (including appeals) from time to time.

"**U.K. Pension Trustee**" means Nortel Networks U.K. Pension Trust Limited as trustee of the Nortel Networks Pension Plan.

"**U.S. Allocation**" has the meaning set forth in Section 2(c)(i) hereof.

"**U.S. Canadian Claim**" has the meaning set forth in Section 4(b)(i) hereof.

"**U.S. Canadian Priority Claim**" has the meaning set forth in Section 4(b)(i) hereof.

"**U.S. Court**" means any and all of the Bankruptcy Court, the United States District Court for the District of Delaware, the Third Circuit, the United States Supreme Court or any other court of competent jurisdiction overseeing the U.S. Proceedings (including appeals) from time to time.

"**U.S. Debtors**" means, collectively, NNI, NNCC, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc., Nortel Networks (CALA) Inc., and Nortel Networks India International Inc.

"**U.S. Disclosure Statement**" means a disclosure statement to be provided to the U.S. Voting Creditors relating to the U.S. Plans that complies with sections 1125 and 1126(b) of the Bankruptcy Code.

"**U.S. Escrow Release Order**" means an order issued by the Bankruptcy Court authorizing and directing the release of the Sale Proceeds from the Escrow Accounts in the manner contemplated hereby.

13

"**U.S. Plans**" means the chapter 11 plans of reorganization (including any exhibits, annexes and schedules thereto) for the U.S. Debtors that effectuate the Settlement, consistent with the terms of this Settlement and Support Agreement, as they may be modified or supplemented in accordance with their respective terms.

"**U.S. Principal Officer**" means John J. Ray III, who was appointed Principal Officer of each of the U.S. Debtors pursuant to an order entered by the Bankruptcy Court on January 6, 2010.

"**U.S. Proceedings**" means, collectively, those Nortel Insolvency Proceedings that were commenced before the Bankruptcy Court on or after January 14, 2009 in respect of the U.S. Debtors pursuant to chapter 11 of the Bankruptcy Code.

"**U.S. Voting Creditors**" means unsecured creditors of the U.S. Debtors that are entitled to vote on one or more of the U.S. Plans and whose votes will count toward acceptance of such plans.

"**Worldwide Ds&Os**" has the meaning set forth in Section 8(b)(i) hereof.

The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise (a) any reference herein to any Person shall be construed to include such Person's successors and assigns, (b) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Settlement and Support Agreement in its entirety and not to any particular provision hereof, and (c) all references herein to Sections and Annexes shall be construed to refer to Sections of, and Annexes to, this Settlement and Support Agreement. The division of this Settlement and Support Agreement into Sections and the insertion of headings are for convenience only and are not to affect or be used in the construction or interpretation of this Settlement and Support Agreement.

## Section 2.  Settlement of Allocation Dispute

(a)     For the avoidance of doubt, this Section 2 is subject to the satisfaction of the conditions contained in Section 9(a) hereof, except to the extent expressly indicated in Section 9(c) hereof.

(b)     The Parties hereby agree to settle the Allocation Dispute on the terms set forth herein and enter into coordinated processes which shall include, among other things, (i) the drafting of the Canadian Plan and its submission to Canadian Voting Creditors for voting under the CCAA and to the CCAA Court for sanction, (ii) the drafting of the U.S. Plans and their submission to U.S. Voting Creditors for voting and to the Bankruptcy Court for confirmation, each on the schedule set forth in the Timetable, (iii) the submission of the Settlement and Support Agreement to the U.K. Court and the French Court, and (iv) submission to the Beddoes Court for authorization of the U.K. Pension Trustee to implement the Settlement and Support Agreement, as contemplated by Section 6 hereof.

(c)    The Parties hereto agree to allocate the Sale Proceeds as follows:

    (i)    U.S. Debtors: 24.350%, U.S.$1,766,417,002 (the "**U.S. Allocation**")[4];

    (ii)    Canadian Debtors: 57.1065%, U.S.$4,142,665,131 (the "**Canadian Allocation**");

    (iii)    EMEA (Non-NNSA/Non-NNUK) Debtors: 1.4859%, U.S.$ 107,788,879 (the "**EMEA (Non-NNSA/Non-NNUK) Allocation**")[5];

    (iv)    NNUK: 14.0249%, U.S.$1,017,408,257 (the "**NNUK Allocation**"); and

    (v)    NNSA: U.S.$220,000,000 (the "**NNSA Allocation**," and collectively with the EMEA (Non-NNSA/Non-NNUK) Allocation and the NNUK Allocation, the "**EMEA Allocation**"). The EMEA Allocation shall be 18.5435%, provided, however, within the EMEA Allocation, the NNSA Allocation is fixed at U.S.$220,000,000 and NNSA shall not share proportionally with any increase or decrease in the Sale Proceeds as the result of the matters contemplated in Section 2(d) hereof, and any such increase or decrease in the Sale Proceeds that would but for this Section 2(c)(v) have been allocated to NNSA shall be allocated to NNUK.

(d)    The Sale Proceeds to be allocated in accordance with Section 2(c) hereof include the Buyer Escrow Amount. To the extent that the amount of Sale Proceeds ultimately released from the Buyer Escrow Accounts to the Debtors is less than the Buyer Escrow Amount, any such shortfall shall be allocated among the Debtors in the percentages set forth in Section 2(c), subject to Section 2(c)(v) hereof, so that the amount of Sale Proceeds to be allocated in accordance with Section 2(c), subject to Section 2(c)(v) hereof, shall be reduced by the amount of such shortfall.

    (i)    Any fees and costs of the Escrow Agents for the Existing Escrow Agreements (other than costs and fees relating to any currency conversion that occurs pursuant to Section 7) shall be borne and allocated among the Debtors in the percentages set forth in Section 2(c), subject to Section 2(c)(v) hereof.

    (ii)    Any further amounts credited to the Escrow Accounts following the date of this Agreement, including any accrued interest not otherwise reflected in Annex A earned on the Sale Proceeds, shall be allocated among the Debtors in the percentages set forth in Section 2(c), subject

---

[4] Such allocation is to be distributed among the U.S. Debtors in the amounts and proportions set forth in Annex F.

[5] Such allocation is to be distributed among the EMEA Debtors (other than NNUK) in the amounts and proportions set forth in Annex E.

to the provisions of Sections 2(c)(v) and 7(b)(vi), 7(c)(x) and 7(e) hereof.

(e)    The Parties hereto further agree first to distribute the following amounts from the Iceberg Escrow Account, which amounts shall not be subject to the Section 2(c) allocation percentages or be deemed to constitute Sale Proceeds:

    (i)    U.S.$2.8 million of the Iceberg Amendment Fee to NNI and U.S.$2.2 million of the Iceberg Amendment Fee to NNUK, and

    (ii)    U.S.$20 million to NNI and U.S.$35 million to the Canadian Debtors on account of the M&A Cost Reimbursement.

(f)    Distributions of the Sale Proceeds will next be made as follows:

    (i)    all amounts in the Canadian Escrow Account shall be released to the Canadian Estate, with the funds received by the Canadian Estate being credited against the Canadian Allocation set forth in Section 2(c)(ii) in the manner set forth in Section 7(g);

    (ii)    all amounts (if any) in the EMEA Euro Escrow Account shall be released to NNSA with the funds received by NNSA being credited against the NNSA Allocation as set forth in Section 2(c)(v), in the manner set forth in Section 7(g);

    (iii)    all amounts (if any) in the EMEA Sterling Escrow Account shall be released to the EMEA Debtors who are Converting Debtors in proportion to their allocation set out at Annex E, with the funds received by such Converting Debtors being credited against the allocation of such Converting Debtors in the manner set forth in Section 7(g);

    (iv)    remaining amounts in the Existing Escrow Accounts shall be released (A) in accordance with the allocations set forth in Section 2(c) hereof, and (B) taking into account the funds to be released from the New Escrow Accounts under Sections 2(f)(i), (ii) and (iii) hereof; and

    (v)    for the avoidance of doubt, total distributions under Sections 2(f)(i)(ii)(iii) and (iv) hereof, will be strictly in accordance with the allocations set forth in Section 2(c) hereof.

(g)    NNC, NNL, NNI and NNUK shall use reasonable best efforts to obtain the release of the remaining amounts held in the Buyer Escrow Accounts, totaling approximately U.S.$21.8 million (the "**Buyer Escrow Amount**"), into the Escrow Account holding that portion of the Sale Proceeds attributable to the particular sale (or such other accounts as jointly agreed to and directed by NNC, NNL, NNI, and NNUK for their respective shares). Any amount so obtained shall be allocated in accordance with the percentages set forth in Section 2(c).

16

(h)    In connection with the distribution of Sale Proceeds contemplated pursuant to Section 2(f), NNIF shall pay U.S. $3 million to the Canadian Estate within 30 days of the conditions in Section 9(a) being satisfied and such payment obligation shall rank as an administration expense of NNIF. Subject to receipt by the Canadian Estate of such amount, such payment shall be in full satisfaction of the Remaining HOC Claim.

**Section 3.**  **Release of Sale Proceeds**

(a)    For the avoidance of doubt, this Section 3 is subject to the satisfaction of the conditions contained in Section 9(a) hereof, except to the extent expressly indicated in Section 9(c) hereof.

(b)    As set forth in Section 6(b) hereof, the Canadian Debtors and Monitor shall seek entry of the Canadian Escrow Release Order, which order shall be entered with, or promptly following entry of, the Sanction Order and will be conditioned on the occurrence of the Plans Effective Date.

(c)    As set forth in Section 6(c) hereof, the U.S. Debtors shall seek entry of the U.S. Escrow Release Order, which order shall be entered with, or promptly following entry of, the Confirmation Order and will be conditioned on the occurrence of the Plans Effective Date.

(d)    The Escrow Release Orders shall: (i) constitute the order required under Section 12(b) of the IFSA to permit and authorize the distribution of the Sale Proceeds in accordance with the allocation set forth in Section 2(c) hereof; (ii) constitute the orders of the "dispute resolvers" contemplated by the Escrow Agreements to permit and authorize the Escrow Agents to distribute the Sale Proceeds; and (iii) be in form and substance reasonably satisfactory to the Parties.

(e)    In addition to any Escrow Release Orders, the parties to the Escrow Agreements may also provide joint instructions to the Escrow Agents, as permitted by the Escrow Agreements, directing the release of the Sale Proceeds in accordance with this Settlement and Support Agreement, the form and substance of such joint instructions being reasonably satisfactory to the Parties.

(f)    Immediately following the occurrence of the Plans Effective Date, the Canadian Debtors, the Monitor, the EMEA Debtors, NNSA, the EMEA Non-Filed Entities, the U.S. Debtors and the UCC shall jointly provide copies of the Escrow Release Orders to the Escrow Agents and the parties to the Escrow Agreements shall take such other and further steps as are reasonably necessary, including but not limited to the provision of joint instructions or other notices to the Escrow Agents under Section 3(e) above, in order to cause the Escrow Agents to release the Sale Proceeds in accordance with the terms of this Settlement and Support Agreement.

(g)    It is understood and agreed that the Canadian Debtors, the Monitor, the U.S. Debtors, the UCC, the EMEA Debtors, NNSA, and the EMEA Non-Filed Entities, to the extent necessary, may provide more specific instructions to the Escrow Agents in connection with the Escrow Release Orders or any instruction

17

provided pursuant to Section 3(e) hereof, to direct payment to specific Debtor estates subject always to the collective maximum allocation and distribution of Sale Proceeds allocated to each of the U.S. Debtors, Canadian Debtors, EMEA Debtors and NNSA, respectively, as set forth in Section 2(c) hereof (and, in the case of the U.S. Debtors and the EMEA Debtors subject to the agreed allocations set forth in Annexes F and E, respectively) and each of the U.S. Debtors, the Canadian Debtors, the EMEA Debtors, NNSA, and the EMEA Non-Filed Entities in their capacity as Depositors under the Escrow Agreements (to the extent they are Depositors under any specific Escrow Agreement), and the Monitor and the UCC in their capacity as Estate Fiduciaries under the Escrow Agreements, shall give such instructions or consents as may be reasonably required in connection with the foregoing. In relation to NNSA, any such instructions shall be given conjointly by the NNSA Conflicts Administrator and the French Liquidator following agreement with the Joint Administrators. The Bondholder Group and the UCC shall provide any consent as may be reasonably necessary under the IFSA in connection with any such instruction. If, following the Plans Effective Date, all or any portion of the remaining Buyer Escrow Amount is to be released in accordance with this Settlement and Support Agreement then the parties to such escrows shall give the necessary instructions to the relevant Escrow Agent to apportion and release those proceeds to the Debtors in the respective allocation percentages set forth in Section 2(c).

**Section 4.  Additional Settlement Provisions**

The following provisions are also essential terms of the Settlement, which provisions, in respect of the U.S. Debtors, shall be incorporated into the U.S. Plans and, in respect of the Canadian Debtors, shall be incorporated into the Canadian Plan, as applicable. For the avoidance of doubt, this Section 4 is subject to the satisfaction of the conditions contained in Section 9(a) hereof, except to the extent expressly indicated in Section 9(c) hereof.

(a)    Estate Administration

     (i)    The Canadian Debtor estates will be administered by the Monitor.

     (ii)    The EMEA Debtor and NNSA (in the French Main Proceeding) estates will be administered by their respective representatives being the Joint Administrators in respect of each EMEA Debtor and being the Joint Administrators and the NNSA Conflicts Administrator in respect of NNSA in the French Main Proceeding.

     (iii)    The French Secondary Proceeding will be administered by its representative, being the French Liquidator.

     (iv)    The U.S. Debtor estates will be administered by the U.S. Principal Officer.

     (v)    Notwithstanding the separate administration of the estates of the Canadian Debtors, the EMEA Debtors, NNSA, the U.S. Debtors and of the EMEA Non-Filed Entities, the Parties shall work cooperatively and

18

use reasonable efforts to implement this Settlement and Support Agreement and the Plans in a tax efficient manner. In addition, the Debtors shall, upon the written request of a Debtor to another Debtor and to the extent permitted by applicable local law and not inconsistent with the statutory duties of the Debtor, or the Debtor's representatives and fiduciaries, to which a request is made, reasonably cooperate with each other, including providing such documents, other information, access to current personnel and/or permission to communicate with former personnel as may reasonably be requested by the requesting Debtor, in connection with the preparation and filing of tax returns and responding to or contesting any challenges, inquiries, audits or other disputes by tax authorities in relation thereto (collectively, "**Tax Disputes**"); provided, however, that no Debtor shall be obligated to cooperate to the extent such requested cooperation would prejudice the interests of such Debtor. The Debtor requesting cooperation shall bear all costs and expenses, including reasonable attorney fees, of the Debtor providing such cooperation, including the reasonable costs of accessing, processing, reviewing and making available any documents, other information and/or personnel requested. For the avoidance of doubt, each Debtor shall be solely responsible for preparing and filing its own tax returns and contesting or challenging any Tax Disputes in relation thereto, and no other Debtor shall have any obligation to respond to, contest, challenge, dispute or appear in any other Debtor's Tax Disputes. It is acknowledged that the Debtors intend to progress the wind-up of their respective estates, including the continuing disposal of records and decommissioning of their electronic data infrastructure (such as servers), and that the cooperation contemplated pursuant to this Section 4(a)(v) shall in no way preclude any of the Debtors from taking any steps in connection with such wind-up. To the extent that any Debtor receiving a request under this Section 4(a)(v) takes the position that it is unable to provide the assistance requested, such Debtor shall confer with the Debtor making the request as to the basis for such position.

(vi)    No Party will interfere with or oppose any Debtor regarding such Debtor's asset monetization, subsidiary wind-downs, tax positions, distributions, or marshalling, to the extent such actions are not inconsistent with this Settlement and Support Agreement, provided however, that the foregoing shall not compromise (x) the right, if any, of a creditor to (A) object, if such creditor has a claim that remains outstanding and unpaid against the relevant Debtor or Debtors against which the claim is to be allowed, after the date of this Settlement and Support Agreement, in the U.S. Court allowing a claim against the U.S. Debtors or in the Canadian Court allowing a claim as a Proven Claim against the Canadian Estate, in each case, other than claims expressly referred to in this Settlement and Support Agreement, and/or (B) exercise any right it may have as a creditor in respect of its claim including in respect of a Debtor's asset monetization, except in a

19

manner that directly contradicts any term of this Settlement and Support Agreement, or (y) the Parties' rights and obligations, if any, under the Cross-Border Protocol, the Cross-Border Protocol on the Resolution of Claims approved by the CCAA Court by Order dated September 16, 2010 and by the Bankruptcy Court by order dated September 16, 2010, or the Claims Resolution Order of the CCAA Court, dated September 16, 2010 .

(b)     Estate Consolidation

       (i)     Canadian Debtors – The Canadian Debtors shall be substantively consolidated pursuant to the Canadian Plan on the Plans Effective Date with all intercompany claims between and among the Canadian Debtors being thereby eliminated for purposes of the Canadian Plan and no distributions or payments will be made by the Canadian Debtors on account of such claims under the Canadian Plan or otherwise, and all unsecured creditors holding claims against the Canadian Estate (including the U.S. Debtors' $2.0 billion Proven Claim (the "**U.S. Canadian Claim**"), the Crossover Bondholders' Proven Claims of U.S.$3,940,750,260 in the aggregate, the NNCC Bondholders' Proven Claim of U.S.$150,951,562, the Proven Claims held by certain of the EMEA Debtors in an aggregate amount not to exceed U.S.$125,000,000 (subject to the contractually agreed upon conditions in clause 2.2 of the Agreement Settling EMEA Canadian Claims and Related Claims among, *inter alia*, the Canadian Debtors, the Monitor, the EMEA Debtors and NNSA, dated July 9, 2014) (respectively the "**EMEA Canadian Claim**" and the "**EMEA Canada Settlement Agreement**") and the UKPI's Proven Claim of £339.75 million[6] (the "**UKPI Canadian Claim**") and the Canadian Pension Claim) will be paid *pari passu* by the Canadian Estate with all other general unsecured creditor distributions without discrimination of any kind. The U.S. Debtors' allowed U.S.$62.7 million secured claim (defined as the "Remaining Revolver Claim" in the CFSA) (the "**U.S. Canadian Priority Claim**") will retain its priority status granted by the CCAA Court in the order dated January 21, 2010.

       (ii)     U.S. Debtors – The U.S. Debtors' estates shall not be substantively consolidated, provided, however, that NNCC shall be substantively consolidated with and into NNI on the Plans Effective Date.

       (iii)     EMEA Debtors – The EMEA Debtors' estates and NNSA (or any of them) shall not be substantively consolidated.

(c)     Coordination of Crossover Claims (Issuer Pays First)

---

[6] Being U.S.$494,879,850 when converted from £339.75 million in accordance with Appendix "A" to the Claims Procedure Order.

(i)    The U.S. Plans and the Canadian Plan shall contain the following provisions with respect to claims arising out of a debt or other obligation of one or more of the U.S. Debtors that is guaranteed or indemnified by one or more of the Canadian Debtors, or a debt or other obligation of one or more of the Canadian Debtors that is guaranteed or indemnified by one or more of the U.S. Debtors (such claims, including, without limitation, the Crossover Bonds Claims, NNCC Bonds Claims and EDC claims, but excluding, in relation to the Canadian Debtors, any obligation of a Canadian Debtor guaranteed by another Canadian Debtor, being the "**Crossover Claims**"):

    (A)    In the event that the creditor shall have a Proven Claim against the Canadian Estate and an allowed claim against the relevant U.S. Debtor, then, subject to Section 4(c)(i)(B) and 4(g)(vi), the issuer (or primary) Debtor estate and any guarantor (or secondary) Debtor estate shall pay distributions on the full amount of the allowed claim, if a claim against a U.S. Debtor estate, or the full amount of the Proven Claim, if a claim against the Canadian Estate, on a *pari passu* basis with all other creditors holding allowed claims (in the case of the U.S. Debtors) or Proven Claims (in the case of the Canadian Debtors) with the same priority without discrimination of any kind.

    (B)    In no case shall a creditor holding a Crossover Claim be entitled to receive (i) any further distributions from the U.S. Debtors where the aggregate distributions made by the U.S. Debtors and the Canadian Estate in respect of such Crossover Claim equal the total allowed amount of such Crossover Claim against the U.S. Debtors, or (ii) any further distributions from the Canadian Estate where the aggregate distributions made by the U.S. Debtors and the Canadian Estate in respect of such Crossover Claim equal the total Proven Claim amount of such Crossover Claim against the Canadian Estate. For the avoidance of doubt, in no event shall a holder of a Crossover Claim be entitled to receive aggregated distributions in respect of its allowed Crossover Claim of more than 100% of the greater of (i) its pre-filing allowed claim (U.S.), and (ii) Proven Claim (Canada) when taking into account distributions received from both the issuer (or primary) Debtor estate and guarantor (or secondary) Debtor estate (such greater amount, the "**Creditor's Maximum**"). For the further avoidance of doubt, in relation to a specific Crossover Claim, if the amount in U.S. Dollars of the allowed claim (U.S.) for such Crossover Claim is not the same as the amount of the Proven Claim (Canada) for such Crossover Claim, the Creditor's Maximum shall not be reached until the greater of the two amounts has been distributed to the creditor. Any amounts paid pursuant to Section 4(m) shall not be included in calculating the Creditor's Maximum as it pertains to the NNCC Bonds.

21

(C)     Notwithstanding Section 4(c)(i)(B) above, if the relevant creditor receives an aggregate amount of distributions equal to the Creditor's Maximum on account of its Crossover Claim, then the guarantor (or secondary) Debtor estate shall subrogate into the Crossover Claim against the issuer (or primary) Debtor estate (for the NNCC Bonds, the issuer Debtor estate is NNCC as of the date hereof, but shall be deemed to be NNI on the Plans Effective Date when NNCC is consolidated into NNI) and will be entitled to receive any and all subsequent distributions from the issuer (or primary) Debtor estate on account of such Crossover Claim on a *pari passu* basis with all other creditors holding allowed claims (U.S.) or Proven Claims (Canada) with the same priority from the issuer (or primary) Debtor estate without discrimination of any kind, provided that (i) the guarantor (or secondary) Debtor estate shall not receive any distributions on such claim in excess of payments the guarantor (or secondary) Debtor estate has made to the underlying holder of such Crossover Claim and (ii) in the case of the Crossover Bonds Claims, NNI shall receive distributions from the Canadian Estate as a result of such subrogation for distributions NNI has made on the allowed Crossover Bonds Claims only to the extent that NNI makes distributions in respect of the allowed Crossover Bonds Claims in excess of U.S.$1.25 billion and such subrogation shall be only in respect of amounts distributed in excess of U.S.$1.25 billion, it being understood that NNI's right of subrogation pursuant to this Section 4(c)(i)(C), if any, against the Canadian Estate in respect of the Crossover Bonds Claims remains subject to distributions equal to the Creditor's Maximum first being received by holders of the Crossover Bonds Claims on account of such claims.

(ii)    For the avoidance of doubt, no right of subrogation or indemnity (however described) will arise in favour of any Canadian Debtor or any U.S. Debtor against any EMEA Debtor, NNSA, or any EMEA Non-Filed Entity in respect of any amount paid by a Canadian Debtor or any U.S. Debtor pursuant to any guarantee or indemnity in respect of a liability of any EMEA Debtor, NNSA or EMEA Non-Filed Entity, and no Canadian Debtor nor any U.S. Debtor shall pursue or file any such claims or assert any right of subrogation against any EMEA Debtor, NNSA or EMEA Non-Filed Entity.

(iii)   The issuer Debtor estate and the guarantor Debtor estate shall reasonably cooperate to give effect to the provisions of this Section 4(c), including sharing information regarding the Crossover Claims and intended and actual distributions thereon.

(d)     <u>Post-Petition Date Interest</u> — No post-Petition Date interest (or make whole premium or similar claim accruing post-Petition Date) shall be included in any creditor claims, nor be paid on creditor claims in any Debtor estate, save and

except with respect to any EMEA Debtor estate, and then only to the extent payment is required under applicable law (and, if interest is payable by an EMEA Debtor, nothing herein shall restrict the right of the EMEA Debtor to compromise in whole or in part the amount of interest due and payable), provided, however, that the Canadian Debtors agree that they shall not receive post-Petition Date interest on the Remaining HOC Claim.

(e)     Side Letters, IFSA, CFSA and T&T Claims – In full and final resolution of (i) all entitlements and obligations arising under side letters to which any of the U.S. Debtors and Canadian Debtors are party (as further specified on Annex C hereto and which, for purposes of this Section 4(e) and Annex C shall include the IFSA and CFSA, collectively, the "**Side Letters**"), and (ii) the T&T Claim, NNI shall receive payment from the Canadian Estate in the amount of U.S.$77.5 million. After receipt of such payment by NNI, NNI shall have a 27% interest in the remaining assets of the Cascade Trust and the Canadian Estate shall have a 73% interest in the remaining assets of the Cascade Trust.  The Parties agree that except in relation to the Iceberg Amendment Fee, in respect of which NNUK will be entitled to a payment of U.S.$2.2 million from the Iceberg Sale Proceeds, neither the EMEA Debtors (nor NNSA) nor the EMEA Non-Filed Entities shall have any other entitlements or obligations under the Side Letters.

(f)     SNMP – There shall be no holdback of Sale Proceeds with respect to any liability that may be due or become due to one or both of SNMP Research International Inc. or SNMP Research Inc. (either or together, "**SNMP**").  No Debtor has or shall have any claim (whether by way of contribution, indemnity or otherwise) against any other Debtor in respect of any liability due or which may become due to SNMP and no Debtor or any other Party will assist SNMP in bringing any claim against any other Debtor.

(g)     Resolution of Certain Claims – The Parties have agreed to the following treatment for the following claims:

(i)     the Canadian registered pension plans deficit claims against each of the Canadian Debtors shall be allowed as unsecured Proven Claims against the Canadian Estate in the aggregate amount of CAD$1,889,479,000 (the "**Canadian Pension Claim**");

(ii)    the PBGC claim against each of the U.S. Debtors (and against any non-debtor U.S. Nortel Group entity) shall be a maximum of U.S.$708,000,000 and all rights of the U.S. Debtors and other U.S. based parties-in-interest in the U.S. Proceedings to contest such PBGC claims are expressly reserved and the allocation percentages provided for in Section 2(c) shall not change if the PBGC claims are admitted or allowed for a different amount;

(iii)   the Parties (other than NNUK and the UKPI) agree that they will not challenge the adjudication by the Joint Administrators of NNUK of the UKPI's claim arising under section 75 of the U.K. Pension Act 1995 (presently filed in the amount of £2,147,000,000) against NNUK and

23

the allocation percentages provided for in Section 2(c) shall not change if the UKPI claim is admitted or allowed for a different amount;

(iv) the Crossover Bonds Claims (a) against NNL and NNC shall be allowed as unsecured Proven Claims against the Canadian Estate in the aggregate amount of U.S.$3,940,750,260, as specified in Annex G hereto, and (b) against NNI shall be allowed as a general unsecured claim in the aggregate amount of U.S.$3,934,521,442, as specified in Schedule A to the Agreement Settling The NNI Post-Petition Interest Dispute And Related Matters dated July 24, 2014;

(v) the NNCC Bonds Claims (a) against NNI (into which NNCC shall be substantively consolidated on the Plans Effective Date) shall be allowed as a general unsecured claim in the amount of U.S.$150,951,562, and (b) against NNL shall be allowed as an unsecured Proven Claim against the Canadian Estate in the amount of U.S.$150,951,562;

(vi) the U.S. Plans shall provide that NNI shall reserve U.S.$7.5 million from cash otherwise available for distributions to NNI unsecured creditors, to be made available to be paid in respect of the NNCC Bonds Claims in the event that distributions (including deemed distributions related to the Crossover Bondholder Fee Letter) in respect of the NNCC Bonds Claims will be less than U.S.$150,951,562 (exclusive of any amount paid pursuant to Section 4(m)) upon the completion of distributions in respect of the NNCC Bonds Claims on the allowed claim against NNI (which claim against NNI results from the consolidation of NNCC with and into NNI) and the Proven Claim against the Canadian Estate, provided, however, that NNI shall use such reserves to make distributions in respect of the NNCC Bond Claims only in the amount of the lesser of (A) U.S.$150,951,562 less total distributions from NNI and the Canadian Estate (exclusive of any amount paid pursuant to Section 4(m)), and (B) U.S.$7.5 million;

(vii) The Bondholder Group agrees that it will negotiate in good faith with the Nortel U.S. Trade Claims Consortium regarding additional terms that would cause such group to support the Settlement and the U.S. Plans; and

(viii) the UKPI Canadian Claim and the EMEA Canadian Claim shall be allowed as unsecured Proven Claims against the Canadian Estate.

(h) Book Intercompany Claims – Pre-filing intercompany claims in the amounts recorded in the books and records of companies comprising the Nortel Group as set out in Annex L shall be included in the determination of the allowed unsecured claims against a Debtor (except to the extent such claims are between Canadian Debtors, where no distributions or payments will be made by the Canadian Debtors on account of such claims under the Canadian Plan or otherwise). Annex L shall be treated as the definitive position for all pre-filing intercompany claims between the Nortel Group entities specified thereon. Any

24

and all other pre-filing books and records claims between (A) any of the Canadian Debtors, on the one hand, and (B) any of the U.S. Debtors and their other subsidiaries as specified on Annex L, on the other hand, which are not preserved specifically herein (including, without limitation the claims referenced in Sections 4(b)(i) and 4(g)), are forever released and barred. Other than the EMEA Canadian Claim, the Remaining HOC Claim and any other pre-filing intercompany claims set forth on Annex L, all pre-filing books and records claims, including any claims that a Debtor now holds as a consequence of an assignment (excluding claims against an EMEA Debtor assigned to NNUK in connection with the EMEA Canada Settlement Agreement), between (G) any of the EMEA Debtors, NNSA or the EMEA Non-Filed Entities, on the one hand, and (H) any of the Canadian Debtors or the U.S. Debtors, on the other hand, are forever released and barred. The EMEA Debtors and the Canadian Debtors agree that in full and final settlement of: (Q) the Tranche 2 Payment (as such term is defined in the Q1 2010 Transfer Pricing Settlement Agreement among, *inter alia*, certain of the Canadian Debtors, the Joint Administrators and the EMEA Debtors, dated September 8, 2011); and (R) the U.S.$7,621,249 claim of certain of the Canadian Debtors against NNIF related to HOC, the Canadian Estate shall have an accepted post-Petition Date claim against NNIF in the amount of U.S.$3 million (the "**Remaining HOC Claim**"). The Remaining HOC Claim shall rank as an administration expense of NNIF payable in full in accordance with Section 2(h) and not subject to compromise or reduction. For the avoidance of doubt, the Tranche 2 Payment (being the remaining amount of the Shortfall Payments (as defined in the IFSA)) is forever released and barred. The Parties agree and acknowledge that, as at the date hereof, there are no post-filing books and records claims owing between (Y) any of the Canadian Debtors, on the one hand, and any of the U.S. Debtors, the EMEA Debtors, NNSA and the EMEA Non-Filed Entities, on the other, and (Z) any of the U.S. Debtors, on the one hand, and any of the EMEA Debtors, NNSA and the EMEA Non-Filed Entities, on the other.

(i)   <u>Intra-EMEA Claims</u> – Nothing in this Settlement and Support Agreement affects claims as between or among any of the EMEA Debtors and/or NNSA and/or the EMEA Non-Filed Entities, which shall be dealt with separately between the EMEA Debtors, NNSA and the EMEA Non-Filed Entities. Nothing in this Settlement and Support Agreement affects claims between or among the UKPI, any EMEA Debtor, NNSA, or the EMEA Non-Filed Entities, the Joint Administrators, the NNSA Conflicts Administrator or the French Liquidator, which shall be dealt with separately between and among the EMEA Debtors, NNSA, the EMEA Non-Filed Entities, the Joint Administrators, the NNSA Conflicts Administrator, the French Liquidator and the UKPI.

(j)   <u>Remaining Assets and Other Proceeds</u> – Each Debtor estate has the right to retain the value of its respective remaining assets, if any, and shall not be subject to any claims thereto by any other Debtor save and except those acknowledged herein. Other than those claims acknowledged herein to receive distributions from the proceeds of such assets, the U.S. Debtors, the EMEA Debtors, NNSA, the UKPI and the EMEA Non-Filed Entities release any claims they have asserted or may assert or have as against (i) those proceeds held by the Canadian Debtors as

"Restricted Cash" or "Unavailable Cash" (as noted in Monitor's Reports to the CCAA Court), including in respect of the realization of the interests in LG-N, the Strandherd Lands, Relay and IP Addresses, and (ii) the remaining IP Addresses, including any proceeds arising therefrom. For the avoidance of doubt, nothing in this subsection shall (i) prohibit the assertion of claims to enforce this Settlement and Support Agreement and claims that are reserved in this Settlement and Support Agreement (including without limitation, the claims referenced in Section 4(b)(i) hereof) or (ii) affect the Parties' rights to receive distributions as creditors of the various Debtors' estates.

(k)     Bondholder Group Fees – The aggregate amount of fees under the existing fee letter dated June 23, 2011 between various advisors to the Bondholder Group and NNC and NNL (the "**Crossover Bondholder Fee Letter**") to be deducted from distributions to Crossover Bondholders and NNCC Bondholders in respect of their Proven Claims against the Canadian Estate shall be U.S.$47 million (which includes U.S.$3.0 million in respect of the deferred compensation fee payable to FTI Consulting). An additional U.S.$7.0 million may be deducted from Canadian Estate distributions to Crossover Bondholders and NNCC Bondholders in further payment of the deferred compensation fee payable to FTI Consulting. All such deductions shall be borne by the Crossover Bondholders and the NNCC Bondholders on a pro rata basis based on the amount of the Proven Claims of the Crossover Bondholders and the NNCC Bondholders as set forth on Annex G hereto.

(l)     Canadian Fees – The Canadian Debtors and Monitor agree that the Canadian Debtors will not pay voluntarily, or seek permission to pay, legal or advisor fees of any stakeholder that the Canadian Debtors are not paying as of the date hereof. Payment of any such further legal or advisor fees will be done only pursuant to an order of the CCAA Court.

(m)     NNCC Fees – The U.S. Plans shall provide that NNI shall pay the reasonable and documented fees of (a) the NNCC Bonds Trustee, in an amount not to exceed U.S.$4.25 million, and (b) counsel to Solus Alternative Asset Management LP and PointState Capital LP in an amount not to exceed U.S.$750,000. Notwithstanding any other term in this Settlement and Support Agreement, if any amount remains in the cash reserve established pursuant to Section 4(g)(vi) hereof after the making of payments required thereunder, the U.S. Plans shall provide that, out of such funds, NNI shall pay or reimburse reasonable and documented fees (up to an additional U.S.$2.0 million) incurred by professionals in connection with the assertion of rights related to the NNCC Bonds. Any amount payable by NNI under this Section 4(m) shall include an amount equal to, and be in addition to, any fees paid by the Canadian Debtors under the Crossover Bondholder Fee Letter allocated to the NNCC Bondholders that are deducted from distributions made by the Canadian Estate to the NNCC Bondholders as described in Section 4(k).

(n)     Canadian Debtor Claim Distributions – Solely for determining *pari passu* distributions in respect of unsecured claims against the Canadian Estate, claims

26

will be valued in U.S. Dollars and all non-U.S. Dollar denominated Proven Claims against the Canadian Estate will be converted to U.S. Dollars at the prevailing exchange rate reported by Reuters on January 14, 2009 (as reflected at Appendix "A" to the Claims Procedure Order).

    (i)    Proven Claims against the Canadian Estate predominantly denominated in Canadian Dollars ("**CAD Claims**") will be paid from Canadian Estate assets in Canadian Dollars.

    (ii)    All other Proven Claims against the Canadian Estate will be paid in U.S. Dollars.

    (iii)    For purposes of determining the amount of Canadian Dollars to be paid by the Canadian Estate on distributions on CAD Claims, the amount of such distribution in U.S. Dollars (as calculated in accordance with this Section 4(n)), shall be converted to Canadian Dollars at the Applicable FX Rate at which Sale Proceeds are converted from U.S. Dollars to Canadian Dollars as contemplated by Section 7 hereof.

(o)    <u>Plans Effective Date</u> – Each of the Plans shall contain a term to the effect that the U.S. Plans and the Canadian Plan shall become effective at the same time.

## Section 5.  **Litigation Resolution**

(a)    For the avoidance of doubt, this Section 5 is subject to the satisfaction of the conditions set forth in Section 9(a) hereof, except to the extent expressly indicated in Section 9(c) hereof.

(b)    Promptly following the Plans Effective Date, the Parties shall dismiss with prejudice and with no order as to costs all appeals, leave to appeal applications and other litigations among any of the Parties (including the pending appeals and cross-appeals in respect of the Allocation Dispute, the pending appeal of the PPI Settlement by the Canadian Debtors, the pending appeal of the SNMP impleader action and related denial of a chapter 15 stay to which the U.S. Debtors and the EMEA Debtors and SNMP are parties, and the pending appeal and cross-appeal in respect of the claims of the UKPI against the Canadian Debtors), save and except for the Non-Released Matters and provided that rights are reserved to enforce this Settlement and Support Agreement. Such dismissals will be effected by the filing of the appropriate documents with the appropriate courts in each jurisdiction, the form of which documents must be reasonably acceptable to the Parties party to such litigation.

(c)    The Parties hereby agree that immediately upon this Settlement and Support Agreement being executed by all Parties, in a coordinated fashion the Parties shall contact the CCAA Court, the Bankruptcy Court, the Ontario Court of Appeal, the Supreme Court of Canada, the U.S. District Court for the District of Delaware, the Third Circuit, the U.K. Court, the French Court, and such other courts as may be necessary, and notify them that the Settlement and Support Agreement has been executed.  Counsel to the Monitor shall coordinate contacting the Canadian

27

Courts (except with respect to contacting the Supreme Court of Canada in connection with the leave application filed therewith, which shall be coordinated by counsel to the U.S. Debtors in consultation with counsel to the Monitor), counsel to the U.S. Debtors shall coordinate contacting the U.S. Courts, counsel to the Joint Administrators shall coordinate contacting the U.K. Court and counsel to each of the French Liquidator and NNSA Conflicts Administrator shall coordinate contacting the French Court.

(d)     Subject to Section 5(e), the Parties hereby agree that immediately upon this Settlement and Support Agreement being executed by all Parties, in a coordinated fashion the Parties shall request that the Canadian Courts and the U.S. Courts stay any and all matters pending before those courts between any of the Parties to, or that are otherwise related to, this Settlement and Support Agreement, including, without limitation, the litigation described in Section 5(b) hereof, pending satisfaction of the conditions set forth in Section 9(a) hereof.

(e)     The Parties hereby agree not to commence or take any step to advance any action, claim, appeal, objection or other similar proceeding (a "**Proceeding**") seeking relief that is the subject of the matters addressed in this Settlement and Support Agreement; provided, however, that (i) to the extent that a stay contemplated by subsection 5(d) above is not granted or ceases to exist in respect of any Proceeding, the Parties shall be entitled to take all reasonably necessary steps to preserve their rights in all relevant jurisdictions in respect of such Proceeding prior to the Plans Effective Date, provided, further, however, in accordance with Section 10 hereof, in the event of a termination of this Settlement and Support Agreement, upon the occurrence of such termination, the Parties agree to notify the relevant courts of such termination and immediately thereafter recommence, or continue, as applicable, litigation.   For the avoidance of doubt, the Parties rights to propose or oppose expedition of any Proceeding in the event of such termination are preserved as set forth in Section 10(c) herein.

## Section 6.  Support of Settlement, Disclosure Statements and Plans

(a)     For the avoidance of doubt, this Section 6 is subject to the satisfaction of the conditions set forth in Section 9(a) hereof, except to the extent expressly indicated in Section 9(c) hereof.

(b)     The Canadian Debtors and Monitor hereby agree to take any and all reasonably necessary and appropriate actions (including, without limitation, obtaining requisite corporate approvals, if any) to (i) file the Canadian Plan and Canadian Information Circular with the CCAA Court (each of which shall be in a form and substance that contains, implements and accurately reflects the terms and conditions of this Settlement and Support Agreement), seek approval of the Canadian Meeting Order and solicit votes from Canadian Voting Creditors to accept the Canadian Plan, and (ii) seek entry of the Sanction Order and the Canadian Escrow Release Order.   The sanction of the Canadian Plan will be conditioned on, among other things, confirmation of the U.S. Plans.

Consideration of the Canadian Plan and the U.S. Plans will take place in joint hearings conducted in accordance with the Cross-Border Protocol.

(c)     The U.S. Debtors hereby agree to take any and all reasonably necessary and appropriate actions (including, without limitation, obtaining requisite corporate approvals, if any) to (A) file the U.S. Plans and Disclosure Statement with the U.S. Court (each of which shall be in a form and substance that contains, implements and accurately reflects the terms and conditions of this Settlement and Support Agreement) and seek approval of the Disclosure Statement by the Bankruptcy Court, (B) solicit votes from U.S. Voting Creditors to accept the U.S. Plans, and (C) seek entry of the Confirmation Order and the U.S. Escrow Release Order.   Confirmation of the U.S. Plans will be conditioned on, among other things, sanction of the Canadian Plan.  Consideration of the Canadian Plan and the U.S. Plans will take place in joint hearings conducted in accordance with the Cross-Border Protocol.

(d)     The EMEA Debtors hereby agree to take any and all reasonably necessary and appropriate actions (including, without limitation, obtaining requisite corporate approvals, if any) to (A) file with the U.K. Court materials (which shall be, *inter alia*, in a form and substance that accurately reflects the terms and conditions of this Settlement and Support Agreement) as contemplated by Section 9(a)(iv) hereof, and (B) seek entry of the order or orders from the U.K. Court as contemplated by Section 9(a)(iv) hereof.

(e)     The French Liquidator hereby agrees to take any and all reasonably necessary and appropriate actions (including, without limitation, obtaining requisite corporate approvals, if any) to (A) file with the French Court materials (which shall be, *inter alia,* in a form and substance that accurately reflects the terms and conditions of this Settlement and Support Agreement) seeking the approval required by Section 9(a)(vi) hereof, and (B) seek entry of an order or orders from the French Court granting such approval.

(f)     The NNSA Conflicts Administrator hereby agrees to take any and all reasonably necessary and appropriate actions (including, without limitation, obtaining requisite corporate approvals, if any) to (A) file with the U.K. Court materials (which shall be, *inter alia,* in a form and substance that accurately reflects the terms and conditions of this Settlement and Support Agreement) as contemplated by Section 9(a)(v) hereof, and (B) seek entry of the order or orders from the U.K. Court as contemplated by 9(a)(v) hereof.

(g)     The U.K. Pension Trustee hereby agrees to take any and all reasonably necessary and appropriate actions (including, without limitation, obtaining requisite corporate approvals, if any) to (A) file with the Beddoes Court materials (which shall be in a form and substance that accurately reflects the terms and conditions of this Settlement and Support Agreement) seeking the approval required by Section 9(a)(vii) hereof, and (B) seek entry of an order or orders from the Beddoes Court authorizing the U.K. Pension Trustee to implement this Settlement and Support Agreement.

29

(h)     Subject to the Plans and the Disclosure Statements (A) accurately incorporating the terms and conditions of this Settlement and Support Agreement, and (B) being in form and substance reasonably satisfactory to the respective Parties (including in respect of any material amendments to the Plans), each of the Parties and each of the Participating Creditors hereby agrees to:

(i)     support the Settlement and all of the transactions and actions contemplated hereby (including the Plans) and take any and all reasonably necessary and appropriate actions in furtherance of consummation of the Settlement, the Plans and this Settlement and Support Agreement;

(ii)     support approval of the Disclosure Statements, the granting of the Canadian Meeting Order (and not object to approval of the Disclosure Statements or the granting of the Canadian Meeting Order, or support the efforts of any other Person to oppose or object to, approval of the Disclosure Statements or the granting of the Canadian Meeting Order) and the granting of the approvals from the U.K. Court, the French Court and the Beddoes Court;

(iii)     subject to receipt of the Disclosure Statements and solicitation in accordance with (as applicable) Sections 1125 and 1126 of the Bankruptcy Code and/or the Canadian Meeting Order,

(A)     (1) as necessary given its creditor status, deliver its duly-completed ballot(s) and/or proxy(ies) for receipt (at the address specified therein) by the required date (or to attend at the meeting of creditors to be held pursuant to the Canadian Meeting Order) in order to vote its claims to accept the Plans, (2) with respect to voting of any claim held by a Participating Creditor for trades not settled (but which claims will be bound by the terms hereof upon the closing of such trade), to direct the delivery of duly-completed ballot(s) and/or proxy(ies) for receipt (at the address specified therein) by the required date in order to vote such claims to accept the Plans, and (3) not change or withdraw (or cause to be changed or withdrawn) any such vote, unless the Plan related thereto is modified to be inconsistent with this Settlement and Support Agreement or is otherwise modified in a manner not permitted by such Plan;

(B)     (1) support the granting of the Confirmation Order, the Sanction Order and the Escrow Release Orders (and not object to approval of the granting of such orders, or support the efforts of any other Person to oppose or object to, the granting of such orders), unless the Plan related thereto is modified to be inconsistent with this Settlement and Support Agreement or is otherwise modified in a manner not permitted by such Plan, and (2) refrain from taking any action not required by law that is inconsistent with, or that would delay or impede sanction, confirmation or consummation of the

30

Plans or that is otherwise inconsistent with the express terms of this Settlement and Support Agreement; and

(C) not, directly or indirectly, propose, support, solicit, encourage, or participate in the formulation of any alternative plan or plans of compromise, arrangement, reorganization or liquidation in the Chapter 11 Cases or the Canadian Proceedings other than the Plans.

(iv) in the case of Participating Creditors who are Crossover Bondholders, issue directions to the trustees under the indentures governing the Crossover Bonds to support this Settlement and Support Agreement and the Plans and to act in a manner as contemplated pursuant to this Section 6(h); and

(v) in the case of Participating Creditors who are NNCC Bondholders, issue directions to the NNCC Bonds Trustee to cause the NNCC Bonds Trustee to support this Settlement and Support Agreement and the Plans and to act in a manner as contemplated pursuant to this Section 6(h).

(i) For the avoidance of doubt, each of the Parties and each Participating Creditor also agrees that it will not take any action (or refrain from taking an action) that, directly or indirectly, would interfere with, delay, impede, or postpone or take any other action that interferes with, the implementation of the Settlement, the confirmation and consummation of the U.S. Plans, the sanction and consummation of the Canadian Plan and/or the granting of the approvals by the U.K. Court, the French Court and the Beddoes Court.

(j) Transfers of Claims and Interests.

(i) No Participating Creditor shall (i) sell, transfer, assign, pledge, grant a participation interest in, or otherwise dispose of, directly or indirectly, its right, title, or interest in respect of any of such Participating Creditor's claims against any Debtor in whole or in part, or (ii) deposit any of such Participating Creditor's claims against any Debtor, as applicable, into a voting trust, or grant any proxies, or enter into a voting agreement with respect to any such claims or interests (the actions described in clauses (i) and (ii) are collectively referred to herein as a "**Transfer**" and the Participating Creditor making such Transfer is referred to herein as the "**Transferor**"), unless such Transfer is to another Party or Participating Creditor or any other Person that first agrees in writing to be bound by the terms of this Settlement and Support Agreement by executing and delivering a Transferee Joinder substantially in the form attached hereto as Annex H  (the "**Transferee Joinder**") to the Debtors or, if to a Party or Participating Creditor, which Party or Participating Creditor has already executed this Settlement and Support Agreement, in which case, the Party or Participating Creditor receiving such Transferee Joinder shall deliver same to the Debtors.  With respect to claims against or interests in a

31

Debtor held by the relevant transferee upon consummation of a Transfer in accordance herewith, such transferee is deemed to make all of the representations, warranties, and covenants of a Participating Creditor, as applicable, set forth in this Agreement. Upon compliance with the foregoing, the Transferor shall be deemed to relinquish its rights (and be released from its obligations, except for any claim for breach of this Settlement and Support Agreement or any related non-disclosure agreement that occurs prior to such Transfer) under this Agreement to the extent of such transferred rights and obligations. Any Transfer made in violation of this Sub-Clause (i) of this Section 6(j) shall be deemed null and void *ab initio* and of no force or effect, regardless of any prior notice provided to the Debtors, and shall not create any obligation or liability of any Debtor or any other Party to the purported transferee.

(ii)     Notwithstanding Sub-Clause (i) of this Section 6(j), an entity that is acting in its capacity as a Qualified Marketmaker shall not be required to execute and deliver a Transferee Joinder on its own behalf to effect any transfer (by purchase, sale, assignment, participation, or otherwise) of any claim against any Debtor, by a Participating Creditor to a transferee; *provided that* (A) such transfer by a Participating Creditor to a transferee shall be in all other respects in accordance with and subject to Section 6(j)(i), including in that the ultimate transferee shall execute a Transferee Joinder, and (B) to the extent that a Participating Creditor, acting in its capacity as a Qualified Marketmaker, acquires any claim against, or interest in, any Debtor from a holder of such claim who is not a Participating Creditor, it may transfer (by purchase, sale, assignment, participation, or otherwise) such claim or interest without the requirement that the transferee be or become a Party in accordance with this Section 6(j). For purposes of this Section 6(j)(ii), a "**Qualified Marketmaker**" means an entity that (Y) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers claims against any of the Debtors (including debt securities or other debt) or enter with customers into long and short positions in claims against the Debtors (including debt securities or other debt), in its capacity as a dealer or market maker in such claims against the Debtors, and (Z) is in fact regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt). For the avoidance of doubt, if a Qualified Marketmaker purchases a claim against a Debtor from a Participating Creditor for its own account or otherwise has a beneficial ownership interest in a claim being acquired from a Participating Creditor, it shall be required to execute and deliver a Transferee Joinder to the Debtors.

## Section 7.  Currency Conversion

(a)     The Parties hereby agree to cooperate and coordinate efforts to convert portions of the Sale Proceeds from U.S. Dollars to, as the case may be, Canadian Dollars, Sterling and Euros (collectively, the "**Other Currencies**").

32

(b)  Canadian Dollar Conversion.

    (i)  The Canadian Debtors have elected to convert a portion of the Sale Proceeds, not to exceed US$1.2 billion, into Canadian Dollars. The Parties hereto agree to such conversion subject to the terms of this Section 7.

    (ii)  Within seven (7) Business Days of the date the conditions specified in Sections 9(a)(i) and 9(a)(ii) hereof are satisfied or waived in writing by the Parties:

        (A)  NNC, NNL, NNI, NNUK, NNSA, the other existing Depositors under the relevant Existing Escrow Agreements, the Monitor and the UCC shall enter into the Canadian Escrow Agreement, which agreement shall be subject to the separate approvals of the Bankruptcy Court and the CCAA Court; and

        (B)  the U.S. Debtors agree to make a motion to the Bankruptcy Court, and the Canadian Debtors agree to make a motion to the CCAA Court, for orders approving the conversion contemplated by this Section 7(b).

    (iii)  Each Party appearing at the hearings on the motions contemplated by Section 7(b)(ii)(B) will confirm to the Bankruptcy Court and/or the CCAA Court its support for the conversion and will take all necessary steps to support the conversion motions before the Bankruptcy Court and CCAA Court.

    (iv)  Forthwith upon the granting of the approvals of the Bankruptcy Court and the CCAA Court contemplated by Section 7(b)(ii)(B), the Parties (and in particular the relevant Depositors and Estate Fiduciaries) shall issue such instructions and/or directions to the existing Escrow Agents as may be necessary to give effect to the transfer of an amount of the Sale Proceeds as specified by the Monitor in writing (not to exceed the amount specified in Section 7(b)(i)) to the Canadian Escrow Agent.

    (v)  Following receipt by the Canadian Escrow Agent of such Sale Proceeds, the Monitor shall direct the conversion of such Sale Proceeds by the Canadian Escrow Agent (or its affiliate) on the date(s) and in the manner specified from time to time by the Monitor.

    (vi)  Any foreign exchange gain or loss made in respect of any amount in the Canadian Escrow Account (following conversion from U.S. Dollars to Canadian Dollars) shall be solely for the credit or debit of the Canadian Debtors.

(c)  Sterling and Euro Conversion Elections.

(i)     The EMEA Debtors and NNSA have not yet elected to convert a portion of Sale Proceeds into Sterling or Euros.

    (A)     Any of the EMEA Debtors and NNSA may, subject to the conditions set forth in this Section 7, elect to convert, in the case of an EMEA Debtor, up to the amount specified for that EMEA Debtor in Annex E into Sterling (a "**Sterling Conversion Election**") and, in the case of NNSA, up to $220 million into Euros, and in each case, less the pro rata percentage of the Buyer Escrow Amount attributable to NNSA and each EMEA Debtor (the "**Euro Conversion Election**," and together with any Sterling Conversion Election, the "**Conversion Elections**").

(ii)    A Conversion Election may be requested at any time following the satisfaction of the conditions contained in Section 9(a)(i),(ii), (iv), (v) and (vi).

(iii)   A Conversion Election must be made in writing to the Parties (a "**Conversion Election Request**") and be accompanied by the form of the EMEA Sterling Escrow Agreement in the event the Sterling Conversion Election is requested and/or the EMEA Euro Escrow Agreement in the event the Euro Conversion Election is requested, which agreements shall be on terms and conditions that are substantially similar to the terms and conditions of the Existing Escrow Agreements governing the Existing Escrow Accounts and shall include, without limitation:

    (A)     provisions that provide for the same level of joint control by the Bankruptcy Court and the CCAA Court over the EMEA Escrow Accounts that such courts now have over the Existing Escrow Accounts; and

    (B)     provisions that provide for the release of funds from the EMEA Escrow Accounts on the same terms and conditions that govern the release of funds from the Existing Escrow Accounts; and

    (C)     a requirement that the funds shall be held in a bank in London (U.K.) acceptable to the U.S. Debtors, the Canadian Debtors, the EMEA Debtors and NNSA.

(iv)    Promptly following delivery of a Conversion Election Request, the U.S. Debtors, the Canadian Debtors, the EMEA Debtors, NNSA, the Monitor and the UCC shall work together in good faith to agree the terms of the EMEA Euro Escrow Agreement and the EMEA Sterling Escrow Agreement, as applicable.

(v)     Promptly following delivery of a Conversion Election Request, the Debtors shall agree on the U.S. Dollar amount of Sale Proceeds to be

34

transferred from each of the Existing Escrow Accounts to satisfy the Conversion Election Request.

(vi)    Each of the EMEA Escrow Agreements shall be subject to the approval of the Bankruptcy Court and the CCAA Court, respectively. The Parties agree that within seven (7) Business Days of agreement on the form of the relevant EMEA Escrow Agreement:

(A)    the U.S. Debtors shall apply to the Bankruptcy Court; and

(B)    the Canadian Debtors shall apply to the CCAA Court,

in each case for permission to complete the relevant conversion and for approval to enter into the relevant EMEA Escrow Agreement.

(vii)    Each Party appearing at the motions contemplated by Section 7(c)(vi) will confirm to the Bankruptcy Court and/or the CCAA Court its support for the conversion and will take all necessary steps to support the conversion motions before the Bankruptcy Court and the CCAA Court.

(viii)    Within:

(A)    seven (7) Business Days; or

(B)    such longer period as the Party making the Conversion Election Request may require,

of obtaining the approvals of the Bankruptcy Court and the CCAA Court contemplated by Section 7(c)(vi), the Parties (and in particular the relevant Depositors and Estate Fiduciaries) shall issue such instructions and/or directions to the Existing Escrow Agents as may be necessary to give effect to the Conversion Election Request(s) and to the transfer of the requisite amount to the EMEA Euro Escrow Agent and/or the EMEA Sterling Escrow Agent, as the case may be, for conversion in accordance with Section 7(c)(ix) below.

(ix)    The Parties agree that the currency conversions contemplated under this Section 7(c) shall occur:

(A)    in the case of a Conversion Election by an EMEA Debtor, on the date(s) and in the manner specified from time to time by the Joint Administrators of that EMEA Debtor (which in the case of NNUK shall follow consultation between the Joint Administrators and the UKPI); and

(B)    in the case of a Conversion Election by NNSA, on the date(s) and in the manner specified from time to time by the NNSA Conflicts

35

Administrator following consultation with the French Liquidator and the agreement of the Joint Administrators of NNSA.

(x) Any foreign exchange gain or loss made in respect of any amount in the relevant EMEA Escrow Account pursuant to a Conversion Election (following conversion from U.S. Dollars to Euros or Sterling) shall be solely for the credit or debit of the EMEA Debtor who requested such Conversion Election or NNSA, as the case may be.

(d) The Parties undertake and agree to cooperate with the Escrow Agents to establish appropriate steps necessary to effect the necessary and timely conversion contemplated in this Section 7.

(e) The fees and costs of the Escrow Agents (including reasonable attorneys' fees costs), if any, associated with any currency conversion shall be borne by the Debtor(s) requesting such conversion and shall be paid out of the amount of their respective Sale Proceeds allocation or directly by the relevant Debtor out of its estate assets.

(f) Without in any way limiting the right of the EMEA Debtors and NNSA to convert any amount to Sterling or Euros in accordance with Section 7(c), it is the current intention of the EMEA Debtors and NNSA that:

(i) they will not issue a Conversion Election Request prior to the Plans Effective Date; and

(ii) they will receive their respective allocations pursuant to Section 2 (or following a Final Allocation Determination) in U.S. Dollars.

(g) For purposes of determining the allocation entitlements of the Debtors either pursuant to Section 2(c) hereof or pursuant to a Final Allocation Determination, any Sale Proceeds converted into Other Currencies as contemplated by this Section 7 (for the avoidance of doubt, on such converted amount) shall, when distributed to a Debtor, be valued as a U.S. Dollar equivalent of such Other Currency at the spot rate or blended rate (as applicable, which blended rate shall take into account the amounts converted and the rates at which such conversion occurred) at which such Sale Proceeds were converted from U.S. Dollars to such Other Currency (any such spot or blended conversion rate, the "**Applicable FX Rate**"). Solely for illustrative purposes, if U.S.$10 of Sale Proceeds was converted to CAD$13 (spot rate or blended rate of U.S.$1.00 to CAD$1.30), receipt by the Canadian Debtors of CAD$13 from the Canadian Escrow Account would constitute receipt of US$10 for purposes of determining the Canadian Debtors' allocation entitlement pursuant to Section 2(c) hereof or pursuant to a Final Allocation Determination regardless of the actual relative value of U.S. Dollars to Canadian Dollars at the date of distribution of such Sale Proceeds to the Canadian Estate.

(h)     If this Agreement terminates after the date of any currency conversion pursuant to this Section 7, then any amount so converted shall, absent any agreement among the parties to the relevant New Escrow Agreement, remain in the relevant New Escrow Account in the form of the converted Other Currency until such time as the Allocation Dispute has been finally resolved and the amount to be distributed to each Debtor estate has been finally determined (the "**Final Allocation Determination**", and the amount calculated as payable to each Debtor pursuant to the Final Allocation Determination, its "**Final Allocation Amount**").  In assisting the U.S. Court and the Canadian Court to come to a Final Allocation Determination, the Parties hereby agree to inform the U.S. Court and the Canadian Court that the Final Allocation Determination should be made as though no currency conversion had taken place.

(i)     For the purpose of Section 7(j) to (k), inclusive, the following terms shall have the following meaning:

    (i)     "**Converting Debtor**" means any Debtor that has elected to convert a portion of the Sale Proceeds and has a New Escrow Account established into which converted currency is paid pursuant to this Section 7;

    (ii)     "**Non-Converting Debtor**" means any Debtor that is not a Converting Debtor;

    (iii)     "**Positive Converting Debtor**" means any Converting Debtor in respect of which the Sale Proceeds in the relevant New Escrow Account (as expressed in U.S. Dollars using the Applicable FX Rate) exceeds the Final Allocation Amount due to such Converting Debtor;

    (iv)     "**Negative Converting Debtor**" means any Converting Debtor who is not a Positive Converting Debtor; and

    (v)     "**Surplus Amount**" means any, all of or any combination of a Canadian Surplus Amount, an EMEA Surplus Amount or an NNSA Surplus Amount.

(j)     In respect of the Canadian Debtors, upon a Final Allocation Determination:

    (i)     If the amount of Sale Proceeds in the Canadian Escrow Account plus any fees and costs paid pursuant to Section 7(e) from such Sale Proceeds (in each case as expressed in U.S. Dollars using the Applicable FX Rate) is greater than the aggregate of the Final Allocation Amounts due to the Canadian Debtors, then the Canadian Debtors shall pay into the Existing Escrow Accounts an amount, in U.S. Dollars, equal to the amount by which:

        (A)     the amount of Sale Proceeds in the Canadian Escrow Account plus any fees and costs paid pursuant to Section 7(e) from such Sale

Proceeds (in each case as expressed in U.S. Dollars using the Applicable FX Rate), *exceeds*

(B)    the aggregate of the Final Allocation Amounts due to the Canadian Debtors (such excess amount, the "**Canadian Surplus Amount**").

(ii)    The Canadian Surplus Amount shall, at the election of the Canadian Debtors and the Monitor, be satisfied from: (A) the Canadian Debtors' own assets; (B) the Canadian Escrow Account; or (C) any combination of the foregoing (A) and (B). If all or part of the Canadian Surplus Amount is to be transferred from the Canadian Escrow Account then all of the Parties agree that they shall issue such instructions or other directions to the Canadian Escrow Agent as may be required in order to effect such transfer to the Existing Escrow Accounts. Any fees or costs associated with the transfer of such funds from the Canadian Escrow Account or the conversion of such funds back to U.S. Dollars for the purpose of transfer, including without limitation any fees and costs of the Escrow Agents or their counsel, shall be borne by the Canadian Debtors either directly or from the Canadian Escrow Account.

(iii)    Once the Canadian Surplus Amount has been paid into the Existing Escrow Accounts then:

(A)    the amounts in the Existing Escrow Accounts (less any costs of the Existing Escrow Agents) shall be applied in payment of the amounts due to the Non-Converting Debtors in proportion to their respective Final Allocation Amounts; and

(B)    the amounts in the Canadian Escrow Account shall be paid to the Canadian Debtors.

(iv)    If there is no Canadian Surplus Amount upon a Final Allocation Determination:

(A)    the amounts in the Canadian Escrow Account shall be paid to the Canadian Debtors; and

(B)    the amounts in the Existing Escrow Accounts (less any costs of the Existing Escrow Agents) shall be paid to all Debtors as necessary to satisfy their respective Final Allocation Amounts (taking into account the amount of Sale Proceeds to be paid to the Canadian Debtors pursuant to the foregoing (A) plus any fees and costs paid pursuant to Section 7(e) from such Sale Proceeds (in each case as expressed in U.S. Dollars using the Applicable FX Rate)).

(k)    If an EMEA Debtor and/or NNSA also becomes a Converting Debtor then Section 7(j)(iii) and (iv) shall not apply and the following provisions shall apply upon a Final Allocation Determination:

38

(i)     If the amount of Sale Proceeds in the EMEA Sterling Escrow Account attributable to a Conversion Election made by that EMEA Debtor plus any fees and costs paid pursuant to Section 7(e) from such Sale Proceeds attributable to that EMEA Debtor (in each case as expressed in U.S. Dollars using the Applicable FX Rate) is greater than the Final Allocation Amount due to that EMEA Debtor, then that EMEA Debtor shall pay into the Existing Escrow Accounts an amount, in U.S. Dollars, equal to the amount by which:

     (A)     the amount of Sale Proceeds in the EMEA Sterling Escrow Account attributable to a Conversion Election made by that EMEA Debtor plus any fees and costs paid pursuant to Section 7(e) from such Sale Proceeds attributable to that EMEA Debtor (in each case as expressed in U.S. Dollars using the Applicable FX Rate), *exceeds*

     (B)     the Final Allocation Amount due to that EMEA Debtor (such excess amount, the "**EMEA Surplus Amount**").

(ii)    The EMEA Surplus Amount shall, at the election of that EMEA Debtor, be satisfied from: (A) the EMEA Debtor's own assets; (B) the EMEA Sterling Escrow Account; or (C) any combination of the foregoing (A) and (B). If all or part of the EMEA Surplus Amount is to be transferred from the EMEA Sterling Escrow Account then all of the Parties agree that they shall issue such instructions or other directions to the EMEA Sterling Escrow Agent as may be required in order to effect such transfer to the Existing Escrow Accounts. Any fees or costs associated with the transfer of such funds from the EMEA Sterling Escrow Account or the conversion of such funds back to U.S. Dollars for the purpose of transfer, including without limitation any fees and costs of the Escrow Agents or their counsel, shall be borne by that EMEA Debtor either directly or from the EMEA Sterling Escrow Account.

(iii)   If the amount of Sale Proceeds in the EMEA Euro Escrow Account plus any fees and costs paid pursuant to Section 7(e) from such Sale Proceeds (in each case as expressed in U.S. Dollars using the Applicable FX Rate) is greater than the aggregate of the Final Allocation Amount due to NNSA, then NNSA shall pay into the Existing Escrow Accounts an amount, in U.S. Dollars, equal to the amount by which:

     (A)     the amount of Sale Proceeds in the EMEA Euro Escrow Account plus any fees and costs paid pursuant to Section 7(e) from such Sale Proceeds (as expressed in U.S. Dollars using the Applicable FX Rate), *exceeds*

     (B)     the Final Allocation Amount due to NNSA (such excess amount, the "**NNSA Surplus Amount**").

(iv)     The NNSA Surplus Amount shall, at the election of NNSA, be satisfied from: (A) NNSA's own assets; (B) the EMEA Euro Escrow Account; or (C) any combination of the foregoing (A) and (B). If all or part of the NNSA Surplus Amount is to be transferred from the EMEA Euro Escrow Account then all of the Parties agree that they shall issue such instructions or other directions to the EMEA Euro Escrow Agent as may be required in order to effect such transfer to the Existing Escrow Accounts. Any fees or costs associated with the transfer of such funds from the EMEA Euro Escrow Account or the conversion of such funds back to U.S. Dollars for the purpose of transfer, including without limitation any fees and costs of the Escrow Agents or their counsel, shall be borne by NNSA either directly or from the EMEA Euro Escrow Account.

(v)     If there is a Surplus Amount then once such Surplus Amount has been paid into the Existing Escrow Accounts in accordance with Sections 7(j)(i), 7(j)(ii) and 7(k)(i-iv), as applicable:

      (A)     the amounts in the Existing Escrow Accounts (less any costs of the Existing Escrow Agents) shall be applied in payment of the amounts due to (i) all Non-Converting Debtors; and (ii) all Negative Converting Debtors (taking into account the amount of Sale Proceeds to be paid to such Negative Converting Debtors pursuant to the following (B), (C) and (D), as expressed in U.S. Dollars using the Applicable FX Rate), in proportion to their respective Final Allocation Amounts;

      (B)     the amounts in the Canadian Escrow Account shall be paid to the Canadian Debtors;

      (C)     the amounts in the EMEA Sterling Escrow Account shall be paid to the EMEA Debtors who are Converting Debtors in proportion to their respective Final Allocation Amounts; and

      (D)     the amounts in the EMEA Euro Escrow Account shall be paid to NNSA.

(vi)     If there is no Surplus Amount:

      (A)     the amounts in the Canadian Escrow Account shall be paid to the Canadian Debtors;

      (B)     the amounts in the EMEA Sterling Escrow Account shall be paid to the EMEA Debtors who are Converting Debtors in proportion to their respective Final Allocation Amounts;

      (C)     the amounts in the EMEA Euro Escrow Account shall be paid to NNSA; and

(D)    the amounts in the Existing Escrow Accounts (less any costs of the Existing Escrow Agents) shall be paid to all Debtors as necessary to satisfy their respective Final Allocation Amounts (taking into account the amount of Sale Proceeds to be paid pursuant to the foregoing (A), (B) and (C) plus any fees and costs paid pursuant to Section 7(e) from such Sale Proceeds (in each case as expressed in U.S. Dollars using the Applicable FX Rate)).

(l)    Notwithstanding the terms of any New Escrow Agreement, the Parties acknowledge that, in the event of the termination of this Settlement and Plan Support Agreement, each of the Debtors (other than Nortel Communications Inc., Architel Systems Corporation, Northern Telecom Canada Limited and Nortel Networks India International Inc.) reserves its rights pursuant to the Allocation Decisions with respect to any interest it may have in the Sale Proceeds on deposit in the New Escrow Accounts.

## Section 8.  Releases

(a)    For the avoidance of doubt, this Section 8 is subject to the satisfaction of the conditions contained in Section 9(a) hereof.

(b)    Subject to Section 8(b)(iii) and 8(i) hereof, upon the Plans Effective Date, each of the Parties and the Participating Creditors and their respective representatives, agents, successors and assigns (each a "**Releasor**"):

    (i)    release and forever discharge the other Releasors and each other Releasor's respective employees, officers, directors, agents, advisors, lawyers, successors and assigns and the directors and officers, both former and current, of any Nortel entity ("**Worldwide Ds&Os**") (each being a "**Releasee**") from any and all liability for claims, defences, demands, liabilities, damages, actions, contributions, subrogation, causes of action, setoffs, recoupments, costs and expenses (including lawyers' or other fees or expenses), the foregoing terms to be construed as broadly as possible, whether known or unknown, past or present, fixed or contingent, liquidated or unliquidated, which any of the Releasors now have, had, may have had or hereafter may have however so arising out of or in connection with the Allocation Dispute, any other matters resolved herein or any other matter relating to the Nortel Insolvency Proceedings or the Nortel Group (collectively and excluding the Non-Released Matters, "**Released Claims**"); and

    (ii)    undertakes, covenants and agrees not to make any claim, participate in any proceeding or take any action against any other person or entity who would as a result of such claim, proceeding or action have a claim for contribution or indemnity against any of the Releasees in relation to the matters herein resolved and released (collectively, the "**Releases**").

    (iii)    Notwithstanding the above Sections 8(b)(i) and 8(b)(ii), each of the Canadian Debtors and U.S. Debtors do not release or in any way

compromise their right to object to, or assert counterclaims for purposes of setoff against, claims made against them by Worldwide Ds&Os against such Debtors.

(c)     Notwithstanding the Releases provided in Section 8(b), the Debtors shall, upon the written request of a Debtor to another Debtor and to the extent permitted by applicable local law and not inconsistent with the statutory duties of the Debtor, or the Debtor's representatives and fiduciaries, to which a request is made, reasonably cooperate with each other, including providing such documents, other information, access to current personnel and/or permission to communicate with former personnel as may reasonably be requested by the requesting Debtor, in connection with opposing claims asserted by third parties against one or more of the Debtors ("**Third Party Claims**"), which Third Party Claims would have, but for the Releases, given rise to claims for indemnity and/or contribution among one or more of the Debtors; provided, however, that no Debtor shall be obligated to cooperate to the extent such requested cooperation would prejudice the interests of such Debtor.  Further, a Debtor shall only be obligated to provide cooperation in respect of a Third Party Claim pursuant to this Section 8(c) if, but for the Releases, such Third Party Claim would have given rise to a claim for indemnity and/or contribution against such Debtor.   The Debtor requesting cooperation shall bear all costs and expenses, including reasonable attorney fees, of the Debtor providing such cooperation, including the costs of accessing, processing, reviewing and making available any documents, other information and/or personnel requested.  For the avoidance of doubt (i) each Debtor shall be solely responsible for responding to and defending any Third Party Claims against it, and no other Debtor shall have any obligation to respond to, defend, appear in or become party to any Third Party Claims asserted against another Debtor, and (ii) this Section 8(c) shall not create any rights on the part of any person asserting a Third Party Claim, including any discovery or similar rights.   It is acknowledged that the Debtors intend to progress the wind-up of their respective estates, including the continuing disposal of records and decommissioning of their electronic data infrastructure (such as servers), and that the cooperation contemplated pursuant to this Section 8(c) shall in no way preclude any of the Debtors from taking any steps in connection with such wind-up.  To the extent that a Debtor receiving a request under this Section 8(c) takes the position that it is unable to provide the assistance requested, such Debtor shall confer with the Debtor making the request as to the basis for such position.

(d)     The U.S. Plans will include the Releases and the delivery thereof will be authorized by the Confirmation Order.  With respect to any Participating Creditor, such Releases shall be effective regardless of whether such Participating Creditor elects or opts out of any third-party release in the U.S. Plans.

(e)     The Canadian Plan will include the Releases and the effectiveness thereof will be authorized by the Sanction Order.

(f)     The Releases provided by the Joint Administrators, the NNSA Conflicts Administrator, NNSA (in the French Main Proceeding) and the EMEA Debtors

42

will be effective on the occurrence of the Plans Effective Date and the foregoing will be obliged to give effect to the releases as a result of the orders of the U.K. Court referred to in Section 9(a)(iv) and 9(a)(v).

(g)     The Releases provided by the French Liquidator and NNSA (in the French Secondary Proceeding) will be authorized by the French Court to be effective on the occurrence of the Plans Effective Date.

(h)     The Releases provided by the U.K. Pension Trustee will be authorized by the Beddoes Court to be effective on the occurrence of the Plans Effective Date.

(i)     Nothing in this Settlement and Support Agreement shall constitute a release, waiver or discharge of:

    (i)     any claims advanced by any party represented by a member of the CCC as against any of the Canadian Debtors or their directors, and any claims of the Canadian registered pension plans (or their administrator or other authorized representative on their behalf) against the Pension Benefits Guarantee Fund (Ontario);

    (ii)     any allowed claims (U.S.) or Proven Claims (Canadian) against the U.S. Debtors or the Canadian Estate for payment of the Crossover Bonds or the NNCC Bonds;

    (iii)     the U.S. Canadian Claim, the U.S. Canadian Priority Claim, the EMEA Canadian Claim, the UKPI Canadian Claim, the Remaining HOC Claim and the pre-filing intercompany claims specified on Annex L;

    (iv)     any claim advanced by any EMEA Debtor or EMEA Non-Filed Entity against any other EMEA Debtor or EMEA Non-Filed Entity, or NNSA;

    (v)     any claim advanced by NNSA against any EMEA Debtor or the Joint Administrators;

    (vi)     any claim advanced by the UKPI against any EMEA Debtor, the Joint Administrators, or NNSA;

    (vii)     any claim advanced by any EMEA Debtor or NNSA against the UKPI;

    (viii)     any claim between or among any of the U.S. Debtors and their subsidiaries;

    (ix)     any claim between the PBGC and the U.S. Debtors or any of their U.S. subsidiaries;

    (x)     any claim between or among the Canadian Debtors, provided no distributions or payments will be made by the Canadian Debtors on account of such claims under the Canadian Plan or otherwise; and

43

(xi)    any claim to enforce the terms of this Settlement and Support Agreement, the Plans and any orders of the U.S. Court or the CCAA Court related thereto (collectively, (i) through (xi), the "**Non-Released Matters**").

## Section 9. Conditions

(a)    The effectiveness of the Settlement and this Settlement and Support Agreement and each of the provisions hereof is subject to the satisfaction or the express written waiver by each of the Canadian Debtors (such waiver by the Canadian Debtors being subject to the prior consent of the CCC acting reasonably and in good faith), the EMEA Debtors (such waiver by NNUK being subject to the prior consent of the U.K. Pension Trustee and the PPF acting reasonably and in good faith), NNSA and the U.S. Debtors (such waiver by the U.S. Debtors being subject to the prior consent of the UCC and the Bondholder Group acting reasonably and in good faith) of the following conditions:

(i)    <u>Crossover Bondholder Joinder</u>. Execution and delivery by the date that is fourteen (14) days from the date of this Settlement and Support Agreement of Creditor Joinders from Crossover Bondholders beneficially holding notes representing at least 67% of the principal amount (as of the Petition Date) of the Crossover Bonds Claims outstanding as at the Petition Date.

(ii)    <u>NNCC Bondholder Joinder</u>. Execution and delivery by the date that is fourteen (14) days from the date of this Settlement and Support Agreement of Creditor Joinders from NNCC Bondholders beneficially holding notes representing at least 67% of the principal amount (as of the Petition Date) of the NNCC Bonds Claims outstanding as at the Petition Date.

(iii)    <u>Currency Conversion</u>. Approval orders shall have been obtained from the CCAA Court and the Bankruptcy Court authorizing the Canadian Debtors and U.S. Debtors, respectively, to enter into the Canadian Escrow Agreement, open the Canadian Escrow Account, and convert a portion of the Sale Proceeds from U.S. Dollars to Canadian Dollars, all as contemplated by Section 7, by no later than October 21, 2016.

(iv)    <u>Order by U.K. Court</u>. Entry of an order or orders by no later than November 4, 2016 by the U.K. Court that the Joint Administrators be at liberty to perform and procure the relevant EMEA Debtor in respect of which they are appointed to perform their respective obligations under this Settlement and Support Agreement, including, without limitation, delivering the Releases, and any other actions necessary to implement the Settlement.

(v)    <u>Order by U.K. Court for French Main Proceeding</u>. Entry of an order or orders by no later than November 4, 2016 by the U.K. Court that the NNSA Conflicts Administrator and NNSA (in the French Main

44

Proceeding) be at liberty to perform their obligations under this Settlement and Support Agreement, including, without limitation, delivering the Releases, and any other actions necessary to implement the Settlement.

(vi)     Approval by French Court.  Entry of an order or orders by no later than November 4, 2016 by the French Court approving and authorizing the entry into this Settlement and Support Agreement by NNSA (in the French Secondary Proceeding), and authorizing NNSA to perform its obligations under this Settlement and Support Agreement, including, without limitation, delivering the Releases, and any other actions necessary to implement the Settlement.

(vii)    Authorization by Beddoes Court.  Entry of an order or orders by no later than November 4, 2016 by the Beddoes Court authorizing the U.K. Pension Trustee to implement this Settlement and Support Agreement and perform its obligations under this Settlement and Support Agreement, including, without limitation, delivering the Releases, and any other actions necessary to implement the Settlement.

(viii)   Confirmation of U.S. Plans.  The Confirmation Order shall have been entered by the Bankruptcy Court by no later than February 17, 2017 and thereafter shall have become a Final Order.

(ix)     Sanction of Canadian Plan.  The Sanction Order shall have been issued by the CCAA Court by no later than February 17, 2017 and entered and thereafter shall have become a Final Order.

(x)      Litigation Dismissal Notices Exchanged in Escrow.  Appropriate notices and other documents dismissing with prejudice the various pending litigations specified in Section 5(b) shall have been executed by the requisite Parties party to such litigation and delivered to one another in escrow.

(xi)     Plans Implementation.  The Plans Effective Date shall have occurred by no later than August 31, 2017.

(b)     The Parties agree to work in good faith and provide such reasonable cooperation to one another as may be necessary or desirable to achieve the satisfaction of the conditions specified in Section 9(a) and certain related steps on the timetable specified in Annex 1 (the "**Timetable**"), it being understood and agreed that a failure to achieve the satisfaction of a particular condition by the specified date on the Timetable shall not constitute a breach of this Agreement or result in a failure of such condition except as expressly contemplated by Section 9(a) hereof.  The following Parties shall have responsibility for seeking to satisfy the conditions specified in the Section(s) indicated next to the Party's name, it being understood and agreed that such Parties will, upon request, keep the other Parties reasonably informed as to their progress in satisfying such conditions and share drafts of any

45

proposed court filings (except that there shall be no obligations to share any court filings, or drafts thereof, in respect of which a confidential order shall be sought):

    (i)       Bondholder Group – Section 9(a)(i) and (a)(iii)

    (ii)     NNCC Bondholders – Section 9(a)(ii)

    (iii)    Joint Administrators and NNSA Conflicts Administrator – Section 9(a)(iii), (a)(iv) and (a)(v)

    (iv)    French Liquidator – Section 9(a)(iii) and (a)(vi)

    (v)     U.K. Pension Trustee – Section 9(a)(vii)

    (vi)    U.S. Debtors – Sections 9(a)(iii), (a)(viii) and (a)(xi)

    (vii)   Canadian Debtors/Monitor – Sections 9(a)(iii), (a)(ix) and (a)(xi)

    (viii)  Parties that are parties to the litigations specified in Section 5(b) – Section 9(a)(x)

(c)    Notwithstanding the foregoing Section 9(a): (i) the following provisions of this Settlement and Support Agreement shall be enforceable immediately upon execution of this Settlement and Support Agreement by the Parties: Sections 1 (as necessary to the implementation of the Sections referenced in this Section 9(c)), 5(c), 5(d), 5(e), 7, 9, 10, 11, 12, 13, 14 and 15 (other than Section 15(b)(i)); and (ii) the following provisions of this Settlement and Support Agreement shall be enforceable immediately upon satisfaction of the conditions specified in Section 9(a)(i) and 9(a)(ii): Sections 2(g) (but only the first sentence thereof), 3(b), 3(c), 4(g)(vii), 4(l), the other provisions of Section 4 (but solely to the extent of obligating the U.S. Debtors and the Canadian Debtors to include such provisions in the Canadian Plan and the U.S. Plan, as applicable) and Section 6. All other provisions of this Settlement and Support Agreement shall be enforceable upon the satisfaction or waiver of all the conditions set forth in Section 9(a).

## Section 10. **Termination**

    (a)    Upon the non-satisfaction of any condition set forth in Section 9(a) hereof (a "**Termination Event**"), unless such condition is waived by the Debtors in accordance with Sections 9(a) hereof, this Settlement and Support Agreement may be terminated by any of the Canadian Debtors, the EMEA Debtors, NNSA or the U.S. Debtors after the passage of ten (10) Business Days following the delivery of a written notice by any of the foregoing Parties to each of the other Parties in the manner set forth in Section 12 hereof. Prior to the expiration of such ten (10) Business Day period, the Parties shall meet and confer with respect to such Termination Event to discuss alternatives to termination. No Party may terminate this Settlement and Support Agreement in accordance with this Section 10(a) if the non-satisfaction of that condition was caused by a breach of that Party.

(b)     In the event this Settlement and Support Agreement is terminated, the Parties reserve all of their rights and defenses with respect to the claims and other matters resolved by this Settlement and Support Agreement and this proposed settlement shall not constitute an admission by any Party regarding the validity of the litigations, claims or defenses resolved by this Settlement and Support Agreement or that they have any liability in connection with such litigations, claims or defenses. Upon termination, Parties are free to notify courts of such termination and to immediately thereafter recommence litigation.

(c)     In the event this Settlement and Support Agreement is terminated, the Parties agree that such termination shall be deemed an occurrence arising more than fourteen (14) days after the opening of the appeals from the Allocation Decisions currently pending before the Third Circuit for purposes of Third Circuit Local Rule of Appellate Procedure 4.1. If a motion to expedite is made after such termination, the Parties agree not to oppose such motion on the grounds that it was not timely filed, but the Parties reserve all rights to support or oppose such motion on any other grounds.

(d)     The termination of this Settlement and Support Agreement for any reason shall:

   (i)     not affect this Section 10(d), Sections 7(b)(vi), 7(c)(x), 7(e) and (g)-(l), Section 11, Section 12, and Sections 15(a), 15(d), 15(e), 15(h), 15(i) and 15(j), which provisions shall continue in force after such termination; and

   (ii)    otherwise result in this Settlement and Support Agreement being no longer effective and the rights of all Parties, including all rights advanced in litigation (including in respect of the Allocation Dispute), shall be restored to the *status quo ante*.

## Section 11. <u>Limitations of Liability</u>

(a)     <u>Joint Administrators' and NNSA Representatives' Limited Liability</u> – The Joint Administrators of the EMEA Debtors (including for the purpose of this subsection, NNSA) and the NNSA Conflicts Administrator have entered into and signed this Settlement and Support Agreement as agents for the EMEA Debtors and NNSA for the purpose of obtaining the releases contained in this clause and neither they, their firm, nor its affiliates, shareholders, employees, advisors, lawyers, representatives or agents shall incur any personal liability whatsoever in respect of any of the obligations undertaken by the EMEA Debtors or NNSA or in respect of any failure on the part of the EMEA Debtors or NNSA to observe, perform or comply with any obligation under this Settlement and Support Agreement or under or in relation to any associated arrangements or negotiations or under any document or assurance made pursuant to this Settlement and Support Agreement. The French Liquidator and the NNSA Conflicts Administrator have entered into and signed this Settlement and Support Agreement as agents for NNSA and neither they, their firms, nor their attorneys or other representatives shall incur any personal liability whatsoever in respect of any of the obligations undertaken by NNSA or in respect of any failure on the part of NNSA to observe, perform or comply with any obligation under this Settlement and Support

47

Agreement or under or in relation to any associated arrangements or negotiations or under any document or assurance made pursuant to this Settlement and Support Agreement. Any release, discharge or other benefit conferred upon the Joint Administrators, the NNSA Conflicts Administrator, and the French Liquidator pursuant to this Settlement and Support Agreement or the Plans shall enure to their benefit in their personal capacities and each of the Joint Administrators, the NNSA Conflicts Administrator, and the French Liquidator in their personal capacity shall be a third party beneficiary to this Settlement and Support Agreement and the Plans entitled to enforce such releases, discharges and benefits in accordance with the terms of this Settlement and Support Agreement and the Plans.

(b)     <u>Joint Liquidators' Liability</u> - Each of the Joint Liquidators is a Party to this Agreement: (i) as an agent of NNOCL or NNNI, respectively, in such appointed capacity; and (ii) in their own capacity solely for taking the benefit of this Section 11. Notwithstanding anything else to the contrary herein, any claim, action or proceeding against the Joint Liquidators in their personal capacity (and not as agent for NNOCL or NNNI respectively) under this Settlement and Support Agreement shall be governed exclusively by English law and subject to the exclusive jurisdiction of the U.K. Courts. None of the Joint Liquidators, their firms, partners, employees, advisors, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any company in the Nortel Group to observe, perform or comply with any of its obligations under this Settlement and Support Agreement or under or in relation to any associated arrangements or negotiations.

(c)     <u>Monitor's Limited Liability</u> – The Monitor is a party to this Settlement and Support Agreement solely in its capacity as the CCAA Court appointed Monitor of the Canadian Debtors and not in its personal capacity and shall have all of the protections granted to it under the CCAA and the orders of the CCAA Court, including the Initial Order dated January 14, 2009 (as amended and restated), the Order dated August 14, 2009, the Claims Procedure Order, the Claims Resolution Order dated September 16, 2010, the EMEA Claims Procedure Order dated January 14, 2011, the Intercompany Claims Procedure Order dated July 27, 2012 and the Order (Monitor's Expansion of Power Order #2) dated October 3, 2014. None of the Monitor or its affiliates, shareholders, employees, advisors, lawyers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any Nortel Group company to observe, perform or comply with any of its obligations under this Settlement and Support Agreement or under or in relation to any associated arrangements or negotiations. Any release, discharge or other benefit conferred upon the Monitor pursuant to this Settlement and Support Agreement or the Plans shall enure to the benefit of Ernst & Young Inc. in its personal capacity and Ernst & Young Inc. in its personal capacity shall be a third party beneficiary to this Settlement and Support Agreement and the Plans entitled to enforce such releases, discharges and benefits in accordance with the terms of this Settlement and Support Agreement and the Plans.

(d)     <u>U.S. Principal Officer's Limited Liability</u> – The U.S. Principal Officer has signed this Settlement and Support Agreement solely in its capacity as the Bankruptcy Court appointed Principal Officer of the U.S. Debtors and not in his personal capacity. None of the U.S. Principal Officer or his firm or its affiliates, shareholders, employees, advisors, lawyers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any Nortel Group company to observe, perform or comply with any of its obligations under this Settlement and Support Agreement or under or in relation to any associated arrangements or negotiations. Any release, discharge or other benefit conferred upon the U.S. Principal Officer pursuant to this Settlement and Support Agreement or the Plans shall enure to the benefit of the U.S. Principal Officer in his personal capacity and his firm, in its personal capacity shall be a third party beneficiary to this Settlement and Support Agreement entitled to enforce such releases, discharges and benefits in accordance with the terms of this Settlement and Support Agreement and the Plans.

## Section 12. <u>Notice</u>

All demands, notices and communications provided for in this Settlement and Support Agreement shall be in writing and shall be sent by facsimile transmission with confirmation to the number specified on Annex J, electronic format via email, personally delivered or sent by reputable overnight courier service (delivery charges prepaid) to any Party at the address and other particulars specified on Annex J, or at such other address or particulars as the recipient Party has specified by prior written notice to the other Parties pursuant to the provisions of this Section 12.

## Section 13. <u>Further Acquisition of Claims</u>

Except as set forth in Section 6(j), nothing in this Settlement and Support Agreement shall be construed as precluding any Party or any of its affiliates from acquiring additional Crossover Bonds, NNCC Bonds, claims, or interests in the instruments underlying the Crossover Bonds, NNCC Bonds or claims; provided, however, that any additional Crossover Bonds, NNCC Bonds, claims, or interests in the underlying instruments acquired by any Party and with respect to which such Party is the legal owner, beneficial owner, and/or investment advisor or manager of or with power and/or authority to bind any claims or interests held by it shall automatically be subject to the terms and conditions of this Settlement and Support Agreement. Upon any such further acquisition, such Party shall promptly notify the Debtors, the Monitor and counsel to the Bondholder Group.

## Section 14. <u>Relationship Among Parties.</u>

Notwithstanding anything in this Settlement and Support Agreement to the contrary, the duties and obligations of the Parties under this Settlement and Support Agreement shall be several, and not joint. No Party shall have any responsibility by virtue of this Settlement and Support Agreement for any trading by any other entity. No prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect or negate this Settlement and Support Agreement. The Parties acknowledge that this Settlement and Support Agreement does not constitute an agreement, arrangement, or understanding with respect to

acting together for the purpose of acquiring, holding, voting, or disposing of any equity securities of the Debtors and they (or any combination of them) do not constitute a "group" within the meaning of Rule 13d-5 under the U.S. Securities Exchange Act of 1934, as amended. No action taken by any Party pursuant to this Settlement and Support Agreement shall be deemed to constitute or to create a presumption by any of the Parties that the Parties are in any way acting in concert or as such a "group."

**Section 15.  Miscellaneous Provisions**

     (a)    Evidentiary Limitations/No Waiver or Admission – This Settlement and Support Agreement is being entered into as part of a comprehensive resolution of multiple disputes, each element of which is consideration for the other elements and an integral aspect of the proposed resolution. The Parties may submit this Settlement and Support Agreement to any court of competent jurisdiction in connection with seeking approval of this Settlement and Support Agreement, provided, however, except for purposes of seeking to implement or enforce this Settlement and Support Agreement, its terms and the transactions, agreements and actions contemplated hereby, no Party shall introduce, tender, reference or otherwise seek to rely on the Settlement, this Settlement and Support Agreement or any term, compromise or agreement reflected herein in any litigation in or related to the Nortel Insolvency Proceedings, including the Allocation Dispute, and this Settlement and Support Agreement is entitled to protection as a settlement communication pursuant to Federal Rule of Evidence 408 and any other rule of similar effect in any relevant jurisdiction. As the terms of this Settlement and Support Agreement constitute a settlement, nothing herein shall constitute or shall be argued to constitute an admission of any fact or legal position, waiver of any legal or factual argument or defense, or estop any Party from advancing or defending against any legal or factual argument for any other purpose.

     (b)    Costs and Expenses – Each Party shall: (i) pay its own costs incurred in relation to the litigation which is resolved by this Settlement and Support Agreement, except as otherwise agreed, and no Party shall contest such costs in any manner; and (ii) bear its own costs and expenses (including legal fees and expenses) incurred in connection with this Settlement and Support Agreement, the Plans and the transactions contemplated hereby and thereby. Nothing in the foregoing sentence or in Section 8(b) shall alter any pre-existing arrangement, order or agreement pursuant to which a Debtor estate has agreed or is obligated to pay the professional costs of a Party hereto, save and except as outlined in Sections 4(k) and 4(m).

     (c)    Adjudication of Claims – For the avoidance of doubt, nothing in this Settlement and Support Agreement is intended to affect the rights of the respective Debtor estate representatives to resolve and adjudicate claims in their estates, except as set out in Sections 4(b)(i), 4(g), and 4(h) hereof.

     (d)    Disputes – To the fullest extent permitted by applicable law, each Party (i) agrees to submit to the non-exclusive jurisdiction of the Bankruptcy Court and the CCAA Court (in a joint hearing conducted under the Cross-Border Protocol), for

purpose of all legal proceedings to the extent relating to the matters agreed in this Settlement and Support Agreement (which shall not include legal proceedings relating to the adjudication of claims not resolved herein, which proceedings shall take place before the supervising court of the Debtor against whom such claims have been asserted, subject to the Cross-Border Protocol, where applicable), (ii) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters agreed in this Settlement and Support Agreement may be brought in the Bankruptcy Court and the CCAA Court, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of venue of any such action brought in such court, or any claim that any such action brought in such a court, has been brought in an inconvenient forum, (iv) agrees that email service of process or other papers in connection with any such action or proceeding shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law. Notwithstanding anything in this Section 15(d), any claim, action or proceeding against (x) the Joint Administrators or the NNSA Conflicts Administrator in their personal capacities under this Settlement and Support Agreement shall be governed exclusively by English law and subject to the exclusive jurisdiction of the U.K. Court, and any such claim, action or proceeding against the French Liquidator in his personal capacity under this Settlement and Support Agreement shall be governed exclusively by French law and subject to the exclusive jurisdiction of the French Court; (y) the U.S. Principal Officer in his personal capacity under this Settlement and Support Agreement shall be governed exclusively by law of the State of New York and subject to the exclusive jurisdiction of the Bankruptcy Court; and (z) the Monitor in its personal capacity under this Settlement and Support Agreement shall be governed exclusively by the law of Ontario and the federal laws of Canada applicable therein and subject to the exclusive jurisdiction of the CCAA Court.  For the avoidance of doubt, nothing in this Section 15(d) shall apply to (A) any claim between or among the UKPI, any EMEA Debtor, any EMEA Non-Filed Entity, the Joint Administrators or NNSA or any claim of any EMEA Debtor against any other EMEA Debtor, EMEA Non-Filed Entity or NNSA, (B) any claim of the PBGC against any U.S. Debtor or affiliate or any claim of any U.S. Debtor against any other U.S. Debtor, or (C) any claim of any creditor against any Debtor or affiliate, in each case except to the extent relating to the matters agreed in this Settlement and Support Agreement.

(e)    **Waiver of Jury Trial.  Each Party hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in respect of any litigation directly or indirectly arising out of or in connection with this Settlement and Support Agreement or any transaction contemplated hereby or thereby. Each Party (i) certifies that no representative, agent or attorney of any other Party has represented, expressly or otherwise, that such other Party would not, in the event of litigation, seek to enforce the foregoing waiver, and (ii) acknowledges that it has entered into this Settlement and Support Agreement as a result of,**

**among other things, the mutual waivers and certifications in this Section 15(e).**

(f)    <u>Injunctive Relief</u> – All remedies available at law or equity, including specific performance, to any Party for a breach of this Settlement and Support Agreement by another Party shall be available to the non-breaching Parties. The Parties further agree that irreparable damage would occur in the event that any of the provisions of this Settlement and Support Agreement were not performed in accordance with their specific terms or were otherwise breached. Accordingly, each of the Parties shall be entitled to equitable relief to prevent or remedy breaches of this Settlement and Support Agreement prior to the Plans Effective Date, without the proof of actual damages, including in the form of an injunction or injunctions or orders for specific performance in respect of such breaches. Each Party agrees, to the extent that such Party is subject to any equitable remedy, to waive any requirement for the security or posting of any bond in connection with any such equitable remedy.

(g)    <u>Further Assurances</u> – The Parties undertake and agree to cooperate in good faith to effectuate the terms of this Settlement and Support Agreement, obtain confirmation of the U.S. Plans, obtain sanction of the Canadian Plan and obtain approvals from the U.K. Court, the French Court and the Beddoes Court.

(h)    <u>Governing Law</u> – This Settlement and Support Agreement shall be interpreted, construed and enforced in accordance with the laws of the State of New York without giving effect to the choice of law provisions thereof that would result in the application of the law of another jurisdiction.

(i)    <u>Entire Agreement</u> – This Settlement and Support Agreement constitutes the entire agreement among the Parties and supersedes all prior or contemporaneous written or oral communications, understandings and agreements with respect to the settlement of the Allocation Dispute and the other matters and disputes among the Parties that are resolved herein. For the avoidance of doubt, the EMEA Debtors, NNSA, the Joint Administrators, the NNSA Conflicts Administrator, the French Liquidator, the EMEA Non-Filed Entities, the Joint Liquidators, the U.K. Pension Trustee and the PPF are party to certain side agreements amongst some or all of them related to this Settlement and Support Agreement, which side agreements shall bind solely the parties to such side agreements for the purposes of those side agreements, it being understood and agreed that any such side agreement shall have no impact on the Parties' rights and obligations under this Settlement and Support Agreement or the interpretation of this Settlement and Support Agreement.

(j)    <u>Amendments and Waivers</u> – This Settlement and Support Agreement may not be amended, supplemented or modified except by a written instrument executed by each of the Parties to this Settlement and Support Agreement. No Party shall be deemed to have waived any provision of this Settlement and Support Agreement unless such waiver is in writing, and then such waiver shall be limited to the circumstances set forth in such written waiver.

(k)    Non-Severability – Each of the provisions of this Settlement and Support Agreement is an integrated, essential and non-severable part of this Settlement and Support Agreement.

(l)    Representative Capacity – Each person executing this Settlement and Support Agreement in a representative capacity represents and warrants that he or she is empowered to do so.

(m)    Successors and Assigns – This Settlement and Support Agreement shall enure to the benefit of, and shall be binding upon, each Party and its respective agents, successors and assigns.

(n)    Authorization – Each Party represents and warrants, severally and not jointly, that as of the date of this Settlement and Support Agreement, it has the requisite power and authorization to enter into this Settlement and Support Agreement and carry out the transactions contemplated hereby, provided, however, that in the case of the U.S. Debtors, the Canadian Debtors and the Monitor, the EMEA Debtors, NNSA and the U.K. Pension Trustee, such power and authorization to carry out the transactions contemplated herein is subject to the granting of the Confirmation Order, the Sanction Order, and the orders of the U.K. Court, the French Court and the Beddoes Court, respectively.

(o)    Manner of Execution – This Settlement and Support Agreement may be executed in counterparts, each of which shall be an original, and such counterparts shall be construed together as one instrument. The signature of any of the Parties hereto may be evidenced by a facsimile, scanned email or internet transmission copy of this Settlement and Support Agreement bearing such signature.

(p)    French Court Approval – Immediately upon receipt of an order (the "**First French Order**") from the French supervisory judge (*Juge-commissaire*) (the "**French Supervisory Judge**") appointed in respect of NNSA in form and substance satisfactory to the Parties, acting reasonably, each of the Parties shall execute and deliver a release and waiver to the French Liquidator that: (i) waives the requirement for notification of the First French Order; (ii) consents to the terms of the First French Order; and (ii) waives any appeal or other remedy in respect of the First French Order. The French Liquidator shall deliver a draft of the First French Order with a certified English translation thereof to the other Parties within five (5) Business Days of execution of this Settlement and Support Agreement. Forthwith following entry of the First French Order by the French Supervisory Judge, the French Liquidator shall deliver a certified copy of the First French Order together with a certified English translation thereof to the other Parties for their review and consideration.

IN WITNESS WHEREOF, the Parties have executed this Agreement on the date first above written.

**Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Global Corporation, Nortel Networks International Corporation, Nortel Networks Technology Corporation, Nortel Communications Inc., Architel Systems Corporation and Northern Telecom Canada Limited.**

By: _____

Name:  Tanecia Wong Ken

Title:    Authorized Representative

**Ernst & Young Inc. in its capacity as Monitor of Nortel Networks Corporation, *et al.*, and not in its personal capacity.**

By: _____

Name:  Murray A. McDonald

Title:  President

**Nortel Networks Inc., Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc., Nortel Networks (CALA) Inc. and Nortel Networks India International Inc.**

By: _____

Name:  John J. Ray III

Title:  U.S. Principal Officer

IN WITNESS WHEREOF, the Parties have executed this Agreement on the date first above

written.

**Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Global Corporation, Nortel Networks International Corporation, Nortel Networks Technology Corporation, Nortel Communications Inc., Architel Systems Corporation and Northern Telecom Canada Limited.**

By:_____

Name:

Title:

**Ernst & Young Inc. in its capacity as Monitor of Nortel Networks Corporation, *et al.*, and not in its personal capacity.**

By: _____

Name:  Murray A. McDonald

Title:  President

**Nortel Networks Inc., Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc., Nortel Networks (CALA) Inc. and Nortel Networks India International Inc.**

By:_____

Name:  John J. Ray III

Title:  U.S. Principal Officer

IN WITNESS WHEREOF, the Parties have executed this Agreement on the date first above

written.

**Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Global Corporation, Nortel Networks International Corporation, Nortel Networks Technology Corporation, Nortel Communications Inc., Architel Systems Corporation and Northern Telecom Canada Limited.**

By:_____
Name:
Title:

**Ernst & Young Inc. in its capacity as Monitor of Nortel Networks Corporation, *et al.*, and not in its personal capacity.**

By:_____
Name:  Murray A. McDonald
Title:  President

**Nortel Networks Inc., Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc., Nortel Networks (CALA) Inc. and Nortel Networks India International Inc.**

By:_____
Name: John J. Ray III
Title: U.S. Principal Officer

**The EMEA Debtors**

**Nortel Networks UK Limited (in administration)**

acting by :

as joint administrator (acting as agent and without personal liability)

**Nortel Networks NV (in administration)**

acting by :

as joint administrator (acting as agent and without personal liability)

**Nortel Networks B.V. (in administration)**

acting by :

as joint administrator (acting as agent and without personal liability)

**Nortel Networks Hispania SA (in administration)**

acting by :

as joint administrator (acting as agent and without personal liability)

**Nortel Networks (Ireland) Limited (in administration)**

acting by :

as joint administrator (acting as agent and without personal liability)

**Nortel Networks SpA (in administration)**

acting by :

as joint administrator (acting as agent and without personal liability)

**Nortel Networks Polska Sp z.o.o. (in administration)**

acting by :

as joint administrator (acting as agent and without personal liability)

**Nortel Networks (Austria) GmbH (in administration)**

acting by :

as joint administrator (acting as agent and without personal liability)

**The EMEA Debtors**

**Nortel Networks UK Limited (in administration)**

**Nortel Networks (Ireland) Limited (in administration)**

acting by
:

acting by DAVID HUGHES
:

as joint administrator (acting as agent and without personal liability)

as joint administrator (acting as agent and without personal liability)

**Nortel Networks NV (in administration)**

**Nortel Networks SpA (in administration)**

acting by
:

acting by
:

as joint administrator (acting as agent and without personal liability)

as joint administrator (acting as agent and without personal liability)

**Nortel Networks B.V. (in administration)**

**Nortel Networks Polska Sp z.o.o. (in administration)**

acting by
:

acting by
:

as joint administrator (acting as agent and without personal liability)

as joint administrator (acting as agent and without personal liability)

**Nortel Networks Hispania SA (in administration)**

**Nortel Networks (Austria) GmbH (in administration)**

acting by
:

acting by
:

as joint administrator (acting as agent and without personal liability)

as joint administrator (acting as agent and without personal liability)

**Nortel Networks s.r.o. (in administration)**

acting by

as joint administrator (acting as agent and without personal liability)

**Nortel Networks Engineering Service Kft (in administration)**

acting by

as joint administrator (acting as agent and without personal liability)

**Nortel Networks Portugal SA (in administration)**

acting by

as joint administrator (acting as agent and without personal liability)

**Nortel Networks Slovensko s.r.o. (in administration)**

acting by

as joint administrator (acting as agent and without personal liability)

**Networks Romania SRL (in administration)**

acting by

as joint administrator (acting as agent and without personal liability)

**Nortel GmbH (in administration)**

acting by

as joint administrator (acting as agent and without personal liability)

**Nortel Networks OY (in administration)**

acting by

as joint administrator (acting as agent and without personal liability)

**Nortel Networks AB (in administration)**

acting by

as joint administrator (acting as agent and without personal liability)

Nortel Networks International Finance & Holding B.V. (in administration)

acting by
:

as joint administrator (acting as agent and without personal liability)

Nortel Networks France S.A.S. (in administration)

acting by
:

as joint administrator (acting as agent and without personal liability)

**The EMEA Non-Filed Entities**

Nortel Networks AS

_____

acting by
: DAVE QUANE ( DIRECTOR )

Nortel Networks AG

_____

acting by
: DAVE QUANE ( DIRECTOR )

Nortel Networks South Africa (Pty) Limited

_____

acting by
: DAVE QUANE ( DIRECTOR )

Nortel Networks (Northern Ireland)
Limited (in liquidation)

_____

acting by
:_____

as joint liquidator (acting as agent and without
personal liability)

**Nortel Networks Optical Components
Limited (in liquidation)**

_____

acting by
:_____

as joint liquidator (acting as agent and without
personal liability)

**The EMEA Non-Filed Entities**

**Nortel Networks AS**

**Nortel Networks AG**

acting by
:

acting by
:

**Nortel Networks South Africa (Pty) Limited**

**Nortel Networks (Northern Ireland) Limited (in liquidation)**

acting by
:

acting by
:    RICHARD BARKER

as joint liquidator (acting as agent and without personal liability)

**Nortel Networks Optical Components Limited (in liquidation)**

acting by
:    RICHARD BARKER

as joint liquidator (acting as agent and without personal liability)

Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson and Stephen John Harris, as the administrators of all EMEA Debtors and Nortel Networks S.A. except Nortel Networks (Ireland) Limited (in administration), and Alan Robert Bloom and David Martin Hughes as Administrators for Nortel Networks (Ireland) Limited (in administration).

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

**Nortel Networks S.A. (in administration and in *liquidation judiciaire*)**

acting by
: _____

as joint administrator (acting as agent and without personal liability)

acting by :Stephen Jonathan Taylor

as NNSA Conflicts Administrator (acting as agent and without personal liability)

acting by : Maître Cosme Rogeau as French Liquidator (acting as agent and without personal liability)

Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson and Stephen John Harris, as the administrators of all EMEA Debtors and Nortel Networks S.A. except Nortel Networks (Ireland) Limited (in administration), and Alan Robert Bloom and David Martin Hughes as Administrators for Nortel Networks (Ireland) Limited (in administration).

By:_____

Name:

Title:

By:_____

Name:

Title:

By:_____

Name:

Title:

Nortel Networks S.A. (in administration and in *liquidation judiciaire*)

_____

acting by

:_____

as joint administrator (acting as agent and without personal liability)

acting by :Stephen Jonathan Taylor

as NNSA Conflicts Administrator (acting as agent and without personal liability)

_____

acting by : Maître Cosme Rogeau as French Liquidator (acting as agent and without personal liability)

**Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson and Stephen John Harris, as the administrators of all EMEA Debtors and Nortel Networks S.A. except Nortel Networks (Ireland) Limited (in administration), and Alan Robert Bloom and David Martin Hughes as Administrators for Nortel Networks (Ireland) Limited (in administration).**

By:_____
Name:
Title:

By:_____
Name:
Title:

By:_____
Name:
Title:

**Nortel Networks S.A. (in administration and in *liquidation judiciaire*)**

_____

acting by
:_____

as joint administrator (acting as agent and without personal liability)

_____

acting by :Stephen Jonathan Taylor

as NNSA Conflicts Administrator (acting as agent and without personal liability)

_____

acting by : Maître Cosme Rogeau as French Liquidator (acting as agent and without personal liability)

**Stephen Jonathan Taylor of Isonomy Limited as Conflicts Administrator of Nortel Networks S.A.**

By: _____

Name: Stephen Taylor

Title: Conflicts Administrator

**Maître Cosme Rogeau in his capacity as Liquidator for Nortel Networks S.A. under the French Secondary Proceeding.**

By: _____

Name: Maître Cosme Rogeau

Title: French Liquidator

**The ad hoc group of bondholders that hold notes issued and/or guaranteed by Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Inc., and Nortel Networks Capital Corporation, which on June 15, 2016, filed with the Bankruptcy Court a disclosure form under Bankruptcy Rule 2019, as such group may be constituted from time to time.**

By: _____

Name:

Title:

By: _____

Name:

Title:

By: _____

Name:

Title:

**Stephen Jonathan Taylor of Isonomy Limited as Conflicts Administrator of Nortel Networks S.A.**

By:_____

Name:  Stephen Taylor

Title:  Conflicts Administrator


**Maître Cosme Rogeau in his capacity as Liquidator for Nortel Networks S.A. under the French Secondary Proceeding.**

By:_____

Name: Maître Cosme Rogeau

Title: French Liquidator


**The ad hoc group of bondholders that hold notes issued and/or guaranteed by Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Inc., and Nortel Networks Capital Corporation, which on June 15, 2016, filed with the Bankruptcy Court a disclosure form under Bankruptcy Rule 2019, as such group may be constituted from time to time.**

By:_____

Name:

Title:


By:_____

Name:

Title:


By:_____

Name:

Title:

**Stephen Jonathan Taylor of Isonomy Limited as Conflicts Administrator of Nortel Networks S.A.**

By: _____

Name:  Stephen Taylor
Title:  Conflicts Administrator


**Maître Cosme Rogeau in his capacity as Liquidator for Nortel Networks S.A. under the French Secondary Proceeding.**

By: _____

Name: Maître Cosme Rogeau
Title: French Liquidator


**The ad hoc group of bondholders that hold notes issued and/or guaranteed by Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Inc., and Nortel Networks Capital Corporation, which on June 15, 2016, filed with the Bankruptcy Court a disclosure form under Bankruptcy Rule 2019, as such group may be constituted from time to time.**

**MILBANK, TWEED, HADLEY & MCCLOY LLP,** as counsel to the Bondholder Group

By: _____

Name: Albert Pisa
Title:  Partner


**Bennett Jones LLP,** as counsel to the Bondholder Group

By: _____
Name:
Title:  Partner


**FTI Capital Advisors LLC,** as financial advisor to the Bondholder Group

By: _____
Name:
Title:

**Stephen Jonathan Taylor of Isonomy Limited as Conflicts Administrator of Nortel Networks S.A.**

By:_____
Name:  Stephen Taylor
Title:  Conflicts Administrator


**Maître Cosme Rogeau in his capacity as Liquidator for Nortel Networks S.A. under the French Secondary Proceeding.**

By:_____
Name: Maître Cosme Rogeau
Title: French Liquidator


**The ad hoc group of bondholders that hold notes issued and/or guaranteed by Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Inc., and Nortel Networks Capital Corporation, which on June 15, 2016, filed with the Bankruptcy Court a disclosure form under Bankruptcy Rule 2019, as such group may be constituted from time to time.**

**MILBANK, TWEED, HADLEY & MCCLOY LLP**, as counsel to the Bondholder Group

By: _____
Name: Albert Pisa
Title:  Partner


**Bennett Jones LLP**, as counsel to the Bondholder Group

By: _____
Name: Kevin Zych
Title:  Partner


**FTI Capital Advisors LLC**, as financial advisor to the Bondholder Group

By: _____
Name:
Title:

**Stephen Jonathan Taylor of Isonomy Limited as Conflicts Administrator of Nortel Networks S.A.**

By:_____
Name:  Stephen Taylor
Title:  Conflicts Administrator


**Maître Cosme Rogeau in his capacity as Liquidator for Nortel Networks S.A. under the French Secondary Proceeding.**

By:_____
Name: Maître Cosme Rogeau
Title: French Liquidator

**The ad hoc group of bondholders that hold notes issued and/or guaranteed by Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Inc., and Nortel Networks Capital Corporation, which on June 15, 2016, filed with the Bankruptcy Court a disclosure form under Bankruptcy Rule 2019, as such group may be constituted from time to time.**

**MILBANK, TWEED, HADLEY& MCCLOY LLP**, as counsel to the Bondholder Group


By: _____
Name: Albert Pisa
Title:  Partner


**Bennett Jones LLP**, as counsel to the Bondholder Group


By: _____
Name:
Title:  Partner


**FTI Capital Advisors LLC**, as financial advisor to the Bondholder Group

By: _____
Name: Mark Spragg
Title:  Senior Managing Director

Ad hoc committee of creditors having claims only against the Canadian Debtors comprised of: the former and disabled Canadian employees of the Canadian Debtors through their court-appointed representatives, Unifor, Morneau Shepell Ltd. as Administrator of Nortel's Canadian registered pension plans, Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund and the court-appointed representatives of the current and transferred employees of the Canadian Debtors.

By: _____
Name: DONALD E SPROULE
Title: COURT APPOINTED REP
FORMER NORTEL EMPLOYEES

By: _____
Name:
Title:

By: _____
Name:
Title:

The Official Committee of Unsecured Creditors of Nortel Networks Inc., et al. appointed pursuant to an order entered by the Bankruptcy Court on January 26, 2009, as the same may be constituted from time to time.

By: _____
Name:
Title:

Nortel Networks U.K. Pension Trust Limited as trustee of the Nortel Networks U.K. Pension Plan

By: _____
Name:
Title:

**Ad hoc committee of creditors having claims only against the Canadian Debtors comprised of:  the former and disabled Canadian employees of the Canadian Debtors through their court-appointed representatives, Unifor, Morneau Shepell Ltd. as Administrator of Nortel's Canadian registered pension plans, Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund and the court-appointed representatives of the current and transferred employees of the Canadian Debtors.**

By: _____
Name:
Title:

By: _____
Name: DAVID D. ARCHIBALD,
Title: COURT APPOINTED REP.

By: _____
Name:
Title:

**The Official Committee of Unsecured Creditors of Nortel Networks Inc., et al. appointed pursuant to an order entered by the Bankruptcy Court on January 26, 2009, as the same may be constituted from time to time.**

By: _____
Name:
Title:

**Nortel Networks U.K. Pension Trust Limited as trustee of the Nortel Networks U.K. Pension Plan**

By: _____
Name:
Title:

Ad hoc committee of creditors having claims only against the Canadian Debtors comprised of: the former and disabled Canadian employees of the Canadian Debtors through their court-appointed representatives, Unifor, Morneau Shepell Ltd. as Administrator of Nortel's Canadian registered pension plans, Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund and the court-appointed representatives of the current and transferred employees of the Canadian Debtors.

By: _M.G. Campbell P.Eng._

Name: M.A. CAMPBELL, P.ENG.

Title: COURT APPOINTED REP.

By:_____

Name:

Title:

By:_____

Name:

Title:

The Official Committee of Unsecured Creditors of Nortel Networks Inc., et al. appointed pursuant to an order entered by the Bankruptcy Court on January 26, 2009, as the same may be constituted from time to time.

By:_____

Name:

Title:

Nortel Networks U.K. Pension Trust Limited as trustee of the Nortel Networks U.K. Pension Plan

By:_____

Name:

Title:

Ad hoc committee of creditors having claims only against the Canadian Debtors comprised of: the former and disabled Canadian employees of the Canadian Debtors through their court-appointed representatives, Unifor, Morneau Shepell Ltd. as Administrator of Nortel's Canadian registered pension plans, Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund and the court-appointed representatives of the current and transferred employees of the Canadian Debtors.

By: _Susan Kennedy_
Name: Susan Kennedy
Title: Court - Appointed representative
for Disabled Employees

By:_____
Name:
Title:


By:_____
Name:
Title:


The Official Committee of Unsecured Creditors of Nortel Networks Inc., et al. appointed pursuant to an order entered by the Bankruptcy Court on January 26, 2009, as the same may be constituted from time to time.

By:_____
Name:
Title:


Nortel Networks U.K. Pension Trust Limited as trustee of the Nortel Networks U.K. Pension Plan

By:_____
Name:
Title:

Ad hoc committee of creditors having claims only against the Canadian Debtors comprised of: the former and disabled Canadian employees of the Canadian Debtors through their court-appointed representatives, Unifor, Morneau Shepell Ltd. as Administrator of Nortel's Canadian registered pension plans, Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund and the court-appointed representatives of the current and transferred employees of the Canadian Debtors.

By:_____
Name: Jerry Dias
Title: President, Unifor

By:_____
Name:
Title:

By:_____
Name:
Title:

The Official Committee of Unsecured Creditors of Nortel Networks Inc., et al. appointed pursuant to an order entered by the Bankruptcy Court on January 26, 2009, as the same may be constituted from time to time.

By:_____
Name:
Title:

Nortel Networks U.K. Pension Trust Limited as trustee of the Nortel Networks U.K. Pension Plan

By:_____
Name:
Title:

**Ad hoc committee of creditors having claims only against the Canadian Debtors comprised of: the former and disabled Canadian employees of the Canadian Debtors through their court-appointed representatives, Unifor, Morneau Shepell Ltd. as Administrator of Nortel's Canadian registered pension plans, Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund and the court-appointed representatives of the current and transferred employees of the Canadian Debtors.**

By: _____

Name: HAMISH DUNLOP

Title: PRINCIPAL, MORNEAU SHEPELL IN ITS CAPACITY AS ADMINISTRATOR OF NORTEL'S CANADIAN REGISTERED PENSION PLANS

By: AND NOT IN ITS PERSONAL CAPACITY

Name:

Title:

By: _____

Name:

Title:

**The Official Committee of Unsecured Creditors of Nortel Networks Inc., et al. appointed pursuant to an order entered by the Bankruptcy Court on January 26, 2009, as the same may be constituted from time to time.**

By: _____

Name:

Title:

**Nortel Networks U.K. Pension Trust Limited as trustee of the Nortel Networks U.K. Pension Plan**

By: _____

Name:

Title:

**Ad hoc committee of creditors having claims only against the Canadian Debtors comprised of: the former and disabled Canadian employees of the Canadian Debtors through their court-appointed representatives, Unifor, Morneau Shepell Ltd. as Administrator of Nortel's Canadian registered pension plans, Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund and the court-appointed representatives of the current and transferred employees of the Canadian Debtors.**

By:_____
Name:
Title:


By:_____
Name:
Title:

By:_____
Name: Brian Mills
Title: Superintendent of Financial Services of Ontario


**The Official Committee of Unsecured Creditors of Nortel Networks Inc., et al. appointed pursuant to an order entered by the Bankruptcy Court on January 26, 2009, as the same may be constituted from time to time.**

By:_____
Name:
Title:


**Nortel Networks U.K. Pension Trust Limited as trustee of the Nortel Networks U.K. Pension Plan**

By:_____
Name:
Title:

Ad hoc committee of creditors having claims only against the Canadian Debtors comprised of: the former and disabled Canadian employees of the Canadian Debtors through their court-appointed representatives, Unifor, Morneau Shepell Ltd. as Administrator of Nortel's Canadian registered pension plans, Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund and the court-appointed representatives of the current and transferred employees of the Canadian Debtors.

By: _____

Name: _Kent Felske_

Title: Representative NCCE
(Nortel Canadian Continuing Employees)

By: _____

Name:

Title:

By: _____

Name:

Title:

The Official Committee of Unsecured Creditors of Nortel Networks Inc., et al. appointed pursuant to an order entered by the Bankruptcy Court on January 26, 2009, as the same may be constituted from time to time.

By: _____

Name:

Title:

Nortel Networks U.K. Pension Trust Limited as trustee of the Nortel Networks U.K. Pension Plan

By: _____

Name:

Title:

Ad hoc committee of creditors having claims only against the Canadian Debtors comprised of: the former and disabled Canadian employees of the Canadian Debtors through their court-appointed representatives, Unifor, Morneau Shepell Ltd. as Administrator of Nortel's Canadian registered pension plans, Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund and the court-appointed representatives of the current and transferred employees of the Canadian Debtors.

By:_____

Name:   Dany Sylvain

Title:   Representative NCCE

( Nortel Canadian Continuing Employees)

By:_____

Name:

Title:

By:_____

Name:

Title:

The Official Committee of Unsecured Creditors of Nortel Networks Inc., et al. appointed pursuant to an order entered by the Bankruptcy Court on January 26, 2009, as the same may be constituted from time to time.

By:_____

Name:

Title:

Nortel Networks U.K. Pension Trust Limited as trustee of the Nortel Networks U.K. Pension Plan

By:_____

Name:

Title:

**The Official Committee of Unsecured Creditors of Nortel Networks Inc., et al. appointed pursuant to an order entered by the Bankruptcy Court on January 26, 2009, as the same may be constituted from time to time.**

By:  AKIN GUMP STRAUSS HAUER & FELD LLP, as Counsel to the Committee and authorized signatory and not in its individual capacity

By: _____
Name:  David H. Botter
Title:   Partner

Ad hoc committee of creditors having claims only against the Canadian Debtors comprised of: the former and disabled Canadian employees of the Canadian Debtors through their court-appointed representatives, Unifor, Morneau Shepell Ltd. as Administrator of Nortel's Canadian registered pension plans, Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund and the court-appointed representatives of the current and transferred employees of the Canadian Debtors.

By: _____
Name:
Title:

By: _____
Name:
Title:

By: _____
Name:
Title:

The Official Committee of Unsecured Creditors of Nortel Networks Inc., et al. appointed pursuant to an order entered by the Bankruptcy Court on January 26, 2009, as the same may be constituted from time to time.

By: _____
Name:
Title:

Nortel Networks U.K. Pension Trust Limited as trustee of the Nortel Networks U.K. Pension Plan

By: _____
Name: DAVID DAVIES
Title: DIRECTOR

**Board of the Pension Protection Fund, a statutory corporation established under the provisions of the Pensions Act 2004, whose principal place of business is Renaissance, 12 Dingwall Road, Croydon, England, CRO 2NA.**

By: _____

Name: MALCOLM WEIR

Title: HEAD OF RESTRUCTURING & INSOLVENCY

**Richard Barker and Joseph Luke Charleton, as the liquidators of Nortel Networks (Northern Ireland) Limited (in liquidation) and Richard Barker and Samantha Keen as liquidators of Nortel Networks Optical Components Limited (in liquidation).**

By: _____
Name:
Title:

By: _____
Name:
Title:

By: _____
Name:
Title:

Board of the Pension Protection Fund, a statutory corporation established under the provisions of the Pensions Act 2004, whose principal place of business is Renaissance, 12 Dingwall Road, Croydon, England, CRO 2NA.

By:_____
Name:
Title:

Richard Barker and Joseph Luke Charleton, as the liquidators of Nortel Networks (Northern Ireland) Limited (in liquidation) and Richard Barker and Samantha Keen as liquidators of Nortel Networks Optical Components Limited (in liquidation).

By:_____
Name:  RICHARD BARKER
Title:  JOINT LIQUIDATOR

By:_____
Name:
Title:

By:_____
Name:
Title:

**Holders of Nortel Networks Capital Corporation Bonds**

Solus Alternative Asset Management LP

By: _C J Larktree_
Name: CJ Larktree
Title: Authorized Signatory

PointState Capital LP

By:_____
Name:
Title:

**Holders of Nortel Networks Capital Corporation Bonds**

Solus Alternative Asset Management LP

By:_____
Name:
Title:

PointState Capital LP

By:_____
Alfred J. Barbagallo
Managing Director & General Counsel

## ANNEX A

### Sale Proceeds[7]

| Transaction | Purchaser | Account Type | Account Description | Escrow Agent | July 31, 2016 Balance |
|---|---|---|---|---|---|
| Layer 4-7 | Radware | Escrow | Purchase Price | JP Morgan | 18,135,907 |
| CDMA | Ericsson | Escrow | Purchase Price | JP Morgan | 1,054,408,277 |
| Enterprise | Avaya | Escrow | Purchase Price | JP Morgan | 844,174,607 |
| GSM | Ericsson & Kapsch | Escrow | Purchase Price | JP Morgan | 104,664,988 |
| GSM-CALA | Ericsson | Escrow | Purchase Price | JP Morgan | 1,503,009 |
| Packet Core | Hitachi | Escrow | Purchase Price | JP Morgan | 10,390,694 |
| MEN | Ciena | Escrow | Purchase Price | JP Morgan | 611,047,234 |
| CVAS | Genband | Escrow | Purchase Price | JP Morgan | 140,337,608 |
| MSS | Ericsson | Escrow | Purchase Price | JP Morgan | 46,112,548 |
| Iceberg | Rockstar | Escrow | Purchase Price | JP Morgan | 4,461,637,286 |
| | | | | | 7,292,412,156 |
| MEN Buyer Escrow | Ciena | Escrow | Tax | Citibank | 10,047,067 |
| MEN Buyer Escrow | Ciena | Escrow | EMEA Tax | Citibank | 2,513,188 |
| MEN Buyer Escrow | Ciena | Escrow | Italian Tax | Citibank | 753,950 |
| MEN Buyer Escrow | Ciena | Escrow | Poland | Citibank | 1,005,272 |
| MEN Buyer Escrow | Ciena | Escrow | TSA | Citibank | 7,545,535 |
| MEN Buyer Escrow | Ciena | Escrow | Working Capital | Citibank | 2,101 |
| Buyer Escrows | | | | | 21,867,113 |
| **Total** | | | | | **7,314,279,269** |
| | | | Less: M&A Cost Reimbursement | | (55,000,000) |
| | | | Less: Iceberg Amendment Fee | | (5,000,000) |
| | | | **Sale Proceeds for Allocation** | | **$7,254,279,269** |

[7] All amounts in U.S. dollars.

## ANNEX B

### EXISTING ESCROW ACCOUNTS

#### Distribution Escrow Accounts

| Escrow Agreement | Date | Account Number | Escrow Agent |
|---|---|---|---|
| Layer 4-7 | March 31, 2009 | *[8] | JP Morgan |
| CDMA | November 11, 2009 | * | JP Morgan |
| Enterprise | December 18, 2009 | * | JP Morgan |
| GSM | March 31, 2010 | * | JP Morgan |
| GSM-CALA | June 3, 2010 | * | JP Morgan |
| Packet Core | December 1, 2009 | * | JP Morgan |
| MEN | March 19, 2010 | * | JP Morgan |
| CVAS | May 27, 2010 | * | JP Morgan |
| MSS | March 11, 2011 | * | JP Morgan |
| Iceberg | July 28, 2011 | * | JP Morgan |

#### Buyer Escrow Accounts

| | | | |
|---|---|---|---|
| MEN Buyer Escrow | March 19, 2010 | * | Citibank |
| MEN Buyer Escrow | March 19, 2010 | * | Citibank |
| MEN Buyer Escrow | March 19, 2010 | * | Citibank |
| MEN Buyer Escrow | March 19, 2010 | * | Citibank |
| MEN Buyer Escrow | March 19, 2010 | * | Citibank |
| MEN Buyer Escrow | March 19, 2010 | * | Citibank |

---

[8] Redacted

## ANNEX C

### CANADA-U.S. SIDE LETTERS

1. Side Agreement in respect of Enterprise dated July 20, 2009;

2. China Side Agreement dated November 2, 2009;

3. Side Agreement in respect of Flextronics dated November 20, 2009;

4. Incentive Fee Side Agreement in respect of GSM dated January 8, 2010;

5. Jabil Side Agreement dated February 5, 2010;

6. Metro Ethernet Networks Side Agreement dated February 26, 2010;

7. Offer in respect of Argentina dated March 19, 2010;

8. GSM/GSM-R Side Agreement dated March 31, 2010;

9. CVAS Side Agreement;[9]

10. Cascade Trust Side Letter;

11. Lazard Fees Side Agreement dated November 23, 2010;

12. Amended and Restated MSS Side Agreement dated March 10, 2011 (including any prior version of this agreement);

13. IP Transaction Side Agreement dated April 4, 2011;

14. Supplemental IP Transaction Side Agreement re Certain Transaction Costs and Related Matters dated July 27, 2011;

15. Second Amended and Restated IP Transaction Side Agreement re: Certain Structural Matters dated July 27, 2011 (including any prior version of this agreement); and

16. The so-called "Canada/U.S. Interestate Term Sheet" (styled "August 2011 – Timeline for and Proposed Resolution of U.S./Canada Issues") executed on or about September 8, 2011.

---

[9] This side agreement was never executed but is included for the avoidance of doubt.

**ANNEX D**

**FORM OF CREDITOR JOINDER**

This joinder (this "**Creditor Joinder**") to the Settlement and Plans Support Agreement (the "**Settlement and Support Agreement**")[5] dated as of [__], 2016 and entered into by and among: (i) the Canadian Debtors; (ii) the Monitor; (iii) the U.S. Debtors; (iv) the EMEA Debtors; (v) the EMEA Non-Filed Entities; (vi) the Joint Administrators; (vii) NNSA; (viii) the NNSA Conflicts Administrator; (ix) the French Liquidator; (x) the Bondholder Group; (xi) the members of the CCC; (xii) the UCC; (xiii) the U.K. Pension Trustee; (xiv) the PPF; (xv) the Joint Liquidators; and (xvi) the NNCC Bondholder Signatories (collectively, the "**Parties**" and each a "**Party**"), is executed and delivered by [_____] (the "**Joining Creditor**") as of [_____], 2016.

     1.     **Agreement to be Bound.** The Joining Creditor hereby agrees to be bound by all of the terms of the Settlement and Support Agreement, a copy of which is attached to this Joinder as Exhibit 1 (as the same has been or may be hereafter amended, restated, or otherwise modified from time to time in accordance with the provisions thereof). The Joining Creditor shall hereafter be deemed to be a Participating Creditor for all purposes under the Settlement and Support Agreement.

     2.     **Representations and Warranties.** The Joining Creditor hereby represents and warrants to each Party to the Settlement and Support Agreement that, as of the date hereof, such Joining Party (a) is the legal or beneficial owner of, and has all necessary authority (including authority to bind any other legal or beneficial owner) with respect to, the claims identified below its name on the signature page hereof, and (b) makes, as of the date hereof, the representations, warranties and covenants of a Participating Creditor set forth in the Settlement and Support Agreement to each Party.

     3.     **Governing Law.** This Joinder shall be governed by and construed in accordance with the laws of the state of New York.

     4.     **Notice.** All notices and other communications given or made pursuant to the Settlement and Support Agreement shall be sent to:

     To the Joining Creditor at:

---

[5] Each capitalized term used herein but not otherwise defined shall have the meaning ascribed to it in the Settlement and Support Agreement.

[JOINING    PARTY]
[ADDRESS]

Attn:

Facsimile:      [FAX]
EMAIL:

IN WITNESS WHEREOF, the Joining Creditor has caused this Joinder to be executed as of the date first written above.

[JOINING CREDITOR]

**Aggregate Face Amounts Beneficially Owned or Managed on Account of:**

10.75% Notes:  $_____

10.125% Notes:  $_____

Floating Rate Notes:  $_____

2.125% Notes:  $_____

1.75% Notes:  $_____

7.875% Notes:  $_____

Other:

Name of Institution:

_____

By _____

    Name:

    Title:


For signatories requiring a second signature
    line:


By _____

    Name:

    Title:

## ANNEX E

### EMEA DEBTOR ALLOCATION PROPORTION

| EMEA Debtor | Allocation Proportion | Allocation Amount |
|---|---|---|
| Ireland | 0.5473% | 39,700,848 |
| NNF | 0.0536% | 3,888,460 |
| Germany | 0.2985% | 21,657,395 |
| Spain | 0.1171% | 8,494,707 |
| Portugal | 0.0119% | 859,908 |
| Belgium | 0.0538% | 3,901,159 |
| Netherlands | 0.1310% | 9,505,530 |
| Austria | 0.0117% | 846,210 |
| Poland | 0.0888% | 6,441,991 |
| Italy | 0.0734% | 5,321,673 |
| Czech | 0.0258% | 1,870,623 |
| Slovakia | 0.0098% | 713,284 |
| Hungary | 0.0130% | 940,938 |
| Romania | 0.0049% | 353,402 |
| Finland | 0.0004% | 31,282 |
| Sweden | 0.0071% | 518,276 |
| NNIF | 0.0378% | 2,743,194 |
| NNUK | 14.0249% | 1,017,408,257 |
|  | 15.5108% | 1,125,197,136 |
| NNSA |  | 220,000,000 |
| **Total** |  | 1,345,197,136 |

6557501

## ANNEX F

## U.S. DEBTOR ALLOCATION PROPORTION

| U.S. Debtor | Allocation Amount[10] |
|---|---:|
| Nortel Networks Inc. | $1,716,346,052 |
| Nortel Networks (CALA) Inc. | $50,070,950 |
| Nortel Networks Capital Corporation (see Note (9) below) | 0 |
| Nortel Altsystems Inc. | 0 |
| Nortel Altsystems International Inc. | 0 |
| Xros, Inc. | 0 |
| Sonoma Systems | 0 |
| Qtera Corporation | 0 |
| CoreTek, Inc. | 0 |
| Nortel Networks Applications Management Solutions Inc. | 0 |
| Nortel Networks Optical Components Inc. | 0 |
| Nortel Networks HPOCS Inc. | 0 |
| Architel Systems (U.S.) Corporation | 0 |
| Nortel Networks International Inc. | 0 |
| Northern Telecom International Inc. | 0 |
| Nortel Networks Cable Solutions Inc. | 0 |
| Nortel Networks India International Inc. | 0 |
| | $1,766,417,002 |

---

[10] Such allocation amounts are based on Sale Proceeds included in Annex A, which includes the MEN Buyer Escrow Amount. NNCC is consolidated into NNI for the purposes of this Annex.

## ANNEX G

## CROSSOVER BONDS PROVEN CLAIMS AGAINST CANADIAN ESTATE[11]

| | |
|---|---|
| 1. Nortel Networks Limited and Nortel Networks Corporation and Nortel Networks Inc. and the Bank of New York as indenture trustee for 10.750% Senior Notes due 2016 | $1,185,132,812 |
| 2. Nortel Networks Limited and Nortel Networks Corporation and Nortel Networks Inc. and the Bank of New York as indenture trustee for 10.125% Senior Notes due 2013 | $577,689,063 |
| 3. Nortel Networks Limited and Nortel Networks Corporation and Nortel Networks Inc. and the Bank of New York as indenture trustee for Floating Rate Senior Notes due 2011 | $1,022,419,965 |
| 4. Nortel Networks Corporation and Nortel Networks Limited and Nortel Networks Inc. and the Bank of New York as indenture trustee for 2.125% Convertible Senior Notes due 2014 | $578,020,746 |
| 5. Nortel Networks Corporation and Nortel Networks Limited and Nortel Networks Inc. and the Bank of New York as indenture trustee for 1.75% Convertible Senior Note Due 2012 | $577,487,674 |

## NNCC BONDS PROVEN CLAIMS AGAINST CANADIAN ESTATE

| | |
|---|---|
| 1. Northern Telecom Limited and the Northern Telecom Capital Corporation and the Bank of New York as indenture trustee for 7.875% Notes due June 15, 2026 | $150,951,562 |

---

[11] All amounts in U.S. Dollars.

## ANNEX H

### Form of Transferee Joinder

This joinder (this "**Transferee Joinder**") to the Settlement and Plans Support Agreement (the "**Settlement and Support Agreement**")[12] dated as of [__], 2016 and entered into by and among: (i) the Canadian Debtors; (ii) the Monitor; (iii) the U.S. Debtors; (iv) the EMEA Debtors; (v) the EMEA Non-Filed Entities; (vi) the Joint Administrators; (vii) NNSA; (viii) the NNSA Conflicts Administrator; (ix) the French Liquidator; (x) the Bondholder Group; (xi) the members of the CCC; (xii) the UCC; (xiii) the U.K. Pension Trustee; (xiv) the PPF; (xv) the Joint Liquidators; and (xvi) the NNCC Bondholder Signatories (collectively, the "**Parties**" and each a "**Party**"), is executed and delivered by [_____] (the "**Joining Creditor**") as of [_____], 2016.

1.    Agreement to be Bound.  The Joining Party hereby agrees to be bound by all of the terms of the Settlement and Support Agreement, a copy of which is attached to this Joinder as Exhibit 1 (as the same has been or may be hereafter amended, restated, or otherwise modified from time to time in accordance with the provisions thereof). The Joining Creditor shall hereafter be deemed to be a Participating Creditor for all purposes under the Settlement Support Agreement.

2.    Representations and Warranties.  The Joining Creditor hereby represents and warrants to each Party to the Settlement and Support Agreement that, as of the date hereof, such Joining Creditor (a) is the legal or beneficial holder of, and has all necessary authority (including authority to bind any other legal or beneficial holder) with respect to, the claims identified below its name on the signature page hereof, and (b) makes, as of the date hereof, the representations, warranties and covenants of a Participating Creditor, as applicable, set forth in the Settlement and Support Agreement to each Party.

3.    Governing Law.  This Joinder shall be governed by and construed in accordance with the laws of the State of New York.

4.    Notice.  All notices and other communications given or made pursuant to the Support Agreement shall be sent to:

To the Joining Creditor at:

[JOINING        PARTY]
[ADDRESS]

---

[12] Each capitalized term used herein but not otherwise defined shall have the meaning ascribed to it in the Settlement and Support Agreement.

Attn:

Facsimile:        [FAX]
EMAIL:

IN WITNESS WHEREOF, the Joining Creditor has caused this Joinder to be executed as of the date first written above.

[JOINING PARTY]

**Aggregate Face Amounts Beneficially Owned or Managed on Account of:**

10.75% Notes:  $_____

10.125% Notes:  $_____

Floating Rate Notes:  $_____

2.125% Notes:  $_____

1.75% Notes:  $_____

7.875% Notes:  $_____

Other:

Name of Institution:

_____

By  _____
     Name:

Title:

For signatories requiring a second signature line:

By _____

Name:

Title:

### Exhibit 1 to the Form of Transferee Joinder

**Settlement and Plans Support Agreement**

## ANNEX I

## TIMETABLE

| | Step | Target Date[8] |
|---|---|---|
| 1. | Entry of orders authorizing currency conversion | October 14, 2016 |
| 2. | Filing of U.S. Plans and Disclosure Statement with Bankruptcy Court and Canadian Plan and Canadian Information Circular with CCAA Court | October 28, 2016 |
| 3. | Canadian Meeting Order Hearing (CCAA Court) | December 1, 2016 |
| 4. | Disclosure Statement Hearing (Bankruptcy Court) | December 1, 2016 |
| 5. | Creditors' Meeting (Canada) | By January 17, 2017 |
| 6. | Plan Confirmation Hearing (Bankruptcy Court) and Sanction Hearing (CCAA Court) | January 24, 2017 |
| 7. | Plans Effective Date | February 15, 2017 |
| 8. | Long Stop Date | August 31, 2017 |

## ANNEX J

## NOTICE PARTICULARS

(a)     Notice to Canadian Debtors/Monitor:

        Goodmans LLP
        Bay Adelaide Centre
        333 Bay Street, Suite 3400
        Toronto, ON M5H 2S7
        Canada
        Attention:  Jay Carfagnini
        Facsimile:  416-979-1234
        Email:  jcarfagnini@goodmans.ca

        Attention:  Joseph Pasquariello
        Facsimile:  416-979-1234
        Email:  jpasquariello@goodmans.ca

        Allen & Overy LLP
        1221 Ave of the Americas
        New York, NY 10020
        United States
        Attention:  Ken Coleman
        Facsimile:  212-610-6399
        Email:  ken.coleman@allenovery.com

(b)     Notice to U.S. Debtors

        Cleary Gottlieb Steen & Hamilton
        One Liberty Plaza
        New York, New York 10006
        United States
        Attention:  James Bromley
        Facsimile:  212-225-3999
        Email:  jbromley@cgsh.com

        Attention:  Lisa Schweitzer
        Facsimile:  212-225-3999
        Email:  lschweitzer@cgsh.com

Torys LLP
79 Wellington St. W. 30th Floor
Box 270 TD South Tower
Toronto, Ontario M5K 1N2
Canada
Attention: Scott Bomhof
Facsimile: 416-865-7380
Email: sbomhof@torys.com

(c)     Notice to EMEA Debtors (other than NNSA)

Debevoise & Plimpton
65 Gresham Street
London EC2V 7NQ
United Kingdom
Attention: Kevin Lloyd
Facsimile: +44-20-7588-4180
Email: klloyd@debevoise.com

Herbert Smith Freehills
Exchange House
Primrose Street
London EC2A 2EG
United Kingdom
Attention: Kevin Pullen
Facsimile: +44 20-7098-4976
Email: kevin.pullen@hsf.com

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004
United States
Attention: Derek Adler
Facsimile: 212-422-4726
Email: derek.adler@hugheshubbard.com

(d)    Notice to NNSA

        Skadden, Arps, Slate, Meagher & Flom LLP
        4 Times Square
        New York, New York 10036
        United States
        Attention:  Susan Salzstein
        Facsimile:  917-777-4132
        Email:  susan.saltzstein@skadden.com

        Stikeman Elliot LLP
        5300 Commerce Court West
        199 Bay Street
        Toronto, ON M5L 1B9
        Canada
        Attention:  Daniel Murdoch
        Facsimile:  416-947-0866
        Email:  DMurdoch@stikeman.com

(e)    Notice to UCC

        Akin, Gump, Strauss, Hauer & Feld LLP
        Bank of America Tower,
        One Bryant Park, 42nd Floor
        New York, New York 10036
        United States
        Attention:  Fred Hodara
        Facsimile:  212-872-1002
        Email:  fhodara@akingump.com

        Attention:  David Botter
        Facsimile:  212-872-1002
        Email:  dbotter@akingump.com

        Cassels Brock & Blackwell LLP
        Suite 2010, Scotia Plaza
        40 King Street West
        Toronto, Ontario M5H 3C2
        Canada
        Attention:  Michael Wunder
        Facsimile:  416-640-3206
        Email:  mwunder@casselsbrock.com

(f)     Notice to CCC

Koskie Minsky LLP
20 Queen Street West
Suite 900, Box 52
Toronto, Ontario M5H 3R3
Canada
Attention: Mark Zigler
Facsimile: 416-977-8353
Email: mzigler@kmlaw.ca

McCarthy Tétrault LLP
Suite 5300, TD Bank Tower
Box 48, 66 Wellington Street West
Toronto ON M5K 1E6
Canada
Attention: James D. Gage
Facsimile: 416-868-0673
Email: jgage@mccarthy.ca

Paliare Roland Rosenberg Rothstein LLP
155 Wellington St. W., Suite 3500
Toronto, ON M5V 3H1
Attention: Ken Rosenberg
Facsimile: 416-646-4301
Email: ken.rosenberg@paliareroland.com

(g)     Notice to Ad Hoc Bondholder Group

Milbank, Tweed, Hadley & McCloy LLP
28 Liberty Street
New York, New York 10005
United States
Attention: Albert Pisa
Facsimile: 212-822-5319
Email: apisa@milbank.com

Bennett Jones
3400 One First Canadian Place
P.O. Box 130
Toronto, Ontario M5X 1A4
Canada
Attention: Kevin Zych
Facsimile: 416-863-1716
Email: zychk@bennettjones.com

(h)     Notice to UKPI

Hogan Lovells International LLP
Atlantic House
Holborn Viaduct
London EC1A 2FG
United Kingdom
Attention:  Angela Dimsdale Gill
Facsimile:  +44 20-7296-2001
Email:  amdg@hoganlovells.com

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York 10019
United States
Attention:  Marc Abrams
Facsimile:  212-728-9200
Email:  mabrams@willkie.com

Thornton Grout Finnigan LLP
Suite 3200, 100 Wellington Street West
P.O. Box 329, Toronto-Dominion Centre
Toronto, ON M5K 1K7, Canada
Attention:  D.J. Miller
Facsimile:  416-304-1313
Email:  djmiller@tgf.ca

Blake, Cassels & Graydon LLP
199 Bay Street, Suite 4000
Toronto, Ontario M5L 1A9
Canada
Attention:  Michael Barrack
Facsimile:  416-863-2653
Email:  michael.barrack@blakes.com

(i)     Notice to NNCC Bondholder Signatories

Quinn Emanuel Urquardt & Sullivan, LLP
51 Madison Avenue
New York, New York 10010
United States
Attention:  James Tecce
Facsimile:  212-849-7100
Email:  jamestecce@quinnemanuel.com

## ANNEX K

**Canadian Distribution Escrow Agreement**

**CANADIAN DISTRIBUTION ESCROW AGREEMENT**

among

**NORTEL NETWORKS CORPORATION
NORTEL NETWORKS LIMITED
NORTEL NETWORKS INC.
NORTEL NETWORKS UK LIMITED**

and

**THE OTHER DEPOSITORS**

and

**THE ESTATE FIDUCIARIES**

and

**Royal Trust Corporation of Canada, as Canadian Distribution Agent**

dated as of September ●, 2016

This **CANADIAN DISTRIBUTION ESCROW AGREEMENT** (the "**Agreement**"), dated as of September ●, 2016, by and among

(i)     Nortel Networks Corporation ("**NNC**"), a corporation organized under the laws of Canada;

(ii)    Nortel Networks Limited ("**NNL**"), a corporation organized under the laws of Canada;

(iii)   Nortel Networks Inc. ("**NNI**"), a corporation organized under the laws of Delaware;

(iv)    Nortel Networks UK Limited (in administration) ("**NNUK**"), a corporation organized under the laws of the United Kingdom acting by Alan Robert Bloom, Stephen John Harris, Alan Michael Hudson and Christopher John Wilkinson Hill of Ernst & Young LLP (the "**Joint Administrators**");

(v)     the affiliates of NNC, NNL, NNI and NNUK specified on Schedule "A" hereto (collectively, the "**Other Depositors**" and with NNC, NNL, NNI and NNUK, the "**Depositors**");

(vi)    the Estate Fiduciaries (as defined below) with the exclusion from liability set forth in Section 26; and

(vii)   Royal Trust Corporation of Canada, a trust company organized and existing under the laws of Canada (in its capacity as distribution escrow agent hereunder, the "**Canadian Distribution Agent**").

**WHEREAS**, on January 14, 2009 (the "**Petition Date**"), NNC, NNL and certain of their affiliates (collectively, the "**Canadian Debtors**") filed with the Ontario Superior Court of Justice (the "**Canadian Court**") an application for protection under the *Companies' Creditors Arrangement Act* (Canada) (the "**CCAA**") and were granted certain creditor protection pursuant to an order issued by the Canadian Court on the same date, which has been extended from time to time by further order of the Canadian Court (such proceedings, together with any other formal insolvency proceedings commenced in Canada in respect of NNL, the "**Canadian Cases**");

**WHEREAS**, NNI and certain of its affiliates (collectively, the "**U.S. Debtors**") are debtors-in-possession under Title 11 of the United States Code (the "**U.S. Bankruptcy Code**"), which commenced cases under Chapter 11 of the U.S. Bankruptcy Code on the Petition Date by filing voluntary petitions for relief in the U.S. Bankruptcy Court for the District of Delaware (the "**U.S. Court**") (the "**U.S. Cases**" and together with the Canadian Cases, the "**Bankruptcy Cases**");

**WHEREAS**, the Canadian Court has appointed Ernst & Young Inc. as Monitor in the Canadian Cases (the "**Monitor**"), and the Office of the United States Trustee for the District of Delaware has appointed an Official Committee of Unsecured Creditors as representative for the unsecured creditors of the U.S. Debtors (the "**Committee**" and, together with the Monitor, the "**Estate Fiduciaries**"), and in addition, an *ad hoc* group of bondholders holding claims against certain of the U.S. Debtors and certain of the Canadian Debtors has also been organized (the "**Bondholder Group**");

- 2 -

**WHEREAS**, on the Petition Date, the High Court of Justice in London, England (the "**English Court**") ordered that NNUK and certain of its affiliates (collectively, the "**EMEA Debtors**") be placed into administration under the English Insolvency Act 1986, as amended (the "**Insolvency Act**") and European Union's Council Regulation (EC) No. 1346/2000 on Insolvency Proceedings (the "**EC Regulation**") and appointed the Joint Administrators to manage the affairs, business and property of NNUK and certain of its affiliates;

**WHEREAS**, while the administration proceedings in respect of Nortel Networks S.A. ("**NNSA**"), being main proceedings pursuant to Article 3(1) of the EC Regulation and under the Insolvency Act are continuing, subsequent to the Petition Date, NNSA commenced secondary insolvency proceedings within the meaning of Article 27 of the EC Regulation pursuant to which the Commercial Court of Versailles (the "**French Court**") appointed Maître Cosme Rogeau, 26, avenue Hoche, 78000 Versailles as the "Mandataire Liquidateur" of NNSA (the "**French Liquidator**");

**WHEREAS**, Stephen Taylor of Isonomy Limited has been appointed as conflicts administrator of NNSA (the "**Conflicts Administrator**");

**WHEREAS** the Depositors and certain other parties (together, the "**IFSA Parties**") have entered into that certain agreement to address interim funding and the settlement of certain intercompany matters dated June 9, 2009 (the "**IFSA**"), pursuant to clause 12.c and clause 12.g of which, the IFSA Parties agreed to negotiate in good faith a protocol for resolving disputes concerning the allocation of sale proceeds from sale transactions;

**WHEREAS** the Depositors and certain of their affiliates sold certain of their assets pursuant to various sale transactions approved by the Canadian Court and the U.S. Court over the period 2009 through 2011, the sale proceeds of which (the "**Sale Proceeds**") were placed into escrow with JPMorgan Chase Bank, N.A., as distribution escrow agent (the "**U.S. Distribution Agent**");

**WHEREAS** by order of the Canadian Court dated April 3, 2013 and order of the U.S. Court dated May 17, 2013, the Canadian Court and U.S. Court approved an allocation protocol (the "**Allocation Protocol**") to resolve the allocation of the Sale Proceeds amongst the Depositors and certain of their affiliates;

**WHEREAS** the Depositors, certain of their affiliates, certain of their respective creditors and the Estate Fiduciaries participated in a joint trial pursuant to the Allocation Protocol before the Canadian Court and U.S. Court pursuant to which decisions concerning the allocation of the Sale Proceeds were issued and various appeals have been taken and sought from such decisions (collectively, the "**Allocation Dispute**");

**WHEREAS** the Depositors, certain of their affiliates, certain of their respective creditors and the Estate Fiduciaries have entered into a Settlement and Plans Support Agreement dated September ●, 2016 (the "**Settlement and Support Agreement**"), pursuant to which, subject to the effectiveness of the Settlement and Support Agreement, they have agreed to resolve the Allocation Dispute and certain other matters on the terms contemplated by the Settlement and Support Agreement;

- 3 -

**WHEREAS** the Settlement and Support Agreement contemplates the conversion of an amount of the Sale Proceeds not exceeding US$1.2 billion (the "**CAD Sale Proceeds**") from U.S. dollars to Canadian dollars and the Depositors and Estate Fiduciaries are desirous of entering into this Agreement so that the Canadian Distribution Agent can receive, hold, convert such funds from U.S. dollars to Canadian dollars and release such funds in furtherance of the Settlement and Support Agreement and in accordance with the terms and conditions of the Settlement and Support Agreement and this Agreement;

**WHEREAS**, the U.S. Debtors shall seek authorization from the U.S. Court to enter into this Agreement, to cause the transfer of the CAD Sale Proceeds to the Canadian Distribution Agent and to convert certain of the Sale Proceeds as contemplated hereby (the "**U.S. Court Approval**");

**WHEREAS** the Canadian Debtors and the Monitor shall seek authorization from the Canadian Court to enter into this Agreement, to cause the transfer of the CAD Sale Proceeds to the Canadian Distribution Agent and to convert certain of the Sale Proceeds as contemplated hereby (the "**Canadian Court Approval**" and with the U.S. Court Approval, the "**Court Approvals**"); and

**WHEREAS**, the Depositors and the Estate Fiduciaries wish to appoint the Canadian Distribution Agent as escrow and distribution agent and the Canadian Distribution Agent is willing to accept such appointment and to act as escrow and distribution agent, in each case upon the terms and conditions of the Agreement.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and adequacy of which is hereby irrevocably acknowledged, the Depositors, the Estate Fiduciaries and the Canadian Distribution Agent agree as follows:

1.     Appointment of Canadian Distribution Agent.

The Depositors and the Estate Fiduciaries hereby jointly nominate, constitute and appoint the Canadian Distribution Agent as escrow and distribution agent to hold the Escrow Property (as defined below) in the Distribution Account (as defined below) upon the terms and conditions set forth herein. The Canadian Distribution Agent hereby accepts such appointment and agrees that deposits to, and disbursements from, the Distribution Account, or applicable portions thereof, shall only be made in accordance with the terms and conditions of this Agreement. The Canadian Distribution Agent hereby represents to each of the Depositors that it has the corporate power and legal authority to execute this Agreement and to perform its obligations hereunder. The Depositors and the Canadian Distribution Agent agree that any action specified in this Agreement as to be taken by all of the Depositors, acting jointly, when taken by all of the Depositors, shall be binding upon each of the Depositors and the Canadian Distribution Agent shall be entitled to act and rely upon any action taken by all of the Depositors, acting jointly, and to the extent required hereunder, the Estate Fiduciaries, as provided in this Agreement.

2.     Deposit of Escrow Property and Conversion of CAD Sale Proceeds.

(a)     Forthwith upon the granting of the Court Approvals, the Depositors, certain of their affiliates and the Estate Fiduciaries shall instruct the U.S. Distribution Agent

- 4 -

to transfer the CAD Sale Proceeds to the Canadian Distribution Agent by wire transfer of immediately available funds (such funds as received by the Canadian Distribution Agent, the "**Escrow Funds**") to an account established with the Canadian Distribution Agent (the "**Distribution Account**"). The Canadian Distribution Agent shall forthwith notify the Depositors and the Estate Fiduciaries in writing of the account number for the Distribution Account upon the Distribution Account being established. The Escrow Funds and all interest and other income therefrom received by the Canadian Distribution Agent, together with any investments of the Escrow Property, less any funds distributed or paid in accordance with this Agreement are collectively referred to herein as "**Escrow Property**". The Canadian Distribution Agent shall provide written confirmation to the Depositors, the Estate Fiduciaries, the Bondholder Group and the U.S. Distribution Agent upon its receipt of the Escrow Funds. Prior to the deposits made in accordance with this Section 2, there shall be no other funds in the Distribution Account. The Escrow Property shall at all times, until disbursement as provided herein, remain segregated and separately identified by the Canadian Distribution Agent and shall not be commingled with the other assets held by the Canadian Distribution Agent.

(b)    The Monitor shall be entitled to instruct the Canadian Distribution Agent (or its affiliated financial institutions as specified on Schedule E) on not less than one (1) Business Days' notice to the Canadian Distribution Agent, and the Canadian Distribution Agent shall be entitled to solely rely on such instruction, to convert the CAD Sale Proceeds from U.S. dollars to Canadian dollars on the date(s) and in the manner specified from time to time by the Monitor, provided that such specifications allow the Canadian Distribution Agent to convert the CAD Sale Proceeds from U.S. dollars to Canadian dollars in an orderly manner. NNL shall provide notice to the other Depositors within three Business Days of any conversion of the amount of U.S. dollars converted, the date of such conversion and the rate(s) at which such conversion occurred.

3.    Investment of Escrow Property.

(a)    The Canadian Distribution Agent shall hold, invest and reinvest the Escrow Property strictly in accordance with joint, written instructions executed by all of the Depositors and the Estate Fiduciaries and delivered to the Canadian Distribution Agent; provided, however, that any investment of the Escrow Property shall be limited to Government of Canada treasury bills ("**Canadian T-Bills**"). Until otherwise jointly directed by all of the Depositors and the Estate Fiduciaries, the Canadian Distribution Agent shall invest the Escrow Property (once converted into Canadian dollars) in Canadian T-Bills having maturities of up to two months, on a rolling basis. In the event that Canadian T-Bills having maturities of up to two months are not available, the Canadian Distribution Agent shall invest the Escrow Property in Canadian T-Bills with the next available maturity date(s) available in the relevant market. For greater certainty, depending on market availability, the Escrow Property may be invested in one or more Canadian T-Bills having various maturity dates. The parties hereto further understand and agree that, notwithstanding the Canadian Distribution Agent's

- 5 -

obligations hereunder to invest and reinvest the Escrow Property, depending on market availability, the Canadian Distribution Agent may not be able to invest all of the Escrow Property in Canadian T-Bills, and that any cash balances constituting that portion of the Escrow Property unable to be invested in Canadian T-Bills, that is required to be held in cash in contemplation of the conversions contemplated hereby, that is required for a distribution to be made hereunder, or that is earned as a result of the investment or holding of the Escrow Property (the "**Cash Balances**") may be deposited as provided for in Section 3(b). The Canadian Distribution Agent makes no representation as to the yield available upon the Escrow Property and shall bear no liability for any failure to achieve any yield from the Escrow Property. The Canadian Distribution Agent shall use reasonable efforts to obtain the requested maturity dates for any such investments, however, the Canadian Distribution Agent shall have no responsibility whatsoever with respect to the availability of maturity dates and will not be liable in any respect for: (i) any investment-related loss resulting from the sale of an investment prior to its maturity date or for the unavailability of all or any portion of the Escrow Funds resulting from an investment maturity date, or (ii) any investment of the Escrow Property in a particular investment made in accordance with the terms of this Agreement.

(b)     The Canadian Distribution Agent may deposit any Cash Balances in an interest bearing cash account with the Canadian Distribution Agent, Royal Bank of Canada or any financial institution affiliated or related to the Royal Bank of Canada as listed on Schedule E hereto (collectively, "**Authorized Depositaries**") notwithstanding that the Canadian Distribution Agent and/or any of the other Authorized Depositaries may benefit therefrom, and the Canadian Distribution Agent or other Authorized Depositaries shall not be required to account for, or to give up, any such benefit. In particular, it shall not be improper for the Canadian Distribution Agent to deposit moneys with, or give custody of the Escrow Property to any other Authorized Depositaries, notwithstanding any benefit realized as a result, including retaining a profit in excess of interest paid (if any) on, or fees payable to any affiliated or related companies in respect of, such deposit or custody arrangement.

(c)     The Canadian Distribution Agent shall be authorized to sell any investment of the Escrow Property from time to time, including prior to any maturity date, in order to make a payment or release Escrow Property pursuant to this Agreement or a written direction executed by all of the Depositors and the Estate Fiduciaries.

(d)     Any written notice to remit payment received by the Canadian Distribution Agent after 11:00 a.m. Toronto time shall be treated as if received on the following Business Day. For purposes of this Agreement, "**Business Day**" shall mean any day, other than a Saturday or Sunday, on which Schedule I Canadian chartered banks are open for business in Toronto, Ontario, Canada.

- 6 -

4.    Ownership of Escrow Property; Taxes.

(a)    The Escrow Property at all times is and shall be the exclusive property of the Depositors. All T-5 slips and other tax information related to the Distribution Account will be reported by the Canadian Distribution Agent (i) based upon the disbursement of the Escrow Property to Depositors pursuant to Section 5 if such Escrow Property was disbursed during such calendar year, or (ii) with respect to any Escrow Property not disbursed during such calendar year, in the name of NNL (it being understood that the designation of NNL on such T-5 slip or other tax information shall not be presented by any Depositor or Estate Fiduciary as being indicative of the final allocation of the Escrow Property). The Canadian Distribution Agent acknowledges and agrees that the foregoing Section 4(a)(ii) is not indicative of the final allocation of the Escrow Property. Each Depositor acknowledges and agrees that any taxes payable from the income earned by such Depositor on the investment of any sums held in the Escrow Property shall be paid by such Depositor.

(b)    Notwithstanding the provisions of Section 4(a), to the extent that the Canadian Distribution Agent becomes liable for the payment of any taxes in respect of income derived from the investment of the Escrow Property, the Canadian Distribution Agent shall satisfy such liability to the extent possible from the Escrow Property. The Depositors shall jointly and severally indemnify, defend and save harmless the Canadian Distribution Agent from and against any and all tax, late payment, interest, penalty or other costs and expenses (including, without limitation, the reasonable fees and expenses of outside counsel) that may be assessed against or incurred by the Canadian Distribution Agent on or with respect to the Escrow Property and the investment thereof, except to the extent such tax, late payment, interest, penalty or other expense are finally adjudicated (and not subject to appeal) by a court of competent jurisdiction to have been a direct result of the gross negligence or willful misconduct of the Canadian Distribution Agent. The indemnification provided for by this Section 4(b) shall be initially satisfied out of the Escrow Property to the extent available. The indemnification provided by this Section 4(b) is in addition to the limitations of liability and indemnification provisions set out in Sections 9 and 10 and shall survive the resignation or removal of the Canadian Distribution Agent and the termination or expiration of this Agreement. As among themselves, the Depositors agree that the costs of any such indemnification shall be borne on a pro rata basis by the Depositors in accordance with the percentage of the Escrow Property allocable to each of the Depositors pursuant to the Allocation Protocol or a letter of direction as described in Section 5(a) and, notwithstanding anything to the contrary in the Settlement and Support Agreement, any Depositor paying in excess of its pro rata share of the cost of such indemnification shall have rights of contribution vis-à-vis any Depositor that has paid less than its pro rata share of such costs either directly to the Canadian Distribution Agent or by payment to another Depositor pursuant to this sentence; provided, that if the costs of any such indemnification arise from a breach of this Agreement or other fault of a Depositor, the Depositor(s) so in breach or at fault shall bear the cost of such

- 7 -

indemnification and any Depositor paying in excess of its share of the cost of such indemnification, after taking into account the breach or fault of the other Depositors, shall, notwithstanding anything to the contrary in the Settlement and Support Agreement, have rights of contribution vis-à-vis any Depositor that has paid less than its share of such costs either directly to the Canadian Distribution Agent or by payment to another Depositor.

(c)     In connection with making a distribution hereunder, the Canadian Distribution Agent shall be entitled to withhold any taxes required to be withheld by applicable law in connection with such distribution, including but not limited to applicable withholding taxes, and shall remit such taxes to the appropriate tax authority; provided, however, that the Canadian Distribution Agent shall not withhold any taxes if it receives documentation from the Depositors demonstrating to the Canadian Distribution Agent, acting reasonably, that no such withholding is required.

5.     Distribution of Escrow Property.

The Depositors, the Estate Fiduciaries and the Canadian Distribution Agent hereby agree that, until the termination of the escrow established pursuant to this Agreement, the Canadian Distribution Agent shall hold the Escrow Property and not disburse any amounts from the Distribution Account except in accordance with the following terms and conditions:

(a)     The Canadian Distribution Agent shall disburse to any person amounts from the Escrow Property if and as so instructed pursuant to (i) a letter of direction substantially in the form attached as Exhibit B hereto jointly executed by the Depositors and the Estate Fiduciaries, a copy of which shall be provided by the Depositors to the Bondholder Group, or (ii) any Depositor's delivery to the Canadian Distribution Agent, with copies to the other Depositors, the Estate Fiduciaries and the Bondholder Group, of a duly authenticated copy of the binding decision made by the relevant dispute resolver(s) under the Allocation Protocol (a "**Decision**") which is not stayed or subject to appeal, accompanied by a certificate from such Depositor certifying as to the finality of the Decision.

(b)     Any joint instruction given by the Depositors and Estate Fiduciaries pursuant to Section 5(a) shall be executed by the respective Authorized Representatives (as defined below) of such Depositors and Estate Fiduciaries. In relation to NNSA, any instructions shall be executed jointly by the French Liquidator and the Conflicts Administrator with the agreement of the Joint Administrators. The Canadian Distribution Agent is authorized but not required to seek confirmation of such instructions by telephone call-back to the person or persons designated on Schedule D hereto (each an "**Authorized Representative**" of the applicable Depositor or Estate Fiduciary), and the Canadian Distribution Agent may rely upon the confirmations of anyone purporting to be the person or persons so designated. The Authorized Representative(s) and telephone numbers for call-backs may be changed only in writing from the applicable Depositor or Estate Fiduciary actually received and acknowledged by the Canadian Distribution Agent (with a copy of such writing to be delivered to the other Depositors, the

- 8 -

Estate Fiduciaries and the Bondholder Group) it being understood that each Depositor and Estate Fiduciary shall have the right to replace its Authorized Representative from time to time by providing written notice to the Canadian Distribution Agent, the other Depositors, the Estate Fiduciaries and the Bondholder Group or by providing a copy of a final and non-appealable court order of a court of competent jurisdiction (as provided in Section 21 below) to the Canadian Distribution Agent designating a successor Authorized Representative. The Depositors and Estate Fiduciaries acknowledge that such security procedure is commercially reasonable. Concurrent with the execution of this Agreement, the Depositors and the Estate Fiduciaries shall deliver to the Canadian Distribution Agent sample signatures of the Authorized Representatives as set forth on Schedule D.

(c)     The Canadian Distribution Agent shall have no responsibility or obligation for investigating or determining the validity or sufficiency of any matter asserted in a letter of instruction or of any pending claim for entitlement to release of funds from the Distribution Account. The Canadian Distribution Agent shall have the right to withhold an amount equal to the amount due and owing to the Canadian Distribution Agent under the terms of this Agreement, plus any reasonable costs and expenses incurred by Canadian Distribution Agent in accordance with the terms of this Agreement in connection with the termination of the Distribution Account.

(d)     No Depositor shall submit to the Canadian Distribution Agent a certificate that falsely certifies to the finality of a Decision.

6.     Termination of Distribution Account.

The Agreement shall terminate upon the distribution of all Escrow Property from the Distribution Account established hereunder in accordance with Section 5(a) hereof, subject to the survival of provisions which expressly survive the termination of this Agreement. Without limiting the foregoing, Sections 4(b), 9, 10 and 12 shall survive the termination of this Agreement.

7.     Method of Payment.

Any payments to be made hereunder shall be made by wire transfer in immediately available funds to the account of such Depositor designated on Schedule B annexed hereto (collectively, the "**Standing Settlement Instructions**"). Any Depositor shall have the right, from time to time, to provide written notice to the Canadian Distribution Agent and the other Depositors updating its Standing Settlement Instructions, and the Canadian Distribution Agent shall thereafter use such revised Standing Settlement Instructions for purposes of any subsequent distributions to such Depositor pursuant to Section 5(a) until such Standing Settlement Instructions have been further updated pursuant to this Section 7. The Depositors acknowledge that the Canadian Distribution Agent may rely upon all identifying information set forth in the Standing Settlement Instructions. The Depositors acknowledge that such Standing Settlement Instructions are a security procedure and are commercially reasonable.

- 9 -

8.    <u>Monthly Reports.</u>

The Canadian Distribution Agent shall, following the end of each calendar month, provide monthly account statements to the Depositors with respect to the Distribution Account, with copies to the Estate Fiduciaries and the Bondholder Group.

9.    <u>Liability of Canadian Distribution Agent.</u>

    (a)    Notwithstanding any other provision of this Agreement, the Canadian Distribution Agent shall:

        (i)    have only those duties as are specifically provided herein, which shall be deemed purely procedural and administerial in nature, and shall under no circumstance be deemed a fiduciary of any of the Depositors, the Estate Fiduciaries, the Bondholder Group, the U.S. Distribution Agent or of any of their respective officers, directors, employees, agents, representatives, members, attorneys, successors or assigns. The Canadian Distribution Agent shall neither be responsible for nor chargeable with knowledge of the terms and conditions of any other agreement, instrument or document between or involving the other parties hereto, including the Settlement and Support Agreement, the IFSA or the Allocation Protocol, nor shall the Canadian Distribution Agent be required to determine if any person or entity has complied with any such agreements, nor shall any additional obligations of the Canadian Distribution Agent be inferred from the terms of such agreements, even though reference thereto may be made in this Agreement. This Agreement sets forth all matters pertinent to the escrow contemplated hereunder and no additional duties or obligations of the Canadian Distribution Agent shall be inferred from the terms of this Agreement or any other agreement, instrument or document. The permissive rights of the Canadian Distribution Agent to do things enumerated in this Agreement shall not be construed as duties or obligations;

        (ii)    be entitled to rely exclusively upon, and shall have no responsibility to investigate, inquire into or determine the genuineness, authenticity or sufficiency of, any document, notice, direction, request, demand, instrument or other instruction (or, in each case, any signature thereon) submitted to it or otherwise given in connection with this Agreement;

        (iii)    be entitled to assume that any person who is an Authorized Representative of a Depositor or Estate Fiduciary has the full power and authority to act on behalf of and to bind, for all intents and purposes, such party, as applicable;

        (iv)    be entitled to rely upon and have no liability in acting on the opinion, advice of or information obtained from its counsel (including in-house counsel) or other advisors in relation to any matter arising in connection

- 10 -

with this Agreement, provided that the Canadian Distribution Agent does not act with gross negligence or wilful misconduct;

(v)    have the right, but not the obligation, to consult with any counsel (including in-house counsel) or other advisors of its choice in relation to any matter arising in connection with this Agreement;

(vi)    have the right to perform any of its duties hereunder through agents, attorneys, custodians or nominees; and

(vii)    not be responsible for any failure to act or other omission as a result of causes beyond the reasonable control of the Canadian Distribution Agent.

(b)    None of the Canadian Distribution Agent, nor any of the officers, directors, employees, agents, representatives, attorneys, successors or assigns of the Canadian Distribution Agent, shall be liable, directly or indirectly, to any person or entity, including any of the other parties, for any costs, expenses, damages, claims, actions, demands or liabilities arising out of or relating to any of the services provided hereunder, except to the extent such costs, expenses, damages, claims, actions, demands or liabilities have been finally adjudicated to have resulted from the Canadian Distribution Agent's or its officers, directors, employees, agents, representatives or attorneys gross negligence or willful misconduct. Without limiting the generality of the foregoing, none of the Canadian Distribution Agent, nor any of the officers, directors, employees, agents, representatives, attorneys, successors or assigns of the Canadian Distribution Agent, shall:

(i)    have any duty or responsibility, and shall not incur any liability, with respect to the adequacy of the Escrow Property to meet and discharge any payments, obligations, liabilities or other commitments of any person or entity;

(ii)    have any duty to solicit any payments which may be due to it in connection with the Distribution Account, including without limitation, the Escrow Funds or any amounts due on any investments of the Escrow Property; provided, that the Canadian Distribution Agent shall advise the Depositors and the Estate Fiduciaries in writing forthwith upon it becoming aware of any amounts due to it in connection with the Distribution Account having not been paid;

(iii)    have no duty or obligation to make any calculations of any kind in connection with any distribution or allocation of the Escrow Property;

(iv)    be responsible for any loss to, or diminution of, the Escrow Property resulting from the acquisition, retention, investment or sale of any investments made in accordance with this Agreement or pursuant to any investment direction delivered pursuant to this Agreement; or

- 11 -

    (v)    be liable for any special, indirect or consequential damages or losses of any kind whatsoever (including but not limited to lost profits), even if the Canadian Distribution Agent has been advised of the likelihood of such losses or damages and regardless of the form of action.

    (c)    Notwithstanding any other provision of this Agreement, in the event that the Canadian Distribution Agent is uncertain as to how to proceed in any situation not explicitly addressed by the terms of this Agreement, whether because of any conflicting notice, direction, instruction, claim, allegation or demand of a Depositor or Estate Fiduciary or for any other reason whatsoever, the Canadian Distribution Agent shall be entitled, at its option and in its sole discretion, to refuse to comply with any such notice, direction, instruction, claim, allegation or demand with respect thereto as long as such uncertainty is continuing, and in so refusing, the Canadian Distribution Agent may elect, at its option and in its sole discretion, to make no release or delivery of any Escrow Property and its sole obligation shall be to keep safely all property held in escrow until it shall be given a joint instruction in writing by the Depositors and Estate Fiduciaries pursuant to Section 5(a) which eliminates such ambiguity or uncertainty to the satisfaction of the Canadian Distribution Agent or by a final and non-appealable order or judgment of a court of competent jurisdiction (as set forth in Section 21, below).

10.    <u>Indemnification of Canadian Distribution Agent.</u>

    (a)    The Depositors shall jointly and severally indemnify, defend and save harmless the Canadian Distribution Agent and its affiliates and their respective officers, directors, employees, agents, representatives, attorneys, successors and assigns (collectively, "**Indemnitees**") from and against any and all losses, costs, expenses (including without limitation, the reasonable fees and expenses of outside counsel), damages, claims, actions, demands and liabilities incurred by or asserted against any of them directly or indirectly arising out of or relating to this Agreement, including, without limitation, in connection with tax reporting or withholding and the enforcement by the Canadian Distribution Agent of any of its rights or remedies under or in connection with this Agreement, except to the extent such costs, expenses, losses, damages, claims, actions, demands or liabilities are finally adjudicated by a court of competent jurisdiction (as set forth in Section 21 below) to have been a direct result of an Indemnitee's gross negligence or wilful misconduct. For greater certainty, the commencement of formal legal proceedings shall not be a precondition for indemnification hereunder. Further, none of the provisions of this Agreement shall require the Canadian Distribution Agent to expend or risk its own funds, appear in, prosecute or defend proceedings, or otherwise incur financial liability in the performance of any of its duties or in the exercise of any of its rights or powers hereunder, unless the Canadian Distribution Agent is first indemnified to its reasonable satisfaction.

    (b)    Any indemnity payments to the Canadian Distribution Agent arising from the indemnification provided by Section 4(b) or this Section 10 shall be initially satisfied from the Escrow Property to the extent available. As among themselves, the Depositors agree that the costs of any such indemnification shall be borne on a

- 12 -

pro rata basis by the Depositors in accordance with the percentage of the Escrow Property allocable to each of the Depositors pursuant to the Allocation Protocol or a letter of direction as described in Section 5(a)(i), and any Depositor paying in excess of its pro rata share of the cost of such indemnification shall, notwithstanding anything to the contrary in the Settlement and Support Agreement, have rights of contribution vis-à-vis any Depositor that has paid less than its pro rata share of such costs either directly to the Canadian Distribution Agent or by payment to another Depositor pursuant to this sentence; provided, that if the costs of any such indemnification arise from a breach of this Agreement or other fault of a Depositor, the Depositor(s) so in breach or at fault shall bear the cost of such indemnification and any Depositor paying in excess of its share of the cost of such indemnification, after taking into account the breach or fault of the other Depositors, shall, notwithstanding anything to the contrary in the Settlement and Support Agreement, have rights of contribution vis-à-vis any Depositor that has paid less than its share of such costs either directly to the Canadian Distribution Agent or by payment to another Depositor. The indemnification provided by this Section 10 is in addition to the indemnification provided in Section 4(b) and shall survive the resignation or removal of the Canadian Distribution Agent and the termination of this Agreement.

11.    Resignation or Removal of Canadian Distribution Agent.

The Canadian Distribution Agent may, at any time and for any reason or for no reason, in its sole discretion, resign as escrow holder under this Agreement by giving the Depositors and the Estate Fiduciaries at least thirty (30) Business Days' notice in writing of its intention to resign, or such shorter notice as the Depositors and the Estate Fiduciaries may accept in writing as sufficient. The Depositors and the Estate Fiduciaries may, at any time and for any reason or for no reason, in their sole discretion, remove the Canadian Distribution Agent as escrow holder under this Agreement by giving the Canadian Distribution Agent at least thirty (30) Business Days' notice in writing of their intention to remove, or such shorter notice as the Canadian Distribution Agent may accept in writing as sufficient. Each of the Depositors and the Estate Fiduciaries agree that they shall forthwith, upon receipt of such notice from the Canadian Distribution Agent or upon the giving of such notice to the Canadian Distribution Agent, as applicable, work diligently to find and appoint a new escrow holder to act in the place and stead of the Canadian Distribution Agent and if they fail to agree on such appointment, any of the Depositors, the Estate Fiduciaries or the Canadian Distribution Agent may apply to a court of competent jurisdiction (as set forth in Section 21, below) for the appointment of a new escrow holder and any such resulting appointment shall be binding upon all of the parties hereto. Upon any such appointment, the new escrow holder shall be vested with the same powers, rights, duties and obligations as if it had been originally named herein as escrow holder and such new escrow holder shall enter into an agreement with the Depositors and the Estate Fiduciaries with respect to such replacement escrow arrangement. If at any time or for any reason the Canadian Distribution Agent is authorized or directed to release and deliver the Escrow Property to a new escrow holder or to any other person, the Canadian Distribution Agent shall, prior to effecting such release and transfer, be paid all of its unpaid fees, non-reimbursed expenses and costs arising pursuant to this Agreement.

- 13 -

Notwithstanding any other provision of this Agreement, upon the release from escrow by the Canadian Distribution Agent of all of the Escrow Property pursuant to or as contemplated by this Agreement (whether such release occurs before or after any termination of this Agreement), the Canadian Distribution Agent and each of the officers, directors, employees, agents, representatives, attorneys, successors and assigns of the Canadian Distribution Agent shall be fully and unconditionally relieved, discharged and released from any and all claims, duties, obligations and liabilities arising under or in connection with this Agreement, and none of them shall be subject to or liable for any claim whatsoever made against it by or on behalf of any other person or entity (including any party to this Agreement) with respect to this Agreement.

12.    Compensation of Canadian Distribution Agent.

The Canadian Distribution Agent shall be entitled to compensation for its services as stated in the Fees of Escrow Agent, attached hereto as Exhibit A, which compensation shall be paid by NNL. The Canadian Distribution Agent will invoice NNL monthly in arrears for such compensation and NNL shall pay such invoices upon receipt. The fees agreed upon for the services rendered hereunder as outlined on Exhibit A are intended as full compensation for the Canadian Distribution Agent's services as contemplated by this Agreement; provided, however, that in the event that the conditions for the disbursement of the Escrow Property under this Agreement are not fulfilled, or the Canadian Distribution Agent renders any service not contemplated in this Agreement, or there is any assignment of interest in the subject matter of this Agreement, or any material modification hereof, or if any material controversy arises hereunder, or the Canadian Distribution Agent is made a party to any litigation pertaining to this Agreement or the subject matter hereof, the Canadian Distribution Agent shall be compensated for such extraordinary services (at a rate of $300 per hour) and reimbursed for all costs and expenses, including reasonable attorneys' fees and expenses, occasioned by any such delay, controversy, litigation or event (collectively, the "**Extraordinary Fees and Expenses**"), it being understood that any Extraordinary Fees and Expenses shall be satisfied and borne by the Depositors in the same manner as the indemnity payments contemplated by Section 10(b). If any amount due to the Canadian Distribution Agent hereunder is not paid within thirty (30) days after the date due, the Canadian Distribution Agent in its sole discretion may charge interest on such amount in an amount equal to the lesser of 10% per annum or the highest rate permitted by applicable law. The Depositors acknowledge and agree that the fees to which the Canadian Distribution Agent is entitled to under this Agreement do not include applicable taxes, whether federal or provincial, including but not limited to goods and services tax and harmonized sales tax, which taxes shall be an additional charge payable by NNL or the Depositors, as applicable.

13.    Notices and Discharge/Dissolution.

All communications hereunder shall be in writing and shall be deemed to be duly given and received: (i) upon delivery, if delivered personally, or upon confirmed transmittal, if by facsimile; (ii) on the next Business Day if sent by overnight courier; or (iii) four (4) Business Days after mailing if mailed by prepaid registered mail, return receipt requested, to the appropriate notice address set forth in Schedule C or at such other address as any party hereto may have furnished to the other parties hereto in writing in accordance with this Section 13.

If, at any time prior to the termination of this Agreement, any of the Estate Fiduciaries is discharged, removed or dissolved, whether pursuant to an approved plan of reorganization or

- 14 -

liquidation by order of the Canadian Court or U.S. Court or otherwise, any Depositor or Estate Fiduciary may present to the Canadian Distribution Agent evidence of such discharge, removal or dissolution in the form of a court order or other officially certified document which upon receipt by the Canadian Distribution Agent shall constitute an effective amendment to this Agreement, and such Estate Fiduciary by operation of this Agreement, as amended, shall cease to be such for all purposes of this Agreement and the consent of such removed or dissolved Estate Fiduciary shall no longer be required for any purposes hereunder; provided that, for the avoidance of doubt, nothing in this Section 13 shall affect the rights of the Estate Fiduciaries under Section 26 hereof. If such discharge, removal or dissolution provides for a successor to the duties and responsibilities of such removed or dissolved Estate Fiduciary, or a successor to the same or substantially similar duties and responsibilities of such removed or dissolved Estate Fiduciary (including, without limitation, a trustee in bankruptcy) is otherwise appointed, then the preceding sentence shall be of no effect with respect to such successor entity, the rights and responsibilities of such Estate Fiduciary hereunder shall, subject to Section 30, pass automatically to such successor entity and such successor entity shall be deemed to be a party to this Agreement as if it were a signatory hereto.

If, at any time prior to the termination of this Agreement, any of the Depositors is liquidated or dissolved, whether pursuant to an approved plan of reorganization or liquidation by order of the Canadian Court or U.S. Court or otherwise, any Depositor, or Estate Fiduciary (as the case may be) shall present to the Canadian Distribution Agent evidence of such dissolution or liquidation in the form of a court order or other officially certified document which upon receipt by the Canadian Distribution Agent shall constitute an effective amendment to this Agreement, and such dissolved or liquidated Depositor by operation of this Agreement, as so amended, shall cease to be such for all purposes of this Agreement, as amended, and the consent of such dissolved or liquidated Depositor shall no longer be required for any purposes hereunder. If such dissolution or liquidation provides for a successor to such dissolved or liquidated Depositor, then such rights and responsibilities shall, subject to Section 30, pass automatically to such successor entity. Any person appointed as a liquidator of an EMEA Debtor under the Insolvency Act 1986 (U.K.) shall, subject to Section 30, be treated as a successor of such EMEA Debtor.

14.    Counterparts.

This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but such counterparts shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or electronic mail shall be as effective as delivery of a manually executed counterpart of a signature page to this Agreement. Each of the parties hereto agrees to deliver an original executed signature page to this Agreement to the Canadian Distribution Agent within five (5) Business Days of the date hereof. The Canadian Distribution Agent shall be entitled in its sole and absolute discretion to freeze the Distribution Account until such time as all of the original executed signature pages have been delivered to it.

15.    Section Headings.

The Section headings of this Agreement are for convenience of reference only and shall not be deemed to limit or affect any of the provisions hereof.

- 15 -

16. <u>Amendments; No Waivers.</u>

    (a)    Except for the resignation, removal or replacement of an Estate Fiduciary as set forth in Section 13 or the liquidation or dissolution of a Depositor as set forth in Section 13, any provision of this Agreement may be waived or amended if, and only if, such amendment or waiver is in writing and is signed by the Depositors, the Estate Fiduciaries and the Canadian Distribution Agent (with a copy thereof to the Bondholder Group) and, if prior to the entry of a final decree closing the Bankruptcy Cases, such amendment or waiver is approved by both the U.S. Court and the Canadian Court; provided, however, that (i) court approval shall not be required of any applicable court (whether the U.S. Court or the Canadian Court) if a final decree closing the Bankruptcy Cases pending before such court shall have been entered by such court and (ii) court approval shall not be required of any court if final decrees terminating the Bankruptcy Cases shall have been entered by the U.S. Court and the Canadian Court.

    (b)    No failure by any party hereto to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement, or to exercise any right or remedy consequent upon a breach hereof, shall constitute a waiver of any such breach or any other covenant, duty, agreement or condition hereof.

17. <u>Entire Agreement; No Third Party Beneficiaries.</u>

This Agreement (including any exhibits, schedules and amendments hereto) and (solely with respect to the parties that are party or subject thereto) the IFSA, the Allocation Protocol and the Settlement and Support Agreement (a) constitute the entire agreement and understanding of the parties hereto and supersede all prior agreements and understandings, both written and oral, among the parties hereto with respect to the subject matter hereof and (b) are not intended to confer upon any other person any rights or remedies hereunder; provided, however, that the Joint Administrators shall be entitled to enforce and take the benefit of Section 20 hereof.

18. <u>Governing Law.</u>

Subject to Section 20, this Agreement shall be governed by and construed in accordance with the laws of the Province of Ontario and the federal laws of Canada applicable therein.

19. <u>Severability.</u>

If any provision of this Agreement is determined by a court of competent jurisdiction (as set forth in Section 21 below) to be prohibited or unenforceable by reason of any applicable law of a jurisdiction, then such provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions thereof, and any such prohibition or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction.

- 16 -

20. Exclusion of Liability for the Joint Administrators, Conflict Administrator and the French Liquidator.

    (a)    Subject to Section 20(c) below, the parties hereto agree that the Joint Administrators have negotiated this Agreement both in their capacities as administrators of NNUK and the other EMEA Debtors party hereto and for and on behalf of NNUK and the other EMEA Debtors party hereto and that none of the Joint Administrators or their respective firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of NNUK or the other EMEA Debtors party hereto to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations whether such liability would arise under Section 99(4) of Schedule B1 to the Insolvency Act or otherwise howsoever.

    (b)    Subject to Section 20(c) below, the parties hereto agree that the Conflicts Administrator and French Liquidator have negotiated this Agreement for and on behalf of NNSA, and that none of the Conflicts Administrator, the French Liquidator or their respective firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of NNSA to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations whether such liability would arise under applicable laws or otherwise howsoever.

    (c)    Nothing in this Section 20 or any other provision of this Agreement shall prevent the Depositors or the Canadian Distribution Agent from bringing any action against NNUK, NNSA the other EMEA Debtors, the Joint Administrators, the Conflict Administrator or the French Liquidator for wilful misconduct or fraud.

    (d)    Notwithstanding Section 18 or anything in Section 21, (i) any claim, action or proceeding against the Joint Administrators in their personal capacities (and not as agents for any EMEA Debtor) under this Agreement shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English Court; (ii) any claim, action or proceeding against the Conflicts Administrator in his personal capacity (and not as agent for NNSA) under this Agreement shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English Court, and (iii) any claim, action or proceeding against the French Liquidator in his personal capacity (and not as agent for NNSA) under this Agreement shall be governed by the laws of France and subject to the exclusive jurisdiction of the French Court.

    (e)    Notwithstanding Section 21, any claim, action or proceeding against the Canadian Distribution Agent asserting any personal liability on the part of the Canadian Distribution Agent shall be subject to the exclusive jurisdiction of the Canadian Court.

    (f)    This Section 20 shall survive the termination of this Agreement.

- 17 -

21.    JURISDICTION.

SUBJECT TO SECTION 20, FOR ANY CLAIM, ACTION OR PROCEEDING ARISING UNDER OR OUT OF, IN RESPECT OF, OR IN CONNECTION WITH THIS AGREEMENT, EACH PARTY HEREBY IRREVOCABLY SUBMITS TO AND ACCEPTS FOR ITSELF AND ITS PROPERTIES, GENERALLY AND UNCONDITIONALLY TO THE EXCLUSIVE JURISDICTION OF AND SERVICE OF PROCESS PURSUANT TO THE RULES OF BOTH (I) THE U.S. COURT AND THE CANADIAN COURT, IF SUCH CLAIM, ACTION OR PROCEEDING IS BROUGHT PRIOR TO THE ENTRY OF A FINAL DECREE CLOSING THE BANKRUPTCY CASES INVOLVING THE RELEVANT DEPOSITORS PENDING BEFORE SUCH COURTS, INCLUDING THAT CERTAIN CROSS-BORDER INSOLVENCY PROTOCOL APPROVED BY THE U.S. COURT PURSUANT TO SECTION 105(A) OF THE BANKRUPTCY CODE IN AN ORDER DATED JANUARY 15, 2009, AND BY THE CANADIAN COURT PURSUANT TO AN ORDER DATED JANUARY 14, 2009, AS AMENDED OR AS AMENDED AND RESTATED FROM TIME TO TIME, AND (II) THE CANADIAN COURT, IF BROUGHT AFTER ENTRY OF SUCH FINAL DECREE CLOSING SUCH BANKRUPTCY CASES INVOLVING THE RELEVANT DEPOSITORS PENDING BEFORE THE U.S. COURT OR THE CANADIAN COURT, WAIVES ANY DEFENSE OF FORUM NON CONVENIENS AND AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY ARISING UNDER OR OUT OF, IN RESPECT OF, OR IN CONNECTION WITH THIS AGREEMENT. EXCEPT AS PROVIDED IN THE FOREGOING NO PARTY HERETO SHALL INITIATE ANY CLAIM, ACTION OR PROCEEDING ARISING UNDER OR OUT OF, IN RESPECT OF, OR IN CONNECTION WITH THIS AGREEMENT IN ANY OTHER STATE, PROVINCIAL OR FEDERAL COURT IN THE UNITED STATES OF AMERICA, CANADA OR ANY COURT IN ANY OTHER COUNTRY. EACH PARTY FURTHER IRREVOCABLY DESIGNATES AND APPOINTS THE INDIVIDUAL(S) IDENTIFIED AS ITS AUTHORIZED REPRESENTATIVES TO RECEIVE NOTICES ON ITS BEHALF, AS ITS AGENT TO RECEIVE ON ITS BEHALF SERVICE OF ALL PROCESS IN ANY SUCH CLAIM, ACTION OR PROCEEDING BEFORE ANY BODY, SUCH SERVICE BEING HEREBY ACKNOWLEDGED TO BE EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT. A COPY OF ANY SUCH PROCESS SO SERVED SHALL BE MAILED BY REGISTERED MAIL TO EACH PARTY AT ITS ADDRESS PROVIDED PURSUANT TO SECTION 13; PROVIDED THAT, UNLESS OTHERWISE PROVIDED BY APPLICABLE LAW, ANY FAILURE TO MAIL SUCH COPY SHALL NOT AFFECT THE VALIDITY OF THE SERVICE OF SUCH PROCESS. IF ANY AGENT SO APPOINTED REFUSES TO ACCEPT SERVICE, THE DESIGNATING PARTY HEREBY AGREES THAT SERVICE OF PROCESS SUFFICIENT FOR PERSONAL JURISDICTION IN ANY CLAIM, ACTION OR PROCEEDING AGAINST IT IN THE APPLICABLE JURISDICTION MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ITS ADDRESS PROVIDED PURSUANT TO SECTION 13. EACH PARTY HEREBY ACKNOWLEDGES THAT SUCH SERVICE SHALL BE EFFECTIVE AND BINDING IN EVERY RESPECT. NOTHING HEREIN SHALL AFFECT THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR SHALL LIMIT THE RIGHT OF ANY PARTY TO BRING ANY CLAIM, ACTION OR PROCEEDING AGAINST AN OTHER PARTY IN ANY OTHER JURISDICTION. NOTWITHSTANDING ANYTHING IN THIS SECTION 21 TO THE CONTRARY, ANY CLAIM, ACTION OR PROCEEDING SET FORTH IN SECTION 20 SHALL BE BROUGHT

- 18 -

EXCLUSIVELY IN THE COURTS CONTEMPLATED IN SECTION 20. FINALLY, REGARDLESS OF THE JURISDICTION OF THE APPLICABLE COURT, THE PARTIES FURTHER HEREBY WAIVE ANY RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY LAWSUIT OR JUDICIAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.

22.    Interpretation.

As used in this Agreement (including all exhibits, schedules and amendments hereto), the masculine, feminine or neuter gender and the singular or plural number shall be deemed to include the others whenever the context so requires. References to Sections refer to Sections of this Agreement, unless the context otherwise requires. Words such as "herein," "hereinafter," "hereof," "hereto," "hereby" and "hereunder," and words of like import, unless the context requires otherwise, refer to this Agreement. "Including", "includes" and similar words shall mean including without limiting the generality of the foregoing. The captions contained herein are for convenience only and shall not control or affect the meaning or construction of any provision of this Agreement.

23.    Compliance with Court Orders.

In the event that any of the Escrow Property shall be attached, garnished or levied upon by any court order, or the distribution or disbursement thereof shall be stayed or enjoined by an order of a court of competent jurisdiction (as set forth in Section 21 above), or any order, judgment or decree shall be made or entered by any court order affecting the property deposited under this Agreement, the Canadian Distribution Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all writs, orders or decrees so entered or issued, which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction, and in the event that the Canadian Distribution Agent obeys or complies with any such writ, order or decree it shall not be liable to any of the parties hereto or to any other person, firm or corporation, by reason of such compliance notwithstanding such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.

24.    Force Majeure.

In the event that any party hereto is unable to perform its obligations under the terms of this Agreement because of acts of God, strikes, equipment or transmission failure or damage reasonably beyond its control, or other cause reasonably beyond its control, the Canadian Distribution Agent shall not be liable for damages to the other parties for any damages resulting from such failure to perform otherwise from such causes. Performance under this Agreement shall resume when the Canadian Distribution Agent is able to perform its obligations hereunder.

25.    Merger or Consolidation.

Any corporation or association into which the Canadian Distribution Agent may be converted or merged, or with which it may be consolidated, or to which it may sell or transfer all or substantially all of its corporate escrow business and assets as a whole or substantially as a whole, or any corporation or association resulting from any such conversion, sale, merger, consolidation or transfer to which the Canadian Distribution Agent is a party, shall be and

- 19 -

become the successor escrow agent under this Agreement and shall have and succeed to the rights, powers, duties, immunities and privileges of the Canadian Distribution Agent, without the execution or filing of any instrument or paper or the performance of any further act except for the giving of written notice by the Canadian Distribution Agent to the Depositors and the Estate Fiduciaries.

26.    Exclusion of Liability for Estate Fiduciaries.

The Depositors and the Canadian Distribution Agent agree that (a) each of the Estate Fiduciaries has negotiated and is entering into this Agreement as a representative of its applicable creditor constituency for the purpose of benefiting from the rights being granted hereunder and to allow the Canadian Distribution Agent to be able to rely on any joint instructions signed by the Estate Fiduciaries and (b) none of the Estate Fiduciaries, their firms, members or affiliates of such parties and such parties respective partners, associates, employees, advisers, representatives or agents shall incur any liability whatsoever under this Agreement. This Section 26 shall survive termination of this Agreement.

27.    No Agency.

Each of Depositors and Estate Fiduciaries acknowledge and agree that the Canadian Distribution Agent does not have any interest in the Escrow Property and is acting solely as an escrow holder at the request and for the convenience of the Depositors, having only possession of the Escrow Property. The Canadian Distribution Agent shall not be deemed to be the agent or trustee of any party in respect of the escrow herein referred to and none of the Depositors or the Estate Fiduciaries shall be deemed to be the agent or trustee of the Canadian Distribution Agent in respect of the escrow herein referred to.

28.    Regulatory Compliance.

(a)    If the Canadian Distribution Agent is subject to any legislation, including anti-money laundering legislation and privacy legislation, that requires it to collect information or obtain undertakings, agreements, documents or the like from the parties to this Agreement, their representatives, employees, officers, directors, or any agent or agents of such parties, the parties hereto agree that they shall fully cooperate with the reasonable requests of the Canadian Distribution Agent in this regard, including delivery of information, agreements, or documents or providing signatures or executing documents and to take all reasonable steps to cause the parties' representatives, employees, officers, directors, or agents as the case may be to do the same, all to the extent required to ensure that the Canadian Distribution Agent satisfies applicable legislative requirements, and the parties hereto agree that if for any reason such requirements are not satisfied, the Canadian Distribution Agent may, at its option and in its sole discretion, refuse to act as may otherwise be required under this Agreement until such requirements are satisfied.

(b)    The parties may exchange personal information ("**Confidential Information**"), but only such information as is required in order for the parties to fulfill their duties under this Agreement.

- 20 -

(c)     The parties agree to use the Confidential Information solely for performing their duties under this Agreement. The parties will hold the Confidential Information in confidence and will not use or disclose the Confidential Information to any third party; provided, however, that the parties may disclose any such Confidential Information to their directors, officers, employees, agents, service providers, advisors, internal and external auditors or regulatory authorities as well as those of their affiliates with a need to know such Confidential Information and who agree to be bound by these confidentiality obligations, or as required or permitted by law.

(d)     The parties acknowledge that the Confidential Information may include personal information about identifiable individuals. Each of the parties agree to act in accordance with the Personal Information Protection and Electronic Documents Act ("**PIPEDA**") and applicable provincial private sector privacy legislation which has by order by a court of competent jurisdiction been declared as substantially similar to PIPEDA with respect to collection, use, disclosure, retention of and access to personal information

(e)     The Canadian Distribution Agent will correct or amend any inaccuracy with any Confidential Information promptly after it is notified of the inaccuracy by the parties. If the Canadian Distribution Agent otherwise becomes aware of any inaccuracy with any Confidential Information, the Canadian Distribution Agent will promptly advise the parties.

29.    Service Providers.

The Canadian Distribution Agent's services to the parties hereto are not exclusive and the Canadian Distribution Agent is hereby expressly authorized from time to time in its discretion, for any purpose, including for the purpose of assisting the Canadian Distribution Agent with its duties under, and the administration of, this Agreement, to appoint, employ, invest in, contract or deal with any individual, firm, partnership, association, trust or body corporate, including without limitation, itself and any individual, firm, partnership, association, trust or body corporate with which it may directly or indirectly be affiliated or related or in which it may be directly or indirectly interested, whether on its own account, for this Agreement, or for the account of another (in a fiduciary capacity or otherwise) without being liable to account therefor and without being in breach of this Agreement.

30.    Successors and Assigns.

This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors (including any receiver or trustee in bankruptcy or any such party) and permitted assigns. The Canadian Distribution Agent shall have no obligation in performing this Agreement to recognize any successor or assign of another party hereto unless the Canadian Distribution Agent, acting reasonably, receives authoritative and conclusive written evidence of the change of such party and any documentation required to ensure that the Canadian Distribution Agent satisfies applicable legislative requirements.

*[Signature pages follow]*

**IN WITNESS WHEREOF**, each of the parties hereto has caused this Agreement to be executed on the day and year first above written.

**NORTEL NETWORKS CORPORATION**

By: _____
        Name:  Tanecia Wong Ken
        Title:   Authorized Representative

**NORTEL NETWORKS LIMITED**

By: _____
        Name:  Tanecia Wong Ken
        Title:   Authorized Representative

**NORTEL NETWORKS INC.**

By: _____

Name:  John J. Ray III
Title:   Principal Officer

**SIGNED for and on behalf of Nortel
Networks UK Limited (in
administration) by Alan Bloom and
Stephen Harris as Joint Administrators
(acting as agent and without personal
liability):**

_____                    _____
Alan Bloom                                          Stephen Harris

_____                    _____
Witness Signature                                   Witness Signature
Name:                                               Name:
Address:                                            Address:

**SIGNED for and on behalf of Nortel Networks S.A. (in administration and _liquidation judiciare_) by Alan Bloom as Joint Administrator and Stephen Taylor as Conflict Administrator (both acting as agent and without personal liability):**

_____          _____
Alan Bloom                                    Stephen Taylor


_____          _____
Witness Signature                         Witness Signature
Name:                                           Name:
Address:                                        Address:


**SIGNED for and on behalf of Nortel Networks S.A. (in administration and _liquidation judiciare_) by Maître Cosme Rogeau as _Mandataire Liquidateur_ (acting as agent and without personal liability) in the presence of:**

_____          _____
Witness signature                          Maître Cosme Rogeau
Name:
Address:

**ERNST & YOUNG INC. IN ITS CAPACITY AS THE MONITOR OF NORTEL NETWORKS CORPORATION ET AL., AND NOT IN ITS PERSONAL CAPACITY**

By: _____

    Name:  Murray A. McDonald
    Title:   President

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF NORTEL NETWORKS INC., ET. AL.**

**By: AKIN GUMP STRAUSS HAUER & FELD LLP, as Counsel to the Committee and authorized signatory and not in its individual capacity**

By: _____

    Name:
    Title:

## CANADIAN DISTRIBUTION AGENT

**Royal Trust Corporation of Canada, as Canadian Distribution Agent**

By: _____

Name:
Title:

## SCHEDULE A

## OTHER DEPOSITORS

1. NNSA

2. **[NTD: Any other depositors under existing escrow agreements from which cash to be transferred to Canadian Escrow Agent to be specified herein as Other Depositors and added as signatories. Entities to be specified as Canadian Debtor, U.S. Debtor or EMEA Debtor.]**

**SCHEDULE B**

**REDACTED**

## SCHEDULE C

## NOTICE ADDRESSES

<u>Depositors:</u>

| | |
|---|---|
| NNC and NNL **[and the other Canadian Debtors]**: | 5945 Airport Road<br>Suite 152<br>Mississauga, Ontario, Canada  L4V 1R9<br>Attn: Tanecia Wong Ken<br>Phone: 905-863-1184<br>Facsimile: 416-4789-9688<br><br>With a copy to:<br><br>The Monitor and Goodmans LLP at the address particulars set forth below. |
| NNI **[and the other U.S. Debtors]**: | c/o Cleary Gottlieb Steen & Hamilton LLP<br>One Liberty Plaza<br>New York, NY  10006<br>United States<br>Attention: Lisa Schweitzer<br>Facsimile: +1-212-225-3999 |
| NNUK **[and the other EMEA Debtors]**: | c/o Herbert Smith LLP<br>Exchange House<br>Primrose Street<br>London<br>EC2A 2HS<br>United Kingdom<br>Attn: John Whiteoak and Kevin Pullen<br>Phone: +44 20 7374 8000<br>Facsimile: +44 20 7374 0888 |
| NNSA: | c/o Herbert Smith LLP<br>Exchange House<br>Primrose Street<br>London<br>EC2A 2HS<br>United Kingdom<br>Attn: John Whiteoak and Kevin Pullen<br>Phone: +44 20 7374 8000<br>Facsimile: +44 20 7374 0888<br><br>-and- |

|  | c/o Skadden, Arps, Slate, Meagher & Flom (UK) LLP<br>40 Bank Street<br>Canary Wharf<br>London<br>E14 5DS<br>United Kingdom<br>Attn: Christopher Mallon<br>Phone: +44 20 7519 7236<br>Facsimile: +44 20 7072 7236 |
|---|---|
| Canadian Distribution Agent: | Royal Trust Corporation of Canada<br>155 Wellington St. West, 20th Floor<br>Toronto, Ontario  M5V 3K7<br>Attention: Sharon Yeung, Director,<br>Institutional Trust Services<br>Facsimile: (416) 955-3268 |
| Estate Fiduciaries: | |
| The Official Committee of Unsecured Creditors in connection with the Chapter 11 cases of Nortel Networks Inc., et al. (Case No. 09-10138): | c/o Akin Gump Strauss Hauer & Feld LLP<br>One Bryant Park<br>New York, New York  10036<br>Attn: Fred S. Hodara, Brad Kahn and David H. Botter<br>Phone: 212-872-1000<br>Facsimile: 212-872-1002 |
| Monitor: | Ernst & Young Inc. in its capacity as Monitor of Nortel Networks Corporation et al.<br>Ernst & Young Tower<br>222 Bay Street, P. O. Box 251<br>Toronto, Ontario, Canada<br>M5K 1J7<br>Facsimile: (416) 943-3300<br>Attn: Murray A. McDonald<br><br>With a copy to:<br><br>Goodmans LLP<br>Bay Adelaide Centre<br>333 Bay St., Suite 3400<br>Toronto, ON  M5H 2S7<br>Attn: Jay A. Carfagnini, Joe Pasquariello and Chris Armstrong<br>Phone: (416) 979-2211<br>Facsimile: (416) 979-1234 |

Bondholder Group:                              c/o Milbank, Tweed, Hadley & McCloy LLP
                                               1 Chase Manhattan Plaza
                                               New York, New York  10005
                                               Attn: Albert A. Pisa
                                               Phone: 212-530-5000
                                               Facsimile: 212-822-5735

**SCHEDULE D**

**REDACTED**

## SCHEDULE E

## AFFILIATED FINANCIAL INSTITUTIONS OF CANADIAN DISTRIBUTION AGENT

1. RBC Dominion Securities Inc.

## EXHIBIT A

## FEES OF ESCROW AGENT

INITIAL SERVICES FEE

A one-time fee of $25,000.00 plus legal costs incurred by Royal Trust on a time cost basis will be charged for the review  and modification of escrow document and setting up of the escrow account.

(A)    ANNUAL FEES

For custody and safekeeping of assets, monthly administration, including correspondence, payments, record-keeping, reporting, and related Escrow Agent duties and responsibilities including investments in Government of  Canada Treasury Bills and/or Bankers Acceptances and/or Forward Exchange Contracts, fees will be charged  monthly on the market value of assets held at the previous month at the following:

|  |  |
|---:|:---|
| **Annual Fee:** | 1 basis points or 0.01% |
| **Minimum Annual Fee:** | $20,000.00 CAD |
| **Investment Transactions (e.g., Trades)*:** | $300.00 CAD per transaction |
| **Disbursements:** | $500.00 CAD per transaction |

*excludes any 3rd party fees applicable to investments

(B)    TAX PREPARATION FEES

A fee of $325.00 per hour is applied for the preparation, filing, review of income tax returns and other required tax filings, including issuance of tax slips.

## EXHIBIT B

## FORM OF LETTER OF INSTRUCTION

Reference is made to the Canadian Distribution Escrow Agreement dated September ●, 2016 (the "**Agreement**") among the Depositors, the Estate Fiduciaries and the Canadian Distribution Agent. Capitalized terms used herein that are otherwise undefined shall have the meanings ascribed thereto in the Agreement.

Subject to the terms and conditions of the Agreement, each of the Depositors and the Estate Fiduciaries hereby irrevocably authorizes and directs the Canadian Distribution Agent to:

release from the Distribution Account the amount of CAD$_____ and disburse such amount by wire transfer to_____ using the following wiring transfer instructions:

Bank Name: _____
ABA Number: _____
Account Name: _____
Account Number: _____

and this shall be your good and sufficient authority for so doing.

**[Depositors and Estate Fiduciaries]**

by: _____

Name: ●
Title: ●

6603416

## ANNEX L

## BOOK INTERCOMPANY CLAIMS

US Debtors Pre-filing Intercompany Obligations as at January 14, 2009, except for NNCALA, which is as at July 14, 2009, and NNI, which is at July 26, 2016
Excludes claims filed by the Nortel Joint Ventures (GDNT and NETAS)
The schedule below excludes net intercompany receivables vis-à-vis non-filed entities; however this is not a reflection on the validity and the collectibility of such amounts
All amounts in USD

| Legal company code | Legal company name | Legal trading partner code | Legal trading partner name | Grand Total |
|---|---|---|---|---|
| **Claims as per Nortel Books and Records** | | | | |
| 2001 | Nortel Networks Inc. | 1107 | Architel Systems Corp | (72,556) |
| 2001 | Nortel Networks Inc. | 2103 | Sonoma Systems | (725,588) |
| 2001 | Nortel Networks Inc. | 2106 | Nortel AMS Inc. | (93,032) |
| 2001 | Nortel Networks Inc. | 2113 | Nortel HPOCS Inc. | (813,713) |
| 2001 | Nortel Networks Inc. | 2114 | Architel Systems (U.S.) C | (4,890,419) |
| 2001 | Nortel Networks Inc. | 2117 | Northern Telecom Int Inc. | (9,226) |
| 2001 | Nortel Networks Inc. | 2121 | Nortel Networks Cable Solutions Inc | (640) |
| 2001 | Nortel Networks Inc. | 6211 | Nortel Southeast Asia | - |
| 2001 | Nortel Networks Inc. | 6221 | Nortel Technology Thailand | - |
| 2001 | Nortel Networks Inc. | 3110 | Nortel Industria e Comerc | - |
| 2001 | Nortel Networks Inc. | 3140 | Nortel Networks Colombia | - |
| 2002 | Nortel Networks (CALA) Inc | 1002 | Nortel Networks Limited | (42,983,670) |
| 2002 | Nortel Networks (CALA) Inc | 2001 | Nortel Networks Inc. | (161,910,186) |
| 2002 | Nortel Networks (CALA) Inc | 2107 | Alteon WebSystems, Inc. | (2,700,910) |
| 2002 | Nortel Networks (CALA) Inc | 3140 | Nortel Networks Colombia | - |
| 2101 | Alteon Websystems Int Inc | 2107 | Alteon WebSystems, Inc. | (30,267,270) |
| 2102 | XROS Inc. | 2001 | Nortel Networks Inc. | (44,655,372) |
| 2104 | QTERA Corp | 2001 | Nortel Networks Inc. | (179,966,010) |
| 2106 | CoreTek Inc. | 2001 | Nortel Networks Inc. | (81,325,779) |
| 2107 | Alteon WebSystems, Inc. | 2001 | Nortel Networks Inc. | (6,075,811) |
| 2108 | Nortel Optical Comp Inc. | 2001 | Nortel Networks Inc. | (152,044) |
| 2115 | Nortel Int Inc. | 2001 | Nortel Networks Inc. | (63,972,239) |
| 2112 | Nortel Networks India Int | 1002 | Nortel Networks Limited | (17,695,763) |
| 2112 | Nortel Networks India Int | 2001 | Nortel Networks Inc. | (53,663,414) |
| **Settled Claims** | | | | |
| 2001 | Nortel Networks Inc. | 2110 | Nortel Capital Corp | (164,371,385) |
| 2001 | Nortel Networks Inc. | 3171 | Nortel de Mexico | (4,658,948) |
| 2001 | Nortel Networks Inc. | 6140 | Nortel Korea Ltd | (2,166,853) |
| 2002 | Nortel Networks (CALA) Inc | 3170 | Nortel Networks de Mexico S.A. | (563,142) |
| 2002 | Nortel Networks (CALA) Inc | 3171 | Nortel de México | (3,045,862) |
| 2002 | Nortel Networks (CALA) Inc | 6111 | Nortel (India) Pvt. Ltd. | (187,634) |
| 2002 | Nortel Networks (CALA) Inc | 7100 | Nortel Networks (Asia) Limited | (7,694) |
| 2107 | Alteon WebSystems, Inc. | 3171 | Nortel de México | (5,164) |
| 2115 | Nortel Int Inc. | 3171 | Nortel de México | (836) |
| 2115 | Nortel Int Inc. | 6111 | Nortel (India) Pvt. Ltd. | (17,184) |

Canadian Debtors Pre-filing Intercompany Obligations as at January 14, 2009
Excludes claims filed by the Nortel Joint Ventures (NJMT and NETAS)
The schedules below excludes net intercompany receivables vis-à-vis non-filed entities; however this is not a reflection on the validity and the collectibility of such amounts
All amounts in USD

| Legal company code | Legal company name | Legal trading partner code | Legal trading partner name | Grand Total |
|---|---|---|---|---|
| **Claims as per Nortel Books and Records** | | | | |
| 1107 | Archtelm Systems Corp | 2134 | Archtelm Systems (U.S.) C | (1,912,993) |
| **Settled Claims** | | | | |
| 1802 | Nortel Networks Limited | 2001 | Nortel Networks Inc. | (7,002,700,000) |
| 1802 | Nortel Networks Limited¹ | 4360 | Nortel Networks UK Limited | (127,655,094) |
| 1802 | Nortel Networks Limited | 4720 | Nortel Networks S.p.A. | (12,541,946) |
| 1802 | Nortel Networks Limited | 7120 | Nortel (China) Ltd | (104,216,075) |
| 1802 | Nortel Networks Limited | 6210 | Nortel Networks Singapore Pte | (93,187,570) |
| 1101 | Nortel Technology Corp | 6210 | Nortel Networks Singapore Pte | (8,212) |
| 1101 | Nortel Technology Corp | 3171 | Nortel de México | (276,176) |
| 1101 | Nortel Technology Corp | 7100 | Nortel Networks (Asia) Limited | (176,913) |
| 1101 | Nortel Technology Corp | 6160 | Nortel Malaysia Sdn. Bhd. | (3,222) |
| 1102 | Nortel Intl Corp | 7120 | Nortel (China) Ltd | (734,297) |
| 1102 | Nortel Intl Corp | 6100 | Nortel Networks Australia Pty | (1,460) |
| 1001 | Nortel Networks Corporation | 3171 | Nortel de México | (59) |

1. Balance includes USD 294 subject to satisfaction of paragraph 2.2 of the Agreement Settling EMEA, Canadian Claims and Related Claims

EMEA Debtors and NNSA Pre-filing Intercompany Obligations as at January 14, 2009.
The schedule below excludes any balances between the EMEA Debtors and/or NNSA and/or the
EMEA Non-Filed Entities; however this is not a reflection on the validity and the collectibility of such amounts
All amounts in USD

| Legal Company Code | Legal Company name | Legal trading partner code | Legal trading partner name | Grand Total |
|---|---|---|---|---|
| **Claim as per Nortel Books and Records** | | | | |
| 4100 | Nortel Networks (Austria) GmbH | 3171 | Nortel de México, S. de R.L. de C.V. | (3,821) |
| 4110 | Nortel Networks N.V. | 6111 | Nortel Networks (India) Private Limited | (5,030) |
| 4130 | Nortel Networks, s.r.o. | 3171 | Nortel de México, S. de R.L. de C.V. | (3,015) |
| 4160 | Nortel Networks S.A. | 3140 | Nortel Networks de Colombia S.A. | (17,220) |
| 4160 | Nortel Networks S.A. | 3150 | Nortel Comunicaciones de Colombia S.A. en Liquidación | (22,276) |
| 4160 | Nortel Networks S.A. | 3160 | Nortel Networks de Guatemala Ltda. | (144,402) |
| 4160 | Nortel Networks S.A. | 3170 | Nortel Networks de México, S.A. de C.V. | (2,461) |
| 4160 | Nortel Networks S.A. | 6100 | Nortel Networks Australia Pty. Limited | (2,411) |
| 4160 | Nortel Networks S.A. | 6160 | Nortel Networks Malaysia Sdn. Bhd. | (2,537) |
| 4160 | Nortel Networks S.A. | 6220 | Nortel Networks (Thailand) Limited | (29,046) |
| 4160 | Nortel Networks S.A. | 6231 | Nortel Vietnam Limited | (4,862) |
| 4160 | Nortel Networks S.A. | 7100 | Nortel Networks (Asia) Limited | (269,892) |
| 4160 | Nortel Networks S.A. | 7124 | Guandong Nortel Telecommunications Company Limited | (1,452,851) |
| 4162 | Nortel Networks France S.A.S | 3171 | Nortel de México, S. de R.L. de C.V. | (3,316) |
| 4162 | Nortel Networks France S.A.S | 6111 | Nortel Networks (India) Private Limited | (295) |
| 4162 | Nortel Networks France S.A.S | 7110 | Nortel Networks (Asia) Limited - Taiwan Branch | (22,456) |
| 4180 | Nortel GmbH (formerly 4180 Nortel Network Germany GmbH & Co KG) | 3171 | Nortel de México, S. de R.L. de C.V. | (22,481) |
| 4200 | Nortel Networks Engineering Service Kft. | 3171 | Nortel de México, S. de R.L. de C.V. | (4,478) |
| 4210 | Nortel Networks (Ireland) Limited | 3171 | Nortel de México, S. de R.L. de C.V. | (4,356) |
| 4210 | Nortel Networks (Ireland) Limited | 6100 | Nortel Networks Australia Pty. Limited | (171) |
| 4210 | Nortel Networks (Ireland) Limited | 6111 | Nortel Networks (India) Private Limited | (342) |
| 4210 | Nortel Networks (Ireland) Limited | 6120 | PT Nortel Networks Indonesia | (79) |
| 4210 | Nortel Networks (Ireland) Limited | 7110 | Nortel Networks (Asia) Limited - Taiwan Branch | (19,649) |
| 4220 | Nortel Networks S.p.A. | 7110 | Nortel Networks (Asia) Limited - Taiwan Branch | (5,145) |
| 4260 | Nortel Networks Polska Sp. z o.o. | 3171 | Nortel de México, S. de R.L. de C.V. | (1,823) |
| 4270 | Nortel Networks Portugal S.A. | 3110 | Nortel Networks Telecommunicacoes Industria e Comercio Ltda. | (121,067) |
| 4270 | Nortel Networks Portugal S.A. | 3171 | Nortel de México, S. de R.L. de C.V. | (3,130) |
| 4280 | Nortel Networks Romania SRL | 3171 | Nortel de México, S. de R.L. de C.V. | (553) |
| 4310 | Nortel Networks Hispania, S.A. | 6190 | Nortel Networks (Asia) Limited - Pakistan Branch | (1,294) |
| 4310 | Nortel Networks Hispania, S.A. | 7100 | Nortel Networks (Asia) Limited | (843) |
| 4360 | Nortel Networks UK Limited | 1107 | Architel Systems Corporation | (1,476,649) |
| 4360 | Nortel Networks UK Limited | 3171 | Nortel de México, S. de R.L. de C.V. | (54,166) |
| 4360 | Nortel Networks UK Limited | 4321 | Alteon WebSystems AB | 228,145 1 |
| 4360 | Nortel Networks UK Limited | 6100 | Nortel Networks Australia Pty. Limited | (354,945) |
| 4360 | Nortel Networks UK Limited | 6130 | Nortel Networks Kabushiki Kaisha | 81,375 2 |
| 4360 | Nortel Networks UK Limited | 6140 | Nortel Networks Korea Limited | (32,751) |
| 4360 | Nortel Networks UK Limited | 6160 | Nortel Networks Malaysia Sdn. Bhd. | (86,374) |
| 4360 | Nortel Networks UK Limited | 7120 | Nortel Networks (China) Limited | (190,653) |
| 4360 | Nortel Networks UK Limited | 7124 | Guandong Nortel Telecommunications Company Limited | (4,966) |
| 4360 | Nortel Networks UK Limited | 7125 | Nortel Networks Communications Engineering Limited | (1,312) |

1. Subsequent to the liquidation of Alteon WebSystems AB, the balance of $228,195 is due to Nortel Altsystems Inc.
2. Subsequent to the liquidation of Nortel Networks Kabushiki Kaisha, the balance of $81,375 is due to Nortel Networks Inc.

# **EXHIBIT B**

## **Plan Administration Agreement**

PLAN ADMINISTRATION AGREEMENT

This PLAN ADMINISTRATION AGREEMENT (this "Agreement") is made this [●] day of [●], 2021, by and among Owl Hill Advisory LLC ("Owl Hill") and Nortel Networks India International Inc. ("NNIII").

WITNESSETH:

WHEREAS, on January 14, 2009, Nortel Networks Inc. ("NNI") and certain of its subsidiaries and affiliates filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, and on July 14, 2009, Nortel Networks (CALA) Inc., a direct subsidiary of NNI, filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code; and

WHEREAS on July 26, 2016, NNIII filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case"), which case was consolidated and jointly administered with the Former Debtors' chapter 11 cases for procedural purposes; and

WHEREAS, by the order, dated January 24, 2017, the United States Bankruptcy Court for the District of Delaware confirmed the First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain of its Affiliated Debtors, dated January 23, 2017 (as amended and together with the Plan Supplement and all the schedules and exhibits thereto, the "NNI Plan") pursuant to chapter 11 of the Bankruptcy Code; and

WHEREAS, by the order, dated [●], 2021, the United States Bankruptcy Court for the District of Delaware confirmed the Chapter 11 Plan of Nortel Networks India International Inc., dated [●], 2021 (as amended and together with all the schedules and exhibits thereto, the "Plan") pursuant to chapter 11 of the Bankruptcy Code; and

WHEREAS, in accordance with Section 6.2 of the Plan, certain duties and responsibilities shall be borne by the Plan Administrator; and

WHEREAS, effective upon the Effective Date, NNIII and Wind-Down NNIII desire to appoint Owl Hill to serve as the Plan Administrator under the Plan, and Owl Hill is willing to serve in such capacity, in each case upon the terms and conditions set forth herein; and

NOW, THEREFORE, in consideration of the foregoing and the covenants and agreements set forth herein, the parties hereto agree as follows:

1.    Definitions.  Capitalized terms used herein without definition shall have the respective meanings assigned to such terms in the Plan.

2.    Appointment and Acceptance. NNIII and Wind-Down NNIII hereby appoint Owl Hill to serve as the Plan Administrator under the Plan, and Owl Hill hereby accepts such appointment and agrees to serve in such capacity, in each case effective upon the Effective Date of the Plan (which shall be the effective date of this Agreement).  On the Effective Date, compliance with the provisions of the Plan shall become the general responsibility of the Plan Administrator pursuant to and in accordance with the provisions of the Plan and this Agreement.

2

3.    <u>Obligations of the Plan Administrator</u>.  Subject to the provisions of Article 6 of the Plan as provided herein, the Plan Administrator shall have the following obligations:

(a)    <u>General</u>.  The Plan Administrator shall comply with, and shall cause NNIII and Wind-Down NNIII to comply with, the Plan and the Confirmation Order in connection with the performance of his or her duties hereunder and under the Plan.

(b)    <u>Reserves</u>.  The Plan Administrator shall cause NNIII to establish and maintain (i) such reserves as the Plan Administrator deems necessary to provide sufficient Cash to liquidate and wind down NNIII's Estate and (ii) such reserves as the Plan Administrator deems necessary for contingent liabilities, if any, in each case in accordance with the provisions of the Plan.

(c)    <u>Distributions</u>.  The Plan Administrator shall cause the Disbursing Agent (which may be the Plan Administrator itself) to make distributions on account of Allowed Claims, other remaining assets and appropriate fees and expenses in accordance with and subject to the terms of the Plan.

(d)    <u>Liquidation of Assets</u>.  In accordance with the Plan, the Plan Administrator shall exercise its reasonable business judgment to manage, liquidate or otherwise dispose of any remaining assets of NNIII or Wind-Down NNIII under the Plan and in accordance with applicable law.

(e)    <u>Accounts</u>.  The Plan Administrator shall maintain or establish one or more accounts for NNIII into which the Plan Administrator shall deposit all Cash not required or permitted to be deposited into any other account, reserve or escrow.

(f)    <u>Books and Records</u>.  The Plan Administrator shall oversee the maintenance of appropriate books, records and accounts for NNIII and Wind-Down NNIII to effectuate the Plan.

(g)    <u>Tax Returns</u>.  The Plan Administrator shall administer the tax obligations of NNIII or Wind-Down NNIII, including filing tax returns, paying tax obligations and representing the interest and account of NNIII or its Estate or Wind-Down NNIII before any taxing authority in all matters, including, without limitation, any action, suit, proceeding or audit.

(h)    <u>Filings</u>.  The Plan Administrator shall prepare and file any and all informational returns, reports, statements, returns or disclosures relating to NNIII or Wind-Down NNIII that are required hereunder, by any Governmental Unit or applicable law, including, without limitation, to close the Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

(i)    <u>Reports</u>.  Unless otherwise ordered by the Bankruptcy Court, the Plan Administrator shall be responsible for preparing, filing and serving (if applicable) all reports required by the Plan, this Agreement or applicable law, pursuant to Section 6.2(g) of the Plan.

(j)    <u>Fees</u>.  The Plan Administrator shall be obligated to pay from NNIII's or Wind-Down NNIII's assets, as applicable, fees incurred pursuant to 28 U.S.C. § 1930(a)(6) from

3

NNIII's Estate's assets until such time as a final decree is entered closing the Chapter 11 Case or the Bankruptcy Court orders otherwise.

(k)     No Other Duties.  Other than the obligations of the Plan Administrator enumerated herein or under the Plan, the Plan Administrator shall have no duties or obligations of any kind or nature respecting implementation of the Plan or this Agreement.

4.     Powers and Rights of the Plan Administrator.

(a)     General.  The Plan Administrator shall retain and have all the rights, powers and duties enumerated hereunder and under the Plan and otherwise necessary to carry out his or her responsibilities hereunder and under the Plan.

(b)     Resolution of Disputed Claims.  The Plan Administrator shall have authority to (i) control and effectuate the Claims reconciliation process, including to allow, object to, seek to subordinate, compromise, enter into protocols for the resolution of, or settle any and all Claims against NNIII and (ii) administer the resolution of any and all relevant Claims against NNIII in accordance with the authority granted under the Plan as well as any claims protocols entered into by NNIII and approved by the Bankruptcy Court prior to the Effective Date, including, without limitation, the Bankruptcy Court's *Order Approving Debtors' Motion for an Order Establishing Procedures to Further the Resolution of Claims* [D.I.16551] (the "Omnibus Settlement Procedures Order") and the *Cross-Border Protocol Establishing Resolution of Claims* [D.I. 3922-2], to the extent such procedures remain applicable.

(c)     Prosecution and Settlement of Litigation Claims.  The Plan Administrator shall have the authority to (i) prosecute all Litigation Claims, including Avoidance Actions, on behalf of NNIII and Wind-Down NNIII, (ii) elect not to pursue any Litigation Claim and (iii) determine whether and when to compromise, settle, abandon, dismiss or otherwise dispose of any Litigation Claim, in each case as the Plan Administrator may determine is in the best interests of NNIII and Wind-Down NNIII.

(d)     Professionals.  The Plan Administrator shall have the authority to (i) utilize the services of Wind-Down NNIII's employees and independent contractors, (ii) employ, retain, utilize supervise and compensate professionals, including, without limitation, claims, disbursing and transfer agents, legal counsel, accountants, experts, independent contractors, employees, other advisors, professionals and Professionals appointed in the Chapter 11 Case, to assist him or her in performing his or her duties hereunder or under the Plan or otherwise represent the interests of and serve on behalf of NNIII and Wind-Down NNIII and (iii) cause Wind-Down NNIII to indemnify such professionals (including those Professionals previously retained during the Chapter 11 Case) from any loss (including reasonable attorneys' fees) incurred in connection with the execution and implementation of the Plan other than a loss due to the indemnified party's willful misconduct, gross negligence, breach of contract or fraud. For the avoidance of doubt, the Plan Administrator shall accede to, and control, all privileges of NNIII and Wind-Down NNIII, including, without limitation, the attorney-client privilege and any protection afforded attorney work product under applicable rules and law.

4

(e)     <u>Investment of Cash</u>.  The Plan Administrator shall have the authority to invest the Cash of NNIII or Wind-Down NNIII, including any Cash proceeds realized from the liquidation of any assets of NNIII or Wind-Down NNIII, including any Causes of Action, and any income earned thereon in (i) direct obligations on the United States of America or obligations of any agency or instrumentality thereof which are guaranteed by the full faith and credit of the United States of America, (ii) short term obligations of any agency or corporation which is or may hereafter be created by or pursuant to an act of the Congress of the United States as an agency or instrumentality thereof or (iii) any other investments that may be permissible under (x) section 345 of the Bankruptcy Code or (y) any order of the Bankruptcy Court entered in the Chapter 11 Case.

(f)     <u>Fees</u>.  The Plan Administrator shall have the authority to incur and pay reasonable and necessary expenses in connection with the performance of duties under the Plan, including the reasonable fees and expenses of professionals retained by the Plan Administrator.

(g)     <u>Insurance</u>.  The Plan Administrator shall have the authority to purchase or create and carry all insurance policies and pay all insurance premiums and costs the Plan Administrator deems necessary, including all insurance coverage reasonably necessary for himself or herself, his or her employees or contractors and any agents or professionals hired or retained by him or her and Wind-Down NNIII.  The Plan Administrator is authorized to retain and renew any and all insurance policies of NNIII providing coverage with respect to any claims.

(h)     <u>Management of Wind-Down NNIII</u>.  In accordance with Section 8.3 of the Plan, the Plan Administrator shall have the authority to appoint the board of directors of Wind-Down NNIII.

(i)     <u>Corporate Existence</u>.  In accordance with Section 8.4 of the Plan, the Plan Administrator shall have the authority to (i) make any filings he or she deems necessary to memorialize the dissolution of NNIII and Wind-Down NNIII under the Plan and (ii) maintain or dissolve Wind-Down NNIII.

(j)     <u>Disposition of Assets</u>. The Plan Administrator shall have the authority to sell or otherwise dispose of, and liquidate, convert into Cash or abandon, any non-Cash assets of Wind-Down NNIII, if any, in a manner compatible with the best interests of the holders of Allowed Claims.  All assets of NNIII or Wind-Down NNIII shall be used and held by the Plan Administrator solely for the purposes contemplated by the Plan, the Confirmation Order and this Agreement.

(k)     <u>Reports</u>. The Plan Administrator shall have the authority to prepare and file any informational returns, reports, statements, returns or disclosures relating to NNIII and Wind-Down NNIII that are required by any Governmental Unit or applicable law; and

(l)     <u>Additional Powers</u>.  The Plan Administrator shall have the authority to exercise all powers and rights, and take all actions contemplated by or provided for in this Agreement, the Plan and the Confirmation Order, including, but not limited to, Section 6.2 of the Plan, and to take any and all other actions necessary or appropriate to implement or consummate this Agreement and the Plan.

5.    <u>Compensation and Reimbursement</u>.  The Plan Administrator shall be entitled to receive the following fair and reasonable compensation for his or her services in accordance with his or her prevailing rates:

(a)    <u>Compensation</u>.

|  | Per Hour |
|---|---|
| Senior Managing Director | $1,325 |
| Managing Director | $800 - $950 |
| Senior Director | $700 - $750 |
| Director | $650 - $700 |
| Associate | $450 - $590 |

(b)    <u>Computation of Hours; Recordkeeping</u>.  The Plan Administrator shall maintain a record of Owl Hill's time expended in fulfilling the duties of the Plan Administrator hereunder and under the Plan that shall include a brief description of such activities.

(c)    <u>Reimbursement of Expenses</u>. The Plan Administrator shall be entitled to reimbursement of reasonable expenses incurred in fulfilling the duties of the Plan Administrator hereunder and under the Plan, and shall submit a report of said expenses with each report under Section 2 above.

6.    <u>Exculpation; Indemnification</u>.  Subject to the applicable provisions of the Plan, the Plan Administrator shall have no liability whatsoever for any acts or omissions to NNIII or Wind-Down NNIII or to Holders of Claims against or Interests in NNIII or Wind-Down NNIII other than for willful misconduct, fraud or breach of fiduciary duty by the Plan Administrator as determined by a Final Order, *provided, that*, the Plan Administrator shall have no liability for such acts or omissions if approved by the Bankruptcy Court.  Each of NNIII and Wind-Down NNIII shall indemnify and hold harmless the Plan Administrator for any losses, liabilities and costs incurred in such capacity to the fullest extent allowed by Delaware law.

7.    <u>Termination of Engagement</u>.  The engagement of the Plan Administrator hereunder shall terminate on the earlier of (a) the Removal (as defined below) of the Plan Administrator by Bankruptcy Court for Cause (as defined below) or the effectiveness of his or her Resignation (as defined below) pursuant to Section 8 hereof and (b) the date the order granting the final decree closing, or dismissing, the Chapter 11 Case becomes a Final Order.

8.    <u>Resignation and Removal</u>.

(a)    <u>Resignation</u>. The Plan Administrator may resign as Plan Administrator hereunder upon delivery of sixty (60) days written notice to the Bankruptcy Court. However, if a successor Plan Administrator has not been appointed by the end of such sixty (60) day period, the current Plan Administrator shall continue as Plan Administrator pursuant to the terms specified herein until such time as a successor is appointed by the Bankruptcy Court.

(b)    <u>Removal</u>. The Plan Administrator may be removed with Cause by the Bankruptcy Court.  For the purposes of this Agreement, "<u>Cause</u>" shall be defined as: (i) the Plan

6

Administrator's theft or embezzlement or attempted theft or embezzlement of money or tangible or intangible Assets or property, (ii) the Plan Administrator's violation of any law (whether foreign or domestic) that results in a felony indictment or similar judicial proceeding or (iii) the Plan Administrator's willful misconduct or fraud in the performance of his or her duties.

(c)     <u>Simultaneous Removal and Resignation</u>. To the extent that the Plan Administrator is removed pursuant to the terms specified in Section 8(b) above (a "<u>Removal</u>") or the Plan Administrator resigns pursuant to the terms specified in Section 8(a) above (a "<u>Resignation</u>"), and such Plan Administrator is then serving in any other capacity for or on behalf of Wind-Down NNIII or is serving as Disbursing Agent or as trustee of any trust formed pursuant to the Plan (service by the Plan Administrator in each such additional capacity, a "<u>Position</u>" and collectively, the "<u>Positions</u>"), the Plan Administrator shall be deemed to be terminated (for all purposes and without any further action) from each of his or her other Positions upon his or her Removal or Resignation; *provided*, that the indemnification and exculpation provided in Section 6 herein and any insurance coverage provided to the Plan Administrator at the time of the Resignation and Removal shall continue in full force and effect.

(d)     <u>Appointment of Successor Plan Administrator</u>.  The Plan Administrator shall have the authority to name a successor Plan Administrator, subject to Bankruptcy Court approval.  If the Plan Administrator is unable to make such an appointment, counsel to NNIII or Wind-Down NNIII, as applicable, may appoint a successor Plan Administrator, subject to Bankruptcy Court approval.  Any order of the Bankruptcy Court approving any such appointment shall specify and establish the date on which such appointment shall be effective. Every successor Plan Administrator, without any further act, deed, conveyance or Bankruptcy Court order, shall become vested with all rights, powers, trusts and duties of the retiring Plan Administrator hereunder and under the Plan; *provided*, *however*, that no Plan Administrator shall be liable for the acts or omissions of any prior or subsequent Plan Administrator.

(e)     <u>Continuity</u>. Unless otherwise ordered by the Bankruptcy Court, the termination of the Plan Administrator's engagement hereunder or the Resignation of the Plan Administrator shall not operate to invalidate any action theretofore taken by the Plan Administrator.  Moreover, in any such event, the Plan Administrator shall (i) execute and deliver by the effective date of such Removal or Resignation such documents, instruments and other writings as may be reasonably requested by the Bankruptcy Court to effect the Removal or Resignation of the Plan Administrator and the termination of his or her capacities under this Agreement and (ii) assist and cooperate in effecting the assumption of such Plan Administrator's obligations and functions by a successor Plan Administrator.

9.     <u>Notices</u>. Any notices or other communications required or permitted hereunder shall be sufficiently given if in writing and personally delivered or sent by registered or certified mail, postage prepaid, return receipt requested, or sent by facsimile, addressed as follows or to such other address as any party shall have given notice of pursuant hereto:

In the case of the Plan Administrator: Owl Hill Advisory LLC

c/o Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
(212) 225-3999 (facsimile)
Attn:   Lisa M. Schweitzer, Esq.

with a copy to

Morris, Nichols, Arsht & Tunnell, LLP
1201 North Market Street
Wilmington, Delaware 19801
(302) 658-3989 (facsimile)
Attn:   Derek C. Abbot, Esq.

10.     <u>Assignment</u>.  Neither this Agreement nor any of the rights, duties or obligations of any of the parties hereto may be assigned without the prior written consent of the other parties hereto.

11.     <u>Governing Law; Jurisdiction</u>.  This Agreement shall be governed and construed in accordance with the laws of the State of Delaware, without giving effect to rules governing the conflict of laws. Without limiting any Person or Entity's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to interpret and enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder or the transactions contemplated hereby and (ii) any and all actions related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the exclusive jurisdiction and venue of the Bankruptcy Court.  If for any reason the Bankruptcy Court does not or cannot exercise such jurisdiction, then the parties hereby consent to and submit to the jurisdiction and venue of the state and federal courts located in the State of Delaware.

12.     <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall be an original, and which together shall constitute a single instrument.

13.     <u>Relationship to the Plan</u>. The principal purpose of this Agreement is to aid in the implementation of the Plan and, therefore, this Agreement incorporates and is subject to the provisions of the Plan and Confirmation Order.  To that end, the Plan Administrator shall have full power and authority to take any action consistent with the purposes and provisions of the Plan and Confirmation Order.  In the event that the provisions of this Agreement are found to be inconsistent with the provisions of the Plan or Confirmation Order, the provisions of the Confirmation Order and Plan, in that order, shall control; *provided*, *however*, that provisions of this Agreement adopted by amendment and approved by the Bankruptcy Court following substantial consummation (as such term is used in section 1127(b) of the Bankruptcy Code) shall control over provisions of the Plan.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**Nortel Networks India International Inc.**

By: _____
    Name:
    Title:

**Owl Hill Advisory LLC**

By: _____
    Title:  Plan Administrator

# **EXHIBIT C**

## **List of Directors and Officers of Wind-Down NNIII**

## List of Directors and Officers of Wind-Down NNIII[1]

| Director and Officer | Position | Experience |
|---|---|---|
| John J. Ray, III | Director; President | Mr. John J. Ray, III has served as the Principal Officer for NNIII since August 2016.  In this capacity, Mr. Ray has the principal responsibility for overseeing and directing the restructuring and wind down of NNIII's estate.  Mr. Ray is also Senior Managing Director of Owl Hill Advisory LLC, a provider of restructuring and interim management services.  Mr. Ray has served in various capacities with respect to Chapter 11 bankruptcy estates.  From 2019 to date, Mr. Ray has served on the Board of Ditech Holding Corporation.  From 2015 to date, Mr. Ray has served as Liquidating Trust Manager for Res Cap Liquidating Trust.  From 2012 to 2014, Mr. Ray served as Chief Restructuring Officer of Overseas Shipping Group and from 2014 to 2015, Chairman of the Board of Overseas Shipping Group.  From 2014 to 2016, Mr. Ray served as the Chairman of the Restructuring Committee of the Board of GT Technologies. From 2004 to 2009, Mr. Ray was Chairman of the post confirmation Board of Enron Corporation and, from 2005 to 2009, President of post confirmation Enron Corporation.  He received a B.A. from the University of Massachusetts and a J.D. from Drake University Law School. |
| Mary Cilia | Treasurer | Ms. Mary Cilia has served NNIII since January 2012, primarily in the claims administration and management role.  Ms. Cilia has over 28 years of experience providing expertise in mergers, acquisitions and divestitures and bankruptcies with focus in the areas of claims management and resolution, avoidance actions, creditor distributions, asset recoveries and financial reporting.  Ms. Cilia has served in similar roles for public and private companies, including Overseas Shipholding Group, Inc. and AbitibiBowater.   Previously, Ms. Cilia was responsible for claims and wind down activities at Enron Creditors Recovery Corp. and served as a senior manager at Arthur Andersen LLP, with extensive experience in conducting audits, initial and secondary public offerings, acquisitions and divestitures and related due diligence.  Ms. Cilia earned her bachelor of business administration degree in accounting from the University of Houston and is a certified public accountant in the State of Texas. |
| Kathryn Schultea | Vice President & Secretary | Ms. Kathryn Schultea has supported NNIII since July 2010, focusing on operations, human resources, facility wind down, document and data retention and claims management.  Ms. Schultea has over 20 years of experience providing leadership and expertise in bankruptcies, restructuring, divestitures, office closings, outsourcing efforts and downsizing initiatives.  Reporting directly to the Board of Directors, Ms. Schultea was chief administrative officer, assistant secretary and assistant treasurer of Enron Creditors Recovery Corp., assisting with the reorganization of Enron.  Ms. Schultea served in similar roles for Overseas Shipholding Group, Inc.  Ms. Schultea earned her bachelor of science in business administration from University of Phoenix. |

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the *Chapter 11 Plan of Nortel Networks India International Inc.*

# **EXHIBIT D**

## **Amended By-Laws and Organizational Documents of Wind-Down NNIII**

# RESTATED CERTIFICATE

## OF

## INCORPORATION

## OF

## NORTEL NETWORKS INDIA INTERNATIONAL INC.

Nortel Networks India International Inc., a corporation organized and existing under the laws of the State of Delaware (the "Corporation"), hereby certifies as follows:

A.  The name of the Corporation is Nortel Networks India International Inc.  The Corporation's original Certificate of Incorporation was filed with the Secretary of State of the State of Delaware on June 7, 2002 under the name Nortel Networks RIHC, Inc. (such original Certificate of Incorporation, as amended, the "Original Certificate of Incorporation").

B.  This Restated Certificate of Incorporation has been approved in accordance with Sections 245 and 303 of the Delaware General Corporation Law in furtherance of that certain order of the United States Bankruptcy Court for the District of Delaware dated [•], 2021 (the "Order") confirming the  Chapter 11 Plan of Nortel Networks India International Inc. approved by the Bankruptcy Court and dated as of [•], 2021 (as amended, restated or superseded from time to time, the "Plan")[1] and this Restated Certificate of Incorporation is required by the Order.

C.  The Original Certificate of Incorporation is hereby amended and restated to read in its entirety as set forth below:

**FIRST:**  The name of the Corporation is Nortel Networks India International Inc.

**SECOND:**  The address of the Corporation's registered office in the State of Delaware is at 1209 Orange Street, City of Wilmington, County of New Castle, Delaware 19801.  The name of the Corporation's registered agent at such address is The Corporation Trust Company.

**THIRD:** The nature of the business of the Corporation and the objects and purposes proposed to be transacted and carried on by it are the monetization, liquidation and distribution of the Corporation's assets in accordance with the Plan, and any lawful act or activity for which corporations may be organized under the Delaware General Corporation Law.

**FOURTH:** The total number of shares of stock which the Corporation is authorized to issue is 1,000 shares without par value.

---

[1]  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan.

Notwithstanding anything to the contrary herein, the Corporation shall in no event issue any non-voting equity securities in violation of chapter 11 of title 11 of the United States Code; provided, however, that the foregoing prohibition (i) will have no further force and effect beyond that required under Section 1123(a)(6) of the Bankruptcy Code, (ii) will have such force and effect, if any, only for so long as such Section 1123(a)(6) of the Bankruptcy Code is in effect and (iii) may be amended or eliminated in accordance with applicable law. The prohibition on the issuance of non-voting equity securities is included in this Restated Certificate of Incorporation in compliance with Section 1123(a)(6) of the Bankruptcy Code (11 U.S.C. § 1123(a)(6)).

**FIFTH:** The sole director of the Corporation (the "Director") shall be the person appointed from time to time by the sole shareholder, who on the Effective Date shall be Nortel Networks Inc., or such other entity as established by Nortel Networks Inc. in its reasonable business judgment to be the new sole shareholder in accordance with the Plan.

To the fullest extent permitted by applicable law, the Director shall have the authority to exercise all of the corporate powers and to manage the business and affairs of the Corporation without requiring prior approval from the sole shareholder.  Without limiting the generality of the foregoing, in accordance with the requirements of the Plan and the terms of the plan administration agreement describing the powers, duties and rights of the Plan Administrator, approved by the Bankruptcy Court and dated as of [•], 2021 (as amended, restated or superseded from time to time, the "Plan Administration Agreement"), the Director may, to the fullest extent permitted by applicable law, take and cause the Corporation to take any and all actions he or she deems appropriate in order to consummate the transactions contemplated in the Plan, including, without limitation, selling or otherwise disposing of all assets of the Corporation and winding down the affairs of the Corporation without the affirmative vote of the sole shareholder.  To the fullest extent permitted by applicable law, the Director may take and cause the Corporation to take any and all corporate actions without the affirmative vote of the sole shareholder, including to compromise and settle claims and causes of action of or against the Corporation and its estate, and to dissolve, merge or consolidate the Corporation with any other entity.

**SIXTH:**  In furtherance and not in limitation of the powers conferred by the laws of the State of Delaware, the Director is expressly authorized to make, amend and repeal the by-laws.

**SEVENTH:** A director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the Delaware General Corporation Law or (iv) for any transaction from which the director derived an improper personal benefit.  If the Delaware General Corporation Law is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the Delaware General Corporation Law, as so amended.  Any repeal or modification of this provision shall not adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or modification.

**EIGHTH:** The Corporation reserves the right to amend and repeal any provision contained in this Restated Certificate of Incorporation in the manner from time to time prescribed

by the laws of the State of Delaware.  All rights herein conferred are granted subject to this reservation.

[*The remainder of this page is intentionally left blank. Signature follows.*]

IN WITNESS WHEREOF, this Restated Certificate of Incorporation has been executed by its duly authorized officer this [•] day of [•], 2021.

NORTEL NETWORKS INDIA
INTERNATIONAL INC.

By: _____

    Name: John J. Ray, III

    Title: President

# NORTEL NETWORKS INDIA INTERNATIONAL INC.

# BYLAWS

## ARTICLE I - DIRECTOR

Section 1.        Number.

The sole director of the Corporation (the "Director") shall be the person appointed from time to time by the sole shareholder, who on the Effective Date shall be Nortel Networks Inc., or such other entity as established by Nortel Networks Inc. in its reasonable business judgment to be the new sole shareholder in accordance with the Chapter 11 Plan of Nortel Networks India International Inc. approved by the Bankruptcy Court and dated as of [•], 2021 (as amended, restated or superseded from time to time, the "Plan").

Section 2.        Powers of the Director.

To the fullest extent permitted by applicable law, the Director shall have the authority to exercise all of the corporate powers and to manage the business and affairs of the Corporation without requiring prior approval from the sole shareholder.  Without limiting the generality of the foregoing, in accordance with the requirements of the Plan and the terms of the plan administration agreement describing the powers, duties and rights of the Plan Administrator, approved by the Bankruptcy Court and dated as of [•], 2021 (as amended, restated or superseded from time to time, the "Plan Administration Agreement"), the Director may, to the fullest extent permitted by applicable law, take and cause the Corporation to take any and all actions he or she deems appropriate in order to consummate the transactions contemplated in the Plan, including, without limitation, selling or otherwise disposing of all assets of the Corporation and winding down the affairs of the Corporation without the affirmative vote of the sole shareholder.  To the fullest extent permitted by applicable law, the Director may take and cause the Corporation to take any and all corporate actions without the affirmative vote of the sole shareholder, including to compromise and settle claims and causes of action of or against the Corporation and its estate, and to dissolve, merge or consolidate the Corporation with any other entity.

Section 3.        Vacancies.

Any vacancy of the Director may be filled by the sole shareholder, who on the Effective Date shall be Nortel Networks Inc.

Section 4        Compensation of Directors.

The Director may receive, pursuant to a resolution of the board of directors of the Corporation, fixed fees and other compensation for his or her services as director.

## ARTICLE II - OFFICERS

Section 1.      Designation.

The officers of the Corporation shall consist of a President, one or more Vice Presidents, a Secretary and a Treasurer and such other officers as may from time to time be appointed by the Director.  Any number of offices may be held by the same person.

Section 2.      Appointment.    The Director may appoint all officers of the Corporation for whatever terms of office the Director deems appropriate or necessary.

Section 3.      Delegation of Authority.

The Director may from time to time delegate the powers or duties of any officer to any other officers or agents, notwithstanding any provision hereof.

Section 4.      Removal and Resignation.

Any officer of the Corporation may be removed at any time, with or without cause, by the Director.

Any officer may resign at any time by giving written notice to the Director.  Any such resignation shall take effect at the date of the receipt of such notice or at any later time specified therein, and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

Section 5.      Action with Respect to Securities of Other Entities.

Unless otherwise directed by the Director, the President or any officer of the Corporation authorized by the President shall have power to vote and otherwise act on behalf of the Corporation, in person or by proxy, at any meeting of holders of equity interests in any other entity, or with respect to any action of holders of equity interests in any other entity, in which this Corporation may hold securities and otherwise to exercise any and all rights and powers which this Corporation may possess by reason of its ownership of securities in such other entity.

## ARTICLE III - STOCK

Section 1.      Certificates of Stock.

Each holder of stock represented by certificates shall be entitled to a certificate signed by, or in the name of the Corporation by, the President or a Vice President and by the Secretary or an Assistant Secretary, or the Treasurer or an Assistant Treasurer, certifying the number of shares owned by him or her.  Any or all of the signatures on the certificate may be by facsimile.

## ARTICLE IV - MISCELLANEOUS

Section 1.    Facsimile Signatures.

In addition to the provisions for use of facsimile signatures elsewhere specifically authorized in these Bylaws, facsimile signatures of any officer or officers of the Corporation may be used whenever and as authorized by the Director.

Section 2.    Reliance upon Books, Reports and Records.

The Director and each officer of the Corporation shall, in the performance of his or her duties, be fully protected in relying in good faith upon the books of account or other records of the Corporation and upon such information, opinions, reports or statements presented to the Corporation by any of its officers or employees, or committees of the Board of Directors so designated, or by any other person as to matters which such director or committee member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Corporation.

Section 3.    Fiscal Year.

The fiscal year of the Corporation shall be as fixed by the Director.

Section 4.    Time Periods.

In applying any provision of these Bylaws which requires that an act be done or not be done a specified number of days prior to an event or that an act be done during a period of a specified number of days prior to an event, calendar days shall be used, the day of the doing of the act shall be excluded and the day of the event shall be included.

## ARTICLE V - INDEMNIFICATION OF DIRECTORS AND OFFICERS

Section 1.    Right to Indemnification.

Each person who was or is made a party or is threatened to be made a party to or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), by reason of the fact that he or she is or was a director or an officer of the Corporation or is or was serving at the request of the Corporation as a director, officer or trustee of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to an employee benefit plan (hereinafter an "indemnitee"), whether the basis of such proceeding is alleged action in an official capacity as a director, officer or trustee or in any other capacity while serving as a director, officer or trustee, shall be indemnified and held harmless by the Corporation to the fullest extent permitted by Delaware law, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than such law permitted the Corporation to provide prior to such amendment), against all expense, liability and loss (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid in settlement) reasonably incurred or suffered by such indemnitee in connection therewith; provided, however, that, except as provided in

- 3 -

Section 3 of this ARTICLE V with respect to proceedings to enforce rights to indemnification, the Corporation shall indemnify any such indemnitee in connection with a proceeding (or part thereof) initiated by such indemnitee only if such proceeding (or part thereof) was authorized by the Director of the Corporation.

Section 2.    Right to Advancement of Expenses.

In addition to the right to indemnification conferred in Section 1 of this ARTICLE V, an indemnitee shall also have the right to be paid by the Corporation the expenses (including attorney's fees) incurred in defending any such proceeding in advance of its final disposition (hereinafter an "advancement of expenses"); provided, however, that, if the Delaware General Corporation Law requires, an advancement of expenses incurred by an indemnitee in his or her capacity as a director or officer (and not in any other capacity in which service was or is rendered by such indemnitee, including, without limitation, service to an employee benefit plan) shall be made only upon delivery to the Corporation of an undertaking (hereinafter an "undertaking"), by or on behalf of such indemnitee, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal (hereinafter a "final adjudication") that such indemnitee is not entitled to be indemnified for such expenses under this Section 2 or otherwise.

Section 3.    Right of Indemnitee to Bring Suit.

If a claim under Section 1 or 2 of this ARTICLE V is not paid in full by the Corporation within 60 days after a written claim has been received by the Corporation, except in the case of a claim for an advancement of expenses, in which case the applicable period shall be 20 days, the indemnitee may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim.  To the fullest extent permitted by law, if successful in whole or in part in any such suit, or in a suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the indemnitee shall be entitled to be paid also the expense of prosecuting or defending such suit.  In (i) any suit brought by the indemnitee to enforce a right to indemnification hereunder (but not in a suit brought by the indemnitee to enforce a right to an advancement of expenses) it shall be a defense that, and (ii) in any suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the Corporation shall be entitled to recover such expenses upon a final adjudication that, the indemnitee has not met any applicable standard for indemnification set forth in the Delaware General Corporation Law.  Neither the failure of the Corporation (including its directors who are not parties to such action, a committee of such directors, independent legal counsel or its shareholders) to have made a determination prior to the commencement of such suit that indemnification of the indemnitee is proper in the circumstances because the indemnitee has met the applicable standard of conduct set forth in the Delaware General Corporation Law, nor an actual determination by the Corporation (including its directors who are not parties to such action, a committee of such directors, independent legal counsel or its shareholders) that the indemnitee has not met such applicable standard of conduct, shall create a presumption that the indemnitee has not met the applicable standard of conduct or, in the case of such a suit brought by the indemnitee, be a defense to such suit.  In any suit brought by the indemnitee to enforce a right to indemnification or to an advancement of expenses hereunder, or brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the

- 4 -

burden of proving that the indemnitee is not entitled to be indemnified, or to such advancement of expenses, under this ARTICLE V or otherwise shall be on the Corporation.

Section 4.        <u>Non-Exclusivity of Rights</u>.

The rights to indemnification and to the advancement of expenses conferred in this ARTICLE V shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, the Corporation's Certificate of Incorporation, Bylaws, agreement, vote of shareholders or disinterested directors or otherwise.

Section 5.        <u>Insurance</u>.

The Corporation may maintain insurance, at its expense, to protect itself and any director, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under the Delaware General Corporation Law.

Section 6.        <u>Indemnification of Employees and Agents of the Corporation</u>.

The Corporation may, to the extent authorized from time to time by the Director, grant rights to indemnification and to the advancement of expenses to any employee or agent of the Corporation to the fullest extent of the provisions of this Article with respect to the indemnification and advancement of expenses of directors and officers of the Corporation.

Section 7.        <u>Nature of Rights</u>.

The rights conferred upon indemnitees in this ARTICLE V shall be contract rights and such rights shall continue as to an indemnitee who has ceased to be a director, officer or trustee and shall inure to the benefit of the indemnitee's heirs, executors and administrators.  Any amendment, alteration or repeal of this ARTICLE V that adversely affects any right of an indemnitee or its successors shall be prospective only and shall not limit, eliminate or impair any such right with respect to any proceeding involving any occurrence or alleged occurrence of any action or omission to act that took place prior to such amendment, alteration or repeal.

<u>ARTICLE VI - AMENDMENTS</u>

These Bylaws may be amended or repealed by the Director at any meeting or by the shareholders at any meeting.