# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------------X
:

| | | |
|---|---|---|
| *In re* | : | Chapter 11 |
| | : | |
| Nortel Networks Inc., *et al.*,[1] | : | Case No. 09-10138 (CSS) |
| | : | |
| Wind-Down Debtors. | : | Jointly Administered |
| | : | |

-----------------------------------------------------------X
:

| | | |
|---|---|---|
| *In re* | : | Chapter 11 |
| | : | |
| Nortel Networks India International Inc. | : | Case No. 16-11714 (CSS) |
| | : | |
| Debtor-In-Possession. | : | Jointly Administered |
| | : | |

-----------------------------------------------------------X

## DISCLOSURE STATEMENT FOR THE CHAPTER 11 PLAN OF NORTEL NETWORKS INDIA INTERNATIONAL INC.[2]

**Lisa M. Schweitzer, Esq. (admitted *pro hac vice*)**
**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
**One Liberty Plaza**
**New York, NY 10006**

**Derek C. Abbott, Esq. (No. 3376)**
**Andrew R. Remming, Esq. (No. 5120)**
**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
**1201 North Market Street, 18th Floor**
**P.O. Box 1347**
**Wilmington, DE 19899**

*Attorneys for the Debtors and*
*Debtors-in-Possession*

Dated: August 26, 2021

---

[1]    The Wind-Down Debtors in these chapter 11 cases, along with the last four digits of each Wind-Down Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620) and Nortel Networks (CALA) Inc. (4226).  Contact information for the Former Debtors and their petitions are available at http://dm.epiq11.com/nortel.

[2]    This Disclosure Statement is only a disclosure statement for the Chapter 11 Plan for Nortel Networks India International, Inc.  The First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain of Its Affiliated Debtors [D.I. 17763] was confirmed on January 24, 2017 and went effective on May 8, 2017.

**THE DEADLINE TO VOTE ON THE PLAN (THE "VOTING DEADLINE") IS
SEPTEMBER 28, 2021 AT 4:00 P.M. (PREVAILING EASTERN TIME).**

**FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE
ACTUALLY RECEIVED BY NNIII'S CLAIMS AGENT
BEFORE THE VOTING DEADLINE AS DESCRIBED HEREIN.**

**DISCLAIMER**

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING THE APPENDICES HERETO, THIS "DISCLOSURE STATEMENT") RELATES TO THE CHAPTER 11 PLAN (THE "PLAN") OF NORTEL NETWORKS INDIA INTERNATIONAL INC. ("NNIII"), AND IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.  NO PARTY IS AUTHORIZED TO PROVIDE TO ANY OTHER PARTY ANY INFORMATION CONCERNING THE PLAN OTHER THAN THE CONTENTS OF THIS DISCLOSURE STATEMENT.  NNIII HAS NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING NNIII OR THE VALUE OF ITS PROPERTY OTHER THAN THOSE SET FORTH IN THIS DISCLOSURE STATEMENT.  NNIII HAS NOT AUTHORIZED ANYONE TO GIVE THE CREDITORS (AS DEFINED BELOW), THE INTERESTHOLDERS (AS DEFINED BELOW) AND OTHER PARTIES IN INTEREST ANY INFORMATION OTHER THAN THE INFORMATION CONTAINED HEREIN, AND NNIII TAKES NO RESPONSIBILITY FOR ANY OTHER INFORMATION THAT OTHERS MAY GIVE.

ALL SOLICITED CREDITORS (AS DEFINED BELOW) ARE ADVISED AND ENCOURAGED TO READ AND CONSIDER CAREFULLY THIS DISCLOSURE STATEMENT AND THE PLAN FILED WITH THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE (THE "BANKRUPTCY COURT") IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  ADDITIONAL INFORMATION REGARDING NNIII AND ITS U.S. AFFILIATES IS CONTAINED IN THE DISCLOSURE STATEMENT FOR THE NNI PLAN.  SUMMARIES OF THE PLAN AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, EXHIBITS ANNEXED OR REFERRED TO IN THE PLAN AND APPENDICES TO THIS DISCLOSURE STATEMENT.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.  THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT UNDER ANY CIRCUMSTANCES CREATE AN IMPLICATION THAT THERE HAS NOT BEEN ANY CHANGE IN THE FACTS SET FORTH HEREIN SINCE THE DATE OF THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF TITLE 11 OF THE UNITED STATES CODE (THE "BANKRUPTCY CODE") AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (THE "BANKRUPTCY RULES").  THE BANKRUPTCY COURT HAS

APPROVED THIS DISCLOSURE STATEMENT AS CONTAINING "ADEQUATE INFORMATION" AS PROVIDED IN SECTION 1125 OF THE BANKRUPTCY CODE, BUT THE BANKRUPTCY COURT HAS NOT ENDORSED AND MAY NOT ENDORSE THE PLAN.  THIS DISCLOSURE STATEMENT HAS NOT BEEN REVIEWED OR APPROVED BY ANY OTHER COURT IN ANY OTHER JURISDICTION OR BY ANY REGULATORY BODY IN ANY JURISDICTION.

THIS DISCLOSURE STATEMENT HAS NOT BEEN PREPARED TO COMPLY WITH, AND IS NOT INTENDED TO COMPLY WITH, FEDERAL OR STATE SECURITIES LAWS OR OTHER LAWS GOVERNING DISCLOSURE OUTSIDE THE CONTEXT OF THE BANKRUPTCY CODE.  CREDITORS, INTERESTHOLDERS, OTHER PARTIES IN INTEREST AND ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS AGAINST, INTERESTS IN OR SECURITIES OF, NNIII SHOULD EVALUATE THIS DISCLOSURE STATEMENT ONLY IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED.  THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY STATE SECURITIES COMMISSION, NOR HAS THE SEC APPROVED OR DISAPPROVED OF THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS, AND IS PROTECTED TO THE FULLEST EXTENT PERMITTED BY LAW UNDER RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER SIMILAR LAW, RULE OR REGULATION OF ANY APPLICABLE JURISDICTION.  THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY PROCEEDING OTHER THAN THE CHAPTER 11 CASE (AS DEFINED BELOW), NOR WILL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, ACCOUNTING OR OTHER LEGAL EFFECTS OF THE PLAN AS TO CREDITORS, INTERESTHOLDERS AND OTHER PARTIES IN INTEREST.

EACH CREDITOR, INTERESTHOLDER OR OTHER PARTY IN INTEREST SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, ACCOUNTING AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE SOLICITATION OF THE PLAN, THE APPROVAL OF THE PLAN, THE PLAN ITSELF OR THE TRANSACTIONS CONTEMPLATED THEREBY.

ADDITIONAL HISTORIC INFORMATION REGARDING NORTEL (AS DEFINED BELOW) IS CONTAINED IN THE HISTORIC PUBLIC FILINGS OF NORTEL NETWORKS CORPORATION ("NNC"), INCLUDING ANNUAL REPORTS ON FORM 10-K (THE "NNC FORM 10-K"), QUARTERLY REPORTS ON FORM 10-Q (EACH, A "NNC FORM 10-Q") AND HISTORIC FILINGS WITH THE CANADIAN SECURITIES ADMINISTRATORS (THE "CSA") (SUCH FILINGS, THE "NNC PUBLIC FILINGS"), PREPARED AND FILED BY NNC WITH THE RELEVANT AUTHORITIES, ON A CONSOLIDATED BASIS FOR

NNC AND CERTAIN OF ITS AFFILIATES, INCLUDING NNIII, WHICH WERE ACCOUNTED FOR AS CONSOLIDATED SUBSIDIARIES UNTIL SEPTEMBER 30, 2010 AND AS AN INVESTMENT UNDER THE COST METHOD OF ACCOUNTING THEREAFTER.  SUCH INFORMATION IS NOT A PART OF AND IS NOT DEEMED TO BE INCORPORATED BY REFERENCE IN THIS DISCLOSURE STATEMENT.  CERTAIN OF SUCH INFORMATION RELATES TO NORTEL AFFILIATES OTHER THAN NNIII AND, IN PROVIDING OR REFERRING TO SUCH INFORMATION, NNIII HAS RELIED UPON INFORMATION AND DESCRIPTIONS PROVIDED BY NORTEL AFFILIATES WITHOUT INDEPENDENT VERIFICATION.  THE DESCRIPTIONS AND DISCUSSION OF NORTEL AFFILIATES OTHER THAN NNIII AND THE CREDITOR PROTECTION PROCEEDINGS OTHER THAN THE CHAPTER 11 CASE CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD BE RELIED ON ONLY FOR PURPOSES OF EVALUATING THE PLAN, NNIII AND THE CHAPTER 11 CASE.

ALTHOUGH NNIII HAS USED ITS BEST EFFORTS TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED.  THE HISTORIC FINANCIAL STATEMENTS AND OTHER INFORMATION INCLUDED IN THE NNC PUBLIC FILINGS WERE PREPARED BY NNC ON THE FOLLOWING BASIS: (I) THE EMEA DEBTORS AND NNSA (AS DEFINED BELOW) WERE ACCOUNTED FOR UNDER THE EQUITY METHOD FROM THE PETITION DATE UP TO MAY 31, 2010 AND AS AN INVESTMENT UNDER THE COST METHOD OF ACCOUNTING THEREAFTER; (II) NNIII WAS ACCOUNTED FOR AS A CONSOLIDATED SUBSIDIARY UNTIL SEPTEMBER 30, 2010 AND AS AN INVESTMENT UNDER THE COST METHOD OF ACCOUNTING THEREAFTER; AND (III) ALL OF NNC'S OTHER AFFILIATES, INCLUDING THE FORMER DEBTORS, THE OTHER CANADIAN DEBTORS (AS DEFINED IN THE PLAN) AND CERTAIN ENTITIES NOT SUBJECT TO BANKRUPTCY, INSOLVENCY OR OTHER CREDITOR PROTECTION PROCEEDINGS, WERE ACCOUNTED FOR AS CONSOLIDATED SUBSIDIARIES.  THE CONTENTS OF SUCH NNC PUBLIC FILINGS, INCLUDING FINANCIAL STATEMENTS INCLUDED THEREIN, DO NOT NECESSARILY REPRESENT THE FINANCIAL CONDITION OF NNIII.  NNIII CAN MAKE NO REPRESENTATION AS TO THE ACCURACY OF ANY FINANCIAL AND OTHER INFORMATION CONTAINED IN THE NNC PUBLIC FILINGS, AND BY REFERRING TO THE NNC PUBLIC FILINGS HEREIN, NNIII IS NOT REPRESENTING OR ADMITTING TO THE COMPLETENESS OR ACCURACY OF THE CONTENT OF ANY SUCH FILINGS.

THE RECOVERY ANALYSIS ATTACHED AS APPENDIX B TO THIS DISCLOSURE STATEMENT (COLLECTIVELY, THE "RECOVERY ANALYSIS") WAS PREPARED IN CONSULTATION WITH NNIII'S MANAGEMENT AND FINANCIAL AND LEGAL PROFESSIONALS.  THE RECOVERY ANALYSIS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, IS NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY MANAGEMENT AT THE TIME THEY WERE MADE, MAY NOT BE ACHIEVED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET AND FINANCIAL

UNCERTAINTIES AND CONTINGENCIES (INCLUDING, WITHOUT LIMITATION, POTENTIALLY SIGNIFICANT LITIGATION CONTINGENCIES), MANY OF WHICH ARE BEYOND NNIII'S CONTROL.

THIS DISCLOSURE STATEMENT CONTAINS FORWARD LOOKING STATEMENTS THAT ARE BASED ON NNIII'S CURRENT EXPECTATIONS, ESTIMATES AND FORECASTS CONCERNING FUTURE DEVELOPMENTS, MANY OF WHICH ARE BEYOND NNIII'S CONTROL.  THESE STATEMENTS ARE SUBJECT TO IMPORTANT ASSUMPTIONS, RISKS AND UNCERTAINTIES THAT ARE DIFFICULT TO PREDICT, AND THE ACTUAL OUTCOME MAY BE MATERIALLY DIFFERENT THAN IMPLIED BY SUCH FORWARD LOOKING STATEMENTS.  THE DEBTORS CAUTION THAT NO REPRESENTATION CAN BE MADE AS TO THE ACCURACY OF SUCH FORWARD LOOKING STATEMENTS.  SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE.  FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THIS DISCLOSURE STATEMENT WAS PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER.  THIS DISCLOSURE STATEMENT, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF ANY FUTURE EVENT DISCUSSED HEREIN.

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES AND DESCRIPTIONS OF VARIOUS MOTIONS, COURT ORDERS, AGREEMENTS AND OTHER DOCUMENTS.  SUCH SUMMARIES AND DESCRIPTIONS ARE INCLUDED HEREIN FOR CONVENIENCE PURPOSES AND ARE QUALIFIED BY THE RELEVANT MOTIONS, ORDERS, AGREEMENTS AND OTHER DOCUMENTS IN THEIR ENTIRETY. IN CASE OF INCONSISTENCY BETWEEN SUMMARY OR DESCRIPTION INCLUDED HEREIN AND THE MOTION, ORDER, AGREEMENT OR OTHER DOCUMENTS, THE LATTER CONTROLS IN ALL RESPECTS.  COPIES OF MOTIONS, COURT ORDERS, AGREEMENTS AND OTHER DOCUMENTS FILED WITH THE BANKRUPTCY COURT CAN BE OBTAINED AT THE WEBSITE OF NNIII'S OFFICIAL CLAIMS, NOTICING AND BALLOTING AGENT, EPIQ BANKRUPTCY SOLUTIONS LLC ("EPIQ"), WITHOUT CHARGE, AT http://dm.epiq11.com/nortel.

PLEASE ALSO SEE SECTION V (*CERTAIN RISK FACTORS TO BE CONSIDERED*) FOR A DISCUSSION OF CERTAIN RISK FACTORS, WHICH SHOULD BE CONSIDERED IN CONNECTION WITH A DECISION BY A SOLICITED CREDITOR TO ACCEPT OR REJECT THE PLAN.

INFORMATION CONTAINED ON ANY WEBSITES REFERRED TO HEREIN OR THAT CAN BE ACCESSED THROUGH ANY SUCH WEBSITE DOES NOT CONSTITUTE A PART OF AND IS NOT INCORPORATED BY REFERENCE IN, THIS DISCLOSURE STATEMENT.

NEITHER THIS DISCLOSURE STATEMENT NOR THE PLAN IS OR SHOULD BE CONSTRUED AS AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER.

NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR CLAIM OR POTENTIAL OBJECTION TO A PARTICULAR CLAIM IS, OR IS NOT, IDENTIFIED IN THIS DISCLOSURE STATEMENT. NNIII OR WIND-DOWN NNIII, AS APPLICABLE, MAY SEEK TO INVESTIGATE, FILE AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER CONFIRMATION OR THE EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

**Index of Appendices to the Disclosure Statement**

| | |
|---|---|
| Appendix A | Chapter 11 Plan of NNIII |
| Appendix B | Recovery Analysis |
| Appendix C | Liquidation Analysis |

## DISCLOSURE STATEMENT  FOR THE
## CHAPTER 11 PLAN OF NORTEL NETWORKS INDIA INTERNATIONAL INC.

---

**NNIII RESERVES THE RIGHT TO AMEND OR SUPPLEMENT THIS DISCLOSURE STATEMENT AT OR BEFORE THE CONFIRMATION HEARING.**

---

## I.
## INTRODUCTION

Nortel Networks India International Inc. provides this Disclosure Statement to certain holders of claims against NNIII ("Creditors") to permit such Creditors to make an informed decision in voting to accept or reject the liquidating plan filed on August 12, 2021 with the Bankruptcy Court (as subsequently amended, the "Plan").  On July 26, 2016 (the "NNIII Petition Date"), NNIII, a Delaware corporation and a wholly-owned subsidiary of Nortel Networks Inc. ("NNI"), filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case").  On January 14, 2009 (the "Initial Petition Date"), the Former Debtors, other than NNCALA, filed their respective voluntary petitions for relief under chapter 11 of the Bankruptcy Code and, on July 14, 2009, NNCALA filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (collectively, with the Chapter 11 Case, the "Chapter 11 Cases"). The Chapter 11 Case was ordered to be jointly administered for procedural purposes with the other Chapter 11 Cases under Case No. 09-10138 (CSS).

On December 1, 2016, the Former Debtors filed the NNI Plan.  Concurrently with the filing of the NNI Plan, the Former Debtors filed the NNI Disclosure Statement with respect to the NNI Plan.  NNIII was excluded from the NNI Plan due to the pending appeals in the Indian Tax Appeal Litigation (as defined below).  On January 24, 2017, the Bankruptcy Court entered an order [D.I. 17795] (the "NNI Confirmation Order") confirming the NNI Plan, as amended and dated January 23, 2017 [D.I. 17763], as it related to the Former Debtors (but not to NNIII).  On May 8, 2017, the NNI Plan became effective and was substantially consummated. Additional information regarding the history of the Former Debtors and the Chapter 11 Cases is included in the Disclosure Statement for the First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain of its Affiliated Debtors, filed with the Bankruptcy Court on November 4, 2016 [D.I. 17348] (the "NNI Disclosure Statement").

A statutory committee of unsecured creditors was appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code on January 26, 2009 (as reconstituted from time to time, the "Creditors' Committee").  The Creditors' Committee was dissolved pursuant to Section 15.22 of the NNI Plan on May 8, 2017, the date on which the NNI Plan became effective.  Accordingly, the Plan has not been reviewed by the Creditors' Committee or any other statutory committee of unsecured creditors appointed pursuant to section 1102 of the Bankruptcy Code.

Please see the copy of the Plan that is included in this Disclosure Statement as Appendix A  (*Chapter 11 Plan of NNIII*).

All Solicited Creditors (as defined below) are advised and encouraged to read and consider carefully this Disclosure Statement and the Plan in their entirety before voting to accept or reject the Plan.

**This Disclosure Statement and the Plan are an integral package, and they must be considered together for the reader to be adequately informed. This introduction is qualified in its entirety by the remaining portions of this Disclosure Statement, and this Disclosure Statement in turn is qualified, in its entirety, by the Plan. In the event of any inconsistency between this Disclosure Statement and the Plan, the Plan controls.**

**Capitalized terms used herein but not otherwise defined have the meanings assigned to such terms in the Plan.** Whenever the words "include," "includes" or "including" are used in this Disclosure Statement, they are deemed to be followed by the words "without limitation." All dollar amounts in this Disclosure Statement are in United States Dollars unless otherwise stated.

This Disclosure Statement is presented to certain Creditors in accordance with the requirements of section 1125 of the Bankruptcy Code. Section 1125 of the Bankruptcy Code requires that a disclosure statement provide information sufficient to enable a hypothetical investor typical of the holders of claims against or interests in a debtor to make an informed judgment whether to accept or reject a plan. This Disclosure Statement may not be relied upon for any purpose other than that described above.

This Disclosure Statement solicits acceptances of the Plan from certain Creditors. To the extent that any Class entitled to vote rejects or any Class is deemed to reject the Plan, NNIII intends to seek confirmation of the Plan, notwithstanding such rejection or deemed rejection, pursuant to the "cramdown" provisions of section 1129(b) of the Bankruptcy Code.

NNIII believes that the distributions under the Plan will provide Creditors and holders of Interests in NNIII ("Interestholders") at least the same recovery on account of Allowed Claims or Interests as would distributions by a chapter 7 trustee. Further, NNIII believes that distributions under the Plan to Creditors and Interestholders likely would be made more quickly than distributions by a chapter 7 trustee, NNIII's ability to realize value from the remaining assets could be impaired in a chapter 7 liquidation and a chapter 7 trustee would charge a substantial fee, reducing the amount available for distribution on account of Allowed Claims or Interests.

**NNIII BELIEVES THAT THE PLAN WILL ENABLE NNIII TO ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 THROUGH A TIMELY, EFFICIENT AND COST-EFFECTIVE LIQUIDATION AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF NNIII AND ITS CREDITORS. NNIII URGES ALL CREDITORS ENTITLED TO VOTE ON THE PLAN TO ACCEPT THE PLAN.**

NNIII filed its proposed Chapter 11 Plan of Nortel Networks India International Inc. and an accompanying disclosure statement on July 20, 2021, and each was revised on August 12, 2021. The Bankruptcy Court approved this Disclosure Statement and procedures for

soliciting votes on the Plan by order entered on August 25, 2021 (the "NNIII Disclosure Statement Order"), approving this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable a hypothetical investor in the relevant classes to make an informed judgment whether to accept or reject the Plan.

The Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan (the "Confirmation Hearing") beginning at 11:00 A.M. (prevailing Eastern time) on October 5, 2021, in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 6th Floor, Wilmington, Delaware 19801.  At the Confirmation Hearing, the Bankruptcy Court will consider whether the Plan satisfies the requirements of the Bankruptcy Code, including whether the Plan is in the best interests of the Creditors, and will review a ballot report concerning votes cast for acceptance or rejection of the Plan.

To obtain, at your cost, additional copies of this Disclosure Statement or of the Plan, please contact:

> Nortel Networks India International Inc. Ballot Processing Center
> c/o Epiq Bankruptcy Solutions, LLC
> 10300 SW Allen Boulevard
> Beaverton, OR 97005

Electronic copies of the Plan and Disclosure Statement are available at no cost at Epiq's website at:  http://dm.epiq11.com/nortel.

## A.      Scope of this Disclosure Statement

Before the Initial Petition Date, NNIII, the Former Debtors, NNC and their Affiliates (collectively, "Nortel") were a global group of companies with legal entities conducting business operations across many jurisdictions around the world.  This Disclosure Statement was prepared by NNIII for the Chapter 11 Case only, and not for any Former Debtors or any creditor protection proceedings that have been initiated by Nortel Affiliates under the respective restructuring, insolvency, liquidation or other similar regimes of certain jurisdictions in which such Nortel Affiliates did business ("Creditor Protection Proceedings").  Creditors, Interestholders and other parties in interest are hereby advised that, although certain portions of this Disclosure Statement describe the businesses and history of Nortel as a global group, as well as various Creditor Protection Proceedings initiated by affiliates of Nortel ("Nortel Affiliates") in other jurisdictions, such descriptions are provided solely for background related to the Plan, and should not be relied upon for evaluating any Creditor Protection Proceeding other than the Chapter 11 Case or any Nortel Affiliate other than NNIII.

This Disclosure Statement is based on information provided by NNIII's management, information publicly available in certain SEC and other similar filings and pleadings filed with the Bankruptcy Court and courts of other Creditor Protections Proceedings. While this Disclosure Statement makes reference to the Canadian Debtors, Creditor Protection Proceedings in Canada and certain Former Debtors and other Nortel Affiliates, this Disclosure Statement is solely intended to provide adequate information for purposes of section 1125(a) of the Bankruptcy Code with respect to the Plan.  It is not intended to provide any information

regarding any Creditor Protection Proceeding other than NNIII's Chapter 11 Case or any Former Debtor or Nortel Affiliate, and creditors and shareholders of such other Nortel Affiliates are advised not to rely on this Disclosure Statement for any purpose.  Please see the *Disclaimer* that starts on page (i) above.

NO STATEMENTS OR INFORMATION CONCERNING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY HAVE BEEN AUTHORIZED, OTHER THAN THE STATEMENTS AND INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND THE INFORMATION ACCOMPANYING THIS DISCLOSURE STATEMENT. ALL OTHER STATEMENTS REGARDING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY, WHETHER WRITTEN OR ORAL, ARE UNAUTHORIZED.

**APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.**

The order that, among other things, approves this Disclosure Statement sets forth in detail the deadlines, procedures and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan, the record date for the purposes of voting to accept or reject the Plan, and the applicable standards for tabulating the ballots used for voting (the "Ballots"). Each Holder of a Claim entitled to vote on the Plan should read in their entirety this Disclosure Statement (including the Exhibits attached hereto), the Plan and the instructions accompanying the Ballots before voting on the Plan. These documents contain, among other things, important information concerning the classification of Claims and Interests for voting purposes and the tabulation of votes. No solicitation of votes to accept the Plan may be made except pursuant to section 1125 of the Bankruptcy Code.

B.      **Overview of the Plan and Its Treatment of Claims**

THE FOLLOWING IS A BRIEF SUMMARY OF THE TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN.  THE DESCRIPTION OF THE PLAN SET FORTH BELOW CONSTITUTES A SUMMARY ONLY AND IS QUALIFIED, IN ITS ENTIRETY, BY THE PLAN AND, WHERE APPROPRIATE, THE CONFIRMATION ORDER. CREDITORS, INTERESTHOLDERS AND OTHER PARTIES IN INTEREST ARE URGED TO REVIEW THE MORE DETAILED DESCRIPTION OF THE PLAN CONTAINED IN SECTION IV (*CHAPTER 11 PLAN*) AND THE PLAN ITSELF.  THE PLAN IS INCLUDED IN THIS DISCLOSURE STATEMENT AS APPENDIX A (*CHAPTER 11 PLAN OF NNIII*).  IN THE EVENT OF ANY INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN, THE PLAN CONTROLS.

The key components of the Plan include:

- Payment in full of all Allowed Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, and Secured Claims.

- Incorporation of the global resolution among the Nortel Group regarding the allocation of the Sale Proceeds among each of the Nortel Group estates and settlement of other inter-estate claims and other claims, through the negotiated Settlement and Plans Support Agreement which was approved under Bankruptcy Rule 9019 on January 24, 2017 [D.I. 17794].

- The satisfaction, compromise and settlement of various Intercompany Administrative Expense Claims (as defined in the Plan).

- The appointment of a Plan Administrator to wind down and distribute the assets of NNIII.

Additional detail on certain important features of the Plan follows:

**1.      Classification of Claims**

The Plan divides the Claims against and Interests in NNIII into Classes.  Certain Claims (in particular, Administrative Expense Claims; bankruptcy fees (including filing fees and quarterly fees) due and payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing; Professional Claims; and Priority Tax Claims) remain unclassified in accordance with section 1123(a)(1) of the Bankruptcy Code.  Creditors whose Claims are unclassified are unimpaired and will be deemed to accept the Plan.

Each table included in "*Estimated Recoveries for Each Class of Claims*" below summarizes the classification and treatment under the Plan of the Claims and Interests and reflects the amount and form of consideration that will be distributed in exchange for and in full satisfaction, settlement, release and discharge of such Claims and Interests.

**The classification and treatment for Claims against and Interests in NNIII is as follows:**

"Class 1" consists of Priority Non-Tax Claims against NNIII.  Class 1 is Unimpaired and will be deemed to accept the Plan.

"Class 2" consists of Secured Claims, if any, against NNIII.  Class 2 is Unimpaired and will be deemed to accept the Plan.

"Class 3" consists of General Unsecured Claims, if any, against NNIII.  Class 3 is Impaired and is entitled to vote to accept or reject the Plan.

"Class 4" consists of Interests in NNIII.  Class 4 is Impaired and will be deemed to reject the Plan.

2.      **Estimated Recoveries for Each Class of Claims**

The recovery percentages for each Class of Creditors and Interestholders are set forth in the table below.  These recovery percentages are merely estimates and actual amounts distributed to Holders of Allowed Claims under the Plan may be higher or lower than estimated.

To estimate Allowed Claims, NNIII first calculated the total asserted Claims (other than Administrative Expense Claims, which are based on filed, scheduled, accrued and budgeted amounts) based on Filed and Scheduled Claims.  To the extent a Creditor Filed a proof of claim that superseded a Scheduled Claim, the amount in the Filed proof of claim was used.

NNIII and its advisors then reviewed all of the proofs of claim (if any) asserting Priority Tax Claims, Professional Claims, Secured Claims and General Unsecured Claims. NNIII (with the assistance of its advisors) then analyzed these claims and reduced asserted claim amounts for duplicate claims, amended claims, misclassified claims, settled claims, satisfied claims and claims that lack merit in whole or in part to determine the claims NNIII would allow as Allowed Claims.

The ultimate aggregate amount of Allowed Claims may differ significantly from the amount used for purposes of NNIII's estimates.

| Class | Designation | Range of Estimated Allowed Amounts (Millions of US$) | Estimated Recovery | Status |
|---|---|---|---|---|
| 1 | Priority Non-Tax Claims | $0 | 100% | Unimpaired and not entitled to vote (deemed to accept) |
| 2 | Secured Claims | $0 | 100% | Unimpaired and not entitled to vote (deemed to accept) |
| 3 | General Unsecured Claims | $71.4 | 33.7%[1] | Impaired and entitled to vote |
| 4 | Interests | $0 | 0% | Impaired and not entitled to vote (deemed to reject) |

3.      **Bar Dates**

On August 16, 2016, the Bankruptcy Court entered an order (the "Bar Date Order") fixing the general bar date as 4:00 p.m. (prevailing Eastern time) on September 19, 2016 for filing proofs of claim against NNIII (the "General Bar Date") and January 23, 2017 for filing proofs of claim by governmental entities against NNIII (the "Governmental Bar Date" and, together with the General Bar Date, the "Bar Dates").  NNIII provided notice of the General Bar Date and Governmental Bar Date to all known Creditors of NNIII and to the Indian Taxing Authorities and published notice of the same in THE WALL STREET JOURNAL for both U.S. and Asia distribution.

---

[1]      The estimated recovery percentage includes distributions made by NNIII on such Allowed Claims pursuant to the Interim Distribution Order (as defined below).

**C.      Bankruptcy Plan Voting Instructions and Procedures**

             **NNIII URGES EACH SOLICITED CREDITOR TO VOTE TO <u>ACCEPT</u> THE PLAN.**

             The Bankruptcy Code entitles only holders of impaired claims or interests who are to receive some distribution under a proposed plan to vote to accept or reject that plan. Pursuant to section 1126(f) of the Bankruptcy Code, holders of claims or interests that are Unimpaired under a proposed plan are "conclusively presumed" to have accepted that plan and are not entitled to vote on it.  Pursuant to section 1126(g) of the Bankruptcy Code, holders of claims or interests that will receive no distributions under a proposed plan are deemed to have rejected that plan and, therefore, are also not entitled to vote on it.

             The Creditors in Classes 1 and 2 are Unimpaired under the Plan.  Thus, pursuant to section 1126(f) of the Bankruptcy Code, the Creditors in Classes 1 and 2 of the Plan are "conclusively presumed" to have accepted the Plan and are, therefore, not entitled to vote.

             The Creditors in Class 3 are Impaired and thus may vote to accept or reject the Plan. NNIII has enclosed Ballots with this Disclosure Statement to solicit the votes of all such Creditors.  Each Impaired Creditor entitled to vote to accept or reject the Plan is referred to as a "<u>Solicited Creditor</u>."

             The Class 4 Interestholders will receive no distribution under the Plan.  Thus, pursuant to section 1126(g) of the Bankruptcy Code, the Class 4 Interestholders are deemed to have rejected the Plan and are not entitled to vote.

             **A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO SOLICITED CREDITORS.  SOLICITED CREDITORS SHOULD READ AND CONSIDER CAREFULLY THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

             The voting deadline is 4:00 P.M. (prevailing Eastern time) on September 28, 2021 (the "<u>Voting Deadline</u>"), and the Confirmation Hearing is scheduled for 11:00 A.M. (prevailing Eastern Time) on October 5, 2021.  NNIII presently intends to consummate the Plan and to cause the Effective Date to occur.  However, the confirmation and effectiveness of the Plan are subject to material conditions precedent, some of which may not be satisfied or waived.  There can be no assurance that those conditions will be satisfied or waived and there can also be no assurance as to whether or when the Effective Date actually will occur.  Furthermore, in accordance with the provisions of the Plan, NNIII reserves the right to withdraw the Plan.

             You should use the Ballot sent to you with this Disclosure Statement to cast your vote for or against the Plan.  You may not cast Ballots or votes orally or by facsimile.  **In order for your Ballot to be considered by the Bankruptcy Court, it must be <u>actually received</u> by Epiq by 4:00 P.M. (prevailing Eastern time) on September 28, 2021, at the following address:**

**For general ballots:**

>>>**If by first class mail:**
>>>Nortel Networks India International Inc. Ballot Processing Center
>>>c/o Epiq Bankruptcy Solutions, LLC
>>>P.O. Box 4422
>>>Beaverton, OR 97076-4422

>>>**If by Overnight Courier or Personal Delivery:**
>>>Nortel Networks India International Inc. Ballot Processing Center
>>>c/o Epiq Bankruptcy Solutions, LLC
>>>10300 SW Allen Boulevard
>>>Beaverton, OR 97005

If you are a Solicited Creditor, and you did not receive a Ballot with this Disclosure Statement, please contact the Nortel Networks India International Inc. Ballot Processing Center at the address above to receive a Ballot at no charge.

Only Solicited Creditors are entitled to vote on the Plan.  Any Ballot executed by a Solicited Creditor, but which does not indicate acceptance or rejection of the Plan, will not be considered a vote regarding the Plan.  Any Ballot not timely and properly executed by a Solicited Creditor will not be counted as a vote to accept or reject the Plan.

**An Impaired Class of Claims accepts the Plan if the holders of at least two-thirds in amount and more than one-half in number of the Allowed Claims in such Class that actually vote cast their Ballots in favor of the Plan.**

**YOU MAY BE BOUND EVEN IF YOU DO NOT VOTE.**  Whether or not a Creditor or Interestholder votes on the Plan, such Person will be bound by the terms and treatment set forth in the Plan if the Plan is accepted by the requisite majorities of an Impaired Class of Claims and is confirmed by the Bankruptcy Court.

**REQUEST FOR DEEMED ACCEPTANCE BY NON-VOTING CLASSES.**
If no votes to accept or reject the Plan are received with respect to a Class that is solicited in accordance with the Solicitation Procedures (other than a Class that is deemed eliminated pursuant to Plan Section 5.4(a) (*Elimination of Vacant Classes; Deemed Acceptance by Non-Voting Classes*), NNIII will request at the Confirmation Hearing that the Court deem such Class to have accepted the Plan.

Pursuant to the provisions of section 1126(e) of the Bankruptcy Code, the Bankruptcy Court may disallow any vote accepting or rejecting the Plan if such vote is not cast in good faith.

Subject to the terms of the Disclosure Statement Order, any Claim in an Impaired Class as to which an objection or request for estimation is pending is not entitled to vote unless the holder of such Claim has obtained an order of the Bankruptcy Court temporarily allowing such Claim for the purpose of voting on the Plan; *provided, however*, that if NNIII objects to the

Claim, asserting that the Claim should be Allowed at a reduced amount, the claimant may, absent a Resolution Event (as defined below), vote such Claim at the amount asserted by NNIII. Additionally, subject to the terms of the Disclosure Statement Order, any Claim in an Impaired Class that is listed on the Schedules as unliquidated, disputed or contingent is not entitled to vote unless the holder of such Claim has timely filed a proof of claim and no objection has been filed to such proof of Claim or if an objection is filed with respect to such proof of claim (a) an order of the Bankruptcy Court is entered allowing such Claim pursuant to section 502(b) of the Bankruptcy Code, after notice and a hearing; (b) an order of the Bankruptcy Court is entered temporarily allowing such Claim for voting purposes only pursuant to Bankruptcy Rule 3018(a), after notice and a hearing; (c) a stipulation or other agreement is executed between the holder of such Claim and NNIII resolving the objection and allowing such Claim in an agreed upon amount; (d) a stipulation or other agreement is executed between the holder of such Claim and NNIII temporarily allowing the holder of such Claim to vote its Claim in an agreed upon amount; or (e) the pending objection to such Claim is voluntarily withdrawn by NNIII (each, a "Resolution Event").  Allowance of a Claim for voting purposes or disallowance of a Claim for voting purposes does not necessarily mean that all or a portion of that Claim will be allowed or disallowed for distribution purposes.  NNIII's Schedules listing Claims and indicating whether such Claims are disputed can be reviewed upon reasonable request at the Delaware offices of Morris, Nichols, Arsht, & Tunnell LLP at 1201 North Market Street, 18th Floor, Wilmington, Delaware 19899-1347 (telephone: (302) 351-9238) or are available anytime without charge at the website of the NNIII's official claims, noticing and balloting agent, Epiq Bankruptcy Solutions LLC at http://dm.epiq11.com/nortel.

## D.    Confirmation of the Plan by the Bankruptcy Court

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met.

Among the statutory requirements for confirmation of a chapter 11 plan are that the plan is: (i) accepted by all impaired classes of claims, or if rejected by one or more impaired classes, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such rejecting classes (provided an impaired class has otherwise accepted the plan), (ii) in the "best interests" of creditors that are impaired under the plan and (iii) feasible.

NNIII believes that the Plan will satisfy all of the requirements for confirmation.

## 1.    Acceptance by Impaired Classes

**An impaired class of claims accepts a chapter 11 plan if the holders of at least two-thirds in amount and more than one-half in number of the allowed claims or claims otherwise entitled to vote in such class that actually vote cast their ballots in favor of the Plan.**

Class 4 Interestholders will receive no distributions, in each case, on account of their respective Claims or Interests, and are therefore deemed to have rejected the Plan.

With respect to Class 4, therefore, the Debtors will seek confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code.  Under section 1129(b) of the Bankruptcy

Code, the Bankruptcy Court may confirm the Plan if at least one of the Impaired Classes of Claims (not including any acceptances by "insiders" as defined in section 101(31) of the Bankruptcy Code) accepts the Plan and certain additional conditions are met.

Class 3 General Unsecured Claim Holders are Impaired and thus may vote to accept or reject the Plan. Should Class 3 vote to accept the Plan, NNIII will seek confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code. In the alternative, NNIII reserves the right to have the Chapter 11 Case dismissed or converted, or to liquidate or dissolve under applicable non-bankruptcy procedure or chapter 7 of the Bankruptcy Code.

### 2.    No Unfair Discrimination and Fair and Equitable Test

Section 1129(b) of the Bankruptcy Code is generally referred to as the "cramdown" provision. Pursuant to this section, the Bankruptcy Court may confirm a chapter 11 plan notwithstanding the plan's rejection (or deemed rejection) by one or more impaired classes as long as the plan is accepted by at least one impaired class (by meeting the acceptance requirement described above), "does not discriminate unfairly," is "fair and equitable" as to each impaired class that has not accepted it and meets certain other statutory requirements.

### a.    No Unfair Discrimination

A plan does not "discriminate unfairly" within the meaning of the Bankruptcy Code with respect to a non-accepting class if the value of the consideration to be distributed to the non-accepting class is equal to, or otherwise fair when compared to, the value of the distributions to other classes whose legal rights are the same as those of the non-accepting class.

### b.    Fair and Equitable Test

#### i.    *Secured Creditors*

A plan is "fair and equitable" as to a non-accepting class of secured claims if the plan satisfies one of the alternative requirements of section 1129(b)(2)(A) of the Bankruptcy Code. These requirements are fulfilled if either (i) each impaired secured creditor will retain its liens securing its secured claim and will receive on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor will realize the "indubitable equivalent" of its allowed secured claim or (iii) the property securing the claim will be sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

#### ii.    *Unsecured Creditors*

Likewise, a plan is "fair and equitable" as to a non-accepting class of unsecured claims if the plan satisfies one of the alternative requirements of section 1129(b)(2)(B) of the Bankruptcy Code. These requirements are fulfilled if (i) the non-accepting claimants will receive the full value of their claims or (ii) if the non-accepting claimants receive less than full value, no class of junior priority will receive anything on account of their pre-petition claims or interests.

10

NNIII believes that the Plan does not discriminate unfairly and is fair and equitable as to each Impaired Class.

If the Bankruptcy Court determines that the Plan does not meet the "cramdown" requirements as set forth above, in NNIII's sole discretion, the Plan may be revoked and NNIII's Chapter 11 Case may be continued, converted to chapter 7 liquidation or dismissed in NNIII's sole discretion upon the Bankruptcy Court's approval where required.

**3.    Best Interests Test**

In order for a chapter 11 plan to be confirmed, the Bankruptcy Code requires that, with respect to each impaired class of creditors or interestholders, that each of such impaired creditors or interestholders either (i) accepts the plan or (ii) receives or retains under the plan property of a value, as of the effective date of the plan, that is not less than the amount such class members would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on the effective date (referred to herein as the "Best Interests Test").

NNIII believes that the Plan meets the Best Interests Test. Given the history and complexity of the Chapter 11 Cases with respect to the Former Debtors, and the history of NNIII's operations and its relationship with the Former Debtors, the additional costs and expenses associated with a chapter 7 liquidation, including the substantial fee charged by a chapter 7 trustee, would significantly reduce the amount available for distribution on account of Allowed Claims.  Furthermore, distributions in a chapter 7 case would most likely be significantly delayed compared to distributions under the Plan.  Therefore, NNIII believes that Impaired Creditors will receive more value under the Plan than they would if NNIII was liquidated under chapter 7.

**4.    Feasibility**

To confirm a chapter 11 plan, the Bankruptcy Court must find that the confirmation of the plan is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor, unless and to the extent liquidation is contemplated by the plan.  The Plan contemplates a distribution of NNIII's remaining assets to NNIII's creditors, followed by a liquidation of NNIII.  Therefore, the Plan meets the requirements for feasibility necessary for Confirmation.

**5.    Conversion or Dismissal of the Chapter 11 Case.**

If the requisite Classes do not vote to accept the Plan or the Bankruptcy Court does not confirm the Plan, NNIII reserves the right, subject to Section 15.6 (*Revocation or Withdrawal of the Plan*) of the Plan, to have the Chapter 11 Case dismissed or converted, or to liquidate or dissolve under applicable non-bankruptcy procedure or chapter 7 of the Bankruptcy Code.

THESE ARE COMPLEX STATUTORY PROVISIONS, AND THE PRECEDING PARAGRAPHS ARE NOT INTENDED TO BE A COMPLETE SUMMARY OF THE LAW.  PLEASE CONSULT WITH YOUR ATTORNEY TO OBTAIN A COMPLETE UNDERSTANDING OF THE LAW AND YOUR RIGHTS UNDER THE LAW.

## II.
## BACKGROUND AND CERTAIN PRE-PETITION OPERATIONS OF NNIII

This section provides a general description of NNIII's organization and business prior to the NNIII Petition Date. A comprehensive summary of the Nortel Group's history, structure, business operations and pre-petition capital structure of the Debtors other than NNIII is provided in Part II of the NNI Disclosure Statement.

NNIII is a subsidiary of NNI, which is NNIII's sole shareholder. It was incorporated in Delaware in June 2002 as Nortel Networks RIHC Inc. and acted as a supplier of hardware and software for contracts with certain Nortel customers in India. It sold hardware and software in conjunction with other Nortel affiliates within existing Nortel business units. As a result of the sales of Nortel's business units, NNIII assigned or settled all of its customer relationships and ceased operations in 2009. NNIII has no employees or customers. Aside from certain legal and accounting service providers, it has no suppliers or vendors. Its primary asset is cash and equivalents held in U.S. accounts, and its main creditors are its Nortel affiliates, including NNI.

## III.
## THE CHAPTER 11 CASE AND CERTAIN POST-PETITION OPERATIONS OF NNIII

Below is a summary of certain events leading up to the commencement of the Chapter 11 Case and certain significant events thereafter. A comprehensive summary of the events leading up to and during the Chapter 11 Cases of the Debtors other than NNIII is provided in Part III of the NNI Disclosure Statement.

### A.    Indian Tax Disputes

Since prior to the commencement of NNIII's chapter 11 case, NNIII has been involved in certain disputes with the Indian Taxing Authorities relating to tax obligations allegedly owed by NNIII. Prior to the Initial Petition Date, the Indian Taxing Authorities made tax demands against NNIII in the aggregate amount of approximately USD 7.4 million[2] (including interest) for NNIIII's assessment years 2003-04, 2004-05 and 2005-06 (the "Initial Demand Years"), on the alleged grounds that NNIII was subject to Indian income tax because it conducted business in India and therefore maintained a "permanent establishment" in India. NNIII does not believe that it ever maintained a "permanent establishment" in India, never paid Indian corporate income taxes and vigorously asserted its rights and defenses in the relevant proceedings in India.

---

[2]    Although all tax demands are denominated in Indian Rupees, for ease of reference, they are denominated herein in U.S. Dollars, using an exchange rate of USD 0.013 to 1 INR (which was the exchange rate as of April 30, 2020). The amount of the settlement payment made in January 2021 (described below) reflects the actual amount paid in U.S. Dollars rather than a converted amount.

Subsequently, the Indian Taxing Authorities made further demands in respect of assessment years 2006-07, 2007-08, 2008-09, 2009-10 and 2010-11 (the "Subsequent Demand Years" and, collectively with the Initial Demand Years, the "Demand Years"). In total for the Demand Years, the Indian Taxing Authorities made tax demands on NNIII of approximately USD 16.3 million (including interest) (the "Indian Tax Demands"). NNIII disputed the validity and amount of the Indian Tax Demands, and also took the position that such claims were barred as a result of the passing of the Bar Dates and in any event would be disallowed under applicable law if such issues were litigated in the Bankruptcy Court.

In 2006, NNIII engaged Ernst & Young, India ("EY India") to represent it in appealing the Indian Tax Demands and has been actively litigating these appeals since that time (the "Indian Tax Appeal Litigation").

On May 4, 2016, the High Court of India (India's second highest court, the "High Court") ruled in favor of NNIII in respect of the Initial Demand Years and assessment year 2008-09, finding that, among other things, NNIII did not have a "permanent establishment" in India and was not liable for any Indian corporate taxes for such years (the "High Court Decision"). The Indian Taxing Authorities did not file an appeal of the High Court Decision to India's Supreme Court (the "Indian Supreme Court") prior to the expiration of the statutory appeal period. Consequently, pursuant to the High Court Decision, NNIII sought a refund of certain payments that were made prior to 2012 during the appeals process (the "Stay Payments"), a portion of which was refunded to NNIII on February 28, 2017. Subsequent to such payment, however, the Indian Taxing Authorities filed a late appeal of the High Court Decision to the Indian Supreme Court, which was accepted by the Indian Supreme Court over NNIII's objection that the appeal was untimely because the appeal period had passed.

With respect to assessment years 2006-07, 2007-08, 2009-10 and 2010-2011, NNIII requested that the Indian Income Tax Appellate Tribunal (the "ITAT") hearing the tax appeals apply the High Court Decision to resolve those appeals in NNIII's favor. The ITAT decided in favor of NNIII, and NNIII received an additional refund amount in January 2018. The Indian Taxing Authorities appealed the ITAT decision to the High Court, and those appeals were dismissed by the High Court in March and April 2018 (the "Second High Court Decision"). The Indian Taxing Authorities appealed the Second High Court Decision to the Indian Supreme Court in late 2018.

As of the date of this Disclosure Statement, the Indian Tax Appeal Litigation remains pending before the Indian Supreme Court; however, as NNIII and the Indian Taxing Authorities have agreed to a settlement with respect to the Indian Tax Demands (as discussed below, NNIII is in the process of completing the required documentation to terminate the Indian Tax Appeal Litigation for the years 2003-04 through 2010-11.

In the interest of resolving the long, drawn-out litigation and minimizing uncertainties concerning its potential tax obligations in India, NNIII had continuously explored ways to reach a compromise with the Indian Taxing Authorities through EY India and local counsel. However, NNIII's initial attempts at settlement were rebuffed, as there was no formal means of collectively settling tax demands relating to assessment years under Indian law. On March 4, 2020, the Indian Taxing Authorities notified NNIII of the Direct Tax Vivad se Vishwas

Bill, a bill newly passed by the Indian Parliament that provides for dispute resolution regarding pending income tax litigation (the "Settlement Scheme").  The Settlement Scheme proposes certain discounts in tax payments if a taxpayer settles all tax disputes before a specified date and provides that, upon confirmation of receipt of payment, the Indian Taxing Authorities will withdraw the pending appeals and issue an order, providing immunity to the taxpayer against any prosecution or penalty under India's Income Tax Act, 1961, for the tax demands resolved under the Settlement Scheme.

Based on its review of the Settlement Scheme, NNIII determined that it was in its best interest to pursue a settlement of the Indian Tax Appeal Litigation by participating in the Settlement Scheme.  On May 19, 2020, NNIII filed a motion for an authorization to pursue a settlement of the Indian Tax Appeal Litigation [D.I.s 18819, 18821], which was granted by the Bankruptcy Court on June 4, 2020 (the "Settlement Order") [D.I. 18826].  Pursuant to the Settlement Order, NNIII was authorized to settle the Indian Tax Appeal Litigation if such settlement was deemed appropriate in NNIII's reasonable business judgment at the time of the settlement, without need for further notice to Creditors or order or approval from the Bankruptcy Court.

In December 2020 and January 2021, the Indian Taxing Authorities issued Forms for Certificate Under Sub-Section (1) of Section 5 of the Direct Tax Vivad se Vishwas Act, 2020 (3 of 2020), The Direct Tax Vivad se Vishwas Rules, 2020 ("Form-3") providing for the settlement amounts that NNIII would be required to pay to settle the Indian Tax Appeal Litigation for the tax years 2003-04 through 2010-11.  The total required payment was USD 3.637 million.  NNIII paid the settlement payment to the Indian Taxing Authorities in January 2021 and is in the process of completing the required documentation to terminate the Indian Tax Appeal Litigation for the years 2003-04 through 2010-11.  NNIII believes this will finalize all open tax obligations and appeal litigation with the Indian Taxing Authorities.  The withdrawal of the Indian Tax Appeal Litigation with prejudice or other final resolution to the satisfaction of the U.S. Principal Officer in his sole discretion is a condition precedent to the Effective Date under Section 12.1(h) (*Conditions to the Effective Date*) of the Plan.

## B.    Events Leading up to NNIII's Chapter 11 Case

Given that it had ceased operations, and given the likely length of the outstanding appeals and the potential financial exposure stemming from its Indian tax appeals at that time, NNIII concluded in June 2016 that seeking chapter 11 protection would best preserve and administer its assets in a manner consistent with its and the Former Debtors' larger restructuring efforts.

## C.    Commencement of the Chapter 11 Case and Significant Events During the Chapter 11 Case

On the NNIII Petition Date, NNIII filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  NNIII filed a motion seeking joint administration of NNIII's Chapter 11 Case and the Chapter 11 Cases of the Former Debtors (the "Joint Administration Motion").  Also on the Petition Date, NNIII filed a motion requesting to have certain orders which had been entered in the Chapter 11 Cases in respect of the Former Debtors govern NNIII

(the "<u>Previous Orders Motion</u>").  The relief sought in the Joint Administration Motion and the Previous Orders Motion was granted by the Bankruptcy Court by orders entered August 16, 2016.

### 1.    Settlement and Plans Support Agreement

On October 12, 2016, NNIII and the other SPSA Parties executed an agreement settling litigation in relation to the Allocation Dispute (such agreement, the "<u>SPSA</u>").  The SPSA provides for a full and final settlement of the Allocation Dispute and certain other matters among the SPSA Parties.  Approval of the SPSA as to NNIII under Bankruptcy Rule 9019 was a condition precedent to the NNI Plan Effective Date.  In addition, under the terms of the SPSA, NNIII is independently required to obtain approval of the SPSA as part of its Plan.

The SPSA contains various settlement terms which are integrated and are subject to various terms and conditions.  Among those integrated settlement terms, the SPSA Parties agreed to allocate the Sale Proceeds as follows, subject to the additional terms of <u>Section 2</u> (*Settlement of Allocation Dispute*) of the SPSA:

| Party | Percentage of Proceeds | US$ | Name |
|---|---|---|---|
| Former Debtors | 24.3500 | 1,766,417,002 | U.S. Allocation |
| Canadian Debtors | 57.1065 | 4,142,665,131 | Canadian Allocation |
| EMEA (other than NNSA and NNUK Debtors) | 1.4859 | 107,788,879 | EMEA (Non-NNSA/Non-NNUK) Allocation[3] |
| NNUK | 14.0249 | 1,017,408,257 | NNUK Allocation |
| NNSA | N/A | 220,000,000 | NNSA Allocation |

The U.S. Allocation was distributed among the Former Debtors in the amounts and proportions as set forth in <u>Annex F</u> (*U.S. Debtor Allocation Proportion*) to the SPSA.  No Sale Proceeds are allocated to NNIII.  Under the SPSA, NNIII agreed to the allowance of certain Intercompany Claims against it, and to exchange mutual releases with other parties to the SPSA.  Creditors and parties in interest should read the SPSA in its entirety.

On December 16, 2016, NNIII and the Former Debtors filed a motion seeking approval of the SPSA pursuant to Bankruptcy Rule 9019.  On January 24, 2017, the Bankruptcy Court entered an order (the "<u>9019 Approval Order</u>") approving the SPSA.  As described in the NNI Disclosure Statement, in accordance with the terms of the SPSA, NNL's "Book Intercompany Claim" against NNIII in the amount of $17,695,763 and NNI's "Book Intercompany Claim" against NNIII in the amount of $53,663,414 were thereby allowed as a

---

[3]    Such allocation is to be distributed among the EMEA Debtors (other than NNUK) in the amounts and proportions set forth in <u>Annex E</u> (*EMEA Debtor Allocation Proportion*) to the SPSA.

general unsecured claim against NNIII, entitled to receive distributions on a *pari passu* basis with other general unsecured claims against NNIII.  Additional information regarding the SPSA can be found in Section III.H.3 of the NNI Disclosure Statement.

## 2.    Pre-Effective Date Distributions

On October 31, 2017, NNIII filed a motion with the Bankruptcy Court to authorize an interim distribution to Holders of Allowed Unsecured Claims against NNIII in the amount of $15 million [D.I. 18488].  The Order Granting Nortel Network India International Inc.'s Motion for an Order Authorizing Interim Distributions to Holders of Allowed Unsecured Claims (the "Interim Distribution Order") was entered on December 1, 2017 [D.I. 18540].  In accordance with the Interim Distribution Order, NNIII made distributions to its unaffiliated holders of Allowed Unsecured Claims on December 15, 2017 in the aggregate amount of $13.8 million, consisting of a distribution to NNL in the amount of $0.4 million and a distribution to the Pension Benefit Guaranty Corporation (the "PBGC") in the amount of $13.5 million.  In January 2020, NNIII made a distribution to NNI in the amount of $1.2 million for its share of the $15 million distribution that had not been previously made.

## 3.    Summary of Certain Significant Claims

### a.    NNI Book Intercompany Claim

As described in the NNI Disclosure Statement, in accordance with the terms of the SPSA, NNI's "Book Intercompany Claim" against NNIII in the amount of $53,663,414 was allowed under the SPSA as a general unsecured claim against NNIII, entitled to receive distributions on a *pari passu* basis with other general unsecured claims against NNIII.  Pursuant to the Interim Distribution Order, in January 2020, NNI received $1.2 million from NNIII in respect of its Allowed Book Intercompany Claim.

### b.    NNL Book Intercompany Claim

As described in the NNI Disclosure Statement, in accordance with the terms of the SPSA, NNL's "Book Intercompany Claim" against NNIII in the amount of $17,695,763 was allowed under the SPSA as a general unsecured claim against NNIII, entitled to receive distributions on a *pari passu* basis with other general unsecured claims against NNIII. Pursuant to the Interim Distribution Order, on December 15, 2017, NNL received $0.4 million from NNIII in respect of its Allowed Book Intercompany Claim.

### c.    PBGC Claims

The PBGC filed joint and several claims against NNIII and each of the Former Debtors in the aggregate amount of $707,994,472 for the unfunded benefit liabilities of the Nortel Networks Retirement Income Plan (the "Retirement Income Plan") and for certain other amounts (the "PBGC Claims").

The PBGC is a self-funded United States government corporation that administers the defined benefit plan termination insurance program under Title IV of ERISA.  Pursuant to the statutory framework established under Title IV of ERISA, the PBGC guarantees payment of certain benefits upon termination of qualified pension plans such as the Debtors' Retirement

Income Plan.  As such, the Debtors and the PBGC executed a trusteeship agreement (the "Trusteeship Agreement") which provided that the termination date for the Debtors' Retirement Income Plan was July 17, 2009 and the Debtors' Retirement Income Plan assets were conveyed to the PBGC effective September 8, 2009.

On September 29, 2009, the PBGC filed four proofs of claim against the Debtors other than NNIII on a joint and several basis, asserting: (i) $593,100,000 in respect of the Retirement Income Plan's alleged unfunded benefit liabilities; (ii) unliquidated amounts for any minimum funding contributions the Debtors may have failed to make; (iii) unliquidated amounts for certain insurance premiums, interest and penalties; and (iv) unliquidated amounts for any shortfall amortization or waiver amortization charges (collectively, the "Original PBGC Claims").  On July 7, 2014, the PBGC filed amended claims, amending the previously-filed claims and asserting: (i) $624,601,972 in respect of the Retirement Income Plan's alleged unfunded benefit liabilities; (ii) $83,392.50 as an estimated amount of certain insurance premiums, interest and penalties; (iii) an unliquidated amount for contributions to satisfy certain minimum funding standards; and (iv) an unliquidated amount for any shortfall amortization or waiver amortization charges (collectively, the "Amended PBGC Claims").  On September 15, 2016, the PBGC filed copies of the same proofs of claim against NNIII.  On November 2, 2016, the Debtors and NNIII filed an objection to the Original PBGC Claims and the Amended PBGC Claims [D.I. 17325] (the "PBGC Claims Objection").

On December 20, 2016, the PBGC, NNIII and the Former Debtors entered into an agreement settling the PBGC Claims and related issues (the "PBGC Settlement Agreement"). On December 21, 2016, the Debtors filed their Motion for Entry of an Order Pursuant Bankruptcy Rule 9019 Approving the Settlement Agreement By and Among the Debtors and the Pension Benefit Guaranty Corporation with Respect to the PBGC Claims and Related Issues, which was approved by the Bankruptcy Court by order dated January 6, 2017 [D.I. 17679]. Under the terms of the PBGC Settlement Agreement, the PBGC was entitled to a single Allowed General Unsecured Claim against NNIII (and each of the Former Debtors) in the amount of $624,601,972, subject to a cap on the PBGC's right to receive distributions on such allowed claims in the maximum aggregate amount of $565,000,000.  As part of the PBGC Settlement Agreement, the PBGC also agreed to support the approval of the SPSA and to vote in favor of the NNI Plan and the NNIII Plan, provided such Plan is not inconsistent with the SPSA or the terms of the PBGC Settlement Agreement.  The PBGC Settlement Agreement satisfies the SPSA's requirement that the PBGC claim asserted against each of NNIII and the Former Debtors (and against any U.S. non-debtor Nortel Group entity) shall be allowed in an amount no greater than $708,000,000.

In December 2018, the PBGC received the maximum allowed recovery of $565,000,000 on its claims against NNIII and the Former Debtors.  Accordingly, the PBGC's Allowed General Unsecured Claim against NNIII and any and all claims that have been or could have been asserted by the PBGC against NNIII are deemed paid in full, and the PBGC shall not have any further claims against NNIII or any of the Former Debtors.  The PBGC shall not be entitled to an Allowed Administrative Expense Claim or Priority Non-Tax Claim against NNIII or any of the Former Debtors.

**D.      Current Management of NNIII**

The following provides a brief description of the members of the management team of NNIII as of July 20, 2021:

| Name | Position | Age |
|------|----------|-----|
| John J. Ray, III | Principal Officer of NNIII | 62 |
| Luis-Fernando Guerra Sanz | President | 53 |

*John J. Ray, III* was retained as Principal Officer of each of the Debtors other than NNIII on December 7, 2009, and his appointment was approved by the Bankruptcy Court on January 6, 2010.  By order of the Bankruptcy Court dated August 16, 2016, Mr. Ray's appointment as Principal Officer of NNIII was approved.  Accordingly, Mr. Ray has the principal responsibility for overseeing and directing the restructuring and wind down of NNIII's estate.  Mr. Ray is Senior Managing Director of Owl Hill Advisory LLC.  Mr. Ray has served in various capacities with respect to Chapter 11 bankruptcy estates.  From 2019 to date, Mr. Ray has served on the Board of Ditech Holding Corporation.  From 2015 to date, Mr. Ray has served as Liquidating Trust Manager for Res Cap Liquidating Trust.  From 2012 to 2014, Mr. Ray served as Chief Restructuring Officer of Overseas Shipping Group and from 2014 to 2015, Chairman of the Board of Overseas Shipping Group.  From 2014 to 2016, Mr. Ray served as the Chairman of the Restructuring Committee of the Board of GT Technologies. From 2004 to 2009, Mr. Ray was Chairman of the post confirmation Board of Enron Corporation and, from 2005 to 2009, President of post confirmation Enron Corporation.

*Luis-Fernando Guerra Sanz* has served as the President of NNIII since January 19, 2011.  Prior to this appointment, Mr. Guerra Sanz served in the following positions at one or more entities within the Nortel Group: (i) Vice President (Wind Down Operations and Liquidation) from 2009 to 2011; (ii) Operations Vice President (Americas Enterprise) from 2008 to 2009; (iii) Operations Executive Director (Caribbean and Latin American Region) from 2003 to 2008 and (iv) Operations Director (Vodafone and Iberia Region) from 2000 to 2003.

**IV.**
**CHAPTER 11 PLAN**

As noted above, the fundamental purpose of a chapter 11 case is to formulate a plan to restructure a debtor's finances so as to maximize recoveries to its creditors.  Accordingly, a chapter 11 plan sets forth and governs the treatment and rights to be afforded to creditors and interestholders with respect to their claims against and equity interests in the debtor's bankruptcy estate.

THE FOLLOWING IS A BRIEF SUMMARY OF CERTAIN OF THE MORE SIGNIFICANT MATTERS CONTEMPLATED BY OR IN CONNECTION WITH THE CONFIRMATION OF THE PLAN.  THUS, THE FOLLOWING SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE PLAN, WHICH IS INCLUDED IN THIS DISCLOSURE STATEMENT AS <u>APPENDIX A</u> (*CHAPTER 11 PLAN OF NNIII*).  THIS SUMMARY ONLY

HIGHLIGHTS CERTAIN SUBSTANTIVE PROVISIONS OF THE PLAN. CONSIDERATION OF THIS SUMMARY WILL NOT, NOR IS IT INTENDED TO, YIELD A THOROUGH UNDERSTANDING OF THE PLAN WITHOUT A CONCOMMITANT FULL AND COMPLETE READING OF THE PLAN.  ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO REVIEW THE PLAN CAREFULLY AND, IF NECESSARY, TO CONSULT WITH COUNSEL.  THE PLAN, IF CONFIRMED, WILL BE BINDING ON NNIII AND ALL HOLDERS OF CLAIMS AND INTERESTS.

## A.    Summary of the Plan

The overriding purpose of the Plan is to enable the expeditious distribution of the NNIII's assets to Holders of Allowed Claims and to administer and wind down its remaining assets and obligations.

The Bankruptcy Code requires that, for purposes of treatment and voting, a chapter 11 plan divide the different claims against, and equity interests in, the debtor into separate classes based upon their legal nature. Claims of a substantially similar legal nature are usually classified together, as are equity interests of a substantially similar legal nature.

Under a chapter 11 plan of reorganization, the separate classes of claims and equity interests must be designated either as "impaired" (affected by the plan) or "unimpaired" (unaffected by the plan). If a class of claims is "impaired," the Bankruptcy Code affords certain rights to the holders of such claims, such as the right to vote on the plan, and the right to receive, under the chapter 11 plan, no less value than the holder would receive if the debtor were liquidated in a case under chapter 7 of the Bankruptcy Code. Under section 1124 of the Bankruptcy Code, a class of claims or interests is "impaired" unless the plan (i) does not alter the legal, equitable and contractual rights of the holders or (ii) irrespective of the holders' acceleration rights, cures all defaults (other than those arising from the debtor's insolvency, the commencement of the case or nonperformance of a non-monetary obligation), reinstates the maturity of the claims or interests in the class, compensates the holders for actual damages incurred as a result of their reasonable reliance upon any acceleration rights and does not otherwise alter their legal, equitable and contractual rights. Typically, this means that the holder of an unimpaired claim will receive its distribution on the later of the consummation date or the date on which amounts owing are actually due and payable. Thus, other than its right to accelerate the debtor's obligations, the holder of an unimpaired claim will be placed in the position it would have been in had the debtor's case not been commenced.

NNIII believes that the Plan represents a fair economic solution for all of NNIII's Creditors and Interestholders, will expedite the administration of the Chapter 11 Case and will maximize and accelerate recoveries to Holders of Allowed Claims, particularly compared to the alternative recoveries that a failure to confirm the Plan would provide.

The Plan recognizes the corporate integrity of NNIII and, therefore, Allowed Claims against NNIII will be satisfied only from the assets of NNIII's bankruptcy estate.  A Creditor or Interestholder of NNIII, by virtue of its Claims against or Interests in NNIII, has no direct claim against or interest in any Former Debtor and has no direct claim against or interest in any other Affiliate of that Debtor.

As described in greater detail below, the Plan contemplates payment of all Allowed Administrative Expense Claims in full in Cash, inclusive of Allowed Claims arising under section 503(b) of the Bankruptcy Code and Allowed Priority Tax Claims (subject to permitted installment payments for certain Allowed Priority Tax Claims).

The Plan also provides for the treatment of Allowed Claims as follows:  (i) with respect to each Holder of an Allowed Secured Claim, at the option of NNIII, (a) payment in Cash by or on behalf of NNIII in the amount equal to the Allowed amount of such Secured Claim, (b) the Distribution of the sale or other disposition proceeds of the Collateral securing such Allowed Secured Claim, (c) surrender of the Collateral securing such Allowed Secured Claim to the Holder of such Allowed Secured Claim, (d) such treatment that leaves unaltered the legal, equitable and contractual rights to which the Holder of the Allowed Secured Claim is entitled or (e) such other treatment to which the parties may agree; and (ii) with respect to each Holder of an Allowed General Unsecured Claim, its Pro Rata Share of the Creditor Proceeds as of the applicable Distribution Date.

In addition, the Plan provides for the appointment of a Plan Administrator, who shall have the authority and right on behalf of NNIII and Wind-Down NNIII, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, the SPSA and the Plan Administration Agreement in accordance with the provisions therein.

Additionally, in full and final satisfaction of NNI's claims against NNIII resulting from the Intercompany Administrative Expense Claims attributable to NNIII that have accrued to date, and in addition to the one-time reimbursement payment from NNIII in the amount of $500,000 (the "NNIII Administrative Expense Contribution"), NNI will bear various costs of administering and winding down NNIII's estate, and NNIII shall reimburse NNI quarterly for such costs in an amount not to exceed $100,000 per quarter.  The payment of such amount by NNIII to NNI shall continue until NNIII has been fully and finally liquidated and all costs and expenses related to such administration and wind-down have been incurred.  For the avoidance of doubt, NNI shall retain the right to assert Administrative Expense Claims against NNIII for any Priority Tax Claims that are asserted against and/or paid by NNI that reasonably could be allocated or attributable to NNIII, *provided* that the amount owed by NNIII to NNI in respect of Quarterly Administrative Wind-Down Reimbursement Payments and Priority Tax Claims shall be subject to a cap of $100,000 per quarter.

Under the provisions of the Plan, Wind-Down NNIII will continue to resolve its wind-down obligations and fulfill its other obligations under the Plan.  Upon completion of such obligations, Wind-Down NNIII may be dissolved by the Plan Administrator without further corporate action, subject to appropriate governmental filings.

Statements in this Disclosure Statement as to the rationale underlying the treatment of Claims and Interests under the Plan are not intended to, and shall not, waive, compromise or limit any rights, claims or causes of action in the event the Plan is not confirmed.

B.      **Treatment of Unclassified Claims**

1.      **Administrative Expense Claims**

Administrative Expense Claims are Claims constituting a cost or expense of administration (including Professional Claims) of the Chapter 11 Case allowed under sections 503(b), 507(a)(2) or 507(b) of the Bankruptcy Code up to and including the Effective Date. Such Claims include (i) all actual and necessary costs and expenses of preserving the NNIII's Estate or operating NNIII's business arising on or after the Petition Date; (ii) any payments made under the Plan to cure a default under an executory contract or unexpired lease assumed by NNIII; and (iii) all compensation or reimbursement of expenses of Professionals arising on or after the Petition Date unless the Holder of an Administrative Expense Claim and NNIII agree to different treatment, in each case to the extent allowed by the Bankruptcy Court under the Bankruptcy Code. Any fees or charges assessed against NNIII's estate under section 1930 of chapter 123 of title 28 of the United States Code also are included in the definition of Administrative Expense Claim.

Allowed Administrative Expense Claims will be paid in full, on the later of the Effective Date and the date the Administrative Expense Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter, by NNIII, in (a) Cash or (b) such other treatment as to which NNIII and the holder of such Allowed Administrative Expense Claim have agreed upon in writing. Administrative Expenses Claims with respect to liabilities arising under a written agreement incurred by NNIII in the ordinary course of business during the Chapter 11 Case will be paid in the ordinary course.

2.      **Professional Claims**

Professional Claims are Administrative Expense Claims for the compensation of Professionals and reimbursement of expenses incurred by such professionals pursuant to sections 105(a), 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code.

Pursuant to the Plan, other than a Professional retained by NNIII pursuant to the Ordinary Course Professional Order, each Holder of a Professional Claim shall File its final application for allowance of such compensation and/or reimbursement by no later than the first Business Day that is sixty (60) days after the Effective Date or such other date as may be fixed by the Bankruptcy Court and be paid by or on behalf of NNIII (i) in full and in Cash in the amounts Allowed upon the date the order granting such award becomes a Final Order, or as soon thereafter as practicable or (ii) upon such other terms as may be mutually agreed upon by the claimant and NNIII.

Except as otherwise specifically provided in the Plan, on and after the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate, and, subject to the terms of the Plan Administrator Agreement, the Plan Administrator may employ and pay any Professional for services rendered or expenses incurred after the Effective Date in the ordinary course to facilitate

the wind down of Wind-Down NNIII and effectuate the Plan without any further notice to any party or action, order or approval of the Bankruptcy Court.

**3.      Priority Tax Claims**

Priority Tax Claims are any Claims entitled to priority pursuant to sections 502(i) and 507(a)(8) of the Bankruptcy Code.

Pursuant to the Plan, at the option of NNIII, the Holder of an Allowed Priority Tax Claim will be entitled to receive, in full satisfaction, settlement and release of and in exchange for such Allowed Priority Tax Claim:

a.      Cash in an amount equal to such Allowed Priority Tax Claim on the later of the Effective Date and the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as practicable;

b.      treatment in accordance with section 1129(a)(9)(C) of the Bankruptcy Code; or

c.      such other treatment as to which NNIII and the Holder of such Allowed Priority Tax Claim have agreed upon in writing.

On the Effective Date, the Liens (if any) securing any Priority Tax Claims shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

Because certain taxes carry joint and/or several liability, taxing authorities may file duplicative Priority Tax Claims against multiple Debtors.  However, because the taxing authorities do not collect more than once for a particular joint and/or several tax liability, the amount of any actual payments in respect of duplicative Allowed Priority Tax Claims would be less than the aggregate total of such duplicative claims.

For the avoidance of doubt, there are no Priority Tax Claims in respect of the Indian Tax Demands.

**C.      Treatment of Classified Claims and Interests**

The Plan places all Claims and Interests, except Administrative Expense Claims, Priority Tax Claims and Professional Claims, in the classes listed below for all purposes, including voting, Confirmation and Distributions under the Plan, and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or Interest is placed in a particular Class only to the extent that it falls within the description of that Class, and is classified in any other Class to the extent that any portion thereof falls within the description of such other Class.  A Claim is also classified in a particular Class for the purpose of receiving Distributions under the Plan only

to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released or otherwise satisfied prior to the Effective Date.

Unless otherwise specified below, a Holder of Claims against or Interests in each Class will receive its Pro Rata Share of Creditor Proceeds from NNIII.  For further detail regarding the classification and treatment of the Claims and Interests, see the Plan included in this Disclosure Statement as Appendix A (*Chapter 11 Plan of NNIII*).

### 1.        Class 1 — Priority Non-Tax Claims

Class 1 Claims consist of all Allowed Priority Non-Tax Claims against NNIII, including any Claim, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority of payment under section 507(a) of the Bankruptcy Code.

Each Holder of an Allowed Priority Non-Tax Claim in Class 1 shall be paid by or on behalf of NNIII in Cash in the amount equal to the Allowed amount of such Priority Non-Tax Claim.

For the avoidance of doubt, there are no Allowed Priority Non-Tax Claims in respect of the Indian Tax Demands.

### 2.        Class 2 — Secured Claims

Class 2 Claims consist of all Allowed Secured Claims, if any, against NNIII, including any Claim (a) reflected as a Secured Claim either in the Schedules or upon a proof of claim as a Secured Claim or (b) that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

Except to the extent that the Holder of an Allowed Secured Claim agrees to less favorable treatment, each Holder of an Allowed Secured Claim in Class 2 shall be satisfied by, at the option of NNIII: (i) payment in Cash by or on behalf of NNIII in the amount equal to the Allowed amount of such Secured Claim on the later of the Effective Date and the date on which such Secured Claim becomes an Allowed Secured Claim; (ii) the Distribution of the sale or other disposition proceeds of the Collateral securing such Allowed Secured Claim; (iii) surrender of the Collateral securing such Allowed Secured Claim to the Holder of such Allowed Secured Claim or (iv) such treatment that leaves unaltered the legal, equitable and contractual rights to which the Holder of the Allowed Secured Claim is entitled.  In the event an Allowed Secured Claim is treated under clauses (i) through (iii) above, the Liens securing such Claim shall be deemed released and extinguished without further order of the Bankruptcy Court.

### 3.        Class 3 — General Unsecured Claims

Class 3 Claims consist of all Allowed General Unsecured Claims NNIII.

Each Holder of an Allowed General Unsecured Claim in Class 3 shall, on the Initial Distribution Date or the first Interim Distribution Date after the date such Claim becomes Allowed, receive its Pro Rata Share of the Creditor Proceeds as of the applicable Distribution Date from NNIII.  In accordance with Section 10.3 (*Distributions of Creditor Proceeds*) of the

Plan, the Disbursing Agent shall make periodic Interim Distributions of the remaining available Creditor Proceeds to Holders of Allowed General Unsecured Claims in Class 3 until the Final Distribution Date.

For the avoidance of doubt, there are no General Unsecured Claims in respect of the Indian Tax Demands.

**4.      Class 4 — Interests**

Class 4 Claims consist of all Interests in NNIII, including any shares of common stock, preferred stock, other forms of ownership interest or any interest or right to convert into such an equity or ownership interest or acquire any equity or ownership interest, including, without limitation, vested and/or unvested restricted stock units, contingent stock awards, contingent equity awards, performance stock units and stock options or restricted stock awards granted under management ownership plans, stock incentive plans or employee incentive plans, in each case, in NNIII that was in existence immediately prior to or on the NNIII Petition Date.

NNI, as the only Holder of Interests in NNIII, is not expected to receive any Distributions on account of such Interests under the Plan. On the Effective Date, all Interests in NNIII will continue to be held by NNI until the closing of its Chapter 11 Case, solely for Plan administrative purposes. NNI shall receive no Distributions on account of such Interests until such time that all Allowed Claims in Classes 1 through 3 have been satisfied in full in accordance with the Bankruptcy Code and the Plan. At such time, NNI will receive its Pro Rata Share of any remaining Creditor Proceeds from NNIII.

**D.      Implementation of the Plan**

**1.      General Settlement of Claims and Interests**

The Plan incorporates the terms of the SPSA and, to the extent not previously approved by the Bankruptcy Court, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan and the SPSA.

**2.      Plan Administrator**

**a.      Appointment and Authority of the Plan Administrator**

The Plan appoints Owl Hill Advisory LLC as the Plan Administrator for NNIII and Wind-Down NNIII.

The Plan Administrator will have the authority and right on behalf of NNIII and Wind-Down NNIII, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement the Plan, the SPSA and the Plan Administration Agreement in accordance with their terms.

b.      **Liability and Compensation of the Plan Administrator**

The Plan Administrator will have no liability whatsoever for any acts or
omissions to NNIII or Wind-Down NNIII or to Holders of Claims against or Interests in NNIII
or Wind-Down NNIII other than for willful misconduct, fraud or breach of fiduciary duty by the
Plan Administrator as determined by a Final Order, *provided, that*, the Plan Administrator shall
have no liability for such acts or omissions if approved by the Bankruptcy Court.  Each of NNIII
and Wind-Down NNIII shall indemnify and hold harmless the Plan Administrator for any losses,
liabilities and costs incurred in such capacity to the fullest extent allowed by Delaware law.

In addition to reimbursement for actual out-of-pocket expenses incurred by the
Plan Administrator, the Plan Administrator shall be entitled to receive reasonable compensation
for services rendered on behalf of NNIII and Wind-Down NNIII in an amount and on such terms
as may be reflected in the Plan Administration Agreement.

c.      **Resignation and Removal of the Plan Administrator**

Subject to change and definitive documentation in the Plan Administration
Agreement, it is anticipated that the following terms will be included in the Plan Administration
Agreement.  The Plan Administration Agreement will provide that the Plan Administrator will be
able to resign as Plan Administrator upon delivery of sixty (60) days' written notice to the
Bankruptcy Court. However, if a successor Plan Administrator has not been appointed by the end
of such sixty (60) day period, the current Plan Administrator shall continue as Plan
Administrator pursuant to the terms specified therein until such time as a successor is appointed
by the Bankruptcy Court.

The Plan Administrator may be removed by the Bankruptcy Court on the grounds
of: (i) the Plan Administrator's theft or embezzlement or attempted theft or embezzlement of
money or tangible or intangible Assets or property; (ii) the Plan Administrator's violation of any
law (whether foreign or domestic), which results in a felony indictment or similar judicial
proceeding; or (iii) the Plan Administrator's willful misconduct or fraud in the performance of
his or her duties.

The Plan Administrator shall have the authority to name a successor Plan
Administrator, subject to Bankruptcy Court approval, or, if the Plan Administrator is unable to
make such an appointment, counsel to NNIII or Wind-Down NNIII, as applicable, also may
appoint a successor Plan Administrator, subject to Bankruptcy Court approval.  Any order of the
Bankruptcy Court approving any such appointment shall specify and establish the date on which
such appointment shall be effective.  Every successor Plan Administrator, without any further
act, deed, conveyance or Bankruptcy Court order, shall become vested with all rights, powers,
trusts and duties of the retiring Plan Administrator hereunder and under the Plan; *provided*,
*however*, that no Plan Administrator shall be liable for the acts or omissions of any prior or
subsequent Plan Administrator.

d.      **Establishment of Reserve Accounts for Disputed Claims**

On the Effective Date, NNIII shall account for the Disputed Claims in such
amounts, as agreed by NNIII and the Plan Administrator, in accordance with the terms of the

Plan Administration Agreement, as may be necessary to make sufficient future payments with respect to Disputed Claims as provided by the Plan.  As of the date hereof, there are no known Disputed Claims.

### 3.    Post-Effective Date Management

On the Effective Date, the board of directors of Wind-Down NNIII shall consist of one natural person selected by the Plan Administrator, which person may be the Plan Administrator or an employee or principal thereof, to serve as the board of directors of Wind-Down NNIII through the closing of Wind-Down NNIII's Chapter 11 Case in accordance with Section 6.6 (*Closing of Chapter 11 Case*) of the Plan.  The current officers of NNIII shall continue to serve as the officers of Wind-Down NNIII in accordance with applicable non-bankruptcy law, any employment agreement with NNIII entered into after the Petition Date and NNIII's by-laws, as the same may be amended from time to time, through the closing of Wind-Down NNIII's Chapter 11 Case, unless an officer resigns or is removed by the board of directors of Wind-Down NNIII.

NNIII anticipates that John J. Ray, III will be appointed as the sole director and President of Wind-Down NNIII.  The Plan Administrator will have the authority to appoint the officers of Wind-Down NNIII.  NNIII also expects that Kathryn Schultea of RLKS Executive Solutions LLC will be named as the Vice President and Secretary and Mary Cilia of RLKS Executive Solutions LLC will be named as the Treasurer of Wind-Down NNIII.

### 4.    Corporate Existence of NNIII

After the Effective Date, the Plan Administrator may, in accordance with the Plan Administration Agreement, (a) maintain Wind-Down NNIII as a corporation in good standing until such time as all aspects of the Plan pertaining to Wind-Down NNIII have been completed or (b) subject to Section 8.2 (*Dissolution of Wind-Down NNIII*) of the Plan, dissolve Wind-Down NNIII or complete the winding up of Wind-Down NNIII (including, without limitation, transferring all or part of the Residual Assets of Wind-Down NNIII to a liquidating trust) at such time as the Plan Administrator considers appropriate and consistent with the implementation of the Plan pertaining to Wind-Down NNIII.

### 5.    Effectuating Documents and Further Transactions

NNIII and Wind-Down NNIII and, on and after the Effective Date, the Plan Administrator shall be authorized to execute, deliver, file or record such contracts, instruments, releases, consents, certificates, resolutions, programs and other agreements or documents and take such acts and actions as may be reasonable, necessary or appropriate to effectuate, implement, consummate or further evidence the terms and conditions of the Plan, the Confirmation Order and any transactions described in or contemplated by the Plan, without the need for any approvals, authorization or consents except for those expressly required pursuant to the Plan.

E.    **Provisions Governing Voting and Distributions**

1.    **Voting of Claims**

Section 10.1 (*Voting of Claims*) of the Plan provides that each holder of an Allowed Claim in an Impaired Class of Claims that is entitled to vote on the Plan pursuant to Article 3 (*Classification of Claims and Interests*) and Article 4 (*Treatment of Claims Against and Interests in Debtors*) of the Plan will be entitled to vote separately to accept or reject the Plan, as provided in the order entered by the Bankruptcy Court establishing procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order or orders of the Bankruptcy Court.  With respect to Impaired Classes of Claims or Interests that are deemed to reject the Plan under any such amended Plan, NNIII shall request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code.

2.    **Minimum Distribution**

No payment of Creditor Proceeds of less than $100 shall be made by NNIII to any Holder of an Allowed Claim against NNIII.  Such amounts shall be deemed redistributed to other Holders of Allowed Claims against NNIII and, accordingly, shall be distributed in accordance with the provisions of the Plan and the Bankruptcy Code.  Any payment of Cash made pursuant to the Plan may be made at the option of the Disbursing Agent either by check or by wire transfer.

3.    **Distributions of Creditor Proceeds**

After the satisfaction in full of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims and Allowed Secured Claims (to the extent the Plan Administrator determines, in accordance with the Plan Administration Agreement, that NNIII will pay such Allowed Secured Claim in Cash) against NNIII, the Disbursing Agent shall make a Distribution of Creditor Proceeds in accordance with the provisions of the Plan (a) to each Holder of an Allowed Claim as of the Distribution Record Date against NNIII, within sixty (60) days of the Effective Date, or as soon thereafter as practicable, and (b) to each Holder of an Allowed Claim that is allowed after the Effective Date against NNIII, in accordance with the Class priorities set forth in Article 4 (*Treatment of Claims Against and Interests in Debtors*) and Section 10.3 (*Distributions of Creditor Proceeds*) of the Plan. After the initial Distribution with respect to any Allowed Claim, the Disbursing Agent shall make Distributions of Creditor Proceeds in accordance with the Plan to Holders of Allowed Claims against NNIII on June 30th and December 31st of each year (each such Distribution, an "Interim Distribution") and on the Final Distribution Date.  Notwithstanding the foregoing, the Plan Administrator may determine in accordance with the terms of the Plan Administration Agreement to direct the Disbursing Agent (i) to make Distributions more frequently on dates other than the Interim Distribution dates or (ii) not to make an Interim Distribution if it determines that the costs of making such Interim Distribution would be disproportionate to the Distribution amount.  No Distributions shall be made on account of a claim that is not yet an Allowed Claim until the Plan Administrator (1) determines not to object to such Claim (or the time to object to Claims expires), (2) agrees with the Holder of such Claim to allow such Claim

in an agreed upon amount or (3) objects to such Claim and such Claim is Allowed by a Final Order, during which time such Claim shall be treated as a Disputed Claim.

### 4.    Distribution Record Date

As of the close of business on the Distribution Record Date, the register for NNIII shall be closed and there shall be no further changes to the record holder of any of the Claims or Interests.  NNIII and the Plan Administrator shall have no obligation to recognize any transfer of any Claims or Interests occurring after the close of business on the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder only with those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

PLEASE NOTE THAT IF YOU ACQUIRE A CLAIM FOLLOWING THE DISTRIBUTION RECORD DATE, YOU WILL NOT RECEIVE A DISTRIBUTION FROM NNIII OR WIND-DOWN NNIII ON ACCOUNT OF SUCH CLAIM.  IN ADDITION, IF YOU SELL OR TRANSFER YOUR CLAIM BEFORE THE DISTRIBUTION RECORD DATE YOU WILL NOT RECEIVE A DISTRIBUTION ON ACCOUNT OF SUCH CLAIM.

### 5.    Limitation on Recovery

Section 10.5 (*Limitation on Recovery*) of the Plan provides that, in the event that the sum of the Distributions of Creditor Proceeds and other Distributions with respect to an Allowed Claim hereunder as well as from other sources are in excess of one hundred percent (100%) of such Holder's Allowed Claim, then the Creditor Proceeds remaining to be distributed to such Holder in excess of such one hundred percent (100%) shall be deemed available for distribution to other Holders of Allowed Claims against NNIII and, accordingly, shall be distributed in accordance with the provisions of the Plan and the Bankruptcy Code.

In no event shall any holder of any Allowed Claim receive Distributions under the Plan in excess of the Allowed amount of such Claim.

### 6.    Allocation of Distributions

Distributions to any Holder of an Allowed Claim shall be allocated first to the principal portion of any such Allowed Claim (as determined for federal income tax purposes) and, only after the principal portion of any such Allowed Claim is satisfied in full, to any portion of such Allowed Claim comprising interest (but solely to the extent that interest is an allowable portion of such Allowed Claim).

### 7.    Delivery of Distributions and Undeliverable Distributions

Distributions to Holders of Allowed Claims of NNIII shall be made at the address of each such Holder as set forth on the Schedules Filed, unless superseded by a new address as set forth (a) on a proof of claim Filed by a Holder of an Allowed Claim or (b) in another writing notifying the Claims Agent (at the address listed in Section I (*Introduction*) hereof) of a change of address.  If any Holder's Distribution is returned as undeliverable, no further Distributions shall be made or notices delivered to such Holder on account of such Claim until the Claims

Agent is notified in writing by such Holder of such Holder's current address, at which time all such Distributions shall be made to such Holder without interest; *provided* that such Distributions that are returned as undeliverable shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six (6) months after the Effective Date. After such date, all unclaimed property or interests in property shall become the property of NNIII's Estate, without the need for a further order by the Bankruptcy Court (notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary), and the Claim of any Holder to such property or interest in property shall be discharged and forever barred.

### 8. Time Bar to Cash Payment Rights

Checks issued in respect of Allowed Claims shall be null and void if not negotiated within ninety (90) days after the date of issuance thereof. Requests for reissuance of any check shall be made to the Plan Administrator by the Holder of the Allowed Claim to whom such check originally was issued. Any claim in respect of a voided check shall be made on or before thirty (30) days after the expiration of the ninety (90) day period following the date of issuance of such check. Thereafter, the amount represented by such voided check shall irrevocably revert to NNIII's Estate, to be distributed to other Holders of Allowed Claims against NNIII in accordance with the terms of the Plan and the Bankruptcy Code, and any Claim in respect of such voided check shall be discharged and forever barred from assertion against NNIII, its Estate and its respective property, *provided* that at the discretion of the Plan Administrator, any such amounts may be escheated pursuant to applicable law. In the case of any check issued in respect of an Allowed Claim that is returned as an undeliverable Distribution, such check shall be null and void if not negotiated within ninety (90) days after the date of issuance, and the Allowed Claim for which such Distribution was issued shall be discharged and forever barred pursuant to <u>Section 10.9</u> (*Time Bar to Cash Payment Rights*) of the Plan only after the time period to claim such undeliverable distribution provided in <u>Section 10.7</u> (*Delivery of Distributions and Undeliverable Distributions* ) has passed.

### 9. Withholding and Reporting Requirements

In connection with the Plan and all instruments issued in connection therewith and distributed thereon, NNIII, the Plan Administrator and the Disbursing Agent shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all Distributions under the Plan shall be subject to any such withholding or reporting requirements. Notwithstanding the above, each Holder of an Allowed Claim that is to receive a Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any Tax obligations imposed by any Governmental Unit, including income, withholding and other Tax obligations, on account of such Distribution. The Disbursing Agent has the right, but not the obligation, to withhold a Distribution until such Holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such Tax obligations. The Disbursing Agent may require, as a condition to receipt of a Distribution, that the Holder of an Allowed Claim complete and return a Form W-8 or W-9, as applicable to each such Holder, to the Disbursing Agent. If the Disbursing Agent makes such a request and the Holder fails to comply before the date that is one hundred and eighty (180) days after the request is made, no further Distributions shall be made to such Holder on account of such Claim. In

such cases, the amount of such Distribution shall irrevocably revert to NNIII and such Claim shall be discharged and the Holder of such Claim shall be forever barred from asserting such Claim against NNIII, its Estate or its respective property.  Also, in such cases, any Cash held for Distributions on account of such Claim shall become the property of NNIII's Estate and distributed to other Holders of Allowed Claims against NNIII in accordance with the terms of the Plan and the Bankruptcy Code.

### 10.    Setoffs and Recoupment

NNIII may, but shall not be required to, setoff against the payment of any Claim or other Distributions to be made pursuant to the Plan in respect of such Claim of any nature whatsoever that NNIII may have against the Holder of such Claim; *provided*, *however*, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by NNIII of any such claim NNIII may have against such Holder.

### 11.    Disputed Claims

#### a.    Objections

Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, as of the Effective Date, objections to, and requests for estimation of, all Claims against NNIII may be interposed and prosecuted only by the Plan Administrator, who shall consult with Wind-Down NNIII regarding the same.  Objections to and requests for estimation of Claims shall be Filed and served on the claimant on or before the first Business Day that is one hundred and eighty (180) days after the Effective Date (the "Claims Objection Deadline") or such later date as is established by the filing of a notice by Wind-Down NNIII or the Plan Administrator prior to the expiration of the then-current Claims Objection Deadline.

#### b.    No Distributions Pending Allowance

Notwithstanding any other provision hereof, if any portion of a Claim is a Disputed Claim, no Distribution shall be made on account of the disputed portion of such Claim unless and until such disputed portion of such Claim becomes Allowed.

#### c.    Estimation of Claims

The Plan Administrator may at any time request that the Bankruptcy Court estimate for any purpose including Distribution any contingent, unliquidated or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code or otherwise, regardless of whether NNIII previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection.

#### d.    Resolution of Disputed Claims

On and after the Effective Date, the Plan Administrator shall have the authority to compromise, settle or otherwise resolve or withdraw any objections to Claims and to compromise, enter into protocols for the resolution of, settle or otherwise resolve any Disputed Claims regardless of whether such Claims are in a Class or otherwise (at Wind-Down NNIII's or

the Plan Administrator's sole discretion with or without Bankruptcy Court approval).  On and after the Effective Date, the Plan Administrator shall have the sole authority to administer and adjust the Claims Register to reflect any such settlements or compromises without further notice to or action, order or hearing of the Bankruptcy Court.

### e.   No Interest

Holders of Disputed Claims shall not be entitled to interest if such Disputed Claim becomes an Allowed Claim.

### 12.   No Payment on Saturday, Sunday or Legal Holiday

If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 13.   No Distributions on Late-Filed Claims

In accordance with section 502(b)(9) of the Bankruptcy Code, any entity that failed to File a proof of Claim by the applicable bar date set by the Bankruptcy Court in the Chapter 11 Case and was not otherwise permitted to File a proof of claim after the applicable bar date by a Final Order of the Bankruptcy Court is and shall be barred, estopped and enjoined from asserting any Claim against NNIII (a) in an amount that exceeds the amount, if any, that is identified in the Schedules on behalf of such entity as undisputed, noncontingent and liquidated or (b) of a different nature or a different classification than any Claim identified in the Schedules on behalf of such Entity.  NNIII and Wind-Down NNIII shall be entitled, for the purposes of Distributions, reserves and other similar purposes under the Plan, to treat all Claims Filed after the later of (a) the Effective Date and (b) the Claim's applicable bar date, as disallowed and expunged.

### 14.   Post-Petition Date Interest

No post-Petition Date interest (or make whole premium, no-call payment or similar claim accruing post-Petition Date) shall be included in any Allowed Claim, nor be paid on Allowed Claims by NNIII.

## F.   Treatment of Executory Contracts and Unexpired Leases

### 1.   Previous Assumption, Assignment and Rejection

Any executory contracts and unexpired leases of NNIII that have not been assumed, assumed and assigned or rejected prior to the Confirmation Date or with respect to which NNIII has not otherwise Filed a Notice of Assumption and Assignment or obtained an order assuming, assuming and assigning or rejecting the contract or lease prior to the Confirmation Date (the "Remaining Contracts"), if any, shall be rejected pursuant to Section 9.2 (*Rejection*) of the Plan.

2. **Rejection and Approval of Rejection**

Except for those executory contracts and unexpired leases that have been assumed, assumed and assigned or rejected pursuant to previous orders of the Bankruptcy Court, all executory contracts and unexpired leases of NNIII shall be rejected pursuant to section 365 and 1123(b)(2) of the Bankruptcy Code; *provided*, *however*, that nothing contained in Article 9 (*Treatment of Executory Contracts*) of the Plan shall constitute an admission by NNIII that any contract or lease is an executory contract or unexpired lease or that NNIII or its successors and assigns has any liability thereunder.

The Confirmation Order shall constitute an order of the Bankruptcy Court approving the rejection of executory contracts and unexpired leases under Section 9.2 (*Rejection*) of the Plan pursuant to section 365 and 1123(b)(2) of the Bankruptcy Code as of the Effective Date.  Any Claim for damages arising from any such rejection must be Filed within thirty (30) days after the Effective Date, or such Claim shall receive no Distribution under the Plan or otherwise on account of such Claim.

3. **Pre-existing Obligations to the Debtors under Executory Contracts**

Rejection or repudiation of any executory contract pursuant to the Plan or otherwise will not constitute a termination of pre-existing obligations owed to NNIII under such contracts.  In particular, notwithstanding any non-bankruptcy law to the contrary, Wind-Down NNIII expressly reserves and does not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by NNIII or Wind-Down NNIII, as applicable, from counterparties to any Rejected Contract.

G. **Conditions Precedent to Plan's Confirmation and Effective Date**

1. **Conditions to the Effective Date**

The following are conditions precedent to the Effective Date of the Plan:

(a)     All actions and agreements, instruments, certificates or other documents necessary to implement the terms and provisions of the Plan are effected or executed and delivered, as applicable, in form and substance satisfactory to NNIII.

(b)     All authorizations, consents and regulatory approvals, if any, required in connection with the consummation of the Plan are obtained and not revoked.

(c)     The amended organizational documents of Wind-Down NNIII shall have been filed with the applicable authorities of each Wind-Down Debtor's respective jurisdiction of incorporation or formation in accordance with such jurisdiction's applicable laws.

(d)     All statutory fees then due to the U.S. Trustee shall have been paid in full by NNIII pursuant to the Plan.

(e)     The Confirmation Order shall have been entered by the Bankruptcy Court, and thereafter shall have become a Final Order.

(f)     The SPSA shall not have been terminated.

(g)     An order (or orders) recognizing the Confirmation Order shall have been granted by the CCAA Court in the proceedings commenced in respect of NNIII under section 18.6 of the CCAA.

(h)     The Indian Tax Appeal Litigation shall have been withdrawn with prejudice or otherwise finally resolved to the satisfaction of the U.S. Principal Officer in his sole discretion.

## 2.     Waiver of Conditions

Notwithstanding the foregoing, NNIII reserves its right to waive the occurrence of the conditions precedent to the Effective Date set forth in Section 12.1 (*Conditions to the Effective Date*) of the Plan, other than  Section 12.1(f) of the Plan.  Any such waiver may be given effect at any time, without notice, leave, hearing or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan, provided that notice of any such waiver shall promptly be provided to the SPSA Parties.  Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.  If NNIII decides that one of the conditions precedents to the Effective Date of its Plan cannot be satisfied and the occurrence or such condition is not waived or cannot be waived, then NNIII shall file a notice of the inability to satisfy such condition with the Bankruptcy Court.  The failure of NNIII to exercise any of the foregoing rights shall not be deemed a waiver of any other rights and each right shall be deemed an ongoing right that may be asserted at any time.

## 3.     Dismissal or Conversion of the Plan

NNIII or Wind-Down NNIII reserve the right to dismiss or convert the Chapter 11 Case as necessary to effectuate the SPSA and the settlement contemplated therein or to wind down and cease operations. NNIII or Wind-Down NNIII shall coordinate with the SPSA Parties to make any required amendments or seek any required waivers to or under the SPSA in order to implement any such actions, subject to the SPSA Parties' rights under the SPSA.

## 4.     Notice of Effective Date

Upon the occurrence of the Effective Date or as soon thereafter as is reasonably practicable, Wind-Down NNIII shall File with the Bankruptcy Court the "Notice of Effective Date" in a form reasonably acceptable to Wind-Down NNIII in its sole discretion, which notice shall constitute appropriate and adequate notice that the Plan has become effective; *provided*, *however*, that Wind-Down NNIII shall have no obligation to notify any Person.  The Plan shall be deemed to be effective as of 12:01 a.m., prevailing Eastern Standard Time, on the date of such filing.  A courtesy copy of the Notice of Effective Date may be sent by United States mail, postage prepaid (or at Wind-Down NNIII's option, by courier, facsimile or electronic mail) to

those Persons who have Filed with the Bankruptcy Court requests for notices pursuant to Bankruptcy Rule 2002.

**H.     Effect of the Plan on Assets, Claims and Interests**

**1.     Binding Effect; Plan Binds All Holders of Claims and Interests**

Except as otherwise provided in section 1141(d) of the Bankruptcy Code, on and after the Effective Date, the provisions of the Plan shall, and shall be deemed to, be binding on any Holder of a Claim against or Interest in NNIII and its respective successors and assigns, regardless of whether the Claim or Interest of such Holder is Impaired under the Plan and whether or not such Holder has voted or failed to vote to accept or reject the Plan.

Further, pursuant to section 1142 of the Bankruptcy Code and in accordance with the Confirmation Order, NNIII and any other necessary party shall execute, deliver and join in the execution or delivery (as applicable) of any instrument, document or agreement required to consummate the Plan, and to perform any other act, and the execution of documents contemplated in the Plan that are necessary for the consummation of the Plan and the transactions contemplated herein.

Pursuant to section 1141(d)(3) of the Bankruptcy Code, Confirmation will not discharge Claims against NNIII; *provided*, *however*, that no Holder of any Claim or Interest may, on account of such Claim or Interest, seek or receive any payment or other Distribution from, or seek recourse against, NNIII's Estate, Wind-Down NNIII and/or their respective successors, assigns and/or property, except as expressly provided in this Plan.

**2.     Release of NNIII and Wind-Down NNIII**

**EFFECTIVE AS OF THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION, TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, THE HOLDERS OF CLAIMS AGAINST AND INTERESTS IN NNIII AND EACH OF SUCH HOLDERS' PREDECESSORS, SUCCESSORS, ASSIGNS AND EACH OF THEIR PRESENT AND FORMER OFFICERS, DIRECTORS, EMPLOYEES, CONSULTANTS AND AGENTS (ACTING IN SUCH CAPACITY) WILL BE DEEMED TO HAVE WAIVED, RELEASED AND VOIDED ANY AND ALL CLAIMS, OBLIGATIONS, DAMAGES, DEMANDS, DEBTS, RIGHTS, SUITS, JUDGMENTS OR LIABILITIES (OTHER THAN THE RIGHT TO ENFORCE NNIII'S OR WIND-DOWN NNIII'S OBLIGATIONS UNDER THIS PLAN, THE SPSA AND THE CONTRACTS, INSTRUMENTS, RELEASES, AGREEMENTS AND DOCUMENTS DELIVERED UNDER THIS PLAN) AGAINST NNIII AND WIND-DOWN NNIII, WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, THEN EXISTING OR THEREAFTER ARISING, IN LAW, EQUITY OR OTHERWISE, THAT ARE BASED IN WHOLE OR IN PART ON ANY ACT OR OMISSION, TRANSACTION, EVENT OR OTHER OCCURRENCE TAKING PLACE ON OR PRIOR TO THE EFFECTIVE DATE IN ANY WAY RELATING TO NNIII, THE CHAPTER 11 CASES, THE DISCLOSURE STATEMENT OR THE PLAN**

34

**(INCLUDING, WITHOUT LIMITATION, THE SOLICITATION OF VOTES ON THE PLAN) THAT COULD HAVE BEEN ASSERTED BY THE HOLDERS OF CLAIMS AGAINST OR INTERESTS IN NNIII, IN THEIR INDIVIDUAL CAPACITIES OR ON BEHALF (WHETHER DIRECTLY OR DERIVATIVELY) OF NNIII, ITS ESTATE, WIND-DOWN NNIII, EACH OF THEIR PREDECESSORS, SUCCESSORS, ASSIGNS AND EACH OF THEIR PRESENT AND FORMER OFFICERS, DIRECTORS, EMPLOYEES, CONSULTANTS AND AGENTS (ACTING IN SUCH CAPACITY), IN EACH CASE WITHOUT FURTHER NOTICE TO OR ORDER OF THE BANKRUPTCY COURT, ACT OR ACTION UNDER APPLICABLE LAW, REGULATION, ORDER OR RULE OR THE VOTE, CONSENT OR AUTHORIZATION OR APPROVAL OF ANY PERSON.**

**3.      Release and Discharge of the Plan Released Parties**

**EFFECTIVE AS OF THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION, TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, THE HOLDERS OF CLAIMS AGAINST AND INTERESTS IN NNIII AND EACH OF SUCH HOLDERS' PREDECESSORS, SUCCESSORS, ASSIGNS AND EACH OF THEIR PRESENT AND FORMER OFFICERS, DIRECTORS, EMPLOYEES, CONSULTANTS AND AGENTS (ACTING IN SUCH CAPACITY) WHO: (I) EITHER VOTE TO ACCEPT THE PLAN OR ARE PRESUMED TO HAVE VOTED FOR THE PLAN UNDER SECTION 1126(F) OF THE BANKRUPTCY CODE OR (II) ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN AND ABSTAIN FROM VOTING AND DO NOT MARK THEIR BALLOTS TO INDICATE THEIR REFUSAL TO GRANT THE RELEASES PROVIDED HEREIN WILL BE DEEMED TO HAVE WAIVED, RELEASED, VOIDED AND DISCHARGED EACH OF THE PLAN RELEASED PARTIES FROM ANY AND ALL CLAIMS, OBLIGATIONS, DAMAGES, DEMANDS, DEBTS, RIGHTS, SUITS, JUDGMENTS OR LIABILITIES (OTHER THAN THE RIGHT TO ENFORCE THE PLAN RELEASED PARTIES' OBLIGATIONS UNDER THE PLAN, THE SPSA AND THE CONTRACTS, INSTRUMENTS, RELEASES, AGREEMENTS AND DOCUMENTS DELIVERED UNDER THE PLAN), WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, THEN EXISTING OR THEREAFTER ARISING, IN LAW, EQUITY OR OTHERWISE, THAT ARE BASED IN WHOLE OR IN PART ON ANY ACT OR OMISSION, TRANSACTION, EVENT OR OTHER OCCURRENCE TAKING PLACE ON OR PRIOR TO THE EFFECTIVE DATE IN ANY WAY RELATING TO NNIII, THE CHAPTER 11 CASE, THE DISCLOSURE STATEMENT, THE SPSA OR THE PLAN (INCLUDING, WITHOUT LIMITATION, THE SOLICITATION OF VOTES ON THE PLAN) THAT COULD HAVE BEEN ASSERTED BY THE HOLDERS OF CLAIMS AGAINST OR INTERESTS IN NNIII, IN THEIR INDIVIDUAL CAPACITIES OR ON BEHALF (WHETHER DIRECTLY OR DERIVATIVELY) OF NNIII, ITS ESTATE, WIND-DOWN NNIII, EACH OF THEIR PREDECESSORS, SUCCESSORS, ASSIGNS AND EACH OF THEIR PRESENT AND FORMER OFFICERS, DIRECTORS, EMPLOYEES, CONSULTANTS AND AGENTS (ACTING IN SUCH CAPACITY), IN EACH CASE WITHOUT FURTHER NOTICE TO OR ORDER OF THE BANKRUPTCY COURT, ACT OR ACTION UNDER APPLICABLE**

LAW, REGULATION, ORDER OR RULE OR THE VOTE, CONSENT OR
AUTHORIZATION OR APPROVAL OF ANY PERSON.

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN <u>SECTIONS
13.2</u> (*RELEASE AND DISCHARGE OF NNIII AND WIND-DOWN NNIII*) OR <u>13.3</u>
(*RELEASE AND DISCHARGE OF THE PLAN RELEASED PARTIES*) OF THE PLAN,
THE RELEASES SET FORTH ABOVE DO NOT RELEASE ANY POST-EFFECTIVE
DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, OR ANY
DOCUMENT, INSTRUMENT OR AGREEMENT EXECUTED TO IMPLEMENT THE
PLAN, INCLUDING THE SPSA, AND EXCEPT AS OTHERWISE PROVIDED BY
PRIOR OR SUBSEQUENT FINAL ORDER OF THE BANKRUPTCY COURT,
NOTHING IN <u>SECTIONS 13.2</u> (*RELEASE AND DISCHARGE OF NNIII AND WIND-
DOWN NNIII*) OR <u>13.3</u> (*RELEASE AND DISCHARGE OF THE PLAN RELEASED
PARTIES*) OF THE PLAN SHALL OPERATE AS A WAIVER OR RELEASE OF (A)
ANY PERSON (I) NAMED PRIOR TO THE EFFECTIVE DATE AS A DEFENDANT IN
ANY ACTION COMMENCED BY OR ON BEHALF OF NNIII OR (II) ADJUDICATED
PRIOR TO THE EFFECTIVE DATE BY A COURT OF COMPETENT JURISDICTION
TO HAVE ENGAGED IN ACTS OF DISHONESTY OR WILLFUL MISCONDUCT
DETRIMENTAL TO THE INTEREST OF NNIII OR (B) ANY CLAIM (I) WITH
RESPECT TO ANY LOAN, ADVANCE OR SIMILAR PAYMENT BY NNIII TO ANY
SUCH PERSON, (II) WITH RESPECT TO ANY CONTRACTUAL OBLIGATION
OWED BY SUCH PERSON TO NNIII OR (III) RELATING TO SUCH PERSON'S
KNOWING FRAUD, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT; AND
*PROVIDED*, *FURTHER*, THAT THE FOREGOING IS NOT INTENDED, NOR SHALL
IT BE CONSTRUED, TO RELEASE ANY OF NNIII'S CLAIMS THAT MAY EXIST
AGAINST NNIII'S DIRECTORS AND OFFICERS LIABILITY INSURANCE; AND
*PROVIDED*, *FURTHER*, THAT, NOTWITHSTANDING THE FOREGOING, ALL SUCH
CLAIMS SHALL BE PRESERVED BY NNIII FOR SETOFF PURPOSES.

4.    SPSA Releases

UPON THE EFFECTIVE DATE, AS PROVIDED IN <u>SECTION 8</u> (*Releases*)
OF THE SPSA AND IN CONSIDERATION FOR THE SETTLEMENTS PROVIDED
FOR UNDER THE SPSA INCLUDING THE RELEASES GRANTED IN FAVOR OF
NNIII UNDER THE SPSA, NNIII, TO THE EXTENT NOT PREVIOUSLY RELEASED,
SHALL BE DEEMED TO HAVE RELEASED AND FOREVER DISCHARGED EACH
OF THE OTHER SPSA RELEASED PARTIES FROM ANY AND ALL LIABILITY FOR
CLAIMS, DEFENSES, DEMANDS, LIABILITIES, DAMAGES, ACTIONS,
CONTRIBUTIONS, SUBROGATION, CAUSES OF ACTION, SETOFFS,
RECOUPMENTS, COSTS AND EXPENSES (INCLUDING LAWYERS' OR OTHER
FEES OR EXPENSES), THE FOREGOING TERMS TO BE CONSTRUED AS
BROADLY AS POSSIBLE, WHETHER KNOWN OR UNKNOWN, PAST OR
PRESENT, FIXED OR CONTINGENT, LIQUIDATED OR UNLIQUIDATED, WHICH
ANY OF THE DEBTOR RELEASING PARTIES HAVE, HAD, MAY HAVE HAD OR
HEREAFTER MAY HAVE HOWEVER SO ARISING OUT OF OR IN CONNECTION
WITH THE ALLOCATION DISPUTE, ANY OTHER MATTERS RESOLVED UNDER
THE SPSA OR ANY OTHER MATTER RELATING TO THE CHAPTER 11 CASES OR

THE FOREIGN PROCEEDINGS OR THE NORTEL GROUP (COLLECTIVELY, AND EXCLUDING THE NON-RELEASED MATTERS, THE "SPSA RELEASED CLAIMS") AND UNDERTAKES, COVENANTS AND AGREES NOT TO MAKE ANY CLAIM, PARTICIPATE IN ANY PROCEEDING OR TAKE ANY ACTION AGAINST ANY OTHER PERSON OR ENTITY WHO WOULD AS A RESULT OF SUCH CLAIM, PROCEEDING OR ACTION HAVE A CLAIM FOR CONTRIBUTION OR INDEMNITY AGAINST ANY OF THE OTHER SPSA RELEASED PARTIES IN RELATION TO THE SPSA RELEASED CLAIMS, *PROVIDED HOWEVER*, THAT NNIII'S RIGHT TO OBJECT TO, OR ASSERT COUNTERCLAIMS FOR PURPOSES OF SETOFF AGAINST, CLAIMS MADE AGAINST IT BY DIRECTORS AND OFFICERS OF ANY ENTITY IN THE NORTEL GROUP IS NOT RELEASED OR IN ANY WAY COMPROMISED.

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN SECTION 13.4 (*SPSA RELEASES*) OF THE PLAN, THE RELEASES SET FORTH ABOVE IN SECTION 13.4 (*SPSA RELEASES*) OF THE PLAN DO NOT CONSTITUTE A RELEASE, WAIVER OR DISCHARGE OF ANY PROVEN CLAIMS AGAINST THE CANADIAN ESTATE FOR PAYMENT OF THE CROSSOVER BONDS OR THE NNCC BONDS, THE U.S. CANADIAN CLAIM, THE U.S. CANADIAN PRIORITY CLAIM, THE INTERCOMPANY CLAIMS SPECIFIED ON ANNEX L (*BOOK INTERCOMPANY CLAIMS*) TO THE SPSA, NNI'S RIGHT TO RECEIVE PAYMENT FROM THE CANADIAN ESTATE IN THE AMOUNT OF $77.5 MILLION, AS PROVIDED FOR IN SECTION 4(E) (*SIDE LETTERS, IFSA, CFSA AND T&T CLAIMS*) OF THE SPSA, ANY CLAIM BETWEEN OR AMONG ANY OF THE FORMER DEBTORS AND THEIR SUBSIDIARIES, OR ANY CLAIM TO ENFORCE THE TERMS OF THE SPSA, THE PLAN, THE NNI PLAN, THE CANADIAN PLAN AND ANY ORDER OF THE BANKRUPTCY COURT OR THE CCAA COURT RELATED THERETO (COLLECTIVELY, THE "NON-RELEASED MATTERS").

5.    Exculpation

Pursuant to Section 13.5 (*Exculpation and Limitation of Liability*) of the Plan, none of the Exculpated Parties shall have or incur any liability to any Entity for any act taken or omitted to be taken in connection with and subsequent to the commencement of the Chapter 11 Cases, the formulation, preparation, dissemination, implementation, solicitation of votes, confirmation or approval of the Plan or any compromises or settlements contained therein, the administration of the Plan or Distributions under the Plan, the Disclosure Statement and any ancillary documents related thereto or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan; *provided, however*, the foregoing provisions of Section 13.5 (*Exculpation and Limitation of Liability*) shall not affect the liability of any Exculpated Party that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct, including, without limitation, fraud and criminal misconduct, and in all respects the Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

6.      Injunction on Claims

**Except as otherwise expressly provided in the Plan, the Confirmation Order or such other order of the Bankruptcy Court that may be applicable, all Holders of Claims or other debt or liability that is treated under the Plan or Interest or other right of interest that is terminated or cancelled pursuant to the Plan are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or other debt or liability or Interest or other right of equity interest that is terminated or cancelled pursuant to the Plan against NNIII, NNIII's Estate or Wind-Down NNIII or any properties or interest in properties of NNIII or Wind-Down NNIII, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against NNIII, NNIII's Estate or Wind-Down NNIII or any properties or interest in properties of NNIII or Wind-Down NNIII, (c) creating, perfecting or enforcing any encumbrance of any kind against NNIII, NNIII's Estate or Wind-Down NNIII or any properties or interest in properties of NNIII or Wind-Down NNIII, (d) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from NNIII, NNIII's Estate or Wind-Down NNIII or any properties or interest in properties of NNIII or Wind-Down NNIII, (e) acting or proceeding in any manner that does not conform to or comply with the provisions of the Plan or (f) taking any actions to interfere with the implementation or consummation of the Plan, with respect to any such Claim or other debt or liability that is discharged or Interest or other right of equity interest that is terminated or cancelled pursuant to the Plan.**

7.      **Terms of Injunctions or Stays**

Unless otherwise provided in the Plan, the Confirmation Order or a separate order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Case under sections 105 and 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date shall remain in full force and effect until the Effective Date.  Upon the Effective Date, all injunctions or stays provided for in each Chapter 11 Case under sections 105 or 362 of the Bankruptcy Code, or otherwise, shall be lifted and of no further force or effect— being replaced, to the extent applicable, by the injunctions, discharges, releases and exculpations of Article 13 (*Effect of Confirmation*) of the Plan.

8.      **Retention of Litigation Claims and Reservation of Rights**

Section 13.8 (*Retention of Litigation Claims and Reservation of Rights*) of the Plan provides that, except as expressly provided in the Plan, nothing contained in the Plan or in the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights with respect to Litigation Claims that NNIII, Wind-Down NNIII or the Plan Administrator may have or choose to assert on behalf of NNIII's Estate or Wind-Down NNIII under any provision of the Bankruptcy Code or any applicable non-bankruptcy law, including, without limitation, any and all claims against any Person or Entity, to the extent such Person or Entity asserts a cross-claim, counterclaim or claim for setoff that seeks affirmative relief against NNIII, its officers, directors or representatives.

Except as expressly provided in the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any Litigation Claim, right of setoff or other legal or equitable defense that NNIII had immediately prior to the Petition Date, against or with respect to any Claim. NNIII, Wind-Down NNIII and the Plan Administrator shall have, retain, reserve and be entitled to assert all such Litigation Claims, rights of setoff and other legal or equitable defenses that NNIII had immediately prior to the Petition Date fully as if the Chapter 11 Case had not been commenced, and all of NNIII's legal and equitable rights respecting any Claim may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Case had not been commenced.

Except as expressly provided in the Plan, the Plan Administrator, shall, after the Effective Date, retain the rights of NNIII to prosecute any Litigation Claims that could have been brought by NNIII at any time.

## I.  Retention of Rights

The Plan Administrator and Wind-Down NNIII shall retain the rights of NNIII to enforce all orders entered and relief granted in the Chapter 11 Case.

## J.  Vesting

Except as otherwise expressly provided in the Plan or the SPSA, or any documents or instruments executed in accordance therewith, on the Effective Date, pursuant to section 1141(b) and section 1141(c) of the Bankruptcy Code, Wind-Down NNIII shall be vested with all of the Assets of NNIII's Estate free and clear of all Claims, Interests, Liens, encumbrances, charges and other interests of Creditors and Holders of Interests, and may operate free of any restrictions imposed by the Bankruptcy Code or by the Bankruptcy Court, including, without limitation, performing any contract or lease entered into or assumed by NNIII after the Petition Date. NNIII shall continue as Debtor-in-Possession under the Bankruptcy Code until the Effective Date, and thereafter, subject to the terms of the Plan, Wind-Down NNIII may operate free of any restrictions imposed by the Bankruptcy Code or the Bankruptcy Court.

## K.  Defenses with Respect to Unimpaired Claims

Except as otherwise provided in the Plan, nothing shall affect the rights and legal and equitable defenses of NNIII, Wind-Down NNIII or the Plan Administrator with respect to any Unimpaired Claim, including all rights in respect of legal and equitable defenses to setoffs or recoupments against Unimpaired Claims.

## L.  NNIII's Post-Emergence Wind-Down Activities

The director of Wind-Down NNIII shall have the right to dissolve Wind-Down NNIII, after the occurrence of Wind-Down NNIII's Final Distribution Date, on or shortly following the Effective Date without the necessity for (i) any further approval by the stockholders of Wind-Down NNIII of the dissolution or any plan of distribution, to the extent as such otherwise may be required by applicable law, and to the extent such shareholder approval may be required by applicable law such approval shall be deemed previously provided; or (ii) any other or further actions to be taken by or on behalf of Wind-Down NNIII or payments to be

made in connection therewith, subject to the filing of a certificate of dissolution with the appropriate governmental authorities.

## M.    Summary of Other Provisions of the Plan

### 1.    Retention of Jurisdiction

Article 14 (*Retention of Jurisdiction*) of the Plan provides that, pursuant to sections 105 and 1142 of the Bankruptcy Code, and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising in, arising under or related to the Chapter 11 Case and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

(a)    Allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the allowance or priority of all Claims and Interests;

(b)    Hear and determine any and all Causes of Action against any Person and rights of NNIII and Wind-Down NNIII that arose before or after the Petition Date, including, but not limited to, the rights and powers of a trustee and debtor-in-possession against any Person whatsoever, including, but not limited to, all avoidance powers granted to NNIII under the Bankruptcy Code and all Causes of Action and remedies granted pursuant to sections 502, 506, 510, 541, 542, 543, 544, 545, 547 through 551 and 553 of the Bankruptcy Code;

(c)    Grant or deny any applications for allowance of compensation for Professionals authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or prior to the Effective Date; *provided*, *however*, that the payment of all fees and expenses of Wind-Down NNIII and the Plan Administrator incurred from and after the Effective Date, including counsel fees, shall be made in the ordinary course and without further notice or Bankruptcy Court approval;

(d)    Resolve any matters relating to the assumption, assumption and assignment or rejection of any executory contract or unexpired lease to which NNIII is or was a party or with respect to which NNIII may be liable, including, without limitation, the determination of whether such contract is executory for the purposes of section 365 of the Bankruptcy Code, and hear, determine and, if necessary, liquidate any Claims arising therefrom;

(e)    Enter orders approving Wind-Down NNIII's post-Confirmation sale or other disposition of Residual Assets upon motion by the Plan Administrator;

(f)    Ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(g)    Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving NNIII that may be pending in the Chapter 11 Case on the Effective Date;

(h)    Hear and determine matters concerning state, local or federal taxes in accordance with sections 346, 505, 1129 or 1146 of the Bankruptcy Code;

(i)    Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and the Confirmation Order and all contracts, instruments, releases and other agreements or documents created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

(j)    Hear and determine any matters concerning the enforcement of the provisions of Article 13 (*Effect of Confirmation*) of the Plan and any other exculpations, limitations of liability or injunctions contemplated by the Plan;

(k)    Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or the Confirmation Order;

(l)    Permit NNIII, to the extent authorized pursuant to section 1127 of the Bankruptcy Code, to modify the Plan, Confirmation Order or any agreement, contract, instrument release or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in the Plan or any agreement, contract, instrument, release or document created in connection with the Plan;

(m)    Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with respect to consummation, implementation or enforcement of the Plan or the Confirmation Order;

(n)    Enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings, including with respect to the Plan and the Confirmation Order, entered in connection with the Chapter 11 Case;

(o)    Hear and determine Causes of Action by or on behalf of NNIII or Wind-Down NNIII or the Plan Administrator;

(p)    Enter and enforce such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated, or Distributions pursuant to the Plan are enjoined or stayed;

(q)    Hear and determine all claims, rights or disputes arising under or in connection with the orders previously entered in the Chapter 11 Case;

(r)    Hear and determine any other matters that may arise in connection with or relating to the Plan, the Confirmation Order, the SPSA, the Plan Administration Agreement or any agreement, contract, instrument release or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

(s)    Enter any orders in aid of and resolve any matters relating to or arising under prior orders of the Bankruptcy Court; and

(t)       Enter a final decree closing the Chapter 11 Case.

**N.**    **Other Provisions of the Plan**

Article 15 (*Miscellaneous Provisions*) of the Plan contains a number of additional miscellaneous provisions, which should be carefully reviewed, including: Section 15.1 (*Effectuating Documents and Further Transactions*); Section 15.2 (*Authority to Act*); Section 15.3 (*Amendment or Modification of the Plan*); Section 15.4 (*Administrative Expense Claims Reserve*); Section 15.5 (*Fees and Expenses*); Section 15.6 (*Revocation or Withdrawal of the Plan*); Section 15.7 (*Insurance Preservation*); Section 15.8 (*Exemption from Certain Transfer Taxes*); Section 15.9 (*Subordinated Claims*); Section 15.10 (*Cross-Border Protocol and Cross-Border Claims Protocol*); Section 15.11 (*Governing Law*); Section 15.12 (*No Admissions*); Section 15.13 (*Severability of Plan Provisions*); Section 15.14 (*Successors and Assigns*); Section 15.15 (*Defenses with Respect to Unimpaired Claims*); Section 15.16 (*Section 1125(e) Good Faith Compliance*); Section 15.17 (*No Injunctive Relief*); Section 15.18 (*Payment of Statutory Fees*); Section 15.19 (*Saturday, Sunday or Legal Holiday*); Section 15.20 (*Reservation of Rights*); and Section 15.21 (*Post-Effective Date Rule 2002 Notice List*).

Section 15.22 (*Right to Abandon and Dispose of Debtor Property, Books & Records*) of the Plan provides that after the Effective Date, notwithstanding any prior order of the Bankruptcy Court, the Plan Administrator shall give notice of a proposed abandonment or disposition of property by filing a notice on the docket of the Chapter 11 Case and delivering a copy of such notice to the Canadian Debtors and the Monitor; *provided*, *however*, that the Plan Administrator shall be entitled to abandon, dispose of and/or destroy Records (as defined in the Abandonment and Disposal Procedures Order), without notice and without complying with any Retention Laws (as defined in the Abandonment and Disposal Procedures Order), in accordance with the terms of the Abandonment and Disposal Procedures Order and the Document Disposal Procedures (as defined in the Abandonment and Disposal Procedures Order) attached to the Abandonment and Disposal Procedures Order as Exhibit 1; *provided further*, *however*, that the destruction or other disposition of any Servers or Related Equipment (each as defined in the Server Access and Disposition Order) shall be governed by the Server Access and Disposition Order and NNIII shall only be required to provide written confirmation to the EMEA Debtors of such destruction or other disposition and the means of such destruction or other disposition. The filing of a notice of abandonment or disposition on the docket pursuant to Section 15.22 (*Right to Abandon and Dispose of Debtor Property, Books & Records*) of the Plan shall constitute good and sufficient notice, and no other or further notice of proposed abandonment or disposition is necessary. If no party serves an objection within thirty (30) days of the posting of such notice, the Plan Administrator shall be authorized immediately to abandon or dispose of such property.

Section 15.23 (*Notices*) of the Plan provides that notice required or permitted to be provided under the Plan shall be in writing and served by either (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery or (c) reputable overnight delivery service, freight prepaid, to be addressed as follows:

Counsel for NNIII

Cleary Gottlieb Steen & Hamilton LLP     Morris, Nichols, Arsht & Tunnell LLP

One Liberty Plaza
New York, New York 10006
(212) 225-3999 (facsimile)
Attention:  Lisa M. Schweitzer, Esq.

1201 North Market Street, 18th Floor
P.O. Box 1347
Wilmington, Delaware 19899
(302) 658-3989 (facsimile)
Attention:  Derek C. Abbott, Esq.
            Andrew R. Remming, Esq.

The Plan Administrator

Owl Hill Advisory LLC
Attn:   John J. Ray, III
c/o Counsel for the Plan Administrator

Counsel for the Plan Administrator

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006
(212) 225-3999 (facsimile)
Attention: Lisa M. Schweitzer, Esq.

Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street, 18th Floor
P.O. Box 1347
Wilmington, Delaware 19899
(302) 658-3989 (facsimile)
Attention:  Derek C. Abbott, Esq.
            Andrew R. Remming, Esq.

## V.
## CERTAIN RISK FACTORS TO BE CONSIDERED

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. BEFORE VOTING TO ACCEPT OR REJECT THE PLAN, SOLICITED CREDITORS SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS BELOW, AS WELL AS OTHER RISKS AND UNCERTAINTIES IDENTIFIED IN THIS DISCLOSURE STATEMENT, IN THEIR ENTIRETY.  SUCH RISKS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.  THE ORDER IN WHICH RISK FACTORS ARE HEREIN PRESENTED DOES NOT NECESSARILY REFLECT THEIR ORDER OF IMPORTANCE.

## A.    General Considerations

The Plan sets forth the means for satisfying the Claims against and Interests in NNIII.  Certain Claims may receive partial distributions pursuant to the Plan, and in some instances, no distributions at all.  Please see Section IV (*Chapter 11 Plan*) and Article 4 (*Treatment of Claims Against and Interests in NNIII*) of the Plan.

B.     **Certain Bankruptcy Considerations**

There can be no assurance that the requisite acceptances to confirm the Plan will be obtained.  Even if the requisite acceptances are received and the requirements for "cramdown" are met with respect to relevant Classes of Creditors and Interestholders, there can be no assurance that the Bankruptcy Court will confirm the Plan.  Although the Bankruptcy Court has determined that this Disclosure Statement and the balloting procedures are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it were to find that any of the statutory requirements for confirmation had not been met.  While there can be no assurance that the Bankruptcy Court will conclude that these requirements have been met, NNIII believes that the Plan meets all of the requirements set forth in section 1129 of the Bankruptcy Code.  See Section I (*Introduction*).

The confirmation and consummation of the Plan are also subject to satisfaction or waiver of certain conditions.  There can be no assurance that all of the various conditions to effectiveness of the Plan will be timely satisfied or waived.  If the Plan were not to become effective for not meeting such conditions, it is unclear whether and when Creditors and Interestholders ultimately would receive a distribution, if any, with respect to their Claims and Interests.

If the Bankruptcy Court determines that the Plan does not meet the "cramdown" requirements, in the NNIII's sole discretion, the Plan may be revoked and the Chapter 11 Case may be continued, converted to chapter 7 liquidation or dismissed in NNIII's sole discretion upon the Bankruptcy Court's approval where required.

The continuation of the Chapter 11 Case, particularly if the Plan is not confirmed or consummated in the timeframe currently contemplated, could further adversely affect NNIII's ability to maximize value.  If confirmation and consummation of the Plan do not occur expeditiously, the Chapter 11 Case could result in, among other things, increased costs for professional fees and similar expenses.

C.     **Inherent Uncertainty of Projections and Estimations**

The Recovery Analysis included herein as Appendix B (*Recovery Analysis*) relating to operations of Wind-Down NNIII is based on numerous assumptions including the timing, confirmation and consummation of the Plan in accordance with their terms and the resolution of litigation and other matters, many of which are beyond the control of Wind-Down NNIII and some or all of which may not materialize.  In addition, unanticipated events and circumstances occurring subsequent to the date that this Disclosure Statement was approved by the Bankruptcy Court may affect Wind-Down NNIII's ability to achieve the projections included in the Recovery Analysis.  Such variations may be material.  Because the actual results achieved throughout the periods covered by the Recovery Analysis may vary from the projected budgets and projections, the Recovery Analysis should not be relied upon as a guaranty, representation or other assurance of the actual costs that will be realized.

Except with respect to the Recovery Analysis and except as otherwise specifically and expressly stated herein, this Disclosure Statement does not reflect any events that may occur

subsequent to the date hereof and that may have a material effect on the information contained in this Disclosure Statement.  Neither NNIII nor Wind-Down NNIII intends to update the Recovery Analysis; thus, the Recovery Analysis will not reflect the effect of any subsequent events not already accounted for in the assumptions underlying the Recovery Analysis.

**D.    Liquidation Analysis**

NNIII has prepared the Liquidation Analysis included herein as <u>Appendix C</u> (*Liquidation Analysis*) based on certain assumptions that it believes are reasonable under the circumstances.  Those assumptions that NNIII considers significant are described in the liquidation analysis.  The underlying projections have not been compiled or examined by independent accountants.  NNIII makes no representations regarding the accuracy of the projections or a chapter 7 trustee's ability to achieve the forecasted results.  Many of the assumptions underlying the projections are subject to significant uncertainties.  Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the ultimate financial results.  In the event the Chapter 11 Case is converted to chapter 7 proceedings, actual results may vary materially from the estimates and projections set forth in the liquidation analysis.  Therefore, the liquidation analysis is speculative in nature.  In evaluating the Plan, Creditors, Interestholders and other parties in interest are urged to examine carefully all of the assumptions underlying the liquidation analysis.

**E.    Claims Estimations**

NNIII's estimates of the distributions certain Classes of Creditors or Interestholders will receive under the Plan depend on numerous assumptions, including assumptions concerning the ultimate amount of Allowed Claims in relevant Classes.

There can be no assurance that the estimated amounts of Claims set forth in this Disclosure Statement are correct, and the actual Allowed amounts of Claims may differ materially from the estimates.  Because the estimated amounts are based solely upon (i) a review of NNIII's books and records; (ii) a review of the proofs of claim filed in the Chapter 11 Case; (iii) NNIII's estimates as to additional claims that may be filed in the Chapter 11 Case; and (iv) NNIII's estimates of Claims that will be Allowed following the objections to Claims by NNIII, such estimated amounts are subject to certain risks, uncertainties and assumptions.  This may include the allowance of administrative expense and priority claims in amounts greater than estimated, which would dilute the recoveries for Unsecured Creditors.  Should one or more of these risks or uncertainties materialize or should underlying assumptions prove incorrect, the actual Allowed amounts of Claims may vary materially from those estimated.

Any allowance of Claims in any Class in an amount materially in excess of NNIII's estimate could have a significant negative effect on the distributions received by certain Classes of Creditors.

**F.    Distributions under the Plan**

As discussed above, the Claims of Creditors are subject to the risk of dilution if the total amount of Allowed Claims is higher than NNIII's estimates.  Accordingly, the amount of the Distribution that will ultimately be received by any particular Holder of a Claim may be

adversely affected by the aggregate amount of all Allowed Claims, including to the extent Disputed Claims exist.  In order to account for such risk of dilution, Distributions to General Unsecured Creditors (and certain other Creditors, to the extent necessary and appropriate) of NNIII will be made on an incremental basis until all Disputed Claims, if any, have been resolved.

A substantial amount of time may elapse between the Effective Date and the receipt of Distributions, including, but not limited to, the Distributions received on the Final Distribution Date under the Plan for certain Holders of Claims because of the time required to achieve recovery of certain assets and final resolution of Disputed Claims.

## G.    Conditions to Effectiveness of the Plan

The Plan becomes effective only when and if all of the conditions to its effectiveness are satisfied as provided in Section 12.1 (*Conditions to the Effective Date*) of the Plan or waived pursuant to Section 12.2 (*Waiver of Conditions*) of the Plan.  Creditors, Interestholders and other parties in interest are therefore advised to read carefully the conditions listed above in Section IV (*Chapter 11 Plan*) and Sections 12.1 (*Conditions to the Effective Date*) and Section 12.2 (*Waiver of Conditions*) of the Plan.

## H.    Greater Than Budgeted Wind-Down Costs

Winding down NNIII's estate may be more prolonged and result in greater costs than currently anticipated.  NNIII's wind-down process will require navigating complex legal and regulatory issues, coordinating with other Nortel affiliates, disposing of NNIII's remaining assets and dissolving NNIII.  NNIII has incurred certain costs to date for personnel and professional services.  Due to the uncertainty of the effort, cost and time necessary to wind down NNIII's estate, the future expenditures may be materially different than anticipated and may affect the ultimate value of the estate.

## I.    Intercompany Claims and Causes of Action

The SPSA, including the releases provided for in Section 8 (*Releases*) thereunder, settles and resolves other remaining Intercompany Claims between and among NNIII, the Former Debtors and various of their Affiliates, including Claims against NNIII's and the Former Debtors' officers and employees, arising from the Allocation Dispute or related matters. This includes claims for indemnification or contribution arising from lawsuits against NNIII or one of the Former Debtors by third parties, though NNIII and each of the Former Debtors has an obligation to reasonably cooperate with each of the Former Debtors in such lawsuits to the extent it can do so without prejudicing its own interests if the third party claim would otherwise have given rise to a claim for indemnity or contribution against NNIII or the Former Debtors, as applicable.  These releases under the SPSA do not include the U.S. Canadian Claim, the U.S. Canadian Priority Claim, any other allowed claims against NNIII or the Former Debtors for payment of the Crossover Bonds or the NNCC Bonds, any claim between or among any NNIII or any of the Former Debtors and their U.S. subsidiaries, any Professional Claim or any claim to enforce the terms of the SPSA, the Plan or any order of the U.S. Court or the CCAA Court related thereto.

Allowed Book Intercompany Claims shall be included in the determination of the Allowed General Unsecured Claims against NNIII.  Annex L (*Book Intercompany Claims*) to the SPSA shall be treated as the definitive position for all Allowed Book Intercompany Claims between the Nortel Group entities specified thereon, including NNIII.  Any and all other pre-filing books and records claims between (i) any of the Canadian Debtors, on the one hand, and (ii) NNIII or any of the Former Debtors and their other subsidiaries as specified on Annex L (*Book Intercompany Claims*) to the SPSA, on the other hand, which are not preserved specifically in the SPSA (including, without limitation, the claims referenced in Sections 4(b)(i) (*Estate Consolidation*) and 4(g) (*Resolution of Certain Claims*) of the SPSA), are forever released and barred as of the NNI Plan Effective Date (as defined in the Plan).  Other than the Allowed Book Intercompany Claims, all pre-filing books and records claims, including any claims that NNIII now holds as a consequence of an assignment, between (a) any of the EMEA Debtors, NNSA or the EMEA Non-Filed Entities, on the one hand, and (b) NNIII, on the other hand, are forever released and barred as of the Effective Date to the extent not previously released.  The SPSA Parties agreed and acknowledged that, as of October 12, 2016, there are no post-filing books and records claims owing between (1) any of the Canadian Debtors, on the one hand, and NNIII, the EMEA Debtors, NNSA and the EMEA Non-Filed Entities, on the other hand, and (2) NNIII, on the one hand, and any of the EMEA Debtors, NNSA and the EMEA Non-Filed Entities, on the other hand.

**J.      Certain Tax Considerations**

There are a number of material income tax considerations, risks and uncertainties associated with consummation of the Plan.  Creditors, Interestholders and other interested parties should read carefully the discussion set forth in Section VI (*Certain U.S. Federal Income Tax Considerations*) for a discussion of certain federal income tax consequences of the transactions contemplated under the Plan.  In addition, as discussed in Section V.C above, the recovery estimates for Creditors under the Plan are based on certain assumptions about tax withholding that, if they were to change, could materially affect recoveries for Creditors of NNIII.

# VI.
# CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS

## A.    In General

The following discussion summarizes certain anticipated U.S. federal income tax consequences relating to the Plan.  This summary is based on the IRC, U.S. Treasury regulations (proposed, temporary and final) issued thereunder and administrative and judicial interpretations thereof, all as they currently exist as of the date of this Disclosure Statement and all of which are subject to change, possibly with retroactive effect, so as to result in U.S. federal income tax consequences different from those discussed below.

The following summary is for general information only.  The tax treatment of a beneficial owner of Claims (each a "Holder," and collectively, the "Holders") may vary depending upon such Holder's particular situation.  This summary does not address all of the tax consequences that may be relevant to a Holder, including any alternative minimum tax consequences, and does not address the tax consequences to a Holder that has made an agreement to resolve its Claim in a manner not explicitly provided for in the Plan.  This summary also does not address the U.S. federal income tax consequences to persons not entitled to vote on the Plan; Holders that are non-U.S. persons or Holders subject to special treatment under the U.S. federal income tax laws, such as brokers or dealers in securities or currencies, certain securities traders, tax-exempt entities, financial institutions, insurance companies, foreign persons, partnerships and other pass-through entities; Holders that hold Claims as a position in a "straddle" or as part of a "synthetic security," "hedging," "conversion" or other integrated transaction; Holders that have a "functional currency" other than the United States dollar; and Holders that have acquired Claims in connection with the performance of services.  The following summary assumes that the Claims are held by Holders as "capital assets" (as defined in the IRC) and that all Claims denominated as indebtedness are properly treated as debt for U.S. federal income tax purposes.

The tax treatment of Holders and the character, amount and timing of income, gain or loss recognized as a consequence of the Plan and the distributions provided for by the Plan may vary depending upon, among other things:  (i) whether the Claim (or portion thereof) constitutes a Claim for principal or interest; (ii) the type of consideration received by the Holder in exchange for the Claim and whether the Holder receives distributions under the Plan in more than one taxable year; (iii) whether the Holder is a citizen or resident of the United States for tax purposes, is otherwise subject to U.S. federal income tax on a net basis or falls into any special class of taxpayers, such as those that are excluded from this discussion as noted above; (iv) the manner in which the Holder acquired the Claim; (v) the length of time that the Claim has been held; (vi) whether the Claim was acquired at a discount; (vii) whether the Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (viii) whether the Holder has previously included in income accrued but unpaid interest with respect to the Claim; (ix) the method of tax accounting of the Holder; (x) whether the Claim is an installment obligation for U.S. federal income tax purposes; and (xi) whether the "market discount" rules are applicable to the Holder.  Therefore, each Holder should consult its tax advisor for information that may be relevant to its particular situation and circumstances, and the particular tax consequences to such Holder of the transactions contemplated by the Plan.

THE FOLLOWING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE FOLLOWING DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE.  THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, EACH HOLDER IS STRONGLY URGED TO CONSULT ITS TAX ADVISOR REGARDING THE U.S. FEDERAL, STATE, LOCAL AND APPLICABLE NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

**B.      U.S. Federal Income Tax Consequences to NNIII**

If there is a discharge of a debt obligation by NNIII (in the case of indebtedness with multiple obligors, indebtedness that is allocable to NNIII) for an amount less than the adjusted issue price (in most cases, the amount NNIII received on incurring the obligation, with certain adjustments), such discharge generally would give rise to cancellation of debt ("COD") income, which must be included in NNIII's income.  Settlement of a guarantee should not give rise to COD.

NNIII should be able to utilize a special tax provision which excludes from income COD income attributable to debts discharged in a chapter 11 case (the "Bankruptcy Exception").

Under section 108(b) of the IRC and Treasury regulations that apply to members of a consolidated group, if NNIII does not include COD income in computing taxable income under the Bankruptcy Exception, it will be required to reduce certain tax attributes, including consolidated attributes, such as net operating losses, consolidated net operating losses, and net operating loss carryforwards (and certain other losses, credits and carryforwards, if any), attributable to NNIII; attributes that arose in separate return limitation years of NNIII (if any); and NNIII's tax basis in its assets (but not below the amount of its liabilities remaining immediately after the discharge of indebtedness), in an amount generally equal to the amount of NNIII's COD income excluded from income under the Bankruptcy Exception.  Because NNIII is a member of the NNI Consolidated Group, a "look-through rule" applies when asset basis reduction reduces the basis of stock of another member of the consolidated group and requires corresponding adjustments to be made to the attributes attributable to the lower-tier member.

NNIII believes that, to the extent NNIII has any remaining net operating losses ("NOLs") and tax credit carryforwards after taking into account any income or gain resulting from implementation of the Plan, and the required attribute reduction resulting from the discharge of indebtedness, such remaining NOLs and tax carryforwards (and alternative minimum tax NOLs) of NNIII should be eliminated as of the end of the taxable year which includes the Effective Date of the Plan.

C.      **U.S. Federal Income Tax Consequences to Holders of Claims**

1.      **Generally**

Generally, a Holder of an Allowed Claim will realize gain or loss on the exchange under the Plan of its Allowed Claim for Cash or other property, in an amount equal to the difference between (i) the sum of the amount of any Cash and the fair market value on the date of the exchange of any other property received by the Holder (other than any consideration attributable to a Claim for accrued but unpaid interest) and (ii) the adjusted tax basis of the Allowed Claim exchanged (other than basis attributable to accrued but unpaid interest previously included in the Holder's taxable income).  With respect to the treatment of accrued but unpaid interest and amounts allocable thereto, please see Section VI.D.4 (*Interest Income with Respect to Allowed Claims*).  When gain or loss is recognized as discussed below, such gain or loss may be long-term capital gain or loss if the Claim disposed of is a capital asset in the hands of the Holder and is held for more than one year.  Each Holder of an Allowed Claim should consult its own tax advisor to determine whether gain or loss recognized by such holder will be long-term capital gain or loss and the specific tax effect thereof on such Holder.

2.      **Holders of Allowed General Unsecured Claims**

A Holder of Allowed General Unsecured Claims of NNIII as of the Effective Date should be treated as receiving from NNIII the Holder's share of the Creditor Proceeds (net of any applicable liabilities) of the relevant Class after distributions to Holders of Administrative Expense Claims, Professional Claims, Priority Tax Claims, Priority Non-Tax Claims and Secured Claims against NNIII in satisfaction of those Holders' Allowed Claims and payment of all fees due and payable pursuant to section 1930 of title 28 of the United States Code. Accordingly, a Holder of such a Class 3 Claim should generally recognize gain or loss in an amount equal to the amount of Cash received in the exchange (as described above) less the adjusted tax basis of its Claim.  It is possible that any loss, or a portion of the gain, realized by a Holder may be deferred until all of the distributions to such Holder are received.  As discussed in Section VI.D.4 (*Interest Income with Respect to Allowed Claims*), the amount of Cash received in respect of Claims for accrued but unpaid interest will be taxed as ordinary income, except to the extent previously included in income by a Holder under his or her method of accounting.

Because a Holder's ultimate amount realized in exchange for its Allowed Class 3 Claim may be increased after the Effective Date, as provided for in the Plan, due to the existence of Disputed Claims, such Holder should recognize additional or offsetting gain if, and to the extent that, the aggregate amount of cash ultimately received by such Holder is greater than the amount used in initially determining gain or loss in accordance with the procedures described in the preceding paragraph.

The character of any gain or loss as capital gain or loss or ordinary income or loss and, in the case of capital gain or loss, as short-term or long-term, will depend on a number of factors, including: (i) the nature and origin of the Claim; (ii) the tax status of the Holder of the Claim; (iii) whether the Claim has been held for more than one year; (iv) the extent to which the Holder previously claimed a loss or bad debt deduction with respect to the Claim; and (v) whether the Claim was acquired at a market discount.  A Holder that purchased its Claim from a

prior Holder at a market discount may be subject to the market discount rules of the IRC.  Under those rules (subject to a de minimis exception), assuming that such Holder has made no election to accrue the market discount and include it in income on a current basis, any gain recognized on the exchange of such Claim generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

### 3.      Holders of Disputed Claims

Although not free from doubt, Holders of Disputed Claims should recognize gain or loss in an amount equal to: (i) the amount of cash and the fair market value of any other property actually distributed to such Holder less (ii) the adjusted tax basis of its Claim.

### 4.      Interest Income with Respect to Allowed Claims

Pursuant to Section 10.11 (*Allocation of Distributions*) of the Plan, all distributions in respect of Allowed Claims will be allocated first to the principal amount of the Allowed Claim (as determined for federal income tax purposes), with any excess allocated to accrued but unpaid interest.  However, there is no assurance that such allocation would be respected by the IRS for U.S. federal income tax purposes.  In general, to the extent any amount received (whether stock, cash or other property) by a Holder of a debt is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the Holder as interest income (if not previously included in the Holder's gross income).  Conversely, a Holder generally recognizes a deductible loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full.  Each Holder of an Allowed Claim is urged to consult its own tax advisor regarding the allocation of consideration and the deductibility of unpaid interest for tax purposes.

### D.      Backup Withholding and Information Reporting

Under federal income tax law, interest and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate.  Backup withholding generally applies if the Holder (a) fails to furnish its social security number or other taxpayer identification number, (b) furnishes an incorrect taxpayer identification number, (c) fails properly to report interest or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax identification number provided is its correct number and that it is not subject to backup withholding.  Backup withholding is not an additional tax. but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax.  Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.  These categories are very broad; however, there are numerous exceptions.  Holders of Allowed Claims are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

In addition, Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders are urged to consult their tax advisors

regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holder's tax returns.

Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holder's tax returns.

THE FOREGOING DISCUSSION OF CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS IS FOR GENERAL INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE.  ACCORDINGLY, EACH HOLDER SHOULD CONSULT ITS TAX ADVISOR WITH RESPECT TO THE TAX CONSEQUENCES OF THE PLAN DESCRIBED HEREIN AND THE APPLICATION OF FEDERAL, STATE, LOCAL AND FOREIGN TAX LAWS.  NONE OF NNIII, ANY OF THE FORMER DEBTORS, THE CREDITORS' COMMITTEE OR THEIR RESPECTIVE COUNSEL, ADVISORS OR OTHER PROFESSIONALS SHALL HAVE ANY LIABILITY TO ANY PERSON OR HOLDER ARISING FROM OR RELATED TO THE U.S. FEDERAL, STATE, LOCAL OR FOREIGN TAX CONSEQUENCES OF THE PLAN OR THE FOREGOING DISCUSSION.

# VII.
# ALTERNATIVES TO THE PLAN

NNIII believes that the Plan affords Holders of Allowed Claims the potential for the greatest realization of NNIII's assets and, therefore, is in the best interests of such Holders. If, however, the requisite acceptances are not received, or the requisite acceptances are received, but the Plan is not confirmed and consummated, the theoretical alternatives include: (a) confirmation of another chapter 11 plan, (b) conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code or (c) dismissal of the Chapter 11 Case leaving Creditors and Interestholders to pursue available non-bankruptcy remedies.

These alternatives to the Plan are very limited and not likely to benefit Creditors. Although NNIII could file a new plan, it cannot rule out the possibility that, if the Plan is not confirmed, the Chapter 11 Case could be converted to a case under chapter 7 of the Bankruptcy Code. NNIII believes that conversion of the Chapter 11 Case to a chapter 7 case would result in (i) significant delay in distributions to all Creditors and Interestholders who would have received a distribution under the Plan and (ii) diminished recoveries for certain Classes of Creditors. If the Chapter 11 Case is dismissed, Creditors and Interestholders would be free to pursue non-bankruptcy remedies in their attempts to satisfy claims against NNIII. However, in that event, Creditors and Interestholders would be faced with the costs and difficulties of attempting, each on its own, to collect claims from an entity with very limited or no operations.

## VIII.
## CONCLUSION

For all of the reasons set forth in this Disclosure Statement, NNIII believes that confirmation of the Plan is preferable to all other alternatives.  Consequently, NNIII recommends all Solicited Creditors vote to **ACCEPT** the Plan and complete and return their Ballots so that they will be **RECEIVED** by Epiq on or before 4:00 P.M. (prevailing Eastern time) on September 28, 2021.


**Nortel Networks India International Inc.**


By: _____
     Name:  John J. Ray, III
     Title: Principal Officer

## Appendix A

**Chapter 11 Plan of Nortel Networks India International Inc.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
----------------------------------------------------------X
                                            :
In re                                       :    Chapter 11
                                            :
Nortel Networks Inc., et al.,1              :    Case No. 09-10138 (CSS)
                                            :
            Wind-Down Debtors.              :    Jointly Administered
                                            :
                                            :
                                            :
----------------------------------------------------------X
                                            :
In re                                       :    Chapter 11
                                            :
Nortel Networks India International Inc.     :    Case No. 16-11714 (CSS)
                                            :
            Debtor-In-Possession.           :    Jointly Administered
                                            :
                                            :
                                            :
----------------------------------------------------------X
```

## CHAPTER 11 PLAN OF
## NORTEL NETWORKS INDIA INTERNATIONAL INC.[2]

**Lisa M. Schweitzer, Esq. (admitted *pro hac vice*)**
**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
**One Liberty Plaza**
**New York, NY 10006**

**Derek C. Abbott, Esq. (No. 3376)**
**Andrew R. Remming, Esq. (No. 5120)**
**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
**1201 North Market Street, 18th Floor**
**P.O. Box 1347**
**Wilmington, DE 19899**

*Attorneys for the Debtors and*
*Debtor-in-Possession*          Dated: August 26, 2021

---

[1]      The Wind-Down Debtors in these chapter 11 cases, along with the last four digits of each Wind-Down Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620) and Nortel Networks (CALA) Inc. (4226).  Contact information for the Former Debtors and their petitions are available at http://dm.epiq11.com/nortel.

[2]      This Plan is only a Chapter 11 Plan for Nortel Networks India International Inc.  The First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain of Its Affiliated Debtors [D.I. 17763] was confirmed on January 24, 2017 and went effective on May 8, 2017.

# TABLE OF CONTENTS

**Page**

ARTICLE 1.
DEFINITIONS, INTERPRETATION AND RULES OF CONSTRUCTION

1.1    **Scope of Definitions**................................................................................................. 1

1.2    **Definitions** ............................................................................................................... 1

1.3    **Rules of Interpretation** ........................................................................................ 14

1.4    **Exhibits to this Plan** ............................................................................................ 15

1.5    **Computation of Time** ........................................................................................... 16

ARTICLE 2.
TREATMENT OF UNCLASSIFIED CLAIMS

2.1    **Administrative Expense Claims**........................................................................... 16

2.2    **Statutory Fees** ........................................................................................................ 17

2.3    **Professional Claims**............................................................................................... 17

2.4    **Priority Tax Claims** ............................................................................................. 17

ARTICLE 3.
CLASSIFICATION OF CLAIMS AND INTERESTS

3.1    **Summary of Classifications**................................................................................. 17

3.2    **Classification and Treatment of Claims Against and Interests**........................ 18

ARTICLE 4.
TREATMENT OF CLAIMS AGAINST AND INTERESTS IN NNIII

4.1    **Class 1 – Priority Non-Tax Claims.**..................................................................... 18

4.2    **Class 2 – Secured Claims** ..................................................................................... 19

4.3    **Class 3 – General Unsecured Claims.** ................................................................. 19

4.4    **Class 4 – Interests.**................................................................................................. 20

ARTICLE 5.
ACCEPTANCE OR REJECTION OF THE PLAN

5.1    **Impaired Classes of Claims and Interests Entitled to Vote** ............................. 20

5.2    **Acceptance by an Impaired Class** ...................................................................... 20

5.3    **Presumed Acceptances by Unimpaired Classes** ............................................... 20

5.4    **Elimination of Vacant Classes; Deemed Acceptance by Non-Voting Classes.**......... 20

5.5    **Conversion or Dismissal of the Chapter 11 Case** ............................................. 21

5.6    **Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code**.............. 21

i

# TABLE OF CONTENTS
(continued)

ARTICLE 6.
IMPLEMENTATION OF THE PLAN

| | | |
|---|---|---|
| **6.1** | **General Settlement of Claims and Interests** | 21 |
| **6.2** | **Plan Administrator.** | 21 |
| **6.3** | **Intercompany Account Settlement** | 23 |
| **6.4** | **Settlement of Intercompany Claims and Other Matters** | 23 |
| **6.5** | **Administrative Expense Contribution and Quarterly Administrative Wind-Down Reimbursement Payments** | 23 |
| **6.6** | **Closing of Chapter 11 Case** | 23 |

ARTICLE 7.
THE SETTLEMENT AND PLANS SUPPORT AGREEMENT

| | | |
|---|---|---|
| **7.1** | **SPSA** | 24 |
| **7.2** | **Cooperation** | 24 |
| **7.3** | **Settlement of Allocation Dispute** | 24 |
| **7.5** | **Estate Administration** | 24 |
| **7.6** | **No Double-Recovery** | 24 |
| **7.7** | **Post-Petition Date Interest** | 24 |
| **7.8** | **Resolution of Certain Claims** | 24 |
| **7.9** | **Book Intercompany Claims** | 25 |
| **7.10** | **Remaining Assets and Other Proceeds** | 25 |
| **7.11** | **Debtor Disputes** | 25 |
| **7.12** | **SPSA Releases** | 26 |

ARTICLE 8.
CORPORATE FORM AND ACTION

| | | |
|---|---|---|
| **8.1** | **NNIII Corporate Form and Vesting** | 26 |
| **8.2** | **Dissolution of Wind-Down NNIII** | 26 |
| **8.3** | **Post-Effective Date Management.** | 26 |
| **8.4** | **Corporate Existence** | 27 |
| **8.5** | **Certificate of Incorporation or Certificate of Formation** | 27 |
| **8.6** | **Wind-Down** | 27 |
| **8.7** | **Other Corporate Action** | 27 |

# TABLE OF CONTENTS
(continued)

**Page**

ARTICLE 9.
TREATMENT OF EXECUTORY CONTRACTS

**9.1** **Previous Assumption, Assignment and Rejection** ........................................ 28

**9.2** **Rejection** ........................................................................................................ 28

**9.3** **Approval of Rejection; Rejection Damages Claims Bar Date** .................... 28

**9.4** **Pre-existing Obligations to NNIII under Executory Contracts** ................. 28

ARTICLE 10.
PROVISIONS REGARDING VOTING AND DISTRIBUTIONS UNDER THE PLAN

**10.1** **Voting of Claims** .......................................................................................... 28

**10.2** **Nonconsensual Confirmation** ..................................................................... 28

**10.3** **Distributions of Creditor Proceeds** ............................................................ 29

**10.4** **Minimum Distribution and Manner of Payment** ...................................... 29

**10.5** **Limitation on Recovery** .............................................................................. 29

**10.6** **Distributions Free and Clear** ..................................................................... 29

**10.7** **Delivery of Distributions and Undeliverable Distributions** ..................... 30

**10.8** **Withholding and Reporting Requirements** ............................................... 30

**10.9** **Time Bar to Cash Payment Rights** ............................................................ 30

**10.10** **Distribution Record Date** ........................................................................... 31

**10.11** **Allocation of Distributions** ......................................................................... 31

ARTICLE 11.
PROCEDURES FOR TREATING DISPUTED CLAIMS

**11.1** **Objections** .................................................................................................... 31

**11.2** **No Distributions Pending Allowance** ......................................................... 32

**11.3** **Estimation of Claims** ................................................................................... 32

**11.4** **Resolution of Disputed Claims** ................................................................... 32

**11.5** **No Interest** .................................................................................................... 32

**11.6** **No Amendments to Claims** .......................................................................... 32

**11.7** **No Late-Filed Claims** .................................................................................. 32

ARTICLE 12.
CONDITIONS PRECEDENT

**12.1** **Conditions to the Effective Date** ................................................................ 33

iii

**TABLE OF CONTENTS**
(continued)

**Page**

**12.2**   **Waiver of Conditions** ........................................................................ 33

**12.3**   **Notice of Effective Date** ................................................................... 34

**12.4**   **Dismissal or Conversion** ................................................................. 34

ARTICLE 13.
EFFECT OF CONFIRMATION

**13.1**   **Binding Effect; Plan Binds All Holders of Claims and Interests.** ............ 34

**13.2**   **Release of NNIII and Wind-Down NNIII.** ...................................... 34

**13.3**   **Release and Discharge of the Plan Released Parties** ...................... 35

**13.4**   **SPSA Releases** ................................................................................ 36

**13.5**   **Exculpation and Limitation of Liability** ........................................ 37

**13.6**   **Injunction on Claims** ....................................................................... 38

**13.7**   **Terms of Injunctions or Stays** ....................................................... 38

**13.8**   **Retention of Litigation Claims and Reservation of Rights.** ........... 38

**13.9**   **Retention of Rights** ........................................................................ 39

**13.10**  **Vesting** ............................................................................................. 39

ARTICLE 14.
RETENTION OF JURISDICTION

ARTICLE 15.
MISCELLANEOUS PROVISIONS

**15.1**   **Effectuating Documents and Further Transactions** ....................... 41

**15.2**   **Authority to Act** .............................................................................. 41

**15.3**   **Amendment or Modification of the Plan** ........................................ 42

**15.4**   **Administrative Expense Claims Reserve** ...................................... 42

**15.5**   **Fees and Expenses** .......................................................................... 42

**15.6**   **Revocation or Withdrawal of the Plan** .......................................... 42

**15.7**   **Insurance Preservation** .................................................................. 42

**15.8**   **Exemption from Certain Transfer Taxes** ...................................... 43

**15.9**   **Subordinated Claims** ...................................................................... 43

**15.10**  **Cross-Border Protocol and Cross-Border Claims Protocol** ......... 43

**15.11**  **Governing Law** ............................................................................... 43

**15.12**  **No Admissions** ................................................................................ 43

iv

**TABLE OF CONTENTS**
(continued)

**Page**

**15.13**  **Severability of Plan Provisions** ...................................................................... 43

**15.14**  **Successors and Assigns** ............................................................................... 44

**15.15**  **Defenses with Respect to Unimpaired Claims** ........................................ 44

**15.16**  **Section 1125(e) Good Faith Compliance** .................................................. 44

**15.17**  **No Injunctive Relief** ..................................................................................... 44

**15.18**  **Payment of Statutory Fees** .......................................................................... 44

**15.19**  **Saturday, Sunday or Legal Holiday** ......................................................... 44

**15.20**  **Reservation of Rights** ................................................................................... 44

**15.21**  **Post-Effective Date Rule 2002 Notice List** .............................................. 44

**15.22**  **Right to Abandon and Dispose of Debtor Property, Books & Records** ... 45

**15.23**  **Notices** ........................................................................................................... 45

## TABLE OF CONTENTS

<u>PLAN EXHIBITS</u>

| | |
|---|---|
| Exhibit A | Settlement and Plans Support Agreement |
| Exhibit B | Plan Administration Agreement |
| Exhibit C | List of Directors and Officers of Wind-Down NNIII |
| Exhibit D | Amended By-Laws and Organizational Documents of Wind-Down NNIII |

# INTRODUCTION

Nortel Networks India International Inc. ("NNIII") proposes this Chapter 11 Plan of NNIII (the "Plan") for the resolution and satisfaction of all Claims against and Interests in NNIII.  NNIII is the proponent of this Plan within the meaning of section 1129 of the Bankruptcy Code.  All capitalized terms not defined in this introduction have the meanings ascribed to them in Article 1 of this Plan.

Under section 1125(b) of the Bankruptcy Code, a vote to accept or reject the Plan may not be solicited from holders of Claims and/or Interests until such time as the Disclosure Statement relating to the Plan is approved by the Bankruptcy Court.  NNIII URGES ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  To the extent, if any, that the Disclosure Statement is inconsistent with the Plan, the Plan will govern.  No solicitation materials, other than the Disclosure Statement and any schedules, exhibits and other documents attached thereto or referenced therein or otherwise enclosed with the Disclosure Statement served by NNIII on interested parties, have been authorized by NNIII or the Bankruptcy Court for use in soliciting acceptances of the Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019 and Article 15 of this Plan, NNIII expressly reserves the right to alter, amend, modify, revoke or withdraw this Plan, one or more times, prior to its substantial consummation.

## ARTICLE 1.
## DEFINITIONS, INTERPRETATION AND RULES OF CONSTRUCTION

**1.1    Scope of Definitions.**  For the purposes of this Plan, except as expressly provided or unless the context otherwise requires, all capitalized terms not otherwise defined shall have the meanings ascribed to them in this Article 1 of the Plan.  Any term used in this Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, respectively.

**1.2    Definitions.**  The following terms (which appear in the Plan as capitalized terms) shall have the meanings ascribed to them in this Article 1 of the Plan.

"**9019 Approval Order**" means the Order Approving Settlement and Plans Support Agreement dated January 24, 2017 [D.I. 17794], which approves the entry into the SPSA by NNIII and the Former Debtors.

"**Abandonment and Disposal Procedures Order**" means the Order (I) Approving Procedures for the Abandonment, Disposal, or Destruction of Specified Hard Copy Documents and Electronic Data; (II) Waiving Compliance with Certain Retention Laws and Ordinances; and (III) Granting Related Relief dated December 15, 2015 [D.I. 16389].

"**Administrative Expense Claim**" means any right to payment for any cost or expense of administration of the Chapter 11 Case asserted or arising under sections 503(b), 507(a)(2) or 507(b) of the Bankruptcy Code up to and including the Effective Date, including, to

the extent allowable under such sections, any (i) actual and necessary cost or expense of preserving NNIII's Estate or operating the business of NNIII arising on or after the Petition Date, (ii) payment to be made under this Plan to cure a default under an executory contract or unexpired lease that is assumed pursuant to section 365 of the Bankruptcy Code, (iii) compensation or reimbursement of expenses of Professionals arising on or after the Petition Date, to the extent allowed by the Bankruptcy Court under section 330(a) or section 331 of the Bankruptcy Code and (iv) fees or charges assessed against NNIII's Estate under section 1930, chapter 123 of title 28 of the United States Code.

"**Administrative Expense Claims Bar Date**" means the deadline for filing an Administrative Expense Claim, other than a Professional Claim, which Claims must be Filed so as to be actually received by the Bankruptcy Court on or before 5:00 p.m., prevailing Eastern Standard Time, on the date that is the first Business Day that is thirty (30) days following the Effective Date, unless otherwise ordered by the Bankruptcy Court.

"**Administrative Expense Claims Reserve**" has the meaning set forth in Section 15.4 of this Plan.

"**Affiliate**" shall have the meaning as set forth in section 101(2) of the Bankruptcy Code.

"**Allocation Dispute**" means certain litigation before the Canadian Court and the Bankruptcy Court in which the allocation of the Sale Proceeds is at issue.

"**Allocation Proceeds**" means the Sale Proceeds allocated to each of (a) NNIII and the Former Debtors, collectively, and (b) the Foreign Affiliate Debtors, as provided for under Section 2(c) of the SPSA.

"**Allowed**" means, with reference to any Claim against NNIII, (a) any Claim allowed hereunder, (b) any Claim that is not a Disputed Claim, (c) any Claim that is compromised, settled or otherwise resolved pursuant to the authority granted to NNIII pursuant to a Final Order of the Bankruptcy Court or under Article 11 of the Plan or (d) any Claim that, if it is a Disputed Claim, has been allowed by a Final Order; *provided*, *however*, that Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claims" hereunder.  Unless otherwise specified herein or by order of the Bankruptcy Court, "Allowed Administrative Expense Claim" or "Allowed Claim" shall not, for any purpose under the Plan, include interest on such Administrative Expense Claim or Claim from and after the Petition Date.

"**Allowed Book Intercompany Claims**" means the pre-filing claims between and among the companies comprising the Nortel Group in the amounts recorded in their books and records, as set out in Annex L to the SPSA.

"**Allowed Claim**" means any Claim that is Allowed in accordance with the Plan.

"**Assets**" means all "property" of NNIII's Estate, as defined in section 541 of the Bankruptcy Code, and all Causes of Action that have been or may be commenced by NNIII or its

2

authorized representative for the benefit of NNIII's Estate, unless modified pursuant to the Plan or a Final Order.

"**Available Cash**" means (a) all Cash of NNIII, including, without limitation, the Cash realized from its business operations, the sale or other disposition of its Assets, the Residual Assets Proceeds, the interest earned on invested funds, Cash on hand, recoveries from Litigation Claims and from any other source or otherwise, *less* (b) the amount of Cash estimated and reserved by NNIII and the Plan Administrator in accordance with the Plan Administration Agreement to (i) adequately fund the reasonable and necessary projected costs to carry out the provisions of the Plan on and after the Effective Date, including, without limitation, any fees and expenses incurred by Professionals, (ii) pay holders of all Disputed Claims the amount such holders would be entitled to receive under the Plan if all such Disputed Claims were to become Allowed Claims, (iii) pay all fees payable under section 1930, chapter 123 of title 28 of the United States Code, (iv) pay all other amounts required to be paid to manage and/or liquidate NNIII's Assets on and after the Effective Date and (v) pay holders of Allowed Administrative Expense Claims, Priority Tax Claims and Priority Non-Tax Claims in accordance with the Plan.

"**Bankruptcy Code**" means title 11 of the United States Code, as in effect on the Petition Date and as thereafter amended, as applicable in the Chapter 11 Case.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware or any other court of the United States having jurisdiction over the Chapter 11 Case.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Case, and the local and chambers rules of the Bankruptcy Court, as in effect on the Petition Date and as thereafter amended.

"**Business Day**" means any day (other than a Saturday, Sunday or legal holiday, as such term is defined in Bankruptcy Rule 9006(a)) on which banks are open for general business in New York City, New York, U.S.A. and Toronto, Ontario, Canada, and also, when used in connection with the Plan provisions related to the SPSA, in London, England and Paris, France.

"**Business Line Sales**" means the sales of various Nortel Group business lines, as identified on Annex A to the SPSA. For the avoidance of doubt, the Business Line Sales do not include the Iceberg Sale.

"**Canadian Court**" means any and all of the CCAA Court, the Ontario Court of Appeal, the Supreme Court of Canada or any other court of competent jurisdiction overseeing the Canadian Proceedings (including any appeals) from time to time.

"**Canadian Debtors**" means NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation, Nortel Networks International Corporation, Nortel Communications Inc., Architel Systems Corporation and Northern Telecom Canada Limited.

"**Canadian Estate**" means the Canadian Debtors as substantively consolidated in accordance with the SPSA.

"**Canadian Plan**" means the CCAA plan of compromise or arrangement (including any exhibits, annexes and schedules thereto) for the Canadian Debtors filed in the CCAA Court on November 30, 2016 that, among other things, effectuates the settlement consistent with the terms of the SPSA, as it was sanctioned by the CCAA Court on January 30, 2017, and as it may be modified or supplemented in accordance with its terms.

"**Canadian Proceedings**" means the proceedings that were commenced before the CCAA Court pursuant to the CCAA on or after January 14, 2009 in respect of the Canadian Debtors.

"**Cash**" means legal tender accepted in the United States of America for the payment of public and private debts, currently denominated in United States Dollars.

"**Cash Management Order**" means the Order of the Bankruptcy Court, pursuant to sections 345, 363(c)(l), 364(a) and 503(b)(1) of the Bankruptcy Code, approving NNIII's continued use of the Cash Management System (as defined therein), entered as to the Former Debtors by the Bankruptcy Court on January 15, 2009 [D.I. 58] and made applicable to NNIII by order dated August 16, 2016, No. 16-11714 [D.I. 7], as amended or supplemented.

"**Causes of Action**" means, without limitation, any and all actions, causes of action, controversies, liabilities, obligations, rights, suits, damages, judgments, claims and demands whatsoever, whether known or unknown, reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to or during the course of the Chapter 11 Case through the Effective Date.

"**CCAA**" means the Companies' Creditors Arrangement Act, R.S.C. 1985, c C-36.

"**CCAA Court**" means the Ontario Superior Court of Justice (Commercial List).

"**CFSA**" means the Final Canadian Funding and Settlement Agreement among, inter alia, certain of the Canadian Debtors, the Monitor and certain of the Former Debtors, dated December 23, 2009, approved by order of the Bankruptcy Court on January 21, 2010 [D.I. 2347].

"**Chapter 11 Case**" means the chapter 11 case of NNIII pending before the Bankruptcy Court under Case No. 16-11714 and jointly administered with the Former Debtors' chapter 11 cases under Case No. 09-10138 (KG).

"**Claim**" means a right of an Entity against NNIII, whether or not asserted or Allowed, as defined in section 101(5) of the Bankruptcy Code and as construed pursuant to section 102(2) of the Bankruptcy Code.

"**Claims Agent**" means Epiq Bankruptcy Solutions, LLC, the claims and noticing agent retained in the Chapter 11 Case, or any successor thereto.

4

"**Claims Objection Deadline**" has the meaning set forth in Section 11.1 of this Plan.

"**Claims Register**" means the official register of Claims against, and Interests in, NNIII, maintained by the Claims Agent.

"**Class**" means a group of Claims or Interests as classified in a particular class under the Plan pursuant to section 1122 of the Bankruptcy Code.

"**Collateral**" means any property or interest in property of NNIII's Estate subject to a Lien to secure the payment of a Claim, which Lien is not subject to avoidance or otherwise invalid and unenforceable under the Bankruptcy Code or applicable non-bankruptcy law.

"**Confirmation**" means entry of the Confirmation Order by the Bankruptcy Court.

"**Confirmation Date**" means the date on which the Bankruptcy Court enters the Confirmation Order on its docket, within the meaning of Bankruptcy Rules 5003 and 9021.

"**Confirmation Hearing**" means the duly noticed hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code, including any continuances thereof.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which order shall be in form and substance satisfactory to NNL and the Monitor, acting reasonably.

"**Consummation**" means the occurrence of the Effective Date.

"**Creditor**" means any Entity that holds a Claim against NNIII.

"**Creditor Proceeds**" means (a) Available Cash plus (b) any non-Cash proceeds (including, without limitation, any securities or other interests) of any sale of Residual Assets.

"**Cross-Border Claims Protocol**"  means the Cross-Border Claims Protocol originally approved by the Bankruptcy Court and CCAA Court on or about September 16, 2010, as the same has been amended, with the approval of both the Bankruptcy Court and the CCAA Court, from time to time.

"**Cross-Border Protocol**" means the Cross-Border Protocol originally approved by the Bankruptcy Court and the CCAA Court on or about January 14, 2009, as the same has been amended, with the approval of both the Bankruptcy Court and the CCAA Court, from time to time.

 "**Debtor Releasing Parties**" means NNIII and each of its representatives, agents, successors and assigns.

"**Deficiency Claim**" means, with respect to any Claim secured by a Lien on any interest of NNIII in property having a value of less than the Allowed amount of such Claim (after

taking into account other Liens of higher priority in such property), the portion of such Claim equal to the difference between (a) the Allowed amount of the Claim and (b) the Allowed amount of the secured portion of such Claim (which Allowed secured amount may be set pursuant to this Plan).

"**Disbursing Agent**" means the Plan Administrator or any party designated by NNIII to serve as its disbursing agent under the Plan.

"**Disclosure Statement**" means the written disclosure statement that relates to this Plan Filed in the Chapter 11 Case by NNIII, including the schedules and exhibits attached thereto, as it may be amended, modified or supplemented from time to time, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

"**Disputed Claim**" means a Claim that NNIII has Scheduled as "disputed," "contingent" or "unliquidated," or as to which a proof of claim has been Filed or deemed Filed as contingent or as to which an objection has been or may be timely Filed by NNIII or any other party in interest entitled to do so, which objection, if timely Filed, has not been withdrawn or has not been overruled or denied by a Final Order.

"**Distribution**" means any payment or transfer made under the Plan.

"**Distribution Date**" means any date on which a Distribution is made in accordance with the Plan, including the Initial Distribution Date, an Interim Distribution Date and the Final Distribution Date.

"**Distribution Record Date**" means the record date for the purposes of making Distributions under the Plan on account of Allowed Claims, which date shall be the Confirmation Date.

"**Effective Date**" means the date selected by NNIII that is the first Business Day on which all conditions to the Effective Date set forth in Article 12 of the Plan have been satisfied with respect to NNIII or, if waivable, waived pursuant to Section 12.2 hereof, provided that no stay of the Confirmation Order is in effect.

"**EMEA Debtors**" means, collectively, NNUK, Nortel Networks (Ireland) Limited, Nortel Networks NV (in administration), Nortel Networks SpA (in administration), Nortel Networks BV (in administration), Nortel Networks Polska Sp z.o.o. (in administration), Nortel Networks Hispania SA (in administration), Nortel Networks (Austria) GmbH (in administration), Nortel Networks s.r.o. (in administration), Nortel Networks Engineering Service Kft (in administration), Nortel Networks Portugal SA (in administration), Nortel Networks Slovensko, s.r.o. (in administration), Nortel Networks Romania SRL (in administration), Nortel GmbH (in administration), Nortel Networks OY (in administration), Nortel Networks AB (in administration), Nortel Networks International Finance & Holding BV (in administration) and Nortel Networks France S.A.S. (in administration), but, for the avoidance of doubt, for purposes of the Plan, does not include NNSA.

"**EMEA Non-Filed Entities**" means, collectively, Nortel Networks AS, Nortel Networks AG, Nortel Networks South Africa (Pty) Limited, Nortel Networks (Northern Ireland) Limited (in liquidation) and Nortel Networks Optical Components Limited (in liquidation).

"**Entity**" means an entity as defined in section 101(15) of the Bankruptcy Code.

"**Estate**" means, with regard to NNIII, the estate that was created by the commencement by NNIII of its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code, and shall be deemed to include, without limitation, any and all rights, powers and privileges of NNIII and any and all Assets and interests in property, whether real, personal or mixed, rights, Causes of Action, avoidance powers or extensions of time that NNIII or its Estate shall have had as of the Petition Date, or which such Estate acquired after the commencement of the Chapter 11 Case, whether by virtue of sections 541, 544, 545, 546, 547, 548, 549 or 550 of the Bankruptcy Code or otherwise.

"**Exculpated Party**" means each of (a) NNIII, (b) Wind-Down NNIII and (c) the U.S. Principal Officer, and with respect to each of the foregoing, any of their respective directors, officers, employees, members, attorneys, consultants, accountants, advisors, agents and other professionals (each acting solely in such capacity), and, collectively, all of them.

"**File**" or "**Filed**" means file or filed on the docket of the Bankruptcy Court or its authorized designee in the Chapter 11 Case.

"**Final Distribution Date**" means the date upon which the Plan Administrator or Disbursing Agent makes a final Distribution on account of all Allowed Claims against NNIII, including Allowed Administrative, Priority Non-Tax, Priority Tax, Other Secured Claims and General Unsecured Claims.  As determined by the Plan Administrator, the Final Distribution Date shall be a date (a) which is after the liquidation into Cash of all Residual Assets of Wind-Down NNIII (other than those Residual Assets abandoned by Wind-Down NNIII), if any, and the collection of other sums due or otherwise remitted or returned to NNIII's Estate and (b) on which there remain no Disputed Claims against NNIII.

"**Final Order**" means an order (a) as to which the fourteen-day appeal period under Bankruptcy Rule 8002(a) has passed or has been waived by the Bankruptcy Court and (b) that has not been reversed, stayed, superseded or vacated or, to the extent it has been stayed, such stay has expired.

"**Foreign Affiliate Debtors**" means each of (a) the Canadian Debtors, (b) the EMEA Debtors and (c) NNSA.

"**Foreign Proceeding**" means, collectively, the Canadian Proceedings, the French Main Proceeding, the French Secondary Proceeding, the Israeli Administration Proceedings, the U.K. Proceedings and any other insolvency or similar proceeding filed after the Petition Date in a jurisdiction other than the United States involving an Affiliate of NNIII or the Former Debtors.

"**French Court**" means the judge appointed in the French Secondary Proceeding, the Versailles Commercial Court, any court hearing appeals therefrom and any other court of competent jurisdiction overseeing the French Secondary Proceeding from time to time.

"**French Secondary Proceeding**" means the secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No. 1346/2000 on Insolvency Proceedings in the Republic of France that was commenced before the French Court on May 28, 2009 in respect of NNSA.

"**General Unsecured Claims**" means all Unsecured Claims against NNIII.

"**Global Debtors**" means NNIII, the Former Debtors and the Foreign Affiliate Debtors.

"**Governmental Unit**" shall have the meaning assigned to such term in section 101(27) of the Bankruptcy Code.

"**Holder**" means a Person or Entity holding a Claim or Interest.

"**Iceberg Amendment Fee**" means the $5 million from the Iceberg Sale Proceeds previously agreed by NNIII, the Former Debtors and each of the Foreign Affiliate Debtors to be funded directly as follows: $2.8 million to NNI and $2.2 million to NNUK, prior to any other agreed upon allocation of the Sale Proceeds.

"**Iceberg Escrow Account**" means the escrow account established to hold the Iceberg Sale Proceeds and the Iceberg Amendment Fee.

"**Iceberg Sale**" means the sale of the residual intellectual property remaining after the Business Line Sales, which intellectual property was sold to a consortium in July 2011.

"**Iceberg Sale Proceeds**" means that portion of the Sale Proceeds generated from the Iceberg Sale.

"**IFSA**" means the Interim Funding and Settlement Agreement, dated as of June 9, 2009, entered into among various of the SPSA Parties, as approved by the CCAA Court on June 29, 2009 and by the Bankruptcy Court on June 29, 2009 [D.I. 993].

"**Impaired**" shall have the meaning assigned to such term in section 1124 of the Bankruptcy Code when used with reference to a Claim or an Interest.

"**Indian Tax Appeal Litigation**" means the litigation between NNIII and the Indian Taxing Authorities pending before India's Supreme Court with respect to tax obligations allegedly owed by NNIII.

"**Indian Taxing Authorities**" means the Indian governmental bodies responsible for taxation in India.

"**Initial Distribution Date**" means the date as determined by NNIII upon which the initial distributions of property under this Plan will be made to holders of Allowed Claims, which date shall be within sixty (60) days of the Effective Date or as soon thereafter as practicable.

"**Intellectual Property**" means any and all intellectual property rights in any jurisdiction including, without limitation, rights in or to any of the following: (a) Trademarks; (b) Patents and inventions (whether or not patentable); (c) copyrights and works of authorship of any type in any medium; (d) mask works; (e) trade secrets, know-how and confidential information; (f) databases, including, without limitation, computerized databases and compilations; (g) software and computer programs and (h) domain names and Internet protocol addresses, including, in each case, any applications or registrations for any of the foregoing.

"**Intercompany Claim**" means any Claim against NNIII asserted by its Affiliates other than an Administrative Expense Claim, a Priority Non-Tax Claim, a Secured Claim or a Subordinated Claim.

"**Intercompany Administrative Expense Claim**" means any Administrative Expense Claim against NNIII asserted by any Former Debtor.

"**Interest(s)**" means shares of common stock, preferred stock, other forms of ownership interest or any interest or right to convert into such an equity or ownership interest or acquire any equity or ownership interest, including, without limitation, vested and/or unvested restricted stock units, contingent stock awards, contingent equity awards, performance stock units and stock options or restricted stock awards granted under management ownership plans, stock incentive plans or employee incentive plans, in each case, in NNIII that was in existence immediately prior to or on the Petition Date.

"**Interim Compensation Order**" means the Order under 11 U.S.C. §§ 105(a) and 331, Fed. R. Bankr. P. 2016 and Del. Bankr. L.R. 2016-2 Establishing Procedures for Interim Compensation and Reimbursement of Fees and Expenses for Professionals and Official Committee Members entered by the Bankruptcy Court as to the Former Debtors on February 4, 2009 [D.I. 222] and made applicable to NNIII by order dated August 16, 2016 [D.I. 7].

"**Interim Distribution**" means the quarterly Distributions of Creditor Proceeds made by the Disbursing Agent to holders of Allowed Claims against a Debtor.

"**Interim Distribution Date**" means any date on which an Interim Distribution is made, which dates shall be June 30th and December 31st of each year.

"**IP Addresses**" means internet protocol addresses registered in the name of a Canadian Debtor or a corporate predecessor thereto.

"**Israeli Administration Proceedings**" means the administration proceedings of Nortel Networks Israel (Sales and Marketing) Limited and its subsidiaries commenced on January 19, 2009 pursuant to the Israeli Companies Law, 1999, and the regulations relating thereto for a stay of proceedings.

"**Lien**" means a charge against, interest in or other encumbrance upon property to secure payment of a debt or performance of an obligation.

"**Litigation Claims**" means all claims, rights and Causes of Action of any Debtor or its Estate of every kind or nature whatsoever, whether arising prior to, during or after the

Chapter 11 Case (including, without limitation, Intellectual Property enforcement rights and all rights, claims and Causes of Action arising under sections 544 through 551 of the Bankruptcy Code, except for any Released Claims).

"**M&A Costs**" means the fees and expenses incurred in connection with the Sales.

"**M&A Cost Reimbursement**" means the reimbursement of certain of the M&A Costs, which amounts shall be reimbursed from the Iceberg Escrow Account as follows: $20 million to the Former Debtors and $35 million to the Canadian Debtors.

"**Monitor**" means Ernst & Young Inc. in its capacity as the court-appointed monitor in the Canadian Proceedings.

"**NNC**" means Nortel Networks Corporation, a Canadian Debtor.

"**NNI**" means Nortel Networks Inc., a Delaware corporation.

"**NNI Confirmation Order**" means the January 24, 2017 order of the Bankruptcy Court confirming the NNI Plan pursuant to section 1129 of the Bankruptcy Code as applicable to each of the Former Debtors [D.I. 17795].

"**NNI Plan**" means the First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain of its Affiliated Debtors filed by the Former Debtors on January 23, 2017 [D.I. 17763], as it may be modified or amended in accordance with the terms of the NNI Plan.

"**NNI Plan Effective Date**" means May 8, 2017.

"**NNIII**" means Nortel Networks India International Inc., a Delaware corporation.

"**NNL**" means Nortel Networks Limited, a Canadian Debtor.

"**NNSA**" means Nortel Networks S.A. (in administration and in *liquidation judiciaire*).

"**NNUK**" means Nortel Networks U.K. Limited (in administration), an EMEA Debtor.

"**Non-Released Matters**" has the meaning set forth in Section 13.4.

"**Nortel Group**" means, collectively, NNC and all of its direct and indirect subsidiaries, whether current or former.

"**Notice of Assumption and Assignment**" means any notice of NNIII's intent to assume or assume and assign one or more executory contracts or unexpired leases, which notice shall be Filed by NNIII on the docket of the Bankruptcy Court in the Chapter 11 Case.

"**Ordinary Course Professional Order**" means the Order Authorizing NNIII to Retain and Employ Professionals Used in the Ordinary Course of Business *Nunc Pro Tunc* to the

Petition Date entered by the Bankruptcy Court on August 16, 2016 [D.I. 15], as may be amended, supplemented or modified from time to time.

"**Former Debtor(s)**" or "**Former Debtor(s)-in-Possession**" means each of the following entities, along with the last four digits of each Former Debtor's tax identification number: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567), and Nortel Networks (CALA) Inc. (4226).

"**Other Nortel Claim**" has the meaning set forth in Section 7.6.

"**Patents**" mean all national and multinational patents and utility models (petty patents), including, without limitation, all reissues, divisions, continuations, continuations-in-part, extensions and reexaminations thereof, and all rights therein provided by multinational treaties or conventions.

"**PBGC**" means the Pension Benefit Guaranty Corporation, a United States government corporation.

"**Person**" means an individual, a corporation, a limited liability company, a partnership, an association, a joint stock company, a joint venture, an unincorporated organization or a Governmental Unit as defined in section 101(41) of the Bankruptcy Code.

"**Petition Date**" means July 26, 2016.

"**Plan**" means the chapter 11 plan of NNIII, including without limitation, all exhibits, appendices and schedules hereto and thereto, either in its present form or as the same may be altered, amended, modified or supplemented from time to time in accordance with the provisions of the Plan or the Bankruptcy Code and Bankruptcy Rules.

"**Plan Administration Agreement**" means the agreement describing the powers, duties and rights of the Plan Administrator in administering the Plan, which agreement shall be in substantially the form attached hereto as <u>Exhibit B</u>.

"**Plan Administrator**" means Owl Hill Advisory LLC, retained, as of the Effective Date, by NNIII as the Person responsible for, among other things, the matters described in Section 6.2 hereof.

"**Plan Released Parties**" means the U.S. Principal Officer (solely in such individual's capacity as the U.S. Principal Officer of NNIII) and any of his respective directors, officers, employees, members, attorneys, consultants, accountants, advisors, agents and other professionals (each acting solely in such capacity), and, collectively, all of them.

"**Post-Effective Date Notice List**" has the meaning set forth in Section 15.21.

"**Priority Non-Tax Claim**" means any Claim, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment under section 507(a) of the Bankruptcy Code.

"**Priority Tax Claim**" means any Claim entitled to priority pursuant to sections 502(i) and 507(a)(8) of the Bankruptcy Code.

"**Pro Rata Share**" means, as at any Distribution Date, with respect to the holder of an Allowed Claim in any Class against NNIII, the product of (A/B) x C where:

A = the amount of the particular Allowed Claim;

B = the aggregate amount of all Allowed Claims in the Class; and

C = the total amount of Creditor Proceeds to be distributed to holders of Allowed Claims in such Class on the particular Distribution Date.

"**Professional**" means a Person (a) employed in the Chapter 11 Case pursuant to a Final Order in accordance with sections 327, 328 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to sections 327, 328, 329, 330 and 331 of the Bankruptcy Code, or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

"**Professional Claim**" means a Claim of a Professional for compensation for services rendered or reimbursement of costs, expenses or other charges incurred after the Petition Date and prior to and including the Effective Date.

"**Quarterly Administrative Wind-Down Reimbursement Payments**" has the meaning set forth in Section 6.5.

"**Rejected Contract**" means any executory contract that NNIII has rejected in accordance with Section 9.2 of this Plan

"**Relay**" means NNL's and NNTC's assets related to the wireless backhaul and multi-hop digital repeater/relay research development program, sold in June 2010.

"**Released Claim**" means any claim, right or Cause of Action of NNIII or its Estate released pursuant to the Plan, the Confirmation Order or the SPSA but does not include any claim, right or Causes of Action of any SPSA Party to enforce the SPSA.

"**Releases**" means the releases as set forth herein in Section 13.3.

"**Remaining Contract**" has the meaning set forth in Section 9.1.

"**Residual Assets**" means all Assets of Wind-Down NNIII from and after the Effective Date.

"**Residual Assets Proceeds**" means the net Cash proceeds of the Residual Assets and any income or proceeds therefrom.

"**Sale(s)**" means the Business Line Sales and the Iceberg Sale between 2009 and 2011.

"**Sale Proceeds**" means the remaining proceeds generated by the Sales, such amounts as set forth in Annex A of the SPSA, plus interest accrued thereon, less (i) US$55 million of M&A Cost Reimbursement and (ii) the Iceberg Amendment Fee.

"**Scheduled**" means as listed on the Schedules.

"**Schedules**" means the Schedules of Assets and Liabilities Filed by NNIII in accordance with section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as the same may be amended from time to time prior to the Effective Date in accordance with Bankruptcy Rule 1009.

"**Secured Claim**" means any Claim (a) to the extent reflected in the Schedules or upon a proof of claim to which NNIII has not objected as a "secured claim," which is secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

"**Security**" means any instrument issued by, or interest in, NNIII of the type described in section 101(49) of the Bankruptcy Code.

"**Server Access and Disposition Order**" means the Order Approving the Debtors' Entry into the Server Access and Disposition Agreement dated September 4, 2019 [D.I. 18751], which approves the entry into that certain Server Access and Disposition Agreement by NNIII and the Former Debtors.

"**Solicitation Procedures**" means the Bankruptcy Court-approved procedures related to soliciting votes on the Plan from holders of Claims entitled to vote on the Plan.

"**SPSA**" means that certain Settlement and Plans Support Agreement executed on October 12, 2016, a copy of which is attached hereto as <u>Exhibit A</u>.

"**SPSA Party**" means, individually, each of the signatories to the SPSA.

"**SPSA Released Parties**" means each Releasor (as defined in the SPSA) and each of their respective employees, officers, directors, agents, advisors, lawyers, successors and assigns and their directors and officers, both former and current, in their respective capacities as such.

"**SPSA Released Claims**" has the meaning set forth in Section 13.4.

"**Tax**" or "**Taxes**" means all net income, gross income, capital, value added, goods and services, gross receipts, ad valorem, transfer, profits, business, environmental, gaming,

franchise, excise, stamp, stamp duty reserve, customs, sales, use, employment, withholding, property, payroll and all other taxes, fees, duties, levies, assessments, deductions, withholdings or governmental charges, together with any interest, penalties, additions to tax, fines and similar amounts relating thereto, imposed or collected by or on behalf of any federal, state, local or foreign governmental authority on or from NNIII.

"**Trademarks**" means all trademarks, service marks, trade dress, logos, trade names, corporate names and business names, whether or not registered, together with all goodwill associated therewith, and including all common law rights and all rights therein provided by multinational treaties or conventions.

"**U.K. Proceedings**" means the administration proceedings of the EMEA Debtors and NNSA commenced on January 14, 2009 in the High Court of England and Wales, pursuant to the Insolvency Act 1986.

"**U.S. Principal Officer**" means John J. Ray III, who was appointed Principal Officer of NNIII pursuant to an order entered by the Bankruptcy Court on August 16, 2016.

"**U.S. Trustee**" means the Office of the United States Trustee for the District of Delaware.

"**Unimpaired**" means any Claim or Interest that is not Impaired.

"**Unsecured Claim**" means any Claim against NNIII, including, without limitation, (a) Claims arising from the rejection of executory contracts and unexpired leases, (b) Deficiency Claims and (c) Intercompany Claims, but excluding Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims and Secured Claims.

"**Wind-Down NNIII**" means NNIII on and after the Effective Date.

### 1.3    Rules of Interpretation.

1.      In the event of an inconsistency: (a) the provisions of the Plan shall control over the contents of the Disclosure Statement; and (b) the provisions of the Confirmation Order shall control over the contents of the Plan.

2.      For the purposes of the Plan:

(a)      unless the context requires otherwise, any reference in the Plan to a contract, instrument, release or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; *provided*, *however*, that any change to such form, terms or conditions that is material to a party to such document shall not be modified without such party's consent unless such document or this Plan expressly provide otherwise;

(b)      unless the context requires otherwise, any reference in the Plan to an existing document, exhibit or schedule Filed or to be Filed means such document, exhibit or

schedule, as it may have been or may be amended, modified or supplemented as of the Effective Date;

(c)    unless otherwise specified, all references in the Plan to "Sections," "Articles," "Exhibits" and "Schedules" are references to sections, articles, exhibits and schedules of or to the Plan;

(d)    the words "herein," "hereof," "hereto," "hereunder" and others of similar import refer to the Plan in its entirety rather than to only a particular portion of the Plan;

(e)    captions and headings are inserted for convenience of reference only and are not intended to be part or to affect interpretations of the Plan;

(f)    the words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation";

(g)    the definitions of terms herein shall apply equally to the singular and plural forms of the terms defined;

(h)    whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms;

(i)    the word "will" shall be construed to have the same meaning and effect as the word "shall"; and

(j)    unless the context requires otherwise, any reference herein to any Person shall be construed to include such Person's successors and assigns;

(k)    unless otherwise specified, the rules of construction set forth in section 102 of the Bankruptcy Code will apply to this Plan.

3.    Whenever a Distribution of property is required to be made on a particular date, the Distribution shall be made on such date or as soon as reasonably practicable thereafter.

4.    All Exhibits and Schedules to the Plan are incorporated into the Plan and shall be deemed to be included in the Plan, regardless of when they are Filed.

5.    Unless otherwise specified, all currency amounts are in U.S. Dollars.

**1.4    Exhibits to this Plan.**  All Exhibits are incorporated into and are a part of this Plan as if set forth in full herein.  Holders of Claims and Interests may obtain a copy of the Exhibits upon written request to NNIII.  The Exhibits may be inspected in the office of the clerk of the Bankruptcy Court or its designee during normal business hours, obtained by written request to counsel to NNIII or obtained on the website of the Claims Agent at http://dm.epiq11.com/nortel.

**1.5     Computation of Time.**  In computing any period of time prescribed or allowed by the Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply.

## ARTICLE 2.
## TREATMENT OF UNCLASSIFIED CLAIMS

**2.1     Administrative Expense Claims.**  Subject to the allowance procedures and deadlines provided herein, on or as soon as reasonably practicable after the later to occur of (a) the Effective Date, (b) the date on which an Administrative Expense Claim shall become an Allowed Claim and (c) to the extent an Allowed Administrative Expense Claim relates to a liability arising under another agreement incurred by NNIII in the ordinary course, the date such liability is owed in accordance with the terms and conditions of any agreement or course of dealing relating thereto and consistent with past practice, the Holder of an Allowed Administrative Expense Claim shall receive on account of its Allowed Administrative Expense Claim, and in full satisfaction, settlement and release of and in exchange for such Allowed Administrative Expense Claim, (a) Cash equal to the unpaid portion of such Allowed Administrative Expense Claim or (b) such other treatment as to which NNIII and the Holder of such Allowed Administrative Expense Claim have agreed upon in writing; *provided*, *however*, that Professional Claims shall be paid in accordance with Section 2.3.

A notice setting forth the Effective Date of the Plan and the Administrative Expense Claims Bar Date shall be (i) Filed on the Bankruptcy Court's docket and (ii) posted on NNIII's and the Former Debtors' case information website at http://dm.epiq11.com/nortel. Further notice of the Administrative Expense Claims Bar Date shall be provided as may be directed by the Bankruptcy Court.  All requests for payment of an Administrative Expense Claim that accrued on or before the Effective Date (other than Administrative Expense Claims that (1) have been paid, (2) relate to payment of Professionals, (3) are for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code or (4) are as specified in subparagraph (B) or (C) of section 503(b)(1) of the Bankruptcy Code and held by a Governmental Unit) must be Filed with the Claims Agent and served on counsel for NNIII by the Administrative Expense Claims Bar Date.  Absent further order of the Bankruptcy Court, any requests for payment of Administrative Expense Claims that are not properly Filed and served by the Administrative Expense Claims Bar Date shall not appear on the register of Claims maintained by the Claims Agent and shall be disallowed automatically without the need for any objection from NNIII or any action by the Bankruptcy Court.

NNIII and the Plan Administrator may settle Administrative Expense Claims in the ordinary course without further notice or Bankruptcy Court approval, in accordance with the Plan Administration Agreement, as applicable.  NNIII shall have the right to object to any Administrative Expense Claim within one hundred and eighty (180) days after the Administrative Expense Claims Bar Date, subject to further extensions that may be granted by the Bankruptcy Court.  Unless NNIII or Wind-Down NNIII object to a timely Filed and properly served Administrative Expense Claim, such Administrative Expense Claim shall be deemed Allowed in the amount requested. In the event that NNIII or Wind-Down NNIII object to an Administrative Expense Claim, the parties may confer to try to reach a settlement and, failing

that, the Bankruptcy Court shall determine whether such Administrative Expense Claim should be allowed and, if so, in what amount.

       **2.2**    **Statutory Fees.**  On or before the Effective Date, all fees due and payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid in full, in Cash.

       **2.3**    **Professional Claims.**  Other than a Professional retained by NNIII pursuant to the Ordinary Course Professional Order, any entity seeking an award of the Bankruptcy Court of compensation for services rendered and/or reimbursement of expenses incurred through the Effective Date under sections 105(a), 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code shall File its final application for allowance of such compensation and/or reimbursement by no later than the first Business Day that is sixty (60) days after the Effective Date or such other date as may be fixed by the Bankruptcy Court and be paid by or on behalf of NNIII (a) in full and in Cash in the amounts Allowed upon the date the order granting such award becomes a Final Order, or as soon thereafter as practicable or (b) upon such other terms as may be mutually agreed upon by the claimant and NNIII.

       Except as otherwise specifically provided in this Plan, on and after the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate, and, subject to the terms of the Plan Administration Agreement, the Plan Administrator may employ and pay any Professional for services rendered or expenses incurred after the Effective Date in the ordinary course to facilitate the wind down of Wind-Down NNIII and effectuate the Plan without any further notice to any party or action, order or approval of the Bankruptcy Court.

       **2.4**    **Priority Tax Claims.**  With respect to each Allowed Priority Tax Claim, at the option of NNIII, the Holder of an Allowed Priority Tax Claim shall be entitled to receive, in full satisfaction, settlement and release of and in exchange for such Allowed Priority Tax Claim, (a) Cash in an amount equal to such Allowed Priority Tax Claim on the later of the Effective Date and the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as practicable, (b) treatment in accordance with section 1129(a)(9)(C) of the Bankruptcy Code or (c) such other treatment as to which NNIII and the Holder of such Allowed Priority Tax Claim have agreed upon in writing.  On the Effective Date, the Liens (if any) securing any Priority Tax Claims shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

## ARTICLE 3.
## CLASSIFICATION OF CLAIMS AND INTERESTS

       In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims and Professional Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in this Article.

       **3.1**    **Summary of Classifications.**

All Claims and Interests, other than Administrative Expense Claims, Priority Tax Claims and Professional Claims, are classified in the Classes set forth in this Article for all purposes, including voting, Confirmation and Distributions under this Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest fits within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest fits within the description of such other Classes.  A Claim is also classified in a particular Class for the purpose of receiving Distributions under this Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released or otherwise satisfied prior to the Effective Date.

### 3.2     Classification and Treatment of Claims Against and Interests in NNIII.

The following chart designates the Classes of Claims against and Interests in NNIII and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code and (c) deemed to accept or reject the Plan:

| Class | Designation | Status | Entitlement to Vote |
|-------|-------------|--------|---------------------|
| 1 | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| 2 | Secured Claims | Unimpaired | No (deemed to accept) |
| 3 | General Unsecured Claims | Impaired | Yes |
| 4 | Interests | Impaired | No (deemed to reject) |

## ARTICLE 4.
## TREATMENT OF CLAIMS AGAINST AND INTERESTS IN NNIII

Except to the extent that a Holder of an Allowed Claim against or Interest in NNIII agrees to a less favorable treatment, such Holder shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release and discharge of and in exchange for such Holder's Allowed Claim or Interest.  Unless otherwise indicated, the Holder of an Allowed Claim or Interest, as applicable, shall receive such treatment on the Effective Date, or as soon as reasonably practicable thereafter.

### 4.1     Class 1 – Priority Non-Tax Claims.

(a)     <u>Classification</u>.  Class 1 consists of all Priority Non-Tax Claims against NNIII.

(b)     <u>Impairment and Voting</u>.  Class 1 is Unimpaired by the Plan.  The Holders of Allowed Priority Non-Tax Claims in these Classes are not entitled to vote to accept or reject the Plan and are deemed to accept the Plan.

(c)      <u>Distributions</u>.  Except to the extent that the Holder of an Allowed Priority Non-Tax Claim in Classes 1 agrees to less favorable treatment or has been paid by or on behalf of NNIII on account of such Allowed Priority Non-Tax Claim prior to the Effective Date, on the later of the Effective Date and the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is practicable, each Holder of an Allowed Priority Non-Tax Claim in Class 1 shall be paid by or on behalf of NNIII in Cash in the amount equal to the Allowed amount of such Priority Non-Tax Claim.

### 4.2      **Class 2 – Secured Claims**

(a)      <u>Classification</u>.  Class 2 consists of all Secured Claims against NNIII.

(b)      <u>Impairment and Voting</u>.  Class 2 is Unimpaired by the Plan.  The Holders of Allowed Secured Claims in Class 2 are not entitled to vote to accept or reject the Plan and are deemed to accept the Plan.

(c)      <u>Distributions</u>.  Except to the extent that the Holder of an Allowed Secured Claim agrees to less favorable treatment, each Holder of an Allowed Secured Claim in Class 2 shall be satisfied by, at the option of NNIII: (i) payment in Cash by or on behalf of NNIII in the amount equal to the Allowed amount of such Secured Claim on the later of the Effective Date and the date on which such Secured Claim becomes an Allowed Secured Claim; (ii) the Distribution of the sale or other disposition proceeds of the Collateral securing such Allowed Secured Claim; (iii) surrender of the Collateral securing such Allowed Secured Claim to the Holder of such Allowed Secured Claim or (iv) such treatment that leaves unaltered the legal, equitable and contractual rights to which the Holder of the Allowed Secured Claim is entitled.  In the event an Allowed Secured Claim is treated under clauses (i) through (iii) above, the Liens securing such Claim shall be deemed released and extinguished without further order of the Bankruptcy Court.

### 4.3      **Class 3 – General Unsecured Claims.**

(a)      <u>Classification</u>. Class 3 consists of all General Unsecured Claims against NNIII.

(b)      <u>Impairment and Voting</u>.  Class 3 is Impaired by the Plan.  Each Holder of an Allowed General Unsecured Claim in Class 3 is entitled to vote to accept or reject the Plan.

(c)      <u>Distributions</u>.  Each Holder of an Allowed General Unsecured Claim in Class 3 shall, on the Initial Distribution Date or the first Interim Distribution Date after the date such Claim becomes Allowed, receive its Pro Rata Share of the Creditor Proceeds as of the applicable Distribution Date from NNIII.  In accordance with Section 10.3 herein, the Disbursing Agent shall make periodic Interim Distributions of the remaining available Creditor Proceeds to Holders of Allowed General Unsecured Claims in Class 3 until the Final Distribution Date.

4.4     **Class 4 – Interests.**

(a)     <u>Classification</u>.  Class 4 consists of all Interests in NNIII that were in existence immediately prior to or on the Petition Date.

(b)     <u>Impairment and Voting</u>.  Class 4 is Impaired by the Plan.  The Holders of Interests in Class 4 are not entitled to vote to accept or reject the Plan and are deemed to have rejected the Plan.

(c)     <u>Distributions</u>.  NNI, as the only Holder of Interests in NNIII, is not expected to receive any Distributions on account of such Interests under the Plan.  On the Effective Date, all Interests in NNIII will continue to be held by NNI until the closing of its Chapter 11 Case, solely for Plan administrative purposes.  NNI shall receive no Distributions on account of such Interests until such time that all Allowed Claims in Classes 1 through 3 have been satisfied in full in accordance with the Bankruptcy Code and the Plan.  At such time, NNI will receive its Pro Rata Share of any remaining Creditor Proceeds from NNIII.

## ARTICLE 5.
## <u>ACCEPTANCE OR REJECTION OF THE PLAN</u>

5.1     **Impaired Classes of Claims and Interests Entitled to Vote.**

Holders of Claims in Class 3 are entitled to vote to accept or reject this Plan as provided above or as otherwise set forth in such order as may be entered by the Bankruptcy Court establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order(s) of the Bankruptcy Court.  The votes of Holders of Claims who are entitled to vote and yet abstain from voting, return a ballot with no boxes checked or return a ballot voting both to accept and reject the Plan will not be counted for purposes of accepting or rejecting the Plan.

5.2     **Acceptance by an Impaired Class.**

In accordance with section 1126(c) of the Bankruptcy Code and except as provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted this Plan if this Plan is accepted by the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in such Class that have timely and properly voted to accept or reject this Plan.

5.3     **Presumed Acceptances by Unimpaired Classes.**

Classes 1 and 2 are Unimpaired by this Plan.  Accordingly, under section 1126(f) of the Bankruptcy Code, Holders of such Claims are conclusively presumed to accept this Plan, and the votes of the Holders of such Claims will not be solicited.

5.4     **Elimination of Vacant Classes; Deemed Acceptance by Non-Voting Classes.**

(a)    Any Class of Claims or Interests that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Interest that is Allowed in an amount greater than zero (including temporarily Allowed under Bankruptcy Rule 3018) shall be considered vacant and deemed eliminated from this Plan for purposes of voting to accept or reject this Plan and for purposes of determining whether this Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

(b)    If no votes to accept or reject this Plan are received with respect to a Class that is solicited in accordance with the Solicitation Procedures (other than a Class that is deemed eliminated pursuant to the foregoing Section 5.4(a)), such Class shall be deemed to have voted to accept this Plan, unless the Bankruptcy Court, for cause, orders otherwise.

### 5.5    Conversion or Dismissal of the Chapter 11 Case.

If the requisite Classes do not vote to accept this Plan or the Bankruptcy Court does not confirm this Plan, NNIII reserves the right, subject to Section 15.6 hereof, to have its Chapter 11 Case dismissed or converted, or to liquidate or dissolve NNIII under applicable non-bankruptcy procedure or chapter 7 of the Bankruptcy Code.

### 5.6    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code.

NNIII intends to request that the Bankruptcy Court confirm this Plan in accordance with section 1129(b) of the Bankruptcy Code with respect to any Impaired Class of Claims or Interests that rejects or is deemed to reject the Plan, where this Plan shall constitute a motion for such relief.

### ARTICLE 6.
### IMPLEMENTATION OF THE PLAN

### 6.1    General Settlement of Claims and Interests.

In accordance with the SPSA and the 9019 Approval Order, the terms of the SPSA are incorporated herein and entry of the Confirmation Order will constitute approval of the provisions of this Plan as a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to this Plan and the SPSA.

### 6.2    Plan Administrator.

(a)    <u>Appointment</u>.  Owl Hill Advisory LLC, shall serve as Plan Administrator for NNIII and Wind-Down NNIII pursuant to and in accordance with the provisions of the Plan, the SPSA and the Plan Administration Agreement.

(b)    <u>Authority</u>.  The Plan Administrator shall have the authority and right on behalf of NNIII and Wind-Down NNIII, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, the SPSA and the Plan Administration Agreement in accordance with the provisions therein.  These rights shall include, without limitation, the authority to: (i) except to the extent Claims have been previously allowed, control and effectuate the Claims reconciliation process, including to object to, seek to subordinate, compromise or settle any and all Claims against NNIII or Wind-Down

21

NNIII; (ii) make distributions on account of Allowed Claims, other remaining assets and appropriate fees and expenses in accordance with and subject to the terms of the Plan; (iii) exercise its reasonable business judgment to manage, liquidate or otherwise dispose of any remaining assets of NNIII or Wind-Down NNIII under the Plan and in accordance with applicable law as reasonably necessary to maximize Distributions to holders of Allowed Claims; (iv) prosecute all Causes of Action on behalf of NNIII or Wind-Down NNIII, elect not to pursue any Causes of Action and determine whether and when to compromise, settle, abandon, dismiss or otherwise dispose of any such Causes of Action, as the Plan Administrator may determine is in the best interests of NNIII or Wind-Down NNIII; (v) make payments to existing professionals who will continue to perform in their current capacities; (vi) retain professionals to assist in performing its duties under the Plan; (vii) maintain the books and records and accounts of NNIII and Wind-Down NNIII, as applicable, to effectuate the Plan; (viii) invest Cash of NNIII or Wind-Down NNIII, including any Cash proceeds realized from the liquidation of any assets of NNIII or Wind-Down NNIII, including any Causes of Action, and any income earned thereon; (ix) incur and pay reasonable and necessary expenses in connection with the performance of duties under the Plan, including the reasonable fees and expenses of professionals retained by the Plan Administrator; (x) administer the tax obligations of NNIII or Wind-Down NNIII, including filing tax returns, paying tax obligations and representing the interest and account of NNIII or its Estate or Wind-Down NNIII before any taxing authority in all matters, including, without limitation, any action, suit, proceeding or audit; (xi) prepare and file any and all informational returns, reports, statements, returns or disclosures relating to NNIII or Wind-Down NNIII that are required hereunder, by any Governmental Unit or applicable law; (xii) pay statutory fees in accordance with Section 15.18 of the Plan and (xiv) perform other duties and functions that are reasonable, necessary or appropriate for the implementation of the Plan.

(c)    <u>Compensation of the Plan Administrator</u>.  In addition to reimbursement for actual out-of-pocket expenses incurred by the Plan Administrator, the Plan Administrator shall be entitled to receive reasonable compensation for services rendered on behalf of NNIII and Wind-Down NNIII in an amount and on such terms as may be reflected in the Plan Administration Agreement.

(d)    <u>No Liability of Plan Administrator</u>.  The Plan Administrator will have no liability whatsoever for any acts or omissions to NNIII or Wind-Down NNIII or to Holders of Claims against or Interests in NNIII or Wind-Down NNIII other than for willful misconduct, fraud or breach of fiduciary duty by the Plan Administrator as determined by a Final Order, *provided, that*, the Plan Administrator shall have no liability for such acts or omissions if approved by the Bankruptcy Court.  Each of NNIII and Wind-Down NNIII shall indemnify and hold harmless the Plan Administrator for any losses, liabilities and costs incurred in such capacity to the fullest extent allowed by Delaware law.

(e)    <u>Termination, Resignation and Removal of Plan Administrator</u>. The duties, responsibilities and powers of the Plan Administrator shall terminate pursuant to the terms of the Plan Administration Agreement. The resignation and removal of the Plan Administrator shall occur pursuant to the terms of the Plan Administration Agreement.

(f)    <u>Establishment of Reserves</u>.  On the Effective Date, NNIII shall account for the Disputed Claims in such amounts, as agreed by NNIII and the Plan

Administrator, in accordance with the terms of the Plan Administration Agreement, as may be necessary to make sufficient future payments with respect to Disputed Claims as provided by the Plan.

    (g) <u>Periodic Reporting of the Plan Administrator</u>.  After the Effective Date, the Plan Administrator shall file periodic reports with the Bankruptcy Court regarding the status of the resolution of any remaining Disputed Claims and Distributions expected to be made pursuant to this Plan.

    **6.3** **Intercompany Account Settlement.**  Each of NNIII and Wind-Down NNIII will be entitled to transfer funds between itself and NNI consistent with the terms of the Cash Management Order.  Any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the ordinary course intercompany account settlement practices and will not violate the terms of this Plan.

    **6.4** **Settlement of Intercompany Claims and Other Matters.**  The Bankruptcy Court's entry of the 9019 Approval Order constituted the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the settlement that has been reached among the SPSA Parties with regard to (a) subject to the terms and conditions of the SPSA and the NNI Plan, (i) the Allocation Proceeds and (ii) the Intercompany Claims (including, for the avoidance of doubt, the Allowed Book Intercompany Claims) and (b) the other matters settled under the SPSA.  The 9019 Approval Order also constituted the Bankruptcy Court's finding that such settlement is: (1) in exchange for the good and valuable consideration provided by each of NNIII, the Former Debtors and the SPSA Parties; (2) a good-faith settlement and compromise of the claims released by NNIII and the Former Debtors; (3) in the best interests of NNIII, the Former Debtors, their Estates and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for hearing and (6) a bar to the assertion of any claim or Cause of Actions released pursuant to the SPSA.

    **6.5** **Administrative Expense Contribution and Quarterly Administrative Wind-Down Reimbursement Payments.**  From and after the Effective Date, NNI will bear various costs of administering and winding down NNIII's estate (including costs for professionals retained to assist with such administration or wind-down), and NNIII shall reimburse NNI quarterly for such costs in an amount not to exceed $100,000 (each payment, a "<u>Quarterly Administrative Wind-Down Payment</u>").  The payment of Quarterly Administrative Wind-Down Payments by NNIII to NNI shall continue until NNIII has been fully and finally liquidated and all costs and expenses related to such administration and wind-down have been incurred.  For the avoidance of doubt, NNI shall retain the right to assert Administrative Expense Claims against NNIII for any Priority Tax Claims that are asserted against and/or paid by NNI that reasonably could be allocated or attributable to NNIII, *provided* that the amount owed by NNIII to NNI in respect of Quarterly Administrative Wind-Down Reimbursement Payments and Priority Tax Claims shall be subject to a cap of $100,000 per quarter.

    **6.6** **Closing of Chapter 11 Case.**  After NNIII's Chapter 11 Case has been fully administered, the Plan Administrator shall File all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close NNIII's Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.  The Plan Administrator's

authority with respect to NNIII shall continue until such time as NNIII's Chapter 11 Case has been fully administered and closed.

## ARTICLE 7.
## THE SETTLEMENT AND PLANS SUPPORT AGREEMENT

      **7.1**    **SPSA.**  Pursuant to the 9019 Approval Order, the Bankruptcy Court authorized NNIII's entry into the SPSA and approved the SPSA pursuant to sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019. In the event of an inconsistency between the Plan and the SPSA, the SPSA shall govern. For the avoidance of doubt, the SPSA is and shall remain binding on NNIII and Wind-Down NNIII, whether prior to, on or after the Effective Date, and this Plan shall not in any way modify or be deemed to modify the SPSA.

      **7.2**    **Cooperation.**  NNIII shall cooperate in the implementation of the SPSA in accordance with its cooperation provisions therein in furtherance of the execution and implementation of the SPSA.

      **7.3**    **Settlement of Allocation Dispute.**  Pursuant to the resolution procedures of the IFSA, the SPSA Parties settled the Allocation Dispute on the terms set forth in the SPSA. As part of the integrated settlements contained in the SPSA, and subject to the terms and conditions thereof, NNIII has released any claims it may have for an entitlement to receive the Allocation Proceeds.

      **7.5**    **Estate Administration.**  From the Confirmation Date to the Effective Date, NNIII will be administered by the U.S. Principal Officer.

      **7.6**    **No Double-Recovery.**  In no circumstance shall a Creditor receive aggregate distributions from NNIII or Wind-Down NNIII and any other Entity in the Nortel Group on account of an Allowed Claim in excess of 100% of the amount of such Allowed Claim. In order to be eligible for any Distribution, a Creditor who holds an Allowed Claim against NNIII or Wind-Down NNIII and a related claim against any other Entity in the Nortel Group (an "Other Nortel Claim"), shall, upon the written request of NNIII or Wind-Down NNIII (which may be made from time to time), provide such information to NNIII or Wind-Down NNIII as it may reasonably request in respect of the Other Nortel Claim, including the amount in which the Other Nortel Claim has been allowed, the amount of distributions received or expected to be received on account of such Other Nortel Claim and any and all supporting documentation relating to the foregoing. Subject to further Order of the Bankruptcy Court, NNIII and Wind-Down NNIII are authorized to delay and/or withhold Distributions to Creditors holding Other Nortel Claims pending receipt of documentation acceptable to NNIII or Wind-Down NNIII, acting reasonably, to allow it to confirm that a Creditor has not and will not receive amounts on account of its Allowed Claim in excess of 100% of the amount of such Allowed Claim.

      **7.7**    **Post-Petition Date Interest.**  No post-Petition Date interest (or make whole premium, no-call payment or similar claim accruing post-Petition Date) shall be included in any Allowed Claim, nor be paid on Allowed Claims by NNIII.

      **7.8**    **Resolution of Certain Claims.**  Pursuant to the PBGC Settlement Agreement entered into by the PBGC, NNIII and the Former Debtors on December 20, 2016, the

PBGC was entitled to a single Allowed General Unsecured Claim against NNIII (and each of the Former Debtors) in the amount of $624,601,972, *provided* that the maximum aggregate distribution the PBGC was entitled to receive on its claims against NNIII and the Former Debtors was $565,000,000, and such claims were to be deemed paid in full upon NNIII and the Former Debtors having made aggregate distributions on account of the Allowed General Unsecured Claim in such amount.  In December 2018, the PBGC received the maximum allowed recovery of $565,000,000 on its claims against NNIII and the Former Debtors.  Accordingly, the PBGC's Allowed General Unsecured Claim against NNIII and any and all claims that have been or could have been asserted by the PBGC against NNIII are deemed paid in full, and the PBGC shall not have any further claims against NNIII or any of the Former Debtors.  The PBGC shall not be entitled to an Allowed Administrative Expense Claim or Priority Non-Tax Claim against NNIII or any of the Former Debtors.

   **7.9** **Book Intercompany Claims.**  Allowed Book Intercompany Claims shall be included in the determination of the Allowed General Unsecured Claims against NNIII. Annex L to the SPSA shall be treated as the definitive position for all Allowed Book Intercompany Claims between the Nortel Group entities specified thereon.  Any and all other pre-filing books and records claims between (a) any of the Canadian Debtors, on the one hand, and (b) NNIII, on the other hand, that are not preserved specifically in the SPSA (including, without limitation, the claims referenced in Sections 4(b)(i) and 4(g) of the SPSA) are forever released and barred as of the NNI Plan Effective Date to the extent not previously released. Other than the Allowed Book Intercompany Claims, all pre-filing books and records claims, including any claims that NNIII now holds as a consequence of an assignment, between (i) any of the EMEA Debtors, NNSA or the EMEA Non-Filed Entities, on the one hand, and (ii) NNIII, on the other hand, are forever released and barred as of the Effective Date to the extent not previously released.  The SPSA Parties agreed and acknowledged that, as of October 12, 2016, there are no post-filing books and records claims owing between (1) any of the Canadian Debtors, on the one hand, and NNIII, the EMEA Debtors, NNSA and the EMEA Non-Filed Entities, on the other hand, and (2) NNIII, on the one hand, and any of the EMEA Debtors, NNSA and the EMEA Non-Filed Entities, on the other hand.

   **7.10** **Remaining Assets and Other Proceeds.**  NNIII has the right to retain the value of its respective remaining assets, if any, and shall not be subject to any claims thereto by any other Global Debtor except those acknowledged in the SPSA.  NNIII releases any claims it has asserted or may assert or have as against (a) the proceeds held by the Canadian Debtors as "Restricted Cash" or "Unavailable Cash" (as noted in Monitor's reports to the CCAA Court), including in respect of the realization of the interests in LG-N, the Strandherd Lands, Relay and IP Addresses, and (b) the remaining IP Addresses, including any proceeds arising therefrom, to the extent not previously released.  For the avoidance of doubt, nothing in this Section 7.10 shall (i) prohibit the assertion of claims to enforce the SPSA and claims that are reserved in the SPSA (including, without limitation, the claims referenced in Section 4(b)(i) thereof) or (ii) affect NNIII's rights to receive distributions as a creditor of the various Global Debtors' estates.

   **7.11** **Debtor Disputes.**  Notwithstanding the separate administration of the estates of the Canadian Debtors, the EMEA Debtors, NNSA, NNIII and the Former Debtors and of the EMEA Non-Filed Entities, NNIII shall work cooperatively and use reasonable efforts to implement the SPSA and the Plan in a tax efficient manner. NNIII shall, upon the written request

of a Global Debtor to NNIII and to the extent permitted by applicable local law and not inconsistent with the statutory duties of NNIII, reasonably cooperate with each request, including providing such documents, other information, access to current personnel and/or permission to communicate with former personnel as may reasonably be requested by the requesting Global Debtor, in connection with the preparation and filing of tax returns and responding to or contesting any challenges, inquiries, audits or other disputes by tax authorities in relation thereto; *provided*, *however*, that NNIII shall not be obligated to cooperate to the extent such requested cooperation would prejudice the interests of NNIII and all such cooperation shall conform to the requirements in Section 4(a)(v) of the SPSA.

       **7.12    SPSA Releases.**  NNIII has entered into certain releases pursuant to the terms of the SPSA and Bankruptcy Rule 9019, the terms of which are incorporated herein.

## ARTICLE 8.
## CORPORATE FORM AND ACTION

       **8.1    NNIII Corporate Form and Vesting.**

       (a)    On the Effective Date, Wind-Down NNIII shall maintain its current corporate form, with all powers of a corporation under the laws of its state of incorporation and without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) under such applicable state law, for the purpose of effectuating all aspects of the Plan pertaining to Wind-Down NNIII.  From and after the Effective Date, until dissolved in accordance with this Plan or by the Plan Administrator, Wind-Down NNIII shall exist in order to effectuate all aspects of the Plan and wind down.

       (b)    On the Effective Date, Wind-Down NNIII shall be vested with the Assets of NNIII as provided in Section 13.10 of the Plan.

       **8.2    Dissolution of Wind-Down NNIII.**  The director of Wind-Down NNIII shall have the right to dissolve Wind-Down NNIII, after the occurrence of Wind-Down NNIII's Final Distribution Date, on or shortly following the Effective Date without the necessity for (i) any further approval by the board of directors or stockholders of Wind-Down NNIII of the dissolution or any plan of distribution, to the extent as such otherwise may be required by applicable law, and to the extent such shareholder approval may be required by applicable law such approval shall be deemed previously provided; or (ii) any other or further actions to be taken by or on behalf of Wind-Down NNIII or payments to be made in connection therewith, subject to the filing of a certificate of dissolution with the appropriate governmental authorities.

       **8.3    Post-Effective Date Management.**

       (a)    On the Effective Date, the board of directors of Wind-Down NNIII shall consist of one natural person selected by the Plan Administrator, which person may be the Plan Administrator or an employee or principal thereof, to serve as the board of directors of Wind-Down NNIII through the closing of Wind-Down NNIII's Chapter 11 Case in accordance with Section 6.6 of the Plan.

(b)      The current officers of NNIII shall continue to serve as the officers of Wind-Down NNIII in accordance with applicable non-bankruptcy law, any employment agreement with NNIII entered into after the Petition Date and NNIII's by-laws, as the same may be amended from time to time, through the closing of Wind-Down NNIII's Chapter 11 Case, unless an officer resigns or is removed by the board of directors of Wind-Down NNIII.

**8.4      Corporate Existence.**  After the Effective Date, the Plan Administrator may, in accordance with the Plan Administration Agreement, (a) maintain Wind-Down NNIII as a corporation in good standing until such time as all aspects of the Plan pertaining to Wind-Down NNIII have been completed or (b) subject to Section 8.2 of the Plan, dissolve Wind-Down NNIII or complete the winding up of Wind-Down NNIII (including, without limitation, transferring all or part of the Residual Assets of Wind-Down NNIII to a liquidating trust) at such time as the Plan Administrator considers appropriate and consistent with the implementation of the Plan pertaining to Wind-Down NNIII.

**8.5      Certificate of Incorporation or Certificate of Formation.**  As of the Effective Date, the certificate of incorporation and by-laws of Wind-Down NNIII shall be amended to satisfy the provisions of the Plan and the Bankruptcy Code and shall (a) include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code, and (b) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate the Plan and the transactions contemplated herein, in each case, without further action under applicable law, regulation, order or rule, including, without limitation, any action by the stockholders, managers or members of Wind-Down NNIII. The amended certificate of incorporation and by-laws of Wind-Down NNIII are attached herein as <u>Exhibit D</u>.

**8.6      Wind-Down.**  The Plan Administrator shall effectuate the monetization, wind-down and liquidation of Wind-Down NNIII's Residual Assets (it being understood that such may include the transfer of all or part of the Residual Assets of Wind-Down NNIII to one or more liquidating trusts within the meaning of Treas. Reg. §301.7701-4).

**8.7      Other Corporate Action.**  Without limiting the foregoing, in accordance with the requirements of the Plan and the terms of the Plan Administration Agreement, from and after the Effective Date, Wind-Down NNIII and the Plan Administrator may take any and all actions they deem appropriate in order to consummate the transactions contemplated herein, including, without limitation, to sell or otherwise dispose of any Residual Assets and wind up Wind-Down NNIII's affairs and, notwithstanding any provision contained in Wind-Down NNIII's articles of incorporation, articles of formation or by-laws to the contrary, Wind-Down NNIII shall not require the affirmative vote of Holders of Interests in order to take any corporate action, including to (a) compromise and settle Claims and Causes of Action of or against Wind-Down NNIII and its Estate and (b) dissolve, merge or consolidate with any other Entity.

## ARTICLE 9.
## TREATMENT OF EXECUTORY CONTRACTS

**9.1    Previous Assumption, Assignment and Rejection.**  Any executory contracts and unexpired leases of NNIII that have not been assumed, assumed and assigned or rejected prior to the Confirmation Date or with respect to which NNIII has not otherwise Filed a Notice of Assumption and Assignment or obtained an order assuming, assuming and assigning or rejecting the contract or lease prior to the Confirmation Date (the "Remaining Contracts"), if any, shall be rejected pursuant to Section 9.2 of this Plan.

**9.2    Rejection.**  Except for those executory contracts and unexpired leases that have been assumed, assumed and assigned or rejected pursuant to previous orders of the Bankruptcy Court, all executory contracts and unexpired leases of NNIII shall be rejected pursuant to section 365 and 1123(b)(2) of the Bankruptcy Code; *provided*, *however*, that nothing contained in this Article 9 shall constitute an admission by NNIII that any contract or lease is an executory contract or unexpired lease or that NNIII or its successors and assigns has any liability thereunder.

**9.3    Approval of Rejection; Rejection Damages Claims Bar Date.**  The Confirmation Order shall constitute an order of the Bankruptcy Court approving the rejection of executory contracts and unexpired leases under Section 9.2 above pursuant to section 365 and 1123(b)(2) of the Bankruptcy Code as of the Effective Date.  Any Claim for damages arising from any such rejection must be Filed within thirty (30) days after the Effective Date, or such Claim shall receive no Distribution under the Plan or otherwise on account of such Claim.

**9.4    Pre-existing Obligations to NNIII under Executory Contracts.**  Rejection or repudiation of any executory contract pursuant to the Plan or otherwise will not constitute a termination of pre-existing obligations owed to NNIII under such contracts.  In particular, notwithstanding any non-bankruptcy law to the contrary, Wind-Down NNIII expressly reserves and does not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by NNIII or Wind-Down NNIII, as applicable, from counterparties to any Rejected Contract.

## ARTICLE 10.
## PROVISIONS REGARDING VOTING AND DISTRIBUTIONS UNDER THE PLAN

**10.1    Voting of Claims.**  Each Holder of an Allowed Claim in an Impaired Class of Claims that is entitled to vote on the Plan pursuant to Article 3 and Article 4 of the Plan shall be entitled to vote separately to accept or reject the Plan, as provided in the order entered by the Bankruptcy Court establishing procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order or orders of the Bankruptcy Court.

**10.2    Nonconsensual Confirmation.**  If any Impaired Class of Claims entitled to vote on the Plan does not accept the Plan by the requisite majority provided in section 1126(c) of the Bankruptcy Code, NNIII reserves the right to amend the Plan in accordance with Section 15.3 of the Plan or to undertake to have the Bankruptcy Court confirm the Plan under

section 1129(b) of the Bankruptcy Code or both.  With respect to any Impaired Classes of Claims or Interests that are deemed to reject the Plan under any such amended Plan, NNIII shall request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code.

**10.3    Distributions of Creditor Proceeds.**  After the satisfaction in full of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims and Allowed Secured Claims (to the extent the Plan Administrator determines, in accordance with the Plan Administration Agreement, that NNIII will pay such Allowed Secured Claim in Cash) against NNIII, the Disbursing Agent shall make a Distribution of Creditor Proceeds in accordance with the provisions of the Plan (a) to each Holder of an Allowed Claim as of the Distribution Record Date against NNIII, within sixty (60) days of the Effective Date, or as soon thereafter as practicable, and (b) to each Holder of an Allowed Claim that is allowed after the Effective Date against NNIII, in accordance with the Class priorities set forth in Article 4 herein and the provisions of Article 10 herein.  After the initial Distribution with respect to any Allowed Claim, the Disbursing Agent shall make Distributions of Creditor Proceeds in accordance with the Plan to Holders of Allowed Claims against NNIII on June 30th and December 31st of each year (each such Distribution, an "Interim Distribution") and on the Final Distribution Date.  Notwithstanding the foregoing, the Plan Administrator may determine in accordance with the terms of the Plan Administration Agreement to direct the Disbursing Agent (i) to make Distributions more frequently on dates other than the Interim Distribution dates or (ii) not to make an Interim Distribution if it determines that the costs of making such Interim Distribution would be disproportionate to the Distribution amount.  No Distributions shall be made on account of a claim that is not yet an Allowed Claim until the Plan Administrator (1) determines not to object to such Claim (or the time to object to Claims expires), (2) agrees with the Holder of such Claim to allow such Claim in an agreed upon amount or (3) objects to such Claim and such Claim is Allowed by a Final Order, during which time such Claim shall be treated as a Disputed Claim.

**10.4    Minimum Distribution and Manner of Payment.**  No payment of Creditor Proceeds of less than $100 shall be made by NNIII to any Holder of an Allowed Claim against NNIII.  Such amounts shall be deemed redistributed to other Holders of Allowed Claims against NNIII and, accordingly, shall be distributed in accordance with the provisions of the Plan and the Bankruptcy Code.  Any payment of Cash made pursuant to the Plan may be made at the option of the Disbursing Agent either by check or by wire transfer.

**10.5    Limitation on Recovery.**  Notwithstanding anything contained herein to the contrary, in the event that the sum of the Distributions of Creditor Proceeds and other Distributions with respect to an Allowed Claim hereunder as well as from other sources are in excess of one hundred percent (100%) of such Holder's Allowed Claim, then the Creditor Proceeds remaining to be distributed to such Holder in excess of such one hundred percent (100%) shall be deemed available for distribution to other Holders of Allowed Claims against NNIII and, accordingly, shall be distributed in accordance with the provisions of the Plan and the Bankruptcy Code.

**10.6    Distributions Free and Clear.**  Except as otherwise provided herein, any Distributions under the Plan shall be free and clear of any Liens, Claims and encumbrances, and

no other Entity, including NNIII, Wind-Down NNIII and the Plan Administrator, shall have any interest, legal, beneficial or otherwise, in the Creditor Proceeds, Assets or Residual Assets once transferred to Holders of Allowed Claims pursuant to the Plan.

**10.7    Delivery of Distributions and Undeliverable Distributions.** Distributions to Holders of Allowed Claims of NNIII shall be made at the address of each such Holder as set forth on the Schedules Filed, unless superseded by a new address as set forth (a) on a proof of claim Filed by a Holder of an Allowed Claim or (b) in another writing notifying the Claims Agent (at the address listed in Section I of the Disclosure Statement) of a change of address.  If any Holder's Distribution is returned as undeliverable, no further Distributions shall be made or notices delivered to such Holder on account of such Claim until the Claims Agent is notified in writing by such Holder of such Holder's current address, at which time all such Distributions shall be made to such Holder without interest; *provided* that such Distributions that are returned as undeliverable shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six (6) months after the Effective Date.  After such date, all unclaimed property or interests in property shall become the property of NNIII's Estate, without the need for a further order by the Bankruptcy Court (notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary), and the Claim of any Holder to such property or interest in property shall be discharged and forever barred.

**10.8    Withholding and Reporting Requirements.**  In connection with the Plan and all instruments issued in connection therewith and distributed thereon, NNIII, the Plan Administrator and the Disbursing Agent shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all Distributions under the Plan shall be subject to any such withholding or reporting requirements. Notwithstanding the above, each Holder of an Allowed Claim that is to receive a Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any Tax obligations imposed by any Governmental Unit, including income, withholding and other Tax obligations, on account of such Distribution.  The Disbursing Agent has the right, but not the obligation, to withhold a Distribution until such Holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such Tax obligations.  The Disbursing Agent may require, as a condition to receipt of a Distribution, that the Holder of an Allowed Claim complete and return a Form W-8 or W-9, as applicable to each such Holder, to the Disbursing Agent.  If the Disbursing Agent makes such a request and the Holder fails to comply before the date that is one hundred and eighty (180) days after the request is made, no further Distributions shall be made to such Holder on account of such Claim.  In such cases, the amount of such Distribution shall irrevocably revert to NNIII and such Claim shall be discharged and the Holder of such Claim shall be forever barred from asserting such Claim against NNIII, its Estate or its respective property.  Also, in such cases, any Cash held for Distributions on account of such Claim shall become the property of NNIII's Estate and distributed to other Holders of Allowed Claims against NNIII in accordance with the terms of the Plan and the Bankruptcy Code.

**10.9    Time Bar to Cash Payment Rights.**  Checks issued in respect of Allowed Claims shall be null and void if not negotiated within ninety (90) days after the date of issuance thereof.  Requests for reissuance of any check shall be made to the Plan Administrator by the Holder of the Allowed Claim to whom such check originally was issued.  Any claim in respect of

a voided check shall be made on or before thirty (30) days after the expiration of the ninety (90) day period following the date of issuance of such check.  Thereafter, the amount represented by such voided check shall irrevocably revert to NNIII's Estate, to be distributed to other Holders of Allowed Claims against NNIII in accordance with the terms of the Plan and the Bankruptcy Code, and any Claim in respect of such voided check shall be discharged and forever barred from assertion against NNIII, its Estate and its respective property, *provided* that at the discretion of the Plan Administrator, any such amounts may be escheated pursuant to applicable law.  In the case of any check issued in respect of an Allowed Claim that is returned as an undeliverable Distribution, such check shall be null and void if not negotiated within ninety (90) days after the date of issuance, and the Allowed Claim for which such Distribution was issued shall be discharged and forever barred pursuant to this Section 10.9 only after the time period to claim such undeliverable Distribution provided in Section 10.7 has passed.

**Setoffs and Recoupment.**  NNIII may, but shall not be required to, setoff against the payment of any Claim or other Distributions to be made pursuant to the Plan in respect of such Claim of any nature whatsoever that NNIII may have against the Holder of such Claim; *provided*, *however*, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by NNIII of any such claim NNIII may have against such Holder.

**10.10  Distribution Record Date.**  As of the close of business on the Distribution Record Date, the register for NNIII shall be closed and there shall be no further changes to the record holder of any of the Claims or Interests.  NNIII and the Plan Administrator shall have no obligation to recognize any transfer of any Claims or Interests occurring after the close of business on the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder only with those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

**10.11  Allocation of Distributions.**  Distributions to any Holder of an Allowed Claim shall be allocated first to the principal portion of any such Allowed Claim (as determined for federal income tax purposes) and, only after the principal portion of any such Allowed Claim is satisfied in full, to any portion of such Allowed Claim comprising interest (but solely to the extent that interest is an allowable portion of such Allowed Claim).

## ARTICLE 11.
## PROCEDURES FOR TREATING DISPUTED CLAIMS

**11.1    Objections.**  Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, as of the Effective Date, objections to, and requests for estimation of, all Claims against NNIII may be interposed and prosecuted only by the Plan Administrator, who shall consult with Wind-Down NNIII regarding the same.  Objections to and requests for estimation of Claims shall be Filed and served on the claimant on or before the first Business Day that is one hundred and eighty (180) days after the Effective Date (the "**Claims Objection Deadline**") or such later date as is established by the filing of a notice by Wind-Down NNIII or the Plan Administrator prior to the expiration of the then-current Claims Objection Deadline.

**11.2    No Distributions Pending Allowance.**  Notwithstanding any other provision hereof, if any portion of a Claim is a Disputed Claim, no Distribution shall be made on account of the disputed portion of such Claim unless and until such disputed portion of such Claim becomes Allowed.

**11.3    Estimation of Claims.**  The Plan Administrator may at any time request that the Bankruptcy Court estimate for any purpose including Distribution any contingent, unliquidated or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code or otherwise, regardless of whether NNIII previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection.

**11.4    Resolution of Disputed Claims.**  On and after the Effective Date, the Plan Administrator shall have the authority to compromise, settle or otherwise resolve or withdraw any objections to Claims and to compromise, enter into protocols for the resolution of, settle or otherwise resolve any Disputed Claims regardless of whether such Claims are in a Class or otherwise (at Wind-Down NNIII's or the Plan Administrator's sole discretion with or without Bankruptcy Court approval).  On and after the Effective Date, the Plan Administrator shall have the sole authority to administer and adjust the Claims Register to reflect any such settlements or compromises without further notice to or action, order or hearing of the Bankruptcy Court.

**11.5    No Interest.**  Holders of Disputed Claims shall not be entitled to interest if such Disputed Claim becomes an Allowed Claim.

**11.6    No Amendments to Claims.**  A Claim may be amended before the Confirmation Date only as agreed upon by NNIII and the Holder of such Claim or as otherwise permitted by the Bankruptcy Court, the Bankruptcy Rules or applicable law.  On or after the Confirmation Date, the Holder of a Claim (other than an Administrative Expense Claim or a Professional Claim) must obtain prior authorization from the Bankruptcy Court or Wind-Down NNIII to File or amend a Claim. Any new or amended Claim Filed after the Confirmation Date without such prior authorization will not appear on the Claims Register and will be deemed disallowed in full and expunged without any action required by NNIII or Wind-Down NNIII and without the need for any court order.

**11.7    No Late-Filed Claims**.  In accordance with section 502(b)(9) of the Bankruptcy Code, any entity that failed to File a proof of Claim by the applicable bar date set by the Bankruptcy Court in the Chapter 11 Case and was not otherwise permitted to File a proof of claim after the applicable bar date by a Final Order of the Bankruptcy Court is and shall be barred, estopped and enjoined from asserting any Claim against NNIII (a) in an amount that exceeds the amount, if any, that is identified in the Schedules on behalf of such entity as undisputed, noncontingent and liquidated or (b) of a different nature or a different classification than any Claim identified in the Schedules on behalf of such Entity.  NNIII and Wind-Down NNIII shall be entitled, for the purposes of Distributions, reserves and other similar purposes under this Plan, to treat all Claims Filed after the later of (a) the Effective Date and (b) the Claim's applicable bar date, as disallowed and expunged.

## ARTICLE 12.
## CONDITIONS PRECEDENT

**12.1    Conditions to the Effective Date.**  The following are conditions precedent to the Effective Date of the Plan:

(a)    All actions and agreements, instruments, certificates or other documents necessary to implement the terms and provisions of the Plan are effected or executed and delivered, as applicable, in form and substance satisfactory to NNIII.

(b)    All authorizations, consents and regulatory approvals, if any, required in connection with the consummation of the Plan are obtained and not revoked.

(c)    The amended organizational documents of Wind-Down NNIII shall have been filed with the applicable authorities of its jurisdiction of incorporation or formation in accordance with such jurisdiction's applicable laws.

(d)    All statutory fees then due to the U.S. Trustee shall have been paid in full by NNIII pursuant to the Plan.

(e)    The Confirmation Order shall have been entered by the Bankruptcy Court, and thereafter shall have become a Final Order.

(f)    The SPSA shall not have been terminated.

(g)    An order (or orders) recognizing the Confirmation Order shall have been granted by the CCAA Court in the proceedings commenced in respect of NNIII under section 18.6 of the CCAA.

(h)    The Indian Tax Appeal Litigation shall have been withdrawn with prejudice or otherwise finally resolved to the satisfaction of the U.S. Principal Officer in his sole discretion.

**12.2    Waiver of Conditions.**  Notwithstanding the foregoing, NNIII reserves its right to waive the occurrence of the conditions precedent to the Effective Date set forth in Section 12.1 of the Plan, other than Section 12.1(f) of the Plan.  Any such waiver may be given effect at any time, without notice, leave, hearing or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan, provided that notice of any such waiver shall promptly be provided to the SPSA Parties.  Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.  If NNIII decides that one of the conditions precedents to the Effective Date of its Plan cannot be satisfied and the occurrence or such condition is not waived or cannot be waived, then NNIII shall file a notice of the inability to satisfy such condition with the Bankruptcy Court.  The failure of NNIII to exercise any of the foregoing rights shall not be deemed a waiver of any other rights and each right shall be deemed an ongoing right that may be asserted at any time.

12.3    **Notice of Effective Date.**  Upon the occurrence of the Effective Date or as soon thereafter as is reasonably practicable, Wind-Down NNIII shall File with the Bankruptcy Court the "Notice of Effective Date" in a form reasonably acceptable to Wind-Down NNIII in its sole discretion, which notice shall constitute appropriate and adequate notice that the Plan has become effective; *provided*, *however*, that Wind-Down NNIII shall have no obligation to notify any Person.  The Plan shall be deemed to be effective as of 12:01 a.m., prevailing Eastern Standard Time, on the date of such filing.  A courtesy copy of the Notice of Effective Date may be sent by United States mail, postage prepaid (or at Wind-Down NNIII's option, by courier, facsimile or electronic mail) to those Persons who have Filed with the Bankruptcy Court requests for notices pursuant to Bankruptcy Rule 2002.

12.4    **Dismissal or Conversion.**  NNIII or Wind-Down NNIII reserve the right to dismiss or convert the Chapter 11 Case as necessary to effectuate the SPSA and the settlement contemplated therein or to wind down and cease operations. NNIII or Wind-Down NNIII shall coordinate with the SPSA Parties to make any required amendments or seek any required waivers to or under the SPSA in order to implement any such actions, subject to the SPSA Parties' rights under the SPSA.

## ARTICLE 13.
## EFFECT OF CONFIRMATION

### 13.1    Binding Effect; Plan Binds All Holders of Claims and Interests.

(a)    Except as otherwise provided in section 1141(d) of the Bankruptcy Code, on and after the Effective Date, the provisions of the Plan shall, and shall be deemed to, be binding on any Holder of a Claim against or Interest in NNIII and its respective successors and assigns, regardless of whether the Claim or Interest of such Holder is Impaired under the Plan and whether or not such Holder has voted or failed to vote to accept or reject the Plan.

(b)    Further, pursuant to section 1142 of the Bankruptcy Code and in accordance with the Confirmation Order, NNIII and any other necessary party shall execute, deliver and join in the execution or delivery (as applicable) of any instrument, document or agreement required to consummate the Plan, and to perform any other act, and the execution of documents contemplated in the Plan that are necessary for the consummation of the Plan and the transactions contemplated herein.

(c)    Pursuant to section 1141(d)(3) of the Bankruptcy Code, Confirmation will not discharge Claims against NNIII; *provided*, *however*, that no Holder of any Claim or Interest may, on account of such Claim or Interest, seek or receive any payment or other Distribution from, or seek recourse against, NNIII's Estate, Wind-Down NNIII and/or their respective successors, assigns and/or property, except as expressly provided in this Plan.

### 13.2    Release of NNIII and Wind-Down NNIII.

**EFFECTIVE AS OF THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION, TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, THE HOLDERS OF CLAIMS AGAINST AND INTERESTS IN NNIII AND EACH OF SUCH HOLDERS' PREDECESSORS, SUCCESSORS, ASSIGNS**

34

**AND EACH OF THEIR PRESENT AND FORMER OFFICERS, DIRECTORS, EMPLOYEES, CONSULTANTS AND AGENTS (ACTING IN SUCH CAPACITY) WILL BE DEEMED TO HAVE WAIVED, RELEASED AND VOIDED ANY AND ALL CLAIMS, OBLIGATIONS, DAMAGES, DEMANDS, DEBTS, RIGHTS, SUITS, JUDGMENTS OR LIABILITIES (OTHER THAN THE RIGHT TO ENFORCE NNIII'S OR WIND-DOWN NNIII'S OBLIGATIONS UNDER THIS PLAN, THE SPSA AND THE CONTRACTS, INSTRUMENTS, RELEASES, AGREEMENTS AND DOCUMENTS DELIVERED UNDER THIS PLAN) AGAINST NNIII AND WIND-DOWN NNIII, WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, THEN EXISTING OR THEREAFTER ARISING, IN LAW, EQUITY OR OTHERWISE, THAT ARE BASED IN WHOLE OR IN PART ON ANY ACT OR OMISSION, TRANSACTION, EVENT OR OTHER OCCURRENCE TAKING PLACE ON OR PRIOR TO THE EFFECTIVE DATE IN ANY WAY RELATING TO NNIII, THE CHAPTER 11 CASES, THE DISCLOSURE STATEMENT OR THE PLAN (INCLUDING, WITHOUT LIMITATION, THE SOLICITATION OF VOTES ON THE PLAN) THAT COULD HAVE BEEN ASSERTED BY THE HOLDERS OF CLAIMS AGAINST OR INTERESTS IN NNIII, IN THEIR INDIVIDUAL CAPACITIES OR ON BEHALF (WHETHER DIRECTLY OR DERIVATIVELY) OF NNIII, ITS ESTATE, WIND-DOWN NNIII, EACH OF THEIR PREDECESSORS, SUCCESSORS, ASSIGNS AND EACH OF THEIR PRESENT AND FORMER OFFICERS, DIRECTORS, EMPLOYEES, CONSULTANTS AND AGENTS (ACTING IN SUCH CAPACITY), IN EACH CASE WITHOUT FURTHER NOTICE TO OR ORDER OF THE BANKRUPTCY COURT, ACT OR ACTION UNDER APPLICABLE LAW, REGULATION, ORDER OR RULE OR THE VOTE, CONSENT OR AUTHORIZATION OR APPROVAL OF ANY PERSON.**

**13.3    Release and Discharge of the Plan Released Parties.**

**EFFECTIVE AS OF THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION, TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, THE HOLDERS OF CLAIMS AGAINST AND INTERESTS IN NNIII AND EACH OF SUCH HOLDERS' PREDECESSORS, SUCCESSORS, ASSIGNS AND EACH OF THEIR PRESENT AND FORMER OFFICERS, DIRECTORS, EMPLOYEES, CONSULTANTS AND AGENTS (ACTING IN SUCH CAPACITY) WHO: (I) EITHER VOTE TO ACCEPT THIS PLAN OR ARE PRESUMED TO HAVE VOTED FOR THIS PLAN UNDER SECTION 1126(F) OF THE BANKRUPTCY CODE OR (II) ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THIS PLAN AND ABSTAIN FROM VOTING AND DO NOT MARK THEIR BALLOTS TO INDICATE THEIR REFUSAL TO GRANT THE RELEASES PROVIDED HEREIN WILL BE DEEMED TO HAVE WAIVED, RELEASED, VOIDED AND DISCHARGED EACH OF THE PLAN RELEASED PARTIES FROM ANY AND ALL CLAIMS, OBLIGATIONS, DAMAGES, DEMANDS, DEBTS, RIGHTS, SUITS, JUDGMENTS OR LIABILITIES (OTHER THAN THE RIGHT TO ENFORCE THE PLAN RELEASED PARTIES' OBLIGATIONS UNDER THIS PLAN, THE SPSA AND THE CONTRACTS, INSTRUMENTS, RELEASES, AGREEMENTS AND DOCUMENTS DELIVERED UNDER THIS PLAN), WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT,**

35

**MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, THEN EXISTING OR THEREAFTER ARISING, IN LAW, EQUITY OR OTHERWISE, THAT ARE BASED IN WHOLE OR IN PART ON ANY ACT OR OMISSION, TRANSACTION, EVENT OR OTHER OCCURRENCE TAKING PLACE ON OR PRIOR TO THE EFFECTIVE DATE IN ANY WAY RELATING TO NNIII, THE CHAPTER 11 CASE, THE DISCLOSURE STATEMENT, THE SPSA OR THE PLAN (INCLUDING, WITHOUT LIMITATION, THE SOLICITATION OF VOTES ON THE PLAN) THAT COULD HAVE BEEN ASSERTED BY THE HOLDERS OF CLAIMS AGAINST OR INTERESTS IN NNIII, IN THEIR INDIVIDUAL CAPACITIES OR ON BEHALF (WHETHER DIRECTLY OR DERIVATIVELY) OF NNIII, ITS ESTATE, WIND-DOWN NNIII, EACH OF THEIR PREDECESSORS, SUCCESSORS, ASSIGNS AND EACH OF THEIR PRESENT AND FORMER OFFICERS, DIRECTORS, EMPLOYEES, CONSULTANTS AND AGENTS (ACTING IN SUCH CAPACITY), IN EACH CASE WITHOUT FURTHER NOTICE TO OR ORDER OF THE BANKRUPTCY COURT, ACT OR ACTION UNDER APPLICABLE LAW, REGULATION, ORDER OR RULE OR THE VOTE, CONSENT OR AUTHORIZATION OR APPROVAL OF ANY PERSON.**

**NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS SECTION 13.3 OR SECTION 13.2 HEREOF, THE RELEASES SET FORTH ABOVE DO NOT RELEASE (I) ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, OR ANY DOCUMENT, INSTRUMENT OR AGREEMENT EXECUTED TO IMPLEMENT THE PLAN OR  (II) ANY OBLIGATIONS (WHETHER PRE- OR POST-EFFECTIVE DATE) UNDER THE NNI PLAN OR THE SPSA OR ANY DOCUMENT, INSTRUMENT OR ARGREEMENT EXECUTED TO IMPLEMENT THE NNI PLAN OR THE SPSA, AND EXCEPT AS OTHERWISE PROVIDED BY PRIOR OR SUBSEQUENT FINAL ORDER OF THE BANKRUPTCY COURT, NOTHING IN THIS SECTION 13.3 OR SECTION 13.2 SHALL OPERATE AS A WAIVER OR RELEASE OF (A) ANY PERSON (I) NAMED PRIOR TO THE EFFECTIVE DATE AS A DEFENDANT IN ANY ACTION COMMENCED BY OR ON BEHALF OF NNIII OR (II) ADJUDICATED PRIOR TO THE EFFECTIVE DATE BY A COURT OF COMPETENT JURISDICTION TO HAVE ENGAGED IN ACTS OF DISHONESTY OR WILLFUL MISCONDUCT DETRIMENTAL TO THE INTEREST OF NNIII OR (B) ANY CLAIM (I) WITH RESPECT TO ANY LOAN, ADVANCE OR SIMILAR PAYMENT BY NNIII TO ANY SUCH PERSON, (II) WITH RESPECT TO ANY CONTRACTUAL OBLIGATION OWED BY SUCH PERSON TO NNIII OR (III) RELATING TO SUCH PERSON'S KNOWING FRAUD, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT; AND *PROVIDED*, *FURTHER*, THAT THE FOREGOING IS NOT INTENDED, NOR SHALL IT BE CONSTRUED, TO RELEASE ANY OF NNIII'S CLAIMS THAT MAY EXIST AGAINST NNIII'S DIRECTORS AND OFFICERS LIABILITY INSURANCE; AND *PROVIDED*, *FURTHER*, THAT, NOTWITHSTANDING THE FOREGOING, ALL SUCH CLAIMS SHALL BE PRESERVED BY NNIII FOR SETOFF PURPOSES.**

**13.4    SPSA Releases.**

**UPON THE EFFECTIVE DATE, AS PROVIDED IN SECTION 8 OF THE SPSA AND IN CONSIDERATION FOR THE SETTLEMENTS PROVIDED FOR UNDER THE SPSA INCLUDING THE RELEASES GRANTED IN FAVOR OF NNIII UNDER THE SPSA, NNIII AND THE OTHER DEBTOR RELEASING PARTIES, TO THE EXTENT NOT PREVIOUSLY RELEASED PURSUANT TO THE 9019 APPROVAL ORDER OR OTHERWISE, SHALL BE DEEMED TO HAVE RELEASED AND FOREVER DISCHARGED EACH OF THE OTHER SPSA RELEASED PARTIES FROM ANY AND ALL LIABILITY FOR CLAIMS, DEFENSES, DEMANDS, LIABILITIES, DAMAGES, ACTIONS, CONTRIBUTIONS, SUBROGATION, CAUSES OF ACTION, SETOFFS, RECOUPMENTS, COSTS AND EXPENSES (INCLUDING LAWYERS' OR OTHER FEES OR EXPENSES), THE FOREGOING TERMS TO BE CONSTRUED AS BROADLY AS POSSIBLE, WHETHER KNOWN OR UNKNOWN, PAST OR PRESENT, FIXED OR CONTINGENT, LIQUIDATED OR UNLIQUIDATED, WHICH ANY OF THE DEBTOR RELEASING PARTIES HAVE, HAD, MAY HAVE HAD OR HEREAFTER MAY HAVE HOWEVER SO ARISING OUT OF OR IN CONNECTION WITH THE ALLOCATION DISPUTE, ANY OTHER MATTERS RESOLVED UNDER THE SPSA OR ANY OTHER MATTER RELATING TO THE CHAPTER 11 CASES OR THE FOREIGN PROCEEDINGS OR THE NORTEL GROUP (COLLECTIVELY, AND EXCLUDING THE NON-RELEASED MATTERS, THE "SPSA RELEASED CLAIMS") AND UNDERTAKES, COVENANTS AND AGREES NOT TO MAKE ANY CLAIM, PARTICIPATE IN ANY PROCEEDING OR TAKE ANY ACTION AGAINST ANY OTHER PERSON OR ENTITY WHO WOULD AS A RESULT OF SUCH CLAIM, PROCEEDING OR ACTION HAVE A CLAIM FOR CONTRIBUTION OR INDEMNITY AGAINST ANY OF THE OTHER SPSA RELEASED PARTIES IN RELATION TO THE SPSA RELEASED CLAIMS, *PROVIDED HOWEVER*, THAT NNIII'S RIGHT TO OBJECT TO, OR ASSERT COUNTERCLAIMS FOR PURPOSES OF SETOFF AGAINST, CLAIMS MADE AGAINST IT BY DIRECTORS AND OFFICERS OF ANY ENTITY IN THE NORTEL GROUP IS NOT RELEASED OR IN ANY WAY COMPROMISED. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS PARAGRAPH, THE RELEASES SET FORTH ABOVE IN THIS SECTION 13.4 DO NOT CONSTITUTE A RELEASE, WAIVER OR DISCHARGE OF THE INTERCOMPANY CLAIMS SPECIFIED ON ANNEX L TO THE SPSA, ANY CLAIM BETWEEN OR AMONG ANY OF THE FORMER DEBTORS AND THEIR SUBSIDIARIES, OR ANY CLAIM TO ENFORCE THE TERMS OF THE SPSA, THE PLAN, THE NNI PLAN, THE CANADIAN PLAN AND ANY ORDER OF THE BANKRUPTCY COURT OR THE CCAA COURT RELATED THERETO (COLLECTIVELY, THE "NON-RELEASED MATTERS").**

### 13.5    Exculpation and Limitation of Liability.

None of the Exculpated Parties shall have or incur any liability to any Entity for any act taken or omitted to be taken in connection with and subsequent to the commencement of the Chapter 11 Cases, the formulation, preparation, dissemination, implementation, solicitation of votes, confirmation or approval of the Plan or any compromises or settlements contained therein, the administration of the Plan or Distributions under the Plan, the Disclosure Statement and any ancillary documents related thereto or any contract, instrument, release or other agreement or document

provided for or contemplated in connection with the consummation of the transactions set forth in the Plan; *provided, however,* the foregoing provisions of this Section 13.5 shall not affect the liability of any Exculpated Party that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct, including, without limitation, fraud and criminal misconduct, and in all respects the Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under this Plan.

13.6    **Injunction on Claims.**

Except as otherwise expressly provided in the Plan, the Confirmation Order or such other order of the Bankruptcy Court that may be applicable, all Holders of Claims or other debt or liability that is treated under the Plan or Interest or other right of interest that is terminated or cancelled pursuant to the Plan are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or other debt or liability or Interest or other right of equity interest that is terminated or cancelled pursuant to the Plan against NNIII, NNIII's Estate or Wind-Down NNIII or any properties or interest in properties of NNIII or Wind-Down NNIII, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against NNIII, NNIII's Estate or Wind-Down NNIII or any properties or interest in properties of NNIII or Wind-Down NNIII, (c) creating, perfecting or enforcing any encumbrance of any kind against NNIII, NNIII's Estate or Wind-Down NNIII or any properties or interest in properties of NNIII or Wind-Down NNIII, (d) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from NNIII, NNIII's Estate or Wind-Down NNIII or any properties or interest in properties of NNIII or Wind-Down NNIII, (e) acting or proceeding in any manner that does not conform to or comply with the provisions of the Plan or (f) taking any actions to interfere with the implementation or consummation of the Plan, with respect to any such Claim or other debt or liability that is discharged or Interest or other right of equity interest that is terminated or cancelled pursuant to the Plan.

13.7    **Terms of Injunctions or Stays.**  Unless otherwise provided in the Plan, the Confirmation Order or a separate order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Case under sections 105 and 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date shall remain in full force and effect until the Effective Date.  Upon the Effective Date, all injunctions or stays provided for in each Chapter 11 Case under sections 105 or 362 of the Bankruptcy Code, or otherwise, shall be lifted and of no further force or effect—being replaced, to the extent applicable, by the injunctions, discharges, releases and exculpations of this Article 13.

13.8    **Retention of Litigation Claims and Reservation of Rights.**

(a)    Except as expressly provided in the Plan, nothing contained in the Plan or in the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights with respect to Litigation Claims that NNIII, Wind-Down NNIII or the Plan Administrator may have or choose to assert on behalf of NNIII's Estate or Wind-Down NNIII under any provision

38

of the Bankruptcy Code or any applicable non-bankruptcy law, including, without limitation, any and all claims against any Person or Entity, to the extent such Person or Entity asserts a cross-claim, counterclaim or claim for setoff that seeks affirmative relief against NNIII, its officers, directors or representatives.

(b)     Except as expressly provided in the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any Litigation Claim, right of setoff or other legal or equitable defense that NNIII had immediately prior to the Petition Date, against or with respect to any Claim.  NNIII, Wind-Down NNIII and the Plan Administrator shall have, retain, reserve and be entitled to assert all such Litigation Claims, rights of setoff and other legal or equitable defenses that NNIII had immediately prior to the Petition Date fully as if the Chapter 11 Case had not been commenced, and all of NNIII's legal and equitable rights respecting any Claim may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Case had not been commenced.

(c)     Except as expressly provided in the Plan, the Plan Administrator, shall, after the Effective Date, retain the rights of NNIII to prosecute any Litigation Claims that could have been brought by NNIII at any time.

**13.9     Retention of Rights.**  The Plan Administrator and Wind-Down NNIII shall retain the rights of NNIII to enforce all orders entered and relief granted in the Chapter 11 Case.

**13.10    Vesting.**  Except as otherwise expressly provided in the Plan or the SPSA, or any documents or instruments executed in accordance therewith, on the Effective Date, pursuant to section 1141(b) and section 1141(c) of the Bankruptcy Code, Wind-Down NNIII shall be vested with all of the Assets of NNIII's Estate free and clear of all Claims, Interests, Liens, encumbrances, charges and other interests of Creditors and Holders of Interests, and may operate free of any restrictions imposed by the Bankruptcy Code or by the Bankruptcy Court, including, without limitation, performing any contract or lease entered into or assumed by NNIII after the Petition Date.  NNIII shall continue as Debtor-in-Possession under the Bankruptcy Code until the Effective Date, and thereafter, subject to the terms of the Plan, Wind-Down NNIII may operate free of any restrictions imposed by the Bankruptcy Code or the Bankruptcy Court.

# ARTICLE 14.
# RETENTION OF JURISDICTION

Pursuant to sections 105 and 1142 of the Bankruptcy Code, and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising in, arising under or related to the Chapter 11 Case and this Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

(a)     Allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the allowance or priority of all Claims and Interests;

(b)      Hear and determine any and all Causes of Action against any Person and rights of NNIII and Wind-Down NNIII that arose before or after the Petition Date, including, but not limited to, the rights and powers of a trustee and Debtor-in-Possession against any Person whatsoever, including, but not limited to, all avoidance powers granted to NNIII under the Bankruptcy Code and all Causes of Action and remedies granted pursuant to sections 502, 506, 510, 541, 542, 543, 544, 545, 547 through 551 and 553 of the Bankruptcy Code;

(c)      Grant or deny any applications for allowance of compensation for Professionals authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or prior to the Effective Date; *provided*, *however*, that the payment of all fees and expenses of Wind-Down NNIII and the Plan Administrator incurred from and after the Effective Date, including counsel fees, shall be made in the ordinary course and without further notice or Bankruptcy Court approval;

(d)      Resolve any matters relating to the assumption, assumption and assignment or rejection of any executory contract or unexpired lease to which NNIII is or was a party or with respect to which NNIII may be liable, including, without limitation, the determination of whether such contract is executory for the purposes of section 365 of the Bankruptcy Code, and hear, determine and, if necessary, liquidate any Claims arising therefrom;

(e)      Enter orders approving Wind-Down NNIII's post-Confirmation sale or other disposition of Residual Assets upon motion by the Plan Administrator;

(f)      Ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(g)      Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving NNIII that may be pending in the Chapter 11 Case on the Effective Date;

(h)      Hear and determine matters concerning state, local or federal taxes in accordance with sections 346, 505, 1129 or 1146 of the Bankruptcy Code;

(i)      Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and the Confirmation Order and all contracts, instruments, releases and other agreements or documents created in connection with this Plan, the Disclosure Statement or the Confirmation Order;

(j)      Hear and determine any matters concerning the enforcement of the provisions of Article 13 of this Plan and any other exculpations, limitations of liability or injunctions contemplated by this Plan;

(k)      Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or the Confirmation Order;

(l)      Permit NNIII, to the extent authorized pursuant to section 1127 of the Bankruptcy Code, to modify the Plan, Confirmation Order or any agreement, contract,

instrument release or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in the Plan or any agreement, contract, instrument, release or document created in connection with the Plan;

(m)    Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with respect to consummation, implementation or enforcement of the Plan or the Confirmation Order;

(n)    Enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings, including with respect to the Plan and the Confirmation Order, entered in connection with the Chapter 11 Case;

(o)    Hear and determine Causes of Action by or on behalf of NNIII or Wind-Down NNIII or the Plan Administrator;

(p)    Enter and enforce such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked vacated, or Distributions pursuant to the Plan are enjoined or stayed;

(q)    Hear and determine all claims, rights or disputes arising under or in connection with the orders previously entered in the Chapter 11 Case;

(r)    Hear and determine any other matters that may arise in connection with or relating to the Plan, the Confirmation Order, the SPSA, the Plan Administration Agreement or any agreement, contract, instrument release or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

(s)    Enter any orders in aid of and resolve any matters relating to or arising under prior orders of the Bankruptcy Court; and

(t)    Enter a final decree closing the Chapter 11 Case.

## ARTICLE 15.
## MISCELLANEOUS PROVISIONS

**15.1    Effectuating Documents and Further Transactions.**  NNIII and Wind-Down NNIII and, on and after the Effective Date, the Plan Administrator shall be authorized to execute, deliver, file or record such contracts, instruments, releases, consents, certificates, resolutions, programs and other agreements or documents and take such acts and actions as may be reasonable, necessary or appropriate to effectuate, implement, consummate or further evidence the terms and conditions of this Plan, the Confirmation Order and any transactions described in or contemplated by this Plan, without the need for any approvals, authorization or consents except for those expressly required pursuant to the Plan.

**15.2    Authority to Act.**  All matters expressly provided for under this Plan that would otherwise require approval of the stockholders, security holders, officers, directors, partners, managers, members or other owners of NNIII or Wind-Down NNIII or one or more of

the Former Debtors shall be deemed to have occurred and shall be in effect prior to, on or after the Effective Date (as appropriate) pursuant to the applicable law of the states in which NNIII or Wind-Down NNIII are formed, without any requirement of further vote, consent, approval, authorization or other action by such stockholders, security holders, officers, directors, partners, managers, members or other owners of such entities or notice to, order of or hearing before the Bankruptcy Court.

**15.3    Amendment or Modification of the Plan.**  Subject to Section 6(c) of the SPSA and subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123 and 1125 of the Bankruptcy Code, NNIII reserves the right to alter, amend or modify the Plan at any time prior to the Confirmation Date but prior to the substantial consummation of the Plan.  Notwithstanding the foregoing, NNIII shall not alter, amend, withdraw, replace or modify the Plan in a manner that is inconsistent with its obligations under the SPSA.  A Holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claims of such Holder and is consistent with this Section 15.3.  For the avoidance of doubt, nothing in this Section 15.3 limits any SPSA Party's rights pursuant to Section 6(h) of the SPSA with respect to any proposed amendment, restatement, modification and/or supplement to the Plan.

**15.4    Administrative Expense Claims Reserve.**  On or before the Effective Date, NNIII shall reserve for an estimated amount for unpaid Professional Claims and any other Administrative Expense Claims that have not been Filed as of the Effective Date (the "Administrative Expense Claims Reserve").  The balance of the Cash held in the Administrative Expense Claims Reserve, if any, after all Professional Claims and Administrative Expense Claims have been paid, and Distributions made in accordance with the Plan, shall be available for Distribution to Holders of Allowed Claims, in accordance with the provisions of the Plan and the Confirmation Order.

**15.5    Fees and Expenses.**  From and after the Effective Date, Wind-Down NNIII shall, in the ordinary course and without the necessity for any approval by the Bankruptcy Court, pay the reasonable and necessary fees and expenses incurred by the Disbursing Agent and Plan Administrator in accordance with and from the funds provided for such use in this Plan.

**15.6    Revocation or Withdrawal of the Plan.**  Subject to the terms of the SPSA, NNIII reserves the right to revoke or withdraw the Plan prior to the Effective Date.  If NNIII revokes or withdraws the Plan, or if Confirmation does not occur or if the Plan does not become effective, then the Plan shall be null and void, and nothing contained in the Plan or Disclosure Statement shall: (a) constitute a waiver or release of any Claims by or against, or any Interests in, NNIII or any other Person; (b) constitute an admission of any fact or legal conclusion by NNIII or any other Entity or (c) prejudice in any manner the rights of NNIII in any further proceedings involving NNIII.

**15.7    Insurance Preservation.**  Nothing in the Plan, including any releases, shall diminish or impair the enforceability of any insurance policies or other policies of insurance that may cover insurance claims or other claims against NNIII or any other Person.

**15.8    Exemption from Certain Transfer Taxes.**  Pursuant to section 1146 of the Bankruptcy Code, any transfers from NNIII, Wind-Down NNIII or the Plan Administrator pursuant to, in furtherance of or in connection with this Plan shall not be subject to any stamp tax, recording tax, personal property tax, real estate transfer tax, sales tax, use tax, transaction privilege tax, privilege taxes or other similar tax, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**15.9    Subordinated Claims.**  The allowance, classification and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, NNIII reserves the right for the Plan Administrator to re-classify any Allowed Claim or Interest in accordance with any contractual, legal or equitable subordination relating thereto.

**15.10    Cross-Border Protocol and Cross-Border Claims Protocol.**  The Cross-Border Protocol and Cross-Border Claims Protocol shall each remain in full force and effect in accordance with their respective terms.

**15.11    Governing Law.**  Unless a rule of law or procedure is supplied by (a) United States federal law (including the Bankruptcy Code and Bankruptcy Rules) or (b) an express choice of law provision in any agreement, contract, instrument or document provided for, or executed in connection with, the Plan, the rights and obligations arising under the Plan and any agreements, certificates, by-laws, releases, contracts, documents and instruments executed in connection with the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof.

**15.12    No Admissions.**  Notwithstanding anything herein to the contrary, nothing in the Plan shall be deemed as an admission by NNIII with respect to any matter set forth herein, including liability on any Claim.

**15.13    Severability of Plan Provisions.**  Subject to the terms of the SPSA, if, prior to Confirmation, any term or provision of the Plan that does not govern the treatment of Claims or Interests is held by the Bankruptcy Court to be invalid, void or unenforceable, at the request of NNIII the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a final judicial determination and shall provide that each term and provision of the Plan, as it may have been

altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**15.14   Successors and Assigns.**   This Plan shall be binding upon and inure to the benefit of NNIII and its successors and assigns, including, without limitation, Wind-Down NNIII. The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

**15.15   Defenses with Respect to Unimpaired Claims.**   Except as otherwise provided in this Plan, nothing shall affect the rights and legal and equitable defenses of NNIII, Wind-Down NNIII or the Plan Administrator with respect to any Unimpaired Claim, including all rights in respect of legal and equitable defenses to setoffs or recoupments against Unimpaired Claims.

**15.16   Section 1125(e) Good Faith Compliance.**   Confirmation of the Plan shall act as a finding by the Bankruptcy Court that NNIII and each of its representatives have acted in "good faith" under section 1125(e) of the Bankruptcy Code**.**

**15.17   No Injunctive Relief.**   Except as otherwise provided in the Plan or Confirmation Order, no Claim or Interest shall under any circumstances be entitled to specific performance or other injunctive, equitable or other prospective relief.

**15.18   Payment of Statutory Fees.**   All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court, shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Case is converted, dismissed or closed, whichever occurs first.

**15.19   Saturday, Sunday or Legal Holiday.**   If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

**15.20   Reservation of Rights**.   Except as expressly set forth herein, the Plan shall have no force or effect unless and until the Effective Date occurs.  Neither the filing of the Plan, any statement or provision contained herein, nor the taking of any action by NNIII or any Entity with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) NNIII with respect to the Holders of Claims or Interests or other parties-in-interest; or (2) any Holder of a Claim or Interest or other party-in-interest prior to the Effective Date.

**15.21   Post-Effective Date Rule 2002 Notice List**.   After the Effective Date, any Entity that, prior to the Effective Date, had requested from NNIII or the Claims Agent to receive notice in the Chapter 11 Case pursuant to Bankruptcy Rule 2002 must renew such request in writing to the Claims Agent in order to be included on the list of entities entitled to receive documents from Wind-Down NNIII pursuant to Bankruptcy Rule 2002 (the "**Post-Effective Date Notice List**").   On and after the Effective Date, Wind-Down NNIII is authorized to limit the list of entities receiving documents pursuant to Bankruptcy Rule 2002 to those entities that request to be included on the Post-Effective Date Notice List.

      **15.22   Right to Abandon and Dispose of Debtor Property, Books & Records**.
After the Effective Date, notwithstanding any prior order of the Bankruptcy Court, the Plan
Administrator shall give notice of a proposed abandonment or disposition of property by filing a
notice on the docket of the Chapter 11 Case and delivering a copy of such notice to the Canadian
Debtors and the Monitor; *provided*, *however*, that the Plan Administrator shall be entitled to
abandon, dispose of and/or destroy Records (as defined in the Abandonment and Disposal
Procedures Order), without notice and without complying with any Retention Laws (as defined
in the Abandonment and Disposal Procedures Order), in accordance with the terms of the
Abandonment and Disposal Procedures Order and the Document Disposal Procedures (as
defined in the Abandonment and Disposal Procedures Order) attached to the Abandonment and
Disposal Procedures Order as Exhibit 1; *provided further*, *however*, that the destruction or other
disposition of any Servers or Related Equipment (each as defined in the Server Access and
Disposition Order) shall be governed by the Server Access and Disposition Order and NNIII
shall only be required to provide written confirmation to the EMEA Debtors of such destruction
or other disposition and the means of such destruction or other disposition.  The filing of a notice
of abandonment or disposition on the docket pursuant to this Section 15.22 shall constitute good
and sufficient notice, and no other or further notice of proposed abandonment or disposition is
necessary.  If no party serves an objection within thirty (30) days of the posting of such notice,
the Plan Administrator shall be authorized immediately to abandon or dispose of such property.

      **15.23   Notices.**  Any notice required or permitted to be provided under this Plan
shall be in writing and served by either (a) certified mail, return receipt requested, postage
prepaid, (b) hand delivery or (c) reputable overnight delivery service, freight prepaid, to be
addressed as follows:

      Counsel for NNIII

            Cleary Gottlieb Steen & Hamilton LLP
            One Liberty Plaza
            New York, NY 10006
            (212) 225-3999 (facsimile)
            Attn:   Lisa M. Schweitzer, Esq.

                - and -

            Morris, Nichols, Arsht & Tunnell LLP
            1201 North Market Street, 18th Floor
            P.O. Box 1347
            Wilmington, DE 19899
            (302) 658-3989 (facsimile)
            Attn:   Derek C. Abbott, Esq.
                    Andrew R. Remming, Esq.

      The Plan Administrator

            Owl Hill Advisory LLC
            Attn:   John J. Ray, III

c/o Counsel for the Plan Administrator

<u>Counsel for the Plan Administrator</u>

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
(212) 225-3999 (facsimile)
Attn:   Lisa M. Schweitzer, Esq.

Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street, 18th Floor
P.O. Box 1347
Wilmington, DE 19899
(302) 658-3989 (facsimile)
Attn:   Derek C. Abbott, Esq.
        Andrew R. Remming, Esq.

Dated: August 26, 2021.

**Nortel Networks India International Inc.**


By: _____
    Name:  John J. Ray, III
    Title:   Principal Officer

## Appendix B

## Recovery Analysis for NNIII[1]

The information and data included in this recovery analysis (the "Recovery Analysis") are estimates derived from sources available to NNIII. The Recovery Analysis is based on the Assets and financial estimates of NNIII as of April 30, 2021, plus certain settlements contemplated under the Plan (the "Plan Settlements") as described herein. Allowed Book Intercompany Claims against NNIII asserted by NNI and NNL are treated in accordance with the terms of the Plan and Annex L of the SPSA. The information presented herein is for illustrative purposes only and prepared solely to estimate possible recoveries of various Claims depending on the possible outcome of numerous contingencies, and shall not constitute evidence of the purported validity of any Claim and should not be used for any other purpose than as described herein.

The recoveries are based on cash on hand expected to be available for distribution over the period from April 30, 2021 through December 31, 2021 (the "Forecast Period"). NNIII's Assets are assumed to be fully monetized during the Forecast Period. To the extent certain Assets have not been fully realized during the Forecast Period, NNIII may incur additional expenses beyond the Forecast Period to realize value for the Assets.

The Recovery Analysis amounts may differ from the presentation of Assets in the Balance Sheets disclosed by the Debtors' monthly operating reports (collectively, the "MORs"). The differences primarily include: certain intercompany and affiliate account receivables are fully reserved for accounting purposes in the MORs and the liabilities subject to compromise as laid out in the MORs are have not been adjusted for all Claim activity. In addition, certain intercompany account receivables are offset against intercompany account payables. A description of the manner in which Assets are presented in the MORs is included in each MOR and the notes thereto.

In preparing this Recovery Analysis, NNIII made various estimates and assumptions based on available information. Therefore, actual results may differ from estimated recoveries and could have a material effect on the recovery percentages. The assumptions contained herein are made solely for modeling purposes and do not constitute a waiver of any of NNIII's rights or defenses with respect to any of its Claims and Assets.

As more information becomes available to NNIII, including the ability to realize additional value from the Assets or regarding the expected costs of the remaining case, it is possible that estimates included in the Recovery Analysis may change, and such changes may be material.

---

[1] Capitalized terms used in this Appendix B and not defined herein shall have the definitions ascribed to them in the Plan or the Disclosure Statement, as applicable.

1)  **Assumptions with Respect to Assets**

NNIII has categorized its Assets into various classes.  Below is a short description of these categories and the treatment accorded to them in the Recovery Analysis.

*a)  Cash*

Cash includes demand deposits, interest-bearing deposits with banks, U.S. government obligations, U.S. government guaranteed securities as of April 30, 2021.

*b)  Intercompany Accounts Receivable*

For the purpose of determining recoveries, the Recovery Analysis assumes that all Affiliates recognize certain pre-petition balances as a basis for determining NNIII's Intercompany Claims against such Affiliates.  NNIII's remaining receivable balance with Nortel Networks India (Private) Ltd. of approximately $11.3 million has been agreed, compromised and or settled with Nortel Networks India (Private) Ltd.  Due to uncertainties regarding timing and amount of any future distributions from Nortel Networks India (Private) Ltd., the Recovery Analysis does not include any value for a recovery on this receivable balance.  Such assumption is an estimate and the actual result could vary materially.

2)  **Assumptions with Respect to Claims**

**This Recovery Analysis is premised upon a number of estimates and assumptions that, although developed and considered reasonable by NNIII, are inherently subject to significant business, economic and additional uncertainties beyond the control of NNIII and, as discussed below, may be subject to change.**

*a)  Estimated Fees and Expenses after Effective Date*

As outlined in the Plan, NNIII will pay NNI an expense reimbursement fee of up to $100,000 per quarter for post-effective date distribution management, wind-down costs and reimbursement of US Trustee costs.  Additionally, NNIII is expected to incur direct professional fees and expenses related to the wind-down of its affairs in both the U.S. and India. The Recovery Analysis includes estimated incurred and unpaid administrative costs as of the Effective Date.  The Recovery Analysis includes an estimate of $1.1 million associated with these estimated costs.

NNIII's cost estimates outlined above are highly dependent upon key assumptions including, but not limited to:

- a resolution, during the Forecast Period, of all of NNIII's Intercompany Claims against Affiliates; and
- an accurate assessment of the costs necessary to wind down and liquidate NNIII in both the U.S. and India.

To the extent any of these assumptions are not realized, NNIII's costs may differ from estimated costs, and such additional costs could have a material effect on the recovery percentages for creditors under the Plan.

### b)  *NNIII General Unsecured Claims*

The General Unsecured Claims class includes two Claims:
- The Allowed Book Intercompany Claim of NNL of $17.6 million; and
- The Allowed Book Intercompany Claim of NNI of $53.6 million.

The amount of such Allowed Book Intercompany Claims is inclusive of amounts previously distributed by NNIII to NNI and NNL pursuant to the Interim Distribution Order.  This Recovery Analysis excludes the allowed PBGC Claim of $624.6 million as the PBGC has received the maximum allowed recovery on its claims against NNIII and the Former Debtors under the PBGC Settlement Agreement as described in Section 7.8 of the Plan.

## 3)  Net Distributable Assets and Recovery Analysis

This Recovery Analysis includes tables containing the net distributable Assets and the estimated recoveries.  This Recovery Analysis also includes the Interim Distribution for the two Claims outlined above.

Various contingency reserves will be taken by NNIII against the cash available for distribution and NNIII's receipt of distributions on Affiliate receivables may be realized over an extended period of time.  This Recovery Analysis does not take any such reserves and timing matters into consideration and the analysis is based on the ultimate recovery to the creditors, regardless of when such recovery is received.

**Nortel Networks India International Inc.**

Recovery Analysis

($ millions)

| | Estimated Plan Assets | | Claims | Recovery | |
|---|---|---|---|---|---|
| | | | | **$** | **%** |
| Cash | 23.6 | Class 1: Priority Non-Tax Claims | - | - | N/A |
| | Receivable Amount | | | | |
| Receivables - Estimated Recoveries | | Class 2: Secured Claims | - | - | N/A |
| Nortel Networks India (Pvt) Ltd. | 11.3 | - | | | |
| | | Class 3: General Unsecured Claims[1] | 71.4 | 22.5 | 31.5% |
| Operating and Wind-Down Costs | | | | | |
| Chapter 7 Trustee Costs | - | | | | |
| Estimated Fees & Expenses after Effective Date | (0.6) | Class 4: Interests | - | - | N/A |
| Certain Administrative Claims/Reserves | | | | | |
| NNI Administrative Claim | (0.5) | | | | |
| **DISTRIBUTABLE ASSETS** | **22.5** | **TOTAL** | **71.4** | **22.5** | |

| | Class 3: General Unsecured Claims | | |
|---|---|---|---|
| | Interim Distribution | 1.5 | 2.2% |
| | Plan Distribution | 22.5 | 31.5% |
| | **Total Recovery** | **24.0** | **33.7%** |

1. Class 3 General Unsecured Claim Estimate excludes PBGC claim of $624.6 million and the recovery amounts exclude interim distribution of $13.4 million made on account of this claim.

## Appendix C

## Liquidation Analysis for NNIII[1]

The information and data included in this liquidation analysis (the "Liquidation Analysis") are estimates derived from sources available to NNIII. The Liquidation Analysis reflects the estimated assets of NNIII if NNIII were to be liquidated in a chapter 7 case. Allowed Book Intercompany Claims against NNIII asserted by NNI and NNL are treated in accordance with the terms of the Plan and Annex L of the SPSA. Underlying the Liquidation Analysis are a number of estimates and assumptions regarding liquidation proceeds that, although developed and considered reasonable by NNIII, are inherently subject to significant uncertainties and contingencies beyond the control of NNIII. The information presented herein is for illustrative purposes only and assumptions prepared solely to provide an estimated range of possible liquidation recoveries for various Classes of Claims, where such estimates necessarily depend on the outcome of numerous contingencies. The Liquidation Analysis shall not constitute evidence of the purported validity of any Claim and should not be used for any other purpose than as described herein. **ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE RECOVERIES REFLECTED IN THE LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE DEBTORS WERE, IN FACT, TO UNDERGO SUCH A LIQUIDATION, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SHOWN HERE.**

The Liquidation Analysis assumes that certain economic settlements achieved in the SPSA also would be achieved in a chapter 7 liquidation, including, but not limited to, (a) the allowance of the Allowed Book Intercompany Claims of NNI and NNL against NNIII in the amounts set forth in Annex L of the SPSA and (b) the release by the Canadian Debtors and the EMEA Debtors, NNSA and the EMEA Non-Filed Entities of any and all other pre-filing books and records claims against NNIII.

While NNIII believes these settlements could be replicated in a chapter 7 liquidation, a liquidation under chapter 7 likely would, at minimum, cause NNIII to incur additional costs, and also introduce additional risks that could materially reduce the ultimate assets available to NNIII for distribution to their creditors. For purposes of this Liquidation Analysis, these risks associated with the assets available to the Debts were not quantified.

---

[1]     Capitalized terms used in this Appendix C and not defined herein shall have the definitions ascribed to them in the Plan or the Disclosure Statement, as applicable.

Solely for purposes of this illustrative analysis, NNIII estimated the Assets from its Estate that would be available in a chapter 7 liquidation and the estimated Claims against its Estate in a liquidation scenario on the same basis that it estimated the Assets available and estimated expected Claims in the Recovery Analysis, with the following important changes:

- Additional Estimated Fees & Expenses at NNIII: Estimated $0.4 million increase in fees and expenses at NNIII for additional counsel or professionals that would be engaged to assist a chapter 7 trustee in the liquidation, and for expected inefficiencies associated with changing or adding new professionals to address the remaining matters to be addressed at NNIII at this advanced stage of the Chapter 11 Case.
- Trustee Compensation: Estimated compensation for the chapter 7 trustee or trustees as 4% of Assets distributable to creditors of NNIII.

**Nortel Networks India International Inc.**

Liquidation Analysis
($ millions)

| | Estimated Plan Assets | | Claims | Recovery | |
|---|---|---|---|---|---|
| | | | | $ | % |
| Cash | 23.6 | Class 1: Priority Non-Tax Claims | - | - | N/A |
| | Receivable Amount | | | | |
| Receivables - Estimated Recoveries | | Class 2: Secured Claims | - | - | N/A |
| Nortel Networks India (Pvt) Ltd. | 11.3 | - | | | |
| | | Class 3: General Unsecured Claims[1] | 71.4 | 21.1 | 29.6% |
| Operating and Wind-Down Costs | | | | | |
| Chapter 7 Trustee Costs | (1.0) | | | | |
| Estimated Fees & Expenses after Effective Date | (1.0) | Class 4: Interests | - | - | N/A |
| Certain Administrative Claims/Reserves | | | | | |
| NNI Administrative Claim | (0.5) | | | | |
| **DISTRIBUTABLE ASSETS** | **21.1** | **TOTAL** | 71.4 | 21.1 | |
| | | Class 3: General Unsecured Claims | | | |
| | | Interim Distribution | | 1.5 | 2.2% |
| | | Plan Distribution | | 21.1 | 29.6% |
| | | **Total Recovery** | | **22.6** | **31.7%** |

1. Class 3 General Unsecured Claim Estimate excludes PBGC claim of $624.6 million and the recovery amounts exclude interim distribution of $13.4 million made on account of this claim.