IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>Nortel Networks Inc., *et al.*,[1]<br><br>Wind-Down Debtors. | Chapter 11<br><br>Case No. 09-10138 (CSS)<br><br>Jointly Administered |
| In re<br><br>Nortel Networks India International Inc.<br><br>Debtor-in-Possession. | Chapter 11<br><br>Case No. 16-11714 (CSS)<br><br>Jointly Administered<br><br>**Re: D.I. 18887, 18895** |

**DECLARATION OF JOHN J. RAY III IN SUPPORT OF CONFIRMATION OF THE CHAPTER 11 PLAN OF NORTEL NETWORKS INDIA INTERNATIONAL INC.**

I, John J. Ray III, do hereby declare as follows:

1.  I am the U.S. Principal Officer of Nortel Networks India International Inc. ("NNIII"), the debtor and debtor-in-possession in the above-captioned chapter 11 case (the "Chapter 11 Case"). I was appointed by this Court as U.S. Principal Officer of the Former Debtors in January 2010, *nunc pro tunc* to December 2009, pursuant to the *Order Pursuant to Section 363 Authorizing and Approving the Employment and Retention of John Ray as the Debtors' Principal Officer,* Nunc Pro Tunc *to December 7, 2009* [D.I. 2249] (the "Principal Officer Order") and, on August 16, 2016, this Court entered an order applying, among other

---

[1] The Wind-Down Debtors in these chapter 11 cases, along with the last four digits of each Wind-Down Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620) and Nortel Networks (CALA) Inc. (4226). Contact information for the Former Debtors and their petitions are available at http://dm.epiq11.com/nortel.

things, the Principal Officer Order to the Chapter 11 Case such that I was appointed as the U.S. Principal Officer of NNIII.  As U.S. Principal Officer, I oversee and am familiar with all affairs of NNIII, including efforts to wind down NNIII and resolve certain Claims, including intercompany Claims, against NNIII.

2.      I submit this declaration (the "Declaration") in support of confirmation of the *Chapter 11 Plan of Nortel Networks India International Inc.*, dated August 26, 2021 [D.I. 18887] (as it may be further amended, the "Plan"),[2] together with the exhibits thereto, pursuant to section 1129 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code").  Specifically, I submit this Declaration to provide certain background facts and opinions relevant to: (i) the standards for confirmation under section 1129 of the Bankruptcy Code, including the good faith standard set forth in section 1129(a)(3) of the Bankruptcy Code, and (ii) the standards for approval of the release, exculpation and injunction provisions provided in the Plan.

3.      I have reviewed and am generally familiar with the terms and provisions of the Plan.  Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge, belief and understanding upon my review of applicable books and records and other information made available to me, including discussions with NNIII's advisors and agents, as well as my familiarity and experience with and knowledge of NNIII's business and financial affairs.  I am duly authorized to make this Declaration and submit this Declaration on behalf of NNIII and, if I were called upon to testify, I could and would testify competently to the facts set forth herein.

---

[2]     Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan.

I. **Plan Formulation Process**

    A. **Procedural History**

4. On July 26, 2016, NNIII, a Delaware corporation and a wholly-owned subsidiary of Nortel Networks Inc. ("NNI"), filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case"). On January 14, 2009, the Former Debtors, other than NNCALA, filed their respective voluntary petitions for relief under chapter 11 of the Bankruptcy Code and, on July 14, 2009, NNCALA filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (collectively, with the Chapter 11 Case, the "Chapter 11 Cases"). The Chapter 11 Case was ordered to be jointly administered for procedural purposes with the other Chapter 11 Cases under Case No. 09-10138 (CSS), provided that a plan has already been confirmed and become effective for the Former Debtors.

    B. **The Indian Tax Disputes**

5. Since prior to the commencement of NNIII's Chapter 11 Case, NNIII has been involved in certain disputes with the Indian Taxing Authorities relating to tax obligations allegedly owed by NNIII. NNIII disputed the validity and amount of the obligations asserted by the Indian Taxing Authorities (the "Indian Tax Demands"), and also took the position that such claims were barred as a result of the passing of the bar dates and in any event would be disallowed under applicable law if such issues were litigated in the Bankruptcy Court. In 2006, NNIII engaged Ernst & Young, India to represent it in appealing the Indian Tax Demands and has been actively litigating these appeals since that time (the "Indian Tax Appeal Litigation"). Following a ruling in favor of NNIII (the "High Court Decision") in India's second highest court, the High Court of India, and the expiration of the statutory appeal period, NNIII also sought a refund of certain payments made during the appeals process, a portion of which was refunded to

NNIII on February 28, 2017. Subsequent to such payment, however, the Indian Taxing Authorities filed a late appeal of the High Court Decision to the Indian Supreme Court, which was accepted by the Indian Supreme Court over NNIII's objection that the appeal was untimely because the appeal period had passed.

6.    On June 4, 2020, the Court entered an order [D.I. 18826] authorizing NNIII to pursue a settlement of the Indian Tax Appeal Litigation with the Indian Taxing Authorities and to settle such litigation for up to a specified maximum settlement amount without the need for further notice or approval from the Court. NNIII and the Indian Taxing Authorities agreed to a settlement with respect to the Indian Tax Demands pursuant to which NNIII was required to make a total payment of $3.637 million to the Indian Taxing Authorities, which NNIII paid in January 2021. On September 13, 2021, the Indian Supreme Court entered an order terminating the Indian Tax Appeal Litigation. NNIII is in the process of completing a rectification application with the Indian Taxing Authorities for tax years 2018-2019 and believes that NNIII's settlement with the Indian Taxing Authorities, once fully implemented, will finalize all open tax obligations and appeal litigation with the Indian Taxing Authorities.

### C.  The Settlement and Plans Support Agreement

7.    On October 12, 2016, NNIII and the other SPSA Parties executed an agreement settling litigation in relation to the Allocation Dispute (such agreement, the "SPSA"). The SPSA provides for a full and final settlement of the Allocation Dispute and certain other matters among the SPSA Parties. Approval of the SPSA as to NNIII under Bankruptcy Rule 9019 was a condition precedent to the NNI Plan Effective Date. In addition, under the terms of the SPSA, NNIII is required to include certain provisions of the SPSA as part of its Plan.

8. On December 16, 2016, NNIII and the Former Debtors filed a motion seeking approval of the SPSA pursuant to Bankruptcy Rule 9019. On January 24, 2017, the Bankruptcy Court entered an order approving the SPSA. As described in the Disclosure Statement, in accordance with the terms of the SPSA, NNL's "Book Intercompany Claim" against NNIII in the amount of $17,695,763 and NNI's "Book Intercompany Claim" against NNIII in the amount of $53,663,414 were thereby allowed as General Unsecured Claims against NNIII, and were entitled to receive distributions on a *pari passu* basis with other General Unsecured Claims against NNIII.

### D. The Plan

9. On July 20, 2021, NNIII filed with this Court its proposed Chapter 11 Plan of Nortel Networks India International Inc. [D.I. 18865] and the accompanying disclosure statement [D.I. 18866], and each was revised on August 12, 2021 [D.I.s 18874 and 18875]. This Court approved the Disclosure Statement and the solicitation procedures for soliciting votes on the Plan by an order entered on August 25, 2021 [D.I. 18884]. The solicitation version of the Plan [D.I. 18887] and Disclosure Statement [D.I. 18888] were filed by NNIII on August 30, 2021.

## II. The Plan Complies with All Applicable Confirmation Requirements

10. It is my understanding that the Plan complies with all requirements for confirmation of a chapter 11 plan, including all applicable provisions of section 1129. To the best of my understanding, the Plan complies with all applicable provisions of the Bankruptcy Code and has been proposed in good faith and not by any means forbidden by law. In addition, to the best of my understanding, NNIII, as the plan proponent, also has complied with all applicable provisions of the Bankruptcy Code. Accordingly, I believe that the Court should confirm the Plan.

### A. The Plan Complies with Section 1129(a)(1) of the Bankruptcy Code

11.     It is my understanding that the Plan satisfies the confirmation requirements of section 1129(a)(1) of the Bankruptcy Code, which requires that the Plan comply with Bankruptcy Code sections 1122 and 1123 in all respects.

12.     I understand that each Class of Claims or Interests under the Plan is composed of substantially similar Claims or Interests and that no classification was made for purposes of gerrymandering votes. I understand that the classification of Claims and Interests under the Plan satisfies sections 1122 and 1123(a)(1) of the Bankruptcy Code.

13.     In addition, the Plan specifies the Classes of Claims or Interests that are Impaired and Unimpaired under the Plan, as I understand is required by sections 1123(a)(2) and 1123(a)(3) of the Bankruptcy Code. Subject to the provisions of the Plan relating to the payment in full of Claims, the Plan also provides that Holders of General Unsecured Claims against NNIII will receive their proportional share of Cash available for distribution to all such Holders, which I understand is required by section 1123(a)(4). In addition, I understand that the Plan provides adequate means for the Plan's implementation as required by section 1123(a)(5) of the Bankruptcy Code, in that NNIII will have sufficient Cash to make all payments prescribed pursuant to the Plan and the Plan contemplates that NNIII will distribute its available Cash to creditors in accordance with the priorities and classification of Claims under the Plan, and ultimately will wind down and dissolve. As such, NNIII does not expect to need to seek further financial reorganization to implement the Plan.

14.     I understand that proposed amended organizational documents for Wind-Down NNIII are attached to the Plan as Exhibit D and I believe that such documents include provisions that Wind-Down NNIII will not issue non-voting equity securities to the extent prohibited by

section 1123(a)(6) of the Bankruptcy Code, which I understand is required by section 1123(a)(6) of the Bankruptcy Code.

15.    I believe that the Plan satisfies section 1123(a)(7) of the Bankruptcy Code to the best of my understanding because the manner of selecting any officer, director or trustee of Wind-Down NNIII under the Plan is entirely consistent with applicable law, the Bankruptcy Code and the interests of Holders of Claims and Interests and public policy.  Specifically, the Plan provides that the Plan Administrator shall have the power to select the director of Wind-Down NNIII and that the current officers of NNIII shall continue to serve in such capacity in accordance with applicable non-bankruptcy law.  Exhibit C to the Plan identifies that, after the Effective Date, I will serve as Director and President of Wind-Down NNIII (in addition to my role as Plan Administrator), Mary Cilia will serve as Treasurer and Kathryn Schultea will serve as Vice President and Secretary in accordance with the Plan and Wind-Down NNIII's bylaws.

### B. The Plan Complies with Section 1129(a)(3) of the Bankruptcy Code

16.    I believe that the Plan satisfies section 1129(a)(3) of the Bankruptcy Code because it has been proposed by NNIII in good faith and to the best of my understanding not by any means forbidden by law.

17.    Having been extensively involved in the Chapter 11 Case since 2016 in my role as U.S. Principal Officer, including in the development of the Plan and the negotiations relating to the Plan, I believe that NNIII is proposing the Plan in good faith consistent with section 1129(a)(3), with honest and good intentions, and on the basis that the Plan is consistent with applicable law.

### III.    Recovery Analysis and Liquidation Analysis

18.    I have reviewed the Recovery Analysis prepared by NNIII's financial advisor, Chilmark Partners, LLC ("Chilmark") and attached as Appendix B to the Disclosure Statement,

which provides estimates of possible recoveries on General Unsecured Claims depending on the outcome of numerous contingencies.  I am generally familiar with the Recovery Analysis and the underlying assumptions, assets and financial estimates upon which the Recovery Analysis is based, which are described and set forth in the Recovery Analysis and its accompanying notes.  I believe that the estimates of the recoveries on Claims against NNIII are fair and reasonable based on the assumptions set forth therein.

19. I have reviewed the hypothetical liquidation analysis (the "Liquidation Analysis") prepared by Chilmark and attached as Appendix C to the Disclosure Statement, which reflects the estimated assets of NNIII if NNIII was to be liquidated in a chapter 7 case.  I am generally familiar with the Liquidation Analysis and the underlying financial data and assumptions upon which the Liquidation Analysis is based, which are described in the Liquidation Analysis and accompanying notes.  I believe that the estimated liquidation values set forth in the Liquidation Analysis are fair and reasonable estimates of the value of NNIII's assets based on the assumptions set forth therein.

### IV.    The Plan's Release, Exculpation and Injunction Provisions Are Appropriate

20. I understand that the Plan includes various other provisions that are permitted but not required under section 1123(b) of the Bankruptcy Code.  In particular, sections 13.2 through 13.7 of the Plan provide for the granting of certain releases, exculpations and injunctions, which are discussed below.  I believe these releases, exculpations and injunctions are the product of good faith, arm's length-negotiations by and among NNIII, its creditors and creditor representatives and other parties to the SPSA; are given in return for substantial consideration by each of the parties; and are reasonably tailored and necessary for NNIII to exit chapter 11.  As

such, I believe that the release, exculpation and injunction provisions are fair, equitable and in the best interests of NNIII's Estate.

### A. The SPSA Releases

21. Section 13.4 of the Plan provides for the release (the "SPSA Release") by NNIII and the other Debtor Releasing Parties, as of the Effective Date, of, among other things, any and all claims, defenses, demands, liabilities, subrogation, causes of action, setoffs, recoupments and costs and expenses that NNIII and the other Debtor Releasing Parties may have against each of the other SPSA Released Parties. The SPSA Release is an integral and integrated part of the settlements contained in the SPSA, which this Court previously approved pursuant to the 9019 Approval Order, and is incorporated into the Plan as required under the SPSA. For these reasons, I believe the SPSA Release is being given in exchange for good and valuable consideration contributed by the SPSA Released Parties and is in the best interest of NNIII's Estate.

### B. The Third-Party Releases

22. Section 13.2 of the Plan provides for the release (the "Third Party Debtor Release") by Holders of Claims against and Interests in NNIII, as of the Effective Date, of, among other things, any and all claims, rights, demands and liabilities that such Holders may have against NNIII and Wind-Down NNIII. Section 13.3 of the Plan provides for the release (the "Third Party Non-Debtor Release" and, together with the Third Party Debtor Release, the "Third Party Release") by certain Holders of Claims against and Interests in NNIII, as of the Effective Date, of, among other things, any and all claims, rights, demands and liabilities that such Holders may have against the U.S. Principal Officer (solely in such individual's capacity as the U.S. Principal Officer of NNIII) and any of his respective directors, officers, employees, members, attorneys, consultants, accountants, advisors, agents and other professionals (each

acting solely in such capacity), and, collectively, all of them. The Third Party Release does not release any post-Effective Date obligations of any party or entity under the Plan to implement the Plan, including the terms of the SPSA.

23. The Plan contains provisions that permit voting creditors to opt out of granting the Third Party Non-Debtor Release in order to make the Third Party Non-Debtor Release consensual. The Plan, Disclosure Statement and the Ballots each include provisions disclosing the existence of the Third Party Release and informing those parties voting on the Plan of their ability to opt out of the Third Party Non-Debtor Release by abstaining from voting and indicating their intention to opt out of the releases, or by voting to reject the Plan. Accordingly, I believe that the Third Party Non-Debtor Release is consensual and I understand these procedures are consistent with those used in other chapter 11 cases.

24. Additionally, I believe that the Third Party Release is important to the Plan and constitutes the release of parties who have actively participated in the Chapter 11 Case and contributed to the successful completion of the Chapter 11 Case. The Third Party Release releases many of the same parties benefitting from the SPSA Release who participated in negotiations over the SPSA and the Plan and/or participated in the investigation, litigation, prosecution and settlement of other material claims in the Chapter 11 Case. NNIII is not aware of material claims that likely would be asserted against any of these parties absent the granting of such releases and no claims have been asserted to date; however, given the length of the Chapter 11 Case, the substantial efforts of the various parties over the course of the Chapter 11 Case and the various claims being compromised under the Plan, the granting of the Third Party Release is important to the implementation of the Plan and to bring closure to the Chapter 11 Case.

25. For these reasons, I believe the Third Party Release is in exchange for good and valuable consideration and is in the best interests of the NNIII Estate.

### C. Exculpation

26. I believe that the exculpation provision proposed in Section 13.5 of the Plan (the "Exculpation Provision") is appropriate and essential under the circumstances of the Chapter 11 Case. The Plan and the related transactions were negotiated and implemented in good faith, including the extensive negotiations among NNIII, the Former Debtors and the other SPSA Parties that resulted in the SPSA, the terms of which are incorporated into the Plan. The Exculpation Provision, which includes a carve-out for gross negligence and willful misconduct, including fraud and criminal misconduct, was important to the development of a feasible, confirmable Plan. I submit that the Exculpation Provision is necessary to insulate the parties who have made significant contributions to the Chapter 11 Case, including with respect to the resolution of various claims and disputes over the course of the Chapter 11 Case and the collection and monetization of NNIII's assets, from future challenges or claims related to actions taken in good faith in connection with the Chapter 11 Case, the development and pursuit of the Plan and the wind-down of NNIII. The parties benefiting from the Exculpation Provision provided direct and substantial participation in the Chapter 11 Case, including the facilitation and marshaling of the complex settlement negotiations that resulted in the SPSA and the benefits it provides to the NNIII Estate. Accordingly, under these circumstances, I believe the protections afforded by the Exculpation Provision are reasonable and appropriate.

### D. Injunction

27. The injunction provisions set forth in Sections 13.6 and 13.7 of the Plan implement the Plan's release and exculpation provisions and channel all claims through the Plan

itself. I believe that the injunction is a key provision of the Plan because it preserves and enforces the releases of NNIII, Wind-Down NNIII, the Plan Released Parties, the SPSA Released Parties and the Exculpation Provision, as well as the compromise of various other NNIII claims through the Plan, all of which are centrally important to the Plan. Moreover, I believe that the injunction provision is necessary to protect Wind-Down NNIII after the Effective Date from, among other things, any potential actions, enforcements, attachments, encumbrances of any kind, setoffs, subrogation and recoupments as it implements the provisions of the Plan, and that the injunction provision is narrowly tailored to achieve its purpose.

### V.    Conclusion

28.    Based on the matters described above, I believe that (i) the Plan satisfies the standards for confirmation under section 1129 of the Bankruptcy Code and (ii) the release, exculpation and injunction provisions provided in the Plan meet the applicable standard.

29.    I hereby reserve the right to amend and supplement the testimony set forth herein as necessary at the hearing to consider confirmation of the Plan.

*[Remainder of Page Intentionally Left Blank]*

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on:   September 30, 2021
               Naples, Florida

_____
John J. Ray III
U.S. Principal Officer
Nortel Networks India International Inc.